[ORAL ARGUMENT NOT SCHEDULED]

No. 25-5452

---

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

In re DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES, *et al.*,

Petitioners.

---

On Petition for a Writ of Mandamus to the United States
District Court for the District of Columbia
No. 1:25-cv-00766
The Hon. James E. Boasberg

---

## RESPONDENTS' OPPOSITION TO
## PETITIONERS' PETITION FOR A WRIT OF MANDAMUS

---

Evelyn Danforth-Scott
Spencer Amdur
Oscar Sarabia Roman
My Khanh Ngo
Cody Wofsy
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770

Lee Gelernt
   *Counsel of Record*
Daniel Galindo
Ashley Gorski
Patrick Toomey
Omar Jadwat
Hina Shamsi
Sidra Mahfooz
Sean M. Lau
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org

Arthur B. Spitzer
Scott Michelman
Aditi Shah
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION OF
    THE DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800

Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
915 15th Street, NW, 7th Floor
Washington, D.C. 20005
(212) 549-2500

*Barred in Texas and Arizona only;
supervised by a member of the D.C. Bar

*Counsel for Respondents*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

ARGUMENT ........................................................................................5

  I.   ADDITIONAL FACT-GATHERING IS NECESSARY TO ASSESS WHETHER PROBABLE CAUSE EXISTS. .........................................5

    A.  Friday, March 14. .....................................................................5

    B.  Saturday, March 15. ...................................................................7

    C.  Post-Hearing Decisions. ...........................................................9

    D.  Mazzara, Bove, and Blanche Declarations. .............................12

    E.  Noem Declaration. ...................................................................14

    F.  Post-Transfer. ...........................................................................15

  II.  THE DISTRICT COURT IS WELL WITHIN ITS DISCRETION TO TAKE MEASURED STEPS TO GATHER INFORMATION. ......................................16

    A.  A District Court Has Inherent Authority to Inquire Into Indirect Criminal Contempt and Has Discretion to Assess Probable Cause Before Making Any Referral. ..............................................................................16

    B.  The Government Is Wrong that the District Court Clearly and Indisputably Abused Its Discretion in Seeking to Assess Whether Any Individual Acted Willfully. .................................................................................19

  III.  DEFENDANTS' PRIVILEGE ARGUMENTS ARE PREMATURE AND WRONG. ...................................................................................23

    A.  Defendants' Blanket Assertion of Privilege to Block All Testimony Is Improper. ..................................................................................24

    B.  The Attorney-Client Privilege Does Not Apply. .......................25

1.  Waiver. ..................................................................................25

2.  Crime-Fraud Exception. .........................................................31

3.  Self-Defense Exception. .........................................................33

4.  Exception for Government Attorneys....................................33

IV.  THE REQUEST FOR REASSIGNMENT IS MERITLESS. ......................35

V.  THE DISTRICT COURT MAY ALSO IMPOSE SANCTIONS SHORT OF
CRIMINAL REFERRAL. ....................................................................36

## TABLE OF AUTHORITIES

**Cases**

*In re Al Baluchi*,
  952 F.3d 363 (D.C. Cir. 2020)............................................................................18

*American Airlines, Inc. v. Allied Pilots Ass'n*,
  968 F.2d 523 (5th Cir. 1992) .............................................................................22

*Backertop Licensing LLC v. Canary Connect, Inc.*,
  107 F.4th 1335 (Fed. Cir. 2024) ........................................................................37

*In re Blackmon*,
  2016 WL 4055650 (W.D.N.C. July 25, 2016) ...................................................17

*In re Boulware*,
  2010 WL 3724668 (D.S.C. Sept. 17, 2010) .......................................................19

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991)..............................................................................................36

*Cheney v. U.S. Dist. Ct. for the Dist. of Columbia*,
  542 U.S. 367 (2004).............................................................................................25

*Clark v. United States*,
  289 U.S. 1 (1933).................................................................................................31

*Cox v. Adm'r U.S. Steel & Carnegie*,
  17 F.3d 1386 (11th Cir. 1994) ............................................................................26

*Davenport v. Djourabchi*,
  2020 WL 7042813 (D.D.C. Nov. 30, 2020)........................................................28

*E.A. Renfroe & Co., Inc. v. Moran*,
  508 F. Supp. 2d 986 (N.D. Ala. 2007).................................................................18

*Feld v. Fireman's Fund Ins. Co.*,
  292 F.R.D. 129 (D.D.C. 2013) ...........................................................................26

*Ex parte Fisk*,
  113 U.S. 713 (1885)...............................................................................................2

*In re Flynn*,
    973 F.3d 74 (D.C. Cir. 2020) ...............................................................35

*Ganek v. Leibowitz*,
    874 F.3d 73 (2d Cir. 2017) .................................................................23

*Goodrich Corp. v. EPA*,
    593 F. Supp. 2d 184 (D.D.C. 2009)....................................................29

*In re Grand Jury Subpoena Duces Tecum*,
    112 F.3d 910 (8th Cir. 1997) .......................................................34, 35

*In re Green*,
    369 U.S. 689 (1962)...............................................................................2

*In re Icenhower*,
    755 F.3d 1130 (9th Cir. 2014) .....................................................32, 33

*Ideal Elec. Sec. Co. Inc. v. Int'l Fidelity Ins. Co.*,
    129 F.3d 143 (D.C. Cir. 1997).............................................................26

*J.G.G. v. Trump*,
    147 F.4th 1044 (D.C. Cir. 2025)....................................................2, 10

*J.G.G. v. Trump*,
    2025 WL 3198891 (D.C. Cir. Nov. 14, 2025)..........................1, 2, 16

*J.G.G. v. Trump*,
    778 F. Supp. 3d 24 (D.D.C. 2025).........................................13, 15, 18

*J.G.G. v. Trump*,
    No. 1:25-cv-00766 (D.D.C.)..................................................................5

*J.G.G. v. Trump*,
    No. 25-5124 (D.C. Cir. Apr. 25, 2025)....................................2, 27, 30

*J.O.P. v. DHS*,
    2025 WL 3240078 (D. Md. Nov. 20, 2025) .......................................18

*In re Jolly Joint, Inc.*,
    23 B.R. 395 (Bankr. E.D.N.Y. 1982) .................................................19

*JTR Enters., LLC v. Columbian Emeralds*,
    697 F. App'x 976 (11th Cir. 2017) .......................................................32

*Koch v. Cox*,
    489 F.3d 384 (D.C. Cir. 2007) ............................................................29

*In re La Varre*,
    48 F.2d 216 (S.D. Ga. 1930) ..............................................................18

*In re LeFande*,
    919 F.3d 554 (D.C. Cir. 2019) ...................................................2, 24, 31

*In re Lindsey*,
    158 F.3d 1263 (D.C. Cir. 1998) ...........................................24, 25, 34, 35

*Minebea Co., Ltd. v. Papst*,
    355 F. Supp. 2d 518 (D.D.C. 2005) ....................................................26

*Objective Solutions Int'l, Ltd. v. Gammon*,
    2008 WL 538445 (S.D.N.Y. Feb. 25, 2008) ........................................17

*Permian Corp. v. United States*,
    665 F.2d 1214 (D.C. Cir. 1981) ...........................................................29

*Recycling Sols., Inc. v. District of Columbia*,
    175 F.R.D. 407 (D.D.C. 1997) ...........................................................32

*Ex parte Robinson*,
    86 U.S. 505 (1873) ............................................................................16

*Root Refin. Co. v. Universal Oil Prods. Co.*,
    169 F.2d 514 (3d Cir. 1948) ...............................................................37

*Rosen v. NLRB*,
    735 F.2d 564 (D.C. Cir. 1984) ............................................................33

*In re Sealed Case*,
    107 F.3d 46 (D.C. Cir. 1997) .........................................................32, 33

*In re Sealed Case*,
    223 F.3d 775 (D.C. Cir. 2000) ............................................................32

*In re Sealed Case*,
    676 F.2d 793 (D.C. Cir. 1982).......................................................29, 32

*In re Sealed Case*,
    754 F.2d 395 (D.C. Cir. 1985).......................................................31, 32

*In re Sealed Case*,
    877 F.2d 976 (D.C. Cir. 1989).......................................................26, 29

*Straub v. United States*,
    2008 WL 2961319 (U.S. July 30, 2008)...............................................2

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991) ............................................................26

*United States v. Christian*,
    187 F.3d 663 (D.C. Cir. 1999)...........................................................23

*United States v. Exxon Corp.*,
    94 F.R.D. 246 (D.D.C. 1981).............................................................26

*United States v. Hankins*,
    565 F.2d 1344 (5th Cir. 1978) ..........................................................24

*United States v. Jacobs*,
    117 F.3d 82 (2d Cir. 1997) ...............................................................29

*United States v. Mattatall*,
    2009 WL 2905477 (C.D. Cal. Sept. 3, 2009) ....................................18

*United States v. Mullins*,
    2012 WL 4458153 (W.D. Va. Aug. 28, 2012) ...................................18

*United States v. Neal*,
    101 F.3d 993(4th Cir. 1996) .............................................................22

*United States v. Smith*,
    502 F. Supp. 2d 852 (D. Minn. 2007)...............................................18

*United States v. Straub*,
    508 F.3d 1003 (11th Cir. 2007) ...........................................................2

*United States v. Young*,
107 F.3d 903 (D.C. Cir. 1997).................................................20, 21

*Universal Oil Prods. Co. v. Root Refining Co.*,
328 U.S. 575 (1946).................................................36

*Wadler v. Bio-Rad Laboratories Inc.*,
212 F. Supp. 3d 829 (N.D. Cal. 2016).................................................29, 30

*Willy v. Coastal Corp.*,
503 U.S. 131 (1992).................................................2

*Wilson v. Vaccaro*,
883 F. Supp. 258 (N.D. Ill. 1995).................................................17

*Ybarra v. Illinois*,
444 U.S. 85 (1979).................................................20

*Young v. United States ex rel. Vuitton et Fils S.A.*,
481 U.S. 787 (1987).................................................16, 19, 22, 23, 35

**Statutes**

28 U.S.C. § 535(b).................................................35

50 U.S.C. § 21.................................................6

Whistleblower Protection Act,
Pub. L. No. 101–12, 103 Stat. 16.................................................35

**Other Authorities**

D.C. R. Pro. Conduct 1.6(e).................................................35

Fed. R. Crim. P. 42(a)(1).................................................19

Hum. Rts. Watch, "You Have Arrived in Hell": Torture and Other
Abuses Against Venezuelans in El Salvador's Mega Prison (2025),
https://perma.cc/8H6N-MJX4.................................................15

Wright & Miller,
    3A Fed. Prac. & Proc. Crim. § 709 (4th ed.) ......................................................19

## INTRODUCTION

The district court has acted with restraint and incrementally, yet the government is once again rushing to this Court seeking the extraordinary remedy of mandamus. Mandamus is plainly inappropriate. The district court has neither clearly abused its discretion nor violated clearly mandated legal authority. *See J.G.G. v. Trump*, 2025 WL 3198891, at \*2 (D.C. Cir. Nov. 14, 2025) (Pillard, Wilkins, & Garcia, JJ.) (mandamus for "district court's ongoing effort to identify potential contemnors must surely be reserved for truly exceptional circumstances"); *id.* at \*4 (Millett, J.) (mandamus requires "exceptional and demanding justification"); *id.* at \*6 (Pan & Childs, JJ.) (mandamus is "drastic" remedy "reserved for really extraordinary causes").

The government contends that the district court's contempt inquiry must be immediately terminated because (1) its information-gathering usurps an "executive" function, Pet. 12-13; (2) the oral TRO was "tentative" and the written order was insufficiently clear to *ever* justify criminal contempt, *id.* at 2; (3) criminal contempt cannot be available where a single judge viewed the order as ambiguous; and (4) criminal contempt cannot lie due to vacatur of the TRO, *id.* at 19-20. But these are the same arguments previously advanced before the Circuit in support of the position that, from the outset, the district court lacked authority to gather facts. Then, only one of eleven judges concluded that the inquiry must end; indeed, a majority of the

1

Court wrote to explain that they believed the original panel had erred in granting mandamus relief.[1]

The Court should accordingly view these recycled arguments that the district court lacked any authority to gather facts as a dead end. *See J.G.G.*, 2025 WL 3198891, at *2 (Pillard, Wilkins, & Garcia, JJ.) (district court's request for information was "measured and essential response to what it reasonably perceived as shocking Executive Branch conduct"); *id.* at *4 (Millett, J.) (district court acting pursuant to "most fundamental and inherent authority … to police the integrity of proceedings in its own courtroom"); *id.* (Pan & Childs, JJ.) (district court "properly

---

[1] In particular, the government now devotes considerable space to claiming that the district court cannot pursue even criminal contempt because of the TRO's vacatur. *But see* Appellants' Response & Reply 5 n.1, *J.G.G. v. Trump*, No. 25-5124 (D.C. Cir. Apr. 25, 2025). But that claim, if correct, would necessarily have meant that a majority of the Circuit would already have shut down the inquiry. It is also, in any event, flatly wrong and no basis for mandamus, as Judge Pillard explained. *J.G.G. v. Trump*, 147 F.4th 1044, 1083-84 (Pillard, J., dissenting); *see also id.* at 1073 (Rao, J., concurring) (correctly noting TRO vacatur concerned "venue"). Plaintiffs add that the Eleventh Circuit, in *United States v. Straub*, 508 F.3d 1003 (11th Cir. 2007), squarely rejected Defendants' argument predicated on *Ex parte Fisk*, 113 U.S. 713 (1885), and *In re Green*, 369 U.S. 689 (1962). That court correctly relied on *Willy v. Coastal Corp.*, 503 U.S. 131, 137 (1992), to hold that a court has jurisdiction over criminal contempt for an order's violation even if the underlying case is dismissed due to lack of jurisdiction. *See also In re LeFande*, 919 F.3d 554, 561 (D.C. Cir. 2019) (similar). Notably, in *Straub*, the United States took the opposite position it advances here and (correctly) observed that *Fisk* and *Green* are inapposite. Br. for the United States in Opposition, *Straub v. United States*, 2008 WL 2961319, at *6 (U.S. July 30, 2008).

2

proceeded to investigate" given "serious transgression that went to the heart of the judicial process").

Presumably recognizing that these arguments did not fly the first time around, the government alternatively contends that in light of declarations from Secretary Kristi Noem and four lawyers, the district court now has sufficient information and must either drop its contempt inquiry or make a criminal referral, even if the court has not yet assessed whether there are reasonable grounds to believe that anyone willfully violated its order or misled the court, and thus whether probable cause exists as to any particular individual. Pet. 15. But the district court in no way abused its discretion in concluding that these scant declarations—most of which are just two substantive sentences—did not shed sufficient light on whether Secretary Noem or other potential contemnors willfully misled the court or disobeyed its order. The district court understandably did not wish to take the extraordinary step of calling for potential criminal prosecutions of high-level government officials absent more certainty.

There can be no question that a district court has authority to gather facts regarding indirect criminal contempt under its inherent authority. And issuing a criminal referral only after the district court makes a probable cause determination is likewise supported by longstanding practice. Even more pertinent for mandamus, there is certainly no indisputable legal authority *prohibiting* the court's fact-

3

gathering or *compelling* referral prior to a probable cause determination. Similarly, there is no doubt that the district court could engage in a factual inquiry to determine whether non-criminal sanctions were warranted.

The government's argument that a criminal referral on less than probable cause is *required* is a perplexing rule for the Department of Justice to advance, particularly with respect to high-ranking government officials. Referral is a weighty step that has long been understood by courts as a last resort, to be taken with caution.

The government alternatively contends that live testimony must be completely shut down because it will jeopardize attorney-client privilege. Pet. 22-23. But the well-settled rule is that courts do not categorically and preemptively bar witness testimony but, instead, address any claim of privilege as it arises. The district court certainly did not clearly abuse its discretion or rule contrary to any clear legal rule in choosing to proceed in that settled manner. That is especially so where, as here, there are numerous indisputably *non*-privileged issues to which the witnesses can testify, and any supposed claim of privilege is best assessed in a concrete setting as to specific questions.

At every turn, the government asserts that the district court is violating the separation of powers. But it never acknowledges the separation-of-powers issues that would arise if the Executive Branch could obstruct judicial inquiries into willful violations of court orders, as the government has repeatedly sought to do here.

## ARGUMENT

## I.     ADDITIONAL FACT-GATHERING IS NECESSARY TO ASSESS WHETHER PROBABLE CAUSE EXISTS.

It appears, based on currently available information, that Defendants may have engaged in a premeditated attempt to fraudulently and willfully evade judicial scrutiny, mislead the district court, and ultimately violate its TRO. Erez Reuveni (then-Acting Deputy Director for the Office of Immigration Litigation ("OIL")) and Drew Ensign (who leads OIL) are common-sense witnesses to provide relevant information, as they are a whistleblower and the DOJ attorney who argued the TRO, respectively. The government's suggestion that they were not sufficiently senior to have made the final decision, Pet. 18, is beside the point, because they can shed significant light on how events unfolded. Moreover, had the district court begun with high-level officials, the government would undoubtedly have claimed that to be even more improper. *See* ECF 198 at 3.[2] Indeed, the theme that runs through much of the government's petition is "heads we win, tails the district court loses."

### A.     Friday, March 14.

The AEA Proclamation was signed in secret at some time on Friday, March 14, even though the statute expressly requires a "public" announcement. 50 U.S.C.

_____

[2] All ECF citations are to the district court docket. *J.G.G. v. Trump*, No. 1:25-cv-00766 (D.D.C.).

§ 21. Although the Proclamation was not released until after 3 p.m. EDT on Saturday, March 15, it appears that the government sought to remove AEA detainees the day before but failed due to the plane's mechanical failure. ECF 3-3 ¶ 6; ECF 3-4 ¶ 19; ECF 3-5 ¶ 8.

Also on March 14, Reuveni states, he, Ensign, and other DOJ attorneys attended a meeting in which Emil Bove (the then-Principal Associate Deputy Attorney General) informed attendees that "one or more planes containing individuals subject to the AEA would be taking off over the weekend—meaning Saturday, March 15 and Sunday, March 16" and that these planes "needed to take off no matter what." ECF 158-1 ("Disclosure") at 7. Reuveni stated that Bove raised "the possibility that a court order would enjoin those removals before they could be effectuated" and "stated that DOJ would need to consider telling the courts 'fuck you' and ignore any such court order." *Id.*

Plainly, if Bove did in fact make those remarkable statements, it is essential to know that for purposes of assessing probable cause of criminal contempt. Such statements would illuminate the mens rea underlying many subsequent actions Defendants took and would suggest a premeditated plan to violate any subsequent order. And they would provide an important lens with which to view the legal advice Bove and others provided to Secretary Noem.

6

The government claims Reuveni is just a "self-appointed 'whistleblower'" ex-employee, Pet. 10, but Ensign could confirm or deny Reuveni's account. Both, moreover, could testify to who else attended the meeting.

### B.     Saturday, March 15.

Based on reports from immigration lawyers that their Venezuelan clients were being hurriedly prepared for removal on Friday, Plaintiffs filed their request for a classwide TRO early in the morning of Saturday, March 15, at 1:50 a.m. Later that morning, at 9:40 a.m., the district court entered a TRO for the five named plaintiffs and scheduled a hearing on the classwide TRO for Monday. Plaintiffs, concerned that Monday would likely be too late, asked the court for a Saturday afternoon hearing. ECF 205-1, Exh. A. Ultimately, the court moved the hearing to Saturday at 5 p.m., over Reuveni's protest that Saturday was "premature" and that the court should retain the Monday hearing. *Id.* Reuveni and others knew from Bove that the planes were scheduled to depart over the weekend, yet Reuveni requested a Monday hearing, knowing that Monday would be too late. This attempt to delay the court's proceedings was consistent with Bove's reported comment that the administration should not allow the courts to prevent AEA removals. But to determine the specific potentially contumacious actors, the district court must determine who may have instructed Reuveni to request the Monday hearing and why.

At the hearing later that day, the district court plainly understood the urgency of the situation and asked Ensign whether "imminent deportations and removals under this proclamation [are] planned … in the next 24 or 48 hours." Ensign told the district court, "I don't know the answer to that question." ECF 20 (Mar. 15 Hearing Tr.) at 11:12-16. However, as contemporaneous texts between Reuveni and an unidentified colleague show, Ensign knew from the Friday meeting with Bove that there were planes scheduled to leave that weekend. ECF 177-9, Exh. 1 at 2.

The district court then postponed the hearing so Ensign could obtain the information from his clients; yet, when the hearing resumed, Ensign claimed he had no details for the court "at this time" and that "I have been trying to get those details, and I don't presently know when I would be able to get that. I'm certainly trying to get that information, but that is not something, the details, that I know." ECF 20 at 16:13, 16:17-21. In fact, an email from an ICE official sent to Reuveni and others reflects that one plane departed prior to the recess and the other during. ECF 177-8, Exh. 4 at 17.

The district court thus must determine, for purposes of contempt referral, if the government misled it and whether Ensign was instructed to do so by any of the high-level officials the government says were involved in the ultimate decision to disobey the TRO. The district court also must determine with whom Ensign communicated during the break in the hearing. Given that the planes took off during

the hearing, it strains credulity that Ensign was unable to obtain this information. Ensign either made no real attempt to get the information, was purposely kept in the dark by his clients, or was instructed to continue lying or misleading the court about what he knew—or perhaps some combination. Whatever the truth, the district court must obtain this information to understand which officials may have engaged in contumacious acts.

### C.     Post-Hearing Decisions.

According to Ensign's declaration, he informed "senior staff" at DHS and DOJ of both the Court's oral order and its written memorialization. ECF 201-1 ("Ensign Decl.") ¶¶ 3-4. But, among other things, given the lack of a transcript, Ensign does not say how he informed them of the court's oral order or how much context he provided, or whether Bove, Todd Blanche (the Deputy Attorney General), or Joseph Mazzara (DHS's Acting General Counsel) listened to the Zoom hearing themselves. Indeed, his declaration states only that he "summarized" the oral order. *Id.* ¶ 3. In his whistleblower disclosure, Reuveni states that Ensign's email to DHS officials Mazzara and James Percival on March 15 at 7:31 p.m. "informed the recipients of both the oral and written injunctions, informed the agency counsel that their clients were required to not remove anyone within the class definition, and reflected that Ensign understood the judge to be requiring that DHS not deplane any planes that had departed U.S. airspace." Disclosure 12-13.

9

Though Ensign adds that he did not give further legal advice to DHS "before the decision was made" and that he was "not involved in any discussions with DOJ leadership regarding any legal advice given to DHS on that topic," Ensign Decl. ¶ 5, Ensign argued the case, entered the sole appearance for the government, and was the Deputy Assistant Attorney General leading DOJ OIL. Had Defendants been genuinely interested in understanding what the order required, it is unthinkable that Ensign would not have been consulted if there was disagreement about its proper interpretation—especially if, as Reuveni's disclosure indicates, Ensign had already communicated his understanding that the order barred the transfers.[3]

Reuveni's testimony about post-hearing events is also critical. In emails throughout the evening and early the next morning to DHS, DOJ, and State Department recipients (which he made public), he advised that the court had "specifically" ordered Defendants "to return anyone in the air"; requested confirmation that "no one lacking a title 8 final order will be taken off these planes when they land" "to avoid contempt"; and reiterated "our advice here on injunction compliance … to not deplane anyone from these planes who is subject to an AEA

---

[3] As explained by Judge Pillard, such disagreement beggars belief, given that the district court focused on potentially losing the ability to order relief if the men were transferred to Salvadoran physical custody and it did not discuss (nor did Defendants raise) the time the planes might depart U.S. airspace. *See J.G.G. v. Trump*, 147 F.4th at 1076-77, 1087-88, 1091.

removal." ECF 177-8, Exh. 4 at 10, 15, Exh. 5 at 24. Reuveni's testimony would show the specific email recipients who were informed of his considered view of the order and its unambiguous meaning—a view that was apparently uncontradicted by August Flentje, then-Acting Director of OIL and Mr. Reuveni's superior (the only currently known recipient of the emails). Were Mazzara, Bove, and Blanche on the chain? If not, does Reuveni (or Ensign) know whether they were made aware of his view?

Reuveni's disclosure described further events during the night of March 15-16 that raise questions as to specific officials' actions and their role in any decision to violate the court's order, including as to the Attorney General's involvement. The disclosure stated that, shortly after 10:13 p.m., DHS informed Reuveni via email "that they were holding issuance of guidance pending a decision from the Attorney General." Disclosure 13. Defendants' cursory declarations do not address whether the Attorney General was involved in the decision-making process or why Defendants failed to issue guidance for hours after the district court's order, given the need for prompt compliance.

Reuveni's disclosure also described a decision *not* to notify the court as to the government's interpretation of the court's order until the afternoon of Sunday, March 16. He stated, "Sometime around midnight, Ensign informed Mr. Reuveni that DOJ would be filing a notice with the court, signed by Bove, explaining its interpretation

11

of the court order." *Id.* at 13. However, "at 12:23 a.m. Ensign informed Mr. Reuveni by phone that Bove would no longer be filing either a notice of appearance or a notice to the court explaining the government's interpretation of the court's orders." *Id.* "At 12:33 a.m., Ensign telephoned Mr. Reuveni informing him that DOJ leadership did not appear to be in a hurry to file any such notice." *Id.* At some as-yet unknown time during the night, Plaintiffs were deplaned. Defendants did not notify the court as to their interpretation of the order until March 16 at 3:46 PM. ECF 19. The current record does not indicate who was involved in Defendants' decision not to notify the court for at least fifteen hours.

> ### D.    Mazzara, Bove, and Blanche Declarations.

Bove's and Blanche's declarations each contain a single sentence of substance, stating only that they provided legal advice to Secretary Noem through Mazzara. ECF 199 ("Bove Decl.") ¶ 5; ECF 198-3 ("Blanche Decl.") ¶ 1. Mazzara, in turn, submitted his own short declaration, stating that he provided the Secretary with his own legal advice and "also" conveyed the advice of "senior Department of Justice leaders." ECF 198-2 ("Mazzara Decl.") ¶¶ 1-2. Mazzara does not state whether his own advice differed from that of Bove or Blanche or whether the "senior Department of Justice leaders" included only Bove and Blanche. And nowhere do Bove, Blanche, or Mazzara state whether they were informed of, disagreed with, or discussed Reuveni's and/or Ensign's contrary understanding of the order.

12

Most importantly, and perhaps the overriding fact in discerning Defendants' intentions, Mazzara, Bove, and Blanche do not say why, if they disagreed with Reuveni and/or Ensign, they did not ask either to seek clarification from the district court. Under the circumstances of this case, it is impossible to fathom these experienced attorneys taking a view so at odds with the experienced attorneys directly involved in the case and not seeking clarification—unless, of course, they knew very well what the district court would say and instead preferred to effectuate transfer and then seek to retroactively justify it based on a contrived reading of the order.

Reuveni and Ensign can both testify whether they or anyone else sought approval to go back to the district court for clarification during the more than five hours between the hearing's conclusion and the transfer of the men and, if so, what instructions they were given. Throughout the day, the district judge left no doubt he was available and would continue to make himself available even though it was a Saturday night. And, understandably, the government has now abandoned its previous argument that it would have been logistically difficult to comply with the court's order—given that it is now known that it returned eight women and one Nicaraguan man on those flights, after the Salvadoran government refused to accept them. *See J.G.G. v. Trump*, 778 F. Supp. 3d 24, 34-35 (D.D.C. 2025).

13

### E.     Noem Declaration.

The Secretary's two-sentence declaration says she made the decision to transfer the men. ECF 198-1 ("Noem Decl.") ¶ 1. The government says that this should be the end of the matter and the court must either drop the criminal contempt inquiry or make a referral. Pet. 15. But the Secretary would not be liable for criminal contempt if she did not willfully disregard the district court's order. *Infra* Section II.B. That might turn on what she was told by Mazzara, conveying either his or senior DOJ officials' advice. She states only that she received the legal advice "[b]efore" making the decision, Noem Decl. ¶ 2, not that the decision was based on, or consistent with, the legal advice. Did Mazzara tell her, consistent with Reuveni's understanding, that the order flatly prohibited the transfer, but she went ahead anyway? Did Mazzara tell her that the order allowed her to undertake the transfers and that this was (incorrectly) the consensus view? Did Mazzara tell her that he, Bove, and/or Blanche understood the order to permit the transfers but that there was significant disagreement from the attorneys on the case? Additionally, while the Secretary says it was her decision, she neglects to state whether (besides the identified legal advice) she consulted with anyone else regarding the decision to go through with the transfer.

14

### F.    Post-Transfer.

On March 16 at 7:46 AM, El Salvador's President posted a headline about the district court's order to return the flights, adding "Oopsie … Too late 😂." *J.G.G.*, 778 F. Supp. 3d at 35. Secretary Rubio reposted the Salvadoran President's post. *Id.*

Upon their transfer to CECOT, the Venezuelan men—Plaintiffs in this litigation—were subjected to incommunicado detention and horrific prison conditions, regularly beaten, and denied basic hygiene, sanitation, and access to healthcare; some were subjected to sexual violence. Hum. Rts. Watch, "You Have Arrived in Hell": Torture and Other Abuses Against Venezuelans in El Salvador's Mega Prison (2025), https://perma.cc/8H6N-MJX4. As the district court noted, the defiance of its order is thus hardly an "academic" issue. ECF 208 at 1.

\*          \*          \*

Reuveni and Ensign cannot testify to everything, in part because their superiors or their clients may have deliberately kept them in the dark. But they can begin to unravel the events of that weekend so the district court can assess who, if anyone, may have willfully misled it and deliberately decided to violate its order, in what may have been a step-by-step fraud on the court.

Among other things, they can tell the court what Bove said at the Friday, March 14 meeting, statements that may have set off the ensuing events and are highly relevant to mens rea; who attended that meeting; why Defendants asked for a

Monday hearing when they knew planes were departing over the weekend; what
Ensign said to Mazzara, Bove, and Blanche (or others) about his understanding of
the order; who Reuveni emailed about his clear understanding of the order; why
Ensign stated he had no knowledge of planes departing over the weekend; why the
government did not tell the district court about the already-departed flights after the
recess; and why no one sought clarification from the court regarding the scope of its
order.

## II.    THE DISTRICT COURT IS WELL WITHIN ITS DISCRETION TO TAKE MEASURED STEPS TO GATHER INFORMATION.

### A.    A District Court Has Inherent Authority to Inquire into Indirect Criminal Contempt and Has Discretion to Assess Probable Cause Before Making Any Referral.

1. A majority of this Court has already concluded that the district court has
authority to gather information into these events. The panel has nonetheless inquired
as to the precise legal basis for doing so. It is a court's inherent authority. The district
court's inquiry "exercises its most fundamental and inherent authority" in "polic[ing]
the integrity of proceedings in its own courtroom." *J.G.G.*, 2025 WL 3198891 at \*4
(Millett, J.); *see also Ex parte Robinson*, 86 U.S. 505, 510 (1873) (the "power to
punish for contempts" is "essential to the preservation of order in judicial
proceedings"); *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 795

(1987) ("[T]he initiation of contempt proceedings to punish disobedience to court orders is a part of the judicial function.").

The ability to gather facts is a necessary corollary to this inherent power. Otherwise, courts would be forced into standardless and arbitrary referrals, potentially based on just the slightest suspicion. Courts accordingly may hold evidentiary proceedings before deciding whether to refer for indirect criminal contempt. *See, e.g.*, *Objective Solutions Int'l, Ltd. v. Gammon*, 2008 WL 538445, at *1, 3-4 (S.D.N.Y. Feb. 25, 2008) (Rakoff, J.) (upon plaintiff's request to hold defendants in criminal contempt for indirect contempt, holding "evidentiary hearing" at which contemnor gave evidence under oath, but then declining to refer misconduct to prosecutor); *In re Blackmon*, 2016 WL 4055650, at *2 (W.D.N.C. July 25, 2016) (making referral for indirect contempt after holding criminal contempt hearing in which defendant "did not attempt to rebut the evidence of contempt"); *Wilson v. Vaccaro*, 883 F. Supp. 258, 261, 263 (N.D. Ill. 1995) (holding evidentiary hearing on indirect contempt at which potential contemnors and other witnesses were subject to direct and cross-examination, and referring to prosecutor "based on the evidentiary hearing").

Most importantly for present purposes, there is no clear legal authority prohibiting (or even suggesting) that in the indirect criminal contempt setting a district court may not gather facts to make a preliminary determination of probable

17

cause as to whether it was misled or whether a party willfully violated its order. *See In re Al Baluchi*, 952 F.3d 363, 369 (D.C. Cir. 2020) (mandamus requires that petitioner "point to cases in which a federal court has held that relief is warranted in a matter involving like issues and comparable circumstances").

2. The panel additionally asked what the legal basis is for determining probable cause before a criminal contempt referral. Again, for mandamus purposes, the relevant question is whether it is "clear and indisputable" that the district court abused its discretion. *Id.* Just the opposite. The district court chose the more conventional path in not taking the weighty step of a criminal referral before it made a careful assessment whether there was probable cause as to any individual.

As the district court noted here, "[s]ome courts … have opted to make or require findings of probable cause before initiating criminal-contempt proceedings." *J.G.G.*, 778 F. Supp. 3d at 39. It explained that such a practice was "a prudent way of affording alleged contemnors the procedural protections associated with other criminal proceedings" *Id.* (collecting cases); *see also, e.g., In re La Varre*, 48 F.2d 216, 218 (S.D. Ga. 1930); *E.A. Renfroe & Co., Inc. v. Moran*, 508 F. Supp. 2d 986, 995-98 (N.D. Ala. 2007) (reviewing evidence and making criminal contempt referral based on probable cause); *United States v. Smith*, 502 F. Supp. 2d 852, 854 (D. Minn. 2007); *United States v. Mattatall*, 2009 WL 2905477, at *1 (C.D. Cal. Sept. 3, 2009); *United States v. Mullins*, 2012 WL 4458153, at *2 (W.D. Va. Aug. 28, 2012); *J.O.P.*

18

*v. DHS*, 2025 WL 3240078, at *6 (D. Md. Nov. 20, 2025); *In re Jolly Joint, Inc.*, 23 B.R. 395, 403 (Bankr. E.D.N.Y. 1982); *In re Boulware*, 2010 WL 3724668, at *1 (D.S.C. Sept. 17, 2010).

Making a probable cause determination prior to referral makes sense given the momentous consequences of a referral. It is all the more understandable because an indictment or information is not required for initiation of criminal contempt actions: potential defendants could otherwise be deprived of a critical safety valve that usually precedes a federal prosecution. *See* Fed. R. Crim. P. 42(a)(1); Wright & Miller, 3A Fed. Prac. & Proc. Crim. § 709 (4th ed.); *Young*, 481 U.S. at 814 ("Even if a defendant is ultimately acquitted, forced immersion in criminal investigation and adjudication is a wrenching disruption of everyday life.").

The probable cause requirement provides a clear, familiar, principled standard, thereby avoiding courts adopting a variety of arbitrary standards untethered to the criminal context, or no standard at all. And any written opinion accompanying a probable cause determination furthers Rule 42's requirement that the court must provide notice to the person charged that "state[s] the essential facts constituting the charged criminal contempt and describe[s] it as such."

**B.    The Government Is Wrong that the District Court Clearly and Indisputably Abused Its Discretion in Seeking to Assess Whether Any Individual Acted Willfully.**

19

1. The government's principal contention is that because it has now told the district court that Secretary Noem made the decision after receiving legal advice from Bove, Blanche, and Mazzara, the court has sufficient information if it wishes to make a referral, even if the proper standard is probable cause. That is plainly wrong. More pertinently for mandamus, the district court certainly did not transgress clear legal authority or otherwise clearly and indisputably abuse its discretion.

In contrast to civil contempt, criminal contempt requires a "willful" violation. *United States v. Young*, 107 F.3d 903, 907 (D.C. Cir. 1997). And probable cause must be specific to a particular individual. *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (emphasizing that probable cause must be "particularized with respect to that person").

As discussed, nothing in the government's anemic declarations allowed the district court to assess who, if anyone, acted "willfully" in misleading it and ultimately disobeying its order. For instance, the government seeks to paint Reuveni as a disgruntled whistleblower. But Ensign's testimony may confirm Reuveni's account that Bove told a group of DOJ attorneys "that DOJ would need to consider telling the courts 'fuck you' and ignore any such court order" if the courts barred AEA removals over the weekend. Disclosure 7. If so, that would be an important fact for assessing Defendants' subsequent actions and identifying who, specifically, may have deliberately sought to mislead the court and defy its order.

20

Similarly revealing would be whether anyone instructed Reuveni on Saturday morning to ask the court for a Monday hearing, knowing full well that flights were scheduled to depart that afternoon. And it would be especially important to know if that directive came from Mazzara, Bove, Blanche, or even the Secretary herself. Equally revealing would be whether Ensign did in fact know that there were imminent departures but was instructed by these or any other high-ranking officials to mislead or lie to the district court, thereby keeping the court from acting as swiftly as possible.

Most importantly, the declarations provide no insight into who may have acted willfully in making the final decision to transfer the men. Did Secretary Noem allow the transfers without consulting with anyone else (other than the legal advice conveyed by or through Mazzara)? Was she told the order unequivocally prevented her from transferring Plaintiffs but decided to do so anyway? Did Bove, Blanche, and Mazzara in fact understand that the order barred the transfers but nonetheless tell the Secretary they would justify it to the court *after* the transfers (as they ultimately tried to do that Sunday)? *See Young*, 107 F.3d at 907-08 (objective contempt standard "takes into account" the "audience to which [the order] is addressed" and how others "understood" the order's scope). Was there a deliberate decision not to include Ensign and Reuveni in a discussion about the scope of the order, even though they were the lawyers on the case? And, critically, was there a

21

deliberate decision not to seek clarification from the court, notwithstanding Reuveni's multiple emails stating that the order clearly barred transfers?

Absent answers to at least some of these questions, the court would be in a position of blindly referring for potential prosecution all these high-ranking officials, including a Cabinet member. That the district court has chosen not to do so speaks to its caution and is plainly not a clear and indisputable abuse of discretion—the only relevant question for mandamus.

2. The government cites cases limiting a court's ability to *prosecute and convict* a person for criminal contempt, but those cases have no bearing here. In *United States v. Neal*, the court conducted the entire indirect contempt proceeding itself, from start to finish, convicting the alleged contemnor without any referral to prosecutors. 101 F.3d 993, 995-96 (4th Cir. 1996). The Fourth Circuit found that "the district court erred in prosecuting the contempt charge," because "the inherent contempt power does not permit a judge to dispense with a prosecutor altogether and fill the role himself." *Id.* at 997-98. The same error permeated the district court's contempt conviction in *American Airlines, Inc. v. Allied Pilots Association*, where the court singlehandedly initiated the prosecution, conducted the trial, "and then decided all factual and legal issues." 968 F.2d 523, 531 (5th Cir. 1992). Similarly, *Young* did not address the type of pre-referral issue presented here; *Young* involved a court's power to appoint plaintiffs' attorneys to conduct the *prosecution* itself. 481

22

U.S. at 806. To the extent *Young* discussed "investigative" activities performed by the appointed prosecutors, those were "undercover" sting operations that produced "more than 100 audio and video tapes" of out-of-court "meetings and telephone conversations." *Id.* at 791-92.

The government additionally seeks to invent a rule that the court cannot inquire into mens rea, as if state of mind were uniquely off-limits. Pet. 15. But it cites no case that supports that radical claim, much less satisfies the mandamus standard. The most it can muster is one out-of-circuit case stating that probable cause does not always require evidence of every element of an offense. *Id.* (citing *Ganek v. Leibowitz*, 874 F.3d 73 (2d Cir. 2017)). But it fails to acknowledge the law of this Circuit, which requires evidence about a person's mental state to establish probable cause for offenses requiring intent. *E.g.*, *United States v. Christian*, 187 F.3d 663, 667 (D.C. Cir. 1999) (absent evidence concerning intent, "there was no probable cause for arrest").

## III.  DEFENDANTS' PRIVILEGE ARGUMENTS ARE PREMATURE AND WRONG.

When this case last appeared before the Circuit in a mandamus posture, the district court had already made clear that it intended to proceed first through declarations and then, "[s]hould those be unsatisfactory … live witness testimony." ECF 81 at 44. Defendants now attempt to preemptively and categorically invoke the

attorney-client privilege to thwart *any* live testimony by Reuveni or Ensign—before the court has posed a single question to a single witness. This is wildly premature. The district court's order for testimony is not a clear abuse of discretion or contrary to clear legal authority.

Defendants' privilege assertions are also flatly contradicted by longstanding limitations on the attorney-client privilege and the legal duties of government attorneys to the public, issues best resolved in a concrete setting, if they arise.

## A. Defendants' Blanket Assertion of Privilege to Block All Testimony Is Improper.

A party invoking the attorney-client privilege bears the burden of establishing that the privilege applies to specific pending questions. *See In re LeFande*, 919 F.3d 554, 563 (D.C. Cir. 2019). A "blanket assertion of the privilege [does] not suffice." *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998), *cert. denied*, 525 U.S. 996.

Because blanket assertions are impermissible, the privilege does not excuse a witness from appearing. Rather, the "correct process" is to "take the stand" and assert the privilege as to each question. *See LeFande,* 919 F.3d at 563 (lawyer not excused from testifying on ground he might reveal client confidences, where he was accused of violating preliminary injunction); *see also, e.g.*, *United States v. Hankins*, 565 F.2d 1344, 1349-50 (5th Cir. 1978) (party must appear and assert privilege as to particular questions). These requirements are consistent with this Court's directive

that the privilege must be "strictly confined within the narrowest possible limits consistent with the logic of its principle." *Lindsey*, 158 F.3d at 1272.

The government claims that the district court declined to enter a protective order or implement protocols in advance of the testimony. But the district court expressly stated that it was aware of the government's concerns and would address them as they arose, *see* ECF 208 at 3—the proper procedure, and certainly not an abuse of discretion warranting mandamus. *See Cheney v. U.S. Dist. Ct. for the Dist. of Columbia*, 542 U.S. 367, 380-81 (2004) (no-other-adequate-remedy requirement for mandamus "ensure[s] that the writ will not be used as a substitute for the regular appeals process").

## B.     The Attorney-Client Privilege Does Not Apply.

Because the government's blanket assertion of privilege is overbroad and premature, this Court need not address whether any basis exists for asserting the privilege in advance of any specific questions for which the government might claim privilege. But for several reasons, the privilege would not apply to most, if not all, relevant questions that could arise. And, needless to say, there are numerous critical questions that would not even implicate the privilege, *see* ECF 208 at 2-3, even under the government's view.

### 1.     Waiver.

A party waives attorney-client privilege by "plac[ing] otherwise privileged

25

matters in controversy." *Ideal Elec. Sec. Co. Inc. v. Int'l Fidelity Ins. Co.*, 129 F.3d 143, 151 (D.C. Cir. 1997). The exact scope of the waiver is for the district court to determine. *In re Sealed Case*, 877 F.2d 976, 981 (D.C. Cir. 1989). Relevant here, courts routinely find that a party's affirmative assertion about its state of mind waives privilege, as when a party insists on its good faith. *See, e.g.*, *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1419 (11th Cir. 1994) (by "assert[ing] good faith" defense, defendant "injected the issue of its knowledge of the law into the case and thereby waived the attorney-client privilege"); *United States v. Bilzerian*, 926 F.2d 1285, 1291-92, 1294 (2d Cir. 1991) (defendant's "assert[ion of] his good faith" required exploration of "conversations with counsel regarding the legality of [the defendant's] schemes," despite defendant's argument that good-faith defense would not rely on the "content or even the existence of any privileged communications"); *United States v. Exxon Corp.*, 94 F.R.D. 246, 248-49 (D.D.C. 1981) ("only way" to test defendant's arguments about its subjective understanding was "to investigate attorney-client communications" about that understanding); *Feld v. Fireman's Fund Ins. Co.*, 292 F.R.D. 129, 140-41 (D.D.C. 2013) (similar).

Similarly, a party waives privilege by arguing that it took a "reasonable understanding" of another's statement or "justifiably relied" on it. *Minebea Co., Ltd. v. Papst*, 355 F. Supp. 2d 518, 519, 524 (D.D.C. 2005).

Here, the government has injected into this litigation the question of whether

26

its interpretation of the order was in good faith and reasonable. Two days after this litigation commenced, the government's counsel asked "to be heard on the issue of why we believe that we complied with the [TRO]." ECF 25 at 11:24-12:1. The attorney argued that additional factual inquiry sought by Plaintiffs was not "necessary because we did comply with the Court's written order and did rely in good faith on it, and I can walk you through the reasons why." *Id.* at 14:24-15:1; *see also id.* at 16:20-22 (similar); *id.* at 22:12-15 ("[W]hat we are talking about is whether there was good faith compliance with the injunction and whether the United States believed it reasonably, which they did in this scenario.").

The government has doubled down on its position throughout this litigation. *See, e.g.*, ECF 58 at 7 ("When the written order did not include that [no-transfer] command, the Government could reasonably have understood that as reflecting the Court's more considered view in a quickly evolving situation."); Emergency Mot. 14-15, *J.G.G. v. Trump*, No. 25-5124 (D.C. Cir. Apr. 18, 2025) (arguing that contempt inquiry should be "foreclosed" based on "Defendants' *understanding* that removal meant departure from the United States") (emphasis added); Appellants' Resp. to Mot. to Dismiss 17, *J.G.G. v. Trump*, No. 25-5124 (D.C. Cir. Apr. 25, 2025) (arguing no contempt because "the government in good faith interpreted the limited written order to mean territorial removal").

Notably, in an email disclosed by Mr. Reuveni, then-Acting Assistant

27

Attorney General Yaakov Roth memorialized legal advice that DOJ provided to DHS on March 15, writing that Mr. Bove "advised DHS last night that the deplaning of the flights that had departed US airspace prior the court's minute order was permissible under the law and the court's order." ECF 177-8, Exh. 6 at 27. The government has cited this email as "mak[ing] clear that high-level officials *believed* the TRO did not apply once a flight was outside the United States." ECF 182 at 20 (emphasis added).

And after the district court recommenced its contempt inquiry, the government argued that its "interpretation of the Court's order [was] correct," and that this interpretation was "reasonable." ECF 195 at 1. The government also asserted that Secretary Noem received legal advice from Blanche, Bove, and Mazzara, and—after receiving that advice—decided to transfer Plaintiffs. *Id.* at 2. This decision, the government contends, was "lawful" and "consistent" with its "reasonable interpretation of the Court's order." *Id.* These assertions, taken together, amount to an argument that the government relied on the legal advice it received, irrespective of any affirmative defenses formally asserted. *See Davenport v. Djourabchi*, 2020 WL 7042813, at *11 (D.D.C. Nov. 30, 2020) (privilege waivers are "not limited to reliance on advice of counsel as an affirmative defense; they also apply wherever the party resisting discovery raised as a defense that which transpired between client and counsel").

By putting into issue whether its understanding of the district court's order was in good faith—and by shielding itself behind the legal advice it received—the government has repeatedly chosen to waive privilege. The government cannot now seek refuge behind the privilege, which it has "irretrievably breached." *See Permian Corp. v. United States*, 665 F.2d 1214, 1220 (D.C. Cir. 1981). Insofar as the government is making a point of telling the court that the Secretary received legal advice "[b]efore" making her decision, Noem Decl. ¶ 2, but refusing to say whether she relied on that advice, the government is trying to have it both ways.[4]

The government has further waived privilege by disclosing the *contents* of privileged communications. Disclosure of "part of a privileged communication" waives privilege "as to all other communications relating to the same subject matter." *In re Sealed Case*, 676 F.2d 793, 818 (D.C. Cir. 1982); *see also Koch v. Cox*, 489 F.3d 384, 390 (D.C. Cir. 2007) (similar); *Sealed Case*, 877 F.2d at 980 (similar).

Waiver occurs if the "substance" or "gist" of a privileged communication is revealed. *See United States v. Jacobs*, 117 F.3d 82, 90 (2d Cir. 1997); *Goodrich Corp. v. EPA*, 593 F. Supp. 2d 184, 191 (D.D.C. 2009) (similar). For example, in *Wadler v. Bio-Rad Laboratories Inc.*, 212 F. Supp. 3d 829 (N.D. Cal. 2016), the defendant

---

[4] Although the government insists that contemnors are entitled to wait before asserting an advice-of-counsel defense, *see* Pet. 3, 17, none of its cases suggest that the government cannot waive attorney-client privilege now, or that the possibility it might formally assert the defense later prohibits the probable cause inquiry.

insisted that a whistleblower attorney who earlier disclosed the defendant's privileged information could not have waived the defendant's privilege. *Id.* at 835-36. But because the defendant subsequently commented on the material, including by "describ[ing the whistleblower's] legal advice" in public filings, the defendant had itself waived privilege. *Id.* at 851-54.

Here also, the government maintains that a whistleblower cannot waive its privilege. Pet. 22. But, as in *Wadler*, the government itself has disclosed in this litigation the substance of privileged communications. It has offered its own spin on and even quoted from Roth's March 16 email, first disclosed by Reuveni, that memorializes legal advice given to DHS. *See* ECF 177-8, Exh. 6 at 27 (Roth's email); Resp. to Mot. to Suppl. R. 3-4, *J.G.G. v. Trump*, No. 25-5124 (D.C. Cir. July 23, 2025) ("[T]he Government's attorneys ultimately concluded that deplaning the already-removed aliens was 'permissible under the law and the court's order.' … That is exactly the legal position that the Government promptly articulated in court and has consistently maintained."); *see also* ECF 195 ¶ 10 (DHS was "formally advised about compliance with this Court's order both by DOJ leadership and the Acting General Counsel of DHS.").

The government has also sought to infer from Roth's email what "high-level officials" understood their legal obligations to be, though the email does not on its terms address their understanding. *See* ECF 182 at 20 (citing Roth's email as

"mak[ing] clear that high-level officials believed the TRO did not apply once a flight was outside the United States"). These characterizations of and direct quotation from legal advice go well beyond merely "*mentioning*" that legal advice was given. *See* Pet. 23.

In short, the government has waived privilege not only by putting privileged communications at issue, but also by disclosing the substance of those communications.

## 2. Crime-Fraud Exception.

Any ruling on the crime-fraud exception would be premature. *LeFande*, 919 F.3d at 563 ("no obligation to establish" crime-fraud exception until witness "appeared and properly asserted a valid claim of privilege"). Nonetheless, the district court correctly opined that this exception might vitiate privilege over some of the government's communications. ECF 208 at 3.

Because "privilege takes flight" where the attorney-client relationship is abused, *Clark v. United States*, 289 U.S. 1, 15 (1933), privilege does not protect communications "made in furtherance of a crime, fraud, or other misconduct," *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985). For example, attorney-client communications are not privileged if used to perpetrate "fraud in litigation." *See id.* at 401 (exception applied to fraudulent conduct, including suborning perjury, which "necessarily str[uck] at the very foundations of the adversary system and the judicial

31

process"); *see also JTR Enters., LLC v. Columbian Emeralds*, 697 F. App'x 976, 988 (11th Cir. 2017) ("massive fraud of the court" was "more than sufficient basis" for applying crime-fraud exception). Similarly, communications that further "obstruction" of a court order fall within the exception. *In re Icenhower*, 755 F.3d 1130, 1141 (9th Cir. 2014).

Privilege will also not protect communications used to further misconduct—even if not criminal or fraudulent—that is "fundamentally inconsistent with the basic premises of the adversary system." *Sealed Case*, 676 F.2d at 812; *see, e.g.*, *Recycling Sols., Inc. v. District of Columbia*, 175 F.R.D. 407, 409 (D.D.C. 1997) (crime-fraud exception satisfied by actions "designed to facilitate" unconstitutional racial discrimination).

For the crime-fraud exception to apply, the misconduct need not be proven; it is enough that there is "evidence that if believed … would establish the elements of an ongoing or imminent crime[.]" *Sealed Case*, 754 F.2d at 399; *In re Sealed Case*, 107 F.3d 46, 50 (D.C. Cir. 1997) (same). Instead, all that is needed to lose the benefit of the privilege is for a communication to have been made or received with intent to further misconduct and for the misconduct to have then occurred. *See id.* at 49; *In re Sealed Case*, 223 F.3d 775, 778 (D.C. Cir. 2000) (same). For the reasons already discussed, there is ample evidence that, if believed, would show that government attorneys furthered an unlawful scheme to evade judicial review including—if

32

necessary—by lying or misleading the court or deliberately disobeying its order.[5]

### 3.    Self-Defense Exception.

The government has also failed to dispute the rule that information is not treated as privileged if testifying attorneys need to disclose that information to respond to charges of misconduct. "When a serious charge against an attorney arises out of his or her representation of a client, courts have allowed attorneys to disclose confidential information obtained from the client." *Rosen v. NLRB*, 735 F.2d 564, 576-77 (D.C. Cir. 1984) (lawyers accused of soliciting false testimony "clearly could have argued that the privilege was inapplicable"). For example, to the extent that Ensign has been identified as a possible wrongdoer, he would be able to reveal client confidences to defend himself. *Cf.* Disclosure 9 (whistleblower disclosure stating that Ensign "willfully misled" the court).

### 4.    Exception for Government Attorneys.

---

[5] The government frames the standard as "*at least* probable cause[,]" Pet. 23 n.1, but that is not this Circuit's standard, as the government's own case notes. *See Sealed Case*, 107 F.3d at 50 (distinguishing between "the sort of probable cause showing the Second Circuit would demand" and the D.C. Circuit's evidence-that-if-believed-would-establish standard). Insofar as the government is suggesting that application of the crime-fraud exception should wait until after any criminal referral, courts have applied the exception outside of criminal prosecutions. *See Icenhower*, 755 F.3d at 1141.

Finally, the government may not use the attorney-client privilege as a shield to protect itself from inquiry into potential misconduct by government officials. Controlling precedent squarely rejects the proposition that Defendants can invoke the privilege in the current context: "The obligation of a government lawyer to uphold the public trust reposed in him or her strongly militates against allowing the client agency to invoke a privilege to prevent the lawyer from providing evidence of the possible commission of criminal offenses within the government." *Lindsey*, 158 F.3d at 1273.

When criminal misconduct is at issue, the attorney-client privilege does not apply to government attorneys in the same way it does to private attorneys. The privilege for government officials is narrower because of the government attorneys' duty to the public interest. *See id.* at 1272; *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 921 (8th Cir. 1997), *cert. denied*, 521 U.S. 1105 (governmental attorney-client privilege unavailable because "allow[ing] any part of the federal government to use its in-house attorneys as a shield against the production of information relevant to a federal criminal investigation would represent a gross misuse of public assets").

By invoking the privilege in an attempt to block a criminal contempt inquiry, Defendants fundamentally misunderstand the role of government attorneys and their duty of loyalty. The government attorney's "duty is not to defend clients against

34

criminal charges and it is not to protect wrongdoers from public exposure." *Lindsey*, 158 F.3d at 1272. Instead, it is to vindicate the "public interest in honest government and in exposing wrongdoing[.]" *Id.* at 1266; *see also Grand Jury Subpoena Duces Tecum*, 112 F.3d 910 (similar); D.C. R. Pro. Conduct 1.6(e) ("A lawyer may use or reveal client confidences or secrets … when permitted by these Rules or required by law or court order" and, "*if a government lawyer*, when permitted or authorized by law." (emphasis added)); Whistleblower Protection Act, Pub. L. No. 101–12, 103 Stat. 16; 28 U.S.C. § 535(b) (government attorneys *must* "expeditiously report[]" information "relating to violations of Federal criminal law involving Government officers and employees").

## IV.    THE REQUEST FOR REASSIGNMENT IS MERITLESS.

From the very beginning, the government has sought to have the district judge thrown off this case—first because of its initial TRO loss. The government's current claim that the district court is biased and acting in a "vindictive[] and retaliat[ory]" manner, Pet. 15, is baseless. *See In re Flynn*, 973 F.3d 74, 83 (D.C. Cir. 2020) (en banc) (judge's actions did not "come[] close to meeting the very high standard of conduct so extreme as to display clear inability to render fair judgment").[6]

---

[6] The government suggests that Plaintiffs' counsel cannot be involved in the criminal contempt inquiry, but the cases it cites involved interested counsel serving as a *prosecutor* or otherwise controlling the inquiry. Pet. 24-25. The district court certainly does not abuse its discretion by simply obtaining assistance from the party

## V.    THE DISTRICT COURT MAY ALSO IMPOSE SANCTIONS SHORT OF CRIMINAL REFERRAL.

Finally, even if there were any force to the government's argument that mandamus is warranted to shut down the district court's criminal contempt inquiry, there is no question that the district court has inherent authority to continue its factual inquiry to determine whether sanctions short of criminal contempt are warranted, such as attorneys' fees, referral to a bar authority, adverse inferences in the related litigation involving Plaintiffs, or any other non-criminal sanction.

A federal court has inherent "power to conduct an independent investigation in order to determine whether it has been the victim of fraud" and to impose a variety of sanctions. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). In *Chambers*, the Supreme Court endorsed that power as "of particular relevance" in a strikingly similar case that involved "attempts to deprive the Court of jurisdiction, fraud, misleading and lying to the court[,]" including a lawyer who "intentionally withheld … information from the court" during a TRO hearing. *Id.* at 37, 41-42, 44, 50. A court has the "power to unearth [fraud] effectively." *Universal Oil Prods. Co. v. Root Refining Co.*, 328 U.S. 575, 580 (1946). And an order that requires a witness to appear for live testimony "falls squarely" within a court's inherent power.

---

with knowledge of the events in question. *See Young*, 481 U.S. at 806 n.17. Moreover, the district court's factual inquiry may ultimately lead to sanctions short of criminal referral. *See infra* Section V.

*Backertop Licensing LLC v. Canary Connect, Inc.*, 107 F.4th 1335, 1342, 1345 (Fed.
Cir. 2024); *see also Root Refin. Co. v. Universal Oil Prods. Co.*, 169 F.2d 514, 520
(3d Cir. 1948) (similar).

*          *          *

Over the past nine months, the government has engaged in an open strategy
of "stonewalling" and "increasing obstructionism." ECF 81 at 10. Its failure to abide
by the district court's TRO meant that more than a hundred men were hurriedly sent
without any due process to a notorious Salvadoran prison to be tortured and
abused—a point the government does not even contest. The Court should not permit
further obstruction and delay of the district court's effort to assess which government
officials may have willfully violated its order. Mandamus is plainly not appropriate
here.

Date: December 29, 2025

Evelyn Danforth-Scott
Spencer Amdur
Oscar Sarabia Roman
My Khanh Ngo
Cody Wofsy
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770

Arthur B. Spitzer
Scott Michelman
Aditi Shah
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION OF
   THE DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800

Respectfully submitted,

/s/ *Lee Gelernt*
Lee Gelernt
   *Counsel of Record*
Daniel Galindo
Ashley Gorski
Patrick Toomey
Omar Jadwat
Hina Shamsi
Sidra Mahfooz
Sean M. Lau
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org

Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
915 15th Street, NW, 7th Floor
Washington, D.C. 20005
(212) 549-2500

*Barred in Texas and Arizona only;
supervised by a member of the D.C. Bar*

*Counsel for Respondents*

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 8,797 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced and easy-to-read typeface using Microsoft Word in 14-point size font.

/s/ *Lee Gelernt*
Lee Gelernt
December 29, 2025
*Counsel for Respondents*

## CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2025, I electronically filed the foregoing Response with the Clerk for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ *Lee Gelernt*
Lee Gelernt
December 29, 2025
*Counsel for Respondents*