# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Decided April 14, 2026

No. 25-5452

IN RE: DONALD J. TRUMP, ET AL.,
PETITIONERS

On Petition for Writ of Mandamus
(No. 1:25-cv-00766)

*Brett A. Shumate*, Assistant Attorney General, U.S. Department of Justice, *Yaakov M. Roth*, Principal Deputy Assistant Attorney General, and *Tiberius T. Davis*, Counsel to the Assistant Attorney General, were on the petition for writ of mandamus and the reply in support of the petition for writ of mandamus.

*Evelyn Danforth-Scott*, *My Khanh Ngo*, *Cody Wofsy*, *Lee Gelernt*, *Daniel Galindo*, *Ashley Gorski*, *Patrick Toomey*, *Omar Jadwat*, *Hina Shamsi*, *Arthur B. Spitzer*, *Scott Michelman*, *Aditi Shah*, and *Kathryn Huddleston* were on the opposition to the petition for writ of mandamus. *Michael Tan* entered an appearance.

Before: RAO, WALKER, and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RAO.

Concurring opinion filed by *Circuit Judge* WALKER.

Dissenting opinion filed by *Circuit Judge* CHILDS.

RAO, *Circuit Judge*: More than a year ago, the President invoked the Alien Enemies Act against members of Tren de Aragua, a Venezuelan criminal gang and foreign terrorist organization, and ordered that they be detained and removed from the United States. In a series of fast-moving events on March 15, 2025, the government placed a group of alleged gang members, including plaintiffs in this case, on planes to El Salvador. After the planes took off and left the country, the district court ordered the government not to remove the plaintiffs from the United States.

The Supreme Court vacated the district court's order because it was premised on a legal error and the plaintiffs' suit was brought in the wrong court. Nonetheless, the district court threatened to hold government officials in criminal contempt unless they complied with the now-vacated order by, for instance, taking back custody of the plaintiffs. We issued a writ of mandamus vacating the court's first contempt order.

Undeterred, the district court is proceeding with criminal contempt for the government's decision to transfer the plaintiffs to the custody of El Salvador. To cooperate, the government identified then-Secretary of Homeland Security Kristi Noem as the official responsible for the transfer decision. The district court previously said this was the *only* information it required to make a referral for prosecution. But the district court has now expanded its inquest and ordered hearings to extract more information from government counsel about exactly what happened last March. The government petitions for mandamus.

The widening gyre of the district court's investigation again calls for the extraordinary remedy of mandamus to halt the judicial "impairment of another branch in the performance of its constitutional duties." *Cheney v. U.S. Dist. Ct. for D.C.*,

542 U.S. 367, 390 (2004) (cleaned up). The district court proposes to probe high-level Executive Branch deliberations about matters of national security and diplomacy. These proceedings are a clear abuse of discretion, as the district court's order said nothing about transferring custody of the plaintiffs and therefore lacks the clarity to support criminal contempt based on the transfer of custody. Moreover, the government has already provided the name of the responsible official, so further judicial investigation is unnecessary and therefore improper. In these circumstances, mandamus is appropriate to prevent the district court from assuming an antagonistic jurisdiction that encroaches on the autonomy of the Executive Branch.

## I.

Our assessment of the government's second petition for a writ of mandamus must account for the remarkable procedural posture of this case. We proceed by recounting the escalating exchanges between the district court and the government that have brought us to this stage.

### A.

On March 14, 2025, the President invoked his authority under the Alien Enemies Act ("AEA") and proclaimed that the foreign terrorist organization Tren de Aragua had perpetrated an "invasion or predatory incursion."[1] *Invocation of the Alien*

---

[1] In February 2025, the Secretary of State designated Tren de Aragua as a foreign terrorist organization under the Antiterrorism and Effective Death Penalty Act of 1996. *Foreign Terrorist Organization Designations*, 90 Fed. Reg. 10030 (Feb. 20, 2025); *see* 8 U.S.C. § 1189(a)(1). This designation was based on a finding that Tren de Aragua "threatens the security of United States nationals or the national security of the United States." 8 U.S.C. § 1189(a)(1)(C).

*Enemies Act Regarding the Invasion of the United States by Tren de Aragua*, 90 Fed. Reg. 13033, 13034 (Mar. 20, 2025) ("AEA Proclamation"); *see* 50 U.S.C. § 21. The President determined that Tren de Aragua was operating "at the direction" of Venezuelan authorities to "invade," "conduct[] irregular warfare," and "undertak[e] hostile actions against the United States." AEA Proclamation, 90 Fed. Reg. at 13033–34. The President directed the Attorney General and Secretary of Homeland Security to, "consistent with applicable law, apprehend, restrain, secure, and remove" Tren de Aragua members who were not naturalized or lawful permanent residents. *Id.* at 13034.

In the early hours of the next day, March 15, suspected Tren de Aragua members detained in Raymondville, Texas, were transported to a nearby airport in preparation for their removal from the United States. Counsel for five of the detainees had learned of the planned removals and filed suit seeking emergency relief in the United States District Court for the District of Columbia. The complaint named the President, the Attorney General, the Secretary of Homeland Security, and other Executive Branch officials and agencies as defendants. The plaintiffs brought, *inter alia*, Administrative Procedure Act ("APA") and federal habeas corpus claims and sought to represent a class of similarly situated detainees. They also requested a temporary restraining order enjoining their removal from the United States and, in the event they had been removed but remained in United States custody, ordering the government to return them to the United States.

The district court issued an *ex parte* order at 9:40 a.m. that barred the government from "remov[ing] any of the individual Plaintiffs from the United States for 14 days." First Minute

Order (Mar. 15, 2025).[2] The government returned the named plaintiffs to the detention facility.

At 5:00 p.m. the same day, the district court held an emergency hearing to determine whether to certify a class of detainees and to extend interim relief to the broader class. The district court asked government counsel whether any removals under the AEA Proclamation were planned for the next 24 or 48 hours. Counsel responded that he did not know but would try to find out. The district court adjourned the hearing until 6:00 p.m. so counsel could learn more and report back. While the hearing was adjourned, two flights of detainees departed.

When the hearing resumed, plaintiffs' counsel informed the district court that two flights had already departed and another flight was expected to follow. Observing that "flights are actively departing and plan to depart," the district court provisionally certified a class of detainees. Mar. 15 Hr'g Tr. at 23–25, 43. Relying on the plaintiffs' APA claims, the court granted a class-wide temporary restraining order. The district court directed government counsel:

> [Y]ou shall inform your clients of this immediately, and that any plane containing these folks that is going to take off or is in the air needs to be returned to the United States, but those people need to be returned to the United States. However that's accomplished, whether turning around a plane or not embarking anyone on the plane or those people covered by this on the plane, I leave to you. But this is something

---

[2] Record citations to the proceedings below are from *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C.), unless otherwise indicated.

> that you need to make sure is complied with immediately.

*Id.* at 43. The court also stated that it would "issue a minute order memorializing" the oral directive "so you don't have to race to write it down." *Id.* at 42.

Shortly after the hearing, the district court issued the written temporary restraining order at issue in these contempt proceedings. The court certified a class of aliens subject to the AEA Proclamation and directed that the "Government is ENJOINED from removing members of such class (not otherwise subject to removal) pursuant to the Proclamation for 14 days or until further Order of the Court." Second Minute Order (Mar. 15, 2025) ("TRO"). Several hours later, the two planes that had departed before the TRO issued arrived in El Salvador, where Salvadoran authorities transferred most of the detainees to the Center for Terrorism Confinement.[3]

After this court denied the government's request for an emergency stay, the Supreme Court vacated the TRO. The Court determined that plaintiffs' challenge to their detention and removal could not be brought under the APA because they "fall within the 'core' of the writ of habeas corpus" and therefore must be brought in habeas. *Trump v. J.G.G.*, 145 S. Ct. 1003, 1005–06 (2025) (per curiam) (cleaned up); *see also id.* at 1007 (Kavanaugh, J., concurring) (explaining "that habeas corpus, not the APA, is the proper vehicle" for the plaintiffs' claims). Because habeas petitions must be brought in the district of confinement, the Court held the government

---

[3] No flights departed pursuant to the AEA Proclamation after the district court issued the TRO. *See J.G.G. v. Trump*, 778 F. Supp. 3d 24, 34 (D.D.C. 2025) (recognizing a third flight took off at 7:36 p.m. but carried only individuals removable under non-AEA authorities).

was likely to succeed on the merits because the District of Columbia was not the proper venue for detainees confined in Texas. *Id.* at 1005–06.

Despite the Supreme Court's vacatur of the TRO, the district court forged ahead with criminal contempt proceedings on the theory that the government had violated the TRO by transferring the detainees to Salvadoran custody. Recognizing the vacated TRO could not serve as the basis for civil contempt, the district court nonetheless reasoned that "the fact that the TRO was legally unsound is no obstacle to a [criminal] contempt conviction."[4] *J.G.G. v. Trump*, 778 F. Supp. 3d 24, 39 (D.D.C. 2025). The court found probable cause that the government committed criminal contempt. On the district court's view, the TRO was a "clear and unequivocal" command "that anyone on a removal flight that had already landed abroad should not be discharged from U.S. custody and turned over to Salvadoran … authorities." *Id.* at 46. And the government had "willfully disobeyed" this directive. *Id.* at 54.

According to the district court, the only step left on the path to criminal contempt was to "identify the individual(s) responsible for the contumacious conduct" so the district court could ask the government to prosecute that individual or, if the government declined, "appoint another attorney to prosecute the contempt." *Id.* (quoting Fed. R. Crim. P. 42(a)(2)). The district court offered to forgo referral for prosecution if the government came into compliance with the district court's understanding of the vacated TRO, such as by asserting

---

[4] The district court explained its probable cause finding in a memorandum opinion, *J.G.G. v. Trump*, 778 F. Supp. 3d 24 (D.D.C. 2025), incorporated by reference in the accompanying Probable Cause Order (April 16, 2025). For simplicity, we refer to both the opinion and order as the "probable cause order."

custody over the affected detainees so they could challenge their removals.

The government petitioned for a writ of mandamus. We granted the petition and vacated the probable cause order because the district court had clearly exceeded its lawful authority. *J.G.G. v. Trump*, 147 F.4th 1044, 1045 (D.C. Cir. 2025) (per curiam). Judge Katsas concluded that because the TRO was insufficiently clear, there was no possibility for a criminal contempt conviction. *Id.* at 1046 (Katsas, J., concurring). Judge Rao concluded that the specific legal error consisted in leveraging the threat of criminal contempt to force the government's compliance with an order the Supreme Court had vacated. *Id.* at 1065 (Rao, J., concurring). Although the two judges in the majority identified different legal errors,[5] they agreed mandamus was appropriate and that criminal contempt proceedings in this area of foreign affairs raised grave separation of powers concerns. *J.G.G.*, 147 F.4th at 1059–60, 1062–63 (Katsas, J., concurring); *id.* at 1065–70, 1073 (Rao, J., concurring). Judge Rao also highlighted the "difficult questions that would arise from initiating criminal contempt against senior Executive Branch officials," and explained that "[i]f the district court chooses the problematic and uncertain path of criminal contempt, the government may seek relief

---

[5] Judge Katsas would have terminated the district court proceedings because no criminal contempt prosecution could result in a conviction. *Id.* at 1063 (Katsas, J., concurring). Judge Rao determined the mandamus remedy should be limited to vacating the probable cause order because mandamus must be tailored to remedying the specific harm at hand and, at that stage, the harm was the coercive effect of the probable cause order. *Id.* at 1072–73 (Rao, J., concurring); *see also U.S. ex rel. Greathouse v. Dern*, 289 U.S. 352, 359 (1933) (emphasizing that the "allowance [of mandamus] is controlled by equitable principles").

from this court to remedy any specific harms arising from the district court's actions." *Id.* at 1073 (Rao, J., concurring).

This court denied the plaintiffs' petition for rehearing en banc, and the writ of mandamus issued.

B.

After we issued the extraordinary writ of mandamus, the district court concluded it could and should pursue criminal contempt.[6] First, picking up where it left off in the vacated probable cause order, the district court ordered the parties to propose next steps in the court's criminal contempt inquiry, suggesting the government could "start" by providing "names of people [it] believe[s] had a role" in the decision to transfer custody. Nov. 19 Hr'g Tr. at 7–8. While maintaining that transferring custody of the detainees to El Salvador did not violate the TRO, the government identified Secretary Noem as the official responsible for the decision.

Unsatisfied, the district court next ordered the government to "submit declarations from all individuals involved in the decision not to halt the transfer of class members out of U.S. physical custody on March 15 and 16, 2025." Order Requiring Declarations at 2 (Nov. 28, 2025). The government complied by providing declarations from Secretary Noem and senior counsel at the Department of Justice and Department of Homeland Security. The declarations confirmed that the

[6] The district court reasoned it could proceed because only one judge found the probable cause order fatally ambiguous. Order Requiring Declarations at 1 (Nov. 28, 2025); *see* Nov. 19 Hr'g Tr. at 3. The court offered no explanation for why proceeding with criminal contempt was appropriate in light of the serious separation of powers concerns raised by both judges issuing mandamus and vacating the probable cause order.

Secretary made the decision after receiving legal advice from those attorneys. At that point, the government had provided everything the district court had indicated was necessary for the court to make a criminal contempt referral.

Rather than make a decision regarding referral, the district court again moved the goalposts. In its latest order, the court proposed further judicial investigation into whether the Secretary's "decision was a willful violation" of the TRO. Order Scheduling Hearings at 1 (Dec. 8, 2025) ("Hearing Order"). The district court sought live testimony to investigate "the bases of the decision to transfer the deportees out of United States custody." *Id.* The order directed the appearance of two witnesses who were counsel for the government at the time the TRO issued. The first witness filed a whistleblower complaint alleging misconduct by Justice Department officials involved in the litigation, while the second witness continues to serve as government counsel in the underlying litigation. The order explicitly permitted plaintiffs' counsel to participate in questioning the witnesses.[7]

Having already identified the responsible official and provided declarations, the government vigorously protested any further investigation. The government argued that the district court already had all the information it needed to make a referral and that any further investigation would usurp the Executive's prosecutorial power. In denying the government's motion for reconsideration, the district court explained that revisiting probable cause was warranted because this court had vacated the probable cause order and, in the whistleblower

---

[7] The district court vacated the scheduled hearings in response to this panel's administrative stay. The district court did not vacate the Hearing Order, and nothing suggests the hearings will not proceed if permitted by this court.

complaint, former counsel for the government had brought new evidence to light that implicated the question of willfulness. Order Denying Reconsideration at 2 (Dec. 12, 2025). Moreover, the court found the plaintiffs were "uniquely positioned to assist the Court" in its investigation, while admitting they could "have no role were an actual contempt prosecution initiated following a potential referral." *Id.*

The government again petitions for a writ of mandamus terminating the contempt proceedings.[8]

II.

A writ of mandamus is an "extraordinary remedy" reserved for "exceptional circumstances amounting to a judicial usurpation of power, or a clear abuse of discretion." *Cheney*, 542 U.S. at 380 (cleaned up). Mandamus may issue only if three requirements are met: (1) the petitioner has "no other adequate means" of relief; (2) there is a "clear and

[8] Although the government has styled its petition as one for a writ of mandamus, its request to halt the district court's criminal contempt inquiry is more precisely understood as a petition for a writ of prohibition. Formally speaking, a "writ of mandamus compels action not being taken, while a writ of prohibition, as its name suggests, orders a halt to action." *In re United States*, 143 F.4th 411, 423 n.1 (D.C. Cir. 2025); James L. High, *A Treatise on Extraordinary Legal Remedies* § 763 (1896) ("[M]andamus is an affirmative remedy, commanding certain things to be done, while prohibition is negative in nature and forbids the doing of certain things which ought not to be done."). Over time, judicial practice has collapsed the two writs, and, as a consequence, "[t]he grounds for issuing the two are virtually identical, and a petitioner need not precisely distinguish which writ he seeks." *In re United States*, 143 F.4th at 423 n.1 (cleaned up). We accordingly follow the parties in describing the relief the government seeks as a writ of mandamus.

indisputable" right to relief; and (3) the court is satisfied that mandamus is "appropriate under the circumstances." *Id.* at 380–81 (cleaned up).

"[S]pecial considerations control" when a mandamus petition implicates the "Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications." *Id.* at 385. Moreover, when evaluating the mandamus factors in a case implicating the separation of powers, we "must also ask … whether the District Court's actions constituted an unwarranted impairment of another branch in the performance of its constitutional duties." *Id.* at 390. When the "Executive Branch, at its highest level, is seeking the aid of the courts to protect its constitutional prerogatives," separation of powers considerations must inform our evaluation of entitlement to the writ. *Id.* at 385.

III.

Disregarding the reasons for the first writ of mandamus, the district court has now squarely launched a criminal contempt investigation against a senior Executive Branch official. The district court previously found that the government willfully violated the TRO and sought to identify the responsible official in order to make a referral for criminal contempt prosecution. The government has attested that Secretary Noem was the responsible official. Rather than decide whether to make a referral to the Department of Justice, the district court has ordered further investigation into high-level Executive Branch deliberations surrounding the events of March 15, 2025.

Mandamus is appropriate again to forestall unwarranted judicial intrusion into Executive Branch decisionmaking regarding matters of national security. First, the government has no other means to attain the relief it seeks because the

ordinary appellate process cannot adequately redress the harms created by the district court's unnecessary investigation. Second, the government has a clear and indisputable right to termination of this judicial investigation because it is premised on an order that is insufficiently clear and specific to sustain a charge of criminal contempt. Finally, mandamus is the appropriate remedy to halt the "antagonistic jurisdiction" assumed by the district court in pursuit of this improper inquest against the Executive. *See Ex parte Peru*, 318 U.S. 578, 588 (1943) (cleaned up); *Cheney*, 542 U.S. at 380–85.

A.

For mandamus to issue, the government must have no other adequate means to obtain the relief it seeks. The government now requests an end to the district court's ongoing criminal contempt proceedings. The government suggests the district court may refer Secretary Noem for prosecution if it believes contempt occurred. Nonetheless, the government maintains the district court's ongoing investigation exceeds its authority and trammels the separation of powers by intruding on the autonomy and constitutional prerogatives of the Executive Branch. Because immediate appeal is unavailable and review at a later stage would come too late to prevent these constitutional harms, we conclude that no adequate alternative means are available for the government to obtain relief from this improper inquest.[9]

---

[9] We have jurisdiction to issue the writ because this court would have jurisdiction over an appeal from a criminal contempt conviction. "Once there has been a proceeding of some kind that might lead to an appeal, we have jurisdiction to issue writs." *In re United States*, 143 F.4th at 422 (cleaned up); *see* 28 U.S.C. § 1651(a) (providing that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions"). The dissent does not dispute

As an initial matter, there is no order from which the government may immediately appeal to obtain review of the investigation. The Hearing Order is not a final decision. *See* 28 U.S.C. § 1291 (allowing appeals from "all final decisions" of federal district courts). Nor does it "finally determine" a specific claim collateral to the merits of the underlying case as required for interlocutory appeals under the collateral order doctrine. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). And it is not immediately appealable as an order with the "practical effect" of granting or denying an injunction. *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 83–84 (1981).

Furthermore, at this juncture, the harms of further judicial investigation cannot be remedied by a later appeal. When the Executive alleges judicial intrusion into its deliberations, courts must recognize "the paramount necessity of protecting the Executive Branch from vexatious litigation." *Cheney*, 542 U.S. at 382; *see also In re CFTC*, 941 F.3d 869, 872 (7th Cir. 2019) ("*Cheney* holds that mandamus is the appropriate remedy when a district court has authorized an inquest into the internal deliberations of the Executive Branch's senior officials."). In other circumstances, we have held that intrusion into government decisionmaking warranted immediate relief through mandamus. For instance, in *Cobell v. Norton*, we issued the writ to prevent the reappointment of a monitor to oversee an agency's compliance with a court order, explaining that "interference with the internal deliberations" of government officials was a harm that could not "be remedied by an appeal from the final judgment." 334 F.3d 1128, 1139–40 (D.C. Cir. 2003) (cleaned up). The Seventh Circuit similarly ruled that mandamus was necessary to terminate a district

---

this well-established ground for mandamus jurisdiction, a point that is analytically distinct from the question of whether the government has an adequate alternative to mandamus. *Cf.* Dissenting Op. 33–37.

court's investigation into the internal deliberations of a United States Attorney's office because a "swift end to this contretemps" between the court and the Executive was warranted. *In re United States*, 398 F.3d 615, 620 (7th Cir. 2005) (per curiam).

Review by mandamus may be particularly appropriate when a court seeks to investigate Executive Branch deliberations involving national security, foreign affairs, or diplomacy, matters constitutionally committed to the political branches, not the courts. *See Cheney*, 542 U.S. at 382. An "embarrass[ment]" to "the executive arm of the Government in conducting foreign relations" is precisely the kind of harm that calls for mandamus or prohibition relief because it cannot be remedied by an eventual appeal. *Ex parte Peru*, 318 U.S. at 588.

These separation of powers interests are front and center in this case involving the President's decisions under the Alien Enemies Act. The district court proposes to conduct further factfinding into high-level Executive Branch deliberations about the implementation of the President's directive to expel members of a foreign terrorist organization from the United States. The President found that members of Tren de Aragua are "perpetrating … an invasion or predatory incursion," "undertaking hostile actions[,] and conducting irregular warfare against the territory of the United States both directly and at the direction … of the Maduro regime in Venezuela." AEA Proclamation, 90 Fed. Reg. at 13034. Reflecting the sensitive nature of these determinations, the AEA "largely precludes judicial review." *J.G.G.*, 145 S. Ct. at 1005 (citing *Ludecke v. Watkins*, 335 U.S. 160, 163–64 (1948)) (cleaned up).

The AEA Proclamation has since been followed by broader diplomatic and military initiatives against the regime of Nicolás Maduro, in which United States forces captured Maduro and brought him to the United States to face conspiracy charges for narco-terrorism, cocaine trafficking, and possession of illegal weapons. Against this backdrop of ongoing military and national security initiatives undertaken by the Executive Branch, the district court proposes further probing into the decisionmaking that occurred on March 15, 2025. Such questioning is an "interfer[ence] with a coequal branch's ability to discharge its constitutional responsibilities," an interference that cannot be remedied by a later appeal. *Cheney*, 542 U.S. at 382.

Moreover, the district court continues to expand the scope of its investigation because it "certainly intend[s] to find out what happened on" March 15.[10] Nov. 19 Hr'g Tr. at 8. Resting nominally on the need to probe Secretary Noem's willfulness, the court's hearings also would allow plaintiffs' counsel to

---

[10] The district court justified further hearings on the ground that this court vacated the probable cause order and so inquiring about the Secretary's willfulness was appropriate before making a referral for prosecution. *See* Order Denying Reconsideration at 2; Dissenting Op. 30, 60 (emphasizing this justification). Such justification rings hollow, however, when the district court has not meaningfully addressed the arguments supporting the first writ of mandamus. The district court glossed over whether the TRO had the requisite clarity to support criminal contempt, *see J.G.G.*, 147 F.4th at 1046 (Katsas, J., concurring), and whether the pursuit of criminal contempt was appropriate in these circumstances, *see id.* at 1071–73 (Rao, J., concurring). Despite this court's admonition to respect the separation of powers in this sensitive inquiry against senior Executive Branch officials in the conduct of foreign affairs, the district court not only chose to squarely pursue criminal contempt but also expanded the scope of its investigation.

question government officials. Hearing Order at 2. Plaintiffs' counsel are of course not disinterested and in fact are continuing to seek the return of the expelled plaintiffs through a habeas corpus class action. *See, e.g.*, *J.G.G. v. Trump*, 2025 WL 3706685 (D.D.C. Dec. 22, 2025). Interested counsel are barred from participating in the prosecution of criminal contempt, as the district court recognized. This prohibition reflects the risk that interested parties may use the prosecutorial power for ends other than the "attainment of justice," such as "gather[ing] information of use" in other lawsuits. *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 790, 806, 814 (1987).

The participation of opposing counsel in the *investigation* of criminal contempt is similarly improper in these circumstances. Enabling interested plaintiffs to wield the sword of coercive investigation creates opportunities for "private interest to influence the discharge of public duty." *Id.* at 805. Throughout this contentious litigation, plaintiffs' counsel have made clear their desire to probe the decisionmaking of numerous senior officials at the Department of Justice and the Department of Homeland Security. *See* Plaintiffs' Resp. to Nov. 24 Order at 1–2 (Nov. 25, 2025) (providing list of nine "potential witnesses" that "is not intended to be exhaustive").

The proposed hearings anticipate airing whistleblower grievances and allowing plaintiffs' counsel to participate. These proceedings improperly threaten an open-ended, freewheeling inquiry into Executive Branch decisionmaking on matters of national security that implicate ongoing military and diplomatic initiatives. This judicial intrusion into the autonomy of a co-equal department cannot be remedied by a later appeal from a contempt conviction.

The government's imminent harms are amplified by the fact that the burden imposed by these hearings is wholly unnecessary for making a referral for criminal contempt. *See In re Clinton*, 973 F.3d 106, 113 (D.C. Cir. 2020) (explaining the "burden" and "complete irrelevance" of further depositions by former Secretary of State Hillary Clinton demonstrated there was no adequate alternative to mandamus). When first initiating proceedings to hold the government in contempt, the district court concluded there was probable cause that the government willfully violated the TRO. The district court explained that the *only* remaining step before making a referral for prosecution was to "identify the individual(s) responsible for the contumacious conduct." *J.G.G.*, 778 F. Supp. 3d at 54; *see also J.G.G.*, 147 F.4th at 1074, 1076, 1096 (Pillard, J., dissenting) (explaining the district court was seeking only to identify the individuals responsible for the allegedly contumacious conduct).

The government has identified Secretary Noem as the responsible official and also provided further declarations from other high-ranking officials. The district court now possesses the information it identified as necessary to make a referral for prosecution.[11] Any further judicial investigation is irrelevant,

---

[11] We do not dispute that a district court may, incidental to its referral authority, undertake some limited factfinding before making a referral for criminal contempt. Nevertheless, the district court has only the power to refer a person for criminal contempt, not the power to prosecute it. Ignoring this distinction, the dissent maintains further "responsive factfinding" is proper because the government's declarations were inadequate and "contradictory." Dissenting Op. 77. Yet the dissent provides no evidence for this assertion. The declarations clearly state that Secretary Noem made the decision on advice of attorneys other than government trial counsel, and the representations made by trial counsel on March 15 are wholly consistent with those declarations. *Cf. id.* at 31 n.14. Furthermore,

which only bolsters the government's need for mandamus relief.

The Supreme Court has admonished this court not to wait for a confrontation between the Executive Branch and the courts to issue mandamus because "occasions for constitutional confrontation between the two branches should be avoided whenever possible." *Cheney*, 542 U.S. at 389–90 (cleaned up). The district court's improper and unnecessary investigation, with its shifting scope and justification, intrudes upon the Executive in a manner for which mandamus is the only adequate remedy.

B.

We also conclude the government's right to termination of these proceedings is "clear and indisputable." *Cheney*, 542 U.S. at 381 (cleaned up). A petitioner satisfies this requirement "if the challenged order constitutes a clear abuse of discretion." *In re Clinton*, 973 F.3d at 113 (cleaned up). The legal error at the heart of these criminal contempt proceedings demonstrates why further investigation by the district court is an abuse of discretion. Criminal contempt is available only for the violation of an order that is clear and specific. The TRO did not clearly and specifically bar the government from transferring plaintiffs into Salvadoran custody. The TRO therefore cannot support criminal contempt, and the district court clearly abused its

---

the dissent characterizes the hearings as mere "inconveniences," *id.* at 38, but nowhere explains why further judicial investigation into Executive Branch decisionmaking is necessary or appropriate in these circumstances in which separation of powers concerns are at their apex, *see Cheney*, 542 U.S. at 380–85.

discretion by launching this inquest into the decisionmaking of senior Executive Branch officials.

1.

Criminal contempt premised on the violation of a court order has three elements: "(1) the order must be clear and reasonably specific; (2) the defendant must have violated the order; and (3) the violation must have been willful." *United States v. Rapone*, 131 F.3d 188, 192 (D.C. Cir. 1997); *see also* 3A Wright & Miller, *Federal Practice & Procedure* § 708 n.6 (4th ed. Sept. 2025 update) (explaining that courts have largely converged on these elements).

Although the district court has focused its investigation on willfulness, the legal error in these proceedings centers on the first element. A clear and specific order is an essential prerequisite to criminal contempt. "[C]ontempt is a severe remedy, and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct." *Calif. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885). "[B]efore one may be punished for contempt for violating a court order, the terms of such order should be clear and specific, and leave no doubt or uncertainty in the minds of those to whom it is addressed." *In re Brown*, 454 F.2d 999, 1008 n.49 (D.C. Cir. 1971) (cleaned up). These limitations reflect the "fundamental principle that no citizen should be … subjected to punishment that is not clearly prescribed." *United States v. Santos*, 553 U.S. 507, 514 (2008) (Scalia, J., plurality opinion); *cf. Taggart v. Lorenzen*, 139 S. Ct. 1795, 1802 (2019) ("[B]asic fairness require[s] that those enjoined receive explicit notice of what conduct is outlawed before being held in … contempt.") (cleaned up). For a judicial order "[t]o serve as a valid basis for [criminal] contempt, the court's direction must be clear and unequivocal at the time it is

issued."[12] *Traub v. United States*, 232 F.2d 43, 47 (D.C. Cir. 1955).

In determining whether a judicial order has the requisite clarity and specificity for criminal contempt, we review the language de novo, objectively, and without deference to the district court. *See United States v. Young*, 107 F.3d 903, 907 (D.C. Cir. 1997); *cf. Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Eastern Airlines, Inc.*, 849 F.2d 1481, 1485 (D.C. Cir. 1988) (holding the scope of an injunction is "a question of law to be determined by the independent judgment" of the court) (cleaned up). Any ambiguities must be resolved in the alleged contemnor's favor. *See Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971) (per curiam) ("The longstanding, salutary rule in contempt cases is that ambiguities and omissions in orders redound to the benefit of the person charged with contempt."); *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir. 1991) (same).

2.

The district court is investigating alleged criminal contempt based on the government's transfer of the plaintiffs to Salvadoran custody. Because the TRO did not clearly or

---

[12] The dissent agrees that "[c]ontempt will only lie 'if the putative contemnor has violated an order that is clear and unambiguous.'" Dissenting Op. 66–67 (citing *United States v. NYNEX Corp.*, 8 F.3d 52, 54–55 (D.C. Cir. 1993)). But the dissent provides no support for its remarkable suggestion that an order must have greater clarity to support civil contempt than criminal contempt. *Id.* at 65 n.22.

specifically prohibit the transfer of custody, it cannot support the ongoing criminal contempt investigation.[13]

The TRO's restriction provided in full: "The Government is ENJOINED from removing members of [the] class (not otherwise subject to removal) pursuant to the Proclamation for 14 days or until further Order of the Court." In its first contempt order, the district court explained that "[t]he fair reading of the TRO is that it only prevented class members' *transfer* from American into foreign custody." *J.G.G.*, 778 F. Supp. 3d at 50 (emphasis added). Following our first writ of mandamus, the district court continues to interpret the TRO as prohibiting the government from "relinquish[ing] physical custody of the men." *J.G.G.*, 2025 WL 3706685, at *2. The alleged contempt therefore turns entirely on whether transfer of custody was barred by the TRO.

"In determining whether an order is sufficiently clear and specific to justify a contempt conviction, we apply an objective standard that takes into account both the language of the order and the objective circumstances surrounding the issuance of the order." *Young*, 107 F.3d at 907. The intentions and unstated purposes of the district court cannot provide the basis for criminal contempt.

Starting with the text of the order, it said nothing at all about transferring the plaintiffs out of the custody of the United States. There was no specific directive as to what the government had to do with the plaintiffs who were already outside of the territorial United States. The district court maintains the TRO prohibited the government from

[13] In reviewing the first contempt order, Judge Katsas analyzed the lack of clarity in the TRO, and we draw on that analysis here. *See J.G.G.*, 147 F.4th at 1051–57 (Katsas, J., concurring).

relinquishing custody, but the TRO says nothing about custody. Criminal contempt cannot lie for transferring custody when the TRO was entirely "silent" as to that requirement. *See Broderick v. Donaldson*, 437 F.3d 1226, 1234 (D.C. Cir. 2006).

Despite the absence of an explicit directive against transferring custody, the district court insists that the order barring "removing" the plaintiffs somehow also prohibited transferring them out of United States custody, particularly when understood in light of the emergency hearing. *J.G.G.*, 778 F. Supp. 3d at 42–47. An objective interpretation of the TRO's text and surrounding circumstances, however, fails to provide a clear directive not to transfer custody of the plaintiffs.

To begin with, the ordinary meaning of "remove" refers to a change in territorial location, not custody. Both legal and lay dictionaries confirm that "removing" an individual means to move him from one place to another. *See, e.g.*, *Removal*, Black's Law Dictionary (12th ed. 2024) ("The transfer or moving of a person or thing from one location, position, or residence to another."); *Remove*, Merriam Webster's Collegiate Dictionary (12th ed. 2025) ("[T]o change the location, position, station, or residence of."); *Remove*, Oxford English Dictionary (2d ed. 1989) ("To take away, withdraw, from a place, person, etc."); *see also J.G.G.*, 147 F.4th at 1052 (Katsas, J., concurring).

The legal context of this case, involving the expulsion of aliens pursuant to the President's AEA Proclamation, similarly confirms the understanding that "removing" refers to removal from United States territory. When the President faces an "invasion or predatory incursion … against the territory of the United States" and "makes public proclamation of the event," the AEA authorizes him "to provide for the removal of" enemy aliens. 50 U.S.C. § 21. Under certain circumstances, the AEA

also authorizes federal courts to order covered aliens "be removed out of the territory of the United States." *Id.* § 23. Upon an order by the President or a court, marshals must "cause[] a removal of such alien[s] out of the territory of the United States." *Id.* § 24. Removal under the AEA, which is what these detainees were facing, means removal from United States territory.

Moreover, the TRO also explicitly referenced other types of removal under immigration law by enjoining the government from "removing members of [the] class (*not otherwise subject to removal*)." The phrase "not otherwise subject to removal" refers to other statutory removal authorities, which in turn use "removal" in the territorial sense. For instance, the Immigration and Nationality Act ("INA"), the statutory authority for most deportations, incorporates a territorial conception of removal. *See, e.g.*, 8 U.S.C. § 1101(g) ("[A]ny alien ordered deported or removed ... who has left the United States, shall be considered to have been deported or removed in pursuance of law, irrespective of … the place to which he departed."). In the immigration context, to "remove" an alien means to expel an alien from the physical territory of the United States.

The TRO prohibited "removing" detainees "pursuant to the [AEA] Proclamation," a directive that government officials would naturally understand as prohibiting the removal of detainees from the territorial United States.[14] Because the two

[14] No one doubts the TRO provided a clear directive not to remove the plaintiffs from United States territory, and in fact, after the TRO issued, the government did not remove any additional detainees pursuant to the AEA. *J.G.G.*, 778 F. Supp. 3d at 34. The district court's criminal contempt inquiry does not (and cannot) rest on the government's removal of the detainees from the territorial United States because that occurred before the TRO issued.

planes were outside United States airspace when the TRO issued, no further "removal" was possible.[15] And the TRO provided no directives whatsoever with respect to the plaintiffs outside the United States. Nothing in the TRO clearly and specifically, much less unequivocally, prohibited the transfer of detainees to the custody of El Salvador.

The "objective circumstances surrounding the issuance of the order" largely confirm the plain meaning of the TRO. *See Young*, 107 F.3d at 907. Both the district court's first order, the one entered in the morning as to the named plaintiffs, and the relief the plaintiffs requested confirm that "removal" refers to removal from the territorial United States, as distinct from a transfer of custody. While some statements made at the hearing cut the other way, nothing in the hearing indicated that the district court's prohibition on removal clearly and specifically included a prohibition against transfer of custody.

Presented with a motion for emergency relief on March 15, the district court's first temporary restraining order expressly linked removal to the territorial United States, stating the government "shall not remove any of the individual Plaintiffs *from the United States* for 14 days." First Minute Order (emphasis added). Later that day, the district court issued the TRO underlying the current contempt dispute, which barred the government "from removing" members of the provisionally certified class. The most coherent understanding of the TRO in context is that both orders barred removal of detainees from the

---

[15] Our dissenting colleague does not dispute the ordinary meaning of "removal" or the definition of "removal" in the "legal context" of this case. Dissenting Op. 71. This concession is fatal to the dissent's attempts to redefine "removal" in light of the TRO's broader purposes because criminal contempt requires the violation of an "order that is clear and unambiguous." *Id.* at 66 (cleaned up).

territorial United States, even if the later TRO did not include the explicit "from the United States" qualifier. As Judge Katsas explained, an Executive Branch official reading the orders would not understand "*removing* under the second TRO [to mean] something different from *remove* under the first." *J.G.G.*, 147 F.4th at 1054 (Katsas, J., concurring). And certainly nothing in the TRO indicated that, by prohibiting "removal," the district court not only barred removal from the territorial United States but also *sub silentio* prohibited the transfer of custody.

Furthermore, the relief the plaintiffs requested reinforces the natural reading that "removal" referred to expulsion from United States territory. The plaintiffs sought two distinct remedies. First, they proposed an order instructing the government "not to remove Plaintiffs … from the United States pursuant to the Alien Enemies Act." Proposed TRO at 1 (Mar. 15, 2025). Second, the plaintiffs requested an order providing that "insofar as any Plaintiffs … *have already been removed* from the United States pursuant to the Alien Enemies Act, *but remain within the custody*, control, and or/jurisdiction of the United States, such individuals shall be *returned* to the United States." *Id.* at 2 (emphases added). The plaintiffs' requested relief explicitly distinguished between "remov[al]" from the United States under the AEA and "return[]" to the United States. Importantly, the plaintiffs did not request an order requiring the government to retain custody.

Faced with the plaintiffs' specific requests, the district court's written TRO enjoined only removal and said nothing with respect to "returning" detainees or preventing the transfer of custody to El Salvador. Reading the TRO against the backdrop of the plaintiffs' requested remedies further confirms that when the district court barred "removing" class members, it referred to removal from the territorial United States and

refrained from ordering the government to do anything with regard to detainees already removed.

To be sure, statements made at the March 15, 2025, hearing provide some support for the idea that the district court was *contemplating* that any detainees who were removed would have to be returned to the United States. The district court told government counsel that "any plane containing these folks that is going to take off or is in the air needs to be returned to the United States." Mar. 15 Hr'g Tr. at 43. It added, "[h]owever that's accomplished, whether turning around a plane or not embarking anyone on the plane or those people covered by this on the plane, I leave to you." *Id.* While these oral statements were perhaps suggestive of some custodial responsibility, they did not clearly and specifically require the government to retain custody. Nor did the district court's oral statements clearly prohibit the transfer of custody or connect "removing" the plaintiffs to maintaining custody over them.[16]

Moreover, these oral statements were of limited value in light of the district court's assurance that it would "issue a minute order memorializing this so you don't have to race to write it down." Mar. 15 Hr'g Tr. at 42; *see id.* at 46 (district court repeating to counsel that it "will issue a minute order memorializing all of this"). And other remarks in the same hearing undercut the district court's most suggestive statements. For instance, the district court stated that "once [the detainees] are out of the country, I'm not sure what I can do

[16] Our dissenting colleague proposes a novel standard by which we should defer to the district court's interpretation of the TRO and allow the district court to expand the order's reach by invoking broader unstated purposes. Dissenting Op. 73–76. Such a deferential approach would be unprecedented in the context of criminal contempt and at odds with basic principles underlying criminal liability. *See supra* 20–21.

there." *Id.* at 36. The court's doubt as to this authority is reflected in the TRO, which in fact did not order anything with respect to detainees already out of the country.

When a district court makes oral statements that support two plausible interpretations of its order, the order will often be insufficiently clear to support criminal contempt. *See Traub*, 232 F.2d at 47 (holding order lacked requisite clarity for criminal contempt when "[a]t the hearing in which the direction was issued, the court made statements pointing both ways"). A government official seeking to understand the obligations imposed by the TRO would look to the written order as the district court directed, especially when the hearing transcript was not available until the next day. And that written order prohibited only removal from the territorial United States.

In sum, the TRO did not clearly or specifically prohibit the transfer of plaintiffs. Therefore, criminal contempt cannot lie for their transfer into Salvadoran custody.[17]

* * *

The district court has launched an intrusive criminal contempt investigation into whether the government acted willfully when it transferred suspected Tren de Aragua members to Salvadoran custody. But the end of this investigation is a legal dead end. The TRO simply said nothing about transferring custody, nor did the district court prohibit the transfer of custody in oral statements. In our constitutional system of government, criminal liability cannot turn on the unstated intentions (or post hoc assertions) of a district court judge. The pursuit of this improper investigation is a clear

---

[17] Because this ground is sufficient for mandamus, we do not address the government's other arguments that its right to relief is clear and indisputable. *Cf.* Dissenting Op. 42–63.

abuse of discretion that entitles the government to a writ of mandamus.

C.

Finally, in exercising our discretion to issue mandamus, we are "satisfied that the writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 381. Although mandamus must be reserved for extraordinary circumstances, it is an important tool to "forestall future error" in lower courts. *Colonial Times, Inc. v. Gasch*, 509 F.2d 517, 525 (D.C. Cir. 1975). The ordinary appellate process suffices to correct ordinary errors, but mandamus is appropriate when courts assume an "antagonistic jurisdiction." *Ex parte Peru*, 318 U.S. at 588 (cleaned up).

The writ has historically provided a mechanism for accountability and supervision within the Judiciary. In cases implicating the separation of powers, mandamus has been used to prevent lower courts from intruding into the province of the Executive through what amounts to a "judicial usurpation of power." *Cheney*, 542 U.S. at 390 (cleaned up); *see id.* at 389–90 (recognizing interbranch confrontations "should be avoided whenever possible"). By keeping lower courts within their lawful sphere, mandamus may also serve to protect the independence of the Judiciary.

The district court's widening and unnecessary inquiry into Executive Branch decisionmaking, conducted on the erroneous premise that the TRO is sufficiently clear and specific, is at least a clear abuse of discretion. *Cf. Ex parte New York*, 256 U.S. 490, 503 (1921) ("The want of authority in the District Court to entertain these proceedings … is so clear … that instead of permitting them to run their slow course to final decree, with inevitably futile result, the writ of prohibition should be issued."). Mandamus is appropriate to "halt … the

inquest" and relieve the Executive Branch of this improper intrusion into its constitutional prerogatives. *In re United States*, 398 F.3d at 617.

The Supreme Court has long recognized mandamus may be used to prevent judicial actions that would "threaten the separation of powers by embarrassing the executive arm of the Government" or that would interfere with the Executive Branch's conduct of its internal affairs. *Cheney*, 542 U.S. at 381 (cleaned up); *see also Ex parte Peru*, 318 U.S. at 587 (holding mandamus may be appropriate when "the delay and inconvenience of a prolonged litigation" hinders "action of the political arm of the Government taken within its appropriate sphere"); *Cobell*, 334 F.3d at 1139–40 (finding mandamus appropriate when a district court "interfer[ed] with the internal deliberations" of an agency). More specifically, because the power to punish contempt is uniquely "liable to abuse," *Ex parte Terry*, 128 U.S. 289, 313 (1888), courts have issued mandamus to halt improper contempt proceedings directed against Executive Branch officials, *see In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1065–66 (D.C. Cir. 1998) (per curiam); *In re United States*, 398 F.3d at 617.

At this stage of the proceedings, the district court has received the information it sought from the government regarding the official responsible for transferring the detainees to Salvadoran custody. By continuing to selectively probe whether Secretary Noem acted willfully, the district court is encroaching on the prosecutorial role. This inquest pushes the boundaries of what is permissible under Rule 42, which requires that contempt committed outside the court's presence "be prosecuted by an attorney for the government." Fed. R. Crim. P. 42(a)(2). "[W]hen a prima facie case of criminal contempt has been made out, and the contempt is not committed in the judge's presence[,] … the judge must turn the

matter over to a prosecutor." *In re United States*, 398 F.3d at 618. This comports with the Constitution's allocation of the prosecution power to the politically accountable Executive. *See Trump v. United States*, 144 S. Ct. 2312, 2335 (2024) ("Investigative and prosecutorial decisionmaking is the special province of the Executive Branch.") (cleaned up); *United States v. Texas*, 143 S. Ct. 1964, 1971 (2023) ("The Executive Branch—not the Judiciary—makes arrests and prosecutes offenses on behalf of the United States."). The government has acknowledged the district court could refer the alleged contemnor for prosecution by the Department of Justice. Instead, however, the district court has embarked on further judicial factfinding and investigation, all in service of vindicating a TRO that lacks the clarity and specificity to support criminal contempt.

Indeed, this court has granted mandamus for far less. We held mandamus was appropriate in a Freedom of Information Act suit. In *In re Clinton*, we halted discovery seeking further information from former Secretary of State Hillary Clinton relating to the attack on the American Embassy in Benghazi. 973 F.3d at 109–11. We emphasized that "[t]he mere suspicion of bad faith on the part of the government cannot be used as a dragnet to authorize voluminous discovery that is irrelevant to the remaining issues in a case." *Id.* at 114. Because the "topics [were] completely attenuated from any relevant issue," further discovery into Secretary Clinton's motives had to be stopped. *Id.* at 115–16. We concluded the demanding standards for mandamus were satisfied even without taking account of the potential separation of powers concerns raised by civil discovery targeting a former Secretary of State. *See id.* at 113.

Mandamus is all the more appropriate here, when the district court is expanding its investigation of criminal contempt in a national security context squarely within the

purview of the Executive. At this stage of the proceedings, this improper inquest is doubly irrelevant. First, the district court already possesses all the information it had represented was necessary, so further investigation is irrelevant to the only decision before the district court, that is, whether to make a referral for criminal contempt. Second, any referral for prosecution faces a dead end because the TRO did not clearly and specifically say anything about transferring custody of the detainees and therefore cannot support a charge of criminal contempt.

As these shifting and expanding proceedings demonstrate, the district court has assumed an improper jurisdiction antagonistic to the Executive Branch. Mandamus is appropriate to halt the district court's inquest.

* * *

For the foregoing reasons, we issue the writ of mandamus to confine the district court to its lawful jurisdiction and terminate these criminal contempt proceedings.

*So ordered.*

WALKER, Circuit Judge, concurring:

In an oral order, the district court limited what the Government could do with certain aliens covered by a recent presidential proclamation. Some of the covered individuals were inside the United States, and others were on planes, in flight, outside U.S. air space. Less than an hour after the oral order, the district court issued a written order that prohibited the removal of certain aliens *currently* in the United States. But unlike the oral order, the written order did not protect anyone already removed from U.S. territory. It prohibited only future removals and said nothing about those already removed.

After the written order, the Government took actions that the oral order had arguably prohibited (and that the written order did not prohibit). So if the effect of the (broader) oral order survived the (narrower) written order, the Government's conduct would raise a host of difficult questions. But before issuing its oral order, the district court said, **"I will issue a minute order memorializing this so you don't have to race to write it down."**[1]

In my view, the district court's **"you don't have to . . . write it down"** line simplifies this otherwise complicated case because it made the written order supersede the oral order. The Government did not violate the oral order *while it was in effect*. And at no point did the Government violate the written order that superseded it.

I join Judge Rao's opinion in full. However, I write separately to emphasize just one point: the importance of the district court's **"you don't have to . . . write it down"** line.

---

[1] March 15 Hearing Transcript at 42:22-23, ECF No. 20. Record citations refer to the district court proceedings, *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C. Mar. 15, 2025).

* * *

On February 20, 2025, the Secretary of State designated Tren de Aragua as a Foreign Terrorist Organization.[2] Then, on March 14, the President issued a Proclamation invoking the Alien Enemies Act.[3] It directed officials to "remove" certain members of Tren de Aragua from the United States.[4]

The next day, Saturday March 15, five plaintiffs sued in the U.S. District Court for the District of Columbia to challenge the Proclamation.[5]

The district court needed to make a quick decision. The facts on the ground were changing, jurisdiction was unclear, and the merits depended on the meaning of a statute from the 1700s that hadn't been invoked in the past 75 years.[6] I do not envy the position of any judge facing such time pressure to make hard and high-stakes legal decisions. Fortunately, the trial judge assigned to this case had more than two decades of judicial experience, with a widely respected record of dispassionate decisionmaking.

---

[2] *Foreign Terrorist Organization Designations*, 90 Fed. Reg. 10030 (Feb. 20, 2025).

[3] *Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua*, 90 Fed. Reg. 13033 (Mar. 20, 2025).

[4] *Id.* at 13034.

[5] Complaint, ECF No. 1.

[6] *See* Hearing Transcript at 11:8-13:6 (discussing uncertain facts and jurisdiction); *W.M.M. v. Trump*, 154 F.4th 207, 215 (5th Cir.) (discussing prior invocations), *reh'g en banc granted, opinion vacated*, 154 F.4th 319 (5th Cir. 2025).

The district court issued an ex parte temporary restraining order the morning that the case was filed. The order did not cover the proposed class but instead was limited to the handful of individual Plaintiffs. It ordered the Government not to "remove any of the individual Plaintiffs from the United States for 14 days."[7]

The district court also scheduled a hearing by videoconference for later in the day.[8] At that hearing, the district court was informed that two planes carrying members of the proposed class — but not the "individual Plaintiffs"[9] — had departed for El Salvador.[10] Then, at 6:45 P.M., with the two departed planes already out of U.S. territory, the court provisionally certified a class of "noncitizens in U.S. custody who are subject to the [March 15] proclamation."[11] The court also announced that a temporary restraining order was appropriate.[12]

---

[7] Minute Order 1, Mar. 15, 2025.

[8] Minute Order 2, Mar. 15, 2025.

[9] Minute Order 1, Mar. 15, 2025.

[10] Hearing Transcript at 17:22-25 ("MR. GELERNT: We understand that two flights went to El Salvador this afternoon; one very recently, and then another flight is scheduled for 6:23, we believe, to Honduras, but we are not entirely sure.").

In a later decision, the district court concluded that "all evidence suggests" the two flights to El Salvador took off around 5:25 PM and 5:45 P.M. *J.G.G. v. Trump*, 778 F. Supp. 3d 24, 33 (D.D.C.), *mandamus granted, order vacated*, 147 F.4th 1044 (D.C. Cir. 2025).

[11] Hearing Transcript at 23:3; 42:18-21; *see J.G.G.*, 778 F. Supp. 3d at 34.

[12] Hearing Transcript at 42:16-17.

Before describing the temporary restraining order, the district court said, **"I will issue a minute order memorializing this so you don't have to race to write it down."**[13] In other words — and for good reason on a Saturday evening emergency Zoom hearing about momentous and unprecedented legal questions — the district court told the Government that a forthcoming written minute order, rather than any extemporaneous remarks, would tell everyone everything they needed to know about what they were required to do.

The district court then spoke directly to the Government's attorney:

> [T]he first point is that . . . you shall inform your clients of this immediately, and that any plane containing these folks that is going to take off or is in the air needs to be returned to the United States, but those people need to be returned to the United States. **However that's accomplished**, whether turning around a plane or not [dis]embarking anyone on the plane or those people covered by this on the plane, **I leave to you**. But this is something that you need to make sure is complied with immediately.[14]

After issuing that oral order, the district court again assured the attorneys, "I will issue a minute order memorializing all of this."[15] Then at 6:53 P.M., the hearing concluded.[16]

---

[13] *Id.* at 42:22-23.

[14] *Id.* at 43:11-19.

[15] *Id.* at 46:9-10.

[16] *Id.* at 47:19.

At 7:25 P.M., the district court issued its written minute order.[17] The order read as follows:

> **The Government is ENJOINED from removing members of [the] class** (not otherwise subject to removal) **pursuant to the Proclamation** for 14 days or until further Order of the Court.[18]

Unlike the oral order, the written order made no mention of returning anyone to the United States or keeping custody over anyone already removed from the country.[19] In fact, it did not say *anything* about *anyone* already removed. It enjoined the Government only "from removing" people who had not *already* been removed.

* * *

To see why the Government did not violate the oral order or the written order, start with the oral order. While that order was in effect, the Government complied with it. Then the written order superseded it.[20]

---

[17] *See J.G.G.*, 778 F. Supp. 3d at 42.

[18] Minute Order 3, Mar. 15, 2025 (emphasis added).

[19] *See* Majority Op. at 26-28.

[20] I agree with the dissent that the oral order required compliance before the written order was issued. *Cf.* Dissenting Op. at 21-22 n.8 (the district court said that "you shall inform your clients of this immediately" and that this "is something that you need to make sure is complied with immediately," and the Government counsel said that "the Government is now under a TRO") (cleaned up). But the dissent does not believe that the district court "notified the parties that a later written order would supersede its present oral order." *Id.* at 69 n.24. On that narrow, case-specific, factual question, we disagree.

Some accounts would suggest the Government violated the oral order the moment it failed to "turn the planes around."[21] After all, during the period the oral order was in effect, the planes were not "returned to the United States" before reaching El Salvador. Does that mean the Government violated the district court's oral order? No. Contrary to the predictably inaccurate commentary that plagues our better-first-than-accurate media era, the district court did not order the Government to turn the planes around, and today's dissent does not argue otherwise. Rather, the district court said one option was to turn a plane around immediately and *another equally acceptable option* was simply "not [dis]embarking anyone on the plane" when it reached El Salvador.

From 6:45 P.M. to 7:25 P.M. — from the time of the oral order to the time of the written order — the Government did "not [dis]embark[] anyone on [a] plane." So for that period, the Government did not violate the oral order. That much is undisputed.

* * *

Now consider the written order. At 7:25 P.M., it superseded the oral order. That is so because of the unique

---

[21] *See, e.g.*, Katherine Faulders, *Trump administration ignores judge's order to turn deportation planes around: Sources*, ABC News (March 16, 2025, at 18:54 ET), https://perma.cc/393Y-HUJC ("The verbal order . . . explicitly told the government to turn around any aircraft that had already departed the country if it was still in the air."); *A Judge Ordered Deportation Planes to Turn Around. The White House Didn't Listen.*, N.Y. Times (March 17, 2025), https://perma.cc/GC7T-9P4B ("If any planes were in the air, the judge said, they should turn back.").

facts of this case. The district court told the lawyers they had no need to **"write [the oral order] down,"** and that instruction makes sense only if the written minute order could be expected to say everything necessary.

Since the Government complied with the oral order at least until the court issued the written order — no one has said otherwise — and since the written order superseded the oral order, the important question is: What did the Government do to people covered by the written order once that order was issued?

The answer appears to be: Nothing. As the majority opinion explains, the written order covered only people who had *not already* been removed from the United States.[22] It prohibited the Government "from removing members of [the] class . . . pursuant to the Proclamation,"[23] and you cannot remove people who have *already* been removed.

There is no allegation in this case that the Government used the Proclamation to remove anyone not already removed when the written order was issued. So as far as we know, the class members not already removed by then started the day in Texas, ended the day in Texas, and (a year later) still have not been "remov[ed] . . . pursuant to the Proclamation" — even if the Government would very much like to have long-ago removed them.[24]

---

[22] Majority Op. at 26-28.

[23] Minute Order 3.

[24] *See A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1366 (2025) ("The detainees allege that . . . putative class members were served

That is enough to resolve this case. From the time between the oral order and the written order, the Government did not violate the oral order. Then, once the written order superseded it, the Government did not violate the written order. The upshot is that because the Government didn't violate an order, there are no witnesses to subpoena, no reasons to prosecute, and no people to hold in contempt.

* * *

Much of the ink spilled over this case concerns a question I have not yet addressed because the question is completely irrelevant to whether the Government can be prosecuted for contempt: What did the Government do to the people who were on the planes when the district court issued the oral and written orders?

At the time of the oral order — and later at the time of the written order — they were on planes, beyond U.S. airspace, in U.S. custody, and heading to Central America.[25] When their planes reached El Salvador, after the written

---

notices of AEA removal and told that they would be removed 'tonight or tomorrow.'").

The district court referred to a "third flight" which "reportedly took off" after the written order issued in a previous opinion. *See J.G.G.*, 778 F. Supp. 3d at 34. But it also noted in that opinion that "the Government maintains that all aboard were removed under authorities other than the Proclamation." *Id.* And in the orders under consideration in this case, the district court referred only to decisions about planes that had already departed at the time of the order. *See* Order (Nov. 28, 2025), ECF No. 196; Order (Dec. 8, 2025), ECF No. 200.

[25] *See* Majority Op. at 24-25.

order, the Government transferred them to Salvadoran custody.[26]

Why do I say that is irrelevant? Because they had *already* been removed when the written order was issued. Which means the written order didn't cover them. Which in turn means their transfer to Salvadoran custody didn't violate the written order (which, again, had superseded the oral order).

If the written order had been violated — or perhaps even if the oral order had been violated before it was superseded by the written order — the Government's conduct would raise a host of important questions. Those questions and others have been ably discussed by the district court, the Government, the plaintiffs, enough amici to field a football team, everyone on last year's panel, several judges concurring or dissenting from the denial of en banc review, the author of today's majority opinion, and our dissenting colleague.[27]

Many of those questions, however, are not properly presented. That's because the Government did "not [dis]embark[] anyone on [a] plane"[28] while the oral order was in effect. Nor has it "remov[ed] members of [the] class (not otherwise subject to removal) pursuant to the Proclamation"[29] since the written order was issued.

---

[26] *See id.* at 6.

[27] *See J.G.G. v. Trump*, 147 F.4th 1044 (D.C. Cir. 2025); *J.G.G. v. Trump*, No. 25-5124, 2025 WL 3198891 (D.C. Cir. Nov. 14, 2025) (denying petition for en banc review).

[28] Hearing Transcript at 43:17.

[29] Minute Order 3; *see also* Majority Op. at 24 n.14 (Government compliance).

Reaching that conclusion is hardly a "Hail Mary."[30] And at least for me, it does not depend on the (correct) assumptions and (correctly applied) canons of interpretation to which the dissent objects.[31] Nor does it require us to decide whether the oral version of the order or the written version of the order would control *absent* the district court's instruction to the Government: **"you don't have to . . . write it down."**[32]

Finally, a quick note about the consequences of today's decision for any future cases: There are none. Though the dissent disagrees with the majority's interpretation of the district court's order, that disagreement does not turn on legal questions with enduring relevance for our jurisprudence. It turns instead on facts unique to this case, including the text of the written order and the district court's guarantee that the written order, once issued, would be the only order the Government needed to obey (or even **"to write . . . down"**).[33]

---

[30] *Cf.* Dissenting Op. at 63 ("the majority chooses the Government's Hail Mary pass").

[31] *Cf. id.* at 70-71.

[32] *Cf. id.* at 68-70, 68 n.23.

[33] Hearing Transcript 42:23.

CHILDS, *Circuit Judge*, dissenting: Contempt of court is a public offense, and the fate of our democratic republic will depend on whether we treat it as such. In the many forms in which it can be committed, contempt degrades the power that the People, through their Constitution and Congress, gave the federal courts. Without the contempt power, the rule of law is an illusion, a theory that stands upon shifting sands. For contempt offends not only the authority of whichever judge has been subjected to such incursions, but it also offends our system of governance. Addressing contempt is, therefore, a responsibility that is part and parcel of the court's duty to interpret and apply the laws of the governed.

And yet, a court's inquiry into contempt is a responsibility that can be just as difficult as it is sacred. The complexity of this task explains why, for some contempt proceedings, factfinding is required for a trial court to fairly identify contemnors, their contumacious acts, and then hold them accountable. Thus, we cannot judge the early actions of a trial court in such a proceeding heavy-handedly, for contempt of court is not addressed for the district court's vanity; it is done to preserve and enforce our law. As a court of review, we preserve the sanctity of these proceedings by reviewing judgments of contempt with an eye towards vindicating the dignity and authority of the courts while simultaneously respecting the individual liberties and rights of contemnors. Here, unfortunately, we have overstepped in adjudicating this balance of interests.

Today, we are not reviewing a judgment of contempt made by the trial court, nor are we even reviewing a referral for a contempt prosecution. Instead, we examine an interlocutory order from a district court that, irrespective of its rulings in the underlying case, is just trying to understand the events of a single weekend in March, including the actions which may have led to the willful violation of one of its orders. This is important because the district court's earlier attempt to identify

potential contemnors, make findings of fact, and address alleged contumacious behavior was rejected by an earlier panel of this court. In obedience to that earlier panel's writ of mandamus—which vacated its probable cause order and factual findings—the district court dutifully and carefully started on a clean slate, calling a hearing for testimony about the actions of the alleged contemnors. Unsurprisingly, testimony is a hallmark of the factual inquiry that judges of this court had identified as a proper step before initiating criminal contempt proceedings.

Instead of properly rejecting the current petition to end the district court's factual inquiry, the majority has determined that no further facts are needed because, as a matter of *law*, the alleged contemnors just *cannot* have committed contempt. In so doing, the majority has stymied the district court's inherent and statutory powers and done so in a way that will affect not only these contempt proceedings but will also echo in future proceedings against all litigants. Now, any litigant can argue, based on their preferred interpretation of a court's order, that they did not commit contempt before contempt findings are even made. And now, in any challenge where one may wave the wand of separation of powers, the Government knows it can petition this court for mandamus to relieve it from such proceedings. I cannot agree with an approach that sets such precedent.

Issuing the writ of mandamus against a lower court judge is a drastic and extraordinary remedy. *Ex parte Fahey*, 332 U.S. 258, 259 (1947). It has "the unfortunate consequence of making the judge a litigant, obliged to obtain personal counsel or to leave his defense to one of the litigants before him." *Id.* at 260. For this reason, in scenarios like this one we must be "unwilling to utilize [the writ] as a substitute for appeal." *Id.* Consequently, the Government owes this court a strong basis

to justify the slash of the writ's sword. Instead, it has given us a pittance, so much so that the majority largely declines to rely on the Government's arguments for this relief.

I find nothing in the petition before us to warrant the use of mandamus, especially at this interlocutory stage. The Government has failed to show that it has no other form of relief available to it. The Government has not shown that it has a clear and indisputable right to relief under controlling law, despite advancing several theories. Nor has the Government shown that mandamus is the appropriate relief for this court to provide under the circumstances before us. As a result, we should not grant a petition for a writ of mandamus here. And yet, the majority has done so.

There is no question that there could be much to fear in a factual inquiry about the actions of potential contemnors who may have defied a court order. However, that does not mean that this court must intervene to end a criminal case before it begins, even for the Executive Branch. Accordingly, I must respectfully dissent.

**I.**

**A.**

1.

The singularity of the powers contained in our common law writs cannot be overstated. The discussion the writs produce about the propriety and bounds of a superior court's power to command the actions of a person, agency, or lower court, is more than just an element of our constitutional order: it is the basis of our understanding of judicial power and judicial review. Thus, when the writ power is exercised, it is critical to reflect on its extreme nature, its history, and the

evolution of its usage in the United States. This is especially true in this case where this court has now not once, but twice, used the writ to demand that the district court comply with this court's judgment about the district court's inherent authority.[1] Only when placed in a historical context may we properly determine whether it is necessary and appropriate to employ the mandamus power here.

What history shows us is that the United States departed from the previous English tradition of using mandamus as a prerogative power. The federal judiciary's use of the writ is instead narrow and tailored to fit extreme circumstances. Moreover, the tradition of the writ of mandamus in the federal reports reflects other ways this power notably diverged from its common-law roots. It would behoove us to not use the writ hastily and thus return to what was the tradition of antiquity.

In thirteenth century England, the writ of mandamus began as essentially an executive action, meaning that the courts relied on the authority of the King to command the recipient of the writ to act in a certain way. Chester J. Antieau, 1 *The*

---

[1] The Government again requests a writ of mandamus rather than a more appropriate writ for the relief it seeks. A writ of mandamus is a plea for a command, asking a court to require a governmental body, in this case a lower court, to *do* something as justice requires. *Comm'r of Pats. v. Whiteley*, 71 U.S. 522, 526 (1866). Whereas a writ of prohibition, of course, *prohibits* a court from undertaking a certain action. *Smith v. Whitney*, 116 U.S. 167, 176 (1886). We have described these two writs as "counterpart[s]" to one another in that they are "used together by a higher court to bring a lower court back within its jurisdiction." *Morrow v. District of Columbia*, 417 F.2d 728, 733 (D.C. Cir. 1969). However, I will not amend the Government's petition, as the majority does, by converting this petition for mandamus into a petition for a writ of prohibition, even if there are similarities between the standards for granting these writs.

*Practice of Extraordinary Remedies: Habeas Corpus and the Other Common Law Writs* vol. 1, bk. 2, pt. 1, § 2.00, at 291 (1987); *see also id.* ("The King's prerogative was a part of the common law of England, and mandamus was a high prerogative writ."). In those times, the writ of mandamus was issued in the name of the King from the Court of King's Bench, a common-law court. *Id.* (explaining this process and how it was used in replacement of personal commands made by the King). Later, the writ of mandamus encompassed a broader spectrum of commands in the public good. *See* James Bagg's Case (1615) 77 Eng. Rep. 1271, 1277–78 (KB) (Lord Chief Justice Edward Coke using mandamus to direct a mayor and council to restore James Bagg to his municipal office). The English mandamus jurisprudence was then imposed and maintained in the thirteen colonies and was then replicated in both state and federal law.

However, crossing the midnight blue of the Atlantic and then shrugging off the yokes of the King changed both the source and the scope of the judicial power to issue the writ. These changes involved more than converting the prerogative writs into injunctive orders provided by statute or implied by the same. *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 620–22 (1838) (marking this evolution); *id.* at 622 (Mandamus "is not exercised, as in England, by the king's bench, as having a general supervising power over inferior courts.").

In the United States, mandamus is the embodiment of the court's authority to command or correct action after it has been shown that such a command is required by law. Antieau, *supra* at § 2.02, at 293. Its power flows from the law written and ratified in Article III of the Constitution and developed by statute in the Judiciary Act of 1789. U.S. Const. art. III, §§ 1, 2, cl. 1; Judiciary Act of 1789, ch. 20, § 14, 1 Stat. 73, 81–82 (providing the courts the power to issue writs "necessary for

the exercise of their respective jurisdictions, and agreeable to the principles and usages of law"). Thus, mandamus is a tool to enforce the expectations of the governed against the government to whom they consented to be ruled by. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 166 (1803) (holding that the judicial power is to determine if one possesses a vested legal right, and if so, one may come to the courts for remedy).

Thus, the federal judiciary may not issue writs to control or direct conduct that it, or the parties, feels is simply indecorous or unwise. The Federalist No. 78, at 523 (Alexander Hamilton) (J. Cooke ed., 1961) (The federal judiciary has "neither Force nor Will;" it exercises "judgment."); *Marbury*, 5 U.S. at 170 (The courts "decide on the rights of individuals."). Instead, the federal courts issue mandamus to control the exertions and abdications of power that contravene the law of the land: the Constitution, and the laws enacted thereunder. *See Marbury*, 5 U.S. at 176–78, 180.

With this historical context, I now turn to the modern iteration of the power to issue writs, which is found where it is codified, 28 U.S.C. § 1651. The statute provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." *Id.* § 1651(a). A feature of the modern writ, as the Supreme Court and this court have repeatedly noted, is that, even in alleged clashes between the branches of government, mandamus "is a 'drastic and extraordinary' remedy 'reserved for really extraordinary causes.'" *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (quoting *Fahey*, 332 U.S. at 259–60); *see also, e.g.*, *In re Flynn*, 973 F.3d 74, 78 (D.C. Cir. 2020) (en banc) (reiterating height of standard and denying writ); *In re Cheney*, 544 F.3d 311, 312–

13, 314 (D.C. Cir. 2008) (same); *In re Clinton*, 973 F.3d 106, 111 (D.C. Cir. 2020) (reiterating height of standard and denying writ as to one petitioner), *reh'g denied*, 973 F.3d 106 (D.C. Cir. 2020). Indeed, even in those scenarios we must be reluctant to use the writ because it "is one of 'the most potent weapons in the judicial arsenal.'" *Cheney*, 542 U.S. at 380 (quoting *Will v. United States*, 389 U.S. 90, 107 (1967)).

At minimum, the Supreme Court has indicated that "three conditions must be satisfied" to issue mandamus relief. *Id.* (citing *Kerr v. U.S. Dist. Ct. For N. Dist. Of Cal.*, 426 U.S. 394, 403 (1976)). First, the party seeking "the writ [must] have no other adequate means to attain the relief [they] desire[]." *Id.* (alteration in original) (quoting *Kerr*, 426 U.S. at 403). Second, "the petitioner must satisfy the burden of showing that [their] right to issuance of the writ is clear and indisputable." *Id.* at 381 (citation modified) (quoting *Kerr*, 426 U.S. at 403). And third, "*even if* the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Id.* (emphasis added) (citing *Kerr*, 426 U.S. at 403 (citing *Schlagenhauf v. Holder*, 379 U.S. 104, 112 n.8 (1964))). "These hurdles, however demanding, are not insuperable," *id.*, but no petitioner can be pole vaulted over them, not even the federal government.

Thus defined, the writ is first and foremost not a gift to the persuasive, it must be used for the purpose of vindicating an irrefutable right. *In re Al Baluchi*, 952 F.3d 363, 369 (D.C. Cir. 2020) ("[E]ven if a petitioner's argument . . . pack[s] substantial force," we will deny mandamus if it "is not clearly mandated by statutory authority or case law." (citation modified)). This is because mandamus may not be used "to actually control the decision of the trial court." *Flynn*, 973 F.3d at 78 (quoting *Platt v. Minn. Mining & Mfg. Co.*, 376 U.S. 240,

245 (1964)). We must, therefore, be especially cautious to avoid using mandamus to correct what we perceive as an error on the merits. *I.C.C. v. U.S. ex rel. Campbell*, 289 U.S. 385, 394 (1933) (It is "elementary" that "to compel an adjudication in a particular way . . . is not the function of the writ."); *id.* at 393 (Mandamus cannot be used to correct "[e]rrors of law" in exercise of "essentially judicial" functions just like "errors of fact" may not be thus corrected.).

Given this history and tradition of our law, our responsibility here is to determine whether the district court has done a thing so extreme as to warrant the writ's command. Thus, we must examine the nature of the district court's contempt power, what little facts we know from the underlying record, and the serpentine procedural history of this case. Only then will we be able to determine if the district court has well and truly earned being controlled through mandamus.

2.

Contempt is a chimeric creature that often eludes clean description, but we must try to identify it before casting judgment on the district court's attempt to do the same. Contempt has been generally described as an action that affects "the due and orderly administration of justice" and the ability to "maintain[] the authority and dignity of the court." *Cooke v. United States*, 267 U.S. 517, 539 (1925); *see also* 3A *Wright & Miller's Federal Practice & Procedure* § 702 (4th ed. Sep. 2025 Update) ("Contempt of court is a willful disregard of the authority of the court." (citations omitted)).

Because of the clear dangers contempt poses to the court's authority to apply and interpret the law, the courts, *ex vi termini*, have the power to correct contempt. *Ex parte Robinson*, 86 U.S. 505, 510 (1873) ("The moment the courts of the United States were called into existence and invested with

jurisdiction over any subject, they became possessed" of the power to address contempt.). Yet, at common-law, the contempt power was ripe for abuse. *See* Sir John Charles Fox, The History of Contempt of Court 5 (1927) (referencing the unpublished decision in Almon's Case as the progenitor of this abuse); *id.* at 8–9 (Almon's Case describing the contempt power as derivative of the King's divine rights and station).

Distinct from the common-law tradition from which it originated, the federal courts' modern contempt power has been defined and limited by statute and case law. *Robinson*, 86 U.S. at 510; *see also Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826–27, 831–34 (1994) (collecting cases that afford protections for contempt proceedings); 18 U.S.C. §§ 401–402; Fed. R. Crim. P. 42; An Act Declaratory of the Law Concerning Contempts of Court, ch. 99, §§ 1–2, 4 Stat. 487, 487–88 (1831); Judiciary Act of 1789, ch. 20, § 17, 1 Stat. 73, 83 (1789). Accordingly, from the Founding, the law has been used to stave off the contempt power's potential for abuse.

Moreover, because contumacious behavior appears in many forms, it requires correction uniquely suited to the circumstances in which it arises. *See, e.g.*, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 38 (1991) (violation of a preliminary injunction); *Potter v. District of Columbia*, 126 F.4th 720, 722, 726 (D.C. Cir. 2025) (violation of a permanent injunction); *United States v. Gewin*, 759 F.3d 72, 74–75 (D.C. Cir. 2014) (failure to comply with order for criminal restitution and fine); *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, 637 F.3d 373, 376 (D.C. Cir. 2011) (sovereign's failure to comply with discovery); *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1143–44 (D.C. Cir. 2006) (refusal to comply with a subpoena after motion to quash was denied).

As evidenced by the examples herein, contumacious behavior is unique and can appear at many stages of myriad litigation. As a result, proceedings to address contempt seemingly refuse intelligible categorization. The Supreme Court has said that while contempt proceedings appear "criminal in [their] nature, in that the party is charged with doing something forbidden, and, if found guilty, is punished;" at the same time, they are "resorted to in civil as well as criminal actions, and also independently of any civil or criminal action." *Bessette v. W. B. Conkey Co.*, 194 U.S. 324, 326 (1904). To put it mildly, contempt proceedings are "*sui generis.*" *Id.*

Because contempt proceedings must be responsive to the underlying contumacious behavior and circumstances of the case, the law restricting the contempt power is, in turn, similarly responsive to prevent judicial abuse of it. Here, we consider the appeal of a factfinding order, which the district court has only indicated may help it determine whether to make a criminal contempt referral. Nevertheless, my colleagues have resolved this petition as if it were reviewing a conviction for indirect criminal contempt. These terms—"indirect" and "criminal"— refer to the mode of the contumacious acts and the corrective action the court may take to address the same. In addition, these terms inform us of the constraints, requirements, and expectations our law imposes on contempt proceedings. *Bagwell*, 512 U.S. at 830–34.

The term "indirect" contempt describes the site of the contumacious acts being addressed. Indirect contempt occurs outside of the immediate sphere of the court or its personal knowledge. *Id.* at 833 (noting that "further procedural protections are afforded for contempts *occurring out of court*" (emphasis added)); *see also Indirect Contempt*, *Contempt*, *Black's Law Dictionary* (12th ed. 2024) ("Contempt that is

committed outside court, as when a party disobeys a court order.”). Whereas its obverse, “direct” contempt, occurs essentially in the presence of the court. *Bagwell*, 512 U.S. at 832 (describing “petty, direct contempts in the presence of the court” (citations omitted)).

The term “criminal” contempt refers to what the penalties imposed on the contemnor are meant to vindicate. Criminal contempt proceedings vindicate the authority and dignity of the court. *Doyle v. London Guarantee & Accident Co.*, 204 U.S. 599, 604–05 (1907) (describing some contempt proceedings as “criminal and punitive in . . . nature” where “the government and the public are interested”). By contrast, the term “civil” contempt describes sanctions that are remedial, meant to address and benefit the underlying proceeding or its parties. *Id.* at 605 (defining civil contempt as “remedial [and] . . . coercive in its character[;] . . . chiefly concerned are individuals whose private rights and remedies are undertaken to be protected and enforced” by the court).

This court’s review of criminal contempt proceedings, both direct and indirect, takes a deferential form. For a *conviction* of criminal contempt under 18 U.S.C. § 401, the prosecuting authority must have proven beyond a reasonable doubt that the defendant contemnor “willfully violated a ‘clear and reasonably specific’ order of the court.” *United States v. Rapone*, 131 F.3d 188, 192 (D.C. Cir. 1997) (quoting *United States v. NYNEX Corp.*, 8 F.3d 52, 54 (D.C. Cir. 1993)); *accord United States v. Young*, 107 F.3d 903, 907 (D.C. Cir. 1997) (first citing *NYNEX*, 8 F.3d at 54; then citing *In re Holloway*, 995 F.2d 1080, 1082 (D.C. Cir. 1993)). This court reviews the sufficiency of the evidence *de novo*, viewing the facts in the light most favorable to the prosecutor and “asking whether a fair-minded and reasonable trier of fact [could] accept the evidence as probative of a defendant’s guilt beyond a

reasonable doubt." *Young*, 107 F.3d at 907 (alteration in original) (citations omitted). A sentence from a criminal contempt conviction is reviewed for an abuse of discretion.[2] *Holloway*, 995 F.2d at 1087 (citation omitted). We have never reviewed an interlocutory order in an indirect criminal contempt proceeding like the one before us, where no referral has been made and no contempt trial has even begun.

**B.**

Previously, my colleagues—in granting the first mandamus petition in this case, vacated the district court's previous contempt order, along with its factual findings.[3]

---

[2] Our review of civil contempt has taken a more variable form. *See, e.g.*, *Cobell v. Norton*, 334 F.3d 1128, 1135–36, 1146–47 (D.C. Cir. 2003) (review following a 29-day trial and opinion finding civil contempt of court); *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1065 (D.C. Cir. 1998) (recognizing that civil contempt orders are final and reviewable under 28 U.S.C. § 1291). *But see id.* at 1064–65 (allowing mandamus review before a final order was issued); *In re Clinton*, 970 F.3d 357, 363 (D.C. Cir. 2020) (same), *reh'g denied*, 973 F.3d 106 (D.C. Cir. 2020).

[3] There seems to be persistent confusion about vacatur, and what it means for the district court's order in *J.G.G. v. Trump*, 778 F. Supp. 3d 24 (D.D.C. 2025), *mandamus granted*, *vacated*, 147 F.4th 1044 (D.C. Cir. 2025) [hereinafter Probable Cause Order]. The answer is clear. The order does not exist; it is "void *ab initio* and thus lack[s] any prospective legal effect." *Hewitt v. United States*, 606 U.S. 419, 431 (2025) (citing *United States v. Ayers*, 76 U.S. (9 Wall.) 608, 610 (1869) (explaining that a vacated order is "null and void, and the parties are left in the same situation as if no trial had ever taken place")). We have certainly expressed our frustration before to district courts that have not heeded our vacatur and declined to start their contempt proceedings from scratch. *Cobell v. Norton*, 428 F.3d 1070, 1073 (D.C. Cir. 2005) ("In spite of our decision reversing the district court's contempt citations, the court made clear that it

Today, the majority opinion and my concurring colleague doubly wish to tell a precise tale of the events that led to the petition we now consider. Indeed, in considering today's petition, one of the benefits of this court's earlier vacatur is that no court has preceded us to deliver factual findings and conclusions of law. And both the majority and concurrence take great care with their factual recitations to assure us that no additional facts could support a criminal contempt conviction of contempt of any kind. I, for one, cannot be so sure. Consequently, in response to the statements of facts made by my colleagues and following our court's earlier vacatur, I believe a more detailed discussion of what occurred before this petition is warranted.

On March 14th, 2025, unbeknownst to all but a select few, a historic presidential proclamation was signed. Proclamation 10903, Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. 13,033 (Mar. 20, 2025) [hereinafter the Proclamation]. For just the third time in the history of this republic, a president invoked the Alien Enemies Act, 50 U.S.C. §§ 21–24 [hereinafter the Act]. And for the first time in our history, the Act was invoked in secret and without the United States' involvement in an armed conflict.[4]

While most of the United States was unaware of this historic moment, in the labyrinthine world of immigration custody, it was clear that something was underway. Before the

---

considered its findings of facts undisturbed."). Accordingly, it is improper to reference the Probable Cause Order for its findings, and no one can in good faith suggest that the district court is relying on the Probable Cause Order following vacatur.

[4] As the majority notes, on February 20th, 2025, Secretary of State, Marco Rubio, designated Tren de Aragua as a foreign terrorist organization. Majority Op. at 2 n.1.

Proclamation was even signed, several individuals, including the five Lead Plaintiffs in this case, J.G.G., G.F.F., J.L.G.O., W.G.H., and J.A.V., were being prepared for removal under the Proclamation's authority. In the first two weeks of March, Plaintiffs awaiting their immigration relief hearings were moved from detention centers as far west as Adelanto, California, and as far east as Goshen, New York, to South Texas. During this shuffle, many received the surprise that they were now considered members of Tren de Aragua (TdA). Others, not so lucky, were only interrogated about TdA by Immigration and Customs Enforcement without explanation.

By March 14th, 2025, the Lead Plaintiffs were detained at El Valle Detention Facility (El Valle) in Raymondville, Texas, which is about twenty-three miles from an airfield that is, in turn, less than fifteen nautical miles from the U.S.-Mexico border. Through whispers, they were informed that they would have no further review of their applications for immigration relief. Instead, they were told that they were to be deported to an undisclosed country of removal, potentially as soon as March 14th. Somehow, Plaintiffs informed counsel of their movements and the rumors of their imminent removal. Plaintiffs' counsel then discovered that these removals would be pursuant to a presidential proclamation invoking the Act.

At 1:12 A.M. on Saturday, March 15th, 2025, counsel for Plaintiffs filed a class action suit in the district court, seeking injunctive and habeas relief, as well as a temporary restraining order.[5] Around 8:00 A.M. that morning, the district court was assigned the case. The district court then promptly contacted counsel for the Federal Defendants. By 9:00 A.M., Plaintiffs'

[5] Unless otherwise indicated, all times mentioned are in Eastern Daylight Time.

counsel informed the district court that at least one Plaintiff was moved from El Valle.

By 9:30 A.M., all five Lead Plaintiffs in Texas had been awoken, changed, and shackled. Lead Plaintiffs were then placed on buses; none were informed of their destination, but all were driven to a nearby airfield. No Lead Plaintiff was able to speak to their counsel before being moved from El Valle to the airfield. What became clear in the Texas dawn was that the rumored removal of dozens of Venezuelan migrants had begun.

Though removal efforts were ongoing in Texas, this picture was not yet clear in Washington. At this time, the district court was attempting to reach the Government to no avail. At 9:40 A.M., the district court entered its first *ex parte* temporary restraining order, prohibiting the removal of the Lead Plaintiffs for fourteen days. Min. Order 2, Mar. 15, 2025.[6] The Government acknowledged and immediately appealed this minute order. From then on, the Government participated in the proceedings.

Fearing the fates of the members of the proposed class, at 10:15 A.M., Plaintiffs' counsel asked the district court for an emergency hearing to be held that day on their pending motion for class certification. Plaintiffs' counsel also requested that the district court issue a second temporary restraining order to cover the entire proposed class. The Government objected and instead asked for a hearing on Monday, March 17th, 2025. After considering the parties' requests, at 10:30 A.M., the district court scheduled an emergency hearing for that afternoon at 5:00 P.M.

---

[6] Unless otherwise indicated, all record citations reference the district court docket, *J.G.G. v. Trump*, No. 25-CV-766 (D.D.C. Mar. 15, 2025).

Meanwhile, Plaintiffs were being boarded on planes in Texas. After some time on the tarmac, an officer called the names of the Lead Plaintiffs and told them to deplane. Plaintiffs remained shackled and were then moved to a bus, where they stayed for several more hours. No one else deplaned and joined them on that bus and they were not permitted to have food or water. Lead Plaintiffs also could not speak with counsel or otherwise communicate that they were no longer on the planes.

Hours later, at 3:53 P.M., the White House produced the first publicly available copy of the Proclamation, the publication required by the Act. 50 U.S.C. § 21. At approximately 4:15 P.M., the district court was informed by Plaintiffs' counsel that they believed two flights were scheduled to depart that afternoon from South Texas. The Government offered no response to this communication.

At 5:00 P.M., the parties and the district court convened over Zoom for an emergency hearing. Min. Order 3, Mar. 15, 2025. Drew Ensign appeared for the Government. When asked, Mr. Ensign represented that the five Lead Plaintiffs would not be removed in the next fourteen days but would not confirm if there were other "removal flights" taking off that day with prospective class members. Hr'g Tr. at 4:23–5:5, 5:10–12, Mar. 15, 2025. The district court then directly asked Mr. Ensign whether there were "imminent deportations and removals under this proclamation planned," clarifying that when it said imminent, it meant "in the next 24 or 48 hours." *Id.* at 11:12–14. Mr. Ensign replied:

> Your Honor, I don't know the answer to that question. We can certainly investigate that and report that back to you. But I don't know that -- the answer to that. I know what plaintiffs have

> said to the clerk's office. I don't yet know -- have an ability to confirm that or, you know, contest that.

*Id.* at 11:15–20.

Taking the Government at its word, the district court asked Mr. Ensign when he could get the requested information about any imminent plane departures. Mr. Ensign replied that he would speak "ASAP" to his clients, the Federal Defendants, and that he would try to "find out that information." *Id.* at 11:23–25. The hearing thus adjourned for a recess until 6:00 P.M. to allow Mr. Ensign to speak with his clients. The time was 5:22 P.M.

Just minutes later, two planes were wheels up. At about 5:25 P.M., a flight of El Valle detainees left South Texas. Shortly thereafter, at 5:45 P.M., another flight departed. These planes were embarking on what would be a two-hour flight towards Honduras, with el Centro de Confinamiento del Terrorismo (CECOT), a prison in Tecoluca, El Salvador, another two hours away.

The hearing resumed at about 6:00 P.M. When asked to report on any flight details he gleaned from his clients, the Federal Defendants, Mr. Ensign stated the following:

> Your Honor, unfortunately I don't have many details to share. I have talked to the clients who let me know the sort of operational details as to what is going on with raised potential national security issues, particularly ones if discussed with a public line. So I do not have additional details I can provide at this time.

*Id.* at 15:8–13.

Mr. Ensign then suggested the propriety of an *in camera* hearing, which the district court allowed. However, *in camera*, Mr. Ensign repeated that there was nothing he could share at that time. When asked by the district court when the Federal Defendants would determine what information he could share *in camera*, Mr. Ensign said: "I don't know. I have been trying to get those details, and I don't presently know when I would be able to get that. I'm certainly trying to get that information, but that is not something, the details, that I know." *Id.* at 16:17–21.

At this point, Plaintiffs' counsel interjected, representing that it was their understanding that two flights had departed that afternoon and an additional flight would be departing at 6:23 P.M., which, at this point in the hearing, was minutes away. The Government did not contest this representation. It was then that the district court provisionally certified the class. After finding that Plaintiffs had met the standard for a class-wide temporary restraining order "on the expedited time frame," *id.* at 41:1–6, the district court ordered the following from the bench:

> I find that a TRO is appropriate for the class members, and it would be to prevent the removal of the class for 14 days or until further order of the Court. And the class will be all noncitizens in U.S. custody who are subject to the proclamation of March 15, 2025 and its implementation. And I will issue a minute order memorializing this so you don't have to race to write it down.
>
> So we need to talk about where we go from here because I want to revisit this after some more briefing. And again, these are hard questions,

> and I may end up coming out the other way on some of them after I have had more time to think about them and hear from both sides. But what I am tasked to do today is to make the best ruling I can under the law and the circumstances. And particularly given the plaintiffs' information unrebutted by the government that flights are actively departing and plan to depart, I do not believe that I am able to wait any longer and that I am required to act immediately, which I have done so.
>
> So, Mr. Ensign, the first point is that I -- that you shall inform your clients of this immediately, and that any plane containing these folks that is going to take off or is in the air needs to be returned to the United States, but those people need to be returned to the United States. However that's accomplished, whether turning around a plane or not embarking anyone on the plane or those people covered by this on the plane, I leave to you. But this is something that you need to make sure is complied with immediately.

*Id.* at 42:16–43:19. The temporary restraining order of the court was thus issued.

The district court, then, within seconds, repeated its order and its understanding of its subject-matter jurisdiction: "[a]gain, just so we are clear, *if planes have already landed and discharged their occupants*, aside from the five plaintiffs I enjoined earlier, then this order -- I don't have jurisdiction to

require their return."[7] *Id.* at 44:6–9 (emphasis added). The district court then checked Mr. Ensign's understanding to ensure that he knew that the temporary restraining order enjoined the Federal Defendants:

> The Court: Okay. So, Mr. Ensign, I want to hear from you *since you are now the party being restrained* what you would like to do in terms of briefing and hearing.
>
> Mr. Ensign: Your Honor, offhand, I think we would be prepared to file a brief Monday night. We could potentially do so earlier, but in particular, many of the people subject to this order, many, most, or all of them are incredibly dangerous individuals, and so we would like to be able to develop that as appropriate to --
>
> The Court: No, given -- let me just say, as I said, *you are the one being restrained*, so I will give

[7] My colleague, in his concurrence, insists that the district court gave the Government and Federal Defendants options for compliance with the injunction, and the Government chose the option for compliance that did not involve the class members' mid-flight return. Putting to one side whether that is the proper way for a *party* to consider its compliance with an *injunction*, my colleague points to precisely the moment when the court minced no words about how the Government and Federal Defendants were to be bound. The court did not give options for compliance; rather it enumerated the ways to comply with its order. It needed to do so because there were facts only the Government knew and was *refusing to disclose*, including if there were removal flights and where those flights were. *See* Hr'g Tr. at 44:6–9, Mar. 15, 2025 ("Again, just so we are clear, if planes have already landed and discharged their occupants, aside from the five plaintiffs I enjoined earlier, then this order -- I don't have jurisdiction to require their return.").

> you as much time as you want because *you are the one now who's being disadvantaged*, so it's your motive to expedite.

*Id.* at 44:18–45:7 (emphasis added).

Tellingly, Mr. Ensign made the following reply in response to the court's clarifications:

> Thank you, Your Honor. Could we tentatively set, you know, Monday night, and then we will inform the Court if we think we need additional time, and then we would ask that the plaintiffs' response be on a similarly expedited basis *given that the government is now under a TRO*.

*Id.* at 45:8–13 (emphasis added).

The district court stated that it would issue a minute order to memorialize the proceedings.[8] The hearing thus concluded

---

[8] My concurring colleague writes to "separately emphasize," Concurring Op. at 1, the district court's use of the words "I will issue a minute order memorializing this so you don't have to race to write it down," *id.* at 42:22–23, shortening it sometimes to "you don't have to . . . write it down," *see, e.g.*, Concurring Op. at 1 (citing *id.*). The concurrence concludes that this sentence indicated that a "forthcoming written order" would bind the Federal Defendants, *id.* at 4, rather than anything else, including the district court saying seconds earlier, "you shall inform your clients of this immediately," Hr'g Tr. at 43:11–12, Mar. 15, 2025, or saying to the Government that the injunction "is something that you need to make sure is complied with immediately," *id.* at 43:18–19. Nor does my colleague seem persuaded by Government counsel stating on the record that "the [G]overnment is now under a TRO," *id.* at 45:12–13, and asking for expedited briefing on that basis. In my view, my colleague's focus on this language only separately emphasizes the

at 6:53 P.M. At 7:25 P.M., the court released the following minute order:

> *As discussed in today's hearing*, the Court ORDERS that: 1) Plaintiffs' Motion for Class Certification is GRANTED insofar as a class consisting of "All noncitizens in U.S. custody who are subject to the March 15, 2025, Presidential Proclamation entitled 'Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua' and its implementation" is provisionally certified; 2) The Government is ENJOINED from removing members of such class (not otherwise subject to removal) pursuant to the Proclamation for 14 days or until further Order of the Court; 3) The Government shall file any Motion to Vacate this TRO by March 17, 2025, with Plaintiffs' Opposition due by March 19, 2025 . . . So ORDERED.

Min. Order 4, Mar. 15, 2025 (emphasis added).

It was about ten minutes later that another plane took to the sky.[9] While it is still not clear from the current record just

---

importance of not parsing the words of a hearing without context. The Government and Federal Defendants knew they were immediately bound, regardless of whether they pressed pen to paper for their own commemoration.

[9] In his concurrence, my colleague assures us that there is no allegation that the third flight violated the court's order. However, that is not for us to say before factfinding, especially given the Federal Defendants' recent difficulties with, and related inconsistencies about, the tracking of persons it left in El Salvador, including even the number of those left there and those sent on the

how many flights took off that day, it appears this was at least the third plane with Venezuelan migrants aboard.[10] About an hour after takeoff, at 8:37 P.M., the last event on the docket for the night occurred: the Government's appeal of the district court's fourth minute order, the second temporary restraining order, to this court. Notice of Appeal 2, Mar. 15, 2025.

By the early hours of March 16th, 2025, at least three planes were touchdown in El Salvador.

**C.**

The rest of the story of this petition begins a little later on March 16th, and it starts with an unsworn notice from the Government. It stated that the "Federal Defendants were promptly notified of the Court's temporary restraining order issued in the morning and the 7:26 [P.M.] EDT minute order." Gov't's Notice to the Ct. at 1, Mar. 16, 2025. The notice also stated the following: "Federal Defendants further report, based on information from the Department of Homeland Security, that some gang members subject to removal under the Proclamation had already been removed from United States territory under the Proclamation before the issuance of this

---

third plane. *Contrast* Notice in Resp. to Ct. Order at 1, Mar. 18, 2025, *and* Cerna Decl. ¶ 6, *with* Rubio Decl. ¶ 2.

[10] To this day the Government will not affirmatively state how many planes departed, instead relying on others' representations of the facts. For instance, in their petition for mandamus, the Government cites an opinion of a judge of this court and the district court's vacated probable cause order. Gov't Pet. 6 ("Two AEA flights had departed from the United States *before* the TRO, and even before the court's oral directives.") (first citing *J.G.G. v. Trump*, 147 F.4th 1044, 1051 (D.C. Cir. 2025) (Katsas, J., concurring in the judgment) [hereinafter *J.G.G.*]; then citing Probable Cause Order at 34).

Court's second order." *Id.* The following day, Plaintiffs responded to this notice, providing evidence to suggest that the Federal Defendants violated the court's second order.

The district court scheduled a hearing for the evening of March 17th, directing the Government to be prepared to answer questions about the Federal Defendants' alleged violation of the court's order. Min. Order 1, Mar. 17, 2025; Min. Order 2, Mar. 17, 2025. The Government then made an unsolicited response, stylized as a reply and motion to vacate the hearing. The Government argued that its first notice was sufficient to assure the court of the Federal Defendants' compliance. Yet the Government again claimed it was not bound by the court's order issued during the March 15th hearing. Additionally, the Government argued that any class member in flight at the time of the court's order was removed within the meaning of the Act, and, therefore, excluded from the injunction.

The district court denied the Government's motion to vacate the hearing. Min. Order 3, Mar. 17, 2025. At the hearing, the district court stated that its purpose was "solely to perform fact finding about the government's compliance with [its] orders." Hr'g Tr. at 4:21–22, Mar. 17, 2025. First, the district court asked the Government to confirm on the record that the five Lead Plaintiffs were in the United States, which the Government did. The court then asked if the Government still wished to represent that the flight that took off after the court's order contained persons removable on grounds other than the Proclamation's authority. The Government confirmed this and later swore it in a declaration made under court order.

However, when asked, the Government declined to confirm how many planes departed from the United States pursuant to the Proclamation, declaring it was not at liberty to disclose that information to anyone, including the court. The

Government did not invoke a privilege to justify its nondisclosure, even when *the court* suggested the Government may be referring to the state secrets privilege.[11]

The next day, the Government offered to provide additional details about flights that took off before the written order through *in camera* and *ex parte* declaration. Shortly after the Government's March 18th notice, the district court ordered the Federal Defendants to make their offered declaration and to also provide the number of individuals transferred out of U.S. custody solely under the Proclamation's authority. Min. Order, Mar. 18, 2025. Hours before the filing deadline for the declaration the Government offered to make, it filed an emergency motion to stay or delay the court's previous order. The Government argued that it need not comply because *this* court would likely stay the district court's temporary restraining orders. Also, the Government stated—for the first time—that the Federal Defendants *might* invoke the state secrets privilege to prevent further disclosure of flight or migrant information.

The district court granted the Federal Defendants additional time to either provide the requested information or move to invoke the state secrets privilege. Order at 4, Mar. 19, 2025. The Government missed this deadline without warning or explanation. Order at 1, Mar. 20, 2025. Then, in an *ex parte*

[11] The state secrets privilege, a common-law doctrine, "permits the Government to prevent disclosure of information when that disclosure would harm national security interests." *United States v. Zubaydah*, 595 U.S. 195, 204 (2022) (citing *United States v. Reynolds*, 345 U.S. 1, 10–11 (1953) (military secrets)); *In re Sealed Case*, 494 F.3d 139, 144 (D.C. Cir. 2007) (intelligence information, operatives, and organizational structure) (additional citation omitted)). Courts are permitted a very limited inquiry into information protected by this privilege. *Reynolds*, 345 U.S. at 8–10.

declaration, the Government represented that the Federal Defendants were not yet invoking the state secrets privilege but also still would not provide additional flight information. *Id.* at 1–2. Only then did the court order the Federal Defendants to submit sworn declarations invoking the state secrets privilege and a brief showing cause that they did not violate the temporary restraining orders. *Id.* at 3.

On March 24th, 2025, the Government invoked the state secrets privilege, refusing to release any further information to the court about March 15th. The next day, the Government filed a response to the court's order to show cause, brazenly claiming that while, "[it] had already removed" class members before the injunction, a court could *never* have required the return of class members in flight to CECOT anyway. Resp. to Order to Show Cause at 2, Mar. 25, 2025.

* * * *

Meanwhile, this court considered the Government's March 15th motion to stay the district court's temporary restraining orders. On March 26th, a panel of this court denied the Government's motion over a dissent. *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *1 (D.C. Cir. Mar. 26, 2025). The Government then appealed to the Supreme Court.

On April 7th, the Supreme Court issued its order, *Trump v. J.G.G.*, 604 U.S. 670 (2025) (per curiam). The Court granted the Government's application and vacated the district court's temporary restraining orders. *Id.* at 671. The Court held that Plaintiffs sought "equitable relief against the implementation of the Proclamation *and* against their removal" under the Act. *Id.* (emphasis added). The Court also held that challenges to removal procedures under the Act should be filed in the venue corresponding with the district of confinement. *Id.* at 672–73. Briefly discussing the merits, the entire Court agreed that those

detained and subject to removal under the Act were entitled to notice and an opportunity to challenge their removal and judicial review. *Id.* at 673.

* * * *

On April 16th, the district court issued a written order and memorandum opinion regarding the Government's alleged contempt. *J.G.G. v. Trump*, 778 F. Supp. 3d 24 (D.D.C. 2025), *mandamus granted*, *vacated*, 147 F.4th 1044 (D.C. Cir. 2025) [hereinafter Probable Cause Order]. In the Probable Cause Order, the district court first considered whether, following the Supreme Court's vacatur of the temporary restraining orders, it maintained the authority to make contempt findings. *Id.* at 39–42. The district court remarked that "it is a foundational legal precept that every judicial order 'must be obeyed' — no matter how 'erroneous' it 'may be'— until a *court* reverses it." *Id.* at 30 (quoting *Walker v. City of Birmingham*, 383 U.S. 307, 314 (1967)). To that end, the district court found that while the temporary restraining orders "suffered from a legal defect," it did not "excuse the Government's violation" of the same. *Id.* at 30.

Having assured itself of its authority to make contempt findings, the district court proceeded. The district court analyzed its orders and how they were to restrain the Federal Defendants. After carefully analyzing the facts, standards, and relevant arguments, the district court found the Federal Defendants acted in willful disregard of its orders by transporting members of the court-certified class to foreign custody. *Id.* at 54. The district court then offered the Government two paths forward.[12] *Id.* The Federal Defendants

---

[12] Though a judge of this court has reprimanded the district court for taking this approach, *J.G.G.*, 147 F.4th at 1066, 1068 (Rao, J., concurring in the judgment), our law suggests that this is not

could "purge its contempt," by exercising custody over persons transported in violation of the court's order or the court could proceed to prepare a criminal contempt referral. *Id*.

The Government immediately appealed the Probable Cause Order to this court, asking for an emergency stay pending appeal, or, alternatively, a writ of mandamus to end the contempt proceedings. Plaintiffs also filed a motion to dismiss the appeal for lack of appellate jurisdiction. On April 18th, this court granted an administrative stay to consider these motions.

On August 8th, 2025, the emergency panel issued its decision. *J.G.G. v. Trump*, 147 F.4th 1044, 1044–45 (D.C. Cir. 2025) (per curiam) [hereinafter *J.G.G.*]. The panel granted the Government's petition for the writ over a dissent but was largely split on the issues presented to it. *Id.* at 1045. The panel all agreed, however, that it lacked appellate jurisdiction over the Probable Cause Order. *Id.* Though two panelists concurred in the judgment that the Government was entitled to mandamus, they sharply disagreed on *why*.[13] *Contrast id.* at

---

unprecedented, but perhaps appropriate under certain circumstances to avoid clashes between the court and litigants. *See, e.g.*, *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801 (1987) ("We have suggested . . . that, when confronted with a witness who refuses to testify, a trial judge should first consider the feasibility of prompting testimony through the imposition of civil contempt, utilizing criminal sanctions only if the civil remedy is deemed inadequate." (citation omitted)).

[13] Vacatur cannot be granted as a remedy without a declaration of law upon which to base such relief. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *see also* Benjamin B. Johnson, *A History of Vacatur*, 135 Yale L.J. 761, 771 (2026). There was no declaration of law that accompanied vacatur in *J.G.G. v. Trump* because the majority granting vacatur did not agree on why the Government was entitled to mandamus. 147 F.4th at 1044. While some may suggest

1046 (Katsas, J., concurring in the judgment), *with id.* at 1064–65 (Rao, J., concurring in the judgment). These panelists also did not align on the scope of relief to be granted, agreeing only to vacate the Probable Cause Order. *Id.* at 1063 (Katsas, J., concurring in the judgment); *id.* at 1072 (Rao, J., concurring in the judgment).

One judge granted the writ after resolving what he believed was an interpretive dispute about the language and restrictions of the March 15th temporary restraining orders in the Government's favor. *Id.* at 1051–57 (Katsas, J., concurring in the judgment). The other judge viewed the case differently. Examining the nature of the Probable Cause Order, she found that the district court abused its discretion by providing alternative contempt paths for the Government to choose from, purge (civil) or prosecution (criminal). *Id.* at 1066–68 (Rao, J., concurring in the judgment). However, this judge expressly permitted the district court to continue its criminal contempt proceedings. *Id.* at 1073 (Rao, J., concurring in the judgment) ("Whether to proceed with criminal contempt is a choice left to the district court.").

Plaintiffs petitioned for rehearing *en banc*. On November 14th, this court denied rehearing with three judges dissenting from the denial. *J.G.G. v. Trump*, No. 25-5124, 2025 WL 3198891, at *1, *4 (D.C. Cir. Nov. 14, 2025) (per curiam). Three statements accompanied the denial. Three judges dissented, one concluding that the panel's grant of mandamus relief departed from settled precedent, and the others concluding that the decision carried serious practical and structural consequences for the rule of law. *Id.* at *4 (Millett,

---

this disagreement between the panel indicated *J.G.G.*'s lack of precedential value, I would posit that we did something dangerous: allowing vacatur to be granted as a remedy without providing controlling law to justify it. *Marbury*, 5 U.S. at 177.

J., dissenting); *Id.* at *7–9 (Pan, J., dissenting). Three judges, concurring in the denial of *en banc* review, wrote a statement that questioned whether *J.G.G.* warranted the *en banc* court's review. *Id.* at *3–4 (Pillard, Wilkins & Garcia, JJ., statement). However, the common thread across the three statements, and their six judges, was that the contempt proceedings could go forward. *Id.* at *4 (Millett, J., dissenting); *id.* at *7 (Pan, J., dissenting); *id.* at *3 (Pillard, Wilkins & Garcia, JJ., statement).

* * * *

On November 17th, the district court posted a notice of a hearing during which the parties would discuss future contempt proceedings. Min. Order, Nov. 17, 2025. At the hearing, the district court began by elucidating why it was permitted to proceed with a contempt inquiry. The court clarified that this inquiry was "*not* to determine whether to hold the [G]overnment in contempt," but instead, it was to determine "whether *there is sufficient information* to make a contempt referral." Hr'g Tr. at 2:24–3:1, Nov. 19, 2025 (emphasis added).

The court stated it would determine whether to initiate an indirect criminal contempt proceeding, which it concluded started with factfinding. *Id.* at 5:9–11; *see also id.* at 3:9–12 (citing *J.G.G. v. Trump*, 2025 WL 3198891, at *2 (Pillard, Wilkins & Garcia, JJ., statement)). The district court also determined that it *needed* to begin with factfinding because this court vacated its Probable Cause Order. *Id.* at 5:9–11. As part of its factfinding, the court noted it was permitted to "require the [G]overnment to identify the decisionmakers who directed the potentially contemptuous actions and to carefully consider next steps." *Id.* at 3:19–22 (quoting *J.G.G. v. Trump*, No. 25-5124, 2025 WL 3198891, at *3 (Pillard, Wilkins & Garcia, JJ., statement))

The district court offered the parties the option to either produce witnesses for testimony or declarations from relevant persons to account for their actions on March 15th. The Government first produced declarations, all of which pointed to former Secretary of the Department of Homeland Security, Kristi Noem, as the decision maker who, after receiving advice of government counsel, ordered the planes to continue their flight path to CECOT.[14] *See, e.g.*, Noem Decl. ¶¶ 1–2. The information in the declarations was limited and contradicted earlier representations made by the Government. *Contrast id.*, *and supra* n.11, with *supra* Sections I.B–C. So, "to better understand the bases of the decision to transfer the deportees out of United States custody" on March 15th, the court ordered testimony from attorneys who had either represented the Federal Defendants during the March 15th hearings, or those who had already spoken publicly about the events. Order at 1–2, Dec. 8, 2025 [hereinafter Testimony Order]. This order is

[14] Former Principal Associate Deputy Attorney General Emil Bove stated that he was aware of the district court's March 15th statements and orders and provided privileged legal advice to former Secretary Noem on "the transfer of custody" of persons detained under the Proclamation's authority. Bove Decl. ¶¶ 3–5. Acting General Counsel of the Department of Homeland Security Joseph Mazzara, made similar statements, also remarking that he gave former Secretary Noem "legal advice—prior to her decision—about the legality of continuing with the transfer of custody." Mazzara Decl. ¶ 1. Then Deputy Attorney General of the Department of Justice, Todd Blanche, stated that, along with former General Bove, he provided privileged legal advice to former Secretary Noem, through Mr. Mazzara, regarding the transfer of persons designated as removable under the Proclamation. Blanche Decl. ¶ 1. These declarations contradict the Government's earlier representations that it could not reach the Federal Defendants, did not know their present plans, and as a result could not share their movements.

the basis for the petition for a writ of mandamus that we now consider.

**II.**

We begin, as we must, with the presumption that this cause is "outside [of our] limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citing *Turner v. Bank of N. Am.*, 4 U.S. (4 Dall.) 8, 11 (1799)). To dispel that presumption, the party invoking our jurisdiction bears "the burden of establishing" that we have it. *Id.* (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 182–83 (1936)). And yet, the Government did not devote a word to this burden, likely forfeiting that we even have jurisdiction. *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 53 n.4 (D.C. Cir. 2016) ("Although a party cannot forfeit a claim that we lack jurisdiction, it can forfeit a claim that we possess jurisdiction." (citation omitted)). Still, it is worth explaining why we lack the power to consider this petition.

The difficulty that the Government faces in establishing appellate jurisdiction stems from the order that it wishes us to review, the Testimony Order. While the Government may have felt entitled to come to us at this stage because of *J.G.G.*—where the panel delivered a judgment whilst agreeing that our court was without appellate jurisdiction, 147 F.4th at 1045, our review of the Testimony Order is distinctly problematic.[15] The Testimony Order has notable differences in its character and scope from the Probable Cause Order, including that the former

---

[15] I maintain that the emergency panel in *J.G.G.* did not have appellate jurisdiction and could not otherwise review the petition by way of the All Writs Act. *Cf. United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) ("[T]his Court is not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed *sub silentio*."(citations omitted)).

is an even more egregiously premature basis for a mandamus petition. Still, an additional problem has been posed by the majority's approach today. Dangerously, the majority seems to blend our traditional jurisdictional inquiry with the first condition of the mandamus standard. This is not only improper because it betrays our precedent, but because it *contravenes the purpose* of the standard: when review upon appeal of a final judgment is available for an error, the petitioner must pursue that route to vindication, rather than mandamus.

Thus, as our law requires, I begin with the traditional routes to interlocutory appellate jurisdiction. Then, I explain why we still may not consider the Government's petition.

**A.**

As established by the Judiciary Act of 1789, in general, "only *final* decisions of the federal district courts" are reviewable upon appeal. *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 83 (1981); 28 U.S.C. § 1291. As the Government and majority seem to agree, an order requiring witness testimony is not a final order. *In re Sealed Case*, 737 F.2d 94, 97 (D.C. Cir. 1984) (describing "the main rule" that an order compelling testimony is not immediately appealable (collecting cases)). Nor is the Testimony Order a kind of final order arising out of a contempt proceeding. *Bray v. United States*, 423 U.S. 73, 76 (1975) (recognizing that criminal contempt judgments are final); *see also Salazar ex rel. Salazar v. D.C.*, 602 F.3d 431, 436 (D.C. Cir. 2010) (reviewing an order assessing monetary sanctions as a final judgment).

Of course, "Congress created certain exceptions" to the rigid application of Section 1291, the reviewable orders under Section 1292. *Carson*, 450 U.S. at 83; 28 U.S.C. § 1292. Yet this route to appellate review is also likely foreclosed. *See*

*United States v. Ryan*, 402 U.S. 530, 532, 534 (1971) (holding that a subpoena is not appealable under Section 1292(a)(1)).

The Government also declined to invoke the collateral order doctrine, which allows our review of certain orders not covered by Section 1291.[16] *See Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545–46 (1949)). Regardless, because we apply the collateral order doctrine most narrowly in criminal cases, *United States v. Cisneros*, 169 F.3d 763, 767 (D.C. Cir. 1999) (citations omitted), this avenue also appears closed to the Government, *id.* (describing the doctrine as applying to orders where a defendant asserts "a right not to be tried"). *See also Mohawk*, 558 U.S. at 107–08 (denying collateral review of orders requiring waiver of attorney-client privilege); *Ryan*, 402 U.S. at 534 (denying collateral review of pre-trial discovery orders).

With interlocutory appellate jurisdiction shuttered by precedent, I now consider whether we may otherwise review this petition.

**B.**

The plain language of the All Writs Act gives us leave to issue the writ "in aid of" our appellate jurisdiction,[17] 28 U.S.C.

---

[16] The collateral order doctrine allows for appellate review of orders that are (1) conclusive (2) resolve important questions of law on the merits, and (3) "effectively unreviewable" upon appeal of a final judgment of the underlying case. *O'Connell v. U.S. Conf. of Cath. Bishops*, 134 F.4th 1243, 1249 (D.C. Cir. 2025) (citation omitted).

[17] For mandamus issued under 28 U.S.C. § 1361, *not* the All Writs Act, 28 U.S.C. § 1651, we have held that the requirements for mandamus relief themselves are jurisdictional, meaning that if they are not met, the court is duty-bound to dismiss the petition for lack

§ 1651(a); and we may use all such writs as long as it "is calculated in its sound judgment to achieve the ends of justice entrusted" to us. *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172–73 (1977) (citation omitted). However, mandamus is not *necessarily* limited "by an unduly narrow and technical understanding" of jurisdiction. *Mallard v. U.S. Dist. Ct. for the S. Dist. of Iowa*, 490 U.S. 296, 309 (1989) (quoting *Kerr*, 426 U.S. at 402) (additional citation omitted). Indeed, the Supreme Court has allowed the jurisdictional thresholds of the All Writs Act to be applied "flexibly" at times. *N.Y. Tel. Co.*, 434 U.S. at 173; *see also Cheney*, 542 U.S. at 380 (citation omitted).

Still, the All Writs Act does not provide an independent grant of jurisdiction.[18] *Clinton v. Goldsmith*, 526 U.S. 529, 534–35 (1999) (citations omitted); *accord In re Nat'l Nurses United*, 47 F.4th 746, 752 (D.C. Cir. 2022). The All Writs Act only allows process in aid of our "existing statutory jurisdiction" and it cannot "enlarge it." *In re United States*, 143

---

of jurisdiction. *Citizens for Responsibility and Ethics in Washington v. Trump*, 924 F.3d 602, 606 (D.C. Cir. 2019).

[18] The Government's petition, maybe unintentionally, invokes another way to jurisdiction: its wish for future proceedings to be reassigned to a different judge because of alleged animus. *See* 28 U.S.C. §§ 455(a), 455(b)(1), 2106. However, the Government has not properly made this challenge or met its burdens to earn this relief. *In re al-Nashiri*, 791 F.3d 71, 79 (D.C. Cir. 2015) (noting that we grant such relief "when a judicial officer *declines* to recuse himself." (emphasis added)); *In re Flynn*, 973 F.3d 74, 83 (D.C. Cir. 2020) (en banc) (concluding that reassignment is only appropriate "in the exceedingly rare circumstance that a district judge's conduct is so extreme as to display clear inability to render fair judgment." (citation modified)). In its petition, the Government mimes animus. It provided no examples of retaliation, harassment, bias, or partiality, which is fatal to its request. Though the majority declines to address this argument, I would deny the Government's reassignment request and exercising review of the rest of the petition on the same grounds.

F.4th 411, 422 (D.C. Cir. 2025) (citation modified). As a result, "whatever may be done without the writ may not be done with it." *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 383 (1953) (citing *Ex parte Rowland*, 104 U.S. (14 Otto) 604, 617 (1881)).

In this landscape, there is seemingly only one way that we may consider this mandamus petition.[19] This avenue stems from the notion that the authority to issue writs attaches the moment "there has been a proceeding of some kind that might lead to an appeal." *In re United States*, 143 F.4th at 422 (citing *In re al-Nashiri*, 791 F.3d 71, 76 (D.C. Cir. 2015)). "Accordingly, we can issue a writ of mandamus now to protect the exercise of our appellate jurisdiction later." *al-Nashiri*, 791 F.3d at 76 (*In re Tennant*, 359 F.3d 523, 529 (D.C. Cir. 2004)). Hence, when this court is vested with appellate jurisdiction over the underlying proceeding, we similarly have jurisdiction to issue writs of mandamus. *In re United States*, 143 F.4th at 423 (citing *id.*). Our court has even described this authority to issue mandamus as attaching "[o]nce there has been a proceeding of *some* kind instituted before an agency or court that might lead to an appeal." *Tennant*, 359 F.3d at 529. Interestingly, the majority invokes this avenue now, Majority Op. at 12 n.8, though it was *never* discussed in *J.G.G.*

---

[19] The only other possible avenue arises when this court has exclusive jurisdiction to review final judgments from the underlying proceedings. *See, e.g.*, *al-Nashiri* 791 F.3d at 76 (reviewing a mandamus petition from a proceeding arising under the Military Commissions Act of 2009, which gives this court "exclusive jurisdiction to determine the validity of a final judgment rendered by a military commission." (quoting 10 U.S.C. § 950g(a)). The Government does not contend, nor could it, that we have exclusive jurisdiction to review final judgments from all contempt proceedings.

Regardless, I take issue with using this avenue to exercise mandamus review. This court's review of a petition arising based on the Testimony Order is to allow mandamus review because of the specter of future appellate jurisdiction. For relying on this logic would require us to pile assumption on assumption about the results of this proceeding. We would have to assume that the Testimony Order *will* result in factual findings that *will* result in a probable cause finding, which then *will* result in a prosecutor accepting the referral, and then that such a hypothetical prosecution *will* result in a judgment. Surely, this path to eventual appellate jurisdiction is too attenuated to allow us to consider, much less exercise, the writ of mandamus at this preliminary juncture. As a result, I disagree with any suggestion that we may review this mandamus petition on the basis of our prospective appellate jurisdiction.

**III.**

Even assuming we have jurisdiction to review this petition, I disagree that mandamus relief is warranted. Given that the writ of mandamus is a "potent weapon[]," the Supreme Court requires that "three conditions must be satisfied" before a court can issue this rare award. *Cheney*, 542 U.S. at 380 (citation omitted). First, the petitioner must "have no other adequate means to attain" their relief. *Id.* (citation omitted). Second, the petitioner must demonstrate a "clear and indisputable" right to that relief. *Id.* at 381 (citation omitted). Third, even if the petitioner succeeds on these first two conditions, this court must analyze the relevant equitable principles and the context of the underlying proceedings to determine whether relief is "appropriate under the circumstances." *Id.* (citation omitted). The Supreme Court made these conditions intentionally "demanding," *id.* at 381, so that the "drastic and extraordinary remedy" of mandamus is deployed only for "really

extraordinary causes," *id.* at 380 (quoting *Fahey*, 332 U.S. at 259–60).

**A.**

Even if the Government later shows a clear and indisputable right, it must first show that there is "no other adequate means to attain the relief" it desires. *Id.* (citation omitted). This is a condition "designed to ensure that the writ will not be used as a substitute for the regular appeals process." *Id.* at 380–81 (citing *Fahey*, 332 U.S. at 260). As the Supreme Court has noted, the importance of this condition is that it prevents the writ from being used as a pathway to circumvent the rote inconveniences of appeal, "even though hardship may result from delay and perhaps unnecessary trial." *Schlagenhauf*, 379 U.S. at 110 (citations omitted).

Given that interlocutory appellate jurisdiction is *unavailable* and the ordinary appellate process is *readily available*, *see supra* Section II.A., the Government must show that pursuing an ordinary appeal would be more than inconvenient, rather it would provide wholly inadequate or nugatory relief. *See United States v. Fokker Servs. B.V.*, 818 F.3d 733, 747–49 (D.C. Cir. 2016) (first concluding that interlocutory appeal was unavailable); *see also id.* at 749 (then concluding that because the government would potentially be left with "*no* remedy" it suffered an "irreparable injury" that, without mandamus, would "go unredressed" (emphasis added) (first citing *Cheney*, 542 U.S. at 380; then quoting *al-Nashiri*, 791 F.3d at 79)). I only see a showing from the Government that it wishes to avoid the inconveniences of litigation, and this is not enough.

Indeed, the Government points to no authority contrary to what I have said above, but it argues that it has no other adequate means of relief because the contempt inquiry's

"incursions on Article II functions will occur before any final contempt conviction and cannot be remedied after the fact." Gov't Pet. 26. To support this notion, the Government points to *United States v. Fokker Services B.V.*, suggesting that mandamus is appropriate when the "Executive's primacy" as a prosecutor is at stake. 818 F.3d at 741. I am unpersuaded.

In *Fokker*, this court granted a writ to consider a challenge to the district court's rejection of a deferred prosecution agreement because, in the court's view, it was too lenient for the defendant. *Id.* at 737–38, 740–41. There, we held that mandamus review and relief was warranted because the district court exceeded its authority under the Speedy Trial Act and usurped the role of the prosecutor in plea negotiations. *Id.* at 740–41. Thus, the mandamus rebuke in *Fokker* was to restore authority to the prosecutor and confine the court to its proper role. *Id.* at 741. Here, by contrast, the district court is soliciting testimony in order to determine whether it will exercise its inherent and statutory authority. *See Robinson*, 86 U.S. at 510; 18 U.S.C. §§ 401–402. Accordingly, to exercise mandamus in this scenario would create the opposite result of *Fokker*: it would *take* inherent and statutory authority from the court instead of confining a court to its jurisdiction.

Importantly, the prosecutorial referral, which has not even been made, is a decision that the district court gets to make in the first instance—not the prosecutor and not us. There is also no danger to the Executive's prosecutorial authority posed by the district court seeking limited live testimony from two people. One of these witnesses has already testified publicly on the events in question and the other was representing the Government in the hearings at issue. For reasons explained in greater detail in later portions of this opinion, *see infra* Sections III.B.2.–3., it is natural for the court to inquire about the alleged

contumacious behavior from those who may have direct knowledge of it.

The majority appears to go even further than the Government goes, concluding that the district court is not a usurper but an interloper into the Executive's private deliberations into national security, foreign affairs, and diplomacy. The majority insists that the Supreme Court has demanded that if there is such a danger of a constitutional confrontation between the branches, we may not wait a second before acting. The majority intervenes prematurely.

In the majority's view, the dangers posed by contempt factfinding to our separation of powers scheme are so great that it requires this court's review, in spite of the availability of review after final judgment. To the majority, mandamus is the only way to expeditiously address the Government's concerns. This is backwards. This condition of the mandamus standard exists in our precedent to ensure that mandamus is not substituted for normal appellate review. *Cheney*, 542 U.S. at 380–81 (citing *Fahey*, 332 U.S. at 260). Our precedent distinguishing this condition of mandamus from appellate jurisdiction also aligns with our statutory scheme of judicial review. Surely, given the storied history of the judiciary acts, Congress "contemplated" the availability of mandamus when "providing that *only* final judgments" are within our jurisdiction to review," *Holland*, 346 U.S. at 383, and then providing that the writ may *only* be issued in aid of this court's *existing* jurisdiction, 28 U.S.C. § 1651(a).

I cannot ignore the fact of the matter, which is that an adequate alternative means for relief plainly exists, the appeal of a contempt judgment. Even in a previous contempt proceeding conducted by a district court over Executive Branch employees and officials, this court reviewed the district court's

contempt findings at the appropriate time, upon appeal of a final judgment. *See Cobell v. Norton*, 334 F.3d 1128, 1140 (D.C. Cir. 2003). So it cannot be said that contempt actions against members of the Executive Branch, in and of themselves, require mandamus to avoid a judgment being entered against them. *See id.*

Additionally, the district court is, and has always been, interested in *non-privileged* communications related to the events of March 15th. These events, of course, include the decisions about whether to obey the court's order, which themselves may be unprotected criminal communications. In addition, as I discussed at length above, *see supra* Section I.A., there is more than one way to commit contempt, and assurances from alleged contemnors that only one person deserves the court's scrutiny is cold comfort. For instance, testimony may reveal potential misrepresentations of the facts that were made before the court on the record during the March 15th hearing.

Moreover, as discussed in more detail below, *see infra* Sections III.B.2.–3., allowing examination in a non-adversarial show-cause hearing or other pre-referral evidentiary hearing, is permissible and part of the district court's factfinding before making findings of probable cause. Thus, the factfinding the majority lambasts is not done to examine the innerworkings of the Executive Branch, but instead to determine whether contempt may lie at all against those before the court.

In sum, the Government's showing here is inadequate because it merely reflects an interest in being free from the normal procedures of litigation. In this case, it wishes to be free from factfinding about allegations that it committed criminal activity. The majority also does not do any more to convince me that our separation of powers scheme is so endangered that urgent mandamus intervention is required.

Hence, I am not convinced mandamus must issue at this time and in this posture; there are adequate alternative means available here for review.

**B.**

To be granted the extraordinary relief of the writ, "the petitioner must satisfy the burden of showing that [their] right to issuance of the writ is clear and indisputable." *Cheney*, 542 U.S. at 381 (citation modified). Petitioner may not point to "an erroneous lower court ruling" alone and then cry mandamus; the asserted "error has to be clear." *Al Baluchi*, 952 F.3d at 369 (quoting *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 762 (D.C. Cir. 2014)) (citation modified). To meet this arduous standard, we require petitioners to "point to 'cases in which a federal court has held that' relief is warranted 'in a matter involving like issues and comparable circumstances.'" *Id.* (quoting *Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 355 (D.C. Cir. 2007)).

The Government presented us with a smörgåsbord of bases to determine it has a clear and indisputable right to relief. For instance, the Government argues it cannot be held in contempt for violating an order the Supreme Court vacated for legal error. It also asserts a blanket privilege from testimony about the events of March 15th because that would risk breaching the attorney-client privilege between itself and the Federal Defendants. Additionally, the Government contends we must foreclose further factfinding and any future criminal contempt trial because it threatens the separation of powers. The majority takes up none of these arguments.

Instead, the majority takes a different approach, affixing itself to a position mentioned in a handful of sentences in the petition: the Government has a clear and indisputable right to mandamus because, on the merits, contempt cannot be found

for the disobedience of an order that is not clear and specific. My own response to this position follows in Section III.B.4. However, below, I begin with the merits of the Government's other arguments, for the erroneous logic of each seems to leach into other aspects of the majority's mandamus analysis.

**1.**

The Government argues that the district court lacked jurisdiction to restart criminal contempt proceedings because "contempt cannot exist for the violation of an order that lacked jurisdiction in the first place." Gov't Pet. 19 (citing *Ex parte Fisk*, 113 U.S. 713, 714 (1885)). From that premise, the Government seeks to carve out what it describes as an exception to the collateral bar rule. The district court saw matters differently. In the district court's view, the Supreme Court did not identify a jurisdictional defect, but a defect of venue. The Government responds that the "analogy is inapt," Gov't Pet. 19, insisting that filing a habeas petition outside of Plaintiffs' district of confinement sounds in personal jurisdiction, not venue. Precedent does not carry the Government's argument.

Begin with the collateral bar rule. At bottom, it reflects a straightforward proposition that "persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order." *GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.*, 445 U.S. 375, 386 (1980) (collecting cases). Embedded in that principle is another, equally settled proposition: "a federal court always has jurisdiction to determine its own jurisdiction." *United States v. Ruiz*, 536 U.S. 622, 628 (2002) (citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 291 (1947)). The All Writs Act, as mentioned above, codifies this understanding by

authorizing the federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a); *see also SEC v. Vision Commc'ns, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996) (explaining that the All Writs Act "empowers a district court to issue injunctions to protect its jurisdiction").

That understanding of the All Writs Act fits comfortably within the broader law of provisional relief. For instance, a temporary restraining order, like a preliminary injunction, exists to "preserve the status quo pending the outcome of litigation." *Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006) (citation modified); *see Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); 11A *Wright & Miller's Federal Practice & Procedure Civil* § 2951 (3d ed. Sep. 2025 update) (observing that temporary restraining orders are "designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction"). *United States v. Shipp* makes the logic explicit—until a district court's jurisdictional determination is overturned, it "ha[s] authority, from the necessity of the case, to make orders to preserve the existing conditions and the subject of the petition," because "the law contemplates the possibility of a decision either way." 203 U.S. 563, 573 (1906) (citations omitted). There, Justice Holmes, writing for the Court, explained that it is for the court—and only the court—to determine whether it has "jurisdiction to decide whether the case was properly before it." *Id.* Accordingly, until the court concludes that it or a lower court lack "jurisdiction, it ha[s] authority, from the necessity of the case, to make orders to preserve the existing conditions and the subject of the petition." *United Mine Workers*, 330 U.S. at 291.

To undermine the validity of the instant criminal contempt proceeding, the Government banks on *Fisk*, 113 U.S. at 714,

for the proposition that contempt cannot lie for a violation of an order that lacked jurisdiction in the first place. As a general matter, that much is true. Indeed, *Fisk* contemplated that if an "order itself, being without jurisdiction, is void, [then] the order punishing for the contempt is equally void" as to that defendant. *Id.* at 718. The jurisdictional defect *Fisk* addressed, however, is not the one the Government invokes here.

In *Fisk*, a federal court ordered the defendant to submit to a deposition, but the Supreme Court held that a federal statute barred the court from doing so. *See* 113 U.S. at 726. The Government also relies on *In re Green*, 369 U.S. 689 (1962), for the same proposition it does *Fisk*. There, a state court enjoined union picketing and adjudged the defendant in contempt without affording a hearing or an opportunity to demonstrate that the matter fell within a field committed exclusively to a federal agency. *Id.* at 690, 693. The Court held that the contempt judgment violated procedural due process. *See id.* at 692–93. That decision therefore did not rest on a lack of subject-matter or personal jurisdiction. The district court here, by contrast, lacked proper venue over the underlying cause but issued an order that otherwise was within its authority. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (clarifying that district courts may grant injunctive relief against federal officers who are violating—or planning to violate—federal law (citations omitted)). For that reason, neither *Fisk* nor *Green* has any real bearing here.

The Government also leans on out-of-circuit decisions, suggesting that a party may defeat a contempt charge by arguing that the district court lacked jurisdiction. *See, e.g.*, *In re Novak*, 932 F.2d 1397, 1401–02 (11th Cir. 1991); *In re Estab. Inspection of Hern Iron Works, Inc.*, 881 F.2d 722, 726–27, 726 n.12 (9th Cir. 1989) [hereinafter *Establishment*

*Inspection*]. But those cases do not help the Government's cause. They are difficult to reconcile with the Supreme Court's later decision in *Willy v. Coastal Corp.*, 503 U.S. 131 (1992).

In *Willy*, the Court drew a clean line. A "final determination of lack of subject-matter jurisdiction," it explained, "precludes further adjudication of" the merits, but a sanctions order is "collateral to the merits," and therefore presents no constitutional problem concerning a district court's power to continue with its criminal contempt proceedings. *Id.* at 137–38. Although *Willy* involved sanctions under Federal Rule of Civil Procedure 11, the Court relied on precedent addressing a "criminal contempt citation." *Id.* at 137. In doing so, it noted that in *United Mine Workers*, the Court "upheld a criminal contempt citation even on the assumption that the district court issuing the citation was without jurisdiction over the underlying action." *Id.* (citation omitted). The conceptual bridge between Rule 11 sanctions and criminal contempt is therefore not speculative; it is one the Court itself crossed.

Moreover, this analogy between Rule 11 sanctions and a criminal contempt charge rests on settled doctrine, further lending to its credence here. Like a Rule 11 sanction, "a criminal contempt charge is a separate and independent proceeding at law that is not part of the original action." *In re LeFande*, 919 F.3d 554, 561 (D.C. Cir. 2019) (citation modified). This understanding permits a court to "make an adjudication of contempt and impose a contempt sanction even after the action in which the contempt arose has been terminated." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990) (citation omitted). And criminal contempt, like Rule 11 sanctions, is "punitive" in nature and serves to "vindicate the authority of the court." *Id.* at 441. The analogy is imperfect, but it is close enough to illustrate the point: a district court retains subject-matter jurisdiction over a criminal

contempt proceeding even when it lacks jurisdiction over the underlying cause.

Further deflating the Government's reliance on *Novak*, the Eleventh Circuit upheld a contempt conviction in *United States v. Straub*, 508 F.3d 1003 (11th Cir. 2007), applying *Willy* in the criminal contempt context. There, our sister circuit acknowledged that while the district court "lacked jurisdiction over the underlying controversy," *id.* at 1009, it concluded that the district court nonetheless retained "subject matter jurisdiction to resolve the charge of criminal contempt against" the defendant, *id.* at 1010. The court explained that *Willy* resolved that issue. *Id.* *Straub* thus addressed—and cabined—the precedent predating *Willy* on which the Government relies.

The Government relies on *Novak* for its proposition that "if the issuing court lacks subject-matter jurisdiction over the underlying controversy or personal jurisdiction over the parties to it, its order may be violated with impunity." 932 F.2d at 1401 (citations omitted). However, the Eleventh Circuit later clarified that this language was "dicta" and "should be construed narrowly." *Straub*, 508 F.3d at 1009. The Government nevertheless treats *Novak* as a trump card, but it is not. "[D]ictum is not binding circuit precedent." *Jam v. Int'l Fin. Corp.*, 3 F.4th 405, 409–10 (D.C. Cir. 2021) (citation omitted). Moreover, we are not "bound to follow the decisions of other circuits." *Brink v. Cont'l Ins. Co.*, 787 F.3d 1120, 1126 (D.C. Cir. 2015). *Novak*, therefore, fails to bind us twice over: It is dicta and it is out-of-circuit precedent. *See NetCoalition v. SEC*, 715 F.3d 342, 354 (D.C. Cir. 2013) ("Mandamus does not lie when our precedent no longer, at least in part, binds.").

The Ninth Circuit's decision in *Establishment Inspection* fares no better for the Government. There, the court suggested that one "exception[] to the collateral bar rule" involves "orders

resting upon a defective jurisdictional base." *Establishment Inspection*, 881 F.2d at 726. Put differently, the Ninth Circuit reasoned that "[i]f a court order issues without personal or subject matter jurisdiction, the decree may be violated without incurring the penalty of criminal contempt." *Id.* (citation omitted). That conclusion rested on its reading of *United Mine Workers* as establishing "that a lack of jurisdiction is a complete defense to an order of contempt." *Id.* at 726 n.12 (citation omitted).

The Ninth Circuit, however, acknowledged the fragility of that reading. It observed that "some commentators ha[d] interpreted the case as standing for the opposite principle." *Id.* (citation omitted). And it candidly conceded that it "and readers of the opinion have evidenced a lack of impressive solidity on this point." *Id.* (citation modified). Yet, as discussed above, the Court in *Willy* made explicit that *United Mine Workers* upheld a criminal contempt citation even on the assumption that the district court lacked jurisdiction over the underlying action. *See Willy*, 503 U.S. at 137–38. In that respect, *Willy* displaced the premise on which *Establishment Inspection* rests.

What finally dooms the Government's argument is that even accepting its premise that contempt cannot lie when a court lacks jurisdiction over the underlying cause, that rule would not govern here. The Supreme Court did not vacate the district court's temporary restraining order in this case for want of jurisdiction; it did so for improper venue. *See Trump v. J.G.G.*, 604 U.S. at 672. One judge of this court has explicitly made this point, explaining that when the Supreme Court vacated the temporary restraining order, it held that "*venue* [was] improper in the District of Columbia." *J.G.G.*, 147 F.4th at 1067 (Rao, J., concurring in the judgment) (emphasis added) (citing *Trump v. J.G.G.*, 604 U.S. at 672). The Supreme Court

said the same thing, in the same terms: "The detainees are confined in Texas, so *venue is improper* in the District of Columbia." *Trump v. J.G.G.*, 604 U.S. at 672 (emphasis added).

That decision was no accident. In vacating the temporary restraining order, the Court addressed the proper district of confinement, not the identity of Plaintiffs' immediate custodian. Justice Kavanaugh, clarifying the "Court's disagreement with the dissenters," underscored that the "*venue question* turn[ed] on whether th[o]se transfer claims belong in habeas corpus proceedings or instead may [have] be[en] brought under the Administrative Procedure Act." *Id.* at 674 (Kavanaugh, J., concurring) (emphasis added). Taken together, the Court's reasoning and Justice Kavanaugh's clarification confirm that *Trump v. J.G.G.* turned on venue, not personal jurisdiction.

That distinction matters because the Government's argument depends entirely on collapsing these analytically separate doctrines of jurisdiction and venue into one. Yet federal courts have long resisted that move, insisting instead that "issues of personal jurisdiction and venue . . . should be analyzed discretely." *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Rest.*, 760 F.2d 312, 316 (D.C. Cir. 1985) (citation omitted). Venue defects do not speak to a court's adjudicatory power in the way subject-matter or personal jurisdiction does. *Cf. Marcello v. Att'y Gen. of U.S.*, 495 F.2d 171, 174 (D.C. Cir. 1974) ("[Q]uestions of jurisdiction and venue are distinct."). And once those categories are kept straight, the Government's jurisdictional theory falls apart.

Turning to personal jurisdiction, the Due Process Clause requires that courts have it. *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)

("The requirement that a court have personal jurisdiction flows not from Art. III, but from the Due Process Clause."). Personal jurisdiction concerns the court's authority "over the parties before it." *Molock v. Whole Foods Mkt. Grp., Inc.*, 952 F.3d 293, 298 (D.C. Cir. 2020) (citation modified). Once a party "submits" to the court's power, "the court automatically acquires personal jurisdiction." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 164 (2023) (Barrett, J., dissenting) (citing *Ins. Corp. of Ireland*, 456 U.S. at 703). Fundamentally, personal jurisdiction asks whether the court's exercise of authority exposes a defendant to the forum's "coercive power." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011).

Unlike personal jurisdiction—which is rooted in due process—venue is "defined by legislation." *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168 (1939); *see also Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 55 (2013) ("This question—whether venue is 'wrong' or 'improper'—is generally governed by 28 U.S.C. § 1391. . . ."). Venue involves "primarily . . . choosing a convenient forum," not the existence of jurisdiction. *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979) (citation omitted). Historically, venue has been "plaintiff orient[ed]," reflecting the "time-accepted notion that plaintiffs should be masters of their own lawsuits." *Id.* (citations omitted). Ultimately, venue addresses "the place where [our] judicial authority may be exercised." *U.S. Int'l Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245, 248 (D.C. Cir. 2005) (citing *Neirbo*, 308 U.S. at 167–68).

The separation between venue and personal jurisdiction is especially clear in habeas corpus proceedings. As we have recently explained, the "immediate custodian rule implicates personal jurisdiction," while "the requirement to file in the

district of confinement concerns venue." *Dufur v. U.S. Parole Comm'n*, 34 F.4th 1090, 1097 (D.C. Cir. 2022) (citing *Ramsey v. U.S. Parole Comm'n*, 840 F.3d 853, 859 n.2 (D.C. Cir. 2016)). Yet, neither doctrine, we emphasized, concerns "subject matter jurisdiction." *Id.*

The Government nonetheless invokes *Crawford v. Jackson*, 323 F.3d 123, 125 (D.C. Cir. 2003), and *Chatman-Bey v. Thornburgh*, 864 F.2d 804, 810 (D.C. Cir. 1988), for the proposition that "[s]eeking habeas outside the district of confinement . . . is more analogous to personal jurisdiction than venue." Gov't Pet. 19. That reading overstates what those cases decided and misreads what they said.

Beginning with *Crawford*, there, we explained that "the threshold question" of jurisdiction was "resolved by the United States' waiver of any objection to lack of personal jurisdiction." *Crawford*, 323 F.3d at 125. Everything that followed thus proceeded on assumed ground and is accordingly dicta. And even setting that aside, the court's discussion of personal jurisdiction turned on the identity and location of the immediate custodian—not the district of the prisoner's confinement. *See id.* (explaining that "the appropriate defendant in a habeas action is the custodian of the prisoner," who in that case was "the warden of Lorton, over whom we have jurisdiction" (citations omitted)). We further noted that a prisoner's subsequent transfer "would not ordinarily deprive the court of jurisdiction over the habeas petition." *Id.* (citation omitted). Moreover, the United States waived any objection to personal jurisdiction precisely by agreeing to substitute the new immediate custodian. *Id.* at 126 (citation omitted).

That same focus carried through *Chatman-Bey*. There, the court reiterated that a "habeas court must have personal jurisdiction over the 'custodian.'" *Chatman-Bey*, 864 F.2d at

813 (quoting *Braden v. 30th Jud. Cir. Ct. of Ky.*, 410 U.S. 484, 495 (1973)). It then explained that the district court lacked personal jurisdiction over the warden at FCI Lewisburg, who was the petitioner's custodian. *Id.* Again, the inquiry centered on the defendant—who held the prisoner—not on the district of confinement. Notably, the government in *Chatman-Bey* failed to raise "improper venue or lack of personal jurisdiction over the warden," *id.*, rendering the jurisdictional discussion there dicta as well. Dicta or not, the analysis consistently turned on the same axis—whether the court had personal jurisdiction over the immediate custodian.

Read correctly, then, *Crawford* and *Chatman-Bey* do not support the Government's assertion that "[s]eeking habeas outside the district of confinement . . . is more analogous to personal jurisdiction than venue." Gov't Pet. 19. They support a narrower—and different—proposition that the writ of habeas corpus requires personal jurisdiction over the custodian, while the district of confinement speaks to where the case should be brought.

All told, none of the authorities the Government cites supports its asserted rule that "contempt cannot exist for the violation of an order that lacked jurisdiction in the first place." Gov't Pet. 19. The Government therefore fails to carry its burden of showing a "clear and indisputable right to relief." *Illinois v. Ferriero*, 60 F.4th 704, 713 (D.C. Cir. 2023). Mandamus must be denied where a petitioner's argument, even if "'pack[ing] substantial force,' is not clearly mandated by statutory authority or case law." *Id.* at 714–15 (alteration in original) (quoting *Al Baluchi*, 952 F.3d at 369); *see also Republic of Venezuela v. Philip Morris Inc.*, 287 F.3d 192, 199 (D.C. Cir. 2002) (Petitioners did "not come close" to showing a clear and indisputable right because they "identif[ied] no [on point] precedent of this court or of the Supreme Court.").

Furthermore, even accepting the Government's premise that a jurisdictional defect in the underlying action voids a criminal contempt proceeding, that rule would not control here. The Supreme Court vacated the temporary restraining order for lack of venue, not personal jurisdiction. And as our precedent makes clear, venue and jurisdiction are distinct doctrines, doing distinct work, and triggering distinct consequences. For the foregoing reasons, the Government's argument for mandamus collapses under the weight of its own insufficiency.

**2.**

As an alternative basis for relief, the Government posits several evidentiary challenges that it contends grant it a clear and indisputable right to mandamus relief. First, the Government contends that mandamus is necessary "to preserve the attorney-client privilege." Gov't Pet. 12. The Government argues that to avoid an irrevocable release of privileged information, the district court should allow advance briefing "on cross-cutting legal issues, preliminary *in camera* review, and pre-disclosure appeals." Gov't Reply 14. Next, the Government asserts that the district court is creating a violation of the privilege by allowing testimony from Deputy Assistant Attorney General Drew Ensign and former counsel Erez Reuveni, who both have served as government attorneys "*in this case*." Gov't Pet. 22. Finally, the Government contends that the district court is intentionally exacerbating the threat to its attorney-client privilege by allowing Plaintiffs' attorneys to participate in an unlimited cross-examination disguised as a criminal contempt proceeding. *Id.* at 24. None of these contentions, either individually or collectively, satisfy the mandamus standard.

Federal courts possess "authority to recognize privilege claims" under Rule 501 of the Federal Rules of Evidence. *In*

*re Lindsey*, 158 F.3d 1263, 1268 (D.C. Cir. 1998). As "the oldest of the privileges for confidential communications known to the common law," the attorney-client privilege occupies a sacred space among our system of law. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (citation omitted). As we have noted, this privilege is meant to protect certain "confidential communications" between lawyers and their clients when there is an intent to seek or provide legal advice. *Lindsey*, 158 F.3d at 1267. The purpose of this privilege is "to encourage 'full and frank'" disclosure resulting in more effective representation, which "promote[s] broader public interests in the observance of law and the 'administration of justice.'" *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998) (quoting *Upjohn*, 449 U.S. at 389).

However, the attorney-client privilege, like other types of privileges, exists to protect specific "communications within a particular relationship." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980). Thus, while "the privilege reflects society's judgment that promotion of trust and honesty within the relationship is more important than the burden placed on the discovery of truth," *id.* (citation omitted), this privilege is tailored to the circumstances in which the words are uttered, *see id.* Yet this privilege should "not [be] limited to communications made in the context of litigation or even a specific dispute." *Id.* Instead, the privilege must be read to extend "to all situations in which an attorney's counsel is sought on a legal matter." *Id.* This may include communications needed to prevent direct or implied inadvertent disclosure "of information which the client has previously confided to the attorney's trust." *Id.* (citation omitted).

"It is settled law that the party claiming the privilege bears the burden of proving that the communications are protected."

*Lindsey*, 158 F.3d at 1270. Naturally, "only [those] communications that seek 'legal advice' from 'a professional legal adviser in his capacity as such' are protected." *Id.* To help determine which communications fall within the privilege, we have articulated that only statements which satisfy several criteria are privileged. *In re Sealed Case*, 737 F.2d at 98–99 (enunciating conditions to invoke privilege). Moreover, conclusory statements such as "blanket assertion[s] of the privilege will not suffice" to properly invoke the privilege. *Lindsey*, 158 F.3d at 1270.

This court has acknowledged that the Government may invoke attorney-client privilege to protect confidential disclosures between government officials and attorneys. *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997) ("In the governmental context, the 'client' may be [a government official or] the agency and the attorney may be an agency lawyer."). Like a private party, the Government seeks the comfort of knowing that its interests are protected "and needs the same assurance of confidentiality so it will not be deterred from full and frank communications with its counselors." *Lindsey*, 158 F.3d at 1269 (quoting *Coastal States*, 617 F.2d at 863). However, the government, just like any other party before the court, cannot use the attorney-client privilege to shield it from disclosing information related to possible criminal misconduct. *Id.* at 1278.

Here, the Government's assertion of the attorney-client privilege to avoid the district court's criminal contempt proceeding is deficient for several reasons.

First, the Government has made a "blanket assertion of the privilege," which is generally ineffective. *See, e.g.*, *Lindsey*, 158 F.3d at 1270; *In re Grand Jury Subpoena (Mr. S.)*, 662 F.3d 65, 71 (1st Cir. 2011) ("[A] blanket assertion of privilege

is generally insufficient." (citations omitted)); *In re Grand Jury Proceedings*, 616 F.3d 1172, 1183 (10th Cir. 2010) (holding the privilege must be asserted "as to specific questions or documents" (citation omitted)); *In re Grand Jury Subpoena*, 831 F.2d 225, 226–27 (11th Cir. 1987) (The lawyer "must present himself . . . for questioning, and as to each question . . . elect to raise or not to raise the defense." (citation omitted)); *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983) (holding privilege claim must be "made and sustained on a question-by-question . . . basis" (citation omitted)). With only a blanket assertion of privilege before this panel, I cannot conclude there is a proper foundation to establish attorney-client privilege for *any* potential communication at issue.

Second, the Government asserts that Mr. Ensign and Mr. Reuveni should not have to testify because they "have no personal knowledge of the legal advice given to the Secretary." Gov't Reply 9. I reject this challenge as well. Simply, the Government has failed to establish why the attorney-client privilege forecloses testimony from two lawyers who did not engage in confidential communications for the purpose of providing legal advice. *See id.* ("As Ensign's declaration and Reuveni's account confirm, neither participated in formulating th[e] legal advice or in the subsequent decisionmaking.").

Finally, third, I find no merit in the Government's argument that the district court's decision to allow Plaintiffs' attorneys to cross examine Mr. Ensign and Mr. Reuveni is a "threat to [the Government's] attorney-client privilege." Gov't Pet. 24. A district court has "inherent power to provide themselves with appropriate instruments required for the performance of their duties . . . [and] [t]his power includes authority to appoint persons unconnected with the court to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause." *See Ex parte Peterson*,

253 U.S. 300, 312 (1920) (citation omitted); *see also NASCO*, 501 U.S. at 43 (A court's "powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'"). And for reasons explained below, non-adversarial hearings of this kind are not uncommon before a probable cause referral. *See infra* Section III.B.3.

The Government therefore has failed to carry its burden of establishing the that the protections of the attorney-client privilege give it a clear and indisputable right to terminate the contempt proceedings.

**3.**

The Government also argued that it has a clear and indisputable right to relief because the district court exceeded its inherent and statutory authority to investigate its alleged contempt at all. In the Government's estimation, following this court's vacatur of the Probable Cause Order in *J.G.G.*, the district court should have again found probable cause to support criminal contempt and moved swiftly to referral for prosecution. Thus, the Government surmises that any factfinding by the district court following vacatur suggests that the district court was inappropriately interested in the inner workings of the Executive Branch. Or worse, that the court had usurped the role of the prosecutor in an indirect criminal contempt trial.

To begin, recent statements from this court suggest that diligent factual findings are required before referral for prosecution. *See J.G.G. v. Trump*, 2025 WL 3198891, at *2 (Pillard, Wilkins & Garcia, JJ., statement) ("The first step to judicial exercise of contempt authority may require factual inquiry regarding the seeming defiance."); *id.* at *4 (Millett, J., dissenting) ("[H]ere, the district court exercise[d] its most

fundamental and inherent authority to obtain non-privileged information necessary to police the integrity of proceedings in its own courtroom."); *see also J.G.G.*, 147 F.4th at 1073 (Rao, J., concurring in the judgment) ("Holding Executive Branch officials in contempt demands more sensitive judicial scrutiny than such a sanction imposed on an ordinary litigant." (citation modified)). Given even these statements, it is difficult to see how the Government can have a clear and indisputable right on these grounds.

Moreover, in contrast to the Government's assertions, it is standard practice for the district court to conduct diligent factfinding *before* making a probable cause finding for indirect criminal contempt. A quick look across the federal reports suggests this.[20] And most importantly, our law supports that a district court's findings of fact precede a referral for an indirect criminal contempt prosecution. *See* Fed. R. Crim. P. 42(a)(1) (describing statutory notice requirements for contempt charges); *Bagwell*, 512 U.S. at 833–34 (noting that contempt

[20] Here is but a sample of cases to support that factfinding precedes contempt probable cause findings and prosecutorial referral. *See, e.g.*, *Wilson v. Vacaro*, 883 F. Supp. 258, 261–62 (N.D. Ill. 1995) (conducting evidentiary hearing where alleged contemnors, and other witnesses, were subject to direct and cross-examination to determine if a criminal contempt referral was necessary); *Objective Sols. Int'l, Ltd. v. Gammon*, No. 07 CIV 2347, 2008 WL 538445, at *1 (S.D.N.Y. Feb. 25, 2008) (evidentiary hearing before referral); *In re Res. Tech. Corp.*, No. 08 C 4040, 2008 WL 5411771, at *4 (N.D. Ill. Dec. 23, 2008) (noting that the nature of criminal contempt proceedings requires a judge to "assess whether probable cause exists" before making a charging decision); *In re Blackmon*, No. 3:14-CV-00507, 2016 WL 4055650, at *2 (W.D.N.C. July 25, 2016) (show cause hearing before referral); *United States v. Smith*, 502 F. Supp. 2d 852, 854 (D. Minn. 2007) (noting that factual findings were the first step in criminal contempt proceedings and making such findings).

for disobedience of injunctions may require factfinding (citation omitted)); *United Mine Workers*, 330 U.S. at 297 (describing fulfillment of Rule 42 requirements for adequate notice of contempt charges (citation omitted)). Mandamus, therefore, cannot spring forth from these grounds.

Federal Rule of Criminal Procedure 42 places strict procedural requirements on the prosecution of indirect criminal contempt, which the district court has followed. For one, a district court cannot "summarily punish" defendants subject to indirect criminal contempt proceedings. Fed. R Crim. P. 42(b) (allowing summary disposition only for some criminal contempts done in the court's presence). Indirect criminal contempt charges also require a referral for prosecution. *See Id.* at 42(a)(2) (describing the referral procedure for non-summary criminal contempt); *see also Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801 (1987) (explaining that Rule 42(b) requires referral to an "appropriate prosecuting authority" or to "a private prosecutor" only when the court's referral request is denied).

By consequence, while the Government might urge for what would be, in practice, a summary disposition for indirect contempt, the law largely forbids this because the underlying alleged contempt has happened outside the court's presence and knowledge. *See Cooke*, 267 U.S. at 536 ("When the contempt is not in open court, however, there is no such right or reason in dispensing with the necessity of charges and the opportunity of the accused to present his defense by witnesses and argument."); *Bagwell*, 512 U.S. at 832–33 (similar); Fed. R. Crim. P. 42(a)(2) (requiring prosecutorial referral for some indirect contempts); *see also Sacher v. United States*, 343 U.S. 1, 9 (1952) (noting that Rule 42 "allows summary procedure" for offenses occurring within the judge's personal knowledge and presence).

The district court also could not have done as the Government requests and simply referred the Federal Defendants for prosecution following this court's vacatur of the Probable Cause Order. If it had done so, such process would also be akin to a prohibited summary disposition of the alleged contempt because the Probable Cause Order is a nullity. *See United States v. Ayres*, 76 U.S. 608, 610 (1870) ("[V]acating the former judgment . . . render[s] it null and void, and the parties are left in the same situation as if no trial had ever taken place in the cause."). A vacated order is no order at all, and both this court and the district court are to treat it as though it "never occurred." *Hewitt v. United States*, 606 U.S. 419, 431 (2025). Thus, the factfinding in the Probable Cause Order fell with all other findings by the court; there is not some vestigial remainder. *See Cobell v. Norton*, 428 F.3d 1070, 1073 (D.C. Cir. 2005) (chiding the district court for continuing with contempt proceedings after vacatur without reinitiating factfinding). There is now no factual basis for a referral—which the Government and majority ask for, without new findings—which the Government and majority seek to foreclose.

Additionally, the district court cannot ignore the constitutional rights of alleged contemnors without clear waiver, even if the Government may wish in its petition that these requirements be ignored. Precedent requires that criminal contempt proceedings comply with the procedural and substantive guarantees traditional criminal cases are afforded. *Bagwell*, 512 U.S. at 826–27 (collecting cases granting these rights); *Norton*, 334 F.3d at 1147 (describing indirect criminal contempt proceedings as requiring "the usual protections of the criminal law"). These protections safeguard the Government against miscarriages of justice in criminal contempt proceedings, and the court must take time to observe them.

The law also supplies *evidentiary* expectations for indirect criminal contempt proceedings. Most relevant for our case, the Federal Rules of Criminal Procedure require that adequate "notice" is given to the alleged contemnor. Fed. R. Crim. P. 42(a). This includes the expectation that criminal contempt proceedings provide such notice "in open court, in an order to show cause, or in an arrest order" and that it includes "the time and place" of the eventual trial on the contumacious behavior. *Id.* at 42(a)(1)(A). Notice, likewise, must "allow the defendant a reasonable time to prepare a defense" by "stat[ing] the essential facts constituting the charged criminal contempt and describe it as such." *Id.* at 42(a)(1)(B)–(C).

Now, what is at the heart of the dispute before us is how much we expect to *precede* the district court's notice, and, in effect, the court's referral of criminal contempt to a prosecutor. Rule 42 notice should leave contemnors "fairly and completely apprised of the events and conduct constituting the contempt charged." *United Mine Workers*, 330 U.S. at 297. This requirement presumes that allegations or findings of fact are made by the court *before* notice is given. *See id.* When conducting indirect criminal contempt proceedings, district courts are even encouraged to take additional measures to obey constitutional safeguards and assure themselves of the facts. *See, e.g.*, *Rapone*, 131 F.3d at 191–92 (reviewing a conviction of criminal contempt following a special master's report finding probable cause *and* a district court's order to show cause); *Offutt v. United States*, 232 F.2d 69, 71–72 (D.C. Cir. 1956) (remanding to permit testimony from witnesses about conduct that occurred outside the court's personal knowledge). The Supreme Court has even remarked that indirect contempt involving the disobedience of "complex injunctions often require[s] elaborate and reliable factfinding." *Bagwell*, 512 U.S. at 833–34 (citing *Green v. United States*, 356 U.S. 165, 217 n.33 (1958) (Black, J., dissenting)).

The few cases the Government cites that pertain to contempt do not detract from these points, all instead discuss the restrictions on who may prosecute an indirect criminal contempt *trial*. For instance, in *United States v. Neal*, the district court prosecuted an indirect criminal contempt trial on its own, even deciding who would testify against the contemnor. 101 F.3d 993, 995–96 (4th Cir. 1996). Of course, the district court's error was not in investigating indirect criminal contempt but in declining to refer it for prosecution. *Id.* at 996–98; *see also id.* at 997–98 (collecting cases to support the same proposition). *Neal* is thus primarily inapposite because here the district court is not prosecuting a criminal contempt trial, and we cannot pretend the court is doing so. The district court here is only attempting to make findings of fact to determine whether a referral for probable cause can occur.

The rest of the Government's cases are similarly inapplicable to the case at bar. In *American Airlines, Inc. v. Allied Pilots Ass'n*, the district court was also corrected for prosecuting rather than referring contempt charges, this time in a direct criminal contempt trial. *See* 968 F.2d 523, 525–27, 530–31 (5th Cir. 1992). Then in *Young v. United States ex rel. Vuitton et Fils S.A.*, the district court appointed plaintiffs' attorneys, rather than first referring to the Department of Justice. 481 U.S. 787, 806 (1987). The error was not even in appointing plaintiffs' attorneys as special prosecutors, but in appointing them before the Department of Justice declined to prosecute. *Id.* at 806–08. No such errors were sown here, and we need not employ mandamus as if the district court's factfinding had bloomed into something similar to what occurred in these cases, where the district courts acted contrary to law and their limited jurisdiction.

Simply put, determining whether there are facts to support probable cause for contempt is not a vindictive or retaliatory exercise. Nor does factfinding suggest that the court wishes to intrude in the decisionmaking of the Executive Branch. Our law essentially requires factfinding before referral for indirect criminal contempt prosecution. So, at this juncture, the Government's separation of powers objection to the district court performing its obligations under the law is not an appropriate basis for the mandamus relief the Government seeks. *See Flynn*, 973 F.3d at 80 (denying writ of mandamus where separation of powers harms were speculative and alleged to be arising from a "still-unfolding process").

**4.**

Rather than tangle in the morass of the aforementioned bases for mandamus, the majority chooses the Government's Hail Mary pass. It decides this case on the merits of a contempt prosecution and conviction that have not occurred. Though the majority asks me to also decide whether the Government has committed contempt, I refuse to be pulled into the lagoon with them. I will not decide today whether a conviction can be sustained under 18 U.S.C. § 401. That is not yet within the purview of this court to decide, one way or another.[21] It is the

[21] It is important to note that in its analysis, the majority relies on the *vacated* Probable Cause Order to make some of its strongest accusations of the district court's usurpations of its authority. Majority Op. at 17 (quoting Probable Cause Order at 54), 21 (first quoting Probable Cause Order at 50; then quoting *J.G.G. v. Trump*, No. CV 25-766, 2025 WL 3706685, at *2 (D.D.C. Dec. 22, 2025) (order granting summary judgment on the merits, unrelated to contempt proceedings)), 22 (citing Probable Cause Order at 42–47), 23 n.13 (citing Probable Cause Order at 34). It is improper at the very least, and perhaps dangerous, for the majority to use the Probable Cause Order to accuse the district court of impinging on the

Government who must show that it has a clear and indisputable right to relief by proving no facts could ever support that it committed criminal contempt the weekend of March 15th. Moreover, if even one reading of the court's order belies that the Government should be free from a criminal contempt inquiry *as a matter of right*, then the Government failed to make its showing. Today, in a handful of sentences, the Government merely argues that the court's order failed to be "clear," "decisive," and "contain[] no doubt" as to how the Government and Federal Defendants were to be restrained, doing so in large part by pointing at the opinion of the judge in *J.G.G.* who interpreted the second temporary restraining order in the Government's favor. Gov't Pet. 16 (citation modified); *see also id.*; Gov't Reply 13. However, that is not how one shows a clear and indisputable right to mandamus relief.

Adopting part of the Government's reasoning, the majority decides that because it reads the district court's second temporary restraining order to be ambiguous, the Government cannot have violated the order or at least it cannot be held in criminal contempt for doing so. Curiously, relying on the interpretive canons we use for legal instruments, the majority reads the temporary restraining orders with the scrutiny we require of statutory construction. *But see Brown v. Davenport*, 596 U.S. 118, 141 (2022) ("[T]his Court has long stressed that the language of an opinion is not always to be parsed as though we were dealing with [the] language of a statute." (citation modified)).

No precedent supports the rule that this court uses tools of statutory interpretation to analyze an allegedly violated court order in a criminal contempt proceeding. Instead, our law supports that we cannot, and do not, read judicial statements

---

Executive Branch's authority and making conclusions it has not made.

this way. *Young*, 107 F.3d. at 907–08. Instead, we construe the scope of an injunction in light of "what the decree was really designed to accomplish." *Mayor of Vicksburg v. Henson*, 231 U.S. 259, 273 (1913); *see also Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 135 (2021) (Gorsuch, J., concurring in part) ("[T]his Court [has] often said it is a mistake to parse terms in a judicial opinion with the kind of punctilious exactitude due statutory language." (citation omitted)).

There is also no authority to support that this court may short-circuit a criminal case that only the district court has the authority to initiate. This is what the majority does today by ratifying a litigant's *ex post* determination of what a court order means, and concerningly it does so before the district court has even had a chance to say what it means for itself. *Cf. Potter*, 126 F.4th at 725–26 (collecting cases to discuss the breadth of district court discretion in criminal contempt proceedings). The majority is granting the Government's desired relief by not only cutting factfinding at the knees, but by declaring that the Government has a clear and indisputable right to mandamus relief to be free from prosecution as a matter of law, meaning that it has this right regardless of the underlying facts.

To make matters worse, when formulating contempt precedent this way, the majority uses mandamus to do it.[22] To

---

[22] Throughout the majority's analysis for the second condition of mandamus it erodes the hard-fought barrier between civil and criminal contempt by relying on several civil contempt cases. Majority Op. at 17 (citing *Clinton*, 973 F.3d at 113), 19 (citing *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019)), 20 (first citing *Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971) (per curiam); then citing *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir. 1991)), 22 (citing *Broderick v. Donaldson*, 437 F.3d 1226, 1234 (D.C. Cir. 2006)). This was a barrier that at one point members of this panel

use mandamus here is to grant the Government a motion to dismiss an indictment against it before a charge has even been made. The majority emphatically proclaims this is necessary because the district court is a runaway train for investigating contempt. This is a distraction. At its core, the majority's analysis declares today that there can be no crime if an order violated was not one perfectly written, rather than determine if one was perfectly understood. Such an approach is unsound.

* * * *

The majority's first step is to jump to the review we normally conduct for criminal contempt convictions under 18 U.S.C. § 401(3). Majority Op. at 19 (citing *Rapone*, 131 F.3d at 192 (review of a criminal contempt conviction following a bench trial) (additional citation omitted). Regardless, I will begin where the majority does to clarify the applicable law. On the appeal of a criminal contempt conviction, we examine whether there was sufficient evidence to prove beyond a reasonable doubt, *NYNEX*, 8 F.3d at 54 (citations omitted), that the allegedly violated order was "clear and reasonably specific," and that the order was willfully violated. *Rapone*, 131 F.3d at 192 (citations omitted).

Contempt will only lie "if the putative contemnor has violated an order that is clear and unambiguous." *NYNEX*, 8

---

were keen to police. Perhaps this was for a good reason because when reviewing the civil contempt of a court order we apply different standards, allow different defenses, and even rely on Federal Rule of Civil Procedure 65 as a guide for the specificity of an allegedly violated order. *Taggart*, 587 U.S. at 561–62 (explaining unique standards for a judgment of civil contempt of a court order); *Armstrong v. Exec. Off. of the President, Off. of Admin.*, 1 F.3d 1274, 1289–90 (D.C. Cir. 1993) (same); *Kammerer*, 450 F.2d at 280 (citing Fed. R. Civ. P. 65(d)).

F.3d at 54–55 (citation omitted); *Holloway*, 995 F.2d at 1082 (citation omitted) ("Of course, the relevant order or command must be sufficiently clear and unequivocal at the time it is issued." (citation modified)). However, despite the interpretive approach taken by the majority, in our circuit, the scope of an order is determined through a factual inquiry. *See, e.g.*, *NYNEX*, 8 F.3d at 55–57 (relying on the underlying record, reports, the district court's findings and judgment, and the Government's past practice, to determine whether a consent decree was violated). This factual determination turns on the context of the proceeding and the prosecutor's ability to show sufficient evidence to establish that the order was clear and reasonably specific. *Young*, 107 F.3d at 907–08 ("Whether an order is clear enough depends on the context in which it is issued and the audience to which it is addressed." (citation modified)).

We *do not* review the language of the order *de novo*; instead our precedent requires that we afford considerable deference to the district court's construction of its injunctive order. *Contrast* Majority Op. at 20 ("In determining whether a judicial order has the requisite clarity and specificity for criminal contempt, we review the language de novo, objectively, and without deference to the district court." (citing *Young*, 107 F.3d at 907) (additional citation omitted)), *with* *Young*, 107 F.3d at 907 ("In determining whether an order is sufficiently clear and specific to justify a contempt conviction, we apply an objective standard that takes into account both the language of the order and the objective circumstances surrounding the issuance of the order . . . ."). Again, "this is *not* a statute . . . it *is* an injunctive order," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 792 (1994) (Scalia, J., concurring in the judgment in part and dissenting in part). Clarity and specificity are determined with context in mind.

Our *de novo* review instead concerns the sufficiency of the evidence that would support each element of 18 U.S.C. § 401(3), viewing the facts in the light most favorable to the prosecutor. *Young*, 107 F.3d at 907 (citation omitted). We determine from that position "whether a fair-minded and reasonable trier of fact [could] accept the evidence as probative of a defendant's guilt beyond a reasonable doubt." *Id.* (citations omitted) (alteration in original). When interpreting the language of an order, we determine if it is "*sufficiently* clear and specific." *Id.* (emphasis added). Whether an order is "clear enough" depends "on the context in which it is issued and the audience to which it is addressed." *Id.* at 907–08 (citation omitted).

Before analyzing the injunction, it is worth addressing precisely what constitutes the court's second temporary restraining order. I reject the contention that only the written minute order constitutes the injunction.[23] The context of the hearing supports that the court's order comprises of what it stated on the record and the language of its written minute

---

[23] I do not accept the Government's assertion that it was not bound by an oral order until that order was later reduced to writing in full. Oral orders, once issued, are binding upon parties. *See United States v. Schiavo*, 504 F.2d 1, 5 (3d Cir. 1974) (noting that violating an oral order can result in criminal contempt charges); *Avionic Co. v. Gen. Dynamics Corp.*, 957 F.2d 555, 558 (8th Cir. 1992) (oral discovery proceedings gave litigant notice of their compliance requirements for Rule 37 sanctions); *id.* (collecting cases to support the same); *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542 n.7 (11th Cir. 1993) (holding that for the purpose of Rule 37 sanctions "[o]ral orders are just as binding on litigants as written orders" with the "same" consequences); *see also Trump v. J.G.G.*, 604 U.S. 670, 680 n.3 (2025) (Sotomayor, J., dissenting) (collecting cases regarding routine issuance of appealable oral orders); *J.G.G.*, 147 F.4th at 1089 (Pillard, J., dissenting) (collecting cases regarding binding nature of oral orders).

order.[24] Min. Order 4, Mar. 15, 2025 ("As discussed in today's hearing, the Court ORDERS . . . ."). So, we must begin with the hearing to determine the clarity and reasonable specificity of the temporary restraining order.

During the hearing on March 15th, the court started by defining the class as comprising of noncitizens in United States custody subject to the Proclamation. *See* Hr'g Tr. at 42:16–21, 44:10–16, Mar. 15, 2025. Importantly, the district court's class definition was different than that proposed by Plaintiffs. Proposed Order Granting Pls.' Mot. Class Certification at 2 (defining class as "all noncitizens who were, are, or will be subject to the Alien Enemies Act Proclamation and/or its implementation"). The class certification also followed the district court's immediately preceding discussion about the irreparable harm to class members if they were placed in prisons outside the United States or repatriated to Venezuela. *See* Hr'g Tr. at 42:1–5, Mar. 15, 2025. The district court made a point to exclude any prospective class members that were in

---

[24] I also cannot agree with my concurring colleague who asserts that the district court notified the parties that a later written order would supersede its oral order in the hearing. Parties are bound by extant orders of the court until the court says otherwise. Certainly, in this district, like many others, an order of the court, is superseded only by a clear statement made by that same judge, sometimes accompanied by vacatur of the previous order. *See, e.g.*, *Jamal Adeen v. Obama*, No. CIV.A.08-1236, 2009 WL 3060319, at *1 (D.D.C. Sept. 18, 2009) (ordering "that this ORDER supersedes this Court's ORDER of September 2, 2009" (citation modified)); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. CV 11-1049, 2020 WL 14037588, at *1 (D.D.C. Feb. 20, 2020) (ordering that "the December 19, 2019 Referral Order is VACATED and SUPERSEDED by this referral order"). The district court's statements during the emergency hearing cannot credibly be seen in the same way as superseding orders.

planes that had landed and or had been deplaned. *See id.* at 44:6–9.

As such, the district court delineated the class members over which the court had subject-matter jurisdiction to provide relief: members who had not landed and deplaned, in other words, those still in federal custody. *Id.* at 44:6–9. These were precisely the class members who the district court sought to enjoin the Government from removing. *Id.* at 43:11–19. To that end, the district court thrice clarified on the record with counsel for the Government, that the Federal Defendants were restrained from removing the class members, as defined above, as of the issuance of its oral order. *Id.* at 44:18–20, 45:4–7, 46:9–16. The Government never contested that it was restrained and instead confirmed that it understood it was so bound. *Id.* at 45:11–13 ("[W]e would ask that the plaintiffs' response be on a similarly expedited basis given that the government is now under a TRO.").

This context should be enough to show that the Government understood both under what circumstances it was restrained and that it was restrained immediately. But if more needs to be said, look to the first line of the district court's minute order: "*As discussed in today's hearing*, the Court ORDERS . . . ." Min. Order 4, Mar. 15, 2025 (emphasis added). The district court incorporated by reference the hearing discussion about the details of the injunction, the class, and the basis for the new briefing schedule. *Id.* Thus, there is nothing in the text that suggests that the court was amending its earlier order. *See id.* Nor does the text support that the district court was walking back its previous oral order, rather it was carrying it forward by incorporating its earlier statements. *Id.*

The *only* way that the majority can use the minute order to amend the court's earlier order is by making two critical

assumptions, unsupported by both the available facts and our controlling precedent: First, the court's order, even in the entirety of the aforementioned context, was ambiguous. Then second, it is permissible to use interpretive canons to discern the meaning of that allegedly ambiguous text, even though text with plain meaning does not require such tools. *See Caminetti v. United States*, 242 U.S. 470, 485 (1917) ("Where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion." (citation omitted)).

Although I maintain that this cannot be analyzed in the vacuum of the majority's creation, it is with these assumptions in mind that I now turn to the one sentence its interpretive analysis seizes on: "The Government is ENJOINED from removing members of such class (not otherwise subject to removal) pursuant to the Proclamation for 14 days or until further Order of the Court." Min. Order 4, Mar. 15, 2025. Again, for clarity, the Order defined the class as "consisting of 'All noncitizens *in U.S. custody* who are subject to the March 15, 2025, Presidential Proclamation entitled 'Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua' and its implementation." *Id.* (emphasis added).

Now, I do not contest that the majority has defined the ordinary meaning of the word "removal." *See* Majority Op. at 22–23. Nor do I wish to debate how the majority has defined "removal" in the "legal context of this case," namely the Proclamation, its underlying authority—the Alien Enemies Act, and the Immigration and Nationality Act. *Id.* I wish instead to show you just one of the many ways in which to analyze the district court's order that leads to a different result than the majority; this alone suggests that the Government cannot have a clear and indisputable right to relief.

When examining the word "removing" as used in the district court's order, my first step is to return to a simple lesson in English grammar: the importance of understanding the oft used, yet misunderstood, gerund and present participle. A gerund is a verb that functions as a noun because the letters "ing" have been added to it. *Gerund*, Merriam Webster's Collegiate Dictionary (11th ed. 2020). When a verb has been made a gerund, it "expresses generalized or *uncompleted* action." *Id.* (emphasis added). The gerund's close friend, the present participle, has a similar transformative quality. The present participle indicates when the action of one verb is happening in relation to the time indicated by other verbs in a sentence. *Present Participle*, Merriam Webster's Collegiate Dictionary (11th ed. 2020). In particular, it tells us that an action is *present* and *continuing*. *Id.* (defining present participles as being used in the formation of the progressive tenses); Bryan A. Garner, *Garner's Modern American Usage 1020* (4th ed. 2016) (defining "present participle" as "[a] nonfinite verb form ending in -ing and used in verb phrases to signal the progressive aspect").

So what do these two friends, the gerund and the present participle, tell us about our order? In the order, the district court enjoined the Government from "removing," which is either a gerund or the present participle form of the word "remove." Min. Order 4, Mar. 15, 2025. On a close read, the word "removing" in the district court's order is likely a gerund, but it certainly may be reasonably construed as a present participle. Regardless, the conclusion that flows from construing this as a present participle or a gerund is the same. By conjugating the verb "remove" in this way ("removing"), the district court enjoined what it understood to be the *present* actions of the Federal Defendants. In this case being that the Federal Defendants were in the process of, via a then-unknown number of flights, "removing" hundreds of Venezuelan

migrants. And that it was commanding the Federal Defendants in writing, as it had earlier commanded them in the hearing, to be restrained from the *continuing* and *present* action of removal. The text of the temporary restraining order, therefore, clearly and specifically barred the continued transfer, *id est* the *present* removal of class members to CECOT.

Putting our grammatical friends in the wings for a moment, one interpretive issue addressed by the majority may remain: How must we read the district court's injunctive language when reading its two temporary restraining orders together? The majority starts by conceding the most important point for this interpretive exercise: the district court's injunctive language is meaningfully different between its first and second temporary restraining orders on March 15th. In the first temporary restraining order, issued at 9:40 A.M., the Federal Defendants were enjoined from removing the five Lead Plaintiffs "from the United States." Min. Order 2, Mar. 15, 2025. The majority imbues this language with the district court's supposed understanding of the territorial limits of its injunctive authority. Majority Op. at 24–26. A review of the facts suggests otherwise.

At the time of the district court's first temporary restraining order, it had no understanding of the ongoing removal efforts of the Federal Defendants. It was 9:40 A.M. in Washington and 7:40 A.M. in Texas. Plaintiffs' counsel also knew very little information, only being able to convey that they were aware of at least one of the Lead Plaintiffs being moved from El Valle. At that time, the Government was neither contesting nor acknowledging the events on the docket, despite repeated attempts to contact it. As such, all that was available to the district court at that time was the *ex parte* representation that one plaintiff was being transferred from a facility. This action may have been the precursor of that

plaintiff's removal. Still, without any opportunity from the Government to rebut this, it would be a stretch for the court to leap to the conclusion that this plaintiff was actively being deported from the United States at this time.

It was with this limited understanding of the events unfolding that morning in Texas that the district court ordered that the Federal Defendants "shall not remove" the Lead Plaintiffs. Min. Order 2, Mar. 15, 2025. This word, "remove," given to us in the transitive verb form, fits nicely with the conclusion that the court was unsure of whether the Lead Plaintiffs were in transit. So, the court ordered that they not *be* removed from the location referenced in the order, that being the United States. *Id.* Additionally, the use of distinct prohibitive language, namely the command that the Federal Defendants "shall not" remove the Plaintiffs, also suggests that the district court's understanding at the time was that Plaintiffs were likely still in detention facilities in Texas. *Id.*

It is not an exaggeration to say that nine hours after its first temporary restraining order, the world in front of the district court had changed drastically, and it was an open question where any of the class members were. In the intervening time, when the district court asked the Government directly about ongoing removals, the Government openly and repeatedly declined to answer. The Government, moreover, did not contest Plaintiffs' representations about the ongoing boarding and takeoff of removal flights in open court or *in camera*.

Naturally, nearly two hours of discussion about the uncontested, rapidly evolving facts made the district court's second temporary restraining order different than the first. The district court needed to incorporate by reference the hearing discussion. Min. Order 4, Mar. 15, 2025. The district court needed to broaden its language to enjoin the United States

Government. *Id.* It needed to state that the Government was "ENJOINED" from continuing its action of "removing" class members. *Id.* The class members whom the court had just defined as being "noncitizens in U.S. custody." *Id.* With the hearing context, it is difficult to read these changes as anything other than a deliberate effort by the district court to ensure that its second temporary restraining order was responsive to what it now understood the Government to be doing, removing class members from the Federal Defendants' control and the court's subject-matter jurisdiction. It would be a mistake to read much more into these two minute orders, especially strict theories of territoriality and custody that are not reflected in the content and tenor of the hearing.

Moreover, it would be a mistake to interpret the order, as the majority does, in a way that frustrates its purpose. This is not permitted in our review of criminal contempt proceedings. *See Rapone*, 131 F.3d at 192–93. Indeed, for criminal contempt proceedings, we have recognized that the precise words necessary to enjoin litigants with exactitude are not required for contempt to be found. *See Holloway*, 995 F.2d at 1082 (citing *United States v. Turner*, 812 F.2d 1552, 1567 (11th Cir. 1987) ("Even an egregiously vague order may be thought adequate to cover conduct so gross as to fall within its core.")) (additional citation omitted).

Ratifying an interpretation that would frustrate the instrument's purpose is not even a permitted practice in statutory interpretation. Antonin Scalia & Bryan A. Garner, *Reading Law* 56–58 (2012); *see also id.* at 63 ("A textually permissible interpretation that furthers rather than obstructs a document's purpose should be favored."); *see also John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 94–95 (1993) (ratifying that courts interpret the "language of the governing statute" in light of the statute's "object and

policy"); *United States v. Hayes*, 555 U.S. 415, 427 (2009) (advising against interpreting criminal statutes in a way that would "frustrate Congress' manifest purpose").

In sum, both the context and the text squarely support that the second temporary restraining order was clear and reasonably specific, and it was meant to address the movement of the class members in flight to CECOT. Consequently, while those class members were still in the care and keeping of the United States—as migrants with then-pending removal proceedings, the court's order obligated the Federal Defendants to cease their present, progressive attempt to remove them.

I will properly leave any further analysis of the orders to the district court to do in the first instance. In the meantime, I must do what is required of me upon this petition for review: deny that the Government has asserted a clear and indisputable right to end criminal contempt proceedings before they begin.

**C.**

Finally, "even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 381 (citation omitted). This "totality of the circumstances" review allows us to issue the writ of mandamus only when truly necessary. *See Fokker*, 818 F.3d at 750 (citing *Kellogg*, 756 F.3d at 762). In the past, we have found this element satisfied when a ruling will "have enormous practical consequences." *Id.* (quoting *United States v. Microsoft Corp.*, 56 F.3d 1448, 1456 (D.C. Cir. 1995)). Similarly, we have also suggested when analyzing this element that mandamus may be deployed to prevent future trial courts from committing similar errors. *In re Clinton*, 970 F.3d 357, 368–69 (D.C. Cir. 2020) (citation omitted), *reh'g denied*, 973 F.3d 106 (D.C. Cir. 2020).

Yet how could we make such a conclusion about the circumstances before us? To say that mandamus is appropriate under the circumstances, as the majority does, is to necessarily conclude that the district court stepped so woefully outside of its authority that we must command it to return to the lawful exercise of its jurisdiction. Consequently, the majority *must* say that initiating contempt proceedings was outside the district court's authority. *See Cheney*, 542 U.S at 380. Similarly, by concluding that the district court usurped its lawful jurisdiction, the majority *must* purport that by initiating contempt proceedings, the district court stepped outside of the scope of its inherent contempt powers. *See id.*

However, the district court did not overstep any boundaries in pursuing, before referral, responsive factfinding, especially following the Federal Defendants' curt and contradictory declarations about the events of the weekend in question. *See supra* Sections I.B.–C. Nor can the majority conclude that the district court exceeded the scope of its inherent authority by merely taking the first step to uncover possible contemptuous acts; for a court by its very nature has the power to remedy or penalize contempt of any litigant before it. *See Robinson*, 86 U.S. at 510; 18 U.S.C. §§ 401–402. Conducting contempt factfinding ahead of initiating contempt proceedings is certainly well within the bounds of the court's inherent and statutory authority. *See supra* Section III.B.3. It is well-established that the discretionary authority of the court to investigate, refer, and correct criminal contempt is broad. *See Potter*, 126 F.4th at 725 (explaining that courts "enjoy a broader discretion" to correct criminal contempt); *cf. also Salazar v. Buono*, 559 U.S. 700, 762 (2010) (Breyer, J., dissenting) (A court granting an injunction "is necessarily invested with large discretion in enforcing obedience to its mandate, and courts of appellate powers are exceedingly averse to interfering with the exercise of such judgment and

discretion." (quoting 2 J. High, *Law of Injunctions* § 1458, at 1467–68 (4th ed. 1905)) (citation modified)). Thus, the majority's position that the district court must be corrected through mandamus under these circumstances—when it has even more cautiously proceeded in its factfinding, strains credulity.

Finally, for this condition, I will also briefly return to where our discussion began: the origins of the writ of mandamus. I do so because one aspect of our mandamus precedent is especially notable for its fealty to the English tradition. While mandamus is at its core a remedy of law, not a remedy of equity, several equitable principles were imported into it. *Whitehouse v. Illinois Cent. R.R. Co.*, 349 U.S. 366, 373 (1955) ("[M]andamus is itself governed by equitable considerations and is to be granted only in the exercise of sound discretion."); *see also Union Pac. R.R. Co. v. Hall*, 91 U.S. (1 Otto) 343, 355 (1875) (comparing a mandamus petition to a bill in equity). This includes the equitable considerations we now ponder for the third condition of mandamus, whether the writ is nonetheless appropriate under the circumstances. To that end, I suggest as well that mandamus is inappropriate here because the Government may not be coming to this court with clean hands.

In general, "the unclean hands doctrine requires that a party seeking equitable relief 'show that . . . [their] conduct has been fair, equitable, and honest as to the particular controversy in issue." *Bartko v. Sec. & Exch. Comm'n*, 845 F.3d 1217, 1227 (D.C. Cir. 2017) (citing 27A *Am. Jur. 2d Equity* § 98 (2d ed. Feb. 2026 Update)). As Justices have recently noted, for centuries, courts have "close[d] the doors" of equity to those "tainted with inequitableness or bad faith relative to the matter in which [they] see[k] relief." *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153, 2158 (2025) (mem.) (Sotomayor, J.,

dissenting) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)) (additional citation omitted). The purpose of the doctrine is thus to ensure that the courts, when sitting in equity, are a "vehicle for affirmatively enforcing the requirements of conscience and good faith," and not "abettors of inequity." *Id.* (citing *Precision Instrument*, 324 U.S. at 814) (citation modified).

Fittingly, because "mandamus is not a writ of right," and cannot be used to promote wrongs, equitable principles prohibit the writ of mandamus from being "granted in aid of those who do not come into court with clean hands." *U.S. ex rel. Turner v. Fisher*, 222 U.S. 204, 209 (1911); *accord Garfield v. U.S. ex rel. Turner*, 31 App. D.C. 332, 335–36 (D.C. Cir. 1908). While this principle may apply *differently*, perhaps with less force in some circumstances, the government is plainly not exempted from the consequences of the doctrine. *Bartko*, 845 F.3d at 1227 (collecting cases). Indeed, recent scholarship has also noted that the Executive Branch, in particular, is not exempt from the requirement of coming into court with clean hands. William Baude & Samuel L. Bray, *When the Executive Has Unclean Hands*, 135 Yale L.J. Forum 567, 568, 583, 585–88, 592–93, 595 (2026). Even the limited record available to this court supports the idea that the Government's interactions with the district court may be a patent example of the conduct that the clean hands doctrine seeks to discourage. *Compare supra* Sections I.B.–C, *with id.* at 571–72 (explaining inequitable behavior includes misrepresentations, protecting unlawful conduct, abusing legal rights or powers, and willful ignorance of the same).

As such, I cannot say that I am satisfied that we must exercise our considerable discretion and permit the writ to issue under these circumstances, where there has certainly been no showing, and no independent assessment of the majority, to

support that such relief is "appropriate" to award the Government. *Cheney*, 542 U.S. at 381 (citation omitted). As we are entitled to conclude, I would accordingly deny that mandamus is appropriate under the circumstances before us and deny *en toto* that mandamus may be issued here.

* * * *

Courts of review are privileged to declare and clarify the law, and they are often given ample time, briefing, and anonymity for this role. However, the trial court must face anyone who wishes to enforce and execute the law of the land. It is the trial court that must courageously ensure that our law is properly applied. There is nowhere to hide in the trial court's intimate setting, where litigants, jurists, and the public convene, where a court must factfind and make conclusions of law, and then do so again on remand, and then again after vacatur, and then anew for the next case. Indeed, it is a difficult and delicate exercise, but it should not be a dangerous one.

Addressing contempt is an integral part of the trial court's sacred mystery; it is the key to maintaining the order and safety of the court when applying the law. It is a power so essential for the rule of law that it predates our system of separation of powers and judicial review. It is because of the utmost respect I have for the trial court and the gift of our system of governance that I believe that mandamus should not be used to question a trial court's inherent authority to protect its courtroom and the rule of law. Mandamus, therefore, should only issue on days where it is needed to restore, and not upset, the balance of power in our government. But today is not one of those days.

For the foregoing reasons, the Government's petition for mandamus should be denied. As my colleagues grant the petition, I must respectfully dissent.