No. 25-5452

---

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

In re DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES, *et al.*,

Petitioners.

---

On Petition for a Writ of Mandamus to the United States
District Court for the District of Columbia
No. 1:25-cv-00766
The Hon. James E. Boasberg

---

## RESPONDENTS' PETITION FOR REHEARING EN BANC

---

Evelyn Danforth-Scott
Spencer Amdur
Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770

Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
915 15th Street, NW, 7th Floor
Washington, D.C. 20005
(212) 549-2500

Lee Gelernt
    *Counsel of Record*
Daniel Galindo
Ashley Gorski
Patrick Toomey
Omar Jadwat
Hina Shamsi
Sidra Mahfooz
Sean M. Lau
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org

*Barred in Texas and Arizona
only; supervised by a member of
the D.C. Bar

Arthur B. Spitzer
Scott Michelman
Aditi Shah
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION OF
    THE DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800

*Counsel for Respondents*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................. iv

INTRODUCTION AND RULE 40(b)(2) STATEMENT .........................................1

BACKGROUND ..........................................................................3

REASONS FOR GRANTING REHEARING EN BANC ........................................6

   I. THE PANEL'S RULING IS INCONSISTENT WITH THIS CIRCUIT'S MANDAMUS JURISPRUDENCE. ........................................................6

      A. The District Court's Order Was Objectively and Subjectively Clear......6

      B. Review Is Available Later...................................................11

      C. The Government's Deliberate Obfuscation Strongly Militates Against Mandamus. ....................................................................15

   II. THE PANEL'S RULING HAS PROFOUND IMPLICATIONS FOR THE RULE OF LAW....................................................................16

CONCLUSION ...........................................................................17

CERTIFICATE OF COMPLIANCE..........................................................18

CERTIFICATE OF SERVICE ..............................................................19

(Page 3 of Total)

## TABLE OF AUTHORITIES

**Cases**                                                              **Pages**

*A.A.R.P. v. Trump*,
   605 U.S. 91 (2025)................................................................16

*In re Al Baluchi*,
   952 F.3d 363 (D.C. Cir. 2020)...................................................6

*In re Cheney*,
   544 F.3d 311 (D.C. Cir. 2008)..................................................11

*Food Lion v. United Food & Com. Workers Int'l Union*,
   103 F.3d 1007 (D.C. Cir. 1997)................................................10

*In re Holloway*,
   995 F.2d 1080 (D.C. Cir. 1993)................................................10

*J.G.G. v. Trump*,
   147 F.4th 1044 (D.C. Cir. 2025)...........................................*passim*

*J.G.G. v. Trump*,
   No. 25-5124, 2025 WL 3198891 (D.C. Cir. Nov. 14, 2025) .....................*passim*

*Juan T.R. v. Noem*,
   No. 0:26-cv-00107, 2026 WL 555601 (D. Minn. Feb. 26, 2026) .......................2

*Kumar v. Soto*,
   No. 2:26-cv-00777, 2026 WL 585187 (D.N.J. Mar. 2, 2026)...........................2

*In re LeFande*,
   919 F.3d 554 (D.C. Cir. 2019)..................................................14

*In re Lindsey*,
   158 F.3d 1263 (D.C. Cir. 1998)...............................................14

*Minarcaja Concha v. Lyons*,
   No. 2:25-cv-6695, 2026 WL 307170 (E.D.N.Y. Feb. 4, 2026).........................2

*Ms. L v. ICE*,
   No. 3:18-cv-00428, ECF 937 (S.D. Cal. Feb. 5, 2026) .............................2

*Piemonte v. United States*,
  367 U.S. 556 (1961)........................................................................................11

*In re Sealed Case No. 98-3077*,
  151 F.3d 1059 (D.C. Cir. 1998)......................................................................11

*Soto Cedeno v. Bondi*,
  No. 24-1018, ECF 49.1 (9th Cir. Aug. 4, 2025)..............................................2

*United States v. Young*,
  107 F.3d 903 (D.C. Cir. 1997)...................................................................9, 13

**Statutes**

50 U.S.C. § 21 ..................................................................................................15

**Other Authorities**

Hr'g Tr., *Espinoza Escalona v. Noem*, No. 1:25-cv-00604-CJN
  (D.D.C.), ECF 33-1........................................................................................8

Resp's' Opp., *Espinoza Escalona v. Noem*, No. 1:25-cv-00604-CJN
  (D.D.C.), ECF 14 ...........................................................................................8

**INTRODUCTION AND RULE 40(b)(2) STATEMENT**

The panel's 2-1 ruling mandated that Chief Judge Boasberg end his criminal contempt inquiry into the brazen violation of his order not to remove Plaintiffs to El Salvador—a violation that resulted in Plaintiffs being subjected to months of abuse and torture at the notorious CECOT prison. Op. 2-3. The panel preemptively decided that the district court's order was ambiguous and could not therefore support a criminal contempt finding, even though the government lawyers handling the case stated that they understood the order. The panel also concluded that the district court could have referred the matter for prosecution based on the information in its possession and that seeking any further facts was clear error. But even if the district court were barred from seeking additional information (which it plainly was not), the panel's principal holding that the order's supposed ambiguity precludes criminal contempt now means that the district court is barred from even making a referral. The panel's ruling has thus shielded Defendants from further inquiry into their actions, whether by a prosecutor or the district court.

The panel's extraordinary rulings that the order was ambiguous and that the district court erred in seeking further facts are wrong and warrant rehearing en banc: they are flatly inconsistent with this Circuit's mandamus cases and raise issues of grave importance for the Judiciary's ability to enforce its orders. Indeed, when the case was before the Court previously, six judges stated that these were

1

issues worthy of en banc review. *J.G.G. v. Trump*, No. 25-5124, 2025 WL 3198891 (D.C. Cir. Nov. 14, 2025) (unpublished op.) (hereinafter "*J.G.G.* En Banc Denial").

The panel's ruling undermining the district court's authority to enforce its orders will have implications well beyond this case, as the Executive Branch has continued to violate court orders. Judges around the country have followed Chief Judge Boasberg's courageous lead and refused to allow the Executive Branch to thumb its nose at the Judiciary. *See, e.g.*, *Juan T.R. v. Noem*, No. 0:26-cv-00107, 2026 WL 555601 (D. Minn. Feb. 26, 2026) (Schiltz, J.) (cataloguing that in the District of Minnesota in January and February alone, ICE violated 209 court orders in 142 cases, including 113 *after* an initial show-cause order); *Kumar v. Soto*, No. 2:26-cv-00777, 2026 WL 585187 (D.N.J. Mar. 2, 2026) (finding violation of no-transfer order and similar violations "at a rate of around three every two weeks" in the District of New Jersey); *Soto Cedeno v. Bondi*, No. 24-1018, ECF 49.1 (9th Cir. Aug. 4, 2025) (finding violation of order staying removal); *Minarcaja Concha v. Lyons*, No. 2:25-cv-6695, 2026 WL 307170 (E.D.N.Y. Feb. 4, 2026) (finding violation of orders); *Ms. L v. ICE*, No. 3:18-cv-00428, ECF 937 (S.D. Cal. Feb. 5, 2026) (finding removals in violation of order). The panel's ruling sends a dangerous message that the Executive Branch can escape judicial orders by asserting "spurious, *post hoc* rationalizations [that] manufacture ambiguity where there is none" and "vaguely sketched," "illusory" separation of powers concerns.

*J.G.G. v. Trump*, 147 F.4th 1044, 1085 (Pillard, J., dissenting) (hereinafter "First Mandamus Op.").

## BACKGROUND

In April 2025, the district court found probable cause of criminal contempt and required further information from the government to identify all contemnors, with an option to purge contempt by providing due process to the removed Plaintiffs. ECF 81 at 43-44; ECF 80.[1] This Court granted mandamus. First Mandamus Op., 147 F.4th at 1045 (per curiam). Judge Katsas concluded that the TRO was ambiguous and could have been understood to apply only when the planes were still in U.S. airspace. *Id.* at 1046. Judge Rao concluded only that the district court's "purge" option warranted mandamus but did not vote to halt the district court's inquiry. *Id.* at 1073-74. Judge Pillard dissented, because the TRO could not be deemed ambiguous under any "plausible" reading and the government could adequately seek review later. *Id.* at 1085, 1088.

The Court denied rehearing, but "[s]ix of the eleven active judges on this court opine[d] that the district court did not err." *J.G.G.* En Banc Denial, 2025 WL 3198891, at *5 n.1 (Pan, J., dissenting). Judges Millett, Pan, and Childs would have granted rehearing. Judges Pillard, Wilkins, and Garcia viewed en banc

---

[1] ECF references are to *J.G.G. v. Trump*, No. 1:25-cv-00766 (D.D.C.), unless otherwise noted. Page numbers are ECF pagination except ECF 158-1 ("Reuveni Disclosure").

3

rehearing as unnecessary because the opinion was non-precedential, but explained that the district court had acted well within its discretion and had certainly not violated a clear and unambiguous duty: "The district court's order here was a measured and essential response to what it reasonably perceived as shocking Executive Branch conduct." *Id.* at *2 (statement respecting denial).

On remand, the district court ordered that the government "submit declarations from *all individuals involved* in the decision not to halt the transfer of class members out of U.S. physical custody .…" ECF 196 at 2 (emphasis added). The government, however, submitted declarations only from "the official who personally made the decision and the officials responsible for the legal advice regarding the decision." ECF 198 at 1. Then-Secretary Noem's two-sentence declaration stated only that she received legal advice before making her decision. ECF 198-1. Finding that Noem's declaration did not allow it "to determine whether her decision was a willful violation of the Court's Order," the district court sought testimony from Erez Reuveni (one of the government's counsel in this case and whistleblower) and Drew Ensign (who argued the March 15 hearing for the government). ECF 200. Both have essential information. Critically, both understood the district court's order to prevent the transfer of physical custody regardless of the planes' territorial location. Ensign made that concession in open court six days after the TRO hearing. ECF 51 at 4:17-6:9. Reuveni subsequently

4

disclosed multiple emails he sent to DOJ and the relevant agencies in which he explained that the injunction prevented deplaning Plaintiffs—for example: "Please confirm asap no one lacking a title 8 final order will be taken off these planes when they land. We need to address this asap to avoid contempt." ECF 177-8 at 20; *id.* at 15-16.

Reuveni's whistleblower disclosure stated that both he and Ensign attended a March 14 meeting at which then-Principal Associate Deputy Attorney General Bove said that AEA flights would depart over the weekend and "that DOJ would need to consider telling the courts 'fuck you'" if they sought to enjoin the removals. Reuveni Disclosure at 7. It is certainly appropriate for the district court to determine if Defendants' decision to ignore the order was premeditated.

Ensign could further explain why he told the district court at the March 15 hearing he did not know whether planes were scheduled to depart in the "next 24 or 48 hours," ECF 20 at 11:12-20, given that Reuveni reported that Ensign attended the Bove meeting. Ensign could additionally provide information about events between the hearing and the deplaning in El Salvador, including whether he sought to ensure compliance and why Defendants waited until Sunday afternoon to inform the court of their interpretation of the order.

## REASONS FOR GRANTING REHEARING EN BANC

**I.    THE PANEL'S RULING IS INCONSISTENT WITH THIS CIRCUIT'S MANDAMUS JURISPRUDENCE.**

Mandamus is unwarranted under all three prongs of the Circuit's test: there is no "clear and indisputable" right to the writ; later review is available; and discretionary considerations militate against that extraordinary remedy. *See In re Al Baluchi*, 952 F.3d 363, 368 (D.C. Cir. 2020).

**A. The District Court's Order Was Objectively and Subjectively Clear.**

1. The panel gutted the longstanding rule that mandamus may issue only based on a "clear and indisputable" right to relief, a "demanding," non-negotiable requirement that requires relief be "clearly mandated by statutory authority or case law." *Id.* at 369. The panel found the standard met, accepting the government's contrived, post-hoc argument that the TRO could reasonably have meant that Plaintiffs should not be removed from U.S. "territory," rather than from U.S. physical custody. Op.23-26. But neither the panel nor Defendants offered any conceivable reason why the district court would have been concerned only with Plaintiffs' departure from U.S. territory, given that at the hearing it stressed its concern about losing jurisdiction if the impending transfer of custody occurred. Indeed, the context of the hearing and its urgency was to ensure that the district court did not potentially lose jurisdiction if Defendants transferred custody. First Mandamus Op., 147 F.4th at 1084, 1087 (Pillard, J.) ("unambiguous command,

6

overwhelmingly confirmed by context"); Op.118 (Childs, J., dissenting) (order was "meant to address the movement of the class members in flight to CECOT").

Judge Rao's majority opinion sought to overcome that obstacle by ignoring the clarity of the district court's oral pronouncements and finding that the written order was ambiguous because "removal" could mean different things. Op.23-24. But at the hearing the district court could not have been clearer: "any plane … that is going to take off or is in the air needs to be returned" and "those people need to be returned to the United States." ECF 20 at 43:11-15. Then, leaving nothing to chance, the district court stated that this could be "accomplished" either by "turning around a plane or not [dis]embarking anyone on the plane …" *Id.* at 43:16-18.

Judge Rao nonetheless maintained that "these oral statements" provided only "some support" for reading the court's order as concerned with the transfer of custody and that they were "*perhaps suggestive* of some custodial responsibility" but "did not clearly and specifically require the government to retain custody." Op.27 (emphasis added). That is "entirely implausible." First Mandamus Op., 147 F.4th at 1076-77, 1088 (Pillard, J.); Op.112 (Childs, J.) ("context" demonstrated order provided relief to all "still in federal custody").

Freeing herself of the oral directive, Judge Rao then argued the minute order was ambiguous, focusing on "removal" in isolation. Op.23-24. But nothing about

7

this case would suggest that the district court was concerned with territorial limits, as opposed to physical custody. Notably, when Reuveni (then-Acting Deputy Director for DOJ's Office of Immigration Litigation) emailed the agencies and DOJ colleagues, he asked if anyone "subject to the AEA" was "presently in the air *as part of removal* (but *not yet having landed and disembarked*)." ECF 177-8 at 16 (emphasis added).[2]

Nor, contrary to Judge Rao's suggestion, is the government aided by the difference between the wording of the court's morning and evening orders or the relief requested by Plaintiffs prior to learning the planes were about to depart. *See* Op.113-17 (Childs, J.); First Mandamus Op., 147 F.4th at 1084-85, 1091 (Pillard, J.).

2. Concurring, Judge Walker conceded that the oral order required the government to "turn a plane around immediately" or "not disembark[] anyone on

---

[2] Untethering the case from its context, Judge Rao cited the Immigration and Nationality Act ("INA") to suggest that "removal" can have a territorial rather than custodial meaning. Op.24. But whatever the proper reading of the INA, it is the government's understanding of the order that is relevant here. And *the day before* the AEA flights, Ensign himself told a D.D.C. judge in a different case involving the INA that noncitizens "aren't removed until the United States government officials essentially release them." *Espinoza Escalona v. Noem*, No. 1:25-cv-00604-CJN, ECF 33-1 at 43:4-6; *see also* Resp's' Opp'n, *Espinoza Escalona v. Noem*, No. 1:25-cv-00604-CJN, ECF 14 at 40 ("the removal process is not complete until the individual reaches the final destination"). It is consequently unsurprising that Ensign told Chief Judge Boasberg six days after the flights that he understood his order. *J.G.G.*, ECF 51 at 5:3-6:9.

8

the plane." Op.38. In his view, however, the written order "superseded" and, in effect, countermanded the oral order because the district court stated that the lawyers need not "write down" the oral order and the written order did not then repeat everything from the oral order. *Id.* at 33. But the district court plainly stated just the opposite: it began the written order by specifically stating "[a]s discussed in today's hearing," leaving no doubt that the oral and written orders were congruent. D.D.C. Mar. 15 Evening Minute Order; Op.112 (Childs, J.) (minute order "incorporated by reference" district court's directive not to deplane). Nor is it remotely plausible that "in the thirty-minute interval between the TRO hearing and the Minute Order, the district court changed its mind," wholly altered its prior "point-blank" oral order, and suddenly decided to allow the government to transfer physical custody as long as the planes had cleared U.S. territory—thereby putting its jurisdiction at risk, the very thing it was at pains to prevent. First Mandamus Op., 147 F.4th at 1087-88 (Pillard, J.).

3. Critically, both Judges Rao and Walker also entirely ignored that DOJ counsel on the case (Reuveni and Ensign) understood that the order prevented Plaintiffs' transfer to El Salvador. *See supra* 4-5. Although the contempt standard is "objective," it "takes into account" the "audience to which it is addressed" and how others "understood" the order's scope. *United States v. Young*, 107 F.3d 903, 907-08 (D.C. Cir. 1997). Here, the audience was sophisticated government officials

9

who were informed by their counsel in real time that the injunction prevented deplaning individuals subject to the AEA. *See, e.g.*, *In re Holloway*, 995 F.2d 1080, 1084 (D.C. Cir. 1993) (rejecting effort "to interject some ambiguity" given record evidence that contemnor "knew what the judge meant"). That career DOJ counsel assigned to the case repeatedly notified the relevant agencies of the district court's order, its meaning, and its urgency, yet received no response until the next day, speaks volumes. Reuveni Disclosure at 11-14; ECF 177-8 at 15, 20, 23, 24.

And had Defendants *genuinely* believed the order was unclear, they could have sought clarification. First Mandamus Op., 147 F.4th at 1080 (Pillard, J.) ("Nor, to the extent there was any confusion about the meaning of the TRO, did defendants seek any clarification from the court."); *Food Lion v. United Food & Com. Workers Int'l Union*, 103 F.3d 1007, 1019 (D.C. Cir. 1997) (affirming contempt finding, noting litigant "did not seek a clarification"). Indeed, the planes sat for hours in Honduras after the district court issued its minute order, before Defendants chose to fly them on to El Salvador later that evening. ECF 177-9 at 11; First Mandamus Op., 147 F.4th at 1080 (Pillard, J.). Instead, Defendants chose to inform the court of their contrived interpretation only the next day, as a fait accompli. ECF 19. The district court certainly may explore whether there was a deliberate decision not to include Ensign and Reuveni in any discussion about the scope of the order or compliance, given that they were the lawyers on the case and

10

argued the case (Ensign) or closely monitored it (Reuveni). *See Piemonte v. United States*, 367 U.S. 556, 560 (1961) (where "[n]either [contemnor] nor his counsel ever claimed confusion in the District Court," contemnor's later contention that order was ambiguous was "sheer afterthought"); Op.112 (Childs, J.) (evidence of government understanding of TRO).

### B.  Review Is Available Later.

The majority also wrongly held that there was no other adequate means to attain relief, as mandamus requires. *In re Cheney*, 544 F.3d 311, 312-13 (D.C. Cir. 2008). But review would be available when and *if* the district were to find probable cause that any individual committed criminal contempt, and *if* there were a referral, and *if* there were a conviction. As Judges Childs and Pillard stressed, this Court "ha[s] never reviewed an interlocutory order in an indirect criminal contempt proceeding like the one before us." Op.54 (Childs, J.); First Mandamus Op., 147 F.4th at 1076 (Pillard, J.) ("I am unaware of any case … holding that ambiguity in the disobeyed court order" provides a basis for pre-charging decision mandamus). *In re Sealed Case No. 98-3077*, 151 F.3d 1059 (D.C. Cir. 1998), cited by the panel, Op.30, involved the wholly different context of grand jury proceedings (and associated secrecy), and the potential for irreparable harm to those proceedings. *Id.* at 1065-66.

The panel nonetheless concluded that mandamus was proper because the district court's inquiry created "antagonistic jurisdiction" and "separation of powers considerations" in the "national security" context. Op.3, 12. Insofar as the panel and government suggested that any friction created by the district court's factual inquiry should be resolved by the Judiciary backing off, that is backward. The Executive Branch cannot create friction by disobeying court orders and then complain when the courts seek to uncover the facts. By pegging the writ to amorphous Executive Branch prerogatives, the panel opened the door to the government—and only the government—securing extraordinary relief as a matter of course. *J.G.G.* En Banc Denial, 2025 WL 3198891, at *8 (Pan, J.) (permitting mandamus under a "bespoke" legal standard creates the "unfortunate impression that the government is not subject to the same rules and standards as other parties who come before our court").

Nor does the district court's inquiry remotely seek to delve into matters of national security. Indeed, the panel never explained why asking the Executive Branch to recount how it understood and responded to a court order jeopardizes national security, let alone why existing safeguards like *in camera* review would prove inadequate if sensitive information were hypothetically to surface. The panel's reasoning turns "national security" claims into a blank check that the

12

government may cash whenever it wishes to evade the consequences of its misconduct.

Finally, the panel's conclusion that the "district court now possesses the information it identified as necessary to make a referral for prosecution," making "[a]ny further judicial investigation … irrelevant," Op.18, is factually incorrect. As noted above, the government did not honor the district court's order to submit declarations from all individuals "involved" in the decision, much less provide the district court with sufficient information to determine who may have acted willfully. The referral point is also a red herring because the panel's sweeping writ based on the order's supposed ambiguity precludes the district court from even making a referral.

Moreover, Defendants' cursory declarations obscured rather than illuminated probable cause as to a *willful* violation of the district court's order. *See Young*, 107 F.3d at 909 (willfulness requirement). Among other questions, the declarations did not illuminate whether Noem was in possession of the relevant facts about the district court's order. Nor did they explain whether Noem ordered the transfers against the advice of her lawyers.[3] Equally important, the affidavits did not rule out the possibility that Noem received significant direction or input from non-lawyers.

---

[3] The government has suggested that the district court may not pierce the attorney-client privilege, but that is wrong where "contempt was being considered" by the government. ECF 208 at 2-3. Regardless, that would not justify the sweeping writ

13

For the same reason, the panel's view that the district court moved the "goalposts" because it initially asked only for the individuals involved in the transfer decision, Op.10, is incorrect. The district court did not say that would be the only information it would need and certainly was not precluded from seeking additional information after the government submitted plainly deficient declarations. Op.119 (Childs, J.).

Not only does this Circuit disdain micromanagement of district court factfinding, but here the panel *agreed* that a district court possesses the power to "undertake some limited factfinding before making a referral for criminal contempt." Op.18 n.11. It quibbled only with the scope of these concededly valid powers, but surely that in-the-weeds question of degree—for which the majority provided no on-point authority to substantiate its position—does not establish the kind of clear and indisputable entitlement to relief that justifies mandamus.[4]

---

issued by the panel, especially because the district court expressly stated it would rule on attorney-client issues as they arose. *Id.*; *see In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) (explaining that a "blanket assertion" of attorney-client privilege "will not suffice" and that such claims should instead be resolved based on specific facts); *In re LeFande*, 919 F.3d 554, 563 (D.C. Cir. 2019) (similar).

[4] The panel's conclusion that "[t]he participation of opposing counsel in the *investigation* of criminal contempt is similarly improper in these circumstances," Op.17, also could not possibly be a basis for halting all further inquiry. Even were it a basis for mandamus—which it is not—at the very most, the panel's conclusion on this issue might have limited Plaintiffs' counsel's participation in further proceedings.

14

**C. The Government's Deliberate Obfuscation Strongly Militates Against Mandamus.**

As Judge Childs explained, even assuming the government satisfied the non-negotiable mandamus requirements, the writ is discretionary and should not be awarded to one with "unclean hands." Op.120-21. Here, despite the AEA's requirement of a "public" announcement, 50 U.S.C. § 21, the Proclamation was not issued publicly until late Saturday afternoon, well after the government began preparing Plaintiffs for removal. And at the 5 p.m. hearing, Ensign stated he had no information about the planes' departure times and, remarkably, was unable to provide that information even after the district court called a mid-hearing recess so that he could obtain it. ECF 20 at 11:12-20, 16:7-21. Yet Reuveni's evidence reflected that Ensign clearly knew there were planes departing that weekend. Reuveni Disclosure at 7; ECF 177-9 at 9. And it would be just as bad if Defendants purposely kept Ensign in the dark so he could plausibly deny any knowledge.

Similarly troubling is that Reuveni told the district court on Saturday morning that a weekend hearing would be "premature," ECF 205-1 at 3, even though Bove had informed him and others that the planes would depart that weekend, Reuveni Disclosure at 7. Had the district court known that information, it could have issued a classwide TRO pending a Monday hearing or held the hearing earlier than Saturday evening. It is plainly relevant for the district court to seek to learn who instructed Reuveni to represent that a weekend hearing was unnecessary.

15

Even post-transfer, Defendants acted as if the courts were simply a nuisance. Secretary Rubio, for instance, reposted a headline directing "return" of Plaintiffs with the addendum "Oopsie … too late 😂." ECF 81 at 9-10 (district court opinion) (noting "boasts by Defendants intimated that they had defied the Court's Order deliberately and gleefully"). It's difficult to see the government's actions as anything but unclean and openly disrespectful of the district court.

## II.    THE PANEL'S RULING HAS PROFOUND IMPLICATIONS FOR THE RULE OF LAW.

The ruling independently warrants rehearing because, as a majority of this Court has already concluded, it raises issues of exceptional importance. *J.G.G.* En Banc Denial. The panel's mandamus ruling provides a blueprint for the Executive Branch to evade the normal appellate process. If left undisturbed, the district court would not only be precluded from further factual inquiry, Op.30, but also from referring the matter, given the panel's ambiguity finding, Op.28.

More fundamentally, the ruling will allow the Executive Branch to escape scrutiny and accountability for a transparently deliberate attempt to evade judicial review of its unconstitutional actions and then ignore a judicial order. *A.A.R.P. v. Trump*, 605 U.S. 91, 95 (2025) (due process requires more than twenty-four hours' notice prior to removal of AEA detainees).

\*    \*    \*

16

The Court should grant rehearing and reverse the panel's ambiguity finding. It can then provide whatever direction it deems necessary, if any, to guide the district court's factual inquiry on remand.

## CONCLUSION

Rehearing en banc should be granted.

Date: May 5, 2026

Evelyn Danforth-Scott
Spencer Amdur
Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770

Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
915 15th Street, NW, 7th Floor
Washington, D.C. 20005
(212) 549-2500

*Barred in Texas and Arizona only;
supervised by a member of the D.C. Bar

Respectfully submitted,

/s/ Lee Gelernt
Lee Gelernt
   Counsel of Record
Daniel Galindo
Ashley Gorski
Patrick Toomey
Omar Jadwat
Hina Shamsi
Sidra Mahfooz
Sean M. Lau
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org

Arthur B. Spitzer
Scott Michelman
Aditi Shah
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION OF
   THE DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800

Counsel for Respondents

17

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 40(d)(3)(A) because it contains 3,882 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced and easy-to-read typeface using Microsoft Word in 14-point size font.

/s/ *Lee Gelernt*
Lee Gelernt
May 5, 2026
*Counsel for Respondents*

18

**CERTIFICATE OF SERVICE**

I hereby certify that on May 5, 2026, I electronically filed the foregoing

Petition with the Clerk for the United States Court of Appeals for the District of

Columbia Circuit by using the CM/ECF system. A true and correct copy of this

brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ *Lee Gelernt*
Lee Gelernt
May 5, 2026
*Counsel for Respondents*

19