**[EN BANC ARGUMENT SCHEDULED SEPTEMBER 29, 2026]**

**No. 25-5452**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

In re DONALD J. TRUMP, in his official capacity, et al.,

Petitioners.

---

On Petition for a Writ of Mandamus to the United States
District Court for the District of Columbia
Case No: 1:25-cv-766-JEB

---

## EN BANC OPENING BRIEF FOR PETITIONERS

---

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DEREK WEISS
TIBERIUS DAVIS
  *Attorneys*
  *Civil Division, Room 7230*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.    Parties and Amici

The following were plaintiffs in the district court and are respondents in this proceeding.

- J.G.G.

- G.F.F.

- J.G.O.

- W.G.H.

- J.A.V.

- M.Z.V.V., as next friend on behalf of J.A.B.V.

- M.Y.O.R., as next friend on behalf of M.A.O.R.

- M.M.A.A., as next friend on behalf of G.A.A.A.

- D.A.R.H., as next friend on behalf of Andry Jose Hernandez Romero

- Eylan Schilman, as next friend on behalf of T.C.I.

- Liyanara Sanchez, as next friend on behalf of Frengel Reyes Mota

- Dorys Mendoza, as next friend on behalf of M.R.M

i

The following were defendants in the district court and are

appellants in this appeal.

- Donald J. Trump, in his official capacity as President of the

  United States

- Todd W. Blanche, Acting Attorney General of the United States,

  in his official capacity[1]

- Markwayne Mullin, Secretary of the U.S. Department of

  Homeland Security, in his official capacity[2]

- U.S. Department of Homeland Security

- Todd M. Lyons, Acting Director of U.S. Immigration and Customs

  Enforcement, in his official capacity[3]

- U.S. Immigration and Customs Enforcement

---

[1] Pamela J. Bondi was named in the complaint below as the officeholder.  She is automatically substituted by the current officeholder.  Fed. R. App. P. 43(c)(2).

[2] Kristi L. Noem was named in the complaint below as the officeholder.  She is automatically substituted by the current officeholder.  Fed. R. App. P. 43(c)(2).

[3] Madison Sheahan was named in the complaint below as "Acting Director and Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement, in her official capacity."  She is automatically substituted by the current officeholder.  Fed. R. App. P. 43(c)(2).

- Marco A. Rubio, Secretary of State, in his official capacity

- U.S. State Department

- Peter B. Hegseth, Secretary of War, in his official capacity

- U.S. Department of War

The following were amici in the district court.

- Mark J. Rozell

- Heidi Kitrosser

- Mitchel A. Sollenberger

- Meghan Kelly[4]

The following were movants in the district court.

- The Honorable Brandon Gill

- Janice Wolk Grenadier[5]

- John W. Keker

- Robert A. Van Nest

- Elliot R. Peters

- Laurie Carr Mims

---

[4] This amicus's participation in the case below was terminated January 16, 2026.

[5] This movant's participation in the case below was terminated March 27, 2025.

- Coolidge Reagan Foundation

- Joshua Hall[6]

- Paul M. Dorsey[7]

- Gloria Browning[8]

- Borealis S. Hedling[9]

## B.    Rulings Under Review

This petition for mandamus relates to the following district court rulings:

- The district court's order of November 28, 2025, Dkt. 196, entered by James E. Boasberg, Chief United States District Judge. It is available in the joint appendix at JA335. It does not have an official reporter citation of which undersigned counsel is aware.

- The district court's order of December 8, 2025, Dkt. 200, entered by James E. Boasberg, Chief United States District Judge. It is

---

[6] This movant's participation in the case below was terminated June 4, 2025.

[7] This movant's participation in the case below was terminated July 7, 2025.

[8] This movant's participation in the case below was terminated July 17, 2025.

[9] This movant's participation in the case below was terminated January 16, 2026.

available in the joint appendix at JA383.  It does not have an official reporter citation of which undersigned counsel is aware.

- The district court's order of December 12, 2025, Dkt. 208, entered by James E. Boasberg, Chief United States District Judge.  It is available in the joint appendix at JA391.  It does not have an official reporter citation of which undersigned counsel is aware.

## C.    Related Cases

The following are previous or pending appellate proceedings related to this case:

- *J.G.G. v. Trump*, Nos. 25-5067 & 25-5068 (D.C. Cir.)

- *J.G.G. v. Trump*, No. 25-5124 (D.C. Cir.)

- *J.G.G. v. Trump*, No. 25-5217 (D.C. Cir.)

- *J.G.G. v. Trump*, No. 26-5040 (D.C. Cir.)

- *J.G.G. v. Trump*, No. 26-5074 (D.C. Cir.)

- *Trump v. J.G.G.*, No. 24A931 (U.S.)

*/s/ Derek Weiss*
Derek Weiss

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. viii

GLOSSARY ....................................................................................... xiv

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION ...................................................... 6

STATEMENT OF THE ISSUES ........................................................... 6

PERTINENT STATUTES ..................................................................... 7

STATEMENT OF THE CASE ............................................................... 7

    A.    Statutory and Criminal Procedural Background ................... 7

    B.    Factual Background and Prior Proceedings ......................... 8

SUMMARY OF ARGUMENT ............................................................. 21

STANDARD OF REVIEW ................................................................... 26

ARGUMENT ....................................................................................... 27

I.    The District Court's Criminal Investigation Violates the Separation of Powers ................................................................ 28

    A.    District Courts Cannot Investigate Indirect Criminal Contempt. ........................................................................ 28

        1.    Investigating Crime Is A Core Executive Function. ................................................................ 28

        2.    The December 8 Order Crosses The Line Into Criminal Investigation. ............................................ 32

3. The Panel Dissent Does Not Rehabilitate The District Court's Order. ................................................. 37

B. No Contempt Charges Could Be Viable. .............................. 42

1. The TRO Did Not Clearly Prohibit The Government's Actions. ................................................. 43

2. Contempt Is Impossible Because The TRO Was Void. ....................................................................... 48

C. The Separation-of-Powers Harms Are Plainly Not Justified Given the Testimony's Irrelevance. ....................... 55

1. Probable Cause Is Not Necessary To Refer For Investigation. ............................................................ 56

2. The District Court Already Found Probable Cause. ......................................................................... 57

3. The Witnesses Lack Knowledge Relevant To Probable Cause. ......................................................... 58

II. The District Court's Order Threatens the Attorney-Client Privilege. ..................................................................................... 60

III. Mandamus Relief Is Warranted. .................................................. 66

CONCLUSION ................................................................................... 69

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:**                                                 **Page(s)**

*American Airlines, Inc. v. Allied Pilots Ass'n,*
968 F.2d 523 (5th Cir. 1992) ...................................................... 32

*Ashcroft v. al-Kidd,*
563 U.S. 731 (2011) ................................................................. 46

*Bates v. Johnson,*
901 F.2d 1424 (7th Cir. 1990) .................................................... 46

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran,*
734 F.3d 1175 (D.C. Cir. 2013) ................................................... 48

*Bethune Plaza, Inc. v. Lumpkin,*
863 F.2d 525 (7th Cir. 1988) ..................................................... 45

*Bloom v. Illinois,*
391 U.S. 194 (1968) ............................................................. 7, 28

*Blackmon, In re,*
No. 14-cv-00507, 2016 WL 4055650 (W.D.N.C. July 25, 2016) ......... 41

*Brown, In re,*
454 F.2d 999 (D.C. Cir. 1971) .................................................... 47

*Cheney v. U.S. Dist. Court for D.C.,*
542 U.S. 367 (2004) ............................................................ 27, 66

*Clinton, In re,*
973 F.3d 106 (D.C. Cir. 2020) ................................................... 59

*Cooter & Gell v. Hartmarx Corp.,*
496 U.S. 384 (1990) ............................................................... 53

*Elliott v. Peirsol's Lessee,*
26 U.S. (1 Pet.) 328 (1828) ..................................................... 48

*Ellison v. Shell Oil Co.,*
882 F.2d 349 (9th Cir. 1989) .................................................... 45

*Establishment Inspection of Hern Iron Works, Inc., In re,*
    881 F.2d 722 (9th Cir. 1989) ................................................................ 53

*Fisk, Ex parte,*
    113 U.S. 713 (1885) ................................................................ 23, 48, 49

*Flynn, In re,*
    973 F.3d 74 (D.C. Cir. 2020) (en banc) .......................................... 26, 68

*Ganek v. Leibowitz,*
    874 F.3d 73 (2d Cir. 2017) ................................................................ 57

*Grand Jury Procs. #5 Empanelled Jan. 28, In re,*
    401 F.3d 247 (4th Cir. 2005) ........................................................ 60-61

*Guantanamera Cigar Co. v. Corporacion Habanos, SA,*
    263 F.R.D. 1 (D.D.C. 2009) ................................................................ 61

*J.G.G. v. Trump*:
    147 F.4th 1044 (D.C. Cir. 2025) . 1, 10, 13, 14, 15, 33, 44, 45, 48, 67-68
    2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ...................................... 11
    2025 WL 3198891 (D.C. Cir. Nov. 14, 2025) ................... 15, 16, 40, 68

*Jones v. Clinton,*
    206 F.3d 811 (8th Cir. 2000) ............................................................ 64

*Kellogg Brown & Root, Inc., In re,*
    756 F.3d 754 (D.C. Cir. 2014) .............................................. 27, 63, 67

*Kendig v. Stolar,*
    173 F.4th 466 (3d Cir. 2026) ............................................................ 61

*Kienle v. Jewel Tea Co.,*
    222 F.2d 98 (7th Cir. 1955) ............................................................. 64

*Lau v. Meddaugh,*
    229 F.3d 121 (2d Cir. 2000) ............................................................. 45

*Lindsay v. GEICO,*
    448 F.3d 416 (D.C. Cir. 2006) .......................................................... 55

*Ludecke v. Watkins,*
    335 U.S. 160 (1948) ...................................................... 11, 50, 51, 52

*Mohawk Indus., Inc. v. Carpenter,*
  558 U.S. 100 (2009) ....................................................................... 27

*Morrison v. Olson,*
  487 U.S. 654 (1988) ....................................................................... 30

*Nixon v. Sirica,*
  487 F.2d 700 (D.C. Cir. 1973) ....................................................13-14

*North Carolina v. Pearce,*
  395 U.S. 711 (1969) ....................................................................... 58

*Objective Sols. Int'l v. Gammon,*
  No. 07 Civ. 2347, 2008 WL 538445 (S.D.N.Y. Feb. 25, 2008) .......... 41

*Ramos Colon v. U.S. Att'y for Dist. of P.R.,*
  576 F.2d 1 (1st Cir. 1978) ............................................................... 64

*Resource Tech. Corp., In re,*
  No. 08 C 4040, 2008 WL 5411771 (N.D. Ill. Dec. 23, 2008) ............... 41

*Safeco Ins. Co. of Am. v. Burr,*
  551 U.S. 47 (2007) ......................................................................... 46

*Sealed Case, In re,*
  107 F.3d 46 (D.C. Cir. 1997) ........................................................... 62

*Simplex Time Recorder Co. v. Secretary of Lab.,*
  766 F.2d 575 (D.C. Cir. 1985) ......................................................... 59

*Trump v. J.G.G.,*
  604 U.S. 670 (2025) ................................................................. 11, 50

*Trump v. United States,*
  603 U.S. 593 (2024) ................................................................... 4, 29

*U.S. Cath. Conf. v. Abortion Rts. Mobilization, Inc.,*
  487 U.S. 72 (1988) ......................................................................... 55

*United Mine Workers v. Bagwell,*
  512 U.S. 821 (1994) ....................................................................... 39

*United States, In re,*
    398 F.3d 615 (7th Cir. 2005) .................................................... 30, 31, 36

*United States, In re,*
    583 U.S. 29 (2017) .................................................................. 47

*United States, In re,*
    143 F.4th 411 (D.C. Cir. 2025).................................................. 6

*United States v. Fokker Servs. B.V.,*
    818 F.3d 733 (D.C. Cir. 2016) .................................................. 66, 67

*United States v. Hansen,*
    772 F.2d 940 (D.C. Cir. 1985) .................................................. 62

*United States v. Marshall,*
    371 F.3d 42 (2d Cir. 2004) ...................................................... 30

*United States v. Neal,*
    101 F.3d 993 (4th Cir. 1996) .................................................. 30, 31, 32

*United States v. Nixon,*
    418 U.S. 683 (1974) .................................................................. 13

*United States v. Rapone,*
    131 F.3d 188 (D.C. Cir. 1997) .................................................. 7

*United States v. Shipp,*
    203 U.S. 563 (1906) .................................................................. 55

*United States v. Smith,*
    502 F. Supp. 2d 852 (D. Minn. 2007)........................................ 41

*United States v. Texas,*
    599 U.S. 670 (2023) .................................................................. 28

*United States v. United Mine Workers of Am.,*
    330 U.S. 258 (1947) .................................................................. 49, 55

*United States v. White,*
    887 F.2d 267 (D.C. Cir. 1989) .................................................. 62

*United States ex rel. Ludecke v. Watkins,*
   163 F.2d 143 (2d Cir. 1947) .............................................................. 52

*United States ex rel. Yelverton v. Federal Ins. Co.,*
   831 F.3d 585 (D.C. Cir. 2016) .......................................................... 47

*United Student Aid Funds, Inc. v. Espinosa,*
   559 U.S. 260 (2010) .......................................................................... 48

*Vallely v. N. Fire & Marine Ins. Co.,*
   254 U.S. 348 (1920) .......................................................................... 48

*von Bulow, In re,*
   828 F.2d 94 (2d Cir. 1987) ......................................................... 61, 67

*Walker v. City of Birmingham,*
   388 U.S. 307 (1967) .........................................................................54

*Willy v. Coastal Corp.,*
   503 U.S. 131 (1992) ............................................................... 52, 53-54

*Wilson v. Vaccaro,*
   883 F. Supp. 258 (N.D. Ill. 1995) .................................................... 41

*Young v. United States ex rel. Vuitton,*
   481 U.S. 787 (1987) ................................................... 8, 22, 29, 30, 65

## Statutes:

Administrative Procedure Act (APA):
   5 U.S.C. § 701(a)(1) ..................................................................... 51-52

Alien Enemies Act (AEA):
   50 U.S.C. § 21 ............................................................................ 8, 51-52

18 U.S.C. § 401 ................................................................................... 7

18 U.S.C. § 402 ................................................................................. 29

28 U.S.C. § 1651 ........................................................................... 6, 27

**Regulatory Material:**

Proclamation No. 10903,
   90 Fed. Reg. 13033 (Mar. 20, 2025) ...................................................... 8

**Rules:**

Fed. R. Crim. P. 42 ................................... 1-2, 7-8, 13, 18, 28, 29, 37, 38

**Other Authorities:**

2 James L. High, *A Treatise on the Law of Injunctions*
   (3d ed. 1890) ...................................................................................49

U.S. Dep't of Just., Criminal Resource Manual,
   https://perma.cc/Z5DV-RUNU ...........................................................56

11A *Wright & Miller's Federal Practice & Procedure*
   (3d ed. Apr. 2026 update).....................................................49-50, 52, 54

## GLOSSARY

AEA                  Alien Enemies Act

APA                  Administrative Procedure Act

DHS                  Department of Homeland Security

TRO                  Temporary Restraining Order

## INTRODUCTION

Sixteen months ago, the district court in this case issued a temporary restraining order (TRO) that prohibited the removal of a class of aliens detained under the Alien Enemies Act. The Supreme Court promptly vacated that order for lack of jurisdiction. Ever since, the district court has pursued, with myopic and single-minded determination, an inquiry into whether defendants willfully violated the TRO and thereby committed criminal contempt.

As we have repeatedly and forthrightly explained, the government did not violate that TRO as it was best construed. Three members of this Court have since agreed. *See* Op.22-28; *J.G.G. v. Trump*, 147 F.4th 1044, 1051-57 (D.C. Cir. 2025) (Katsas, J., concurring). The district court judge has explained that he intended something else, and perhaps other members of this Court favor that view. Regardless, it was not plausibly a *crime* for senior Executive Branch officials to act in a manner that was lawful under an interpretation of the TRO shared by three members of this Court.

Yet the district court has been unwilling either to let the matter go or to make a referral to a prosecutor under Federal Rule of Criminal

Procedure 42(a)(2).  First, the court found probable cause for contempt and threatened to make a criminal referral unless the government took steps to comply with the since-vacated TRO.  This Court granted a writ of mandamus quashing that improperly coercive order, with Judge Katsas writing separately to explain why the government did not violate the TRO at all.

Nevertheless, without any effort to reconcile its inquiry with Judge Katsas's careful analysis, the district court plowed ahead.  At the court's request, the government submitted sworn declarations from current and former senior Executive Branch officials identifying Secretary Noem as the responsible decisionmaker.  The Secretary attested in her own declaration that she personally made the decision that the district court contends was contumacious.  With that information in hand, the district court had everything it previously said it needed to make a Rule 42(a)(2) referral.

But the court announced it was still not satisfied.  Declaring it needed additional information to determine if Secretary Noem's decision was "willful," the court announced that it would require live testimony—starting, for some reason, by compelling *the government's*

2

*own litigation counsel in this case* to take the stand and be cross-examined by Plaintiffs.

This case has now come entirely off the rails. Ostensibly to decide whether to issue a contempt referral under Rule 42(a)(2) despite having all the evidence it previously claimed was necessary for such a referral, the district court is now poised to conduct an unconstitutional criminal investigation of its own, interrogating the *mens rea* of Executive officers at the highest levels of government and extracting testimony from the government's own lawyers—all in service of pursuing what cannot, as a matter of law, comprise criminal contempt. The panel correctly granted a writ of mandamus directing the district court to terminate its futile and improper criminal-contempt inquiry. The en banc Court should do the same. At a minimum, the Court should issue a writ of mandamus directing the district court to grant the government's motion for reconsideration and make a referral decision under Rule 42(a)(2) without compelling further testimony.

Like any other crime, indirect criminal contempt is subject to the principle that the "'authority and … discretion' to decide which crimes to investigate and prosecute" are *executive* functions, not *judicial* ones.

3

*Trump v. United States*, 603 U.S. 593, 620 (2024).  Evaluating a putative defendant's *mens rea* is an *investigative* function—a core executive power.  In launching an inquiry into Secretary Noem's alleged criminal scienter, the court has strayed far beyond its proper role in our constitutional scheme, which is limited (at least at this stage) to identifying a potential violation and referring it for investigation and prosecution.

The district court's proposed pre-referral mini-trial concerning criminal scienter would warrant mandamus on its own terms.  But the court's order is even more clearly an abuse of discretion for its futility.  First, it should be plain that the government did not commit criminal contempt by acting consistent with the construction given to the district court's TRO by three judges of this Court.  And in all events, *that* is the heart of the dispute:  whether the term "removing" in the TRO prohibited removal of class members from the territorial jurisdiction of the United States or whether it also barred the transfer of custody of persons already outside the United States.  In no event does a disagreement over that question—a pure question of law—justify the intrusive and rapidly metastasizing criminal investigation that the

district court has now launched. Even aside from the proper interpretation of the TRO, moreover, contempt is legally foreclosed because an injunction entered without jurisdiction cannot support a finding of contempt.

The compelled live testimony of two government lawyers independently warrants this Court's intervention. Their testimony cannot shed light on the Secretary's scienter because neither advised her nor has any other basis to opine on her *mens rea*. But their compelled testimony does pose a plain and mortal threat to the attorney-client privilege. Both witnesses are or were lawyers for the government *in this case*, and the government has not waived privilege. Yet the judge intends to put them on the stand and to allow opposing counsel to cross-examine them. That is grossly improper by every measure. Plaintiffs—who under Supreme Court precedent should have no further role here—have made clear they believe all privileges have either been waived or vitiated by the "crime-fraud" exception. The government has sought an advance ruling or protocol to resolve any privilege disputes with opportunity for appellate review, yet the district court has to date refused to commit to anything.

This long-running saga never should have begun; should not have continued after this Court's last intervention; and certainly should not be allowed to escalate into the unseemly and unnecessary interbranch conflict that it now imminently portends.  This Court should therefore again grant mandamus relief.  At minimum, the Court should forestall the improper investigatory hearing (but allow the district court to decide on this record whether to make a referral for further investigation).  If the Court denies relief, the government respectfully requests that it extend the administrative stay for 14 days to allow the government time to seek relief in the Supreme Court.

## STATEMENT OF JURISDICTION

The government commenced this original proceeding for an extraordinary writ under 28 U.S.C. § 1651(a).  Because this Court would have jurisdiction of any appeal from a criminal-contempt conviction, the Court has mandamus jurisdiction.  *See* Op.11 n.8, 13 n.9 (citing *In re United States*, 143 F.4th 411, 422, 423 n.1 (D.C. Cir. 2025)).

## STATEMENT OF THE ISSUES

1. Whether the Court should issue a writ of mandamus directing the district court to terminate the criminal-contempt proceedings.

2. Whether the Court should, at a minimum, issue a writ of mandamus directing the district court to grant the government's motion for reconsideration and make a referral decision under Rule 42(a)(2) without compelling further testimony.

## PERTINENT STATUTES

Pertinent statutes and rules are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory and Criminal Procedural Background

"Criminal contempt is a crime in the ordinary sense." *Bloom v. Illinois*, 391 U.S. 194, 201 (1968).  Conviction for a violation of 18 U.S.C. § 401 requires three elements:  "(1) the order must be clear and reasonably specific; (2) the defendant must have violated the order; and (3) the violation must have been willful." *United States v. Rapone*, 131 F.3d 188, 192 (D.C. Cir. 1997).

Federal Rule of Criminal Procedure 42 provides criminal-contempt procedures.  Unless the judge "saw or heard the contemptuous conduct," Fed. R. Crim. P. 42(b), a district "court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney," Fed.

7

R. Crim. P. 42(a)(2).  That provision "reflect[s] the holding in *Young v. United States ex rel. Vuitton*, 481 U.S. 787 (1987)."  *Id.* advisory committee's note to 2002 amendment.  Therefore, "the judge makes the initial decision that a contempt prosecution should proceed," but the "prosecutor exercises considerable discretion in matters such as … what methods of investigation should be used, what information will be sought as evidence, [and] which persons should be charged with what offenses."  *Young*, 481 U.S. at 807.  "These decisions, critical to the conduct of a prosecution, are all made outside the supervision of the court."  *Id.*

## B.    Factual Background and Prior Proceedings

**1.**  In March 2025, the President issued a proclamation invoking his authority under the Alien Enemies Act (AEA), 50 U.S.C. § 21, and directing the Attorney General and the Secretary of Homeland Security to detain and remove certain members of Tren de Aragua, a designated foreign terrorist organization.  Proclamation No. 10903, 90 Fed. Reg. 13033 (Mar. 20, 2025) (Proclamation).

**2.**  On Saturday, March 15, five Venezuelan nationals detained in Texas sued in federal district court in the District of Columbia to block

the government from removing them under the Proclamation.  JA58.

They moved to certify a class, Dkt. 4, and for a TRO barring their

removal, Dkt. 3-2, at 2.

Within hours, the district court granted an initial TRO ordering

the government not to "remove any of the individual Plaintiffs from the

United States for 14 days absent further Order of the Court."  JA24.

Later that day, the district court held a hearing.  After dismissing

plaintiffs' habeas claims—which the court worried were unsuitable for

class certification, JA119—the court orally granted class certification

and held that Plaintiffs were likely to succeed on the merits of their

challenge to the AEA removals, JA120; JA138.  Addressing the

implementation of its order, the court reassured counsel it "w[ould]

issue a minute order memorializing [a TRO] so you don't have to race to

write it down."  JA139.  The court explained that the TRO "would be to

prevent the removal of the class for 14 days or until further order of the

Court."  JA139.  Thereafter, in light of an earlier assertion by Plaintiffs'

counsel that flights were scheduled to take off during the hearing, the

court stated that "any plane containing these folks that is going to take

off or is in the air needs to be returned to the United States, but those

9

people need to be returned to the United States[,] [h]owever that's accomplished, whether turning around a plane or not embarking anyone [in the class] on the plane." JA140. The court then repeated its pledge to "issue a minute order memorializing all of this." JA143.

Shortly after the hearing ended, at 7:25 PM, the court issued a minute order memorializing the class certification and providing in relevant part:

> The Government is ENJOINED from removing members of such class (not otherwise subject to removal) pursuant to the Proclamation for 14 days or until further Order of the Court[.]

JA25. As memorialized, the court's order did not direct the government to turn around planes or to return already-removed aliens.

Two AEA flights had departed from the United States before the TRO, and even before the court's oral directives. *J.G.G.*, 147 F.4th at 1051 (Katsas, J., concurring); JA198-99. Early the next day, AEA detainees on those flights, who had been physically removed from the United States before the order, were transferred to the custody of El Salvador. JA198-99. There is not, and has never been, any factual dispute about this timeline.

10

**3.** The government appealed both March 15 TRO orders—the initial named-plaintiff-specific TRO and the classwide TRO—and moved for stays pending appeal. After oral argument, this Court issued a divided ruling denying a stay, with each judge writing separately. *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) (per curiam).

The Supreme Court then vacated the TROs, holding that the district court lacked jurisdiction to issue them. *Trump v. J.G.G.,* 604 U.S. 670, 672 (2025) (per curiam). The Supreme Court explained that "[c]hallenges to removal under the AEA, a statute which largely 'preclude[s] judicial review,' *Ludecke v. Watkins*, 335 U.S. 160, 163-64 (1948), must be brought in habeas." *J.G.G.*, 604 U.S. at 672 (second alteration in original).

**4.** In the meantime, the district court issued an order to show cause regarding whether the government had violated the classwide TRO by continuing the transfer of custody of the aliens who had been removed from the United States before the TRO issued. In response, the government explained that it had complied with the TRO by not

11

removing any class member from United States territory after the TRO issued.  *See* Dkt. 58.

Nine days after the Supreme Court vacated the TRO, the district court declared "that probable cause exists to find the Government in criminal contempt."  JA191.  The court reasoned that its "written TRO and the oral command defining compliance were each sufficiently clear and specific in proscribing the handover of class members to Salvadoran officials"—though the TRO said nothing of the sort.  JA221.  The court characterized the government's reading of the TRO as "clever" and admitted it was consistent with "dictionary definitions," but still rejected it, reasoning that the government should have understood the written order as having incorporated the desires that the judge had expressed orally, despite his having promised to memorialize his order in writing.  JA214.

Having found probable cause, the district court offered a choice. The government could "purge its contempt" within seven days by taking back "custody of the individuals" who had been transferred.  JA233. Alternatively, the government could "identify[] the individual(s) who … made the decision not to halt the transfer of class members out of U.S.

12

custody." JA33. If the government took the latter course, the court would "request that the contempt be prosecuted by an attorney for the government" or "appoint another attorney to prosecute the contempt." JA234; *see* Fed. R. Crim. P. 42(a)(2).[10]

**5.** The government filed a mandamus petition challenging the probable-cause order, and this Court granted an administrative stay pending its resolution of the petition. On August 8, the Court granted the mandamus petition and vacated the probable-cause order. *J.G.G.*, 147 F.4th at 1044-45 (per curiam).

Judges Katsas and Rao wrote concurring opinions, offering independent bases for granting the writ. Judge Katsas explained that mandamus was "particularly appropriate to stave off a looming 'constitutional confrontation' between the Executive and Judicial Branches," *id.* at 1058 (Katsas, J. concurring) (quoting *United States v. Nixon*, 418 U.S. 683, 692 (1974)), or to terminate the "imposition or threat of contempt against Executive Branch officials," *id.* at 1059 (citing *Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973) (en banc) (per

---

[10] All agreed that civil contempt was no longer an option because the Supreme Court vacated the TRO.

13

curiam)).  While, in his view, the "district court's order raises troubling questions about judicial control over core executive functions like the conduct of foreign policy and the prosecution of criminal offenses," a "simpler question" laid at "the end of this dispute":  the government's interpretation of the TRO was correct.  *Id.* at 1046.  The "[p]lain language, legal context, and the Court's first [named-plaintiff-specific] TRO all support the government's narrower reading of the second [classwide] TRO."  *Id.* at 1052; *see id.* at 1051-57.  He reached that conclusion before considering the "strong interpretive presumption [that] governs" interpretation "[i]n the context of criminal contempt, [where] ambiguity in the underlying injunction must be resolved in favor of the alleged contemnor."  *Id.* at 1051-52 (collecting cases).  Judge Katsas also questioned whether the proceeding implicated the rule that "a court may not impose criminal contempt for violation of an order that it lacked jurisdiction to enter."  *Id.* at 1062.

Judge Rao likewise voted to grant the writ.  In her view, the district court's "purge" option was unconstitutional because contempt could not be used to enforce a vacated TRO—particularly to force the government to undertake diplomatic outreach in a way that

14

impermissibly intrudes on Executive authority. *Id.* at 1065-70 (Rao, J., concurring).

Judge Pillard dissented. *Id.* at 1074-99 (Pillard, J., dissenting). In her view, "there [was] no ambiguity in the TRO," it was "not plausible" that the government interpreted the TRO the way Judge Katsas did, and, in any event, that interpretive dispute "could be fully litigated as an ordinary defense to a contempt prosecution and on appeal from conviction, which makes it ineligible for mandamus." *Id.* at 1076.

Plaintiffs then sought en banc rehearing, which this Court denied. *J.G.G. v. Trump*, No. 25-5124, 2025 WL 3198891 (D.C. Cir. Nov. 14, 2025) (per curiam).

**6.** Almost immediately following the denial of rehearing, the district judge made clear he would resume his criminal-contempt inquiry. *See, e.g.*, JA338-43 (Nov. 19, 2025 transcript). The government objected, explaining that Judge Katsas's determination that the government had complied with the TRO made it impossible to establish beyond a reasonable doubt that any official's conduct rose to the level of criminal contempt. JA330-34. Nonetheless, in an effort at

15

accommodation, and recognizing that some members of this Court had said there was no "privilege to withhold the identities of the decision makers," *see J.G.G.*, 2025 WL 3198891, at *3 (statement of Pillard, Wilkins, and Garcia, JJ., respecting the denial of rehearing en banc), the government provided the information previously sought by the district court. The government explained that then-Secretary of Homeland Security Kristi Noem made the decision to continue the transfer of custody after issuance of the TRO, after receiving privileged legal advice from the Acting Department of Homeland Security (DHS) General Counsel and senior leadership of the Department of Justice (namely, the Deputy Attorney General and then-Principal Associate Deputy Attorney General). JA333.

The district court still was not satisfied. The court discounted Judge Katsas's opinion because it was not joined by a majority, JA335-36, instead viewing only its "purge" option as foreclosed, JA341. The judge thus ordered declarations from the officials involved in the decision. JA336.

The government complied, producing declarations from Secretary Noem, Acting DHS General Counsel Joseph Mazzara, and Deputy

16

Attorney General Todd Blanche.  JA374-80.  Third Circuit Judge Emil Bove, who had been Principal Associate Deputy Attorney General, also submitted a declaration.  JA381-82.  All declarants attested that Secretary Noem made the decision after her receipt of legal advice from the other declarants.  None disclosed the substance of the legal advice because of the attorney-client privilege.

At that point, the government had provided all the information that the district court said it needed to decide whether to make a referral under Rule 42(a)(2), given that it had already found probable cause and only needed to learn who was responsible, *supra* p. 12.  But "the district court again moved the goalposts."  Op.10.

On December 8, the judge declared that he lacked information sufficient to determine whether the supposed TRO violation had been "willful," without reconciling that assertion with his previous conclusion that he had probable cause based on less information.  *See* JA383-84 (December 8 Order).  The court ordered live testimony—but not from officials at DHS or the attorneys who advised the Secretary.  Instead, the court ordered the government's *own litigation counsel in this case*, Deputy Assistant Attorney General Drew Ensign, to testify.  JA384.

17

The court further directed Plaintiffs to seek to secure the appearance of a former Department of Justice attorney, Erez Reuveni, who had become a "whistleblower" after his termination.  JA384.  The court offered no explanation for its selection of these witnesses, nor any explanation of why it believed either Ensign or Reuveni might possess relevant, non-privileged information bearing on the Secretary's *mens rea*.  JA383-84.

7.  The government moved for reconsideration or, failing that, a protective order.  Dkt. 201.  The government explained that the court's proposed investigation into the *mens rea* of senior Executive Branch decisionmakers exceeded the district court's authority and that, if the court believed any official might have willfully violated the TRO, the court's role was to make a referral to the Department of Justice.  *See id.* at 2 (citing Fed. R. Crim. P. 42(a)(2)).  The proposed live testimony, the government continued, was also unnecessary, as the district court had already found probable cause for criminal contempt:  "All that has changed is Defendants have now identified the decisionmaker, which is all the Court previously sought in its original order."  *Id.* at 4.  Nor could the proposed testimony yield any relevant new information:  the

18

government would not waive its attorney-client privilege, *id.* at 5-6, and neither Ensign nor Reuveni had any relevant information anyway, as neither had advised Secretary Noem (or even the attorneys who had advised her), *id.* at 7-8.

In sum, the government explained: "Defendants, at this stage and for present purposes, stand solely on their position that there was no willful violation as a matter of law because the Court's order did not clearly prohibit the decision at issue." *Id.* at 6.  The government urged the court to "make a referral decision based on the law and the uncontested facts without compelling further testimony." *Id.* at 11.  If the court nevertheless proceeded with live testimony, the government asked the court to adopt a protocol for resolving privilege disputes in an orderly fashion with a chance for appellate review.  *Id.*

For his part, Reuveni sent a letter stating his intent to testify, but also confirming that his testimony would relate to attorney-client privileged communications, and effectively asking the court to order him to testify so that he could do so without violating ethical duties.  JA394-97.  Plaintiffs also opposed the government's motion for reconsideration.  They too made clear they intend to elicit privileged

19

information, but took the position that all such privileges had been waived or were vitiated by the "crime-fraud" exception.  Dkt. 205.

The district court denied the government's motion for reconsideration.  JA391-93.

8.  The government again sought mandamus, which this Court again granted.  Writing for the majority, Judge Rao explained that the TRO was "insufficiently clear and specific to sustain a charge of criminal contempt"; ordinary appellate review could not "adequately redress the harms created by the district court's unnecessary investigation"; and mandamus was appropriate to avoid the inter-branch collision invited by this "improper inquest against the Executive."  Op.13.  Moreover, Judge Rao explained that "the government has already provided the name of the responsible official, so further judicial investigation is unnecessary and therefore improper," Op.3, and, in any event, the "participation of opposing counsel in the *investigation* of criminal contempt" is inappropriate, Op.17.  "The Supreme Court has admonished this court not to wait for a confrontation between the Executive Branch and the courts to issue mandamus."  Op.19.

Judge Walker concurred, "join[ing] Judge Rao's opinion in full" but "writ[ing] separately to emphasize" the district court's oral statements making clear that its written order would control. Conc.Op.1. Before the oral ruling, the district court said, "I will issue a minute order memorializing this so you don't have to race to write it down." *Id.* at 4 (emphasis omitted) (quoting JA139). Again, after the oral ruling, the district court said, "I will issue a minute order memorializing all of this." *Id.* (quoting JA143). These statements "simplif[y] this otherwise complicated case because [they] made the written order supersede the oral order." *Id.* at 1.

Judge Childs dissented, arguing the government failed all three prongs of the mandamus standard.

On June 22, 2026, the Court granted rehearing en banc.

## SUMMARY OF ARGUMENT

Although it already possesses all the information it needs to make a Rule 42(a) referral if it wishes, the district court is poised to commence investigating the *mens rea* of Executive officers at the highest levels of government—starting, for some reason, by compelling the government's own litigation counsel to take the stand and be cross-

21

examined by Plaintiffs, in plain violation of the attorney-client privilege and *Young v. United States ex rel. Vuitton et Fils SA*, 481 U.S. 787 (1987).  The court proposes to do all of this in service of a theory of criminal contempt that is foreclosed as a matter of law.  Mandamus is warranted.

**1.**  No authority exists for a federal judge to hold a mini-trial dedicated to uncovering and assessing evidence of criminal intent.  The investigation and prosecution of crimes is an Executive Branch prerogative.  Neither the district court nor Plaintiffs nor the panel dissent have cited any precedent for the court's approach, under which an Article III federal judge acts as prosecutor; interrogates witnesses about the motivation for foreign-policy and national-security decisions by senior Executive Branch officials; and issue rulings, *as judge*, on privilege objections about what he, *as investigator*, is entitled to discover—all ostensibly to decide whether "probable cause" exists for a Rule 42(a)(2) referral.  Such a freewheeling, quasi-inquisitorial, quasi-prosecutorial inquest is wholly foreign to centuries of Anglo-American law and our separation of powers, and the panel was right to put a stop to it.

**2.** Mandamus is even more plainly justified because the district court's theory of criminal contempt is doubly foreclosed as a matter of law.

First, the fact that three judges of this Court, after careful analysis, have concurred in the government's reading of the TRO makes it impossible to conclude that the government defied a *clear and specific* order, a basic prerequisite for pursuing criminal-contempt charges. In urging otherwise, Plaintiffs emphasize the district court's oral statements. But by twice reassuring counsel that they need not write down those remarks because the court would memorialize an order in writing, the district court made clear that "the written minute order could be expected to say everything necessary." Conc.Op.7 (Walker, J.). And even Plaintiffs do not seriously contend that the government violated the TRO's text.

Second, it has been true for more than 140 years that contempt cannot exist for violation of an order entered by a court without jurisdiction. *See Ex parte Fisk*, 113 U.S. 713, 714 (1885). The Supreme Court vacated the district court's TRO for lack of jurisdiction, and thus any violation cannot be contempt.

**3.** The district court's deviation from its judicial role is all the more stark because "the burden imposed by these hearings is wholly unnecessary for making a referral for criminal contempt." Op.18. The district court had previously found probable cause for a contempt referral without any testimony and needed only the identity of the decisionmaker. The government then provided that identity. Moreover, the court had no need or basis to probe the Secretary's *mens rea* because, for purposes of a Rule 42(a) referral, the government expressly declined to contest it: "Defendants, at this stage and for present purposes, stand solely on their position that there was no willful violation as a matter of law because the Court's order did not clearly prohibit the decision at issue." Dkt. 201, at 6.

Nonetheless, the district court declared that it needed to explore questions of scienter and that it would compel live testimony from the government's litigation counsel, as well as from a former government lawyer—neither of whom has any personal knowledge of the decisionmaker's scienter.

This pointless spectacle poses a mortal threat to the attorney-client privilege. The witnesses are or were government lawyers, and

24

the government has not waived privilege. Yet the court intends to put both on the stand and even to allow Plaintiffs—adversary counsel who have no proper role in a criminal-contempt case—to cross-examine them. That is grossly improper by every measure, and an appropriate basis for mandamus in its own right. To the government's knowledge, this Court has never countenanced such a proceeding, and it would be extraordinary for the en banc Court to do so now.

**4.** Mandamus is appropriate under settled principles. As the panel explained, the district court's "open-ended, freewheeling inquiry into Executive Branch decisionmaking on matters of national security that implicate ongoing military and diplomatic initiatives … cannot be remedied by a later appeal." Op.17. Preventing judicial overreach and enforcing the Constitution's separation of powers is a classic basis for exercising this Court's mandamus authority. So, too, is protecting the attorney-client privilege by, for example, preventing the district court judge from compelling the government's own litigation counsel to testify to privileged matters.

Plaintiffs and the panel dissent have argued that mandamus is inappropriate because judicial review will be available after any

25

criminal-contempt conviction. The harms to the separation of powers and the Executive Branch's prerogatives, however, are here and now: they will be suffered regardless whether any contempt referral issues or any conviction follows. That is the whole reason for mandamus relief, and the reason that, at a minimum, this Court should pretermit any investigatory hearing. This case is thus unlike *In re Flynn*, 973 F.3d 74 (D.C. Cir. 2020) (en banc) (per curiam), where the en banc Court declined to issue mandamus because the district court had not yet taken any steps to intrude on the prerogatives of the Executive Branch. Here, the district court has already commenced its improper criminal investigation—indeed, live testimony would have already occurred but for this Court's administrative stay—and has denied the government's motion for reconsideration or a protective order. The panel rightly granted mandamus to pretermit the unseemly and unnecessary interbranch conflict that the district court's order imminently portends. The en banc Court should do the same.

## STANDARD OF REVIEW

This Court may issue mandamus to vindicate a "clear and indisputable" right, if "no other adequate means" of relief exists, and if

26

the writ is "appropriate under the circumstances." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004); *see also* 28 U.S.C. § 1651. "As this case implicates the separation of powers, the Court of Appeals must also ask, as part of this inquiry, whether the District Court's actions constituted an unwarranted impairment of another branch in the performance of its constitutional duties." *Cheney*, 542 U.S. at 390.

Mandamus relief is also classically appropriate to preserve the attorney-client privilege, before privileged information is irrevocably released. *See Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009); *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 756 (D.C. Cir. 2014) (Kavanaugh, J.).

## ARGUMENT

The "threshold question" is whether the district court's actions are "legally erroneous." *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 756-57 (D.C. Cir. 2014). We "first consider" that merits issue before addressing "the remaining question … whether that error is the kind that justifies mandamus." *Id.*

## I. The District Court's Criminal Investigation Violates the Separation of Powers.

The district court exceeded its proper role under the Constitution when it commenced a criminal-contempt investigation into the *mens rea* of senior Executive Branch officials. The impropriety of the district court's investigation is exacerbated by its futility: any criminal-contempt charge in these circumstances would be legally foreclosed, and the testimony it has compelled is unnecessary and irrelevant.

### A. District Courts Cannot Investigate Indirect Criminal Contempt.

If the district court believes that the government violated its TRO, or that further investigation might reveal a violation, the court may refer the matter for potential prosecution. Fed. R. Crim. P. 42(a)(2). But there is no authority for the court to conduct an independent investigation.

#### 1. Investigating Crime Is A Core Executive Function.

Indirect contempt is a "crime in the ordinary sense," *Bloom v. Illinois*, 391 U.S. 194, 201 (1968), and the investigation and prosecution of crimes is a core *executive* function, *United States v. Texas*, 599 U.S. 670, 679 (2023). As the Supreme Court has stressed, "the Executive

28

Branch has 'exclusive authority and absolute discretion' to decide which crimes to investigate and prosecute." *Trump v. United States*, 603 U.S. 593, 620 (2024); *see* Op.30-31.

While it is true that federal courts have the power to summarily prosecute criminal contempt "committed in the presence of the court," 18 U.S.C. § 402, that is "reserved for … a 'narrow category' of contempt" that no one argues applies here, *United States v. Marshall*, 371 F.3d 42, 45 (2d Cir. 2004). *See* Fed. R. Crim. P. 42(b).

For all other criminal-contempt cases (often called "indirect" contempt), the "court *must* request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney." Fed. R. Crim. P. 42(a)(2) (emphasis added). Rule 42(a)(2) reflects the baseline allocation of authority in our government. A district court judge is not—and may not function as—a criminal investigator or prosecutor. *See Young v. United States ex rel. Vuitton et Fils SA*, 481 U.S. 787, 820 (1987) (Scalia, J., concurring in the judgment) (courts have "no … investigative or prosecutory authority"). Indeed, "the courts of appeals are in accord that a district court exceeds its power in assuming the role of a

29

prosecutor during proceedings for indirect criminal contempt." *United States v. Neal*, 101 F.3d 993, 998 (4th Cir. 1996).

Referral is required not only for the ultimate prosecution, but also for any preceding investigation. *See Young*, 481 U.S. at 801-02 ("Referral will thus enhance the prospect that investigative activity will be conducted by trained prosecutors pursuant to Justice Department guidelines."). That is because the "discretion" of a "prosecutor" includes "what methods of investigation should be used" and "what information will be sought as evidence." *Id.* at 807. Those two powers—to investigate and to prosecute—are linked as "a quintessentially executive function." *Morrison v. Olson*, 487 U.S. 654, 706 (1988) (Scalia, J., dissenting).

As the Seventh Circuit has explained, therefore, "[i]n the rare situations when a prima facie case of criminal contempt has been made out, and the contempt is not committed in the judge's presence (and thus amenable to summary disposition), the judge must turn the matter over to a prosecutor rather than assume an inquisitorial role inappropriate to the Judicial Branch." *In re United States*, 398 F.3d 615, 618 (7th Cir. 2005) (per curiam) (granting mandamus). In that

30

case, a district court judge threatened to have an Assistant U.S. Attorney prosecuted for criminal contempt based on her submission of an *ex parte* application for release of grand-jury information.  In support of a contempt charge, the judge "demanded to know who within the United States Attorney's Office participated in the decision to file such a request and why they had approved it."  *Id.* at 617.

The Seventh Circuit granted a writ of mandamus, explaining that the district court's factual investigation of the alleged criminal contempt—and in particular, the court's probing into internal Executive Branch decisionmaking—was entirely improper.  "How the United States reaches its litigating positions, who said what to whom within the prosecutor's office, and so on, are for the Attorney General and the President to evaluate."  *Id.* at 618.  The court stressed:  "Our legal system does not contemplate an inquisitorial role for federal judges."  *Id.* at 619.

Likewise, the Fourth Circuit held that a district court erred when it presided over a hearing to investigate a potential criminal contempt, "deciding himself which witnesses would testify" against the alleged contemnor, and then convicted the defendant.  *Neal*, 101 F.3d at 996.  A

31

unanimous panel set aside the contempt conviction under plain-error review, holding that "[t]he melding of the judicial and prosecutorial functions is a fundamental error that undercuts the dispersion of power among the branches and, as a result, casts doubt on the integrity of the judicial process." *Id.* at 999. In particular, the court stressed, "[a]mong those procedures that are fundamental to our adversary system is the use of an independent prosecutor to pursue charges against a criminal defendant." *Id.* at 997; *see also American Airlines, Inc. v. Allied Pilots Ass'n*, 968 F.2d 523, 531 (5th Cir. 1992) (court erred when it "*sua sponte* initiated the contempt proceeding" and "questioned the witnesses").

### 2.    The December 8 Order Crosses The Line Into Criminal Investigation.

The district court's December 8 Order compelling the live testimony of government lawyers flouts these principles.

The district court justified its refusal to make a referral on the existing record on the ground that it needed more information about whether Secretary Noem had made a "willful" decision to violate its order. JA383. But conducting a factual inquiry into an alleged contemnor's *mens rea* is not a task for an impartial district court judge (let alone a judge assisted by litigants adverse to the alleged

32

contemnor). It is a task for a *prosecutor* in evaluating whether to pursue criminal charges. Indeed, the hearing contemplated by the December 8 Order—featuring compelled testimony from selected witnesses, under oath and before the factfinder, for the purpose of assessing the viability of a criminal charge—bears more than a passing resemblance to a grand-jury proceeding.

The inquisitorial nature of the district court's inquest is even more evident when judged against the record already before the district court. By December 8, the district court possessed all the information it needed to make a referral under Rule 42(a)(2) if it wished. In fact, the district court had *already* found probable cause for a referral months earlier, when the court asked for declarations merely to "identify the individual(s) responsible for the contumacious conduct." JA234. True, this Court later vacated that probable-cause order on other grounds. *J.G.G.*, 147 F.4th at 1045. But nothing in this Court's mandamus decision altered the record before the district court—the court could not possibly have *less* evidence about the willfulness of the violation than whatever it had when it previously found sufficient evidence of probable cause.

33

The only new information as of December 8 was that the government had identified Secretary Noem as the person responsible for the allegedly contumacious decision. JA383. Although the district court dismissed the Secretary's personal declaration as "cursory," JA383, her declaration could hardly have been clearer on the critical question: Secretary Noem averred that she personally made "the decision to continue the transfer of custody of the Alien Enemies Act detainees who had been removed from the United States before this Court issued its" TRO. JA378. The Secretary did not suggest that there had been some misunderstanding or that she had been unaware of the TRO. The government simply stood on its view that the TRO, correctly construed, prohibited only removal from the territory of the United States, not the transfer of custody of detainees already outside the United States.

Given its prior probable-cause finding, the identity of the decisionmaker should have been all the district court needed to make a referral if it wished. But the court abruptly changed gears, declaring that a referral would be "premature." JA383. Asserting that Secretary Noem's declaration lacked "enough information for the Court to

34

determine whether her decision was a willful violation of the Court's Order," JA383, the court opined that it was "necessary to hear witness testimony to better understand the bases of the decision to transfer the deportees out of United States custody in the context of the hearing on March 15, 2025," JA383-84.  The court then directed the government to produce its litigation counsel, Drew Ensign, and instructed Plaintiffs to attempt to secure the testimony of Erez Reuveni.

As we explain below, it is entirely unclear what relevance the testimony of Ensign and Reuveni could have to the sole open question identified by the district court—whether Secretary Noem's decision was "willful."  For that matter, it is unclear what the district court found lacking on that score in Secretary Noem's declaration.  To obviate that issue, however, the government filed a reconsideration motion disclaiming any reliance on fact-bound *mens rea* defenses for purposes of the probable-cause inquiry:  "Defendants, at this stage and for present purposes, stand solely on their position that there was no willful violation as a matter of law because the Court's order did not clearly prohibit the decision at issue."  Dkt. 201, at 6.  That

35

representation rendered any inquiry into Secretary Noem's *mens rea* entirely irrelevant.

The district court nonetheless denied reconsideration. JA391-93. The court did not explain why, in light of the government's disclaimer, any factual investigation into Secretary Noem's *mens rea* remained necessary. But the court made clear that its investigative hearing would continue. JA393.

Against this background, there is no question that the court's December 8 Order contemplates a judicial factual inquest far beyond anything a Rule 42(a) referral has been understood to require or authorize. Perhaps the court hopes to elicit evidence that other government actors misled Secretary Noem. Or perhaps the court hopes to elicit inconsistent testimony from other senior Executive Branch officials. Whatever its purpose, conducting such an investigation is plainly not the proper office of a district court judge. As the Seventh Circuit put it in granting mandamus to terminate an analogous judicial investigation, "[o]ur legal system does not contemplate an inquisitorial role for federal judges." *In re United States*, 398 F.3d at 619.

### 3. The Panel Dissent Does Not Rehabilitate The District Court's Order.

The panel dissent contends that that district court's proposed factfinding hearing regarding Secretary Noem's *mens rea* represents an unremarkable exercise of a district court's authority under Rule 42. On the dissent's account, it is both commonplace and appropriate for federal judges to oversee detailed investigations of alleged criminal wrongdoing and to make extensive factual findings of what they uncover, all before a referral to a prosecutor under Rule 42(a)(2). None of the dissent's authorities or arguments, however, supports that extraordinary proposition.

a. The dissent urges that investigation of a crime must precede charging or conviction. Dissent 57-59. The issue is not whether to investigate, however, but *who* investigates. In our constitutional structure, the Executive, not the Judiciary, investigates crimes. That is why Rule 42(a)(2) is framed in mandatory terms: "The court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney." Fed. R. Crim. P. 42(a)(2).

37

The dissent interprets Rule 42 to contemplate that there will already have been a full factual investigation before any referral, pointing to Rule 42(a)(1)'s notice provision.  Dissent 61.  Rule 42(a)(1), however, simply sets out the minimum due-process requirements of a valid prosecution for criminal contempt, including timely notice of the date of the trial, sufficient time to prepare a defense, and an explanation of the essential facts of the charged contempt.  By contrast, Rule 42(a)(2) deals with the separate—and logically antecedent— question of who should investigate and prosecute the contempt.  As the committee notes explain, current Rule 42(a)(2) was added to the Criminal Rules in 2002 to incorporate the Supreme Court's holding in *Young*, and "envisions that a disinterested counsel should be appointed to prosecute the contempt."  *See* Fed. R. Crim. P. 42(a)(2) advisory committee's note to 2002 amendment.  Appointment of that prosecutor will generally entail the prosecutor's further investigation of the facts and decision about whether to file charges, which obviously must precede the scheduling of a trial, the preparation of any defense, or the summary of the precise charges to be tried.

38

The panel dissent also stresses the necessity of careful factfinding in criminal-contempt cases and the need for procedural safeguards. Dissent 60-61.  The dissent quotes from *United Mine Workers v. Bagwell*, 512 U.S. 821 (1994), which explained that a conviction for contempt of an injunction "often require[s] elaborate and reliable factfinding," *id.* at 833-34.  While that is all correct, the dissent misunderstands the import of *Bagwell*, which concerned the conduct of the actual criminal-contempt trial, not some preliminary referral.  The Court's point was that the complexity of the factual questions and the dire punitive consequences of the contempt finding necessitated full-blown criminal procedures, including a jury, to "prevent the arbitrary exercise of judicial power."  *Id.* at 834.  *Bagwell* thus undermines, rather than supports, the judge's inquisitorial pre-referral investigation here.

**b.**    It is therefore unsurprising that neither Plaintiffs nor the panel dissent have identified any examples of district courts conducting substantial factual investigations for the purpose of a contempt referral—much less appellate decisions condoning the practice.  The district court, for its part, cited nothing to rebut the authorities cited in

39

the government's reconsideration motion. *See* JA391-93. The court pointed only to opinions of members of this Court suggesting, at the time of the last mandamus petition, that the court could continue its contempt inquiry. But at the time, the inquiry consisted of "finding out who was responsible," *J.G.G.*, 2025 WL 3198891, at *2 (statement of Judges Pillard, Wilkins, and Garcia, respecting the denial of rehearing en banc), which is "non-privileged information," *id.* at *4 (Millett, J., dissenting from the denial of rehearing en banc). No member of this Court suggested that the district court could significantly expand its inquiry beyond identifying the Executive Branch official responsible for the allegedly contumacious decision.

Asserting that pre-referral court-led investigations are "standard practice," the panel dissent purported to identify five examples of district courts conducting "factfinding" before a "prosecutorial referral." Dissent 58 & n.20. But five examples spanning forty years, the most recent more than a decade old, hardly establish a "standard practice." Dissent 58. If the authority of district court judges to conduct pre-referral hearings to investigate acts of criminal contempt were as well-

established as Plaintiffs and the dissent insist, one would expect to find a far more substantial body of law.

In all events, none of the five cases cited by the dissent supports the extraordinary investigatory hearing here.  In *United States v. Smith*, the referenced judicial "factfinding" occurred at the conclusion of a bench trial for criminal contempt, not in support of a referral.  502 F. Supp. 2d 852, 854-55 (D. Minn. 2007).  *In re Resource Technology Corp.* addressed probable cause for criminal contempt based solely on "the parties' written submissions" and expressly rejected the argument it could hold a "hearing" without first finding probable cause.  No. 08 C 4040, 2008 WL 5411771, at *1, *3 (N.D. Ill. Dec. 23, 2008).

The remaining three are examples of district courts conducting hearings and factfinding on non-criminal matters properly before the court and only incidentally considering those facts when deciding whether to make a referral for criminal contempt.[11]  A district court, for example, clearly has authority to hold hearings and hear testimony

---

[11] *See In re Blackmon*, No. 14-cv-00507, 2016 WL 4055650, at *2 (W.D.N.C. July 25, 2016); *Objective Sols. Int'l v. Gammon*, No. 07 Civ. 2347, 2008 WL 538445, at *3 (S.D.N.Y. Feb. 25, 2008); *Wilson v. Vaccaro*, 883 F. Supp. 258, 261-64 (N.D. Ill. 1995).

41

about *civil* contempt of extant orders, and it can obviously use that information in deciding whether to make a *criminal*-contempt referral. But civil contempt concededly cannot be the basis for this hearing.

None of these cases bears any resemblance to the district court's proposed pre-referral mini-trial concerning the criminal scienter of senior Executive Branch officials.

## B. No Contempt Charges Could Be Viable.

The district court's unconstitutional and intrusive *mens rea* investigation warrants mandamus on its own terms. But mandamus is even more plainly justified because no charge of criminal contempt could be viable on the theory that the district court seeks to investigate. First, three judges of this Court have agreed with the government's interpretation of the TRO. As a matter of law, it could not constitute criminal contempt for the Executive Branch to have acted consistent with that interpretation, which is correct. Second, the district court lacked jurisdiction when it issued the TRO. Under binding precedent, an order issued without jurisdiction is void and cannot support a contempt prosecution.

42

### 1.    The TRO Did Not Clearly Prohibit The Government's Actions.

It is now clearer than ever that no contempt charges could be viable.

**a.** The government did not violate the TRO, which prohibited "removing" class members.  JA25.  It is uncontested that the only flights at issue were outside United States territory before the classwide TRO and before the district court made the oral statements at issue.  The following day, the AEA detainees on those flights, who were already outside the territorial jurisdiction of the United States, were transferred to the custody of El Salvador.  "The alleged contempt therefore turns entirely on whether" the word "removing" in the classwide TRO referred to transferring class members out of U.S. territory or out of U.S. custody.  Op.22.

As the government has consistently explained, the best reading of the district court's TRO is that it prohibits only territorial removal and does not prohibit the transfer of custody of persons already outside of the United States.  After a careful analysis, Judge Katsas reached the same conclusion, explaining that the "[p]lain language, legal context, and the Court's first TRO all support the government's narrower

43

reading of the second TRO as keyed to physical expulsion from United States territory." *J.G.G.*, 147 F.4th at 1052 (Katsas, J., concurring).

The panel majority, too, concluded that the TRO was best understood in that manner. As the panel explained, "the ordinary meaning of 'remove' refers to a change in territorial location." Op.23 (collecting dictionary definitions). Even the panel dissent "d[id] not contest" that ordinary meaning. Dissent 71. The panel added that "[t]he legal context of this case, involving the expulsion of aliens pursuant to the President's AEA Proclamation, similarly confirms the understanding that 'removing' refers to removal from United States territory." Op.23. Additionally, the use of "removal"—as the term is used in the Immigration and Nationality Act—elsewhere in the TRO, Op.26, and the first TRO's command to "not remove any of the individual Plaintiffs from the United States," JA24; *J.G.G.*, 147 F.4th at 1054 (Katsas, J., concurring), supports a territorial rather than a custodial meaning of "removing."

While the district court made "oral statements" that "were perhaps suggestive of some custodial responsibility, they did not clearly and specifically require the government to retain custody." Op.27.

44

Particularly in light of the district court's repeated emphasis that it would issue a written order "memorializing" its ruling and telling the government "you don't have to race to write it down," those equivocal oral statements were superseded by the written order.  Conc.Op.1-8.

Even without the district court's commitment to provide a comprehensive written order, "statements in court … do not change the contents of injunctions." *Bethune Plaza, Inc. v. Lumpkin*, 863 F.2d 525, 527 (7th Cir. 1988).  "Federal Rule of Civil Procedure 65(d) 'contemplates the issuance of a written order' to ensure 'that the litigants receive explicit notice of precisely what conduct is outlawed.'" *J.G.G.*, 147 F.4th at 1056 (Katsas, J., concurring) (quoting *Lau v. Meddaugh*, 229 F.3d 121, 123 (2d Cir. 2000)).  Focusing on the "written opinion" also reflects that "[s]ubsequent consideration" after the "oral" statement "may [have] cause[d] the district judge to modify his or her views." *Ellison v. Shell Oil Co.*, 882 F.2d 349, 352 (9th Cir. 1989).  Moreover, oral statements should play particularly little role in interpreting the written TRO because it is far from clear that oral

45

orders can ever be enforceable by contempt.[12] *See Bates v. Johnson*, 901 F.2d 1424, 1427 (7th Cir. 1990) ("Oral statements are not injunctions.").

**b.** For present purposes, the point is not that Judges Katsas, Rao, and Walker were necessarily correct in their interpretation of the TRO—although the government firmly believes that they were. Other members of this Court, like the dissent, may have a different view. Rather, the point is that, given the reasoned views of three members of this Court interpreting the TRO, it is now impossible as a matter of law to conclude that senior Executive Branch officials committed a *crime* by acting consistent with that view. *Cf. Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (concluding that an executive official's legal position was "reasonable" in part because multiple "Court of Appeals judges agreed with his judgment"); *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69-70 & n.20 (2007) (holding that acting consistent with a "not objectively unreasonable," "albeit erroneous," interpretation cannot support even civil liability under a willfulness standard).

---

[12] Because the transfer of custody the district court is investigating occurred after the written TRO, *see* Conc.Op.7, there is no need to decide whether the oral statements were binding before the written TRO was entered.

Criminal contempt cannot lie unless the order is "clear and specific, and leave[s] no doubt or uncertainty in the minds of those to whom it is addressed." *In re Brown*, 454 F.2d 999, 1008 n.49 (D.C. Cir. 1971); *see also United States ex rel. Yelverton v. Federal Ins. Co.*, 831 F.3d 585, 587 (D.C. Cir. 2016) (holding that courts "resolve 'omissions or ambiguities in the order' in favor of the enjoined party"). Because the TRO did not clearly and unambiguously prohibit the transfer of custody of persons outside the territorial jurisdiction of the United States, criminal contempt is foreclosed as a matter of law.

That should be the end of the contempt question. And contrary to the panel dissent, Dissent 65-66, it is entirely appropriate to issue a writ of mandamus pretermitting the district court's burgeoning inquiry on this basis, *see, e.g.*, *In re United States*, 583 U.S. 29, 31-32 (2017) (per curiam) (granting mandamus to require a ruling on threshold arguments which may "eliminate the need" for discovery about "DACA-related materials"). It would be a profound disservice to the Judiciary and the Executive Branch alike for this Court to allow the district court's improper interrogation of Department of Justice counsel to

47

proceed in the face of the plain reality that, at the end of the day, no contempt charge could be viable.

### 2.    Contempt Is Impossible Because The TRO Was Void.

The district court's contempt investigation is legally futile for another reason.  It has been true for more than 140 years that contempt cannot lie for violating an order that was void because the issuing court lacked jurisdiction.  *See Ex parte Fisk*, 113 U.S. 713, 714 (1885); *J.G.G.*, 147 F.4th at 1062 (Katsas, J., concurring) (collecting cases).  The TRO here was issued without jurisdiction because the Alien Enemies Act stripped the district court of power over this claim.

### a.    Void Orders Cannot Be A Basis For Contempt.

When a court "act[s] without authority, its judgments and orders are … not voidable, but simply void."  *Elliott v. Peirsol's Lessee*, 26 U.S. (1 Pet.) 328, 340 (1828); *see Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1180 (D.C. Cir. 2013) (same).

Void judgments are "nullities."  *Vallely v. Northern Fire & Marine Ins. Co.*, 254 U.S. 348, 353 (1920); *see United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 270 (2010) (same); *see also* JA228-30 (district

48

court suggesting "void" orders are "thus non-binding" and "completely out of the picture").

It is therefore well-settled that there can be no contempt of an order the "court had no authority to make" because "the order itself, being without jurisdiction, is void." *Ex parte Fisk*, 113 U.S. at 718. As *High on Injunctions* explains:

> [I]f the court has no jurisdiction over the matter involved, or if it has exceeded its powers by granting an injunction in a matter beyond its jurisdiction, its injunction will be treated as absolutely void, and defendants can not, in such case, be punished for contempt for its alleged violation.

2 James L. High, *A Treatise on the Law of Injunctions* § 1425 (3d ed. 1890).

This principle coexists with the collateral-bar rule, which generally ensures "an order issued by a court *with jurisdiction over the subject matter and person* must be obeyed by the parties until it is reversed by orderly and proper proceedings." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 293 (1947) (emphasis added). Accordingly, in a criminal-contempt proceeding, "the only legitimate inquiry is whether the court granting the injunction had jurisdiction." High, *supra*, § 1416. Or as Wright & Miller put it, an alleged criminal

"contemnor may challenge only the power of the court to issue the injunction." 11A *Wright & Miller's Federal Practice & Procedure* § 2960 & n.40 (3d ed. Apr. 2026 update).

### b.    The TRO Was Void For Lack of Jurisdiction.

That principle forecloses contempt here because the TRO was void: the Supreme Court vacated the TRO for lack of jurisdiction. *J.G.G.*, 604 U.S. at 672.

The Supreme Court identified three problems with the TRO. First, the Alien Enemies Act "largely 'preclude[s] judicial review,'" including of all claims not "brought in habeas." *Id.* (alteration in original) (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163-64 (1948)). Second, these claims fell "within the 'core' of the writ of habeas corpus and thus," under the habeas-channeling rule, "must be brought in habeas." *Id.* Finally, "[f]or 'core habeas petitions,' 'jurisdiction lies in only one district: the district of confinement.'" *Id.* (citation omitted).

The district court's primary response was that the habeas-channeling rule is not jurisdictional. JA210-11. That is true, but the first defect—the Alien Enemies Act—*is* jurisdictional, rendering the TRO void.

50

Under settled law, the Alien Enemies Act precludes jurisdiction over Administrative Procedure Act (APA) claims. That is significant because the APA was the only remaining jurisdictional basis for the district court proceeding when it entered the TRO. Plaintiffs' complaint purported to rely on both habeas and "non-habeas founts of jurisdiction." JA105.[13] Concerned that the district-of-confinement rule for the habeas claim "preclud[ed] … a nationwide class," JA104-05, however, Plaintiffs consented to "dismiss[ing] the habeas" claim, JA119. Accordingly, the TRO issued solely on the basis of Plaintiffs' asserted "non-habeas founts of jurisdiction"—namely, the APA. JA105.

As the Supreme Court explained, however, the AEA precludes judicial review under the APA and, indeed, every jurisdictional theory other than habeas. *See Ludecke*, 335 U.S. at 164-65. The Supreme Court has long recognized that the President's broad national-security authority under the AEA is generally "not to be subjected to the scrutiny of courts." *Id.* at 165. Thus, the "Alien Enemy Act" "preclude[s] judicial review" within the meaning of the "Administrative

---

[13] The transcript incorrectly transcribes "founts" as "fonds."

51

Procedure Act."  *Id.* at 162-63; *see* 5 U.S.C. § 701(a)(1) (rendering the

APA, including its waiver of immunity, inapplicable when "statutes

preclude judicial review").  As the Second Circuit opinion affirmed in

*Ludecke* explained, the AEA's preclusion of "judicial review" renders

this a "subject over which [a court] has no power."  *United States ex rel.*

*Ludecke v. Watkins*, 163 F.2d 143, 144 (2d Cir. 1947).  And a "court"

lacking "power … to issue the injunction" is the definition of a

jurisdictional defect that renders an order void.  *Wright & Miller's*,

*supra*, § 2960.

In sum, because the district court lacked jurisdiction to enter the

TRO, the order is void and no contempt is possible.  For this reason as

well, mandamus is warranted, because the district court's improper

investigation can come to nothing.

### c.     The District Court's and Panel Dissent's Counterarguments Are Unpersuasive.

The district court's and panel dissent's insistence that *Willy v.*

*Coastal Corp.*, 503 U.S. 131 (1992), displaced the rule that void

injunctions cannot be the basis for contempt conflates two distinct

jurisdictional issues.  *See* JA209-10; Dissent 46-47.

Criminal contempt involves two separate proceedings: the "original action" in which the allegedly violated order issued, and the "separate and independent proceeding at law" for criminal contempt. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990). For contempt, *jurisdiction* over the original action affects the *merits* of the subsequent action. If "the original order is deemed a nullity," then "the accused contemnor" has "violat[ed] nothing at all." *In re Establishment Inspection of Hern Iron Works, Inc.*, 881 F.2d 722, 727 (9th Cir. 1989). But the district court plainly has subject-matter jurisdiction over the subsequent criminal-contempt trial.

The district court's and the panel dissent's reliance on *Willy* falters on that distinction. While *Ex parte Fisk* is about the *merits* of the subsequent criminal enforcement, *Willy* is about *jurisdiction* over the enforcement action. In *Willy*, the Court held that a district court could, consistent with Article III, impose Rule 11 sanctions in a case where the court ultimately lacked subject-matter jurisdiction. There was no question in *Willy* that Rule 11 was valid and binding on the accused attorney. The only dispute was whether the court had subject-matter jurisdiction to enter the sanctions. *Willy* answered that question

53

in the affirmative, reasoning that Rule 11 sanctions involve a question collateral to the merits and therefore do not implicate any question of a court's adjudicating a controversy over which it lacks jurisdiction. 503 U.S. at 137-38. Nothing in *Willy* calls into doubt the distinct and longstanding rule that the nullity of an injunction entered in a prior proceeding is a complete defense, on the *merits*, to a later prosecution for criminal contempt.

The other authorities the district court cited for the proposition that the collateral-bar rule prevents jurisdictional challenges, *see* JA207-09, in fact contradict that assertion. The *Wright & Miller* treatise flatly says challenges to jurisdiction are an exception to the collateral-bar rule. *Wright & Miller's, supra,* § 2960 & n.47. And *Walker v. City of Birmingham* held that "a claim of *nonjurisdictional* error" was not a defense to contempt except in narrow circumstances and repeatedly emphasized that the court had jurisdiction. *See, e.g.,* 388 U.S. 307, 312, 314-15, 319 (1967) (emphasis added).

Two Supreme Court cases do recognize a narrow caveat that the absence of subject-matter jurisdiction over the *controversy* will not render an order void if, despite that defect, the order falls within the

54

court's jurisdiction to *determine its own jurisdiction* by "preserv[ing] existing conditions pending a decision upon its own jurisdiction." *United Mine Workers*, 330 U.S. at 290; *see United States v. Shipp*, 203 U.S. 563, 573 (1906).  That caveat has no application, however, where the district court has already "ruled that it had subject-matter jurisdiction of the case." *U.S. Cath. Conf. v. Abortion Rts. Mobilization, Inc.*, 487 U.S. 72, 80 (1988).  Here, the district court had already "found [it] had jurisdiction," JA105, at the time it entered the TRO, a finding that was a necessary precondition for the court to certify a class, *Lindsay v. GEICO*, 448 F.3d 416, 420 (D.C. Cir. 2006).

## C. The Separation-of-Powers Harms Are Plainly Not Justified Given the Testimony's Irrelevance.

The separation-of-powers problems posed by the December 8 Order are all the more stark because "the burden imposed by these hearings is wholly unnecessary for making a referral for criminal contempt."  Op.18.  That is so for three separate reasons.  First, "probable cause" is not necessary for a referral.  Second, the district court already concluded the record supports probable cause.  Third, the

witnesses compelled to testify have no information relevant to probable cause.

### 1. Probable Cause Is Not Necessary To Refer For Investigation.

The district court justified its December 8 Order on the ground that, absent further evidence of willfulness, "the Court cannot at this juncture find probable cause that [Secretary Noem's] actions constituted criminal contempt." JA383. But as the district court has separately recognized, an insistence on finding "probable cause" "does not appear to be strictly necessary." JA206-07. The court observed that "the Department of Justice has explained in an internal manual[ that] '[i]t is unclear whether probable cause that a willful violation has occurred is a condition precedent to the *commencement of a criminal contempt action*.'" JA206-07 (emphasis added) (quoting U.S. Dep't of Just., Criminal Resource Manual § 763, https://perma.cc/Z5DV-RUNU). Whatever the correct answer to that question, a formal finding of "probable cause" is not necessary for a court merely to refer a matter to the Department of Justice *for further investigation* under Rule 42(a)(2).

The district court nevertheless justified its factual inquest as "a prudent way of affording alleged contemnors the procedural protections

56

associated with other criminal proceedings." JA207. No part of that explanation withstands scrutiny. These are certainly not "protections" that government officials here have sought, JA207, and it is a strange sort of 'protection' that so significantly "interfere[s] with the" government's "internal affairs" that the government contended, and the panel agreed, that mandamus was warranted, Op.30.

A supposed need to establish probable cause, moreover, would not support hearings to investigate *mens rea* because "[t]he law has long recognized that probable cause does not demand evidence of every element of a crime" and "is particularly tolerant with respect to the *mens rea* element." *Ganek v. Leibowitz*, 874 F.3d 73, 86 (2d Cir. 2017).

### 2. The District Court Already Found Probable Cause.

The compelled live testimony is also pointless because, as previously discussed, the court *already found* probable cause for a referral more than a year ago. *See* JA191; JA236. If there was probable cause for a criminal-contempt referral in April 2025, there still was in December 2025, because the district court obviously did not have *less* evidence of a willful violation than it previously had. As noted, by that later point, the government had identified Secretary Noem as the

57

Executive Branch official responsible for the allegedly contumacious decision.

In denying the government's motion for reconsideration, the district court explained that further investigation was needed because new evidence had emerged in the form of "whistleblower" allegations from Reuveni.  JA392.  Setting aside that Reuveni's allegations reflect only his personal window on privileged deliberations, that explanation is not credible.  New evidence that ostensibly *further supports* the prior finding of probable cause obviously cannot necessitate additional investigation to maintain that finding.

The unexplained backtracking after a successful mandamus petition also raises due process concerns.  *Cf.  North Carolina v. Pearce*, 395 U.S. 711, 725 (1969) (requiring an affirmative explanation from a court that imposes a harsher sentence after a successful appeal).

### 3.    The Witnesses Lack Knowledge Relevant To Probable Cause.

Finally, even if probable cause were necessary and the district court had not already found it, the testimony that the district court compelled in the December 8 Order is entirely irrelevant to the Secretary's *mens rea*.  Neither witness played any role in the

Secretary's decision.  Neither provided legal advice to the Secretary, JA378, or were involved in the discussions about what legal advice to provide, JA385-86.  The district court did not order the government to produce the Secretary or the senior officials who advised her, likely because compelling senior officials to testify about their reasons for official decisions would itself constitute an encroachment on the separation of powers warranting mandamus.  *See, e.g.*, *Simplex Time Recorder Co. v. Secretary of Lab.*, 766 F.2d 575, 586 (D.C. Cir. 1985); *In re Clinton*, 973 F.3d 106, 121 (D.C. Cir. 2020).  Instead, however, the court has compelled testimony from two litigators who have nothing to say on the relevant question.

Deputy Assistant Attorney General Drew Ensign represents the government in this litigation and appeared in that capacity at the March 15, 2025 TRO hearing.  But beyond conveying the court's oral statements and written order to his clients, Ensign played no role in formulating the legal advice that was provided to Secretary Noem.  He has so attested under oath.  JA385-86.  As for Reuveni, he likewise has no relevant firsthand information about the advice given to the Secretary or the basis for her decision.  Even in his "whistleblower"

59

report, he never claims otherwise.  *See* JA239-53.  Indeed, his report acknowledges he was often excluded from discussions with leadership at DHS and DOJ.  JA249-52.  So the only testimony he could give would relate to his own subjective understanding of the TRO, which has no legal relevance.

## II.  The District Court's Order Threatens the Attorney-Client Privilege.

Mandamus is warranted for another traditional reason:  Ordering two government litigators to take the stand, subject to cross-examination by their opposing counsel, impermissibly threatens the government's attorney-client privilege.

**A.**  As already discussed, Ensign serves, and Reuveni previously served, as counsel for the government *in this case*.  Both have engaged in communications that are protected by the attorney-client privilege, including discussions in advance of and during the TRO hearings in this case.

Contrary to Plaintiffs' claim below, the government has never put its legal advice at issue and has been careful not to waive privilege.  And although Reuveni is no longer employed by the government, "the client holds the privilege" and has not waived it.  *In re Grand Jury*

*Procs. #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 250 (4th Cir. 2005).

Nor does it matter that Reuveni has made certain purported disclosures

as a "whistleblower"; those do not permit the court to invite further

violations to which the government objects. *See In re von Bulow*, 828

F.2d 94, 100-01 (2d Cir. 1987).

Putting the government's own attorneys on the stand thus poses

an intolerably high risk of violating the privilege.  That is why

"[d]epositions of opposing counsel are generally disfavored in federal

courts." *Guantanamera Cigar Co. v. Corporacion Habanos, SA*, 263

F.R.D. 1, 8 (D.D.C. 2009).  Confirming the problem, Reuveni sent a

letter effectively requesting a court order directing him to divulge

privileged communications so that he can do so without breaching his

ethical obligations.  JA394-97.  And Plaintiffs filed a lengthy opposition

arguing that the government had waived the privilege merely by

*mentioning* the provision of legal advice (without disclosing its

substance) and contending that the district court should invoke the

"crime-fraud" exception to pierce the privilege across the board.  *See*

Dkt. 205, at 17-19.  These two exceptions neither apply nor are relevant

at this pre-referral phase.  The government has not put legal advice at

61

issue, nor could it have as "[r]eliance on advice of counsel is an affirmative defense," *United States v. White*, 887 F.2d 267, 270 (D.C. Cir. 1989), and "affirmative defense[s]" are not usually "relevant to a probable cause determination." *Kendig v. Stolar*, 173 F.4th 466, 475 (3d Cir. 2026).[14]  And the crime-fraud exception has no application. Moreover, invoking that exception requires *at least* probable cause that a crime was actually committed, *In re Sealed Case*, 107 F.3d 46, 50 (D.C. Cir. 1997), at which point continued judicial investigation would be unnecessary.

Although the government raised these concerns with the district court and requested either a protective order or some sort of protocol to allow for the orderly adjudication of privilege disputes with opportunity for appellate review—and although Reuveni and Plaintiffs have both teed up the privilege disputes in their own submissions—the district court denied this request.  JA391-93.

---

[14] A defendant at trial would be entitled to assert an advice-of-counsel defense, and in doing so, waive the privilege.  *See United States v. Hansen*, 772 F.2d 940, 947 (D.C. Cir. 1985).

Allowing a district court judge conducting his own criminal investigation to decide on privilege matters raised by his own investigation and insulate those decisions from appellate review is precisely the sort of abuse that Rule 42(a)(2) is designed to prevent. As this Court has recognized, once privileged information is disclosed, that bell cannot be unrung. *In re Kellogg Brown & Root*, 756 F.3d at 756. Here too, mandamus is required to preserve the government's privileges and to prevent a far-reaching, unjustified inquest into attorney-client communications.

**B.** The threat to the government's attorney-client privilege is exacerbated by another fundamental error: the district court's willingness to allow Plaintiffs to participate in the free-wheeling contempt investigation and cross-examine government witnesses. The court has not only ordered the government to put its current litigation counsel on the stand, but also to subject him to cross-examination by opposing counsel—the same counsel litigating against Ensign (and previously Reuveni) in numerous high-profile immigration cases. And Plaintiffs' counsel have made no secret of their intention to use this opportunity to seek sanctions and generally harass and punish the

government lawyers for doing their jobs.  *See* Dkt. 205 (Plaintiffs' opposition to motion to reconsider).

It is entirely improper for opposing counsel to participate in this roving inquiry.  Criminal contempt concerns the "dignity of the court" and "no longer involves the original litigants as the parties of interest." *Ramos Colon v. U.S. Att'y for Dist. of P.R.*, 576 F.2d 1, 5 (1st Cir. 1978). Whether a contempt proceeding should be investigated is a "matter concerning [the] defendant and the public, in which [the] plaintiff's interest is no greater than that of every member of the general public." *Kienle v. Jewel Tea Co.*, 222 F.2d 98, 100 (7th Cir. 1955).  Plaintiffs thus lack standing to participate as anything other than fact witnesses (and here, not even that, as they lack any relevant personal knowledge).  *See Ramos Colon*, 576 F.2d at 5; *Jones v. Clinton*, 206 F.3d 811, 812 (8th Cir. 2000) (per curiam).

Moreover, it is inappropriate for an interested party to conduct a criminal investigation on behalf of a district court, even assuming the court itself has that power.  By definition, opposing counsel have an interest in the underlying case and are adverse to the government. That makes it wholly improper for them to play any investigatory role.

64

That conclusion follows *a fortiori* from *Young*, where the Supreme Court held that "appoint[ing] counsel for an interested party" as a private prosecutor for contempt was improper. 481 U.S. at 809-14. Granting "prosecutorial powers" under those circumstances creates "an appearance of impropriety." *Id.* The district court here has permitted opposing counsel to participate in a factual investigation intended to determine whether there is a basis for criminal-contempt charges—a question in which Plaintiffs have an obvious and significant bias.

The district court's only explanation for permitting Plaintiffs' participation was that, "given their close familiarity with the case, Plaintiffs are uniquely positioned to assist the Court, and it will permit them to do so." JA392. That rationale only underscores the concern. As in *Young*, allowing opposing counsel to participate in the district court's investigative hearings wrongly permits an adverse party to engage in prosecutorial functions for their own private gain. 481 U.S. at 805-07. To the government's knowledge, this Court has never blessed anything of the kind, and it should not start now.

65

## III.   Mandamus Relief Is Warranted.

The district court's varied and serious errors committed in continuing its unlawful inquiry require immediate mandamus to prevent serious irreparable harm.  As noted, this Court may issue a writ of mandamus to vindicate a (1) "clear and indisputable" right, where (2) "no other adequate means" of relief exists, if (3) the writ is "appropriate under the circumstances."  *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380-81 (2004).  Each of those requirements is satisfied.

As explained above, the government's right to relief in this case is "clear and indisputable."  *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 749 (D.C. Cir. 2016).  The district court's ongoing inquiry is an improper "judicial usurpation of power," that dangerously intrudes on core executive prerogatives over investigations and prosecutions, presenting a classic case for mandamus to maintain the Constitution's separation of powers.  *Cheney*, 542 U.S. at 380; *see id.* at 382 ("Accepted mandamus standards are broad enough to allow a court of appeals to prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional responsibilities.").  And it does so even

66

though the government did not violate the order at issue, much less did Secretary Noem criminally violate it. Finally, dragging witnesses before the court whose only plausibly relevant knowledge is privileged unduly risks the disclosure of privileged information, which there is no valid basis to pierce.

As the panel explained, the government also has "no adequate alternative means" of relief "from this improper inquest." Op.13; *see* Op.14-19. As before, these incursions on Article II functions will occur before any final contempt conviction and cannot be remedied after the fact. *See Fokker Servs.*, 818 F.3d at 741 (mandamus is proper for threats to "[t]he Executive's primacy in criminal charging decisions").

This prong is also "often … met in cases where" there is a risk that a court "erroneously order[s] disclosure of attorney-client privileged" information, because an appeal is not available once "the cat is out of the bag." *In re Kellogg Brown & Root*, 756 F.3d at 760-61; *see also In re von Bulow*, 828 F.2d at 99 (same). In fact, addressing the first mandamus petition, several judges of this Court emphasized the absence of privilege concerns at the time when explaining why they would have denied that petition. *See J.G.G.*, 147 F.4th at 1074, 1075,

67

1076 (Pillard, J., dissenting); *J.G.G.*, 2025 WL 3198891, at *4 (Millett, J., dissenting from the denial of rehearing en banc).

Plaintiffs and the panel dissent have contended that mandamus is inappropriate because judicial review will be available after any criminal-contempt conviction. But that ignores the here-and-now harms to the separation of powers and the Executive Branch's privileges from the district court's improper *mens rea* investigation, including the compelled testimony of government lawyers. Those harms will be suffered even if the district court never issues a contempt referral. Mandamus is the traditional and appropriate remedy in these circumstances.

This case thus stands in stark contrast to this Court's decision in *In re Flynn*, 973 F.3d 74 (D.C. Cir. 2020) (en banc) (per curiam). There, a district court appointed an amicus to help it decide the government's motion to dismiss a criminal case. *Id.* at 77. The en banc Court declined to issue mandamus because the district court had not yet taken any step to intrude on the prerogatives of the Executive Branch. But the *Flynn* Court made clear that mandamus could lie from subsequent "order[s] [that] violate the separation of powers." *Id.* at 80,

68

82.  Here, by contrast, the district court is poised to commence a wide-ranging inquisition into national-security and foreign-policy deliberations of senior Executive officials, including by putting the government's counsel on the stand for cross-examination by opposing counsel.  Indeed, that testimony would *already* have occurred but for this Court's administrative stay.  The district court has, furthermore, denied the government's motion for reconsideration or a protective order.  This Court's intervention is urgently needed.

## CONCLUSION

For the foregoing reasons, the Court should grant the petition for a writ of mandamus and direct the district court to terminate its criminal-contempt inquiry.  At a minimum, the Court should issue a writ of mandamus directing the district court to grant the government's motion for reconsideration and make a referral decision under Rule 42(a)(2) without compelling further testimony.

69

If this Court denies relief, the government requests that it extend the administrative stay for 14 days after its decision to allow time to seek further relief in the Supreme Court.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN

*/s/ Derek Weiss*
DEREK WEISS

TIBERIUS DAVIS
*Attorneys*
*Civil Division, Room 7230*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5365*
*derek.l.weiss@usdoj.gov*

70

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,919 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Derek Weiss*

Derek Weiss

**ADDENDUM**

# TABLE OF CONTENTS

18 U.S.C. § 401.............................................................................. A1

Federal Rule of Criminal Procedure 42.................................................. A2

**18 U.S.C. § 401**

## § 401. Power of court

A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

A1

## Federal Rule of Criminal Procedure 42

## Rule 42. Criminal Contempt

(a) *Disposition After Notice.* Any person who commits criminal contempt may be punished for that contempt after prosecution on notice.

(1) *Notice.* The court must give the person notice in open court, in an order to show cause, or in an arrest order. The notice must:

(A) state the time and place of the trial;

(B) allow the defendant a reasonable time to prepare a defense; and

(C) state the essential facts constituting the charged criminal contempt and describe it as such.

(2) *Appointing a Prosecutor.* The court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney. If the government declines the request, the court must appoint another attorney to prosecute the contempt.

(3) *Trial and Disposition.* A person being prosecuted for criminal contempt is entitled to a jury trial in any case in which federal law so provides and must be released or detained as Rule 46 provides. If the criminal contempt involves disrespect toward or criticism of a judge, that judge is disqualified from presiding at the contempt trial or hearing unless the defendant consents. Upon a finding or verdict of guilty, the court must impose the punishment.

(b) *Summary Disposition.* Notwithstanding any other provision of these rules, the court (other than a magistrate judge) may summarily punish a person who commits criminal contempt in its presence if the judge saw or heard the contemptuous conduct and so certifies; a magistrate judge may summarily punish a person as provided in 28 U.S.C. § 636(e). The contempt order must recite the facts, be signed by the judge, and be filed with the clerk.

A2