**[EN BANC ARGUMENT SCHEDULED SEPTEMBER 29, 2026]**

**No. 25-5452**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

In re DONALD J. TRUMP, in his official capacity, et al.,

Petitioners.

---

On Petition for a Writ of Mandamus to the United States
District Court for the District of Columbia
Case No: 1:25-cv-766-JEB

---

## JOINT APPENDIX

---

LEE GELERNT
  *Counsel of Record*

DANIEL GALINDO
ASHLEY GORSKI
PATRICK TOOMEY
OMAR JADWAT
HINA SHAMSI
SIDRA MAHFOOZ
SEAN M. LAU
  *American Civil Liberties
    Union Foundation*
*125 Broad Street, 18th Floor*
*New York, NY 10004*
*(212) 549-2660*

*Counsel for Respondents*

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DEREK WEISS
TIBERIUS DAVIS
  *Attorneys*
  *Civil Division, Room 7230*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*

*Counsel for Petitioners*

---

**ADDITIONAL COUNSEL LISTED ON INSIDE COVER**

EVELYN DANFORTH-SCOTT
SPENCER AMDUR
NOELLE SMITH
OSCAR SARABIA ROMAN
MY KHANH NGO
  *American Civil Liberties*
      *Union Foundation*
  *425 California Street, Suite 700*
  *San Francisco, CA 94104*
  *(415) 343-0770*


KATHRYN HUDDLESTON\*
  *American Civil Liberties*
      *Union Foundation*
  *915 15th Street, NW, 7th Floor*
  *Washington, D.C. 20005*
  *(212) 549-2500*


ARTHUR B. SPITZER
SCOTT MICHELMAN
ADITI SHAH
  *American Civil Liberties*
      *Union Foundation of*
      *the District of Columbia*
  *529 14th Street, NW, Suite 722*
  *Washington, D.C. 20045*
  *(202) 457-0800*


*Counsel for Respondents*


*\*Barred in Texas and Arizona only;*
*supervised by a member of the D.C. Bar*

## TABLE OF CONTENTS

**Page**

District Court Docket Report ................................................................ JA1

Complaint (Mar. 15, 2025) (Dkt. 1) ..................................................... JA58

Declarations Supporting TRO Motion (Mar. 15, 2025)
     Declaration of J.G.G. (Dkt. 3-3) ................................................ JA82
     Declaration of Grace Carney (Dkt. 3-4) ..................................... JA84
     Declaration of Karyn Ann Shealy (Dkt. 3-5) ............................. JA87
     Declaration of W.G.H. (Dkt. 3-6) .............................................. JA89
     Declaration of Molly Lauterback (Dkt. 3-7) ............................. JA91
     Declaration of J.A.V. (Dkt. 3-8) ................................................ JA94

Defendants' Notice to the Court (Mar. 16, 2025) (Dkt. 19) .............. JA96

Transcript (Mar. 15, 2025) (Dkt. 20) ................................................ JA98

Transcript Excerpts (Mar. 17, 2025) (Dkt. 25) ................................ JA146

Order (Mar. 20, 2025) (Dkt. 47) ....................................................... JA154

Transcript Excerpts (Mar. 21, 2025) (Dkt. 51) ................................ JA157

Transcript Excerpts (Apr. 3, 2025) (Dkt. 76) ................................... JA167

Probable Cause Order (Apr. 16, 2025) (Dkt. 81) ............................. JA191

Order Denying Stay Pending Appeal (Apr. 18, 2025) (Dkt. 91) ...... JA237

*Excerpts of Exhibit A to Notice of Filing (Erez Reuveni Disclosure
Report) (June 26, 2025) (Dkt. 158-1) ............................................... JA239

---

       * These documents are included in the Joint Appendix at
Plaintiffs' request, over the government's objection that they contain
improperly leaked materials covered by the attorney-client
privilege.  *See* Fed. R. App. P. 30(b)(1).  The government reiterates its

*Continued on next page.*

Transcript Excerpts (July 24, 2025) (Dkt. 169)................................ JA254

Exhibits Supporting Preliminary Injunction Motion (Oct. 15, 2025)
        *Exhibit F: Evidence in Support of Erez Reuveni's
        Whistleblower Complaint Part I (Dkt. 177-8)......................... JA259
        *Exhibit G: Evidence in Support of Erez Reuveni's
        Whistleblower Complaint Part II (Dkt. 177-9) ....................... JA295
        Excerpts of Exhibit J: Declaration of Noelle Smith (Dkt. 177-
        12)............................................................................ JA306

Excerpts of Defendants' Opposition to Preliminary Injunction
        Motion (Oct. 31, 2025) (Dkt. 182) .......................................... JA325

Defendants' Response To Court Order (Nov. 25, 2025) (Dkt. 195) . JA330

Order (Nov. 28, 2025) (Dkt. 196)...................................................... JA335

Transcript (Nov. 19, 2025) (Dkt. 197).............................................. JA337

Notice of Filings of Declarations (Dec. 5, 2025) (Dkt. 198).............. JA374
        Declaration of Secretary Noem (Dkt. 198-1) .......................... JA378
        Declaration of Joseph N. Mazzara (Dkt. 198-2)...................... JA379
        Declaration of Deputy A.G. Blanche (Dkt. 198-3).................. JA380

Declaration of the Hon. Emil Bove (Dec. 8, 2025) (Dkt. 199).......... JA381

Order (Dec. 8, 2025) (Dkt. 200) ...................................................... JA383

Declaration of Drew C. Ensign (Dec. 10, 2025) (Dkt. 201-1)........... JA385

Declaration of Daniel A. Galindo (Dec. 11, 2025) (Dkt. 205-1)........ JA387

Order Denying Motion to Reconsider (Dec. 12, 2025) (Dkt. 208).... JA391

Letter from Erez Reuveni's Counsel (Dec. 11, 2025) (Dkt. 209)...... JA394

---

privilege objections to those materials, and it does not waive any privileges by Plaintiffs' inclusion of these documents in this Joint Appendix.

APPEAL,E–FILE,ENJOINED,PSEUDO–GR,STAYED,TYPE–D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25–cv–00766–JEB

J.G.G. et al v. TRUMP et al
Assigned to: Chief Judge James E. Boasberg
Related Cases:  1:25–cv–01774–JEB
                1:26–cv–01008–JEB
Case in other court:  USCA, 25–05068
                     USCA, 25–05068
                     USCA, 25–05124
                     USCA, 25–05217
                     USCA, 25–05452
                     USCA, 26–05040
                     USCA, 26–05074
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 03/15/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**J.G.G.**            represented by    **Aditi Shah**
AMERICAN CIVIL LIBERTIES UNION
OF DC
529 14th Street NW
Ste 722
Washington, DC 20045
202–457–0800
Email: ashah@acludc.org
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
ACLU OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW
Suite 722
Washington, DC 20045
202–601–4266
Email: aspitzer@acludc.org
*ATTORNEY TO BE NOTICED*

**Ashley Gorski**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
18th Floor
New York, NY 10004
212–284–7305
Email: agorski@aclu.org
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
201–824–1347
Email: awiggins@democracyforward.org
*TERMINATED: 05/23/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bradley Girard**

JA1

DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202–812–3840
Email: bgirard@democracyforward.org
*TERMINATED: 11/18/2025*
*ATTORNEY TO BE NOTICED*

**Brian D. Netter**
DEMOCRACY FORWARD
FOUNDATION
PO Box 34553
Washington, DC 20043
202–808–1846
Email: bnetter@democracyforward.org
*TERMINATED: 11/18/2025*
*ATTORNEY TO BE NOTICED*

**Cecillia D. Wang**
ACLU
425 California St
Suite 700
San Francisco, CA 94104
415–343–0775
Email: cwang@aclu.org
*ATTORNEY TO BE NOTICED*

**Christine L. Coogle**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202–448–9090
Email: ccoogle@democracyforward.org
*TERMINATED: 11/18/2025*
*ATTORNEY TO BE NOTICED*

**Cody H. Wofsy**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street
Suite 7th Floor
San Francisco, CA 94104
415–343–0785
Email: cwofsy@aclu.org
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
Suite 18th Floor
New York
New York, NY 10004
646–905–8907
Email: dgalindo@aclu.org
*ATTORNEY TO BE NOTICED*

**Evelyn Danforth–Scott**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street
Ste 7th Floor
San Francisco, CA 94104

JA2

415–343–0780
Email: edanforth–scott@aclu.org
*ATTORNEY TO BE NOTICED*

**Hina Shamsi**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
18th floor
New York, NY 10004
(212) 284–7321
Fax: (212) 549–2654
Email: hshamsi@aclu.org
*ATTORNEY TO BE NOTICED*

**Kathryn Huddleston**
AMERICAN CIVIL LIBERTIES UNION
915 15th Street, NW
7th Floor
Washington, DC 20005
212–549–2500
Email: khuddleston@aclu.org
*ATTORNEY TO BE NOTICED*

**Michael King Thomas Tan**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street
Ste 7th Floor
San Francisco, CA 94104
808–490–3806
Email: m.tan@aclu.org
*ATTORNEY TO BE NOTICED*

**Michael Lawrence Waldman**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202–442–9090
Email: mwaldman@democracyforward.org
*TERMINATED: 05/23/2025*
*ATTORNEY TO BE NOTICED*

**My Khanh Ngo**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street
Ste 7th Floor
San Francisco, CA 94104
718–483–5885
Email: mngo@aclu.org
*ATTORNEY TO BE NOTICED*

**Noelle Smith**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street
Ste 7th Floor
San Francisco, CA 94104
214–663–7451
Email: nsmith@aclu.org
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**

JA3

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
18th Floor
New York, NY 10004
(212) 549–2620
Fax: (212) 549–2654
Email: ojadwat@aclu.org
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street
Ste 7th Floor
San Francisco, CA 94104
916–813–7891
Email: osarabia@aclu.org
*ATTORNEY TO BE NOTICED*

**Patrick Toomey**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
18th Floor
New York, NY 10004
212–519–7816
Email: ptoomey@aclu.org
*ATTORNEY TO BE NOTICED*

**Pooja Boisture**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202–448–9090
Email: pboisture@democracyforward.org
*TERMINATED: 05/23/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah M. Rich**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202–274–7652
Email: srich@democracyforward.org
*TERMINATED: 05/28/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
ACLU FOUNDATION OF THE
DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, DC 20045
202–601–4267
Email: smichelman@acludc.org
*ATTORNEY TO BE NOTICED*

**Sean Ming–Jun Lau**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street

JA4

18th Floor
New York, NY 10004
212–549–2500
Email: slau@aclu.org
*ATTORNEY TO BE NOTICED*

**Sidra Mahfooz**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
New York, NY 10004
631–741–3383
Email: smahfooz@aclu.org
*ATTORNEY TO BE NOTICED*

**Skye Perryman**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
254–722–5745
Email: sperryman@democracyforward.org
*TERMINATED: 05/23/2025*
*ATTORNEY TO BE NOTICED*

**Somil Trivedi**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202–904–7727
Email: strivedi@democracyforward.org
*TERMINATED: 05/23/2025*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
AMERICAN CIVIL LIBERTIES UNION
125 Broad St.
18th Floor
New York, NY 10004
212–549–2616
Fax: 212–549–2654
Email: lgelernt@aclu.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**G.F.F.**                                             represented by **Aditi Shah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ashley Gorski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*TERMINATED: 05/23/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

JA5

**Bradley Girard**
(See above for address)
*TERMINATED: 11/18/2025*
*ATTORNEY TO BE NOTICED*

**Brian D. Netter**
(See above for address)
*TERMINATED: 11/18/2025*
*ATTORNEY TO BE NOTICED*

**Cecillia D. Wang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christine L. Coogle**
(See above for address)
*TERMINATED: 11/18/2025*
*ATTORNEY TO BE NOTICED*

**Cody H. Wofsy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Evelyn Danforth–Scott**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hina Shamsi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Huddleston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael King Thomas Tan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Lawrence Waldman**
(See above for address)
*TERMINATED: 05/23/2025*
*ATTORNEY TO BE NOTICED*

**My Khanh Ngo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Noelle Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patrick Toomey**

JA6

(See above for address)
*ATTORNEY TO BE NOTICED*

**Pooja Boisture**
(See above for address)
*TERMINATED: 05/23/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah M. Rich**
(See above for address)
*TERMINATED: 05/28/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Ming–Jun Lau**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sidra Mahfooz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Skye Perryman**
(See above for address)
*TERMINATED: 05/23/2025*
*ATTORNEY TO BE NOTICED*

**Somil Trivedi**
(See above for address)
*TERMINATED: 05/23/2025*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**J.G.O.**                                   represented by **Aditi Shah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ashley Gorski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*TERMINATED: 05/23/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bradley Girard**
(See above for address)
*TERMINATED: 11/18/2025*
*ATTORNEY TO BE NOTICED*

JA7

**Brian D. Netter**
(See above for address)
*TERMINATED: 11/18/2025*
*ATTORNEY TO BE NOTICED*

**Cecillia D. Wang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christine L. Coogle**
(See above for address)
*TERMINATED: 11/18/2025*
*ATTORNEY TO BE NOTICED*

**Cody H. Wofsy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Evelyn Danforth–Scott**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hina Shamsi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Huddleston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael King Thomas Tan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Lawrence Waldman**
(See above for address)
*TERMINATED: 05/23/2025*
*ATTORNEY TO BE NOTICED*

**My Khanh Ngo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Noelle Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patrick Toomey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Pooja Boisture**

JA8

(See above for address)
*TERMINATED: 05/23/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah M. Rich**
(See above for address)
*TERMINATED: 05/28/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Ming–Jun Lau**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sidra Mahfooz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Skye Perryman**
(See above for address)
*TERMINATED: 05/23/2025*
*ATTORNEY TO BE NOTICED*

**Somil Trivedi**
(See above for address)
*TERMINATED: 05/23/2025*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**W.G.H.**                                    represented by **Aditi Shah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ashley Gorski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*TERMINATED: 05/23/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bradley Girard**
(See above for address)
*TERMINATED: 11/18/2025*
*ATTORNEY TO BE NOTICED*

**Brian D. Netter**
(See above for address)
*TERMINATED: 11/18/2025*

JA9

*ATTORNEY TO BE NOTICED*

**Cecillia D. Wang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christine L. Coogle**
(See above for address)
*TERMINATED: 11/18/2025*
*ATTORNEY TO BE NOTICED*

**Cody H. Wofsy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Evelyn Danforth–Scott**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hina Shamsi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Huddleston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael King Thomas Tan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Lawrence Waldman**
(See above for address)
*TERMINATED: 05/23/2025*
*ATTORNEY TO BE NOTICED*

**My Khanh Ngo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Noelle Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patrick Toomey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Pooja Boisture**
(See above for address)
*TERMINATED: 05/23/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

JA10

**Sarah M. Rich**
(See above for address)
*TERMINATED: 05/28/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Ming–Jun Lau**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sidra Mahfooz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Skye Perryman**
(See above for address)
*TERMINATED: 05/23/2025*
*ATTORNEY TO BE NOTICED*

**Somil Trivedi**
(See above for address)
*TERMINATED: 05/23/2025*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**J.A.V.**                                    represented by  **Aditi Shah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ashley Gorski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*TERMINATED: 05/23/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bradley Girard**
(See above for address)
*TERMINATED: 11/18/2025*
*ATTORNEY TO BE NOTICED*

**Brian D. Netter**
(See above for address)
*TERMINATED: 11/18/2025*
*ATTORNEY TO BE NOTICED*

**Cecillia D. Wang**
(See above for address)

JA11

*ATTORNEY TO BE NOTICED*

**Christine L. Coogle**
(See above for address)
*TERMINATED: 11/18/2025*
*ATTORNEY TO BE NOTICED*

**Cody H. Wofsy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Antonio Galindo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Evelyn Danforth–Scott**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hina Shamsi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Huddleston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael King Thomas Tan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Lawrence Waldman**
(See above for address)
*TERMINATED: 05/23/2025*
*ATTORNEY TO BE NOTICED*

**My Khanh Ngo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Noelle Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oscar Sarabia Roman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patrick Toomey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Pooja Boisture**
(See above for address)
*TERMINATED: 05/23/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah M. Rich**
(See above for address)
*TERMINATED: 05/28/2025*

JA12

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Ming–Jun Lau**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sidra Mahfooz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Skye Perryman**
(See above for address)
*TERMINATED: 05/23/2025*
*ATTORNEY TO BE NOTICED*

**Somil Trivedi**
(See above for address)
*TERMINATED: 05/23/2025*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**M.Z.V.V.**                                    represented by   **Aditi Shah**
*as next friend on behalf of J.A.B.V.*                         (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Kathryn Huddleston**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Michael King Thomas Tan**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Sean Ming–Jun Lau**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Lee Gelernt**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**M.Y.O.R.**                                    represented by   **Aditi Shah**
*as next friend on behalf of M.A.O.R.*                         (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Kathryn Huddleston**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Michael King Thomas Tan**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Sean Ming–Jun Lau**

JA13

(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**M.M.A.A.**
*as next friend on behalf of G.A.A.A.*

represented by **Aditi Shah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Huddleston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael King Thomas Tan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Ming–Jun Lau**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**D.A.R.H.**
*as next friend on behalf of ANDRY JOSE
HERNANDEZ ROMERO*

represented by **Aditi Shah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Huddleston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael King Thomas Tan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Ming–Jun Lau**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EYLAN SCHILMAN**
*as next friend on behalf of T.C.I.*

represented by **Aditi Shah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Huddleston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael King Thomas Tan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Ming–Jun Lau**

JA14

(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**LIYANARA SANCHEZ**
*as next friend on behalf of FRENGEL REYES MOTA*

represented by **Aditi Shah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Huddleston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael King Thomas Tan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Ming–Jun Lau**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DORYS MENDOZA**
*as next friend on behalf of M.R.M.*

represented by **Aditi Shah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Huddleston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael King Thomas Tan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Ming–Jun Lau**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DONALD J. TRUMP**
*in his official capacity as President of the United States*

represented by **Abhishek Kambli**
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street, NW
Washington, DC 20037
202–737–8808
Email: akambli@holtzmanvogel.com
*TERMINATED: 05/15/2026*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA15

**August Edward Flentje**
DOJ–Civ
PO Box 868 Ben Franklin Station
Washington, DC 20044
202–514–3309
Email: august.flentje@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina Greer**
US DEPARTMENT OF JUSTICE, CIVIL
DIVISION
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
(202) 598–8770
Email: christina.greer@usdoj.gov
*TERMINATED: 03/19/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Drew C Ensign**
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue
Washington, DC 20004
202–514–2331
Email: drew.c.ensign@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**
U.S. DEPARTMENT OF JUSTICE
Office of Immigration Litigation,
Appellate Section
PO BOX 878
Ben Franklin Station
Washington, DC 20044
(202) 616–9344
Email: ernesto.h.molina@usdoj.gov
*ATTORNEY TO BE NOTICED*

**John Bailey**
DOJ–Civ
Civil
950 Pennsylvania Ave NW
Ste 3618
Washington, DC 20530
202–514–6993
Email: john.bailey@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
U.S. DEPARTMENT OF JUSTICE
Civil Division
950 Pennsylvania Avenue
Suite 400
Washington, DC 20530–0001
202–514–4357
Email: tiberius.davis@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

represented by

JA16

**PAMELA J. BONDI**
*Attorney General of the United States, in her official capacity*

**Abhishek Kambli**
(See above for address)
*TERMINATED: 05/15/2026*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**August Edward Flentje**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina Greer**
(See above for address)
*TERMINATED: 03/19/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Drew C Ensign**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**KRISTI L. NOEM**
*Secretary of the U.S. Department of Homeland Security, in her official capacity*

represented by **Abhishek Kambli**
(See above for address)
*TERMINATED: 05/15/2026*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**August Edward Flentje**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina Greer**
(See above for address)
*TERMINATED: 03/19/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Drew C Ensign**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA17

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF
HOMELAND SECURITY**

represented by **Abhishek Kambli**
(See above for address)
*TERMINATED: 05/15/2026*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**August Edward Flentje**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina Greer**
(See above for address)
*TERMINATED: 03/19/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Drew C Ensign**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MADISON SHEAHAN**
*Acting Director and Senior Official
Performing the Duties of the Director of
U.S. Immigration and Customs
Enforcement, in her official capacity*

represented by **Abhishek Kambli**
(See above for address)
*TERMINATED: 05/15/2026*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**August Edward Flentje**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina Greer**
(See above for address)
*TERMINATED: 03/19/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Drew C Ensign**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**

JA18

(See above for address)
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT** | represented by | **Abhishek Kambli** (See above for address) *TERMINATED: 05/15/2026* *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**August Edward Flentje**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina Greer**
(See above for address)
*TERMINATED: 03/19/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Drew C Ensign**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **MARCO A. RUBIO** *Secretary of State, in his official capacity* | represented by | **Abhishek Kambli** (See above for address) *TERMINATED: 05/15/2026* *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**August Edward Flentje**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina Greer**
(See above for address)
*TERMINATED: 03/19/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA19

**Drew C Ensign**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. STATE DEPARTMENT**    represented by    **Abhishek Kambli**
(See above for address)
*TERMINATED: 05/15/2026*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**August Edward Flentje**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christina Greer**
(See above for address)
*TERMINATED: 03/19/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Drew C Ensign**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernesto Horacio Molina , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PETER B. HEGSETH**    represented by    **John Bailey**
*Secretary of Defense, in his official*                   (See above for address)
*capacity*                                                *ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF DEFENSE**    represented by

JA20

**Drew C Ensign**
U.S. DEPARTMENT OF JUSTICE
Civil Division
950 Pennsylvania Avenue
Washington, DC 20004
202–514–2331
Email: drew.c.ensign@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**BRANDON GILL**                          represented by   **Andrew Block**
*The Honorable*                                            U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave SE
Washington, DC 20530
202–372–7565
Email: andrew.block@usdoj.gov
*TERMINATED: 01/04/2026*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Andrew Crossin**
AMERICA FIRST LEGAL
FOUNDATION
611 Pennsylvania Avenue, SE
#231
Washington, DC 20003
202–596–9846
Email: bobby.crossin@aflegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan Giannetti**
AMERICA FIRST LEGAL
611 Pennsylvania Avenue SE
Ste 231
Washington, DC 20003
651–402–3821
Email: ryan.giannetti@aflegal.org
*TERMINATED: 06/26/2026*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Frank Scolinos**
AMERICA FIRST LEGAL
FOUNDATION
611 Pennsylvania Avenue, SE
#231
Washington, DC 20003
202–964–3721
Email: william.scolinos@aflegal.org
*ATTORNEY TO BE NOTICED*

**Movant**

**JANICE WOLK GRENADIER**                 represented by   **JANICE WOLK GRENADIER**
*TERMINATED: 03/27/2025*                                  15 West Spring Street

JA21

Alexandria, VA 22301
(202) 268–7178
PRO SE

**Movant**

**JOHN W. KEKER**                    represented by **Steven A. Hirsch**
                                     COMPLEX APPELLATE LITIGATION
                                     GROUP LLP
                                     96 Jessie Street
                                     San Francisco, CA 94105
                                     415–649–6700
                                     Email: steve.hirsch@calg.com
                                     *LEAD ATTORNEY*
                                     *ATTORNEY TO BE NOTICED*

**Movant**

**ROBERT A. VAN NEST**               represented by **Steven A. Hirsch**
                                     (See above for address)
                                     *LEAD ATTORNEY*
                                     *ATTORNEY TO BE NOTICED*

**Movant**

**ELLIOT R. PETERS**                 represented by **Steven A. Hirsch**
                                     (See above for address)
                                     *LEAD ATTORNEY*
                                     *ATTORNEY TO BE NOTICED*

**Movant**

**LAURIE CARR MIMS**                 represented by **Steven A. Hirsch**
                                     (See above for address)
                                     *LEAD ATTORNEY*
                                     *ATTORNEY TO BE NOTICED*

**Movant**

**COOLIDGE REAGAN**                  represented by **Dan Backer**
**FOUNDATION**                       CHALMERS, ADAMS, BACKER &
                                     KAUFMAN LLC
                                     10521 Judicial Drive
                                     Suite 200–A
                                     Fairfax, VA 22030
                                     202–210–5431
                                     Fax: 202–478–0750
                                     Email: dbacker@ChalmersAdams.com
                                     *LEAD ATTORNEY*
                                     *ATTORNEY TO BE NOTICED*

**Movant**

**JOSHUA HALL**                      represented by **JOSHUA HALL**
*TERMINATED: 06/04/2025*             #104525
                                     DAUPHIN COUNTY PRISON
                                     501 MALL ROAD
                                     HARRISBURG, PA 17111–1299
                                     PRO SE

**Movant**

**PAUL M. DORSEY**                   represented by **PAUL M. DORSEY**
*TERMINATED: 07/07/2025*             110 Westminster Drive
                                     West Hartford, CT 06107
                                     (860) 521–0081
                                     PRO SE

JA22

**Movant**

**GLORIA BROWNING**
*TERMINATED: 07/17/2025*

represented by **GLORIA BROWNING**
Brooklyn, NY
PRO SE

**Movant**

**BOREALIS S. HEDLING**
*TERMINATED: 01/16/2026*

represented by **BOREALIS S. HEDLING**
Travelodge Plus Dublin City Centre
44 Townsend Street
Room 120
Dublin 2
Ireland
+1–959–999–8957
PRO SE

**Amicus**

**MARK J. ROZELL**

represented by **Kelly Brian McClanahan**
NATIONAL SECURITY COUNSELORS
1451 Rockville Pike
Suite 250
Rockville, MD 20852
501–301–4672
Fax: 240–681–2189
Email: kel@nationalsecuritylaw.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**HEIDI KITROSSER**

represented by **Kelly Brian McClanahan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**MITCHEL A. SOLLENBERGER**

represented by **Kelly Brian McClanahan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**MEGHAN KELLY**
*TERMINATED: 01/16/2026*

represented by **MEGHAN KELLY**
34012 Shawnee Drive
34012 Shawnee Drive
Dagsboro, DE 19939
302–278–2975
Email: meghankellyesq@yahoo.com
PRO SE

| Date Filed | # | Docket Text |
|---|---|---|
| 03/15/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC–11544662) filed by J.G.O., G.F.F., J.G.G., W.G.H., J.A.V.. (Attachments: # 1 Civil Cover Sheet, # 2 Summons Donald J. Trump, # 3 Summons Pamela Bondi, # 4 Summons Kristi Noem, # 5 Summons DHS, # 6 Summons Madison Sheahan, # 7 Summons ICE, # 8 Summons Marco Rubio, # 9 Summons DOS, # 10 Summons USAO)(Gelernt, Lee) (Entered: 03/15/2025) |
| 03/15/2025 | 2 | SEALED MOTION to Proceed Under Pseudonym filed by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Attachments: # 1 Declaration of J.G.G., # 2 Declaration of W.G.H., # 3 Declaration of Molly Lauterback, # 4 Declaration of J.A.V., # 5 Declaration of Grace |

JA23

| | | |
|---|---|---|
| | | Carney, # 6 Text of Proposed Order)(Gelernt, Lee) (Entered: 03/15/2025) |
| 03/15/2025 | 3 | MOTION for Temporary Restraining Order by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Certificate of Counsel, # 2 Memorandum in Support, # 3 Declaration of J.G.G., # 4 Declaration of Grace Carney, # 5 Declaration of J.G.O., # 6 Declaration of W.G.H., # 7 Declaration of Molly Laterback, # 8 Declaration of J.A.V., # 9 Text of Proposed Order)(Gelernt, Lee) (Entered: 03/15/2025) |
| 03/15/2025 | 4 | MOTION to Certify Class by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Declaration of Daniel Galindo, # 2 Text of Proposed Order)(Gelernt, Lee) (Entered: 03/15/2025) |
| 03/15/2025 | 5 | NOTICE of Appearance by Daniel Antonio Galindo on behalf of All Plaintiffs (Galindo, Daniel) (Entered: 03/15/2025) |
| 03/15/2025 | | MINUTE ORDER granting 2 SEALED MOTION to Proceed Under Pseudonym. The Court has reviewed Plaintiffs' 2 Motion to Proceed Pseudonymously. Given the expedited nature of this matter, it determines that a full Opinion is not practical at this time. Believing that Plaintiffs have made the required showing on the relevant factors, the Court ORDERS that: 1) Their 2 Motion is GRANTED; and 2) They shall be permitted to proceed pseudonymously unless and until the assigned judge determines otherwise. Signed by Chief Judge James E. Boasberg on 3/15/2025. (zjd) Modified on 3/15/2025 (zjd). (Entered: 03/15/2025) |
| 03/15/2025 | | Case Assigned to Chief Judge James E. Boasberg. (zjd) (Entered: 03/15/2025) |
| 03/15/2025 | 6 | SUMMONS (9) Issued Electronically as to All Defendants, U.S. Attorney, and U.S. Attorney General. (Attachments: # 1 Notice and Consent) (zjd) (Entered: 03/15/2025) |
| 03/15/2025 | 7 | NOTICE of Appearance by Bradley Girard on behalf of All Plaintiffs (Girard, Bradley) (Entered: 03/15/2025) |
| 03/15/2025 | | MINUTE ORDER: The Court has reviewed Plaintiffs' Complaint and Motion for Temporary Restraining Order. Given the exigent circumstances that it has been made aware of this morning, it has determined that an immediate Order is warranted to maintain the status quo until a hearing can be set. As Plaintiffs have satisfied the four factors governing the issuance of preliminary relief, the Court accordingly ORDERS that: 1) Plaintiffs' 3 Motion for TRO is GRANTED; 2) Defendants shall not remove any of the individual Plaintiffs from the United States for 14 days absent further Order of the Court; and 3) The parties shall appear for a Zoom hearing on March 17, 2025, at 4:00 p.m. The hearing will proceed by videoconference for the parties and by telephone for members of the public. Toll free number: 833–990–9400. Meeting ID: 049550816. So ORDERED by Chief Judge James E. Boasberg on 3/15/2025. (lcjeb1) Modified to add public access line on 3/15/2025 (znbn). (Entered: 03/15/2025) |
| 03/15/2025 | 8 | NOTICE of Appearance by Skye Perryman on behalf of All Plaintiffs (Perryman, Skye) (Entered: 03/15/2025) |
| 03/15/2025 | 9 | NOTICE of Appearance by Somil Trivedi on behalf of All Plaintiffs (Trivedi, Somil) (Entered: 03/15/2025) |
| 03/15/2025 | | MINUTE ORDER: The Court ORDERS that the parties shall appear for Zoom hearing on Plaintiffs' 4 Motion for Class Certification on March 15, 2025, at 5:00 p.m. The hearing will proceed by videoconference for the parties and by telephone for members of the public. Toll free number: 833–990–9400. Meeting ID: 049550816. So ORDERED by Chief Judge James E. Boasberg on 3/15/2025. (lcjeb1) (Entered: 03/15/2025) |
| 03/15/2025 | 10 | NOTICE of Appearance by Scott Michelman on behalf of All Plaintiffs (Michelman, Scott) (Entered: 03/15/2025) |
| 03/15/2025 | | Set/Reset Hearings: Hearing set for 3/17/2025 at 04:00 PM via Zoom (Audio Line Available) before Chief Judge James E. Boasberg. (znbn) Modified to correct hearing location on 3/15/2025 (znbn). (Entered: 03/15/2025) |
| 03/15/2025 | 11 | NOTICE of Appearance by Christina Greer on behalf of All Defendants (Greer, Christina) (Entered: 03/15/2025) |

JA24

| | | |
|---|---|---|
| 03/15/2025 | 12 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to Order on Motion for TRO,,, by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. Fee Status: No Fee Paid. Parties have been notified. (Greer, Christina) (Entered: 03/15/2025) |
| 03/15/2025 | 13 | NOTICE of Appearance by Arthur B. Spitzer on behalf of All Plaintiffs (Spitzer, Arthur) (Entered: 03/15/2025) |
| 03/15/2025 | 14 | Transmission of the Notice of Appeal, Minute Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 12 Notice of Appeal to DC Circuit Court. (zjd) (Entered: 03/15/2025) |
| 03/15/2025 | 15 | ENTERED IN ERROR.....NOTICE of Appearance by Christina Greer on behalf of All Defendants (Greer, Christina) Modified on 3/17/2025; refiled as docket entry 16 (znmw). (Entered: 03/15/2025) |
| 03/15/2025 | 16 | NOTICE of Appearance by Drew C Ensign on behalf of All Defendants (Ensign, Drew) (Entered: 03/15/2025) |
| 03/15/2025 | | Minute Entry for proceedings held before Chief Judge James E. Boasberg: Motion Hearing held via Zoom (with public access line) on 3/15/2025 re 4 MOTION to Certify Class filed by J.G.O., W.G.H., J.G.G., G.F.F., J.A.V.. Oral arguments heard. Order forthcoming. (Court Reporter Tammy Nestor) (znbn) (Entered: 03/15/2025) |
| 03/15/2025 | | MINUTE ORDER: As discussed in today's hearing, the Court ORDERS that: 1) Plaintiffs' 4 Motion for Class Certification is GRANTED insofar as a class consisting of "All noncitizens in U.S. custody who are subject to the March 15, 2025, Presidential Proclamation entitled 'Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua' and its implementation" is provisionally certified; 2) The Government is ENJOINED from removing members of such class (not otherwise subject to removal) pursuant to the Proclamation for 14 days or until further Order of the Court; 3) The Government shall file any Motion to Vacate this TRO by March 17, 2025, with Plaintiffs' Opposition due by March 19, 2025; and 4) The hearing set for March 17, 2025, is VACATED and RESET for March 21, 2025, at 2:30 p.m. via Zoom. So ORDERED by Chief Judge James E. Boasberg on 3/15/2025. (lcjeb1) (Entered: 03/15/2025) |
| 03/15/2025 | 17 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to Order on Motion to Certify Class,,,, Set/Reset Deadlines,,, by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. Fee Status: No Fee Paid. Parties have been notified. (Greer, Christina) (Entered: 03/15/2025) |
| 03/15/2025 | 18 | Transmission of the Notice of Appeal, Minute Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 17 Notice of Appeal to DC Circuit Court. (zjd) (Entered: 03/15/2025) |
| 03/15/2025 | | USCA Case Number 25−5067 for 12 Notice of Appeal to DC Circuit Court, filed by DONALD J. TRUMP, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, U.S. STATE DEPARTMENT, PAMELA BONDI. (zjm) Modified on 3/17/2025 to correct case number (zjm). (Entered: 03/17/2025) |
| 03/15/2025 | | USCA Case Number 25−5068 for 17 Notice of Appeal to DC Circuit Court, filed by DONALD J. TRUMP, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, U.S. STATE DEPARTMENT, PAMELA BONDI. (zjm) (Entered: 03/17/2025) |
| 03/16/2025 | 19 | NOTICE by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF |

JA25

| | | |
|---|---|---|
| | | HOMELAND SECURITY (Ensign, Drew) (Entered: 03/16/2025) |
| 03/16/2025 | 20 | TRANSCRIPT OF PROCEEDINGS before Chief Judge James E. Boasberg held on 3/15/25; Page Numbers: 1–47. Court Reporter/Transcriber Tammy Nestor, tammy_nestor@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 4/6/2025. Redacted Transcript Deadline set for 4/16/2025. Release of Transcript Restriction set for 6/14/2025.(Nestor, Tammy) (Entered: 03/16/2025) |
| 03/17/2025 | 21 | RESPONSE re 19 Notice (Other) filed by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Gelernt, Lee) (Entered: 03/17/2025) |
| 03/17/2025 | | MINUTE ORDER: The Court ORDERS that the parties shall appear in person (or by Zoom if necessary) for a hearing at 4:00 p.m. today regarding the 19 Notice and 21 Response. The Government shall be prepared to provide answers to the questions raised by Plaintiffs on page 6 of their Response. So ORDERED by Chief Judge James E. Boasberg on 3/17/2025. (lcjeb1) (Entered: 03/17/2025) |
| 03/17/2025 | | MINUTE ORDER: The Court ORDERS that, in order to accommodate the parties' schedules, the hearing set for today at 4:00 p.m. is VACATED and RESET for 5:00 p.m. The hearing will proceed in−person for the parties and by telephone for members of the public. Toll free number: 833−990−9400. Meeting ID: 049550816. Any use of the public−access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24−31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. So ORDERED by Chief Judge James E. Boasberg on 3/17/2025. (lcjeb1) (Entered: 03/17/2025) |
| 03/17/2025 | 22 | NOTICE of Appearance by August Edward Flentje on behalf of All Defendants (Flentje, August) (Entered: 03/17/2025) |
| 03/17/2025 | | Set/Reset Hearings: Miscellaneous Hearing set for 3/17/2025 at 05:00 PM in Courtroom 22A− In Person (Audio Line Available) before Chief Judge James E. Boasberg. Motion Hearing set for 3/21/2025 at 02:30 PM via Zoom (Audio Line Available) before Chief Judge James E. Boasberg. (znbn) (Entered: 03/17/2025) |
| 03/17/2025 | 23 | NOTICE of Appearance by Abhishek Kambli on behalf of All Defendants (Kambli, Abhishek) (Entered: 03/17/2025) |
| 03/17/2025 | 24 | MOTION to Vacate *Response and Motion to Vacate Hearing* re 19 Notice (Other), Order,,,, Set Hearings,,, Set/Reset Hearings, 21 Response to Document by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. (Ensign, Drew) Modified event on 3/17/2025 (znmw). (Entered: 03/17/2025) |
| 03/17/2025 | | MINUTE ORDER: The Court ORDERS that Defendants' 24 Motion to Vacate is DENIED. The hearing will proceed as scheduled. So ORDERED by Chief Judge James E. Boasberg on 3/17/2025. (lcjeb1) (Entered: 03/17/2025) |

JA26

| | | |
|---|---|---|
| 03/17/2025 | | Minute Entry for proceedings held before Chief Judge James E. Boasberg: Hearing held on 3/17/2025. Oral arguments heard. Order forthcoming. (Court Reporter Tammy Nestor) (znbn) (Entered: 03/17/2025) |
| 03/17/2025 | | MINUTE ORDER: As discussed in today's hearing, the Court ORDERS that by 12:00 p.m. on March 18, 2025, the Government shall file a Notice, which may, if necessary, be sealed in part, setting forth: 1) A sworn declaration that no one on any flight departing the United States after 7:25 p.m. on March 15, 2025, was removed solely on the basis of the Proclamation at issue; 2) A sworn declaration setting forth when the Proclamation at issue was signed, when it was made public, and when it went into effect; 3) The Government's best estimate of the number of individuals subject to the Proclamation currently remaining in the United States and how many are currently in U.S. custody; and 4) The Government's position on whether, and in what form, it will provide answers to the Court's questions regarding the particulars of the flights. Such form could include *in camera* review or in a classified setting. If the Government takes the position that it will not provide that information to the Court under any circumstances, it must support such position, including with classified authorities if necessary. So ORDERED by Chief Judge James E. Boasberg on 3/17/2025. (lcjeb1) (Entered: 03/17/2025) |
| 03/17/2025 | 25 | TRANSCRIPT OF PROCEEDINGS before Chief Judge James E. Boasberg held on 3/17/25; Page Numbers: 1–31. Court Reporter/Transcriber Tammy Nestor, tammy_nestor@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form <br><br> For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. <br><br> Redaction Request due 4/7/2025. Redacted Transcript Deadline set for 4/17/2025. Release of Transcript Restriction set for 6/15/2025.(Nestor, Tammy) (Entered: 03/17/2025) |
| 03/17/2025 | 26 | MOTION to Vacate re 3/15/2025 Minute Orders on Temporary Restraining Order and Certification of Class by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 Declaration Declaration of Robert L. Cerna, # 2 Declaration Declaration of Michael G. Kozak)(Flentje, August) Modified event and docket text on 3/18/2025 (znmw). (Entered: 03/17/2025) |
| 03/18/2025 | 27 | NOTICE of Appearance by Hina Shamsi on behalf of All Plaintiffs (Shamsi, Hina) (Entered: 03/18/2025) |
| 03/18/2025 | 28 | NOTICE *in Response to March 17 Minute Order* by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY (Attachments: # 1 Affidavit Cerna Declaration)(Ensign, Drew) (Entered: 03/18/2025) |
| 03/18/2025 | | MINUTE ORDER: The Court ORDERS that the Zoom hearing set for March 21, 2025, at 2:30 p.m. shall now take place in Courtroom 22A. Members of the public may attend in person or by telephone. Toll free number: 833–990–9400. Meeting ID: 049550816. Any use of the public–access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24–31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court–issued media |

JA27

| | | |
|---|---|---|
| | | credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. So ORDERED by Chief Judge James E. Boasberg on 3/18/2025. (lcjeb1) (Entered: 03/18/2025) |
| 03/18/2025 | 29 | NOTICE of Appearance– Pro Bono by Noelle Smith on behalf of All Plaintiffs (Smith, Noelle) (Entered: 03/18/2025) |
| 03/18/2025 | 30 | NOTICE of Appearance– Pro Bono by Omar C. Jadwat on behalf of All Plaintiffs (Jadwat, Omar) (Entered: 03/18/2025) |
| 03/18/2025 | | MINUTE ORDER: In response to Defendants' 28 Notice at page 2, the Court ORDERS that by 12:00 p.m. on March 19, 2025, Defendants shall file *ex parte* and under seal (or submit to the Court) a declaration providing the following details regarding each of the two flights leaving U.S. airspace before 7:25 p.m. on March 15, 2025: 1) What time did the plane take off from U.S. soil and from where? 2) What time did it leave U.S. airspace? 3) What time did it land in which foreign country (including if it made more than one stop)? 4) What time were individuals subject solely to the Proclamation transferred out of U.S. custody? and 5) How many people were aboard solely on the basis of the Proclamation? So ORDERED by Chief Judge James E. Boasberg on 3/18/2025. (lcjeb1) (Entered: 03/18/2025) |
| 03/18/2025 | 31 | NOTICE of Appearance– Pro Bono by Sidra Mahfooz on behalf of All Plaintiffs (Mahfooz, Sidra) (Entered: 03/18/2025) |
| 03/18/2025 | 32 | NOTICE of Appearance– Pro Bono by Oscar Sarabia Roman on behalf of All Plaintiffs (Sarabia Roman, Oscar) (Entered: 03/18/2025) |
| 03/18/2025 | 33 | NOTICE of Appearance– Pro Bono by Ashley Gorski on behalf of All Plaintiffs (Gorski, Ashley) (Entered: 03/18/2025) |
| 03/18/2025 | 34 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Sarah M. Rich, Filing fee $ 100, receipt number ADCDC–11550426. Fee Status: Fee Paid. by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Girard, Bradley) (Entered: 03/18/2025) |
| 03/18/2025 | 35 | NOTICE of Appearance– Pro Bono by Patrick Toomey on behalf of All Plaintiffs (Toomey, Patrick) (Entered: 03/18/2025) |
| 03/18/2025 | | MINUTE ORDER: The Court ORDERS that the 34 Motion for Leave to Appear Pro Hac Vice of Sarah Marion Rich is GRANTED. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. So ORDERED by Chief Judge James E. Boasberg on 3/18/2025. (lcjeb1) (Entered: 03/18/2025) |
| 03/18/2025 | 36 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Audrey Wiggins, Filing fee $ 100, receipt number ADCDC–11551084. Fee Status: Fee Paid. by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Girard, Bradley) (Entered: 03/18/2025) |
| 03/18/2025 | | MINUTE ORDER: The Court ORDERS that the 36 Motion for Leave to Appear Pro Hac Vice of Audrey J. Wiggins is GRANTED. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. So ORDERED by Chief Judge James E. Boasberg on 3/18/2025. (lcjeb1) (Entered: 03/18/2025) |
| 03/19/2025 | 37 | Emergency MOTION to Stay re Order,,,, Set Deadlines,,, by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. (Ensign, Drew) (Entered: 03/19/2025) |
| 03/19/2025 | 38 | ORDER: The Court ORDERS that: 1) Defendants' 37 Motion is GRANTED IN PART and DENIED IN PART; and 2) Defendants shall have until March 20, 2025, at 12:00 p.m. to provide the information discussed in the Minute Order of March 18, 2025, or to invoke the state–secrets doctrine and explain the basis for such invocation. Signed by Chief Judge James E. Boasberg on March 19, 2025. (lcjeb3) (Entered: 03/19/2025) |

JA28

| 03/19/2025 | 39 | NOTICE of Appearance by Sarah Rich on behalf of J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Rich, Sarah) (Entered: 03/19/2025) |
|---|---|---|
| 03/19/2025 | 40 | NOTICE of Appearance by Audrey Jordan Wiggins on behalf of J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Wiggins, Audrey) (Entered: 03/19/2025) |
| 03/19/2025 | 41 | NOTICE of Appearance by Cody H. Wofsy on behalf of All Plaintiffs (Wofsy, Cody) (Entered: 03/19/2025) |
| 03/19/2025 | 42 | NOTICE OF WITHDRAWAL OF APPEARANCE as to MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. Attorney Christina Greer terminated. (Greer, Christina) (Entered: 03/19/2025) |
| 03/19/2025 | 43 | NOTICE of Appearance– Pro Bono by My Khanh Ngo on behalf of All Plaintiffs (Ngo, My Khanh) (Entered: 03/19/2025) |
| 03/19/2025 | 44 | RESPONSE re 26 MOTION to Vacate *TRO* filed by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Index of Exhibits, # 2 Declaration of Deborah Fleishaker, # 3 Declaration of Juanita Goebertus, # 4 Declaration of Sarah Bishop, # 5 Declaration of Linette Tobin, # 6 Declaration of Austin Thierry, # 7 Declaration of Osvaldo E. Caro–Cruz, # 8 Declaration of Katherine Kim, # 9 Declaration of Karyn Ann Shealy, # 10 Declaration of Stephanie Quintero, # 11 Declaration of Grace Carney, # 12 Declaration of Melissa Smyth, # 13 Declaration of Solanyer Michell Sarabia Gonzalez, # 14 Declaration of Jennifer Venghaus, # 15 Declaration of Oscar Sarabia Roman)(Gelernt, Lee) (Entered: 03/19/2025) |
| 03/20/2025 | 45 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Christine L. Coogle, Filing fee $ 100, receipt number ADCDC–11556213. Fee Status: Fee Paid. by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Girard, Bradley) (Entered: 03/20/2025) |
| 03/20/2025 | 46 | NOTICE of Appearance by Michael Lawrence Waldman on behalf of J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Waldman, Michael) (Entered: 03/20/2025) |
| 03/20/2025 | 47 | ORDER: The Court ORDERS that: 1) By March 21, 2025, at 10:00 a.m., Defendants shall submit a sworn declaration by a person with direct involvement in the Cabinet–level discussions regarding invocation of the state–secrets privilege; 2) By March 25, 2025, Defendants shall submit a declaration indicating whether or not the Government is invoking the privilege; 3) By March 25, 2025, Defendants shall file a brief showing cause why they did not violate the Court's Temporary Restraining Orders by failing to return class members removed from the United States on the two earliest planes that departed on March 15, 2025; and 4) Plaintiffs may file any response to such brief by March 31, 2025. Signed by Chief Judge James E. Boasberg on 3/20/2025. (lcjeb1) (Entered: 03/20/2025) |
| 03/20/2025 | 48 | MOTION for Leave to File *Amicus Curiae Brief* by BRANDON GILL. (Attachments: # 1 Exhibit Proposed Brief, # 2 Text of Proposed Order)(Block, Andrew) (Entered: 03/20/2025) |
| 03/20/2025 | 49 | NOTICE by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY (Attachments: # 1 Declaration Declaration of Robert L. Cerna)(Flentje, August) (Entered: 03/20/2025) |
| 03/20/2025 | | MINUTE ORDER: The Court ORDERS that the 45 Motion for Leave to Appear Pro Hac Vice of Christine L. Coogle is GRANTED. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)**. Click for instructions. Signed by Chief Judge James E. Boasberg on 3/20/2025. (lcjeb1) (Entered: 03/20/2025) |
| 03/21/2025 | 50 | RESPONSE TO ORDER OF THE COURT re 47 Order by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY (Attachments: # 1 Declaration)(Flentje, August) Modified event title on 3/21/2025 (znmw). (Entered: |

JA29

| | | 03/21/2025) |
|---|---|---|
| 03/21/2025 | | Minute Entry for proceedings held before Chief Judge James E. Boasberg: Motion Hearing held on 3/21/2025. Oral arguments heard. Order forthcoming. (Court Reporter Sonja Reeves) (znbn) (Entered: 03/21/2025) |
| 03/21/2025 | | MINUTE ORDER: The Court ORDERS that Amicus's 48 Motion for Leave to File is DENIED as untimely. Filing the night before the hearing does not permit the Court sufficient time to consider the arguments asserted. So ORDERED by Chief Judge James E. Boasberg on 3/21/2025. (lcjeb1) (Entered: 03/21/2025) |
| 03/21/2025 | 51 | TRANSCRIPT OF MOTION HEARING before Chief Judge James E. Boasberg held on March 21, 2025; Page Numbers: 1−65. Date of Issuance:March 21, 2025. Court Reporter/Transcriber Sonja L. Reeves, RDR, CRR, Sonja_Reeves@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/11/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/19/2025.(Reeves, Sonja) (Entered: 03/21/2025) |
| 03/24/2025 | 52 | ORDER: For the reasons set forth in the accompanying Memorandum Opinion, the Court ORDERS that: 1) Defendants' 26 Motion to Vacate is DENIED; and 2) If Plaintiffs wish to convert the Temporary Restraining Order into a preliminary injunction, they shall so inform the Court by March 26, 2025. Signed by Chief Judge James E. Boasberg on 3/24/2025. (lcjeb1) (Entered: 03/24/2025) |
| 03/24/2025 | 53 | MEMORANDUM OPINION re 52 Order on Motion to Vacate. Signed by Chief Judge James E. Boasberg on 3/24/2025. (lcjeb1) (Entered: 03/24/2025) |
| 03/24/2025 | 54 | NOTICE of Appearance by Christine L. Coogle on behalf of J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Coogle, Christine) (Entered: 03/24/2025) |
| 03/24/2025 | 55 | NOTICE *in Response to March 19 Minute Order* by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. re 47 Order,,,, Set Deadlines,,, (Attachments: # 1 Exhibit A: Declaration of S.Z.F.R., # 2 Exhibit B: Declaration of E.E.P.B.)(Gelernt, Lee) (Entered: 03/24/2025) |
| 03/24/2025 | 56 | NOTICE *Invoking State Secrets Privilege* by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY re 47 Order,,,, Set Deadlines,,, (Attachments: # 1 Affidavit Attorney General Bondi Declaration, # 2 Affidavit Secretary Rubio Declaration, # 3 Affidavit Secretary Noem Declaration)(Ensign, Drew) (Entered: 03/24/2025) |
| 03/25/2025 | | MINUTE ORDER: Given the Government's 56 Notice Invoking State Secrets Privilege, the Court ORDERS that if Plaintiffs wish to respond, they shall file any Response by March 31, 2025. So ORDERED by Chief Judge James E. Boasberg on 3/25/2025. (lcjeb1) (Entered: 03/25/2025) |
| 03/25/2025 | 57 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Pooja A. Boisture, Filing fee $ 100, receipt number ADCDC−11566919. Fee Status: Fee Paid. by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Girard, Bradley) (Entered: 03/25/2025) |

JA30

| | | |
|---|---|---|
| 03/25/2025 | 58 | RESPONSE TO ORDER TO SHOW CAUSE re 47 Order by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. (Ensign, Drew) Modified event title on 3/26/2025 (znmw). (Entered: 03/25/2025) |
| 03/25/2025 | 59 | LEAVE TO FILE DENIED– Janice Wolk Grenadier – Motion. This document is unavailable as the Court denied its filing. Pro Se party has been notified by first class mail. "Leave to file DENIED." Signed by Chief Judge James E. Boasberg on 3/25/2025. (zjm) (Entered: 03/26/2025) |
| 03/25/2025 | 63 | MOTION to Intervene by JANICE WOLK GRENADIER. "Leave to file GRANTED." signed by Chief Judge James E. Boasberg on 3/25/2025 (Attachment: # 1 Exhibits)(zjm) Modified on 3/27/2025 to correct docket text (zjm). (Entered: 03/27/2025) |
| 03/26/2025 | | MINUTE ORDER: The Court ORDERS that the 57 Motion for Leave to Appear Pro Hac Vice of Pooja Ashok Boisture is GRANTED. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)**. Click for instructions. Signed by Chief Judge James E. Boasberg on 3/26/2025. (lcjeb1) (Entered: 03/26/2025) |
| 03/26/2025 | 60 | Unopposed MOTION for Leave to File Amicus Brief by MARK J. ROZELL, HEIDI KITROSSER, MITCHEL A. SOLLENBERGER. (Attachments: # 1 Text of Proposed Order)(McClanahan, Kelly) (Entered: 03/26/2025) |
| 03/26/2025 | | MINUTE ORDER: The Court ORDERS that: 1) The consent 60 Motion for Leave to File Amicus Brief is GRANTED; and 2) Movants shall file any such brief by April 1, 2025. So ORDERED by Chief Judge James E. Boasberg on 3/26/2025. (lcjeb1) (Entered: 03/26/2025) |
| 03/26/2025 | 61 | NOTICE re 52 Order *Regarding Plaintiffs' Motion for a Preliminary Injunction* by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Gelernt, Lee) Modified to add link on 3/27/2025 (znmw). (Entered: 03/26/2025) |
| 03/26/2025 | | MINUTE ORDER: Given Plaintiffs' 61 Notice, the Court ORDERS that: 1) Plaintiffs shall file a Motion to Extend the TRO by 5:00 p.m. on March 27, 2025, and Defendants shall file any Opposition by 12:00 p.m. on March 28, 2025; 2) Plaintiffs shall file their PI Motion by March 28, 2025; Defendants' Opposition shall be due by April 1, 2025; and Plaintiffs' Reply shall be due by April 4, 2025; and 3) The parties shall appear for a hearing on the Motion on April 8, 2025, at 3:00 p.m. So ORDERED by Chief Judge James E. Boasberg on 3/26/2025. (lcjeb1) (Entered: 03/26/2025) |
| 03/27/2025 | 62 | NOTICE of Appearance by Pooja Boisture on behalf of J.G.G., G.F.F., J.G.O., W.G.H., J.A.V. (Boisture, Pooja) (Entered: 03/27/2025) |
| 03/27/2025 | 64 | MOTION for Temporary Restraining Order *, Motion to Extend Temporary Restraining Order* by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Text of Proposed Order)(Gelernt, Lee) (Entered: 03/27/2025) |
| 03/27/2025 | | MINUTE ORDER: The Court ORDERS that the 63 Motion to Intervene is DENIED. So ORDERED by Chief Judge James E. Boasberg on 3/27/2025. (lcjeb1) (Entered: 03/27/2025) |
| 03/28/2025 | 65 | RESPONSE re 64 MOTION for Temporary Restraining Order *, Motion to Extend Temporary Restraining Order* filed by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA BONDI, U.S. DEPARTMENT OF HOMELAND SECURITY. (Ensign, Drew) (Entered: 03/28/2025) |
| 03/28/2025 | 66 | ORDER: The Court ORDERS that the TROs entered on March 15, 2025, are extended and shall remain in effect until April 12, 2025, or until further order of the Court. Signed by Chief Judge James E. Boasberg on 3/28/2025. (lcjeb1) (Entered: 03/28/2025) |
| 03/28/2025 | 67 | MOTION for Preliminary Injunction by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Attachments: # 1 Memorandum in Support, # 2 Index of Exhibits, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # |

JA31

| | | |
|---|---|---|
| | | 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Text of Proposed Order)(Gelernt, Lee) (Entered: 03/29/2025) |
| 03/31/2025 | | MINUTE ORDER: The Court ORDERS that the parties shall appear on April 3, 2025, at 3:00 p.m. for a hearing on the Court's 47 Order to Defendants to show cause why they did not violate the Court's Temporary Restraining Orders. Members of the public may attend in person or by telephone. Toll free number: 833–990–9400. Meeting ID: 049550816. Any use of the public–access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24–31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. So ORDERED by Chief Judge James E. Boasberg on March 31, 2025. (lcjeb2) (Entered: 03/31/2025) |
| 03/31/2025 | 68 | NOTICE of Appearance by Cecillia D. Wang on behalf of All Plaintiffs (Wang, Cecillia) (Entered: 03/31/2025) |
| 03/31/2025 | 69 | RESPONSE re 56 Notice (Other), *Re: Invocation of State Secrets Privilege* filed by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Gelernt, Lee) (Entered: 03/31/2025) |
| 03/31/2025 | 70 | REPLY re 58 Memorandum, *Re: Order to Show Cause* filed by J.G.G., G.F.F., J.G.O., W.G.H., J.A.V.. (Gelernt, Lee) (Entered: 03/31/2025) |
| 03/31/2025 | 74 | LEAVE TO FILE DENIED– DANA ALBRECHT – Motion. This document is unavailable as the Court denied its filing. Pro Se party has been notified by first class mail. "Leave to file DENIED. Improper to file such motion in this case." Signed by Chief Judge James E. Boasberg on 3/31/25. (zjm) (Entered: 04/02/2025) |
| 04/01/2025 | 71 | NOTICE of Appearance– Pro Bono by Evelyn Danforth–Scott on behalf of All Plaintiffs (Danforth–Scott, Evelyn) (Entered: 04/01/2025) |
| 04/01/2025 | 72 | Memorandum in opposition to re 67 Motion for Preliminary Injunction, filed by MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO A. RUBIO, U.S. STATE DEPARTMENT, DONALD J. TRUMP, PAMELA J. BONDI, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 Declaration Declaration of Selwyn Smith, # 2 Declaration Declaration of Marcos Charles)(Flentje, August) (Entered: 04/01/2025) |
| 04/01/2025 | 75 | LEAVE TO FILE DENIED– DANA ALBRECHT – Motion for CM/ECF.. This document is unavailable as the Court denied its filing. Pro Se party has been notified by first class mail. "Leave to fine DENIED." Signed by Chief Judge James E. Boasberg on 4/1/2025. (zjm) (Entered: 04/03/2025) |
| 04/02/2025 | 73 | AMICUS BRIEF re 56 Notice (Other), *(Amici Curiae)* filed by MARK J. ROZELL, HEIDI KITROSSER, MITCHEL A. SOLLENBERGER. (McClanahan, Kelly) Modified event title on 4/2/2025 (znmw). (Entered: 04/02/2025) |
| 04/03/2025 | | Minute Entry for Show Cause Hearing held before Chief Judge James E. Boasberg on 4/3/2025. Matter taken under advisement; forthcoming Order. (Court Reporter: Tammy Nestor) (lsj) (Entered: 04/03/2025) |
| 04/04/2025 | 76 | TRANSCRIPT OF PROCEEDINGS before Chief Judge James E. Boasberg held on 4/3/25; Page Numbers: 1–31. Court Reporter/Transcriber Tammy Nestor, tammy_nestor@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made |

JA32

| | | |
|---|---|---|
| | | available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/25/2025. Redacted Transcript Deadline set for 5/5/2025. Release of Transcript Restriction set for 7/3/2025.(Nestor, Tammy) (Entered: 04/04/2025) |
| 04/04/2025 | 77 | REPLY to opposition to motion re 67 Motion for Preliminary Injunction, filed by G.F.F., J.A.V., J.G.G., J.G.O., W.G.H.. (Gelernt, Lee) (Entered: 04/04/2025) |
| 04/07/2025 | | MINUTE ORDER: The Court ORDERS that the hearing set for April 8, 2025, at 3:00 p.m. shall take place in Courtroom 22A. Members of the public may attend in person or by telephone. Toll free number: 833–990–9400. Meeting ID: 049550816. Any use of the public–access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24–31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. So ORDERED by Chief Judge James E. Boasberg on 4/7/2025. (lcjeb3) (Entered: 04/07/2025) |
| 04/07/2025 | 78 | NOTICE *Regarding Supreme Court Decision* by PAMELA J. BONDI, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (Attachments: # 1 Exhibit JGG Supreme Court Decision)(Ensign, Drew) (Entered: 04/07/2025) |
| 04/08/2025 | | MINUTE ORDER: In yesterday's ruling vacating this Court's TROs, the Supreme Court held that Plaintiffs cannot be deported under the Alien Enemies Act without an opportunity to challenge their removal in federal court. It also determined that the appropriate venue for such proceedings is the Southern District of Texas or wherever Plaintiffs are currently held. This Court accordingly ORDERS that: 1) Today's preliminary–injunction hearing is VACATED; and 2) Plaintiffs shall file a Notice by April 16, 2025, indicating whether they believe that they still have a basis to proceed on their Motion for Preliminary Injunction in this Court and, if so, proposing a briefing schedule. So ORDERED by Chief Judge James E. Boasberg on 4/8/2025. (lcjeb1) (Entered: 04/08/2025) |
| 04/11/2025 | 79 | REQUEST FOR LEAVE TO FILE REVIEW. The attached document requires leave to file: LAMAR C. CHAPMAN, III – MOTION. Reason(s): Filer is not a party to the case. (Attachments: # 1 Motion, # 2 Motion) (zjm) (Entered: 04/11/2025) |
| 04/14/2025 | 82 | REQUEST FOR LEAVE TO FILE REVIEW. The attached document requires leave to file: MIKE YELLEN's Motion. Reason(s): Filer is not a party to the case. (znmw) (Entered: 04/16/2025) |
| 04/15/2025 | | MINUTE ORDER re 79 Request for Leave to File Review. Leave to file is denied. So ORDERED by Chief Judge James E. Boasberg on 4/15/2025. (lcjeb1) Modified filed date on 4/16/2025 (znmw). (Entered: 04/15/2025) |
| 04/16/2025 | 80 | ORDER: Given the finding of probable cause for contempt set forth in the accompanying Memorandum Opinion, the Court ORDERS that: (1) If Defendants opt to purge their contempt, they shall file by April 23, 2025, a declaration explaining the steps they have taken and will take to do so; and (2) If Defendants opt not to purge their contempt, they shall instead file by April 23, 2025, declaration(s) identifying the individual(s) who, with knowledge of the Court's classwide Temporary Restraining Order, made the decision not to halt the transfer of class members out of U.S. custody on March 15 and 16, 2025. Signed by Chief Judge James E. Boasberg on April 16, 2025. (lcjeb2) (Entered: 04/16/2025) |
| 04/16/2025 | 81 | MEMORANDUM OPINION re: 80 Probable Cause Order. Signed by Chief Judge James E. Boasberg on April 16, 2025. (lcjeb2) (Entered: 04/16/2025) |
| 04/16/2025 | 83 | NOTICE of Appearance by Ernesto Horacio Molina, Jr on behalf of All Defendants (Molina, Ernesto) (Entered: 04/16/2025) |

JA33

| 04/16/2025 | 84 | NOTICE OF APPEAL TO DC CIRCUIT COURT by U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, PAMELA J. BONDI, U.S. STATE DEPARTMENT, DONALD J. TRUMP, U.S. DEPARTMENT OF HOMELAND SECURITY, MARCO A. RUBIO, KRISTI NOEM, MADISON SHEAHAN. Fee Status: No Fee Paid. Parties have been notified. (Molina, Ernesto) (Entered: 04/16/2025) |
|---|---|---|
| 04/16/2025 | 85 | MOTION for Temporary Restraining Order *and Notice in Response to the Court's April 8, 2025 Order* by G.F.F., J.A.V., J.G.G., J.G.O., W.G.H.. (Attachments: # 1 Text of Proposed Order)(Gelernt, Lee) (Entered: 04/16/2025) |
| 04/16/2025 | | MINUTE ORDER: The Court ORDERS that the 82 Request for Leave to File is DENIED. So ORDERED by Chief Judge James E. Boasberg on 4/16/2025. (lcjeb1) (Entered: 04/16/2025) |
| 04/16/2025 | 86 | RESPONSE TO ORDER OF THE COURT re 4/8/2025 Minute Order filed by G.F.F., J.A.V., J.G.G., J.G.O., W.G.H.. (See Docket Entry 85 to view document). (znmw) (Entered: 04/17/2025) |
| 04/17/2025 | 87 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 84 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 04/17/2025) |
| 04/17/2025 | | MINUTE ORDER: The Court ORDERS that: 1) The Government shall file any Opposition to Plaintiffs' 85 Motion for TRO by April 19, 2025, at 9:00 a.m.; Plaintiffs shall file any Reply by April 21, 2025, at 9:00 a.m.; and the parties shall appear for a hearing on April 21, 2025, at 5:00 p.m.; and 2) Plaintiffs shall amend their Complaint and file any new motion for preliminary relief by April 24, 2025; Defendants shall file their Opposition by May 1, 2025; Plaintiffs shall file their Reply by May 5, 2025; and the parties shall appear for a hearing on the motion on May 7, 2025, at 5:00 p.m. Signed by Chief Judge James E. Boasberg on 4/17/2025. (lcjeb1) (Entered: 04/17/2025) |
| 04/17/2025 | | Set/Reset Hearings: Motion Hearing set for 4/21/2025 at 05:00 PM in Courtroom 22A– In Person before Chief Judge James E. Boasberg. Motion Hearing set for 5/7/2025 at 05:00 PM in Courtroom 22A– In Person before Chief Judge James E. Boasberg. (znbn) (Entered: 04/17/2025) |
| 04/17/2025 | | USCA Case Number 25–5124 for 84 Notice of Appeal to DC Circuit Court, filed by DONALD J. TRUMP, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. DEPARTMENT OF HOMELAND SECURITY, MARCO A. RUBIO, KRISTI NOEM, PAMELA J. BONDI, U.S. STATE DEPARTMENT. (zdp) (Entered: 04/17/2025) |
| 04/17/2025 | 96 | REQUEST FOR LEAVE TO FILE REVIEW. The attached documents require leave to file: MEGHAN KELLY – Motion to File Amicus Brief, Motion to Proceed In Forma Pauperis, Motion for Exception to Pro Hac Vice Rules. Reason(s): Filer is not a party to the case. (Attachments: # 1 Amicus Motion – Exhibit A, # 2 Amicus Motion – Exhibit B, # 3 Amicus Motion – Exhibit C, # 4 Amicus Motion – Propose Order, # 5 Motion to Proceed IFP, # 6 IFP Motion – Exhibit 1, # 7 IFP Motion – Exhibit 2, # 8 IFP Motion – Proposed Order, # 9 Motion for Exception to PHV, # 10 PHV Motion – Appendix A, # 11 PHV Motion – Appendix B, # 12 PHV Motion – Appendix C, # 13 PHV Motion – Appendix D, # 14 PHV Motion – Appendix E, # 15 PHV Motion – Appendix F, # 16 PHV Motion – Appendix J–K, # 17 PHV Motion – Appendix L, # 18 PHV Motion – Proposed Order, # 19 Certificate of Service) (znmw) (Entered: 04/22/2025) |
| 04/18/2025 | 88 | Emergency MOTION to Stay re 81 Memorandum & Opinion, 80 Order,,, Set Deadlines,, *Pending Appeal* by PAMELA J. BONDI, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Attachments: # 1 Exhibit)(Molina, Ernesto) (Entered: 04/18/2025) |
| 04/18/2025 | 89 | ERRATA by PAMELA J. BONDI, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT re 88 Motion to Stay,. (Attachments: # 1 Corrected |

JA34

| | | |
|---|---|---|
| | | Emergency Motion For A Stay Pending Appeal)(Molina, Ernesto) (Entered: 04/18/2025) |
| 04/18/2025 | 90 | Emergency MOTION to Expedite *TRO in Light of AEA Removals* by G.F.F., J.A.V., J.G.G., J.G.O., W.G.H.. (Attachments: # 1 Declaration – Brown, # 2 Declaration – Brane)(Gelernt, Lee) (Entered: 04/18/2025) |
| 04/18/2025 | 91 | ORDER: The Court ORDERS that Defendants' 88 Emergency Motion to Stay is DENIED. Signed by Chief Judge James E. Boasberg on April 18, 2025. (lcjeb2) (Entered: 04/18/2025) |
| 04/18/2025 | | MINUTE ORDER: Having reviewed Plaintiffs' 85 Motion for Temporary Restraining Order and 90 Emergency Motion to Expedite, the Court ORDERS that the parties shall appear for a Zoom hearing on April 18, 2025, at 6:15 p.m. The hearing will proceed by videoconference for the parties and by telephone for members of the public. Toll free number: 833–990–9400. Meeting ID: 049550816. So ORDERED by Chief Judge James E. Boasberg on April 18, 2025. (lcjeb2) (Entered: 04/18/2025) |
| 04/18/2025 | 92 | NOTICE by G.F.F., J.A.V., J.G.G., J.G.O., W.G.H. re 90 Motion to Expedite (Attachments: # 1 Exhibit)(Gelernt, Lee) (Entered: 04/18/2025) |
| 04/18/2025 | | MINUTE ORDER: For the reasons discussed in today's hearing, the Court ORDERS that: 1) Plaintiff's 90 Emergency Motion to Expedite the Temporary Restraining Order is DENIED; and 2) The briefing schedule for the TRO and the hearing set for Monday, April 21, 2025, at 5 p.m. are VACATED. So ORDERED by Chief Judge James E. Boasberg on 4/18/2025. (lcjeb4) (Entered: 04/18/2025) |
| 04/18/2025 | | Minute Entry for proceedings held before Chief Judge James E. Boasberg: Motion Hearing held on 4/18/2025 re 90 Emergency MOTION to Expedite *TRO in Light of AEA Removals* filed by J.G.O., W.G.H., J.G.G., G.F.F., J.A.V.. Oral argument heard. (Court Reporter Tammy Nestor) (znbn) (Entered: 04/18/2025) |
| 04/18/2025 | 93 | TRANSCRIPT OF PROCEEDINGS before Chief Judge James E. Boasberg held on 4/18/25; Page Numbers: 1–34. Court Reporter/Transcriber Tammy Nestor, Telephone number tammy_nestor@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 5/9/2025. Redacted Transcript Deadline set for 5/19/2025. Release of Transcript Restriction set for 7/17/2025.(Nestor, Tammy) (Entered: 04/18/2025) |
| 04/18/2025 | 94 | Unopposed MOTION for Leave to File Amicus Brief*of John W. Keker, Robert A. Van Nest, Elliot R. Peters and Laurie Carr Mims* by JOHN W KEKER, ROBERT A. VAN NEST, ELLIOT R. PETERS, LAURIE CARR MIMS. (Attachments: # 1 Exhibit Proposed Amici Curiae Brief, # 2 Text of Proposed Order)(Hirsch, Steven) (Entered: 04/18/2025) |
| 04/19/2025 | | MINUTE ORDER: The Court ORDERS that the Unopposed 94 Motion for Leave to File Amicus Brief is GRANTED. So ORDERED by Chief Judge James E. Boasberg on 4/19/2025. (lcjeb1) (Entered: 04/19/2025) |
| 04/19/2025 | 95 | MOTION for Leave to File Amicus Brief by COOLIDGE REAGAN FOUNDATION. (Attachments: # 1 Brief of Putative Amicus Curiae, # 2 Text of Proposed Order)(Backer, Dan) (Entered: 04/19/2025) |

JA35

| | | |
|---|---|---|
| 04/21/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 95 MOTION for Leave to File Amicus Brief by COOLIDGE REAGAN FOUNDATION. (Attachments: # 1 Brief of Putative Amicus Curiae, # 2 Text of Proposed Order)(Backer, Dan). <br><br> Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney–renewal. <br><br> Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 4/28/2025. (zapb) 4/21/2025 (zapb). (Entered: 04/21/2025) |
| 04/21/2025 | 97 | REQUEST FOR LEAVE TO FILE REVIEW. The attached document requires leave to file: MEGHAN KELLY – Motion to Serve by Email and E–File. Reason(s): Filer is not a party to the case. (Attachments: # 1 E–File – Exhibit 1, # 2 E–File – Exhibit 2, # 3 E– File – Proposed Order, # 4 Certificate of Service) (znmw) (Entered: 04/22/2025) |
| 04/22/2025 | 98 | REQUEST FOR LEAVE TO FILE REVIEW. The attached document requires leave to file: MEGHAN KELLY – Proposed Amicus Brief. Reason(s): Filer is not a party to the case. (Attachments: # 1 Amicus Brief – Exhibits, # 2 Certificate of Service) (znmw) (Entered: 04/22/2025) |
| 04/22/2025 | | MINUTE ORDER: The Court ORDERS that the 95 Motion for Leave to File Amicus Brief is GRANTED. So ORDERED by Chief Judge James E. Boasberg on 4/22/2025. (lcjeb1) (Entered: 04/22/2025) |
| 04/22/2025 | | MINUTE ORDER re 97 Request for Leave to File Review. The Court ORDERS that leave to file is granted. So ORDERED by Chief Judge James E. Boasberg on 4/22/2025. (lcjeb1) (Entered: 04/22/2025) |
| 04/22/2025 | 104 | MOTION for CM/ECF Password by MEGHAN KELLY. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(zjm) (Entered: 04/25/2025) |
| 04/23/2025 | 105 | REQUEST FOR LEAVE TO FILE REVIEW. The attached document requires leave to file: MEGHAN KELLY – Corrected Proposed Amicus Brief. Reason(s): Filer is not a party to the case. (Attachments: # 1 Corrected Amicus Brief, # 2 Exhibit 1–12, # 3 Exhibit 13, # 4 Exhibit 14, # 5 Exhibit 15, # 6 Certificate of Service) (zjm) (Entered: 04/28/2025) |
| 04/24/2025 | 99 | NOTICE of Appearance by Brian D. Netter on behalf of G.F.F., J.A.V., J.G.G., J.G.O., W.G.H. (Netter, Brian) (Entered: 04/24/2025) |
| 04/24/2025 | 100 | REDACTED DOCUMENT– Redacted Public Version of ECF No. 2 *Unsealed Motion to Proceed Under Pseudonyms* by G.F.F., J.A.V., J.G.G., J.G.O., W.G.H.. (Galindo, Daniel) (Entered: 04/24/2025) |
| 04/24/2025 | 101 | AMENDED COMPLAINT against All Defendants filed by G.F.F., J.G.G., J.G.O., W.G.H., J.A.V., M.Z.V.V., M.Y.O.R., M.M.A.A., D.A.R.H., EYLAN SCHILMAN, LIYANARA SANCHEZ, DORYS MENDOZA.(Gelernt, Lee) (Entered: 04/24/2025) |
| 04/25/2025 | 102 | MOTION for Preliminary Injunction by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Attachments: # 1 Memorandum in Support, # 2 Exhibit Declaration of Rebecca Hanson, # 3 Exhibit Declaration of Andres Antillano, # 4 Exhibit Declaration of Steven Dudley, # 5 Exhibit Declaration of Sarah Bishop, # 6 Exhibit Declaration of Juanita Goebertus, # 7 Exhibit Declaration of Liyanara Sanchez, # 8 Exhibit Declaration of DARH, # 9 Exhibit Declaration of MZVV, # 10 Exhibit Declaration of MYOR, # 11 Exhibit Declaration of MMAA, # 12 Exhibit Declaration of Dorys Mendoza, # 13 Exhibit Declaration of Elyan Schulman, # 14 Exhibit Declaration of Oscar Sarabia Roman, # 15 Text of Proposed Order)(Gelernt, Lee) (Entered: 04/25/2025) |
| 04/25/2025 | 103 | MOTION to Certify Class by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN |

JA36

| | | |
|---|---|---|
| | | SCHILMAN, W.G.H.. (Attachments: # 1 Memorandum in Support, # 2 Declaration, # 3 Text of Proposed Order)(Gelernt, Lee) (Entered: 04/25/2025) |
| 04/29/2025 | 106 | REQUEST FOR SUMMONS TO ISSUE filed by LIYANARA SANCHEZ, M.Z.V.V., G.F.F., J.G.G., M.Y.O.R., EYLAN SCHILMAN, M.M.A.A., J.G.O., DORYS MENDOZA, D.A.R.H., W.G.H., J.A.V.. (Attachments: # 1 Summons)(Gelernt, Lee) (Entered: 04/29/2025) |
| 04/30/2025 | 107 | SUMMONS (2) Issued Electronically as to PETE HEGSETH, U.S. DEPARTMENT OF DEFENSE. (znmw) (Entered: 04/30/2025) |
| 05/01/2025 | 108 | Memorandum in opposition to re 102 MOTION for Preliminary Injunction filed by DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Attachments: # 1 Exhibit A: Landau Declaration, # 2 Exhibit B:, # 3 Text of Proposed Order)(Ensign, Drew) (Entered: 05/01/2025) |
| 05/02/2025 | 109 | NOTICE of Appearance by Tiberius T Davis on behalf of All Defendants (Davis, Tiberius) (Entered: 05/02/2025) |
| 05/05/2025 | 110 | NOTICE of Appearance by Aditi Shah on behalf of All Plaintiffs (Shah, Aditi) (Main Document 110 replaced on 5/6/2025) (znmw). (Entered: 05/05/2025) |
| 05/05/2025 | 111 | REPLY to opposition to motion re 102 Motion for Preliminary Injunction,,, filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) (Entered: 05/05/2025) |
| 05/06/2025 | | MINUTE ORDER: The Court ORDERS that Proposed Amicus's 104 Motion, which it construes as a Motion for CM/ECF Password, is GRANTED, provided that she comply with any requirements imposed by the Clerk's Office. So ORDERED by Chief Judge James E. Boasberg on 5/6/2025. (lcjeb1) (Entered: 05/06/2025) |
| 05/06/2025 | | MINUTE ORDER: The Court ORDERS that Proposed Amicus's [98, 105] Requests for Leave to File are DENIED. She must file a motion for leave to file an amicus brief before simply filing one. So ORDERED by Chief Judge James E. Boasberg on 5/6/2025. (lcjeb1) (Entered: 05/06/2025) |
| 05/06/2025 | 112 | NOTICE OF SUPPLEMENTAL AUTHORITY by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. (Attachments: # 1 Supplement Memorandum Opinion from G.F.F. v. Trump, # 2 Supplement Memorandum Opinion from D.B.U. v. Trump)(Gelernt, Lee) (Entered: 05/06/2025) |
| 05/06/2025 | 113 | MOTION for Order to Proceed under Pseudonyms – Supplemental Motion for Leave to Proceed Under Pseudonyms by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Attachments: # 1 Text of Proposed Order)(Gelernt, Lee) Modified on 5/8/2025 to correct event (zjm). (Entered: 05/06/2025) |
| 05/07/2025 | | MINUTE ORDER: The Court ORDERS that the hearing set for today at 5:00 p.m. shall take place in Courtroom 22A. Members of the public may attend in person or by telephone. Toll free number: 833–990–9400. Meeting ID: 049550816. Any use of the public–access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24–31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. So ORDERED by Chief Judge James E. Boasberg on 5/7/2025. (lcjeb1) (Entered: 05/07/2025) |
| 05/07/2025 | 114 | Memorandum in opposition to re 103 MOTION to Certify Class filed by PAMELA J. BONDI, PETE HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Davis, Tiberius) |

JA37

| | | (Entered: 05/07/2025) |
|---|---|---|
| 05/07/2025 | 115 | NOTICE of Proposed Order re 114 Memorandum in opposition to re 103 MOTION to Certify Class *(Proposed Order)* filed by PAMELA J. BONDI, PETE HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Davis, Tiberius) Modified event title on 5/9/2025 (znmw). (Entered: 05/07/2025) |
| 05/07/2025 | | Minute Entry for proceedings held before Chief Judge James E. Boasberg: Motion Hearing held on 5/7/2025 re 85 MOTION for Temporary Restraining Order *and Notice in Response to the Court's April 8, 2025 Order* filed by J.G.O., W.G.H., J.G.G., G.F.F., J.A.V.. Oral argument heard, order forthcoming. (Court Reporter Janice Dickman) (znbn) (Entered: 05/07/2025) |
| 05/08/2025 | 116 | ORDER: As explained at the conclusion of yesterday's hearing, the Court ORDERS that: 1) By May 9, 2025, Respondents shall submit any declarations they wish to provide regarding whether the United States has constructive custody over the proposed CECOT class; 2) By May 12, 2025, Petitioners shall submit to the Court a notice regarding whether they wish to seek jurisdictional discovery, and, if so, the specific discovery they propose to propound; and 3) By May 14, 2025, Respondents shall submit any response to Petitioners' discovery proposal. Signed by Chief Judge James E. Boasberg on 5/8/2025. (lcjeb4) (Entered: 05/08/2025) |
| 05/08/2025 | 117 | ORDER: The Court ORDERS that: 1) Petitioners' 113 Motion for Leave to File Under Pseudonym is GRANTED; 2) All parties shall use the pseudonyms listed in the Amended Complaint in all documents filed in this action; and 3) Within fourteen days of this Order, Petitioners and their next friends must file a sealed declaration containing their real names and residential addresses. Signed by Chief Judge James E. Boasberg on 5/8/2025. (lcjeb1) (Entered: 05/08/2025) |
| 05/09/2025 | 118 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by PAMELA J. BONDI, PETE HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit Sealed Declaration, # 2 Exhibit Sealed Redacted Declaration, # 3 Exhibit Sealed Document 1, # 4 Exhibit Sealed Document 2, # 5 Exhibit Sealed Document 3, # 6 Exhibit Sealed Document 4, # 7 Text of Proposed Order Sealed Proposed Order)(Davis, Tiberius) (Entered: 05/09/2025) |
| 05/10/2025 | 119 | CERTIFICATE OF SERVICE re 118 by PAMELA J. BONDI, PETE HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT *of Sealed Filing*. (Davis, Tiberius) Modified to add link on 5/12/2025 (znmw). (Entered: 05/10/2025) |
| 05/10/2025 | 120 | NOTICE *(Filing Statement)* by PAMELA J. BONDI, PETE HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT re 116 Order,,, Set Deadlines,, (Davis, Tiberius) (Entered: 05/10/2025) |
| 05/11/2025 | 121 | MOTION for Leave to File Excess Pages by MEGHAN KELLY. (Attachments: # 1 proposed order for leave to exceed page limits in Meghan Kelly's amicus brief)(KELLY, MEGHAN) (Entered: 05/11/2025) |
| 05/11/2025 | 122 | MOTION for Leave to File Amicus Brief by MEGHAN KELLY. (Attachments: # 1 4 exhibit A Affidavit Texas venue prejudicial against Plaintiffs to Motion to file Amicus Brief, # 2 5 Exhibit B Meg proposed 5 art of impeachment including protecting kids and folks at the border sent to all 541 congress people to Motion to File Amicus, # 3 6 Exhibit C Texas Governor Abbott's Border_Statement to Motion to file Amicus, # 4 7 Exhibit D Ice court case detained college kid in one state moved her in night across |

JA38

| | | |
|---|---|---|
| | | state lines Appellate Court said unlawful government change venue to manipulate forums to motion to file amicus, # 5 8 Exhibit E Leaked Memo to search without a warrant to Motion to file amicus, # 6 Certificate of Service to Motion to exceed page limits, Motion for Leave to file amicus and exhibits thereto, and proffered Amicus Brief and Exhibits thereto)(KELLY, MEGHAN) (Entered: 05/11/2025) |
| 05/11/2025 | 123 | SUPPLEMENT (Proposed Amicus Brief) re 122 MOTION for Leave to File Amicus Brief by MEGHAN KELLY. (Attachments: # 1 Exhibits 1–12 to proposed amicus brief above, # 2 Exhibit 13 USSC order Texas evaded by declaring insurrection Jan 24 2024 to proposed amicus brief, # 3 Exhibit 14 annexing Canada, Greenland, Panama Canal to proposed amicus brief above, # 4 Exhibit 15 Trump's potentially conflicting corporate interests to proposed amicus brief above, # 5 Proposed order on Meghan Kelly's Motion for Leave to file amicus brief)(KELLY, MEGHAN) Modified event title on 5/12/2025 (znmw). (Entered: 05/11/2025) |
| 05/12/2025 | | MINUTE ORDER: The Court ORDERS that Defendants' 118 Motion for Leave to File Document Under Seal is GRANTED. In the event that the Court, after review, believes that a redacted version of the filing should be placed on the public record, it will so order. So ORDERED by Chief Judge James E. Boasberg on 5/12/2025. (lcjeb1) (Entered: 05/12/2025) |
| 05/12/2025 | | MINUTE ORDER: The Court ORDERS that the 121 Motion for Leave to File Excess Pages is DENIED. So ORDERED by Chief Judge James E. Boasberg on 5/12/2025. (lcjeb1) (Entered: 05/12/2025) |
| 05/12/2025 | 124 | TRANSCRIPT OF PROCEEDINGS before Chief Judge James E. Boasberg held on May 7, 2025; Page Numbers: 1–42. Date of Issuance: May 12, 2025. Court Reporter: Janice Dickman, Telephone number: 202–354–3267, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 6/2/2025. Redacted Transcript Deadline set for 6/12/2025. Release of Transcript Restriction set for 8/10/2025.(Dickman, Janice) (Entered: 05/12/2025) |
| 05/12/2025 | 125 | NOTICE *Regarding Jurisdictional Discovery* by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. (Attachments: # 1 Exhibit A Proposed Discovery Requests)(Gelernt, Lee) (Entered: 05/12/2025) |
| 05/13/2025 | | MINUTE ORDER: The Court ORDERS that Amicus's 122 Motion for Leave is DENIED WITHOUT PREJUDICE. She must attach her proposed brief to any motion for leave to file. So ORDERED by Chief Judge James E. Boasberg on 5/13/2025. (lcjeb1) (Entered: 05/13/2025) |
| 05/14/2025 | 126 | RESPONSE re 125 Notice (Other), *in Opposition to Petitioners–Plaintiffs' Request for Further Discovery,* filed by PAMELA J. BONDI, PETE HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Davis, Tiberius) (Entered: 05/14/2025) |
| 05/14/2025 | 127 | REPLY to opposition to motion re 103 Motion to Certify Class, filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) (Entered: 05/14/2025) |

JA39

| 05/15/2025 | 131 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Intervene. Joshua Hall & Eric Heilner. Reason(s): Filer is not a party to the case. (zjm) (Entered: 05/21/2025) |
|---|---|---|
| 05/16/2025 | 128 | ORDER: The Court ORDERS that: 1) By May 19, 2025, Petitioners shall serve the requests listed in this Order upon Respondents in the finalized form contemplated by the Federal Rules of Civil Procedure; 2) By May 23, 2025, Respondents shall provide responses to the requests listed in this Order, assert any applicable privileges, and explain why such privilege applies; and 3) By May 26, 2025, Petitioners shall file any response to Respondents' submissions. Signed by Chief Judge James E. Boasberg on 5/16/2025. (lcjeb1) (Entered: 05/16/2025) |
| 05/16/2025 |  | MINUTE ORDER: Per the Court's Minute Order of May 12, 2025, granting Defendants' 118 Motion for Leave to File Under Seal, and because they have now informed the Court that they do not oppose filing the redacted exhibit comprising ECF No. 118–2 on the public docket, the Court ORDERS that they shall do so by May 19, 2025. So ORDERED by Chief Judge James E. Boasberg on May 16, 2025. (lcjeb2) (Entered: 05/16/2025) |
| 05/16/2025 | 129 | REDACTED DOCUMENT– Declaration to Order, *filed in response to minute order of May 16, 2025,* by PAMELA J. BONDI, PETE HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Davis, Tiberius) (Entered: 05/16/2025) |
| 05/21/2025 | 130 | MOTION for Leave to File Amicus Brief by MEGHAN KELLY. (Attachments: # 1 declaration to Motion for leave to file an amicus brief by Meghan Kelly, # 2 Exhibit 1 Redacted admission Fraud in AEA by Defendants, # 3 Exhibit 2 proof of secretly concealing evidence in my favor to affect outcome of case on appeal Kelly v Trump Due Process violations and in future planned discipline to discredit me in cover ups and demean relig belief in Jesus, # 4 Exhibits 3 & 4 kelly v trump docs secretly sealed to hide evidence in my favor, # 5 Exhibit 5 and 6 exemption form bar dues in DE, # 6 Exhibit 7 Lexis published Motion to Reign in arms from gov force to compel Meghan forgo or interfere case kelly v trump, # 7 Exhibit 8 Danger against Meg and solicitor generalfuneral US Supreme Court accepted only one full copy the original and the original and 10 copies of the IFP with the required exhibit and 10 copies of Pet for rehearing without exhibits, # 8 9 Yahoo Mail – Number 23–7360_ Fw_ Thank you Lisa Nesbitt Kelly v Swartz_Meg asserts right to live_religious objections to healthcare, science and mental healthcare by..., # 9 Exhibit 10 Exhibit 43 to Appendix F kelly v trump, # 10 Exhibit 11 USSC fired court staff Lisa nesbitt same as state court to cover up mistakes that may be cured not concealed Meg wants to protect and correct not destroy, # 11 Exhibit 12 Proposed amicus brief by Meghan Kelly, # 12 Declaration proposed Amicus Brief, # 13 Certificate of Service og Meghan Kelly's May 21 Motion for leave to file amicus)(KELLY, MEGHAN) (Entered: 05/21/2025) |
| 05/21/2025 | 132 | SEALED DOCUMENT filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. re 117 Order on Motion for Order,, Set/Reset Deadlines, (This document is SEALED and only available to authorized persons.)(Galindo, Daniel) (Entered: 05/21/2025) |
| 05/22/2025 |  | MINUTE ORDER re 131 **Request for Leave to File Review.** Leave to file is granted. The Clerk is directed to file the attached document on the public docket. So ORDERED by Chief Judge James E. Boasberg on 5/22/2025. (lcjeb1) (Entered: 05/22/2025) |
| 05/22/2025 |  | MINUTE ORDER: The Court ORDERS that Amicus's 130 Motion is GRANTED and her [130–11] Brief is deemed FILED. So ORDERED by Chief Judge James E. Boasberg on 5/22/2025. (lcjeb1) (Entered: 05/22/2025) |
| 05/22/2025 |  | MINUTE ORDER: The Court ORDERS that Petitioners–Plaintiffs' Reply to the Government's discovery submissions shall now be due by May 27, 2025. So ORDERED by Chief Judge James E. Boasberg on 5/22/2025. (lcjeb1) (Entered: 05/22/2025) |

JA40

| 05/22/2025 | 133 | MOTION to Intervene by JOSHUA HALL. (znmw) (Entered: 05/23/2025) |
| 05/22/2025 | 143 | AMICUS BRIEF by MEGHAN KELLY. (zjm) (Entered: 05/28/2025) |
| 05/23/2025 | 134 | NOTICE OF WITHDRAWAL OF APPEARANCE as to D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. Attorney Pooja Boisture terminated. (Boisture, Pooja) (Entered: 05/23/2025) |
| 05/23/2025 | 135 | NOTICE OF WITHDRAWAL OF APPEARANCE as to D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. Attorney Skye Perryman terminated. (Perryman, Skye) (Entered: 05/23/2025) |
| 05/23/2025 | 136 | NOTICE OF WITHDRAWAL OF APPEARANCE as to D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. Attorney Somil Trivedi terminated. (Trivedi, Somil) (Entered: 05/23/2025) |
| 05/23/2025 | 137 | NOTICE OF WITHDRAWAL OF APPEARANCE as to D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. Attorney Michael Lawrence Waldman terminated. (Waldman, Michael) (Entered: 05/23/2025) |
| 05/23/2025 | 138 | NOTICE OF WITHDRAWAL OF APPEARANCE as to D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. Attorney Audrey Jordan Wiggins terminated. (Wiggins, Audrey) (Entered: 05/23/2025) |
| 05/23/2025 | 139 | STIPULATION *of Agreed Confidentiality Order* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Davis, Tiberius) Modified on 5/27/2025 (znmw). (Entered: 05/23/2025) |
| 05/27/2025 | | ENTERED IN ERROR.....NOTICE OF ERROR regarding 139 Stipulation,. The following error(s) need correction: Missing signatures – Please refile. (znmw) Modified on 5/27/2025; per request from chambers (znmw). (Entered: 05/27/2025) |
| 05/27/2025 | 140 | ORDER: The Court ORDERS that the 139 Stipulated Confidentiality Order is ADOPTED. Signed by Chief Judge James E. Boasberg on 5/27/2025. (lcjeb4) (Entered: 05/27/2025) |
| 05/27/2025 | 141 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit Sealed Document 1, # 2 Exhibit Sealed Document 2, # 3 Exhibit Sealed Document 3)(Gelernt, Lee) (Entered: 05/27/2025) |
| 05/27/2025 | 142 | CERTIFICATE OF SERVICE by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. re 141 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. (This document is SEALED and only available to authorized person . (Gelernt, Lee) (Entered: 05/27/2025) |
| 05/28/2025 | 144 | NOTICE OF WITHDRAWAL OF APPEARANCE as to D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. Attorney Sarah Rich terminated. (Rich, Sarah) (Entered: 05/28/2025) |
| 05/28/2025 | | MINUTE ORDER: The Court ORDERS that the 141 Sealed Motion for Leave to File Document Under Seal is GRANTED. So ORDERED by Chief Judge James E. Boasberg on 5/28/2025. (lcjeb1) (Entered: 05/28/2025) |

JA41

| | | |
|---|---|---|
| 05/28/2025 | 145 | SEALED Response filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit)(zjm) (Entered: 05/29/2025) |
| 06/04/2025 | 146 | NOTICE of Appearance by Michael King Thomas Tan on behalf of All Plaintiffs (Tan, Michael) (Entered: 06/04/2025) |
| 06/04/2025 | 147 | ORDER: For the reasons set forth in the accompanying Memorandum Opinion, the Court ORDERS that: 1) Plaintiffs' 102 Motion for Preliminary Injunction is GRANTED IN PART and DENIED IN PART; 2) Plaintiffs' 103 Motion for Class Certification is DENIED WITHOUT PREJUDICE as to the Criminal Custody Class and GRANTED as to the CECOT Class with modifications. The latter Class shall be defined as follows:<br><br>All noncitizens removed from U.S. custody and transferred to the Terrorism Confinement Center (CECOT) in El Salvador on March 15 and 16, 2025, pursuant solely to the Presidential Proclamation entitled, "Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua"; and<br><br>3) By June 11, 2025, Defendants shall submit a Notice to the Court advising how they intend to facilitate the ability of the CECOT Class to seek habeas relief. SIGNED by Chief Judge James E. Boasberg on 6/4/2025. (lcjeb3) (Entered: 06/04/2025) |
| 06/04/2025 | 148 | MEMORANDUM OPINION re 147 Order on Preliminary Injunction and Class Certification Motions. SIGNED by Chief Judge James E. Boasberg on 6/4/2025. (lcjeb3) (Entered: 06/04/2025) |
| 06/04/2025 | | MINUTE ORDER: Given the Court's ruling today on Plaintiffs' PI Motion, it ORDERS that Plaintiffs' 85 Motion for TRO is DENIED as moot. Similarly, Plaintiffs' 67 prior PI Motion is DENIED as moot. Finally, proposed Intervenor's 133 Motion to Intervene is DENIED as not satisfying Fed. R. Civ. P. 24. So ORDERED by Chief Judge James E. Boasberg on 6/4/2025. (lcjeb1) (Entered: 06/04/2025) |
| 06/04/2025 | | MINUTE ORDER: As set forth in the Court's 148 Memorandum Opinion, the Court ORDERS that Plaintiffs shall by June 6, 2025, post a $1.00 bond in accordance with Fed. R. Civ. P. 65(c). So ORDERED by Chief Judge James E. Boasberg on 6/4/2025. (lcjeb1) (Entered: 06/04/2025) |
| 06/05/2025 | | DEPOSIT of Funds for Bond in the amount of $ 1.00, Receipt Number 209726, pursuant to 06/04/2025 Minute Order. (zjm) (Entered: 06/06/2025) |
| 06/10/2025 | 149 | ENTERED IN ERROR.....NOTICE OF APPEAL TO DC CIRCUIT COURT as to 147 Order on Motion for Preliminary Injunction,,,, Order on Motion to Certify Class,,,, Set/Reset Deadlines,,, by PAMELA J. BONDI, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT, DONALD J. TRUMP, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF DEFENSE, MARCO RUBIO, KRISTI NOEM, PETER B. HEGSETH. Fee Status: No Fee Paid. Parties have been notified. (Davis, Tiberius) Modified on 6/10/2025 (znmw). (Entered: 06/10/2025) |
| 06/10/2025 | | NOTICE OF ERROR regarding 149 Notice of Appeal to DC Circuit Court,. The following error(s) need correction: Incorrect case number. Please refile. (znmw) (Entered: 06/10/2025) |
| 06/10/2025 | 150 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 147 Order on Motion for Preliminary Injunction,,,, Order on Motion to Certify Class,,,, Set/Reset Deadlines,,, by PAMELA J. BONDI, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT, DONALD J. TRUMP, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF DEFENSE, MARCO RUBIO, KRISTI NOEM, PETER B. HEGSETH. Fee Status: No Fee Paid. Parties have been notified. (Davis, Tiberius) (Entered: 06/10/2025) |
| 06/10/2025 | 151 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 150 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 06/10/2025) |

JA42

| 06/10/2025 | 152 | Emergency MOTION to Stay *Order Pending Appeal* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Attachments: # 1 Proposed Order)(Davis, Tiberius) (Entered: 06/10/2025) |
|---|---|---|
| 06/10/2025 | | USCA Case Number 25–5217 for 150 Notice of Appeal to DC Circuit Court, filed by U.S. DEPARTMENT OF DEFENSE, PETER B. HEGSETH, DONALD J. TRUMP, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, PAMELA J. BONDI, U.S. STATE DEPARTMENT. (zjm) (Entered: 06/17/2025) |
| 06/12/2025 | 153 | ORDER: The Court ORDERS that Defendants' 152 Motion to Stay Pending Appeal is DENIED WITHOUT PREJUDICE. Signed by Chief Judge James E. Boasberg on June 12, 2025. (lcjeb2) (Entered: 06/12/2025) |
| 06/12/2025 | 154 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Intervene – Paul M. Dorsey. Reason(s): Filer is not a party to the case. (Attachments: # 1 List, # 2 Exhibits, # 3 Text of Proposed Order) (zjm) (Entered: 06/17/2025) |
| 06/17/2025 | | MINUTE ORDER  re 154 **Request for Leave to File Review.** Leave to file is granted. The Clerk is directed to file the attached document on the public docket. So ORDERED by Chief Judge James E. Boasberg on 6/17/2025. (lcjeb1) (Entered: 06/17/2025) |
| 06/17/2025 | 155 | Unopposed MOTION to Clarify , Unopposed MOTION to Stay by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Attachments: # 1 Text of Proposed Order)(Davis, Tiberius) (Entered: 06/17/2025) |
| 06/17/2025 | 156 | MOTION to Intervene by PAUL M. DORSEY. (Attachments: # 1 List, # 2 Exhibits, # 3 Text of Proposed Order)(znmw) (Entered: 06/25/2025) |
| 06/20/2025 | | MINUTE ORDER: The Court ORDERS that Defendants' Unopposed 155 Motion to Clarify is GRANTED insofar as the Government need not take any action or file any pleadings until the D.C. Circuit sends down its mandate in the appeal of this Court's 147 Order. So ORDERED by Chief Judge James E. Boasberg on 6/20/2025. (lcjeb1) (Entered: 06/20/2025) |
| 06/24/2025 | 157 | MANDATE of USCA as to 12 Notice of Appeal to DC Circuit Court, filed by DONALD J. TRUMP, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, PAMELA J. BONDI, U.S. STATE DEPARTMENT ; USCA Case Number 25–5067. (Attachments: # 1 USCA Order June 24, 2025)(zjm) (Entered: 06/25/2025) |
| 06/26/2025 | 158 | NOTICE *of Filing* by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. (Attachments: # 1 Exhibit A: 28(j) – 25–5124, # 2 Exhibit B: 28(j) – 25–5217)(Gelernt, Lee) (Entered: 06/26/2025) |
| 07/03/2025 | 159 | NOTICE *of Filing* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (Attachments: # 1 Exhibit 28(j) Response – CADC No. 25–5124, # 2 Exhibit 28(j) Response – CADC No. 25–5217)(Davis, Tiberius) (Entered: 07/03/2025) |
| 07/07/2025 | | MINUTE ORDER: The Court ORDERS that Intervenor's 156 Motion to Intervene is DENIED as he does not satisfy the test set forth in Fed. R. Civ. P. 24. So ORDERED by Chief Judge James E. Boasberg on 7/7/2025. (lcjeb1) (Entered: 07/07/2025) |

| | | |
|---|---|---|
| 07/07/2025 | 160 | NOTICE *of United Nations Document* by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. (Attachments: # 1 Exhibit UN Report on Enforced or Involuntary Disappearances, # 2 Exhibit Petitioners' Requests for Production of Documents)(Gelernt, Lee) (Entered: 07/07/2025) |
| 07/11/2025 | 161 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Notice to Counsel/Party SEALED RESPONSE, # 2 Notice to Counsel/Party SEALED REDACTED RESPONSE, # 3 Text of Proposed Order SEALED PROPOSED ORDER)(Davis, Tiberius) (Entered: 07/11/2025) |
| 07/12/2025 | 162 | CERTIFICATE OF SERVICE by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT re 161 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS EN *FORCEMENT, U.S. STATE DEPARTMENT*. (Davis, Tiberius) (Entered: 07/12/2025) |
| 07/14/2025 | | MINUTE ORDER: The Court ORDERS that Defendants' 161 Sealed Motion for Leave to File Document Under Seal is GRANTED. In the event that the Court, after review, believes that a redacted version of the filing should be placed on the public record, it will so order. So ORDERED by Chief Judge James E. Boasberg on 07/14/2025. (lcjeb1) (Entered: 07/14/2025) |
| 07/14/2025 | 163 | MOTION to Intervene by GLORIA BROWNING. (zjm) (Entered: 07/14/2025) |
| 07/14/2025 | 167 | SEALED Response filed by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. re 160 Notice (Other),. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Notice to Counsel/Party SEALED REDACTED RESPONSE)(zjm) (Entered: 07/17/2025) |
| 07/15/2025 | 164 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 3/24/2025. Answer due for ALL FEDERAL DEFENDANTS by 5/23/2025. (Gelernt, Lee) (Entered: 07/15/2025) |
| 07/15/2025 | 165 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 3/31/2025. (Gelernt, Lee) (Entered: 07/15/2025) |
| 07/15/2025 | 166 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. PETER B. HEGSETH served on 5/6/2025; KRISTI NOEM served on 3/31/2025; MARCO RUBIO served on 3/31/2025; MADISON SHEAHAN served on 3/31/2025; DONALD J. TRUMP served on 3/31/2025; U.S. DEPARTMENT OF DEFENSE served on 5/6/2025; U.S. DEPARTMENT OF HOMELAND SECURITY served on 3/31/2025; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT served on 3/31/2025; U.S. STATE DEPARTMENT served on 3/28/2025 (Gelernt, Lee) (Entered: 07/15/2025) |
| 07/17/2025 | | MINUTE ORDER: The Court ORDERS that Intervenor's 163 Motion to Intervene is DENIED. She does not satisfy the requirements of Fed. R. Civ. P. 24. So ORDERED by Chief Judge James E. Boasberg on 7/17/2025. (lcjeb1) (Entered: 07/17/2025) |
| 07/18/2025 | 168 | NOTICE *of Changed Circumstances* by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. (Attachments: # 1 Exhibit A Declaration of Mellissa Harper)(Gelernt, Lee) (Entered: 07/18/2025) |

JA44

| | | |
|---|---|---|
| 07/21/2025 | | MINUTE ORDER: The Court ORDERS that the parties shall appear for a status hearing on July 24, 2025, at 11:00 a.m. The hearing will proceed in–person for the parties and by telephone for members of the public. Toll free number: 833–990–9400. Meeting ID: 049550816. Any use of the public–access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24–31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. So ORDERED by Chief Judge James E. Boasberg on 7/21/2025. (lcjeb4) Modified to add public line on 7/21/2025 (znbn). (Entered: 07/21/2025) |
| 07/24/2025 | | Minute Entry for proceedings held before Chief Judge James E. Boasberg: Status Conference held on 7/24/2025. Minute Order forthcoming. (Court Reporter Tammy Nestor) (znbn) (Entered: 07/24/2025) |
| 07/24/2025 | | MINUTE ORDER: As discussed at today's status hearing, the Court ORDERS that the parties shall submit a Joint Status Report by August 7, 2025, and every two weeks thereafter until further Order of the Court. So ORDERED by Chief Judge James E. Boasberg on July 24, 2025. (lcjeb3) (Entered: 07/24/2025) |
| 07/24/2025 | 169 | TRANSCRIPT OF PROCEEDINGS before Chief Judge James E. Boasberg held on 7/24/25; Page Numbers: 1–21. Court Reporter/Transcriber Tammy Nestor, tammy_nestor@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 8/14/2025. Redacted Transcript Deadline set for 8/24/2025. Release of Transcript Restriction set for 10/22/2025.(Nestor, Tammy) (Entered: 07/24/2025) |
| 08/07/2025 | 170 | Joint STATUS REPORT by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) (Entered: 08/07/2025) |
| 08/08/2025 | | MINUTE ORDER: Having reviewed the parties' 170 Joint Status Report, the Court ORDERS that they shall now file such reports on the first business day of each month. So ORDERED by Chief Judge James E. Boasberg on 08/08/2025. (lcjeb1) (Entered: 08/08/2025) |
| 08/19/2025 | 171 | MANDATE of USCA as to 150 Notice of Appeal to DC Circuit Court, filed by U.S. DEPARTMENT OF DEFENSE, PETER B. HEGSETH, DONALD J. TRUMP, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. DEPARTMENT OF HOMELAND SECURITY, MARCO A. RUBIO, KRISTI NOEM, PAMELA J. BONDI, U.S. STATE DEPARTMENT ; USCA Case Number 25–5217. (Attachments: # 1 USCA Order August 8, 2025)(zjm) (Entered: 08/21/2025) |
| 09/02/2025 | 172 | Joint STATUS REPORT by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) (Entered: 09/02/2025) |
| 09/03/2025 | | MINUTE ORDER: Having reviewed the parties' 172 Joint Status Report, the Court ORDERS that once Plaintiffs file a new Motion for Preliminary Injunction, they need not file any further JSRs. So ORDERED by Chief Judge James E. Boasberg on 09/03/2025. (lcjeb1) (Entered: 09/03/2025) |

| 10/01/2025 | 173 | Joint STATUS REPORT by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) (Entered: 10/01/2025) |
|---|---|---|
| 10/14/2025 | 174 | NOTICE of Appearance– Pro Bono by Sean Ming–Jun Lau on behalf of All Plaintiffs (Attachments: # 1 Certificate Pursuant to Local Civil Rules 83.2(f) and 83.2(g))(Lau, Sean) (Entered: 10/14/2025) |
| 10/14/2025 | 175 | NOTICE of Appearance– Pro Bono by Kathryn Huddleston on behalf of All Plaintiffs (Huddleston, Kathryn) (Entered: 10/14/2025) |
| 10/15/2025 | 176 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Text of Proposed Order)(Gelernt, Lee) (Entered: 10/15/2025) |
| 10/15/2025 | 177 | MOTION for Preliminary Injunction by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Attachments: # 1 Memorandum in Support, # 2 Exhibit Index, # 3 Exhibit A Declaration of Andres Antillano, # 4 Exhibit B Redacted Declaration, # 5 Exhibit C Redacted Declaration, # 6 Exhibit D Redacted Declaration, # 7 Exhibit E Redacted Declaration, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Declaration J Declaration of Noelle Smith, # 13 Text of Proposed Order)(Gelernt, Lee) (Entered: 10/15/2025) |
| 10/15/2025 | 178 | MOTION to Certify Class by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Gelernt, Lee) (Entered: 10/15/2025) |
| 10/15/2025 | | MINUTE ORDER: The Court ORDERS that: 1) Plaintiffs' 176 Motion for Leave to File Under Seal is GRANTED; and 2) Plaintiffs' [176–1], [176–2], [176–3], [176–4] unredacted Declarations are deemed filed under seal. So ORDERED by Chief Judge James E. Boasberg on October 15, 2025. (lcjeb1) (Entered: 10/15/2025) |
| 10/15/2025 | 181 | SEALED Exhibits filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. re 177 Motion for Preliminary Injunction,,. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(zjm) (Entered: 10/20/2025) |
| 10/16/2025 | 179 | MOTION to Stay *Proceedings Pending Lapse in Appropriations* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Attachments: # 1 Text of Proposed Order)(Davis, Tiberius) (Entered: 10/16/2025) |
| 10/17/2025 | | MINUTE ORDER: Given that this Court's Standing Order's default rule for extensions does not apply to PI Motions and given the importance of a timely resolution of this matter, the Government's 179 Motion to Stay is DENIED. So ORDERED by Chief Judge James E. Boasberg on October 17, 2025. (lcjeb1) (Entered: 10/17/2025) |
| 10/17/2025 | 180 | PROPOSED BRIEFING SCHEDULE *(Joint Submission)* by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) (Entered: 10/17/2025) |
| 10/17/2025 | | MINUTE ORDER: The Court ADOPTS the parties' 180 Joint Proposed Briefing Schedule and ORDERS that: (1) Defendants shall file their Response to Plaintiffs' Motion for Preliminary Injunction and Motion for Class Certification by October 31, 2025; and (2) Plaintiffs shall file their Replies by November 10, 2025. So ORDERED by Chief Judge James E. Boasberg on October 17, 2025. (lcjeb1) (Entered: 10/17/2025) |

JA46

| 10/29/2025 | | MINUTE ORDER: The Court ORDERS that the parties shall appear for a hearing on Plaintiffs' 177 178 Motions on November 19, 2025, at 2:00 p.m. So ORDERED by Chief Judge James E. Boasberg on October 29, 2025. (lcjeb1) (Entered: 10/29/2025) |
|---|---|---|
| 10/31/2025 | 182 | Memorandum in opposition to re 177 MOTION for Preliminary Injunction filed by PAMELA BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Attachments: # 1 Exhibit A – Declaration of Deputy Secretary of State Christopher Landau, # 2 Exhibit B – Declaration of Secretary of State Marco Rubio)(Davis, Tiberius) (Entered: 10/31/2025) |
| 10/31/2025 | 183 | Memorandum in opposition to re 178 MOTION to Certify Class filed by PAMELA BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Attachments: # 1 Exhibit A – Joint Status Report in J.O.P. v. DHS)(Davis, Tiberius) (Entered: 10/31/2025) |
| 10/31/2025 | 184 | NOTICE of Proposed Order by PAMELA BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT re 183 Memorandum in Opposition, 182 Memorandum in Opposition,, (Davis, Tiberius) (Entered: 10/31/2025) |
| 11/10/2025 | 185 | STRICKEN PURSUANT TO THE MINUTE ORDER FILED ON 11/12/2025.....REPLY to opposition to motion re 177 Motion for Preliminary Injunction,, filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) Modified on 11/12/2025 (znbn). (Entered: 11/10/2025) |
| 11/10/2025 | 186 | REPLY to opposition to motion re 178 Motion to Certify Class, filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) (Entered: 11/10/2025) |
| 11/12/2025 | | MINUTE ORDER: The Court ORDERS that Plaintiffs' 185 Reply is STRICKEN for violating the Court's Local Rule on excessive footnotes. Given that the Reply is limited to 25 pages, Plaintiffs shall file a compliant brief with no more than 5 footnotes containing no more than 25 aggregate lines of text by November 13, 2025. So ORDERED by Chief Judge James E. Boasberg on November 12, 2025. (lcjeb1) (Entered: 11/12/2025) |
| 11/12/2025 | 187 | REPLY to opposition to motion re 177 Motion for Preliminary Injunction,, filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) (Entered: 11/12/2025) |
| 11/14/2025 | | NOTICE of Hearing: Motion Hearing set for November 19, 2025, at 02:00 PM in Courtroom 22A– In Person (Audio Line Available) before Chief Judge James E. Boasberg. The hearing will proceed in–person for the parties. Members of the public may attend in person or by telephone. Toll free number: 833–990–9400. Meeting ID: 049550816. Any use of the public–access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24–31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court.(znbn) (Entered: 11/14/2025) |
| 11/17/2025 | | MINUTE ORDER: Given the ruling on November 14, 2025, by the Court of Appeals, the Court ORDERS that at the PI hearing on November 19, 2025, the parties shall be prepared to discuss next steps in this Court's contempt inquiry. So ORDERED by Chief Judge James E. Boasberg on November 17, 2025. (lcjeb1) (Entered: 11/17/2025) |

JA47

| | | |
|---|---|---|
| 11/18/2025 | 188 | NOTICE OF WITHDRAWAL OF APPEARANCE as to G.F.F., J.A.V., J.G.G., J.G.O., W.G.H.. Attorney Brian D. Netter terminated. (Netter, Brian) (Entered: 11/18/2025) |
| 11/18/2025 | 189 | NOTICE OF WITHDRAWAL OF APPEARANCE as to G.F.F., J.A.V., J.G.G., J.G.O., W.G.H.. Attorney Christine L. Coogle terminated. (Coogle, Christine) (Entered: 11/18/2025) |
| 11/18/2025 | 190 | NOTICE OF WITHDRAWAL OF APPEARANCE as to G.F.F., J.A.V., J.G.G., J.G.O., W.G.H.. Attorney Bradley Girard terminated. (Coogle, Christine) (Entered: 11/18/2025) |
| 11/19/2025 | 191 | NOTICE of Appearance by John Bailey on behalf of All Defendants (Bailey, John) (Entered: 11/19/2025) |
| 11/19/2025 | | Minute Entry for proceedings held before Chief Judge James E. Boasberg: Motion Hearing held on 11/19/2025 re 177 MOTION for Preliminary Injunction filed by LIYANARA SANCHEZ, J.G.O., D.A.R.H., M.Y.O.R., W.G.H., M.Z.V.V., G.F.F., M.M.A.A., DORYS MENDOZA, J.G.G., EYLAN SCHILMAN, J.A.V., 178 MOTION to Certify Class filed by LIYANARA SANCHEZ, J.G.O., D.A.R.H., M.Y.O.R., W.G.H., M.Z.V.V., G.F.F., M.M.A.A., DORYS MENDOZA, J.G.G., EYLAN SCHILMAN, J.A.V.. Oral argument heard; motion taken under advisement. (Court Reporter Sara Wick) (znbn) (Entered: 11/19/2025) |
| 11/20/2025 | | NOTICE: As discussed at yesterday's hearing, the Court will issue an Order implementing its proposed next steps in the contempt inquiry once the mandate from the Court of Appeals issues. (lcjeb1) (Entered: 11/20/2025) |
| 11/24/2025 | | MINUTE ORDER: Now that the Mandate from the Court of Appeals has issued, the Court ORDERS that each side shall file by November 25, 2025, its proposals on how the Court's inquiry regarding a potential contempt referral should proceed, including names of possible witnesses and dates for hearings. So ORDERED by Chief Judge James E. Boasberg on November 24, 2025. (lcjeb4) (Entered: 11/24/2025) |
| 11/24/2025 | 192 | MANDATE of USCA as to 84 Notice of Appeal to DC Circuit Court, filed by DONALD J. TRUMP, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. DEPARTMENT OF HOMELAND SECURITY, MARCO A. RUBIO, KRISTI NOEM, PAMELA J. BONDI, U.S. STATE DEPARTMENT ; USCA Case Number 25−5124. (Attachments: # 1 USCA Order 8/8/2025)(znmw) (Entered: 11/24/2025) |
| 11/24/2025 | | MINUTE ORDER: The Court ORDERS that Defendants shall file a Notice by November 25, 2025, regarding their position on converting Plaintiffs' Motion for Preliminary Injunction into a Motion for Summary Judgment. So ORDERED by Chief Judge James E. Boasberg on November 24, 2025. (lcjeb1) (Entered: 11/24/2025) |
| 11/25/2025 | 193 | RESPONSE TO ORDER OF THE COURT *Response To The Court's November 24, 2025 Order* by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. (Gelernt, Lee) Modified event on 12/1/2025 (znmw). (Entered: 11/25/2025) |
| 11/25/2025 | 194 | NOTICE *Regarding Consolidation* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (Davis, Tiberius) (Entered: 11/25/2025) |
| 11/25/2025 | 195 | RESPONSE TO ORDER OF THE COURT *Regarding Proceedings* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (Davis, Tiberius) Modified event on 12/1/2025 (znmw). (Entered: 11/25/2025) |
| 11/28/2025 | 196 | ORDER: The Court ORDERS that the Government shall submit declarations from all individuals involved in the decision not to halt the transfer of class members out of U.S. physical custody on March 15 and 16, 2025, by December 5, 2025. Signed by Chief Judge James E. Boasberg on November 28, 2025. (lcjeb3) (Entered: 11/28/2025) |

JA48

| | | |
|---|---|---|
| 12/01/2025 | 197 | TRANSCRIPT OF PROCEEDINGS before Chief Judge James E. Boasberg held on 11/19/2025. Page Numbers: 1–37. Date of Issuance: 12/01/2025. Court Reporter: Sara Wick, telephone number 202–354–3284. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 12/22/2025. Redacted Transcript Deadline set for 1/1/2026. Release of Transcript Restriction set for 3/1/2026.(Wick, Sara) (Entered: 12/01/2025) |
| 12/05/2025 | 198 | NOTICE *of Filing of Declarations in Response to Court's December 1 Order* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (Attachments: # 1 Declaration of Secretary Noem, # 2 Declaration of Acting General Counsel of DHS Mazzara, # 3 Declaration of Deputy Attorney General Blanche)(Davis, Tiberius) (Entered: 12/05/2025) |
| 12/08/2025 | 199 | DECLARATION by non–party Honorable Emil Bove, Circuit Judge re 196 Order. "Leave to file GRANTED," signed by Chief Judge James E. Boasberg on 12/8/2025. (znmw) (Entered: 12/08/2025) |
| 12/08/2025 | 200 | ORDER: The Court ORDERS that: 1) Plaintiffs shall attempt to secure the presence of Erez Reuveni for testimony on December 15, 2025, at 9:30 a.m.; 2) The Government shall produce Drew Ensign for testimony on December 16, 2025, at 2:00 p.m.; and 3) Both sides shall appear in person at such hearings and will have the opportunity to question witnesses. Signed by Chief Judge James E. Boasberg on December 8, 2025. (lcjeb1) (Entered: 12/08/2025) |
| 12/08/2025 | | Set/Reset Hearings: Contempt Hearing set for 12/15/2025 09:30 AM in Courtroom 22A– In Person before Chief Judge James E. Boasberg. Contempt Hearing set for 12/16/2025 02:00 PM in Courtroom 22A– In Person before Chief Judge James E. Boasberg. (znbn) (Entered: 12/08/2025) |
| 12/10/2025 | 201 | MOTION for Reconsideration *of the Court's December 8 Order (ECF 200)*, MOTION for Protective Order by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Attachments: # 1 Declaration of Deputy Assistant Attorney General Drew Ensign)(Davis, Tiberius) (Entered: 12/10/2025) |
| 12/10/2025 | 202 | MOTION for Leave to File Amicus Brief by MEGHAN KELLY. (Attachments: # 1 Exhibit Exhibits 1 through 12B to Motion emails to opposing counsel and exhibits thereto including Complaint against Democrats and proof gov attacks against Meg delaying amicus Too long to expend time now in light of urgent issues, # 2 Exhibit Final Proposed Amicus Brief By Meghan Kelly, # 3 Exhibit 3 Declaration to Proposed Amicus Brief By Meghan Kelly, # 4 Text of Proposed Order 4 proposed order on amicus brief, # 5 Certificate of Service)(KELLY, MEGHAN) (Entered: 12/10/2025) |
| 12/11/2025 | 203 | NOTICE *OF INTENT TO FILE A RESPONSE* by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. re 201 Motion for Reconsideration,, Motion for Protective Order, (Gelernt, Lee) (Entered: 12/11/2025) |

JA49

| | | |
|---|---|---|
| 12/11/2025 | 204 | NOTICE *OF WITNESS APPEARANCE* by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. re 200 Order, (Gelernt, Lee) (Entered: 12/11/2025) |
| 12/11/2025 | | MINUTE ORDER: The Court ORDERS that the response deadline proposed in Plaintiffs' 203 Notice is approved. So ORDERED by Chief Judge James E. Boasberg on December 11, 2025. (lcjeb1) (Entered: 12/11/2025) |
| 12/11/2025 | 205 | RESPONSE re 201 MOTION for Reconsideration *of the Court's December 8 Order (ECF 200)* MOTION for Protective Order filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Attachments: # 1 Declaration of Daniel Galindo)(Gelernt, Lee) (Entered: 12/11/2025) |
| 12/12/2025 | 206 | NOTICE *(Service of Mandamus Petition)* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI L. NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (Attachments: # 1 Appendix Addendum to Mandamus Petition)(Davis, Tiberius) (Entered: 12/12/2025) |
| 12/12/2025 | 207 | MOTION to Stay *Pending Mandamus* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI L. NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Davis, Tiberius) (Entered: 12/12/2025) |
| 12/12/2025 | 208 | ORDER: The Court ORDERS that Defendants' 201 Motion to Reconsider is DENIED. Signed by Chief Judge James E. Boasberg on December 12, 2025. (lcjeb1) (Entered: 12/12/2025) |
| 12/12/2025 | | MINUTE ORDER: For the reasons set forth in the Court's 208 Order denying the Government's Motion for Reconsideration, the Court ORDERS that the Government's 207 Motion to Stay is DENIED. So ORDERED by Chief Judge James E. Boasberg on December 12, 2025. (lcjeb1) (Entered: 12/12/2025) |
| 12/12/2025 | 209 | NOTICE of Letter to the Court filed by non−party Michael Bromwich, Counsel to Erez Reuveni. "Leave to File is GRANTED," signed by Chief Judge James E. Boasberg on 12/12/2025. (znmw) (Entered: 12/12/2025) |
| 12/12/2025 | 210 | NOTICE *of Administrative Stay* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI L. NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT re 200 Order, (Attachments: # 1 USCA Order Granting Administrative Stay)(Davis, Tiberius) (Entered: 12/12/2025) |
| 12/12/2025 | 211 | ORDER of USCA; USCA Case Number 25−5452. (zjm) (Entered: 12/17/2025) |
| 12/15/2025 | | MINUTE ORDER: Given the administrative stay issued by the Court of Appeals, the Court ORDERS that the hearings set for this week are VACATED. So ORDERED by Chief Judge James E. Boasberg on December 15, 2025. (lcjeb1) (Entered: 12/15/2025) |
| 12/16/2025 | 212 | Emergency MOTION to Intervene, MOTION to Consolidate by BOREALIS S. HEDLING. (Attachments: # 1 Exhibit List, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 17)(zjm) (Additional attachment(s) added on 12/19/2025: # 18 Pro Se Consent to receive Notices of Electronic Filing) (zjm). (Entered: 12/18/2025) |
| 12/16/2025 | 213 | ENTERED IN ERROR.....NEW Pro Se Consent To Receive Notices of Electronic Filing by BOREALIS S. HEDLING (zjm) Modified on 12/19/2025 (zjm). (Entered: 12/18/2025) |
| 12/22/2025 | 214 | ORDER: For the reasons stated in the accompanying Memorandum Opinion, the Court ORDERS that: 1) Plaintiffs' 177 Motion for Summary Judgment is GRANTED; 2) |

| | | |
|---|---|---|
| | | Plaintiffs' <u>178</u> Motion for Class Certification is GRANTED; 3) Defendants' <u>182</u> Motion for Summary Judgment is DENIED; and 4) The Government shall submit its proposal either to facilitate the return of Plaintiffs to the United States or to otherwise provide them with hearings that satisfy the requirements of due process by January 5, 2026. Signed by Chief Judge James E. Boasberg on December 22, 2025. (lcjeb1) (Entered: 12/22/2025) |
| 12/22/2025 | 215 | MEMORANDUM OPINION re <u>214</u> Order on Summary Judgment and Class Certification Motions. Signed by Chief Judge James E. Boasberg on December 22, 2025. (lcjeb1) (Entered: 12/22/2025) |
| 12/23/2025 | 216 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion for Temporary Restraining Order – BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 10.1) (zjm) (Entered: 12/31/2025) |
| 12/23/2025 | 217 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Errata to Emergency Motion – BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # <u>1</u> Exhibit, # <u>2</u> Exhibit 1, # <u>3</u> Exhibit 2, # <u>4</u> Exhibit 10.1, # <u>5</u> Exhibit 4, # <u>6</u> Exhibit 5, # <u>7</u> Exhibit 7, # <u>8</u> Exhibit 6) (zjm) (Entered: 12/31/2025) |
| 12/23/2025 | 218 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Clarify – BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # <u>1</u> Exhibit 18) (zjm) (Entered: 12/31/2025) |
| 12/25/2025 | 219 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Notice – BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # <u>1</u> Exhibit 19, # <u>2</u> Exhibit 20) (zjm) (Entered: 12/31/2025) |
| 12/30/2025 | 220 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion for Declaratory – BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (zjm) (Entered: 12/31/2025) |
| 01/02/2026 | | MINUTE ORDER: As the relief sought has nothing to do with this case, the Court ORDERS that proposed Intervenor's <u>217</u> Motion is DENIED. So ORDERED by Chief Judge James E. Boasberg on January 2, 2026. (lcjeb4) (Entered: 01/02/2026) |
| 01/02/2026 | | MINUTE ORDER: The Court ORDERS that the <u>218</u> , <u>219</u> , and <u>220</u> Requests for Leave to File are DENIED. So ORDERED by Chief Judge James E. Boasberg on January 2, 2026. (lcjeb4) (Entered: 01/02/2026) |
| 01/02/2026 | 225 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Notice of Appeal – BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # <u>1</u> IFP, # <u>2</u> Certificate of Service, # <u>3</u> Supplement Main, # <u>4</u> Supplement 1, # <u>5</u> Supplement 2, # <u>6</u> Supplement 3) (zjm) (Entered: 01/07/2026) |
| 01/03/2026 | 226 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Recuse – BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # <u>1</u> Exhibit) (zjm) (Additional attachment(s) added on 1/7/2026: # <u>2</u> Exhibit) (zjm). (Entered: 01/07/2026) |
| 01/04/2026 | 221 | NOTICE of Appearance by Ryan Giannetti on behalf of BRANDON GILL (Giannetti, Ryan) (Entered: 01/04/2026) |
| 01/04/2026 | 222 | NOTICE OF WITHDRAWAL OF APPEARANCE as to BRANDON GILL. Attorney Andrew Block terminated. (Block, Andrew) (Entered: 01/04/2026) |
| 01/04/2026 | 223 | MOTION for Extension of Time to *Respond to Court's Order* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI L. NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Davis, Tiberius) (Entered: 01/04/2026) |
| 01/04/2026 | 227 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion for TRO – BOREALIS S. HEDLING. Reason(s): Filer is not a |

JA51

| | | |
|---|---|---|
| | | party to the case. (zjm) (Additional attachment(s) added on 1/7/2026: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (zjm). (Entered: 01/07/2026) |
| 01/05/2026 | | MINUTE ORDER: As the Government's 223 Motion fails to comply with LCvR 7(m), the Court ORDERS that it shall file a Rule 7(m) Notice by 5:00 p.m. today. So ORDERED by Chief Judge James E. Boasberg on January 5, 2026. (lcjeb4) (Entered: 01/05/2026) |
| 01/05/2026 | 224 | NOTICE *of Compliance with Local Rule 7(m)* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI L. NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (Davis, Tiberius) (Entered: 01/05/2026) |
| 01/05/2026 | | MINUTE ORDER: The Court ORDERS that: 1) The 223 Motion for Extension of Time is GRANTED; and 2) The Government shall submit its proposal either to facilitate the return of Plaintiffs to the United States or to otherwise provide them with hearings that satisfy the requirements of due process by January 12, 2026. So ORDERED by Chief Judge James E. Boasberg on January 5, 2026. (lcjeb4) (Entered: 01/05/2026) |
| 01/06/2026 | 228 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Withdraw – BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (zjm) (Entered: 01/07/2026) |
| 01/12/2026 | 229 | RSPONSE TO ORDER OF THE COURT re 214 *Response to Court Order* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI L. NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT (Attachments: # 1 Declaration of Secretary of State Rubio)(Davis, Tiberius) Modified event title on 1/13/2026 (znmw). (Entered: 01/12/2026) |
| 01/13/2026 | 230 | MOTION for Leave to File Amicus Brief*Amicus Motion without a brief to preserve facts nd issues for the courts nd paarties to address or not by free choice, not government extinguished choice* by MEGHAN KELLY. (Attachments: # 1 Declaration, # 2 Exhibit 1 email regarding stance on survelience issue and affidavits showing Meg is in danger and may not be able to file in future due to government threats, # 3 Exhibit 2 Newsweek Supreme Court Rulings May Be Based on Threats to JusticesCourt Papers – Newsweek, # 4 Exhibit 3 Donald Trump threatens Cuba, Mexico, Colombia, more post–Venezuela operation, # 5 Exhibit 4 email stance on Trump's invsion of another country to evade and simantle the rule of law while contributing to conditions for overthrow, # 6 Exhibit 5 Yahoo Mail – Meg follow up_ Fw_ Activity in Case 1_25–cv–00766– Order on Motion for Extension of Time to, # 7 Exhibit 6 DUE DATE IS TODAY_I want to draft about protecting pay and pension not this_PLEASE preserve your rights to allow court to save you when clients misbehave_, # 8 Exhibit 7 Senate Judiciary clashes over judicial impeachments, rising threats against judges _ Courthouse News Service, # 9 Exhibit 8 proposed order on amicus motion, # 10 Certificate of Service)(KELLY, MEGHAN) (Entered: 01/13/2026) |
| 01/13/2026 | 232 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Disqualify – BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # 1 Exhibit) (zjm) (Entered: 01/18/2026) |
| 01/14/2026 | | MINUTE ORDER: The Court ORDERS that Plaintiffs shall respond to Defendants' 229 filing by January 16, 2026. So ORDERED by Chief Judge James E. Boasberg on January 14, 2026. (lcjeb1) (Entered: 01/14/2026) |
| 01/15/2026 | 231 | Unopposed MOTION for Extension of Time to File Response/Reply by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Gelernt, Lee) (Entered: 01/15/2026) |
| 01/15/2026 | | MINUTE ORDER: The Court ORDERS that Plaintiffs' 231 Motion for Extension is GRANTED, and they shall file their Response by January 26, 2026. So ORDERED by |

JA52

| | | Chief Judge James E. Boasberg on January 15, 2026. (lcjeb1) (Entered: 01/15/2026) |
|---|---|---|
| 01/16/2026 | | MINUTE ORDER: The Court ORDERS that: 1) The 202 , 230 Motions for Leave to File Amicus Brief are DENIED, as the Court does not believe such brief would assist its resolution of the matter; and 2) The 212 Motion to Intervene is DENIED, as the proposed intervenor's claims are not related to this matter. So ORDERED by Chief Judge James E. Boasberg on January 16, 2026. (lcjeb1) (Entered: 01/16/2026) |
| 01/16/2026 | 233 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Notice of Appeal – BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # 1 IFP, # 2 Affidavit in support, # 3 Supplement Main, # 4 Supplement) (zjm) (Entered: 01/21/2026) |
| 01/20/2026 | | MINUTE ORDER: The Court ORDERS that the 232 Request for Leave to File is DENIED. So ORDERED by Chief Judge James E. Boasberg on January 20, 2026. (lcjeb1) (Entered: 01/20/2026) |
| 01/21/2026 | | MINUTE ORDER re 233 **Request for Leave to File Review.** Leave to file is granted. The Clerk is directed to file the attached document on the public docket. So ORDERED by Chief Judge James E. Boasberg on January 21, 2026. (lcjeb1) (Entered: 01/21/2026) |
| 01/21/2026 | 235 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 01/16/2026 Minute Order on Motion to Intervene,, Order on Motion to Consolidate Cases,, Order on Motion for Leave to File Amicus Brief,,, by BOREALIS S. HEDLING. Fee Status: No Fee Paid. (Attachments: # 1 Supplement)(zjm) Modified on 1/30/2026 to add docket text (zjm). (Entered: 01/30/2026) |
| 01/21/2026 | 236 | MOTION for Leave to Appeal in forma pauperis by BOREALIS S. HEDLING. (Attachments: # 1 Affidavit, # 2 Supplement)(zjm) (Entered: 01/30/2026) |
| 01/21/2026 | 240 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Clarify – BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (zjm) (Entered: 02/03/2026) |
| 01/27/2026 | 234 | RESPONSE TO ORDER OF THE COURT re Order, Set Deadlines filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Attachments: # 1 Declaration of Oscar Sarabia Roman)(Gelernt, Lee) (Entered: 01/27/2026) |
| 01/28/2026 | | MINUTE ORDER: The Court ORDERS that: 1) Defendants shall file a Reply to Plaintiffs' 234 Response by February 2, 2026; and 2) The parties shall appear for a hearing on February 9, 2026, at 10:00 a.m. in Courtroom 22A. In their Reply, Defendants shall respond to, *inter alia*, Plaintiffs' proposal regarding remote proceedings in third countries, their request for the immediate return of passports and identity documents, whether Defendants will parole class members who arrive at a U.S. port of entry, and whether they will issue boarding letters for air travel to the U.S. for Plaintiffs in Venezuela or third countries. The hearing will proceed in–person for the parties. Members of the public may attend in person or by telephone. Toll free number: 833–990–9400. Meeting ID: 049550816. Any use of the public–access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24–31 (JEB). Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. So ORDERED by Chief Judge James E. Boasberg on January 28, 2026. (lcjeb1) (Entered: 01/28/2026) |
| 01/30/2026 | 237 | Transmission of the Notice of Appeal, Minute Order Appealed, and Docket Sheet to US Court of Appeals. The fee remains to be paid and another notice will be transmitted when the fee has been paid in the District Court or motion to proceed In Forma Pauperis has been decided re 235 Notice of Appeal to DC Circuit Court,. (zjm) (Entered: 01/30/2026) |
| 01/30/2026 | 241 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Intervene, Consolidate, and Recuse – BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # 1 Exhibit 1, # 2 |

JA53

| | | |
|---|---|---|
| | | Exhibit 2) (zjm) (Entered: 02/03/2026) |
| 02/02/2026 | | MINUTE ORDER: The Court ORDERS that the 236 Motion for Leave to Appeal in forma pauperis is GRANTED. So ORDERED by Chief Judge James E. Boasberg on February 2, 2026. (lcjeb1) (Entered: 02/02/2026) |
| 02/02/2026 | | USCA Case Number 26–5040 for 235 Notice of Appeal to DC Circuit Court, filed by BOREALIS S. HEDLING. (zjm) (Entered: 02/02/2026) |
| 02/02/2026 | 238 | Supplemental Record on Appeal transmitted to US Court of Appeals re 02/02/2026 Minute Order on Motion for Leave to Appeal in forma pauperis ;USCA Case Number 26–5040. (zjm) (Entered: 02/02/2026) |
| 02/02/2026 | 239 | RESPONSE TO ORDER OF THE COURT re Order,,,,,, Set Deadlines/Hearings,,,,, *Response on Proposal* filed by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI L. NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Davis, Tiberius) (Entered: 02/02/2026) |
| 02/02/2026 | 248 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion for TRO – BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4) (zjm) (Entered: 02/17/2026) |
| 02/03/2026 | | MINUTE ORDER re **240 Request for Leave to File Review.** Leave to file is granted. The Clerk is directed to file the attached document on the public docket. So ORDERED by Chief Judge James E. Boasberg on February 3, 2026. (lcjeb1) (Entered: 02/03/2026) |
| 02/03/2026 | | MINUTE ORDER re **241 Request for Leave to File Review.** Leave to file is granted. The Clerk is directed to file the attached document on the public docket. So ORDERED by Chief Judge James E. Boasberg on February 3, 2026. (lcjeb1) (Entered: 02/03/2026) |
| 02/03/2026 | 242 | MOTION to Clarify by BOREALIS S. HEDLING. (zjm) (Entered: 02/05/2026) |
| 02/03/2026 | 243 | MOTION to Intervene, MOTION to Consolidate, MOTION for Recusal by BOREALIS S. HEDLING. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(zjm) (Entered: 02/05/2026) |
| 02/03/2026 | 245 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Expedite – BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (zjm) (Entered: 02/10/2026) |
| 02/08/2026 | 246 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Emergency Notice – BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (zjm) (Entered: 02/10/2026) |
| 02/09/2026 | | Minute Entry for Hearing held before Chief Judge James E. Boasberg on 2/9/2026: Discussions heard in re 234 Response to Order of the Court re Order. (Court Reporter Tammy Nestor) (znbn) (Entered: 02/09/2026) |
| 02/10/2026 | 244 | TRANSCRIPT OF PROCEEDINGS before Chief Judge James E. Boasberg held on 2/9/26; Page Numbers: 1–42. Court Reporter/Transcriber Tammy Nestor, tammy_nestor@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at |

JA54

| | | |
|---|---|---|
| | | www.dcd.uscourts.gov.<br><br>Redaction Request due 3/3/2026. Redacted Transcript Deadline set for 3/13/2026. Release of Transcript Restriction set for 5/11/2026.(Nestor, Tammy) (Entered: 02/10/2026) |
| 02/11/2026 | 249 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Notice – BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (zjm) (Entered: 02/17/2026) |
| 02/12/2026 | 247 | MEMORANDUM OPINION AND ORDER: The Court ORDERS that 1) Plaintiffs shall file Notices on February 20, 2026; February 27, 2026; and March 9, 2026, as described in the attached Memorandum Opinion and Order; 2) Defendants shall promptly return to Plaintiffs upon written request by their current counsel all passports and identification documents that any agency currently retains, and make good–faith efforts to obtain any such documents that were transferred to El Salvador; and 3) Defendants shall file a Status Report by March 13, 2026, with the information described in the attached Memorandum Opinion and Order. Signed by Chief Judge James E. Boasberg on February 12, 2026. (lcjeb3) (Entered: 02/12/2026) |
| 02/12/2026 | | Set/Reset Deadlines: Status Report due by 3/13/2026. (znbn) (Entered: 02/18/2026) |
| 02/15/2026 | 250 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Motion to Renew, Expedite, and Appoint Counsel; Motion to Modify – BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (Attachments: # 1 Motion to Modify, # 2 Motion to Modify) (zjm) (Entered: 02/17/2026) |
| 02/18/2026 | | MINUTE ORDER: The Court ORDERS that proposed Intervenor's 242 , 243 Motions are DENIED. As he continues to file frivolous and unrelated pleadings that clutter the docket, the Court will accept no more filings from him. His 245 , 246 , 249 , and 250 Requests for Leave to File are thus DENIED. So ORDERED by Chief Judge James E. Boasberg on February 18, 2026. (lcjeb1) (Entered: 02/18/2026) |
| 02/20/2026 | 251 | SEALED DOCUMENT filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. re 247 Order,,, Memorandum & Opinion,, (This document is SEALED and only available to authorized persons.)(Gelernt, Lee) (Entered: 02/20/2026) |
| 02/27/2026 | 252 | NOTICE by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. re 247 Order,,, Memorandum & Opinion,, (Gelernt, Lee) (Entered: 02/27/2026) |
| 02/27/2026 | 253 | SEALED DOCUMENT filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. re 247 Order,,, Memorandum & Opinion,, (This document is SEALED and only available to authorized persons.)(Gelernt, Lee) (Entered: 02/27/2026) |
| 03/04/2026 | 254 | NOTICE OF APPEAL TO DC CIRCUIT COURT by PAMELA J. BONDI, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT, DONALD J. TRUMP, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF DEFENSE, MARCO A. RUBIO, KRISTI L. NOEM, PETER B. HEGSETH. Fee Status: No Fee Paid. (Davis, Tiberius) (Entered: 03/04/2026) |
| 03/05/2026 | 255 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 254 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 03/05/2026) |
| 03/05/2026 | | USCA Case Number 26–5074 for 254 Notice of Appeal to DC Circuit Court, filed by U.S. DEPARTMENT OF DEFENSE, PETER B. HEGSETH, DONALD J. TRUMP, MADISON SHEAHAN, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. DEPARTMENT OF HOMELAND SECURITY, MARCO A. RUBIO, PAMELA J. BONDI, KRISTI L. NOEM, U.S. STATE DEPARTMENT. (zjm) (Entered: |

| | | |
|---|---|---|
| | | 03/06/2026) |
| 03/09/2026 | 256 | MOTION to Stay *the Court's February 12, 2026 Order Pending Appeal* by PAMELA J. BONDI, PETER B. HEGSETH, KRISTI L. NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. (Attachments: # 1 Declaration Exhibit A Castano Declaration, # 2 Text of Proposed Order)(Davis, Tiberius) (Entered: 03/09/2026) |
| 03/09/2026 | 257 | NOTICE by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. re 247 Order,,, Memorandum & Opinion,, (Gelernt, Lee) (Entered: 03/09/2026) |
| 03/09/2026 | 258 | SEALED DOCUMENT filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. re 247 Order,,, Memorandum & Opinion,, (This document is SEALED and only available to authorized persons.)(Gelernt, Lee) (Entered: 03/09/2026) |
| 03/10/2026 | | MINUTE ORDER: The Court ORDERS that Plaintiffs shall respond to Defendants' 256 Motion to Stay by March 12, 2026. So ORDERED by Chief Judge James E. Boasberg on March 10, 2026. (lcjeb3) (Entered: 03/10/2026) |
| 03/12/2026 | 259 | RESPONSE re 256 MOTION to Stay *the Court's February 12, 2026 Order Pending Appeal* filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, W.G.H.. (Gelernt, Lee) (Entered: 03/12/2026) |
| 03/13/2026 | | MINUTE ORDER: Given that Plaintiffs do not oppose a stay pending appeal, the Court ORDERS that: 1) Defendants' 256 Motion for Stay is GRANTED; 2) The case is STAYED pending further Order of the Court; and 3) To the extent that Plaintiffs' 259 Response seeks clarification regarding jurisdiction, the Court believes that its Memorandum Opinion speaks for itself and that additional revision or supplementation is not warranted at this juncture. So ORDERED by Chief Judge James E. Boasberg on March 13, 2026. (lcjeb2) (Entered: 03/13/2026) |
| 03/27/2026 | 260 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Emergency Motion to Reconsider Denial – BOREALIS S. HEDLING. Reason(s): Filer is not a party to the case. (zjm) (Entered: 04/03/2026) |
| 05/15/2026 | 261 | NOTICE OF WITHDRAWAL OF APPEARANCE as to PAMELA J. BONDI, PETER B. HEGSETH, KRISTI L. NOEM, MARCO A. RUBIO, MADISON SHEAHAN, DONALD J. TRUMP, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. STATE DEPARTMENT. Attorney Abhishek Kambli terminated. (Kambli, Abhishek) (Entered: 05/15/2026) |
| 06/03/2026 | 262 | Joint MOTION to Unseal Document 141 SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H. (This document is SEALED and only available to authorized person filed by LIYANARA SANCHEZ, J.G.O., D.A.R.H., M.Y.O.R., W.G.H., M.Z.V.V., G.F.F., M.M.A.A., DORYS MENDOZA, J.G.G., EYLAN SCHILMAN, J.A.V. by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (Attachments: # 1 Text of Proposed Order)(Gelernt, Lee) (Entered: 06/03/2026) |
| 06/04/2026 | | MINUTE ORDER: The Court ORDERS that the Joint 262 Motion to Unseal Document 141−2, Exh. 1, is GRANTED. The Clerk is directed to do a limited unsealing at 145−1 of the unredacted Kozak Declaration and place it on the public docket. So ORDERED by Chief Judge James E. Boasberg on June 4, 2026. (lcjeb1) Modified on 6/4/2026 (znbn). (Entered: 06/04/2026) |

| 06/04/2026 | 263 | DECLARATION of M. Kozak by D.A.R.H., G.F.F., J.A.V., J.G.G., J.G.O., M.M.A.A., M.Y.O.R., M.Z.V.V., DORYS MENDOZA, LIYANARA SANCHEZ, EYLAN SCHILMAN, W.G.H.. (zjm) (Entered: 06/04/2026) |
|---|---|---|
| 06/12/2026 | 264 | MANDATE of USCA as to 235 Notice of Appeal to DC Circuit Court, filed by BOREALIS S. HEDLING ; USCA Case Number 26–5040. (Attachments: # 1 USCA Order April 28, 2026)(zjm) (Entered: 06/17/2026) |
| 06/26/2026 | 265 | NOTICE OF SUBSTITUTION OF COUNSEL by Robert Andrew Crossin on behalf of BRANDON GILL Substituting for attorney Ryan Gianetti (Crossin, Robert) (Entered: 06/26/2026) |
| 06/26/2026 | 266 | NOTICE of Appearance by William Frank Scolinos on behalf of BRANDON GILL (Scolinos, William) (Entered: 06/26/2026) |

JA57

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

J.G.G.,*
El Valle Detention Facility
1800 Industrial Drive
Raymondville, TX 78580;

G.F.F.,*
Orange County Jail
110 Wells Farm Road
Goshen, NY 10924;

J.G.O.,*
El Valle Detention Facility
1800 Industrial Drive
Raymondville, TX 78580;

W.G.H.,*
El Valle Detention Facility
1800 Industrial Drive
Raymondville, TX 78580;

J.A.V.,*
El Valle Detention Facility
1800 Industrial Drive
Raymondville, TX 78580;

*Plaintiffs–Petitioners*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, The White House,
1600 Pennsylvania Avenue, NW, Washington,
D.C. 20500;

PAMELA BONDI, Attorney General of the United
States, in her official capacity, 950 Pennsylvania
Ave., NW, Washington, DC, 20530;

KRISTI NOEM, Secretary of the U.S. Department
of Homeland Security, in her official capacity, 245
Murray Lane SW, Washington, DC 20528;

Case No. _____

**CLASS ACTION COMPLAINT
AND PETITION FOR WRIT
OF HABEAS CORPUS**

JA58

U.S. DEPARTMENT OF HOMELAND
SECURITY, 245 Murray Lane SW, Washington,
DC 20528;

MADISON SHEAHAN, Acting Director and
Senior Official Performing the Duties of the
Director of U.S. Immigration and Customs
Enforcement, in her official capacity, 500 12th
Street, SW, Washington, DC 20536;

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, 500 12th St. SW, Washington,
DC 20536;

MARCO RUBIO, Secretary of State, in his official
capacity, 2201 C Street, NW, Washington, DC
20520;

U.S. STATE DEPARTMENT, 2201 C Street, NW,
Washington, DC 20520;

*Defendants–Respondents*.

* Motion for these Plaintiffs to proceed under pseudonym has been concurrently filed with this complaint.

JA59

## INTRODUCTION

1.      Plaintiffs-Petitioners ("Plaintiffs") are Venezuelan men in immigration custody threatened with imminent removal under the President's expected Proclamation invoking the Alien Enemies Act ("AEA"), a wartime measure that has been used only three times in our Nation's history: the War of 1812, World War 1 and World War II.

2.      The Proclamation is expected to authorize "immediate" removal of noncitizens that the Proclamation deems to be alien enemies, without any opportunity for judicial review.  It also contorts the plain language of the AEA: arrivals of noncitizens from Venezuela are deemed an "invasion" or "predatory incursion" by a "foreign nation or government," where Tren de Aragua, a Venezuelan gang, is deemed to be sufficiently akin to a foreign nation or government.

3.      But the AEA has only ever been a power invoked in time of war, and plainly only applies to warlike actions: it cannot be used here against nationals of a country—Venezuela— with whom the United States is not at war, which is not invading the United States, and which has not launched a predatory incursion into the United States.

4.      The government's Proclamation would allow agents to immediately put noncitizens on planes without any review of any aspect of the determination that they are Alien Enemies.  Upon information and belief, the government has transferred Venezuelans who are in ongoing immigration proceedings in other states, bringing them to Texas to prepare to summarily remove them and to do so before any judicial review—including by this Court.  For that reason, Plaintiffs-Petitioners and the putative class that they represent seek this Court's intervention to temporarily restrain these summary removals, and to determine that this use of the AEA is unlawful and must be stopped.

JA60

## JURISDICTION AND VENUE

5.    This case arises under the Alien Enemies Act ("AEA"), 50 U.S.C. §§ 21-24; the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.* and its implementing regulations; the Convention Against Torture ("CAT"), *see* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231); the All Writs Act, 28 U.S.C. § 1651, and the Fifth Amendment to the U.S. Constitution.

6.    This Court has subject matter jurisdiction under 28 U.S.C. § 2241 et seq. (habeas corpus), art. I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 1361 (mandamus), and 28 U.S.C. § 1651 (All Writs Act). Defendants have waived sovereign immunity for purposes of this suit. 5 U.S.C. §§ 702, 706.

7.    The Court may grant relief pursuant to 28 U.S.C. § 2241; 28 U.S.C. § 2243; the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.; 28 U.S.C. § 1331; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

8.    Venue is proper in this District under 28 § 1391(e)(1) because Defendants are agencies of the United States or officers of the United States acting in their official capacity, Defendants reside in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this district.

JA61

## PARTIES

### A.  Plaintiffs

9.      Plaintiff-Petitioner J.G.G., a Venezuelan national who is detained at El Valle Detention Center in Texas and who, upon information and belief, is at imminent risk of removal under the expected Proclamation.  J.G.G. is seeking asylum, withholding of removal, and CAT protection because he fears being killed, arbitrarily imprisoned, beaten and tortured by Venezuelan police since they have done so previously to him.  During an interview with ICE, he was detained because the officer erroneously suspected that J.G.G. was a Tren de Aragua member on account of his tattoos.  J.G.G. is a professional tattoo artist, and his two tattoos a rose and skull on his leg, which cover a monkey tattoo that he no longer liked, and an eye with a clock inside it, which a fellow tattoo artist applied as practice—neither are associated with Tren de Aragua.  While he was awaiting a hearing on the merits of his applications for protection in Adelanto, California, J.G.G. was awakened at 2:00 am on March 6, 2025, and he was told that he was being released and that he had to sign documents that were available only in English to receive his property.  J.G.G. then signed documents under false pretense.  Instead of being released, J.G.G. was abruptly and without explanation transferred to El Valle Detention Center in Texas.  While in El Valle, he was awakened at 3:00am on March 14, 2025, and told without explanation that he was going to be transferred elsewhere.  He was not transferred because the plane had malfunctioned.  J.G.G. fears that he will be removed under the Proclamation because he has tattoos, despite not being involved whatsoever with Tren de Aragua and despite his ongoing asylum proceedings.

10.      Plaintiff-Petitioner J.A.V. is a Venezuelan national who is detained at El Valle Detention Center in Texas, and who, upon information and belief, is at imminent risk of removal

JA62

under the expected Proclamation. J.A.V. is seeking asylum because of his political views and fear of harm and mistreatment from multiple criminal groups, including the Tren de Aragua. At his asylum interview on February 27, 2025, he was arrested and interrogated by ICE, during which time ICE questioned him about Tren de Aragua. J.A.V. is not and has never been a member of Tren de Aragua—he was in fact victimized by that group and the group is the reason he cannot return to Venezuela. Still, ICE proceeded to detain J.A.V. at Moshannon Valley Processing Center in Pennsylvania. On March 9, 20205, J.A.V was transferred with a group of other Venezuelans to El Valle Detention Center in Texas. Notwithstanding the fact that J.A.V. has a master calendar hearing scheduled for March 19, 2025, he was told on March 14, 2025, that that he was being moved in preparation for a later flight with a group of other Venezuelans. J.A.V has since been informed that he will be put on a plane on Saturday March 15, 2025, or Sunday March 16, 2025. J.A.V fears being deported, being unable to speak with his attorney, and being denied adequate medical care.

11.     Plaintiff-Petitioner G.F.F. is a 21-year-old Venezuelan national who is detained at El Valle Detention Center in Texas, and who, upon information and belief, is at imminent risk of removal under the expected Proclamation. G.F.F. entered the United States in May 2024. He was released on his own recognizance after a credible fear interview. G.F.F. was arrested and detained in New York. Upon his detention, DHS filed an I-213 identifying him as an "associate/affiliate of Tren de Aragua." On March 9, 2025, he was moved to Moshannon and then quickly to El Valle. Only Venezuelans were transferred with him. G.F.F.'s final individual immigration hearing is scheduled for March 17, 2025. On March 14, 2025, ICE officers told G.F.F. that he was going to be deported in the middle of the night on March 14, 2025.

4

JA63

12.    Plaintiff-Petitioner W.G.H. is a 29-year-old Venezuelan national who is detained at El Valle Detention Center in Texas, and who, upon information and belief, is at imminent risk of removal under the expected Proclamation.  W.G.H. lives in Brooklyn, New York, with his wife and his stepdaughter.  W.G.H. requested asylum because he was extorted and threatened by multiple criminal groups in Venezuela, including Tren de Aragua.  On February 20, 2025, ICE arrested W.G.H. and detained him at Moshannon.  He was assigned an attorney from Brooklyn Defender Services.  On March 7, 2025, ICE filed a Form I-213 stating that W.G.H. "has been identified as a Tren de Aragua gang associate."  He is not a member of Tren de Aragua.  On March 9, 2025, he was abruptly transferred to El Valle, where many other Venezuelans were also present.  W.G.H. was scheduled to have a court hearing on March 12, 2025, but W.G.H. was not produced.  W.G.H.'s next immigration court hearing is scheduled for March 26, 2025.  He has been told that he will be taken to a plane on March 15 or 16.  He is extremely afraid of returning to Venezuela.

13.    Plaintiff-Petitioner J.G.O. is a 32- year- old Venezuelan national who is detained at El Valle Detention Center in Texas, and who, upon information and belief, is at imminent risk of removal under the expected Proclamation.  On January 30, 2025, ICE officers arrested and detained J.G.O.  He was later transported to Moshannon.  On March 8, 2025, he was abruptly transferred to El Valle in the middle of the night.  On March 12, J.G.O. was told to sign papers in English, which is not his native language.  He refused to sign.  ICE officer told J.G.O. that he will be deported on the night of March 14, 15, or 16.

### B.  Defendants

14.    Defendant Donald Trump is the President of the United States.  He is sued in his official capacity.  In that capacity, he issued the Proclamation under the Alien Enemies Act.

JA64

15.    Defendant Pamela J. Bondi is the U.S. Attorney General at the U.S. Department of Justice, which is a cabinet-level department of the United States government. She is sued in her official capacity.

16.    Defendant Kristi Noem is the Secretary of the U.S. Department of Homeland Security, which is a cabinet-level department of the United States government. She is sued in her official capacity. In that capacity, Defendant Noem is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103.

17.    Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government. Its components include Immigration and Customs Enforcement ("ICE"). Defendant DHS is a legal custodian of Plaintiffs.

18.    Defendant Madison Sheahan is the Acting Director and Senior Performing the Duties of the Director of ICE. Defendant Sheahan is responsible for ICE's policies, practices, and procedures, including those relating to the detention of immigrants during their removal procedures. Defendant Sheahan is a legal custodian of Plaintiffs. Defendant Sheahan is sued in her official capacity.

19.    Defendant ICE is the subagency of DHS that is responsible for carrying out removal orders and overseeing immigration detention. Defendant ICE is a legal custodian of Plaintiffs.

20.    Defendant Marico Rubio is the Secreaty of State at the U.S. Department of State. He is sued in his official capacity.

21.    Defendant U.S. Department of State, which is a cabinet-level department of the United States government.

6

JA65

## BACKGROUND

**The Alien Enemies Act**

22.     The AEA is a wartime authority enacted in 1798 that grants the President specific powers with respect to the regulation, detention, and deportation of enemy aliens.

23.     The AEA, as codified today, provides that "[w]henever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies." 50 U.S.C. § 21.

24.     The AEA can thus be triggered in only two situations. The first is when a formal declared war exists with a foreign nation or government. The second is when a foreign nation or government perpetrates, attempts, or threatens an invasion or predatory incursion against the territory of the United States.

25.     To trigger the AEA, the President must make a public proclamation of the declared war, or of the attempted or threatened invasion or predatory incursion. *Id.*

26.     The AEA also provides that noncitizens must be permitted the full time to depart as stipulated by any treaty between the United States and the enemy nation, unless the noncitizen has engaged in "actual hostility" against the United States. If no such treaty exists, the President may declare a "reasonable time" for departure, "according to the dictates of humanity and national hospitality." *Id.* § 22.

7

JA66

27. Under the AEA, noncitizens who "refuse or neglect to depart" are subject to removal. *Id.* § 21.

28. The Act has been used only three times in American history, all during actual or imminent wartime.

29. The AEA was first invoked several months into the War of 1812, but President Madison did not use the AEA to remove anyone from the United States during the war.

30. The AEA was invoked a second time during World War I by President Wilson. Upon information and belief, there were no removals effectuated pursuant to the AEA during World War I.

31. The AEA was used again during World War II, though it was never used as a widespread method of removal.

32. On December 7, 1941, after the Japanese invaded Hawaii in the attack on Pearl Harbor, President Roosevelt proclaimed that Japan had perpetrated an invasion upon the territory of the United States. The president issued regulations applicable to Japanese nationals living in the United States. The next day Congress declared war on Japan.

33. On the same day, President Roosevelt issued two separate proclamations stating that an invasion or predatory incursion was threatened upon the territory of the United States by Germany and Italy. The president incorporated the same regulations that were already in effect as to Japanese people for German and Italian people. Three days later Congress voted unanimously to declare war against Germany and Italy.

34. Congress declared war against Hungary, Romania, and Bulgaria on June 5, 1942. Just over a month later, President Roosevelt issued a proclamation recognizing that declaration of war and invoking the AEA against citizens of those countries.

8

JA67

35.   Under these proclamations, the United States infamously interned noncitizens from Japan, Germany, Italy, Hungary Romania, and Bulgaria (with U.S. citizens of Japanese descent subject to a separate order that did not rely on the AEA).

36.   It was not until the end of hostilities that the President provided for the removal of alien enemies from the United States under the AEA.  On July 14, 1945, President Truman issued a proclamation providing that alien enemies detained as a danger to public peace and safety "shall be subject upon the order of the Attorney General to removal from the United States."  The Department of Justice subsequently issued regulations laying out the removal process.  *See* 10 Fed. Reg. 12189 (Sept. 28, 1945).  It was never used as a widespread method of removal.

**Systemic Overhaul of Immigration Law in 1952**

37.   Following the end of World War II, Congress consolidated U.S. immigration laws into a single text under the Immigration and Nationality Act of 1952 ("INA").

38.   The INA, and its subsequent amendments, provide for a comprehensive system of procedures that the government must follow before removing a noncitizen from the United States.  The INA provides the exclusive procedure by which the government may determine whether to remove an individual.  8 U.S.C. § 1229a(a)(3).

39.   In addition to laying out the process by which the government determines whether to remove an individual, the INA also enshrines certain forms of humanitarian protection.

40.   First, the INA provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status," may apply for asylum.  8 U.S.C. § 1158(a)(1).  To qualify for

9

JA68

asylum, a noncitizen must show a "well-founded fear of persecution" on account of a protected ground, such as race, nationality, political opinion, or religion.  8 U.S.C. § 1101(a)(42)(A).

41.    Second, Congress has barred the removal of an individual to a country where it is more likely than not that he would face persecution on one of these protected grounds.  8 U.S.C. § 1231(b)(3).  That protection implements this country's obligations under the 1951 Refugee Convention and the 1967 Protocol relating to the Status of Refugees.  The relevant form of relief, known as "withholding of removal," requires the applicant to satisfy a higher standard with respect to the likelihood of harm than asylum; granting that relief is mandatory if the standard is met absent limited exceptions.

42.    Third, the Convention Against Torture ("CAT") prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture.  *See* 8 U.S.C. § 1231 note.  That protection implements the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242.  As with withholding of removal, CAT relief also requires the applicant to satisfy a higher standard with respect to the likelihood of harm than asylum and relief is mandatory if that standard is met.  There is no exception to CAT relief.

**President Trump's Proclamation Invoking the AEA**

43.    Upon information and belief, President Trump will imminently sign a Proclamation invoking the Alien Enemies Act and promulgate accompanying regulation to implement it ("AEA Process").

44.    Upon information and belief, the Proclamation characterizes Tren de Aragua as a *hybrid criminal state* engaged in an invasion and predatory incursion into the United States as a basis to invoke the AEA.

10

JA69

45.    Upon information and belief, it seeks to characterize Tren de Aragua, a criminal organization, as a foreign nation or government, and will not name Venezuela itself as the "foreign government" as the target of the AEA invocation.

46.    Upon information and belief, the Proclamation is expected to allege that Tren de Aragua is perpetrating, attempting, and threatening predatory incursions, hostile actions, and irregular warfare.

47.    Upon information and belief, the Proclamation is expected to state that all Venezuelan citizens ages fourteen or older alleged to be members of Tren de Aragua—and who are not U.S. citizens or lawful permanent residents—are alien enemies.

48.    Upon information and belief, the Proclamation will further assert that such noncitizens are chargeable with acts of actual hostility and declare them to be a danger to public safety and peace, making them subject to immediate apprehension, restraint, and removal.

49.    Upon information and belief, to determine who is an "alien enemy" subject to the Proclamation, an ICE officer will complete and sign a standardized checklist, which is then attested to by a supervising officer. The checklist, which utilizes a points-based methodology adapted from Bureau of Prisons forms, documents whether the noncitizen satisfies all applicable criteria. Though the noncitizen must then sign the checklist, it will not be translated into Spanish or into any other language.

50.    Upon information and belief, after signing the checklist document, the noncitizen is subject to removal to any location as may be directed but consistent with applicable laws.

51.    Upon information and belief, noncitizens subject to the Proclamation will not be afforded credible fear interviews for asylum, nor will claims for protection under the Convention Against Torture ("CAT") be recognized.

JA70

52.     Tren de Agua, a criminal organization, is not a nation or foreign government and is not part of the Venezuelan government, no does it receive support from the government.

53.     The United States is not in a declared war with Venezuela.  The United States cannot declare war against Tren de Aragua because it is not a nation.  And neither Venezuela nor Tren de Aragua have invaded or threatened to invade the United States.

54.     There is a significant risk that even individuals who do not fall under the terms of the Proclamation will be subject to it.

55.     As a result, countless Venezuelans are at imminent risk of deportation without any hearing or meaningful review, regardless of their ties to the United States or the availability of claims for relief from and defenses to removal.

## CLASS ALLEGATIONS

56.     Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and a class of all other persons similarly situated.

57.     Plaintiffs seek to represent the following Proposed Class: All noncitizens who were, are, or will be subject to the Alien Enemies Act Proclamation and/or its implementation.

58.     The proposed class satisfies the requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable.  Thousands of nationals from Venezuela will potentially be subjected to summary removal under the Proclamation and its implementation by Defendants.  The proposed class also includes numerous future noncitizens who will enter the United States and will be subjected to the Proclamation.

59.     The class satisfies the commonality requirements of Rule 23(a)(2).  The members of the class are subject to a common practice: summary removal under the Proclamation contrary to the AEA, INA, and the statutory protections Congress has enacted.  The suit also raises

12

JA71

questions of law common to members of the proposed class, including whether the Proclamation

and its implementation violate the AEA, the INA, and the statutory protections for asylum

seekers.

60.     The proposed class satisfies the typicality requirements of Rule 23(a)(3), because

the claims of the representative Plaintiffs are typical of the claims of the class.  Each proposed

class member, including the proposed class representatives, has experienced or faces the same

principal injury (unlawful removal), based on the same government practice (the Proclamation

and its implementation), which is unlawful as to the entire class because it violates the AEA, the

INA, the APA, and due process.

61.     The proposed class satisfies the adequacy requirements of Rule 23(a)(4).  The

representative Plaintiffs seek the same relief as the other members of the class—among other

things, an order declaring the Proclamation unlawful and an injunction preventing enforcement

of the Proclamation.  In defending their rights, Plaintiffs will defend the rights of all proposed

class members fairly and adequately.

62.     The proposed class is represented by experienced attorneys from the American

Civil Liberties Union and the Democracy Forward Foundation.  Proposed Class Counsel have

extensive experience litigating class action lawsuits and other complex systemic cases in federal

court on behalf of noncitizens.

63.     The proposed class also satisfies Rule 23(b)(2).  Defendants have acted (or will

act) on grounds generally applicable to the class by subjecting them to summary removal under

the Proclamation rather than affording them the protection of immigration laws.  Injunctive and

declaratory relief is therefore appropriate with respect to the class as a whole.

JA72

**HARM TO PLAINTIFFS**

64. J.G.G. fears that he is at immediate risk of removal under the expected Proclamation because of his Venezuelan nationality and his tattoos, despite his tattoos having no connection to Tren de Aragua. He has ongoing immigration proceedings for asylum, withholding of removal, and CAT protection that ICE is preventing him from continuing. Mr. Hernandez has no involvement whatsoever with Tren de Aragua, but he is at risk of summary removal under the Proclamation.

65. J.A.V. fears that he is at immediate risk of removal under the expected Proclamation because of his Venezuelan nationality, despite not being a member of Tren de Aragua. He has a master calendar hearing scheduled for his asylum application for March 19, 2025. J.A.V. has no involvement whatsoever with Tren de Aragua, but he is at risk of summary removal under the Proclamation.

66. G.F.F. fears that he is at immediate risk of removal under the expected Proclamation because DHS filed an I-213 identifying him as an "associate/affiliate of Tren de Aragua." G.F.F. entered the United in May 2024 and was released on his own recognizance after a credible fear interview. After he was initially arrested and detained in New York, G.F.F. was transferred to El Valle Detention Center in Texas. G.F.F. is at risk of summary removal under the Proclamation. Indeed, on March 14, 2025, ICE officers told G.F.F. that he was going to be deported in the middle of the night on March 14, 2025.

67. W.G.H. fears that he is at immediate risk of removal under the expected Proclamation because DHS filed an I-213 identifying him as a "Tren de Aragua gang associate." He is not a member of Tren de Aragua. W.G.H. requested asylum because he was extorted and threatened by multiple criminal groups in Venezuela, including Tren de Aragua. W.G.H.'s next

14

JA73

immigration court hearing is scheduled for March 26, 2025, but is currently detained at El Valle Detention Center in Texas. W.G.H. is at risk of summary removal under the Proclamation and told that he will be taken on a plane March 15 or 16. He is extremely afraid of returning to Venezuela.

68.    J.G.O. fears that he is at immediate risk of removal under the expected Proclamation because of his Venezuelan nationality. He is currently detained at El Valle Detention Center. On March 12, J.G.O. was told to sign papers in English, which is not his native language. He refused to sign. ICE officer told J.G.O. that he will be deported on the night of March 14, 15, or 16. J.G.O. is at risk of summary removal under the Proclamation.

69.    Each of the foregoing paragraphs is incorporated by reference in each of the following claims.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

*Ultra Vires*, **Violation of 50 U.S.C. § 21**
**(All Defendants)**

70.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

71.    The AEA does not authorize the removal of noncitizens from the United States absent a "declared war" or a "perpetrated, attempted, or threatened" "invasion or predatory incursion" into the United States by a "foreign nation or government." *See* 50 U.S.C. § 21. The expected Proclamation on its face mandates Plaintiffs' removal under the AEA where those preconditions have not been met.

72.    The AEA Process, which was purportedly established pursuant to the authority of 50 U.S.C. § 21, was not authorized by that law.

15

JA74

73.     The application of the AEA Process to Plaintiffs is therefore ultra vires. *See* 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1101, *et seq.*
### (All Defendants)

74.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

75.     The INA, 8 U.S.C. § 1101, *et seq.*, sets out the sole mechanisms established by Congress for the removal of noncitizens.

76.     The INA provides that a removal proceeding before an immigration judge under 8 U.S.C. § 1229a is "the sole and exclusive procedure" by which the government may determine whether to remove an individual, "[u]nless otherwise specified" in the INA.  8 U.S.C. § 1229a(a)(3).

77.     The AEA Process creates an alternative removal mechanism outside of the immigration laws set forth by Congress in Title 8.

78.     The INA's "exclusive procedure" and statutory protections apply to any removal of a noncitizen from the United States, including removals authorized by the AEA.  Because the AEA Process provides for the removal of Plaintiffs without the procedures specified in the INA, it violates 8 U.S.C. § 1229a and the INA.

79.     As a result, the application of the AEA to Plaintiffs, which will result in their removal from the United States, is contrary to law.  *See* 5 U.S.C. § 706(2)(A).

80.     In addition, by refusing to grant Plaintiffs access to the procedures specified in the INA, Defendants have withheld and unreasonably delayed actions mandated by the statute.  5 U.S.C. § 706(1).

JA75

## THIRD CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1158, Asylum
### (All Defendants)

81.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

82.     The INA provides, with certain exceptions, that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title."  8 U.S.C. § 1158(a)(1).

83.     Defendants' application of the AEA Process to Plaintiffs prevents them from applying for asylum in accordance with 8 U.S.C. § 1158(a)(1), and is therefore contrary to law. *See* 5 U.S.C. § 706(2)(A).

## FOURTH CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1231(b)(3), Withholding of Removal
### (All Defendants)

84.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

85.     The "withholding of removal" statute, INA § 241(b)(3), *codified at* 8 U.S.C. § 1231(b)(3), bars the removal of noncitizens to a country where it is more likely than not that they would face persecution.

86.     Defendants' AEA Process and regulations violate the withholding of removal statute because it does not provide adequate safeguards to ensure that Plaintiffs are not returned

17

JA76

to a country where it is more likely than not that they would face persecution. As a result, Defendants' actions against Plaintiffs are contrary to law. *See* 5 U.S.C. § 706(2)(A).

87.     In addition, by refusing to grant Plaintiffs the procedural protections to which they are entitled, Defendants have withheld and unreasonably delayed actions mandated by the statute. 5 U.S.C. § 706(1).

### FIFTH CLAIM FOR RELIEF

**Violation of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), codified at 8 U.S.C. § 1231 note
(All Defendants)**

88.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

89.     FARRA prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture.

90.     Defendants' AEA Process and regulations violate FARRA because it does not provide adequate safeguards to ensure that Plaintiffs are not returned to a country where it is more likely than not that they would face torture. As a result, Defendants' actions against Plaintiffs are contrary to law. *See* 5 U.S.C. § 702(2)(A).

91.     In addition, by refusing to grant Plaintiffs the procedures to which they are entitled, Defendants have withheld and unreasonably delayed actions mandated by the statute. 5 U.S.C. § 706(1).

### SIXTH CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
(All Defendants except Defendant Trump)**

92.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

18

JA77

93.     The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion."  5 U.S.C. § 706(2)(A).

94.     Defendants' actions are arbitrary and capricious.  Defendants have failed to consider relevant factors in applying the AEA Process to Venezuelans, including their fear of persecution and torture in their home country; relied on factors Congress did not intend to be considered; and offered no sufficient explanation for their decision to remove them from this country.

95.     Plaintiffs' subjection to the AEA Process is arbitrary and capricious because it also departs from the agency's existing policies prohibiting the return of individuals who fear persecution or torture, without providing a reasoned explanation for departing from these policies.

## SEVENTH CLAIM FOR RELIEF

### *Ultra Vires*, Violation of 50 U.S.C. § 22
### (All Defendants)

96.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

97.     The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

98.     The AEA requires that noncitizens whose removal is authorized by the AEA, unless "chargeable with actual hostility, or other crime against the public safety," be allowed the full time stipulated by treaty to depart or a reasonable time in which to settle their affairs before departing.  *See* 50 U.S.C. § 22.  The Proclamation on its face denies Plaintiffs any time under

JA78

Section 22 to settle their affairs, because it declares everyone subject to the Proclamation to be "chargeable with actual hostility" and to be a "danger to public safety."

99.   The AEA Process thus contravenes 50 U.S.C. § 22 and is *ultra vires*.

100.   The application of the AEA Process to Plaintiffs is contrary to law.   **EIGHTH**

## CLAIM FOR RELIEF

### Violation of Due Process Under the Fifth Amendment
### (All Defendants)

101.   All of the foregoing allegations are repeated and realleged as if fully set forth herein.

102.   The Due Process Clause of the Fifth Amendment provides in relevant part that: "No person shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

103.   In denying Plaintiffs meaningful procedural protections to challenge their removal, the Proclamation violates due process.

104.   The Proclamation on its face also denies Plaintiffs any time to settle their affairs before departing and thus violates the due process.

## NINTH CLAIM FOR RELIEF

### Violation of Habeas Corpus
### (All Defendants)

105.   Detainees have the right to file petitions for habeas corpus to challenge the legality of their detention or raise other claims related to their detention or to the basis for their removal.

JA79

106.    The detention of Plaintiffs under the Alien Enemies Act has violated and continues to violate their right to habeas corpus. See U.S. Const. art. I, § 9, cl. 2 (Suspension Clause); 28 U.S.C. § 2241.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray this Court to:

a.  Issue permanent injunctive relief prohibiting Defendants from removing Plaintiffs pursuant to the Alien Enemies Act Proclamation;

b.  Grant a temporary restraining order to preserve the status quo pending further proceedings;

c.  Declare unlawful the AEA Process;

d.  Enter an order enjoining Defendants from applying the AEA Process;

e.  Enter an order providing relief by ordering that Defendants to stay their removals under the Proclamation and remove anyone subject to the Proclamation from the AEA Process;

f.  Grant a writ of habeas corpus to Plaintiffs that enjoins Defendants from removing them under the AEA,

g.  Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

h.  Grant such further relief as the Court deems just, equitable, and appropriate.

21

JA80

Dated: March 15, 2025

Noelle Smith*
Oscar Sarabia Roman*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
nsmith@aclu.org
osarabia@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Respectfully submitted,

/s/ *Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
Daniel Galindo (D.D.C. Bar No. NY035)
Ashley Gorski*
Omar C. Jadwat*
Hina Shamsi (D.D.C. Bar No. MI0071)
Patrick Toomey*
Sidra Mahfooz*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org

Somil B. Trivedi (D.C. Bar No. 1617967)
Bradley Girard (D.C. Bar No. 1033743)
Michael Waldman (D.C. Bar No. 414646)
Sarah Rich*
Skye Perryman (D.C. Bar No. 984573)
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
strivedi@democracyforward.org
bgirard@democracyforward.org
mwaldman@democracyforward.org
srich@democracyforward.org
sperryman@democracyforward.org

*Attorneys for Plaintiffs-Petitioners*

**Pro bono representation certificates or
Pro hac vice motions forthcoming*

22

JA81

**DECLARATION OF** █████████████████████

█████ A █████████████

I, ████████████████████████, declare:

1. I was born in █████████████████, Venezuela, on ███████████. Prior to being detained, I was living in Pittsburg, California. I am currently detained at the El Valle Detention Facility in Raymondville, Texas.

2. My only entry into the United States was on March 25, 2024, through El Paso, Texas. I came to the United States because I fear being killed, arbitrarily imprisoned, beaten and tortured by Venezuelan police since they have already tortured, arbitrarily imprisoned me, and beaten me. I fear that the Venezuelan police and government will target me because of my actual/imputed political opinion, my familial connection to my █████ who is a known political dissident, and because the U.S. government erroneously suspects that I am a Tren de Aragua member. Due to this fear, I am seeking asylum, withholding, and CAT protection before the immigration court in Adelanto, California. I am awaiting a hearing on the merits of my applications for protection.

3. ICE erroneously claims that I am a Tren de Aragua member. However, I am not a Tren de Aragua member, and I have never been a Tren de Aragua member. The sole reason ICE claims that I am a Tren de Aragua member is because of my tattoos.

4. I was instructed by ICE to come to their office on October 3, 2024, for an interview. During that interview, I was detained by ICE because they erroneously suspected that I was a Tren de Aragua member on account of my tattoos. I am a tattoo artist, and I told them that none of my tattoos are associated with Tren de Aragua. One of the two tattoos that ICE questioned me about is a tattoo of an eye, ███████████████████████ I got the eye tattoo because I saw it on Google, and I thought it looked cool. A friend did the tattoo for me. Another tattoo of mine that ICE questioned me about is a tattoo on my ████████ that has a rose and a skull. I got that tattoo because I previously had a monkey tattoo on ██████████ that I wanted to cover up. I am not and have never been a member of or associated with Tren de Aragua in any way. I also have not been arrested for or convicted of any crime anywhere in the world, and I have never been a member or associated with any other criminal organization.

5. I was taken to Golden State Annex (GSA) in McFarland, California on October 4, 2024, and was detained there until March 6, 2025. On March 6, 2025, at approximately 2am, I was awoken, taken out of my cell and told that I was being released and made to sign papers in English, which is not my native language. I asked what the papers were concerning, and I was told that I was being released, and the papers were to get by property returned to me. I signed them under the false pretext that I was being released. I was not released and instead was taken to an unknown location. I called my friend ████ and my attorney frantically because I was terrified, and I did not know what was happening. I was then transferred to El Valle Detention Facility in Raymondville, Texas, but I did not learn my destination until I arrived. When I got to El Valle Detention

JA82

Facility, I met other Venezuelans who were also recently transferred there. I learned that these other Venezuelans, like me, do not have any criminal history and are suspected Tren de Aragua members.

6.    On March 14, 2025, at approximately 3am, I was awakened and was told that I was going to be transferred elsewhere. The guards told me to grab all my things because I was going to be taken immediately. I asked the guards where they were taking me, but they said that they did not know, and they refused to give me more information. Soon after, they told me that the plane that I was supposed to get on malfunctioned and that I would be taken elsewhere either at night on March 14, 2025, or in the morning on March 15, 2025. I was then returned to my dorm. At this time, I do not know where I am being taken, and I am terrified of where I will end up or what will happen to me. I called my attorney, Stephanie Quintero, at approximately 9:45am and informed her of what happened.

7.    I ask that I be properly allowed to pursue my applications for protection in the U.S., where I would be safe from harm.

I, ███████████████, swear under penalty of perjury that the forgoing declaration was read back to me in Spanish, and that it is true and correct to the best of my knowledge and recollection.

_____
████████████████

03/14/2025
Date

I, John Cardenas, swear under penalty of perjury that I am fluent in the English and Spanish languages, that I read the foregoing declaration to ███████████████ in Spanish, and that he agreed with its contents.

_____
Name: John Cardenas

03/14/2025
Date

JA83

**GRACE CARNEY ATTORNEY AFFIRMATION:**

**ATTORNEY OF RECORD FOR G.F.F.**

I, Grace Carney, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

1. My name is Grace Carney. I am a Staff Attorney at The Legal Aid Society within the New York Immigrant Family Unity Project ("NYIFUP"). I represent G.F.F. in his removal and bond proceedings. I first entered my appearance in this case on December 31, 2024.

2. G.F.F. was born in ███████, Venezuela on June 20, 2003, and lived there until he was around 16 years old, when he family fled the country for Ecuador.

3. On January 24, 2025, I filed with the Court a Form I-589, Application for Asylum, Withholding of Removal, and Protection under the Convention Against Torture on G.F.F.'s behalf, on the basis of his fear of return to Venezuela. His individual hearing is presently scheduled for March 17, 2025 at 1:00PM EDT at the New York Varick Immigration Court.

4. G.F.F. initially entered the United States at or near El Paso, Texas, on or about May 15, 2024. He was briefly detained by Customs and Border Protection, and a credible fear interview was conducted, before he was ultimately released on his own recognizance. Upon release, he reunited with an older brother, who was living in Chicago, before travelling to New York in November 2024, where he was ultimately detained by ICE.

5. G.F.F. was detained by ICE on December 6, 2024, following an ICE raid at apartment party he attended in the Bronx. Approximate 50 people were in attendance, most of which G.F.F. believed were Venezuelans. G.F.F. attended the party at the insistence of a friend. He did not know anyone else in attendance at the party.

6. Federal officers arrived at the party to execute an S.D.N.Y. arrest warrant for an alleged member of Tren del Aragua. Following the arrest of the individual named in the warrant, federal officers questioned G.F.F. and the other attendees. G.F.F. was thereafter detained at Orange County Jail in Goshen, New York. Upon his detention by ICE, DHS filed an I-213 identifying him as an "associate/affiliate of Tren del Aragua."

7. A motion for custody redetermination was submitted on January 24, 2025. In support, I submitted a copy of G.F.F.'s I-589 Application and a detailed declaration outlining the bases of his claims for asylum.

8. The Immigration Judge scheduled a bond hearing for January 29, 2025. According to DHS's submissions, the individual who was arrested at the party was an alleged member of Tren del Aragua. ICE also filed a ███████ article describing the arrest, wherein G.F.F. was identified as a gang member. ICE additionally filed an informational packet on the organization of Tren del Aragua.

1

JA84

9. The Immigration Judge concluded that G.F.F. had not met his burden in his bond proceedings. The Immigration Judge stated that there was insufficient corroboration that, despite no criminal record, G.F.F. presented a danger to the community and a flight risk.. The Immigration Judge based his decision on DHS's I-213 and an ▇▇▇▇▇▇▇▇▇ identifying G.F.F. as a gang member.

10. G.F.F.'s bond appeal briefing is due to the BIA April 4, 2025. In the interim, G.F.F. and I move forward with preparing for his upcoming individual hearing scheduled for March 17, 2025.

11. On the afternoon of Sunday, March 9, 2025, I learned that G.F.F. had been transferred from Orange County Jail ("OCJ") to Moshannon Valley Processing Center ("MVPC"), in Phillipsburg, Pennsylvania overnight. I confirmed this was the case by checking the ICE Detainee Locator, which indicated that G.F.F. was at Moshannon. I reached out to MVPC that evening via email to schedule a client call at the soonest opportunity.

12. The next morning on Monday, March 10, 2025, I learned from a colleague that her client, a fellow Venezuelan who had also been transferred from OCJ to MVPC over the weekend, had again been transferred to El Valle Detention Facility ("EVDF"), in Raymondville, Texas. I again checked the ICE Detainee Locator and learned that G.F.F. had been again transferred to EVDF. Upon learning this, I reached out to EVDF via email and via telephone to schedule a call with him. I did not receive a response to my multiple attempts to contact EVDF until 6:00PM March 11, 2025.

13. On Wednesday, March 12, 2025, I was able to speak with G.F.F. over video for the first time since he had been transferred. He described the process of his transferred from Orange County to Moshannon, and noted that it appeared only Venezuelans were transferred. He explained he was very nervous and that no one had told him why they were being transferred.

14. At approximately 8:00AM, on Friday morning, March 14, 2025, I was alerted by Legal Aid Society colleagues of rumors of transfers and/or possible deportations of Venezuelan clients from El Valle, Texas, pursuant to reports of President Donald Trump's invocation of the Alien Enemies Act of 1798. Upon learning this, I checked the ICE Detainee Locator, which indicated G.F.F. was still located at EVDF.

15. I immediately contacted EVDF via telephone to inquire as to G.F.F.'s location, and to confirm our scheduled call later that morning. Officer Mary Lou Mesa at EVDF informed me that G.F.F. had been transferred the night before, and explained she was unable to share his location. I indicated that I had a G-28 on file and was the attorney of record in G.F.F.'s case, and that he had an individual hearing scheduled on Monday March 17, 2025. Officer Mesa again informed me that she was unable to share where he was located but confirmed that he was no longer at EVDF.

16. At 1:00PM EDT on March 14, 2025, I received a text message to my work cellphone from EVDF indicating that "A resident from EVDF would like to start a video call." I promptly telephoned EVDF to confirm whether this was my client, or an error, and was informed by

2

JA85

the officer that my client was "back" and available to join the previously scheduled video call. When I inquired about where my client had been, I was told that they could not share that information with me.

17. I joined the video call and was able to speak directly with G.F.F. When I asked what happened, G.F.F. informed me that he had been awoken the night before at 2:30AM by EVDF officers and was told he was being deported. He informed me that he was told to collect his belongings and showed me a bag of his personal effects with him. He said that the officers told him that he was going to be placed on a flight to either Mexico or Venezuela. He explained that he and several other Venezuelans were all told the same thing and brought to a separate room at EVDF to await deportation. He was not told whether he was going to Mexico or Venezuela. He said that the officers told him if he was sent to Mexico, he would be left "on the street."

18. G.F.F. said that he and the other individuals were held in the room from when he was awoken to until right before our call, which was at 1:00PM EDT. At the time of our call, G.F.F. still had his personal effects with him in a bag, as he had yet to go back to his cell. He said that he did not sleep that night or eat, and that his last meal was dinner the evening before.

19. At the time of our conversation, G.F.F. informed me that he was told that his flight was cancelled but did not know why. He shared that the officers told him he would be deported in the "middle of the night" on March 14, 2025. I later learned from colleagues at the Legal Aid Society that the flight was reportedly cancelled due a fire.

20. G.F.F. and I spoke for about thirty minutes about what happened and next steps before he informed me that he felt physically ill due to the prospect of imminent deportation to Venezuela or Mexico. He explained that he had not eaten or slept, and that he was very anxious about being sent to live on the street in Mexico, where he was previously threatened, or Venezuela, where he fears persecution. He told me he wanted to do everything possible to fight his case, and said he could not go back there. G.F.F. thereafter told me he thought that he was going to vomit and said he had to leave, before ending the video call.

21. As of the time of writing this affirmation at 5:00PM EST on March 14, 2025, I have not been informed about what will happen to my client, and whether he will be deported this evening, or whether he will be produced for his hearing on Monday March 17, 2025.

I, Grace T. Carney, affirm under penalty of perjury, that the foregoing is true and correct.

Date: 03/14/2025 _____    _____
                                          Grace T. Carney

3

JA86

**<u>KARYN ANN SHEALY ATTORNEY AFFIRMATION;</u>**

**<u>ATTORNEY OF RECORD FOR J.L.G.O.</u>**

I, Karyn Ann Shealy, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge and belief:

1. I am a staff attorney of the New York Immigrant Family Unity Project at The Legal Aid Society, located at 49 Thomas Street, Fifth Floor, New York, New York 10013. I admitted to the New York State Bar, license number 6161160, and the Massachusetts State Bar, license number 703929. I began representation of J.L.G.O. on February 24, 2025. Through the course of my representation of J.L.G.O. has stated the below:

2. J.L.G.O. was born in Venezuela on August 9, 1992. Prior to being detained, he was living in New York, New York. He is currently detained at El Valle Detention Facility in Raymondville, Texas.

3. J.L.G.O.'s only entry into the United States was on or about September 29, 2022, through El Paso, Texas. J.L.G.O. filed an I-589 Application for Asylum and for Withholding of Removal with U.S. Citizenship and Immigration Services on September 18, 2023.

4. On January 30, 2025, J.L.G.O. was at home when ICE officers detained him and transported him to Orange County Jail in Goshen, New York. J.L.G.O. was placed in removal proceedings at the Varick Street Immigration Court in New York, New York on February 4, 2025. On or about March 1, 2025, J.L.G.O. was transported from Orange County Jail to Moshannon Valley Processing Center.

5. On March 8, 2025, at approximately 3 AM, J.L.G.O. was awoken, taken out of his cell and transferred to El Valle Detention Facility in Raymondville, Texas. J.L.G.O. did not know where he was going or his destination until he arrived.

6. Counsel requested a call with J.L.G.O. and was given limited attorney calls on March 10, 11, and 12, 2025. During the March 12, 2025 call, the line disconnected and Counsel was unable to speak again with J.L.G.O.. Counsel requested an attorney call for March 13, 2025, but it was not granted.

7. On March 12, 2025 after J.L.G.O.'s attorney call, J.L.G.O. was asked to sign papers in English, which is not J.L.G.O.'s native language. J.L.G.O. was told that the paper was to acknowledge his prior transfer from Orange County Jail. J.L.G.O. asked for a translated copy of the papers but was denied. J.L.G.O. refused to sign the papers.

8. On March 14, 2025 at approximately 3 AM, J.L.G.O. was awoken, taken out of his cell, and transported to a large building. There, he was kept with approximately 100 other individuals from Venezuela in preparation for a later flight. At approximately 12:30 PM, J.L.G.O. was told by an ICE officer that the upcoming flight had been cancelled because the plane did not pass inspection. J.L.G.O. was also told that he will be deported in the night of March 14, 15, or 16, 2025.

JA87

9. Counsel's urgent request for an attorney call was granted on March 14, 2025, at approximately 3 PM.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

March 14, 2025
New York, NY

Karyn Ann Shealy, Esq.

JA88

**Declaration of** ▮▮▮▮▮▮▮▮▮▮▮

1. My name is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and I was born in Venezuela. I am a 29-year-old man. I am currently detained by ICE at the El Valle Detention Facility in Raymondville, Texas.

2. I entered the United States on December 15, 2023.

3. I filed for asylum from Venezuela on September 9, 2024 due to my fear of harm and mistreatment from multiple criminal groups, including the Tren de Aragua gang.

4. On February 20, 2025, ICE detained me in front of my wife and stepdaughter at the homeless shelter where we were living in Brooklyn, New York. ICE officers did not tell me why I was being arrested.

5. ICE detained me at the Moshannon Valley Processing Center in Pennsylvania.

6. I was assigned a free lawyer, Molly Lauterback from Brooklyn Defender Services. I learned that my first immigration court date would be on March 12, 2025 and my attorney was preparing my case for a bond hearing.

7. On March 9, 2025, I was transferred by plane to the El Valle Detention Facility in Texas. There are many other Venezuelans detained at El Valle.

8. On March 12, 2025, the date of my court hearing, no one came to get me for my hearing. I was detained at El Valle but not brought to court.

9. On March 14, 2025, myself and a group of people who I believe were also Venezuelan were told that we would be moved in preparation for a later flight. While we were waiting, we were told that there was a problem and they returned us to detention at El Valle.

10. ICE is telling us that we will be taken to the plane on Saturday, March 15th or Sunday, March 16th.

11. I am extremely afraid to be returned to Venezuela. I fled Venezuela and requested asylum in the United States because I was being extorted and threatened by multiple criminal groups including Tren de Aragua.

12. I am not and was not a member of Tren de Aragua. I fear them and need protection from them.

1

JA89

13. My wife and minor stepdaughter live in the United States. Being separated from them is a nightmare.

14. I swear under penalty of perjury that the forgoing declaration was read back to me in Spanish, and that it is true and correct to the best of my knowledge and recollection.

I, Molly Lauterback, swear under penalty of perjury that I am fluent in the English and Spanish languages, that I read the forgoing declaration to ████████████████████ in Spanish, and that he agreed with its contents.

_____                          03/14/2025

Name: Molly Lauterback

2

JA90

**Declaration of Molly Lauterback**

1.   I am a Senior Staff Attorney in the Immigration Practice at Brooklyn Defender Services ("BDS").

2.   BDS is a nonprofit legal services provider which represents detained clients in removal proceedings under the auspices of the New York Immigrant Family Unity Project ("NYFIUP").

3.   Through NYFIUP, qualified indigent people who are detained by Immigration and Customs Enforcement ("ICE") are entitled to free legal representation when they are facing deportation.

4.   I met with Mr. ███████████████ on February 27, 2025 over video. At that time, he was detained at the Moshannon Valley Processing Center. I assessed that he was eligible for our services.

5.   Mr. ██████████ Notice to Appear ("NTA"), which I have reviewed, states that he is a citizen of Venezuela who entered the United States at or near Eagle Pass, Texas on December 15, 2023 and charges him as inadmissible under 8 U.S.C. § 1182(a)(6)(A)(i) as a noncitizen present in the United States without being admitted or paroled or who arrived in the United States at any time or place other than as designated by the Attorney General.

6.   On February 27, 2025, I entered my appearance as his attorney with the Elizabeth Immigration Court in New Jersey.

7.   On March 7, 2025, ICE filed a Form I-213 in Mr. ██████████ case. The I-213 states that he "has been identified as a Tren de Aragua gang associate." ICE has not provided any information beyond that one sentence to support that allegation.

8.   Mr. ██████████ has a pending application for asylum, which he timely filed on August 30, 2024, and the basis for which is his fear of harm and mistreatment from multiple criminal groups, including the Tren de Aragua gang.

9.   On March 7, 2025, Mr. ██████████ wife informed our office that she was unable to add money into Mr. ██████████ commissary account because it had been deactivated.

10.   That same day, I sent an email to ICE stating "As you know, Mr. ██████████ has counsel and a pending removal proceeding before the Elizabeth Immigration Court and therefore cannot be transferred. Can you confirm that Mr. ██████████ is not being transferred to a different facility?" In response, I received an email on Monday, March 10, 2025 that the matter was being investigated.

1

JA91

11. On March 10, 2025, Mr. ████████████ location in the ICE Detainee Locator site was changed to the El Valle Detention Facility in Texas.

12. On March 10, 2025, I sent an email to the El Valle Detention Facility contacts asking for a video call with my client and attaching my Form G-28, Notice of Entry of Appearance as Attorney and Attorney ID Card. I received multiple bounce back auto-responses, but I did not receive any actual responses to my request for a call with my client.

13. On March 12, 2025, I appeared for Mr. ████████████ first master calendar hearing before the Immigration Court. Mr. ████████████ was not produced.

14. During the March 12 immigration hearing, the ICE attorney stated that she believed Mr. ████████████ was at El Valle and that he would be transferred again. When asked where he would be transferred, the ICE attorney stated that she did not know.

15. I explained on the record that I had been unable to speak with my client since his transfer to El Valle and that ICE's failure to allow for our communication was interfering with his due process rights.

16. During the hearing, the ICE attorney did not mention anything about my client's supposed association with the Tren de Aragua.

17. The Immigration Judge reset the case for a master calendar hearing for March 26, 2025 and instructed ICE to submit to the court a completed Form I-830, Notice to EOIR: Alien Address, which informs the Immigration Court of a noncitizen's address and detention status.

18. The Immigration Judge also instructed ICE to assist in facilitating calls between my client and me.

19. I made several attempts to contact my client after ICE failed to produce him for his Master Calendar Hearing.

   a. On March 13, 2025, I emailed the ICE attorney who had appeared in court. She did not respond.  On March 14, 2025, I emailed her again and she responded saying "at this point you are ahead of what I am aware of." When I asked her where my client would be transferred next, I did not receive a response.

   b. On March 14, 2025, I emailed El Valle for the third time to speak to my client and finally received this response at 10:19 am EST: "Good morning, you client [] is no longer at EVDF." When I asked where he was, I was told "We do not have that information."  After receiving that email, I forwarded it to multiple ICE deportation officers for whom I have contact information.

   c. I did not hear back via email so, later in the day on March 14, 2025, I called Assistant Field Office Director Francis Kemp to ask where my client was. Mr. Kemp

JA92

instructed me to send him an email because he was not in his office and stated that my need to know my client's whereabouts was not his problem.

20. At approximately 11:00 am EST on March 14, 2025, ICE filed via ECAS Form I-830, Notice to EOIR: Alien Address, showing that my client was detained at the El Valle Detention Center.

21. The afternoon of March 14, 2025, my client called me from a paid recorded call. After ICE told him he was being moved in preparation for a flight, he was returned to El Valle and called me. I understand ICE is saying they will put him on a flight Saturday, March 15 or Sunday, March 16.

22. I emailed the El Valle Detention Facility at around 1:30pm on March 14, 2025 requesting a confidential call with my client. I received an email stating, "At the moment non-citizen has not arrived to their dorm, once he is available, we will try our best to connect." Later that day, I again spoke to my client from El Valle when he called me from a paid recorded line. During the call he said he had no privacy. I was finally able to have confidential conversation with my client the evening of March 14.

23. Acting Assistant Field Office Director Joseph Pujol responded to my earlier email stating, "Your client remains detained at El Valle at this time." When I asked where he was going to be transferred next, Officer Pujol stated, "Unfortunately he is not a NYC case so I have no further information." Officer Pujol connected me to Deportation Officer Josh Belcher who emailed me and said, "I am monitoring his case, however, I am unable to provide reasoning for his transfer." When I asked where my client would be transferred next, I did not receive a response.

I, Molly Lauterback, swear under penalty of perjury that the forgoing declaration is true and correct to the best of my knowledge and recollection.

_____

03/14/2025

Name: Molly Lauterback

3

JA93

**DECLARATION OF** ██████████████

I, ████████████████, declare:

1. My name is ████████████████ and I am a national of Venezuela. I am a 32-year-old man. I am currently detained by ICE at the El Valle Detention Facility in Raymondville, Texas.

2. I entered the United States around May 3, 2023.

3. I filed for asylum from Venezuela because of my political views and my fear of harm and mistreatment from multiple criminal groups, including the Tren de Aragua gang.

4. At my asylum interview on February 27, 2025, I was arrested and interrogated by ICE.

5. When ICE officers entered my asylum interview, they asked me about the Tren de Aragua gang. I am not and was not a member of the Tren de Aragua gang. I was victimized by that group, which is one of the reasons I cannot return to Venezuela.

6. ICE first detained me at the Moshannon Valley Processing Center in Pennsylvania.

7. Then, on approximately March 9, 2025, I was transferred with a group of other Venezuelans to El Valle Detention Center in Texas.

8. I was assigned a free lawyer, Melissa Smyth, from Brooklyn Defender Services. My attorney explained that she could represent me in my asylum case before the Elizabeth Immigration Court in New Jersey.

9. I have an immigration court Master Calendar Hearing scheduled for March 19, 2025.

10. On March 14, 2025, I was told that I was being moved in preparation for a later flight with a group of other Venezuelans. I was not told where we were going. We were then told that there was a problem and they returned us to detention at El Valle.

11. We are now being told we will be put on a plane on Saturday, March 15th or Sunday, March 16th.

12. Being sent away and deported would be terrible. I need to be able to speak with my attorney to prepare for my court appearances. Also, I was receiving important medical treatment in New York, and I am afraid I will become terribly sick if I do not have access to the proper medical care. I have already missed multiple days of my daily medication when I was initially detained by ICE and again when I was transferred to El Valle.

JA94

13. I am terrified to be deported to Venezuela, where I fear I would be seriously harmed or killed.

14. I swear under penalty of perjury that the forgoing declaration was read back to me in Spanish, and that it is true and correct to the best of my knowledge and recollection.

I, Melissa Smyth, swear under penalty of perjury that I am fluent in the English and Spanish languages, that I read the forgoing declaration to ████████████ in Spanish, and that he agreed with its contents.

_Melissa Smyth (signature)_

_____          03/14/2025_____

Name: Melissa Smyth

2

JA95

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| J.G.G., *et al.*, | ) |
| | ) |
| Plaintiffs-Petitioners, | ) |
| | ) |
| v. | ) |
| | ) |
| DONALD J. TRUMP, in his official | ) |
| capacity as President of the United States, | ) |
| *et al.*, | ) |
| | ) |
| Defendants-Respondents. | ) |
| | ) |

Civil Action No. 1:25-cv-00766

## NOTICE TO THE COURT

For the reasons explained on the record, Federal Defendants object to this Court's assertion of jurisdiction, including over the President's exercise of powers vested in him by Article II. Subject to that objection, Federal Defendants were promptly notified of the Court's temporary restraining order issued in the morning and the 7:26 PM EDT minute order that temporarily enjoined any removals pursuant to the Presidential Proclamation. Federal Defendants have sought emergency appellate relief from the D.C. Circuit as to both orders; the Court of Appeals has now ordered expedited briefing on both motions. The five individual Plaintiffs that were the subject of the first TRO have not been removed.

Going forward, and in the absence of appellate relief, Federal Defendants will continue to protect the United States using authorities other than the Proclamation. Federal Defendants further report, based on information from the Department of Homeland Security, that some gang members subject to removal under the Proclamation had already been removed from United States territory under the Proclamation before the issuance of this Court's second order.

JA96

Respectfully Submitted,

PAMELA J. BONDI
U.S. Attorney General

TODD BLANCHE
Deputy Attorney General

EMIL BOVE
Principal Associate Deputy
Attorney General

CHAD MIZELLE
Acting Associate Attorney General

YAAKOV M. ROTH
Acting Assistant Attorney General

s/ Drew C. Ensign
DREW C. ENSIGN
Deputy Assistant Attorney General
950 Pennsylvania Avenue
Washington, DC 20530
Phone: (202) 514-2000
e-Mail: drew.c.ensign@usdoj.gov

AUGUST E. FLENTJE
Acting Director

EREZ REUVENI
Assistant Director

BRIAN C. WARD
Acting Assistant Director

CHRISTINA P. GREER
Senior Litigation Counsel

PATRICK GLEN
Senior Litigation Counsel

JA97

                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA

J.G.G., et al.,
                                        Civil Case
                 Plaintiff(s),          No. 25-00766 JEB
          v.
                                        Washington, D.C.
DONALD J. TRUMP, et al.,
                                        March 15, 2025
                 Defendant(s).

-----------------------------------------------------------

                    MOTION HEARING HELD VIA ZOOM
              BEFORE THE HONORABLE JAMES E. BOASBERG
                UNITED STATES DISTRICT CHIEF JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S):   Lee Gelernt, Esquire
                        Daniel A. Galindo, Esquire
                        American Civil Liberties Union
                        125 Broad Street
                        18th Floor
                        New York, New York 10004

                        Skye Perryman, Esquire
                        Somil Trivedi, Esquire
                        Sarah Rich, Esquire
                        Democracy Forward Foundation
                        P.O. Box 34533
                        Washington, D.C. 20043


FOR THE DEFENDANT(S):   Drew C. Ensign, Esquire
                        United States Department of Justice
                        950 Pennsylvania Avenue Northwest
                        Washington, D.C. 20530


REPORTED BY:            Tammy Nestor, RMR, CRR
                        Official Court Reporter
                        333 Constitution Avenue Northwest
                        Washington, D.C. 20001
                        tammy_nestor@dcd.uscourts.gov

JA98

The following proceedings began at 5:00 p.m.:

THE COURTROOM DEPUTY:  We are here today for a motion hearing in Civil Action 25-766, JGG, et al. versus President Donald Trump, et al.

Beginning with counsel for the plaintiff, please state your name for the record.

MR. GELERNT:  Good afternoon, Your Honor.  Lee Gelernt for the plaintiffs from the ACLU.

THE COURT:  Good afternoon.

MR. GALINDO:  Good afternoon, Your Honor.  Daniel Galindo for the plaintiffs from the ACLU.

THE COURT:  Thank you.

MS. PERRYMAN:  Good afternoon, Your Honor.  Skye Perryman for the plaintiffs from Democracy Forward Foundation.

THE COURT:  Welcome.

MR. TRIVEDI:  Somil Trivedi from the Democracy Forward Foundation for the plaintiffs.

THE COURT:  Thank you.

MS. RICH:  Good afternoon, Your Honor.  Sarah Rich for the plaintiffs, also from Democracy Forward Foundation.

THE COURT:  Thank you.  Nice to see all of you.

THE COURTROOM DEPUTY:  Okay.  And defense?

MR. ENSIGN:  Good afternoon, Your Honor.  Drew Ensign for the federal defendants.

THE COURT:  Thanks, Mr. Ensign.

Okay.  So first, apologies for my attire.  I went away for the weekend and brought with me neither a robe nor tie nor appropriate shirt, so thank you all for being appropriately attired and hope you will forgive my casual ones.

Thanks also for everybody's availability on such short notice.  Again, I only learned of this case first thing this morning, and I know everybody has been working hard to get up to speed on it since that time.

So I have a few -- just a couple preliminary points and questions, and then we will move forward.

So the first is I was told first thing this morning that at least one of the named plaintiffs was at that point being placed on a plane or imminently being placed on a plane to be deported, and my ruling this morning was, because I was not aware of the issuance of any proclamation and I don't think one had been issued at the time I ruled, my ruling was based on my belief that under the INA, there was no authority to immediately deport folks who were named plaintiffs.

So my ruling was not a preventive ruling related to the AEA because I didn't believe it had been -- there had been a proclamation at that time.  I now see that there has been a proclamation issued.

JA100

Mr. Ensign, do you have a time of day that that was issued you can put on the record?

MR. ENSIGN:  I do not, Your Honor.  We are happy to look into that and get back to you.  I know it was just put on the presidential website about an hour ago.

THE COURT:  But fair to say this afternoon?

MR. ENSIGN:  Your Honor, I don't know the answer to that question.

THE COURT:  Okay.

MR. GELERNT:  Your Honor, I apologize for interrupting.  This is Mr. Gelernt.  My understanding from the proclamation is that it was signed yesterday.  It may not have been made public until today, but that it was signed and, I guess, kept secret until today.

THE COURT:  It's an interesting question of when it is effective if it's not published.  Thank you for that. But just making clear that my ruling was INA-based this morning.

Okay.  The second question which I think the plaintiffs have raised in alerting my chambers to the proclamation is that they expected planes to be departing within the last couple of hours.

And so I will ask you, Mr. Ensign, if any of the named plaintiffs are, in fact, on any plane that has departed?

JA101

MR. ENSIGN: Your Honor, I don't know specifically as to particular planes, but we have confirmed with the clients that these five plaintiffs that are named, the individual named plaintiffs that are a subject of the TRO, will not be removed during the course of that 14 days.

THE COURT: Okay. But then I would assume that means that they are either not on the planes or that they will not be removed from the planes and will be brought back once the planes land in El Salvador. Is that fair?

MR. ENSIGN: Your Honor, I don't know the status of the planes. If there are removal flights, the five would not be on them.

THE COURT: Okay. I'm sorry. Was it not six, Mr. Gelernt?

MR. GELERNT: It was five, Your Honor.

THE COURT: Sorry. Okay. All right. So thank you, Mr. Ensign.

And I also understand just from looking at the docket that the government has appealed my TRO ruling. And that's obviously your right, Mr. Ensign. So I won't go into, because I don't think I have jurisdiction given the appeal, to reargue the TRO ruling, but what we will just look at today is the class question. And then if I do, in fact, certify provisionally, then we can talk.

I think what that would likely mean is that the

JA102

plaintiffs could then seek a TRO on behalf of a certified class, and then we can talk about how we want to go from there. I think we are having an echo.

THE COURTROOM DEPUTY: It is. I am having difficulty with the public line. It may be too many people on here. I'll keep it as long as I can, Your Honor.

THE COURT: Okay. Thank you.

So let me ask the government then what your position is regarding the class issue only.

MR. ENSIGN: Your Honor, we oppose class certification. The principal reason is one of venue and authority. Under -- I think we are getting the echo again.

THE COURT: We are, but let's try to go ahead, and as annoying as it is, let's see if we can push through with the echo.

MR. ENSIGN: Thank you, Your Honor. Will do.

These are claims that plaintiffs have brought that fundamentally sound in habeas. When the supreme court considered the last AEA case in Ludecke versus Watkins, 355 U.S. 160, these were all considered within the scope of habeas. And because this is a habeas case, because it sounds in habeas and because plaintiffs have specifically included a habeas claim, I believe it's Count 9 of their complaint, then the venue rules of habeas apply.

Under the supreme court decision in Rumsfeld v.

JA103

Padilla, venue was only appropriate for a habeas case solely in the location where the person is being detained or where (unintelligible), and so because of that --

(There was an interruption by the court reporter.)

THE COURT:  Sorry, Tammy, the court reporter.

I think when there's an echo, I think you might have to sort of proceed sentence by sentence and pause and let the echo go through and then continue.

And, Tammy, we'll hope that will be satisfactory.

So, Mr. Ensign, again, the issue is venue.  You are saying that it must be brought where the warden or the -- typically prisoner cases, it's the warden, but here, whoever is actually detaining the plaintiffs.  Is that correct?

MR. ENSIGN:  That's correct, Your Honor.  In addition, this Court has recognized, and I believe Your Honor in the Vetre versus Sessions case, which is 316 F. Supp. 70, that when habeas is available, then that is an -- that's an adequate alternative remedy that precludes APA claims under Section 702, and so all the claims would have to be considered under habeas.

And because of that, you know, to the extent that there could ever be a class, it could only be solely within a single judicial district of people there.  And of course, it would still have to satisfy all the other requirements of classes, but certainly that venue issue precludes this Court

JA104

certifying a nationwide class.

THE COURT: Okay. Thank you very much.

Mr. Gelernt, can you respond to the venue question?

MR. GELERNT: Sure, Your Honor. I think initially -- I guess I don't have an echo, so I can continue.

Initially we have -- we think this conflates the merits. And you know, you issued a TRO. You found you had jurisdiction to issue a TRO. So we think that's sufficient at this point. I think we are veering pretty far into the merits.

But just taking it on those terms, for one thing, we filed both a habeas and APA 1331. And you can challenge the Enemy Aliens Act without habeas. There are cases like Clark that do that. But also, for habeas, I would also say that the immediate custodian rule does not apply because this is not core habeas asking for relief. It's to stop the transfer and challenge the constitutionality.

So both because we haven non-habeas fonds of jurisdiction and because the immediate custodian rule doesn't immediately apply in this case, I think that's more than sufficient for this Court to proceed.

THE COURT: So, Mr. Ensign, Mr. Gelernt is right that they are not seeking release, so tell me why you think your venue argument is still appropriate.

MR. ENSIGN: Your Honor, because these claims

inherently sound in habeas.  Plaintiffs recognize that themselves by bringing a habeas case.  The supreme court itself has recognized that it's appropriate to consider this in habeas when it did so in the Ludecke case.

And where habeas applies, it displaces a lot of other law including specifically the APA, as this court found in the Vetre case.  It also displaces even statutory causes of action.  You know, Heck v. Humphrey, for example, even though you would otherwise have a 1983 suit for most constitutional claims, the second they sound in habeas, habeas, you know, cuts off 1983 entirely and forces you to go through the route of habeas.

And so the habeas rule has some real teeth and is ultimately an attack on the authority of wardens to turn people over, you know, to be removed, and they would -- I mean, what they are seeking ultimately is the equivalent to telling the immigration, equivalent to a warden, you may not release these people to be removed from the country.

THE COURT:  Isn't that the exact opposite of habeas where you just said you are ordering them you may not be released as opposed to habeas which is you must be released, right?

MR. ENSIGN:  Your Honor, it is -- in this application, it is a little odd, but certainly the way the supreme court has considered it previously, like,

JA106

specifically challenges to the AEA sounded in habeas. And that was an utterly uncontroversial aspect of the Ludecke decision. Even though it was five-four about, you know, the intricacies of the AEA, it nonetheless was uncontroversial there that this was properly heard as a habeas claim.

THE COURT: Do you want to respond to that, Mr. Gelernt?

MR. GELERNT: Your Honor, I would just say that the fact that some cases can be brought in habeas certainly doesn't preclude them being brought under 1331 and the APA and this court. And Your Honor has opinions along those lines with detainees outside of the district in Damus and I think Heredia Mons as well.

As Your Honor said, this is not a core habeas. We certainly can proceed in habeas in this district, but we don't need to proceed in habeas. We are not aware of any case that says we cannot challenge the Alien Enemies Act on non-habeas grounds.

THE COURT: All right. Well, this is obviously an issue that has not been briefed.

I should have said earlier at the beginning of the hearing, although it is implicit, that there is no broadcasting or recording of this hearing, and I am being informed that it is, in fact, being broadcast by a certain individual. That's in violation of the court's rules. That

JA107

can be punishable by contempt.  You may not broadcast or record any court proceedings.  And further -- I am getting further information we will shut down the public line.

THE COURTROOM DEPUTY:  Your Honor, I did make that statement.

THE COURT:  Thank you.

THE COURTROOM DEPUTY:  You're welcome.

THE COURT:  So I think it would be very helpful for me to get some expedited briefing on this.  And I know that given the circumstances, the plaintiffs are justifiably concerned about imminent deportation.

Can you tell us, Mr. Ensign, are imminent deportations and removals under this proclamation planned? When I say imminent, I mean in the next 24 or 48 hours.

MR. ENSIGN:  Your Honor, I don't know the answer to that question.  We can certainly investigate that and report that back to you.  But I don't know that -- the answer to that.  I know what plaintiffs have said to the clerk's office.  I don't yet know -- have an ability to confirm that or, you know, contest that.

THE COURT:  Okay.  So how soon can you get that information?

MR. ENSIGN:  Your Honor, I can certainly talk to them ASAP and see.  You know, it is Saturday.  I will try to get people as quickly as possible and find out that information.

JA108

You know, I think we were certainly planning on opposing the TRO by tomorrow night in advance of the hearing on Monday if that's still going forward.  We can certainly include it in that filing if that works.

THE COURT:  So, Mr. Gelernt, do you want to propose a schedule for me?  I think I would like the -- we should probably have the government first respond saying there is -- arguing just on the venue issue of class certification, and then you can respond to that and I would rule quickly.

MR. GELERNT:  Your Honor, a couple of things.  One is that I recognize it's Saturday, but on the other hand, the government appears to be moving planes very rapidly to El Salvador with hundreds of people.  So we hope that in the next five minutes, counsel for the government can get an answer to that.

Our understanding from people on the ground, from different sources, is that planes are going right now taking Venezuelans to El Salvador and may be ending up in a Salvadoran prison.  Not only will that divest this Court of jurisdiction, but I think those people are in real trouble, Venezuelans put into a Salvadoran prison.

So we had two flights that we believe were scheduled for this afternoon that may have already taken off or during this hearing, so I think in the next five minutes.

JA109

And we would further ask Your Honor that you issue a class-wide TRO pending the briefing, and we will be prepared to get the venue briefing in as soon as the government can do it and you would like. But I think there is so much urgency here and there is so much harm at stake and this Court's jurisdiction is at stake.

And just one clarification, Your Honor, we don't believe we would need to amend the TRO because the TRO did ask for a class-wide TRO. The complaint was a class complaint. We have class papers, and the TRO was seeking a class TRO.

So we would respectfully urge this Court to issue a class TRO now to avoid any more harm and then brief the venue as fast as the government would like. And we would respond in eight hours or so or ten hours or whatever the Court thinks is appropriate.

THE COURT: I think it would probably be helpful if we adjourned this hearing briefly and let Mr. Ensign do some digging and then returned and talked about this further. So why don't we -- can we adjourn this hearing until 6:00 Eastern Time, at which time, Mr. Ensign, I will want to know, have planes, in fact -- is deportation of people under the proclamation pursuant to the AEA in motion now and will it be for the next 48 hours, because that would require a more immediate decision. All right, Mr. Ensign?

MR. ENSIGN:  We can do that, Your Honor.  I mean, briefly on the irreparable harm point, as the supreme court said in Nken, Although removal is a serious burden for many aliens, it's not categorically irreparable as some courts have said.  It is accordingly plain that the burden of removal alone cannot constitute the requisite irreparable injury.

THE COURT:  I think they have made out more than just removal.  I think they have made out the harm that will befall the individual plaintiffs upon removal.

So what we will do is we will adjourn the hearing until 6:00 p.m. Eastern Time.  We will resume the hearing at that point and get information from Mr. Ensign, and then I will also try to have a better sense of whether I am prepared to -- again, it could be issuing a separate TRO covering this provisional class or not.

Okay.  Any objection to that, Mr. Gelernt?

MR. GELERNT:  No, Your Honor.  Thank you.

THE COURT:  Good.

Mr. Ensign?

MR. ENSIGN:  No, Your Honor.  We will proceed as you instruct.

THE COURT:  Okay.  See everybody in 38 minutes.  Thanks.

THE COURTROOM DEPUTY:  This honorable court is

JA111

adjourned until 6:00 p.m.

(The hearing adjourned at 5:22 p.m.)

THE COURT:  Thanks, Nikki.

Welcome back, everybody.  I don't think we need to have everyone identify themselves again.  I've got the same counsel present.

Mr. Ensign, let's hear your report.

MR. ENSIGN:  Your Honor, unfortunately I don't have many details to share.  I have talked to the clients who let me know the sort of operational details as to what is going on with raised potential national security issues, particularly ones if discussed with a public line.  So I do not have additional details I can provide at this time.

They raised that we may be able to provide Your Honor additional details in an in camera hearing if we were to --

THE COURT:  Fine.  Maybe what we should do -- Nikki, can we either disconnect the public line, or can you put us in breakout rooms?  Can we disconnect and then reconnect the public line, or can we go into a breakout room?

THE COURTROOM DEPUTY:  I can just remove the public line right now.

THE COURT:  And then can you reinstate it?

THE COURTROOM DEPUTY:  I believe so.  If it disconnects, I can call it without interrupting as well. It's different than the courtroom.

JA112

THE COURT: Okay. So we are going to disconnect the public line for this in camera proceeding, and then we will come back.

(The public line was disconnected.)

THE COURT: Okay. The public line is disconnected.

Mr. Ensign.

MR. ENSIGN: Your Honor, I am still trying to get additional details. I don't -- we would have to sort out what can still be provided in camera. They suggested that as a way to potentially provide some details, but I do not personally have those right now.

THE COURT: So you have no details for us in camera?

MR. ENSIGN: Not at this time, Your Honor. We would have to figure out what could be provided in camera.

THE COURT: Okay. Well, when is that going to be determined?

MR. ENSIGN: I don't know. I have been trying to get those details, and I don't presently know when I would be able to get that. I'm certainly trying to get that information, but that is not something, the details, that I know.

MR. GELERNT: Your Honor, I'm sorry.

THE COURT: Sure. Go ahead.

MR. GELERNT: Your Honor, what we understand is that two flights went to El Salvador this afternoon, one very

JA113

recently, and there's another one, we are not sure where it's scheduled to go exactly.  It may be Honduras.  We are not sure.  But it's supposed to leave at 6:23.

THE COURT:  All right.  Let's reconnect the public line.

THE COURT REPORTER:  Your Honor, is the in camera portion of the hearing under seal?

THE COURT:  I trust not, Mr. Ensign, since we didn't hear anything.  Any reason we need to put that under seal, Mr. Ensign?

MR. ENSIGN:  No objection, Your Honor.

THE COURT:  Okay.  So no, Tammy.

(The public line was reconnected.)

THE COURT:  All right.  It looks like it's -- is it back up, Nikki?

THE COURTROOM DEPUTY:  Yes, Your Honor.

THE COURT:  Okay.  So for the public, there were no representations that were able to be made in our private session, so the public has not missed anything.

All right.  So, Mr. Gelernt, why don't you just repeat your statement.

MR. GELERNT:  We understand that two flights went to El Salvador this afternoon; one very recently, and then another flight is scheduled for 6:23, we believe, to Honduras, but we are not entirely sure.  And the flight

destinations have changed for these past two flights.  But we believe it's scheduled for 6:23, so only in a matter of minutes.

THE COURT:  So, Mr. Ensign, you can't -- can you confirm that people -- you can't even confirm -- well, I guess on the public line, you're not -- and actually couldn't make any representations even privately what's happening with any flights.

So let me just go over then a few issues that we discussed earlier.  So the first is the people who would be subject to be certified as a class and then further requested TRO, Mr. Gelernt, they are, as you believe, all currently held under INA?

MR. GELERNT:  They are all in proceedings as far as we understand, and so what the government apparently is doing is using the Alien Enemies Act to circumvent the immigration laws and to remove them before they actually have a final order.  That's the case with the five plaintiffs, and that's what we understand to be happening around the country.

THE COURT:  Right, but what I'm trying to look at is the venue and habeas question.

MR. GELERNT:  Right.

THE COURT:  And so I guess -- it seems that you are not seeking to challenge the fact or duration of their

confinement.  Is that true?

MR. GELERNT:  That's absolutely right, Your Honor. And I think that's the critical distinction here, that it's not a core habeas challenging release.  They are not trying to get out of detention in this lawsuit.  They are going to be held in detention presumably unless they have some individual basis under the INA to get out.  This lawsuit will not allow them to be released, but it will stop their removal hopefully under the Alien Enemies Act so they can continue their proceedings under the immigration law.  So it's absolutely not a core habeas.

THE COURT:  So --

MR. GELERNT:  I apologize, Your Honor.  I was just going to add the point --

THE COURT:  Go ahead.

MR. GELERNT:  -- even if it could be brought in habeas, that doesn't mean it has to be.  So your decision in RILR makes that point, Araceli.  There's a number of cases in this district.  You made the point very clearly in your IRLR decision that even if it could be brought in habeas, it doesn't have to be.

THE COURT:  Mr. Ensign, why do you think then that they are challenging the fact or duration of confinement?

MR. ENSIGN:  Your Honor, I think that this sounds in habeas for several reasons.  I think one is that because the

AEA vests all its authority, relevant authority, with the president himself and the APA can't be used to challenge presidential actions, the only claims that we are left with here are habeas claims.

We think the supreme court's decision in the 1948 case in Ludecke also indicates that this is a habeas case. And it's ultimately challenging, you know, the exercise of the authority over their person under the AEA in a way that has been recognized to sound in habeas previously.

But on top of all those things, we think that even if wasn't core habeas, it would still be subject to the habeas rule. Notably this court in the Vetre case --

THE COURT: You keep saying this court, and I don't think you mean me. Do you?

MR. ENSIGN: I actually do, Your Honor.

THE COURT: Okay. So the 316 F. Supp. 70?

MR. ENSIGN: Yes. 316 F. Supp. 3d.

THE COURT: Right. So I'm saying that F. Supp. predates my time here. Okay. Sorry. Go ahead.

MR. ENSIGN: I apologize, Your Honor. Of course when I mean the court, I mean the district for the District of Columbia.

THE COURT: Right, which I'm not bound by. So if you will distinguish, I try to do that in my opinions, if you would be so kind.

MR. ENSIGN: Absolutely, Your Honor. In the Vetre case, there were non-core habeas claims including conditions. And in that case, this court recognized, this was in a somewhat odd posture, that within DDC, that because prison condition cases could be brought in habeas, they had to be. And so similarly, because these claims can be brought in habeas, they have to be.

THE COURT: The prison condition cases, again, relate to the nature of confinement and duration of your confinement. And here, they are not arguing that they can't be confined. They are just saying they can't be removed, right?

MR. ENSIGN: Your Honor, we are using it to address whether this is core or non-core. In Vetre, a non-core habeas claim was transferred under the venue rule. So whether this is core habeas, as we have argued, and clearly where the venue rule would apply or even if this were non-core habeas, then nonetheless the venue rule still applies to it as this court has recognized.

MR. GELERNT: Your Honor, I would just say that that case involved, I think you were getting at this, but the length of someone's confinement.

THE COURT: Again, I have not gone back and reviewed that case because your citation earlier, Mr. Ensign, led me to believe it was not my case. I know IRLR is.

JA118

I guess your -- do you want to dismiss your habeas claim, Mr. Gelernt?  I don't know.  It's certainly not your primary claim.  You may have other reasons for including it.

MR. GELERNT:  Your Honor, I think if the Court felt like it needed us to dismiss the habeas in order to issue a class-wide TRO, then we are prepared to do that.  We certainly don't feel like we need it.

On the other hand, I think the Court could just hold it in abeyance.  I mean, I think that it's very clear that if you don't need to bring it in habeas, you don't have to and you can bring it -- in other words, I think Your Honor could not have been clearer in IRLR.  There are a number of cases that say that.  Otherwise, virtually every case would be brought in habeas.

THE COURT:  Again, I think this is a reasonably close question, but I've got to rule on it with essentially 40 minutes' notice given that this was first raised by the government in our hearing.  And I'm not blaming the government at all because they haven't had an opportunity to brief it.

And so as brief as my research has been at this period of time, I don't think that venue bars certification. I will, for clarity, I will grant the plaintiffs' -- first grant the plaintiffs' motion to dismiss their habeas count. So that count is dismissed without prejudice at this point.

JA119

But I do find that class certification is warranted under Federal Rule of Civil Procedure 23(a) and 23(b)(2). So I will certify a class, and the class will be -- let's talk about the definition. The plaintiffs ask for all noncitizens who were, are, or will be subject to the AEA proclamation and its implementation.

So now that we actually have a proclamation that we have been able to review, Mr. Gelernt, is there a reason to modify that class definition?

MR. GELERNT: I think certainly, Your Honor, if you want to insert the name of the proclamation and the date, that would be fine with us, or we could submit it to the Court. But I think, if I'm understanding you correctly, I think that's what you are getting at, and that would make sense.

THE COURT: Or if there's other -- that's one point, but whether there's another modification that you would make.

MR. GELERNT: Yeah.

THE COURT: Go ahead.

MR. GELERNT: I think the other point would be that it seems to be the government's position that they can begin these removals pursuant to the act without publicizing and publicize after the removals have started. So that makes us very concerned that there could be another proclamation

JA120

coming tomorrow naming a different gang, MS-13 or some other gang.

So I guess we could start with this one if Your Honor would like to proceed more slowly, but there may be a modification that could say any proclamation that names a non-state actor.

THE COURT:  Yeah, I'm just -- I appreciate that.  I feel that that's going farther than I would be prepared to go as to deal with a hypothetical --

MR. GELERNT:  Right.

THE COURT:  -- proclamation.

MR. GELERNT:  Understood.

THE COURT:  So let me ask you, Mr. Ensign.  I know you are objecting to the certification of the class, and this is a provisional certification only, but do you have concerns, if certified, with the wording, and would you propose amendments to that?

MR. ENSIGN:  Your Honor, first, just for the record, we do object to the class certification, as you know.  I am trying to pull up the specific language right now.  Candidly, it's not a question I have given thought to before.

THE COURT:  No, I understand.  I understand.  Everybody here is operating on the fly a bit.  I can tell you what the -- I think I wrote the -- the language I wrote

JA121

USCA Case #25-5452    Document #2184589    Filed: 07/22/2026    Page 126 of 401

down earlier was all noncitizens who were, are, or will be subject to the AEA proclamation.

I mean, I think -- I don't know why -- Mr. Gelernt, is there a reason we can't simply say all noncitizens who are subject to the proclamation?

MR. GELERNT:  I would prefer that we have will be, but I understand if Your Honor thinks that are covers the waterfront.

THE COURT:  I think so.  So the language would be all noncitizens who are subject to the AEA proclamation, and we will get the specifics, and its implementation.

MR. GELERNT:  And so I assume, Your Honor, that would mean that anybody who is designated a week from now, I mean, will be would cover it obviously, assuming it's going to continue designating people, so I assume that's why it is in there.

THE COURT:  Yes.  Well, when you say designated, you mean for removal?

MR. GELERNT:  Well, I think they have to say you are designated.  I gather what the government is doing is designating you as someone subject to the Alien Enemies Act, and then they can do whatever they want to them, detain them, remove them.  And so that's why the will is in there. But if Your Honor is stating on the record that are would cover anybody who in the future is subject to it --

JA122

THE COURT:  Yes.

MR. GELERNT:  Okay.

THE COURT:  Now or in the future is.

MR. GELERNT:  Right.

THE COURT:  So back to you, Mr. Ensign.  Any modification of that?

MR. ENSIGN:  No, Your Honor.  I mean, no, Your Honor. We don't believe we have a basis to dictate to plaintiffs how they would, you know, define their own class.

THE COURT:  Okay.

MR. ENSIGN:  But as to the substitution of, you know, the specific proclamation at issue, to make it specific to that, that we don't have objection specifically to that.  I would preserve, you know, our objections to -- we focused on venue, but we don't believe the other requirements of class certification have been met here.  In particular, for typicality, there may be very different claims as to those that were lawfully admitted to the United States and those who, you know, never had lawful admission.

THE COURT:  Okay.  I think, again, at this provisional time, and I guess -- what we will say is APA proclamation of March 15, 2025, and we can actually use the specific title which I see based on the text of that.

Okay.  So plaintiffs then are also seeking a TRO related to that class.  And again, so -- I'll just say a few

JA123

things here, that this is obviously a difficult question. My ruling earlier related to the INA. This is difficult for a few reasons. And again, I'm just looking at the likelihood of success on the merits. And under our circuit, the question is is there a serious legal question presented, not is there necessarily a 51 percent chance of prevailing.

And there are really sort of two issues on this. The first is does the political question doctrine or other -- or do other prudential considerations bar judicial scrutiny of the proclamation in the first place, and second, if they do not bar such scrutiny, is the proclamation illegal.

I think that the first question is harder than the second. And again, we have tried to do quick research on a very expedited time frame, and I'm well aware of the president's broad authority to apprehend, restrain, and remove noncitizens deemed alien enemies.

For example, the president has unreviewable authority to determine whether a state of war actually exists, and if so, to remove enemy aliens in the manner he wishes.

So the question is does such authority extend to other determinations within the statute such as invasion or predatory incursion or foreign nation or government. And that, unfortunately, is a question of first impression here.

We certainly looked at some of the cases like Ludecke, L-U-D-E-C-K-E, the 1948 supreme court case, in

addition to Lockington versus Smith from the hoary vintage of 1817, as well as Clark, which is the D.C. Circuit case from 1946, and Von Heyman, H-E-Y-M-A-N, Second Circuit, 1947.

These are difficult questions.  There's also a helpful law review by Professor Vladeck, V-L-A-D-E-C-K, from 2007 in the Lewis & Clark Law Review about enemy aliens, enemy property, and access to courts which sets some of these points out as well.

So I guess, Mr. Ensign, maybe you are prepared to deal with this and maybe you are not yet, but tell me why, given the lack of authority regarding the president's -- whether the president's authority extends to his determination of some of those other terms, I should hold that it does.

Again, I know this was going to be a class cert hearing and we are all racing to get up to speed on this, but I will be happy to hear you if you want to discuss that.

MR. ENSIGN:  Sure, Your Honor.  As you know, there isn't a lot of precedent on this, but what there is, you know, recognizes the quite broad discretion of the president here.

In particular, the Ludecke case arose from a circumstance where a German plaintiff, you know, was still being held under the AEA, who had a facially quite

JA125

reasonable claim, you know, that the war has ended, the war has been over for three years, what are you doing still, you know, exercising AEA authority over me.

And the court said quite clearly, like, no, this is left to the discretion of the president, and the president has determined that the war is continuing notwithstanding the fact that they are not -- you know, there is not fighting going on and that, in fact, the E-day was, I believe, more than three years in the rearview mirror at that point.

And so certainly when the supreme court reached this, it recognized the very broad discretion of the president. There's other language in that case towards the tail end of it that I unfortunately don't have at my fingertips but again underscores the extent to which discretion is vested in the president as to these sorts of questions.

THE COURT:  Right.  But isn't -- and again, read broadly, Ludecke certainly supports you, and certainly even read narrowly, I understand the courts can't question the president's power to remove enemy aliens or even his determination that a state of war continues to exist, but it did seem to accept that courts could hear challenges to the construction and validity of the statute and in that case challenges raising whether the person restrained is, in fact, an enemy alien 14 years of age or older.  That's at

JA126

page 171, footnote 17.

So read more narrowly, why doesn't it leave open the question that judicial review is available to look at whether certain preconditions have been met for the president to invoke the statute?

MR. ENSIGN:  Your Honor, I think the nature of the claims here are ones that are more of the sort that are the political questions.  For example, plaintiffs are very much advancing the concept that, you know, war is not something that can be engaged in or, you know, is a concept that has relevance as to subnational actors.  I think that is a question that has been reserved for the political branches.

In particular, for example, the Congress in 2001 gave the president authorization of war powers to use against subnational actors such as Al-Qaeda.  Here, we have TDA has specifically been designated as a foreign terrorist organization.  So you have a recognition that the war powers do extend to this sort of context as to which plaintiffs are advancing a claim.

And so I think that sort of claim that plaintiffs are raising here sounds in that sort of core political question that has been reserved for the political branches.

THE COURT:  Mr. Gelernt, do you want to respond to that?

MR. GELERNT:  I think Your Honor made the point that

JA127

I was going to make.  I mean, this is ultimately a separation of powers question.  What was going on in Ludecke was whether the war was over, and it was a declared war by Congress, and Congress has not stated that the war was over.  I think that's what the supreme court was ultimately saying.

I don't read Ludecke as saying that the preconditions, the statutory preconditions, can't be challenged; otherwise, there would be no end to what the executive branch could do.  This is a delegation from Congress.  There are very specific terms.  And we read Ludecke as saying that the construction of the statute can be challenged and whether someone fits within the proclamation can be challenged.  I think Ludecke was ultimately, again, about separation of powers.

THE COURT:  And then it would seem that Clark and Von Heyman are better cases for you even though they are -- they precede Ludecke, Mr. Gelernt.  Do you agree with that?

MR. GELERNT:  Your Honor, I don't want to get ahead of myself.  I have not looked back on those cases before this hearing.

THE COURT:  Okay.

MR. GELERNT:  I think there are certainly additional cases.  I was simply responding to Ludecke.  But I think there are many other cases that allow -- that challenge the statutory preconditions.  I think that's, you know, sort of

JA128

fundamental separation of powers law.  This is not sort of the president invoking his inherent authority under the constitution.  We don't think that he would have the power to do it anyway.  But this is the president invoking a specific statutory provision that Congress has laid out very clear guidelines, and I think it would be fundamentally inconsistent with separation of powers for this Court not to be able to review whether those preconditions were met.

THE COURT:  Let me ask you, in looking at the language of the proclamation, why on the merits, if I got to it and found it's not a political question, why don't you think, Mr. Gelernt, that the proclamation suffices to say that TDA is part of the Venezuelan government that is involved in an invasion or predatory incursion?

MR. GELERNT:  Well, Your Honor, I think the government -- I think the proclamation doesn't even go as far as actually stating that TDA is a foreign government.  And the language is pretty clear in the statute that you need a foreign government.  As Your Honor knows, the statute has only been invoked three times in the history of the country and always during a declared war, the War of --

THE COURT:  Let me interrupt.  So it says that, and I'm reading from the proclamation, Venezuelan national and local authorities have ceded ever greater control over their territories to transnational criminal organizations

JA129

including TDA.  The result is a hybrid criminal state that is perpetrating an invasion of and predatory incursion into the United States.

So why don't you think that's a foreign nation?

MR. GELERNT:  Well, I think there's a lot of law, and we will be prepared to reply to the government's submission at the TRO and talk more about it at the TRO on the merits, but I think there is a lot of law about what constitutes a foreign government.  And I don't think the United States recognizes TDA as a foreign government.  They recognize Venezuela as a foreign government.  I think that's the historic understanding of the statute.

We also would take issue with the fact that we think the Court certainly can review whether immigration constitutes some kind of invasion.  You know, it may be that the Court can't second-guess how much of an invasion a foreign government is making, that that may be a matter of degree, but certainly that sort of threshold legal question about whether immigration constitutes an invasion is something the Court can rule on.  And we know of no historical precedent that would suggest that straight migration or noncitizens coming and committing crimes constitutes an invasion within the meaning of the statute or the constitution.

THE COURT:  Mr. Ensign, do you want to respond to

JA130

that?

MR. ENSIGN:  Certainly.  A few things, Your Honor.  I think first, they are trying to draw a distinction between the statutory preconditions at issue here from Ludecke, but it was statutory preconditions in both cases.  Whether or not there's, in fact, a war was very much the issue in Ludecke.  That is one of the statutory conditions.  They are challenging others.  But it's -- they are all part of the same statutory preconditions, you know, framework, are they met or not.  And the Court just straight up deferred to the president in circumstances where a lot of people would think there was not a war.

I guess two other things I would say.  One is that this -- I think this discussion very much illustrates why additional briefing would be desirable to resolve this.

THE COURT:  No, no, absolutely.  I couldn't agree with you more.  But the question is what do we do in the interim, right?  No, I want further briefing from both sides.  I want to look at this longer.  This is not easy.  These are not easy issues.  And I appreciate everyone's diligence on such short notice.  But the question in a case like this is why shouldn't a TRO issue to maintain the status quo on difficult issues while you folks figure it out.

In other words, maybe there's some national security

JA131

or other concerns that you have that you haven't raised yet because you haven't learned of them yet that you could tell me and I would hear, but right now it seems that the status quo is keeping these folks in ICE custody but not deporting them.  And I'm not sure what the prejudice to the government is from such a determination.

I mean, tell me if I'm -- to the extent you can say anything that's not national security to respond to that.

MR. ENSIGN:  Your Honor, I think two responses.  The first is that much of plaintiffs' irreparable harm arguments were predicated on the premise that this Court would somehow lose jurisdiction if people were not -- I mean, not in D.C., but in the United States.  I think that was more a question of habeas.  Now that we are past habeas and we are really just talking about APA, I don't understand why this Court would necessarily lose jurisdiction.

THE COURT:  If they are deported?

MR. ENSIGN:  And I think second is how Nken looks at it as irreparable harm where --

THE COURT:  I think the argument -- the argument, excuse me for interrupting and I will let you respond, but the argument in part is these folks are going to be sent to Salvadoran or Honduran prisons, which were not going to be terribly receptive to Venezuelans, particularly whom you have labeled TDA, and so not only are they going to be

JA132

deported, but it's not going to be to a friendly countryside, but to prisons.  So why isn't -- don't you think that's irreparable?

MR. ENSIGN:  Your Honor, I don't think that's been established by their filings.  More generally, I would just point out that this cuts to the core of the president's Article II powers.  And so interfering with that, you know, both in the -- both in the -- this goes to foreign powers -- or foreign policy.  This goes to war powers.  This goes to immigration.  These are core Article III -- or sorry, Article II areas that -- I mean, this would cut very deeply into the prerogatives of the executive, and for that basis, we think the balance of harms are tipped sharply in our direction.

THE COURT:  So, Mr. Gelernt, do you want to respond to the irreparable harm issue?

MR. GELERNT:  Yes, Your Honor, a few things.  One is I think the Court would lose jurisdiction because it wouldn't be able to offer a remedy.

THE COURT:  Right.  Sure.  I mean, once they are out of the country, I'm not sure what I can do there.

MR. GELERNT:  Right.  So you clearly would lose jurisdiction.  I think that alone is critical.

The other point is that this is just not straight removal, as Your Honor has pointed out.  They may be sent to

JA133

El Salvador.  It seems like many of them already have been sent to El Salvador.  They are in real danger, I can't express that strongly enough, if they end up in a Salvadoran prison.  But even if they end up back in Venezuela, many of them, all of our plaintiffs and many of them, will have asylum claims, and they have been tagged now as the worst of the worst by the president, and so they will be in real danger in Venezuela.

Now, ultimately some of them may lose their asylum claims in the U.S., but they are entitled, we believe, to finishing that, and the Aliens Enemy Act can't circumvent that point.

And the government keeps bringing up the Nken case.  Nken was very clear that the court was not going to lose jurisdiction in that petition for review, that particular petition for review, but also that if there was harm like torture or persecution, then that would be irreparable harm.  The court was just making the simple point that not every deportation involves irreparable harm.  They could be removed to the UK, and there may not be irreparable harm.

So I think this goes far beyond the normal type of irreparable harm.  And even in removal cases, of course, this Court often stays things while it figures it out.  These are individuals who are in detention, so it's not as if they are roaming around.  I think for the government to

JA134

say that the delay in doing this is irreparable --

THE COURT:  Let me ask you, Mr. Gelernt, let me just interrupt you for a second.  I think there was a little bit of confusion or uncertainty in your response earlier on this point.  Is it fair that -- I think you equivocated a little bit, and I'm not saying that in a negative way, on whether all of the potential class was actually held by -- was actually currently in custody in the United States.  Do you know the answer to that?

MR. GELERNT:  We believe that everyone right now who is going to be put on flights is in custody.  I don't know that the proclamation limits it to that, but I think --

THE COURT:  So let me ask you.  So what if the class were narrowed to all noncitizens in United States custody?

MR. GELERNT:  Right.  I think two points about that. One is that would solve the immediate problem of them being put on planes, because if they are not in detention, they can't be put on planes.

But the other point, I think, in terms of irreparable harm is obviously the government remains free to arrest them if they've committed an immigration violation or a criminal violation and put them in detention.  And as Your Honor pointed out earlier, we are not seeking their release from U.S. facilities.  So we are not in any way saying that the government needs to allow them to continue roaming the

JA135

streets.  But if Your Honor feels like at this stage issuing a TRO for the class of individuals who are currently in detention or will be imminently put in detention, I think that would work given that we are all moving very quickly and I know Your Honor is trying to figure this out on the fly.

THE COURT:  So back to you, Mr. Ensign.  In terms of -- so harm to the United States by a TRO of short duration regarding only people who are already in detention so they can't cause any harm within the United States and enjoin their removal from the United States, what's the harm to the government by such a status quo TRO?

MR. ENSIGN:  I mean, I think it cuts to the core of the president's authority over critical areas that have been assigned to them, that war powers, immigration, you know, conducting foreign policy, like, those are harms of, you know, significant sorts.

This is where you have an express statutory authorization, so this is a Youngstown Steel, you know, category 1 type case in our perspective.  So we certainly think there are very substantial harms.

I mean, you know, certainly we object to any TRO. Our preference would obviously be a narrower one if there is one, but we believe that any TRO impermissibly and unconstitutionally infringes upon the prerogatives of the

JA136

president, no more so here than it would have been for the supreme court in Ludecke to tell the president, you know what, you're wrong, World War II is over.

THE COURT:  Right.  And that sort of is the justiciability argument, not the balance of the equities argument, right?

MR. ENSIGN:  No, Your Honor.  I think it sounds in both.  Certainly you see it more frequently in that context, and usually where it applies, you will never get to irreparable harm because it's not justiciable.  But those sorts of harms to the executive have been recognized, you know, certainly as to anything that enjoins an act of Congress.  Maryland versus King recognizes that's irreparable harm.

The same principle applies to, you know, the injunction against the president exercising his powers both inherent in Article II and those given to him by statute such as the AEA.

THE COURT:  All right.  Any response to that, Mr. Gelernt?

MR. GELERNT:  No, Your Honor.  I think I --

THE COURT:  Right.

MR. GELERNT:  I apologize.  I just wanted two housekeeping things, but I will do that after you finish, Your Honor.

JA137

THE COURT: Okay. I am prepared to rule. Again, I think these are hard questions, close questions, and particularly hard questions on the expedited time frame that we are talking about here. But I believe that the plaintiffs have sufficiently made out and satisfied the TRO factors.

I think the hardest remains the likelihood of success on the merits because of the justiciability question. But at this point, they have certainly presented a serious question that this is justiciable because it's outside of what Ludecke talked about, and that once it is justiciable, I think they have certainly presented a serious question that the president's proclamation is not legal under the AEA, or a different way of saying it is that the AEA does not provide a basis for the president's proclamation given that the terms invasion, predatory incursion really relate to hostile acts perpetrated by enemy nations and commensurate to war.

Also the terms nation and government do not apply to non-state actors like criminal gangs. And the statute doesn't refer in my interpretation to unauthorized presence of individuals here including individuals who have entered illegally.

And so as a result, I don't think the AEA provides a basis for removal under this proclamation.

I think on the other three factors, the plaintiffs have an easier time.  I think there's clearly irreparable harm here given that these folks will be deported and many or a vast majority to prisons in other countries or even back to Venezuela where they face persecution or worse.

Again, based on the record that I have, balance of the equities, I think is reasonably straightforward inasmuch as a brief delay in their removal does not cause the government harm, and I haven't heard any harm from the government beyond general infringement on presidential powers which, again, I don't take lightly, but I think that's more of an issue that relates to the justiciability than it does to the balance of the equities.  And again, the public interest in a case like this runs with the factors I have already mentioned.

So I find that a TRO is appropriate for the class members, and it would be to prevent the removal of the class for 14 days or until further order of the Court.  And the class will be all noncitizens in U.S. custody who are subject to the proclamation of March 15, 2025 and its implementation.

And I will issue a minute order memorializing this so you don't have to race to write it down.

So we need to talk about where we go from here because I want to revisit this after some more briefing.

USCA Case #25-5452    Document #2184589    Filed: 07/22/2026    Page 144 of 401

And again, these are hard questions, and I may end up coming out the other way on some of them after I have had more time to think about them and hear from both sides.  But what I am tasked to do today is to make the best ruling I can under the law and the circumstances.

And particularly given the plaintiffs' information unrebutted by the government that flights are actively departing and plan to depart, I do not believe that I am able to wait any longer and that I am required to act immediately, which I have done so.

So, Mr. Ensign, the first point is that I -- that you shall inform your clients of this immediately, and that any plane containing these folks that is going to take off or is in the air needs to be returned to the United States, but those people need to be returned to the United States. However that's accomplished, whether turning around a plane or not embarking anyone on the plane or those people covered by this on the plane, I leave to you.  But this is something that you need to make sure is complied with immediately.

We need to set briefing and hearing schedules. Otherwise, Mr. Gelernt, did your housekeeping matters relate to those or something else?

MR. GELERNT:  No, they didn't, Your Honor.

THE COURT:  So do you want to raise those now?

MR. GELERNT:  Oh, they were very, very small.  One is

JA140

that of the two flights I mentioned that took off this afternoon, I had said that both went to El Salvador.  We are now hearing that maybe only one went to El Salvador, and one may have gone to Honduras.  I just wanted to correct the record.

THE COURT:  Again, just so we are clear, if planes have already landed and discharged their occupants, aside from the five plaintiffs I enjoined earlier, then this order -- I don't have jurisdiction to require their return.

MR. GELERNT:  Right.  And the other thing was also very small.  It's just we would just -- if Your Honor is going to use March 15 as the date, just to say that it was published on the 15th, but we do think it was a March 14 order because that's when it was signed by the president.

THE COURT:  Well, I will be sure to cite the title so there won't be any confusion.

MR. GELERNT:  Thank you, Your Honor.

THE COURT:  Okay.  So, Mr. Ensign, I want to hear from you since you are now the party being restrained what you would like to do in terms of briefing and hearing.  I had set a hearing for Monday.  Given what's now happened, that's not in stone, so what would you like?

MR. ENSIGN:  Your Honor, offhand, I think we would be prepared to file a brief Monday night.  We could potentially do so earlier, but in particular, many of the people subject

JA141

to this order, many, most, or all of them are incredibly dangerous individuals, and so we would like to be able to develop that as appropriate to --

THE COURT:  No, given -- let me just say, as I said, you are the one being restrained, so I will give you as much time as you want because you are the one now who's being disadvantaged, so it's your motive to expedite.

MR. ENSIGN:  Thank you, Your Honor.  Could we tentatively set, you know, Monday night, and then we will inform the Court if we think we need additional time, and then we would ask that the plaintiffs' response be on a similarly expedited basis given that the government is now under a TRO.

THE COURT:  Okay.  So March 17, and that will give you until midnight for the government's opposition, and so this will be, again, to their -- I guess your brief then would be to -- I think your brief would be to vacate the TRO, which, as opposed to an opposition to their request, it should be, I think, to vacate the TRO.

And then the government can -- I'm sorry, the plaintiffs then, I will give you the same amount of time, 48 hours till the end of March -- till March 19 to oppose.

And then for a hearing, we could do Friday, the 21st. Again, because I will need time to review this myself, could we do 2:00 or 2:30 on the 21st, Mr. Gelernt?  And this,

JA142

again, can be by Zoom.

MR. GELERNT:  2:30 works in person or Zoom, Your Honor.

THE COURT:  Mr. Ensign?

MR. ENSIGN:  That should work for us, Your Honor.

THE COURT:  Okay.  I will say 2:30.

So I'm vacating the March 17 hearing.  It will be March 21 at 2:30.

Okay.  So I will issue a minute order memorializing all of this.  And again, it will be -- Mr. Ensign, it's going to be to vacate the current TRO, because the other TRO is on appeal, so it won't be obviously the reason -- well, the reason is somewhat different because now the proclamation has been filed.  But I do not have jurisdiction to act on the prior TRO, so this would be for the current TRO.

MR. ENSIGN:  Understood, Your Honor.  And one point related to that if I might.

THE COURT:  Sure.

MR. ENSIGN:  Would this TRO apply to aliens that otherwise have final orders of removal, because from our perspective, that would be an independent basis to effectuate their removal.

THE COURT:  Right.

MR. ENSIGN:  And the 1252 jurisdictional bars on this

JA143

Court would also apply if --

THE COURT:  Right.  Yes.  No, I think that that's fair.

I would think not, Mr. Gelernt.

MR. GELERNT:  Your Honor, if they are not removing someone based on the Alien Enemies Act but based on some other authority, it wouldn't fall within this jurisdiction.

THE COURT:  Right.  So yes, Mr. Ensign, I agree.

MR. ENSIGN:  Okay.

THE COURT:  Anything else, Mr. Gelernt?

MR. GELERNT:  No, Your Honor.

THE COURT:  Mr. Ensign?

MR. ENSIGN:  No, Your Honor.

THE COURT:  All right.  Again, thanks, everyone, for your diligent work.  I will issue the order, and we will see you on Friday.  Thank you.

MR. GELERNT:  Thank you, Your Honor.

MR. ENSIGN:  Thank you, Your Honor.

(The hearing concluded at 6:53 p.m.)

- - -

JA144

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

3/16/25                    s/ Tammy Nestor
                           Tammy Nestor, RMR, CRR
                           Official Court Reporter
                           333 Constitution Avenue NW
                           Washington, D.C. 20001
                           tammy_nestor@dcd.uscourts.gov

JA145

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

J.G.G., et al.,

                               Civil Case
              Plaintiff(s),    No. 25-00766 JEB
       v.
                                Washington, D.C.
DONALD J. TRUMP, et al.,

                                March 17, 2025
              Defendant(s).

---------------------------------------------------------

HEARING
BEFORE THE HONORABLE JAMES E. BOASBERG
UNITED STATES DISTRICT CHIEF JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S):  Lee Gelernt, Esquire
                        Daniel A. Galindo, Esquire
                        American Civil Liberties Union
                        125 Broad Street
                        18th Floor
                        New York, New York 10004

                        Skye Perryman, Esquire
                        Somil Trivedi, Esquire
                        Sarah Rich, Esquire
                        Bradley Girard, Esquire
                        Democracy Forward Foundation
                        P.O. Box 34533
                        Washington, D.C. 20043

                        Arthur B. Spitzer, Esquire
                        Scott Michelman, Esquire
                        ACLU Foundation of the
                         District of Columbia
                        529 14th Street Northwest
                        Suite 722
                        Washington, D.C. 20045

JA146

Government.

MR. KAMBLI:  Good afternoon, Your Honor.  Abhishek Kambli for the United States.  And I have seated with me August Flentje for the United States as well.  And we will be representing all defendants.

THE COURT:  Great.  And I'm sorry.  Can you just spell your last name for me.

MR. KAMBLI:  Yes, Your Honor, Kambli, K as in kilo, A as in alpha, M as in Mike, B as in bravo, L as in Lima, I as in India.

THE COURT:  Thanks so much.  And welcome to you and Mr. Flentje.  Thank you.

Okay.  So the purpose of this hearing today is not to address the merits of my TRO decisions on Saturday which involved the interplay of complex legal doctrines that we have discussed.  Those TROs are both on appeal.  And I will also, absent a stay from the court of appeals, be considering them again in our Friday hearing after getting briefing from both sides and having more than a few hours to consider the questions, as was the case Saturday.

Now, I know the government has just asked the court

of appeals to stay this hearing itself and asked for me to be removed from the case.  I haven't heard that they have done so.  Mr. Kambli, have you?

MR. KAMBLI:  I have not, Your Honor.

THE COURT:  Okay.  Then we will go ahead.

Now, I want to focus here on the time lines involved and also to get a sense of numbers of people here.  And again, I just want to obtain some facts here.  I'm not planning to issue any rulings about the government's conduct today.  It's just to get information.

And I will give -- I want to hear from the government, but if the plaintiffs have reason to disagree with the facts the government gives me, I will let you have a chance, Mr. Gelernt.

So, Mr. Kambli, why don't you come to the podium then.

So let me -- let's start with the question of is it still true, as Mr. Ensign represented on Saturday, that the five individual plaintiffs in the suit who are subject to the first TRO are still in the United States?

MR. KAMBLI:  Yes, Your Honor.  That is what we represented, and that is what I have been told is true.

THE COURT:  I'm just confirming.  Great.

So the first sort of basic question that I wanted to ask, and you have given, I think, a response in your most

recent filing this afternoon, but just to confirm was, how many planes departed the United States at any point on Saturday carrying any people being deported solely on the basis of the proclamation?

MR. KAMBLI:  Your Honor, as we stated in our motion in response to vacate this hearing, those are operational issues, and I am not at liberty to provide or authorized to provide any information on how many flights left.  The information that I am authorized to provide is that no planes took off from the United States after the written order came through.

And the other information that I can relay is that the two planes that the plaintiffs cite in their filing, the timing of whether it was during the verbal order or the written order does not have any material bearing based on the time lines that they have given.

But that is the only information that I am authorized to give based on national security concerns, diplomatic concerns, and that is all I can provide as far as facts.

THE COURT:  Okay.  Well, let's talk about that for a minute.  First of all, I think you did represent in your most recent filing, and that seems to be what you are saying here today, that the third flight that the plaintiffs identified, and that's the one that the plaintiff identified as having departed from Texas at 7:37 p.m. and landing in

JA149

Honduras at 9:46 p.m., that's the one that your pleading at footnote 1 on page 3 says, that flight carried detainees who were removable on grounds other than the proclamation and is, therefore, irrelevant.

So what you are saying is that anybody on that plane that left after my written order was not removed from the United States on the basis of the proclamation?

MR. KAMBLI:  That is my understanding too, Your Honor.

THE COURT:  Okay.  So then the question is, as to the other flights, and so the plaintiffs identify two, and you say it here in the pleading, you refer to two flights.  I'm sorry.

So I know you mentioned two flights that the plaintiffs refer to because they give times, one leaving Texas at 5:26 p.m. and one leaving Texas at 5:45 p.m.  So you are saying that there are more than two, or you are not stating whether there are or are not more than two?

MR. KAMBLI:  Your Honor, I'm not at liberty to disclose anything about any flights.  And the only reason I mentioned those two is because those were two that plaintiffs explicitly stated.

THE COURT:  Okay.  So you are saying you can't mention them publicly?

MR. KAMBLI:  I cannot mention them in a public

setting, and I don't have the information on any other flight that I can represent.

THE COURT:  Okay.  We can put the husher on, and you can come to the bench and tell me so nobody else will hear that information besides me.

Wait.  You just said you don't have the information?

MR. KAMBLI:  Your Honor, the only information that I am authorized to disclose at this point --

THE COURT:  Wait.  To disclose to whom?  To anybody including me?

MR. KAMBLI:  Yes, Your Honor, at this time is what's in this motion.

THE COURT:  Okay.  So what's the basis of not disclosing it to me?

MR. KAMBLI:  Your Honor, it is based on national security concerns with flight patterns and things of that sort.

THE COURT:  Okay.  So why -- hold on.  So if you are saying that it's classified, which I haven't heard that word yet, I also review classified information all the time.  In fact, as you well know, I was the presiding judge of foreign intelligence surveillance court in which capacity we only looked at classified information.

So are you saying it's classified and that's why I can't see it, or are you saying there's some other basis?

JA151

MR. KAMBLI:  Your Honor, we can discuss with the clients the possibility of an in camera review, but we would not want to disclose this information even in a closed hearing.

THE COURT:  Why are you showing up today and not having answers to why you can't even disclose it, in other words, to me?  That's the purpose of the hearing is so we can find out answers.  And again, maybe those answers are classified.  Maybe they are.  Maybe those answers are not classified, but they shouldn't be for the public.  Fine also.  But you are telling me you don't even -- you can't even tell me which of those applies?

MR. KAMBLI:  Your Honor, all I can say is that I'm authorized to say what we have said in this public filing, and to the extent that there's anything more, it's not relevant because we do believe that we complied with the court order, which is that no flights took off from U.S. territory after the written order.

THE COURT:  Yeah, but that's not -- that's another question.  That does not comply with my order.  So let's go back to the -- in other words, that's not the extent of my order.  My order is broader than that.  It's not a question of taking off from U.S. territory, as anyone who has reviewed the transcript of the hearing knows.

So what I want to know then is you are telling me --

JA152

C E R T I F I C A T E


     I hereby certify that the foregoing is an accurate

transcription of the proceedings in the above-entitled

matter.



3/17/25                      s/ Tammy Nestor
                             Tammy Nestor, RMR, CRR
                             Official Court Reporter
                             333 Constitution Avenue NW
                             Washington, D.C. 20001
                             tammy_nestor@dcd.uscourts.gov

JA153

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

J.G.G., *et al.*,

    Plaintiffs,

      v.

DONALD J. TRUMP, *et al.*,

    Defendants.

Civil Action No. 25-766 (JEB)

## ORDER

On March 18, 2025, the Court ordered Defendants to provide by noon the following day specific information regarding flights carrying individuals subject to the Court's Temporary Restraining Orders issued three days before. See Minute Order of 3/18/25. Defendants instead filed a pleading shortly before the deadline seeking to stay the Order in large part on the ground that they were considering whether to invoke the state-secrets privilege. See ECF No. 37 (Stay Motion) at 3–4. Although skeptical of the applicability of such privilege, the Court granted Defendants another 24 hours either to release the information ordered or to invoke the privilege. See ECF No. 38 (Order).

In an *ex parte* pleading delivered shortly after today's deadline, the Government again evaded its obligations. It submitted a six-paragraph declaration from the Acting Field Office Director for Enforcement and Removal Operations at U.S. Immigration and Customs Enforcement's Harlingen, Texas, Field Office, the contents of which the Government has informed the Court may be disclosed. After four paragraphs of identifying information, he

1

JA154

repeated the same general information about the flights: "On March 15, 2025, two flights carrying aliens being removed under the AEA departed U.S. airspace before the Court's minute order of 7:25 PM EDT, and before the Court's oral statements during the hearing." Decl. of Robert L. Cerna, ¶ 5. He then stated, "I understand that Cabinet Secretaries are currently actively considering whether to invoke the state secrets privilege over the other facts requested by the Court's order. Doing so is a serious matter that requires careful consideration of national security and foreign relations, and it cannot properly be undertaken in just 24 hours." Id., ¶ 6 (emphasis added).

This is woefully insufficient. To begin, the Government cannot proffer a regional ICE official to attest to Cabinet-level discussions of the state-secrets privilege; indeed, his declaration on that point, not surprisingly, is based solely on his unsubstantiated "understand[ing]." Although its skepticism concerning the suitability of such privilege expressed in yesterday's Order remains, the Court at a minimum requires an official with direct involvement to swear that deliberations of the privilege's invocation are ongoing at the level Cerna attests. It further expects such deliberations to be concluded by March 25, 2025, which only exceedingly good cause may excuse.

In addition, to avoid further delay, the Court will require Defendants to show cause on the facts that they have already disclosed as to why the failure to return the class members aboard the two earliest planes did not violate the Court's Temporary Restraining Orders. Further supplementation may be required once particulars are ultimately disclosed.

The Court, accordingly, ORDERS that:

JA155

1. By March 21, 2025, at 10:00 a.m., Defendants shall submit a sworn declaration by a person with direct involvement in the Cabinet-level discussions regarding invocation of the state-secrets privilege;

2. By March 25, 2025, Defendants shall submit a declaration indicating whether or not the Government is invoking the privilege;

3. By March 25, 2025, Defendants shall file a brief showing cause why they did not violate the Court's Temporary Restraining Orders by failing to return class members removed from the United States on the two earliest planes that departed on March 15, 2025; and

4. Plaintiffs may file any response to such brief by March 31, 2025.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: March 20, 2025

3

JA156

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

J.G.G., et al.,                    )
                                   )
          Plaintiffs,              )
                                   )
     vs.                           ) CASE NO. 1:25-cv-00766-JEB
                                   )
DONALD J. TRUMP, et al.,           )
                                   )
          Defendants.              )
_____    )


                    TRANSCRIPT OF MOTION HEARING
     BEFORE THE HONORABLE JAMES E. BOASBERG, CHIEF DISTRICT JUDGE
                    Friday - March 21, 2025
                    2:31 p.m. - 3:47 p.m.
                       Washington, DC

**FOR THE PLAINTIFFS:**
     American Civil Liberties Union
     BY:  LEE GELERNT and DANIEL A. GALINDO
     125 Broad Street, 18th Floor
     New York, New York 10004

     ACLU of the District of Columbia
     BY:  ARTHUR B. SPITZER
     529 14th Street, NW, Suite 722
     Washington, DC 20045

     Democracy Forward Foundation
     BY:  AUDREY J. WIGGINS, CHRISTINE COOGLE,
     SOMIL TRIVEDI, BRADLEY GIRARD, SKYE PERRYMAN
     and SARAH RICH
     P.O. Box 34553
     Washington, DC 20043

_____
                       **SONJA L. REEVES**
                  **Registered Diplomate Reporter**
                   **Certified Realtime Reporter**
                  **Federal Official Court Reporter**
                   333 Constitution Avenue, NW
                      Washington, DC 20001
          Transcript Produced from the Stenographic Record

JA157

plaintiffs.

THE COURT:  Okay.  Welcome to all of you.

Government?

MR. ENSIGN:  Good afternoon, Your Honor.  Drew Ensign, Deputy Assistant Attorney General, for the United States.

THE COURT:  Good afternoon.

MR. FLENTJE:  August Flentje, Department of Justice.

THE COURT:  Thank you.

MR. REUVENI:  Good afternoon, Your Honor. Erez Reuveni, Department of Justice.

THE COURT:  Thank you.

MR. WARD:  Good afternoon, Your Honor.  Brian Ward for DOJ.

THE COURT:  Welcome.

Okay.  So who will be arguing for the government?

MR. ENSIGN:  I will, Your Honor.

THE COURT:  Okay.  So, Mr. Ensign, I noticed that after signing all of the pleadings, including the ones claiming my oral ruling wasn't binding and using the kind of intemperate and disrespectful language that I can't remember seeing from the United States, that you didn't even show up for the hearing on Monday to argue the issue about compliance.  Why was that?

MR. ENSIGN:  Your Honor, I was working on the motion to dissolve the TRO, which was due at midnight that night.

THE COURT:  Okay.  It wasn't because when I said to

JA158

act on my TRO immediately, that you knew exactly what I meant?

MR. ENSIGN: No. That was not the reason, Your Honor.

THE COURT: Okay. And can I ask you now how you interpreted that statement when we had our conversation on Saturday in which I treated all parties with respect and politeness and made that clear without raising my voice, without having any edge? I made it very clear what you had do to do. Did you not understand my statements in that hearing?

MR. ENSIGN: Your Honor, I understood your statements and your directive to -- to relay your directives to the clients, which I have done.

THE COURT: So you did tell them that it was an order from me to turn the planes around, or however -- in whatever fashion you could, to bring back people to the United States? You understood that?

MR. ENSIGN: Your Honor, I can speak to my understanding.

THE COURT: That's what I'm asking.

MR. ENSIGN: As to the specifics of what I told my clients, that is potentially covered by attorney-client privilege.

THE COURT: I'm just asking what you understood. Did you think that that was hypothetical, not serious, that it was going to be modified, or did you understand that when I said "do that immediately" that I meant it?

JA159

MR. ENSIGN:  Your Honor, I understood your intent, that you meant that to be effective at that time.

THE COURT:  So then if your clients or if -- if the pleadings, which have now been filed, say that my oral ruling was not binding, that wouldn't be consistent, then, with what you understood on Saturday?

MR. ENSIGN:  Your Honor, I -- as to my understanding in that moment of what you had instructed, I understood your intent to be that what you were pronouncing would be binding.

THE COURT:  Okay.  And so, therefore, any statement to the contrary that it wasn't wouldn't be consistent with your understanding?

MR. ENSIGN:  Not in my understanding in that particular, you know, 30-minute window of time, Your Honor.

THE COURT:  All right.  So here's my other concern, Mr. Ensign, that in the hearing, you told me, the first part of the hearing, which was between 5:00 and 5:22, that you had no details on the plane flights.  Do you remember that?

MR. ENSIGN:  Yes, Your Honor.

THE COURT:  Okay.  And then we had a recess for 38 minutes for you to find details, and when you came back, even though the flights were in the air, which you all agree now, you still represented you had no details at all about those flights, correct?

MR. ENSIGN:  That's correct, Your Honor.  I did not

JA160

personally have knowledge of where the flights were or if there were flights at that moment.

THE COURT:  And so either DHS sent someone to argue the hearing who knew nothing about the facts, not the law -- that's what you're saying, that they -- no one told you any of -- anything about those flights, so you knew nothing about those flights when you appeared during that whole two hours from 5:00 to 7:00 in which the argument took place?

MR. ENSIGN:  Your Honor, I was aware that plaintiffs had submitted evidence to chambers that we were copied on identifying flights, but I didn't have any information from the government as to the status of them.

THE COURT:  And so yet, your clients had you come argue this and kept you in the dark about all of that?

MR. ENSIGN:  Your Honor, I sought the information in that window between the two hearings and was unable to secure it from my clients.

THE COURT:  I'm going to -- I'll say one other thing, Mr. Ensign, before we resume, and that is that I often tell my clerks before they go out into the world to practice law that the most valuable treasure they possess is their reputation and their credibility, and I just would ask you to make sure that your team retains that lesson.

Okay.  We're now going to move on.  We're going to move from the compliance question into the legal questions that

JA161

your order to show cause.

THE COURT:  So -- and, again, I'm not even worried about my -- I'm not talking -- you may have -- my question may have not been clear.  What I'm talking about, that you've been fully complying not with my orders, but with the law, generally, in the deportations?

I'm not saying you're ignoring my law.  This isn't a trick question.  I'm just saying, the government is complying with the law in its deportations, correct?

MR. ENSIGN:  The government is complying with the law as it understands the law to be.

THE COURT:  Exactly.  I guess -- and maybe you don't have the answers to this, but what's concerning to me is, if that's so, why was this proclamation essentially signed in the dark on Friday, Friday night, or early Saturday morning, and then these people rushed onto planes?  I mean, it seems to me the only reason to do that is if you know it's a problem and you want to get them out of the country before suit is filed.

Can you tell me a little bit about the timing of this?

MR. ENSIGN:  Your Honor, I don't have knowledge of those operational details.  Certainly, as to when the -- Your Honor asked the question previously when the proclamation was effective, and it's effective upon when being published.

THE COURT:  Right.  And that's 3:53 p.m. Saturday, right?

JA162

MR. ENSIGN:  That's my understanding, Your Honor.

THE COURT:  That's in the declaration by Mr. Cerna?

MR. ENSIGN:  That's correct.

THE COURT:  But yet -- and I'm not asking for specifics on times, but within a couple of hours, you have agreed because you say the planes cleared U.S. airspace by -- certainly by 7:00 p.m.  So within a couple of hours, all these people were put on these flights, collected, put on these flights, and the flight has taken off, right?

MR. ENSIGN:  That's my understanding of the record, Your Honor.

THE COURT:  So in other words, it's certainly true that ICE had advanced notice of this proclamation because it's impossible that this could have happened within two hours?

MR. ENSIGN:  Your Honor, I don't have specific knowledge, but that seems like a reasonable inference.

THE COURT:  Okay.  So now -- all right.  Moving to the issue again that we're talking about today.

The question, as I've said, teed up is whether the government can summarily deport people without any individualized assessment of whether they actually fall into the category of the proclamation.

So again, the proclamation says, in relevant part in Section 1, "I proclaim that all Venezuelan citizens 14 years of age or older who are members of TdA, are within the

JA163

obviously does not limit the executive branch. And so --

THE COURT: And I wasn't asking about your knowledge of the law, and I don't expect you to know everything, and in fact for you to show up at that hearing with hours notice, I would not expect -- you knew far more law than I would have expected at that time.

I'm asking about the facts. What I'm concerned about is the facts you knew or didn't know, and more importantly, what you understood me to say, what you understood my order to say. That doesn't require any knowledge of the law. It just required common sense, listening to what I said and understanding what I said. And I think you made clear here today, which I appreciate, that you did understand what I said.

MR. ENSIGN: That's correct, Your Honor. But certainly, for example, we have set forth in our papers and will do why argument under Rule 65(d) that is not an argument that I was aware of at that time, which may --

THE COURT: Right. You talk about that it was not binding until it was in writing.

MR. ENSIGN: That's correct.

THE COURT: That's what you mean. But you didn't think -- we're going around in circles, but I think you have agreed you understood what I said when I told you to have this done immediately, and you intended to comply with that, I trust.

JA164

MR. ENSIGN:  That was my understanding, Your Honor.

THE COURT:  Okay.  Thank you.  Thank you, very much.

Mr. Gelernt.  I mean, I know that you spent a lot of time, and we've all spent a lot of time on the justiciability of the AEA issues.  I would rather spend my time where I did with Mr. Ensign.

So you're not forfeiting any of those arguments. You're not waiving them.  I know you strongly pressed them, and I think they're tough arguments, both sides.  I think they're hard, the legal issues.  But what would be more helpful for me today, and then I'll give you a chance to say anything else you want, is to focus on the issues that I addressed with Mr. Ensign.  And his principal argument, through response to many of my questions, was habeas, habeas, habeas.  So let's hear you on that.

MR. GELERNT:  So a few things, Your Honor.  The first thing I would start off, and before we even get to that question, is that the government is obviously not giving people time to file habeas, so it's an illusory availability of habeas.

And I will tell the Court on information and belief, and I hope the Court will direct the government to provide this to you, we understand that the slip of paper that individuals are getting right before they're put on the plane says, "No review of this designation."  And so I hope the government will

JA165

CERTIFICATE

I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Columbia, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 21st day of March, 2025.


/s/ Sonja L. Reeves
SONJA L. REEVES, RDR-CRR
FEDERAL OFFICIAL COURT REPORTER

JA166

```
                        UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA

     J.G.G., et al.,
                                           Civil Case
                    Plaintiff(s),          No. 25-00766 JEB
             v.
                                           Washington, D.C.
     DONALD J. TRUMP, et al.,
                                           April 3, 2025
                    Defendant(s).

     ------------------------------------------------------------

                        SHOW CAUSE HEARING
                BEFORE THE HONORABLE JAMES E. BOASBERG
                  UNITED STATES DISTRICT CHIEF JUDGE

     APPEARANCES:

     FOR THE PLAINTIFF(S):   Lee Gelernt, Esquire
                             Ashley Gorski, Esquire
                             Patrick Toomey, Esquire
                             American Civil Liberties Union
                             125 Broad Street
                             18th Floor
                             New York, New York 10004

                             Oscar S. Roman, Esquire
                             American Civil Liberties Union
                              Foundation
                             425 California Street
                             Seventh Floor
                             San Francisco, California 94104

                             Skye Perryman, Esquire
                             Somil Trivedi, Esquire
                             Sarah Rich, Esquire
                             Audrey J. Wiggins, Esquire

                             Christine Coogle, Esquire
                             Pooja Boisture, Esquire
                             Democracy Forward Foundation
                             P.O. Box 34533
                             Washington, D.C. 20043
```

JA167

APPEARANCES (Cont.):   Arthur B. Spitzer, Esquire
                       ACLU Foundation of the
                        District of Columbia
                       529 14th Street Northwest
                       Suite 722
                       Washington, D.C. 20045


FOR THE DEFENDANT(S):   Drew C. Ensign, Esquire
                        United States Department of Justice
                        950 Pennsylvania Avenue Northwest
                        Washington, D.C. 20530

                        August E. Flentje, Esquire
                        United States Department of Justice
                        P.O. Box 868 Ben Franklin Station
                        Washington, D.C. 20044


REPORTED BY:            Tammy Nestor, RMR, CRR
                        Official Court Reporter
                        333 Constitution Avenue Northwest
                        Washington, D.C. 20001
                        tammy_nestor@dcd.uscourts.gov

JA168

The following proceedings began at 5:00 p.m.:

THE COURT:  Good afternoon, everyone.

THE COURTROOM DEPUTY:  Good afternoon, Your Honor. We are on the record for Civil Case 25-766, JGG, et al. versus Donald J. Trump, et al.

Counsel, please approach the lectern and identify yourselves for the record starting with the plaintiff.

MR. GELERENT:  Good afternoon, Your Honor.  Lee Gelernt from the ACLU for plaintiffs.

THE COURT:  Good afternoon.

MR. ENSIGN:  Good afternoon, Your Honor.  Drew Ensign for the United States.

THE COURT:  Thank you very much.  Okay.  Welcome, everyone.

All right.  We are here today to look into further the defendants' compliance with my TROs on March 15.  Both parties have had an opportunity to brief the issue.

Mr. Ensign, why don't we start with you.  So again, this case continues to attract public attention.  We see a full gallery here.  So I think it's worth again reiterating the points and the facts that I think you agreed to last time and that aren't in dispute, but I just want to go over those again and make sure you agree with those regarding the effect of the TRO.

So I think that, as I have said before, my TRO

opinion makes clear you agree that my TROs did not order any TdA member to be released from custody, right?

MR. ENSIGN:  That's correct, Your Honor.

THE COURT:  Okay.  And the TROs did not prevent the government from apprehending any TdA member, did they?

MR. ENSIGN:  That's also correct, Your Honor.

THE COURT:  They also did not order that the government could not deport any TdA member via regular INA procedures, right?

MR. ENSIGN:  That's correct, Your Honor.

THE COURT:  In fact, the administration this week deported TdA members using those procedures, didn't it?

MR. ENSIGN:  That's my understanding, Your Honor.

THE COURT:  Mine too.  And that's in part because TdA has been designated a foreign terrorist organization, so you can deport its members with a hearing through regular INA procedures, correct?

MR. ENSIGN:  Yes, Your Honor.

THE COURT:  So what my TROs did and all they did was order that the government could not summarily deport in-custody noncitizens who were subject to the proclamation without a hearing, right?

MR. ENSIGN:  Broadly speaking, yes, Your Honor.

THE COURT:  Okay.  And if the government wants to continue to deport these folks, they may do so, just not

relying on the AEA, right?

MR. ENSIGN:  That's correct, Your Honor, not relying on the proclamation.

THE COURT:  Exactly.  So if any of your clients or anyone in the administration continues to make statements that are contrary to what I have just said, those statements would not be truthful, isn't that right?

MR. ENSIGN:  Your Honor, if they are contrary to --

THE COURT:  Those facts that we have just agreed on, they wouldn't be true?

MR. ENSIGN:  Yes, Your Honor.  To the extent that it's contrary to things that are true, they would be false.

THE COURT:  They would, indeed.

All right.  So now let's proceed and talk about whether the government complied with my TROs issued on March 15.

Now, you maintain that DHS has been -- was in full compliance with the law during these deportations on March 15, correct?

MR. ENSIGN:  Your Honor, it is our position that the actions of the government complied with this Court's two TRO orders.

THE COURT:  Okay.  So it seems to me that there is a fair likelihood that that is not correct, and in fact, that the government acted in bad faith throughout that day.  If

you really believed everything you did that day was legal and could survive a court challenge, I can't believe you ever would have operated in the way you did.

So let's go through that and see if I'm right or you can convince me otherwise.

So let's start, when was the proclamation signed? Was it signed on the 14th or 15th?  That seemed to an issue last time.

MR. ENSIGN:  Your Honor, I believe it was signed the 14th.  That's when it's dated.  I don't have any information, you know, to contravene that.

THE COURT:  And that's what the Federal Register says, the 14th, right?

MR. ENSIGN:  I believe that's correct, Your Honor.

THE COURT:  So why was it not made public until the 15th?

MR. ENSIGN:  Your Honor, I don't know, and the record doesn't disclose that.  But a proclamation is only effective upon its announcement.  It's not effective upon its signing.

THE COURT:  So you don't think then it had anything to do with trying to put measures in place to get people subject to the proclamation removed from the country before it was possible to challenge it legally, do you?

MR. ENSIGN:  Your Honor, I don't have any information on that, and the record doesn't disclose that.  I don't know

those operational details.

THE COURT:  In fact, the president, himself, said at a news conference, I don't know when it was signed because I didn't sign it.  He said that, right?

MR. ENSIGN:  Your Honor, I have seen that reported in the news.

THE COURT:  Have you seen the actual statements at a press conference?  Have you seen that, not just as reported, but actually the statements made on tape?

MR. ENSIGN:  I have not seen the actual press conference itself.  I have seen the reporting on the press conference.

THE COURT:  And so should I do anything with those statements?

MR. ENSIGN:  No, I don't believe so, Your Honor.  I don't think that's relevant to any of the compliance issues that are presented here.

THE COURT:  Okay.  So ICE said that the proclamation was made public at 3:53 p.m.  I think that's when it was posted on the White House website.  Is that right?

MR. ENSIGN:  That's my understanding, Your Honor, and that's what the record shows.

THE COURT:  All right.  But ICE clearly knew of the proclamation before 3:53 on March 15, fair?

MR. ENSIGN:  I don't personally know that, but I

JA173

think that's -- that's something that this Court could potentially infer from the other facts.

THE COURT: Is there any way not to infer that? In other words, you're not saying to me that, starting at 3:53 p.m., people in Texas were able to round up three planeloads of people, get them on those planes, figure them all out, and get them off within a couple of hours, again, not deciding the specific time. So you would agree, pretty unlikely that was the case, right?

MR. ENSIGN: Your Honor, there's no evidence in the record for that; although, I think, certainly, you know, like any national security operation, there may have been preparatory steps that were required in order to carry it out.

THE COURT: In fact, according to scores -- according to declarations submitted by the plaintiffs, so that is evidentiary, it is in the record, that morning the government loaded scores of Venezuelans onto buses, drove them to a nearby airport, and began putting them on three planes. That occurred that morning. Is there reason to doubt the accuracy of those declarations?

MR. ENSIGN: Your Honor, we don't have anything in the record that would contradict that.

THE COURT: Right. So in other words, then if that's true, then it's not that one could arguably infer that they

JA174

were -- that ICE was working on this prior to 3:53 p.m., but that they were working on it prior to that?

MR. ENSIGN:  I think you could draw that inference, Your Honor, and --

THE COURT:  You could, but isn't that the only -- what other inference could you draw from that?

MR. ENSIGN:  Your Honor, I think you can certainly draw that.  And you know, I think it's also reasonable that the government would have engaged in preparatory actions before it began a national security operation.

THE COURT:  Right.  So the only inference to draw is that they were acting in preparation of the proclamation before it was posted?  That's the only inference one could draw, right?

MR. ENSIGN:  I think from this record, that's correct.  But I don't think that's been a live issue, so that's not something that we have made an effort to develop a record on.

THE COURT:  Okay.  So now let's go to the day of March 15.  So my first TRO relating to the class members was entered at 9:40 a.m.  Is that your understanding?

MR. ENSIGN:  As to the five individual plaintiffs, Your Honor, I believe that's correct.

THE COURT:  Okay.  And so when was that information passed on to ICE?

JA175

MR. ENSIGN:  Your Honor, I don't specifically know when that was passed on to ICE.  I know that, you know, that first TRO was absolutely complied with, and there's no suggestion that those individuals were put on any planes or that there was any compliance issue that plaintiffs have raised as to that first TRO.

THE COURT:  So what time did you learn of it?

MR. ENSIGN:  Your Honor, I don't recall.  It wasn't yet on the docket.  It was forwarded to me.  It was sometime in that morning and --

THE COURT:  That morning, right?

MR. ENSIGN:  I believe so, Your Honor.

THE COURT:  So in fact, according to Mr. Reuveney's email to chambers, that TRO had been disseminated to the relevant executive branch agencies by 10:18 a.m., which is the time of his email.  Does that sound about right to you?

MR. ENSIGN:  That sounds correct, Your Honor.

THE COURT:  And the order that I issued at 9:40 said there would be a Zoom hearing at 4:00 p.m. that day, correct?

MR. ENSIGN:  That's my recollection, Your Honor.  I believe it was a hearing set for the class certification.

THE COURT:  And then at 11:04 a.m., I moved the hearing to 5:00 p.m., right?

MR. ENSIGN:  I believe that's correct, Your Honor.

THE COURT: So why -- I guess what I'm trying to figure out here is, is there any other inference that there was an expedited effort to get people onto planes before my hearing at 5:00 or before I ruled? Isn't that the inference that you would draw from this?

MR. ENSIGN: I don't believe so, Your Honor. There's no evidence that, whatever the operational details were, that they were changed in any way as a response to the Court's order.

THE COURT: Again, so you have a proclamation that is signed on the 14th, although not publicized until 3:53 on the 15th, in the afternoon while people are being bused to planes on the morning in order to be removed as quickly as possible so that the plaintiffs couldn't challenge it and so that it couldn't be enjoined by a court, isn't that fair?

MR. ENSIGN: Your Honor, I don't believe so. I don't think there's any facts in the record for that. And you know, if so, it certainly did not prevent plaintiffs from filing suit and obtaining that first TRO.

THE COURT: Well, only because I happened to be available at -- when I was alerted to this was at 7:25 on Saturday morning -- only because I was available and could review first the pseudonymous motion, which I had to review as chief judge, and then the case was then transferred to me or assigned to me. And so it was good fortune that they

JA177

were filing -- I think they filed their complaint something like 2:14 a.m.  Let's take a look.

Sorry.  1:12 a.m. is when they filed it on March 15. And the fact that they were able to file it at 1:12 a.m. and the fact that I was available at 7:30 on Saturday morning is the only reason why they were able to get relief that morning before those people were put on the plane, right?

MR. ENSIGN:  The courts were open and available to hear relief, I think, is the reason, yes.

THE COURT:  Well, the courts weren't open, but the docket, plaintiffs could still file electronically, and yes, I was available.  But you wouldn't typically say that the window between 1:00 a.m. and 7:00 a.m. on a Saturday is the window in which -- is sufficient time to permit someone to challenge government action, would you?

MR. ENSIGN:  Well, speaking generally, not necessarily, Your Honor, though, honestly, TROs are being filed very, very frequently in the last two months, and having them be heard on a schedule not unlike this one is somewhat common.

THE COURT:  I'm not sure the filing at 1:00 a.m. and the hearing and the assigning at 7:00 a.m. and deciding it thereafter is anything close to common; although, I agree with you there have been plenty of TROs being filed.

And so but let me ask you this.  Why, when you knew

JA178

that I was having a hearing at 5:00 which was going to relate to class certification and was going to relate to the plaintiffs' attempts to enjoin action against a larger class, why wouldn't the prudent thing be to say, Let's slow down here.  Let's see what the judge says.  He's already enjoined the removal of five people.  It's certainly in the realm of possibility that he would enjoin further removals.  Let's see what he says.  And if it's -- if he doesn't enjoin it, we can go ahead, but sure better to be safe than risk violating the order.  Why wouldn't the wise, prudent, considered route be that?

MR. ENSIGN:  Well, I guess three responses, Your Honor.  One is that the hearing was only set for class certification.  We didn't have notice that it was going to be also on that second TRO.  A TRO had already issued, and so that, you know -- and we made sure that we had complied with that TRO.  But as, more specifically, to the operational details, I don't have knowledge as to how or when those decisions were made.

THE COURT:  So what you were willing to do by trying to do this as quickly as possible and avoid being enjoined by the Court was to risk putting people on those planes who shouldn't have been on the planes in the first place.

So we have the example of Mr. Kilmar Abrego Garcia, and you have admitted, haven't you, not you personally, but

the administration has admitted that he was removed based on an error, right?

MR. ENSIGN: I believe that's correct, Your Honor. Although, to clarify that, Mr. Abrego was on the third plane for which there are no compliance issues that have been raised by plaintiffs.

THE COURT: On the contrary. They have raised them. We haven't quite gotten to the bottom of the third one yet.

In other words, he is in that group of passengers for three planes that you are rushing to get out of the country before a judge can act, and lo and behold, at least one we know of shouldn't have been there in the first place, right?

MR. ENSIGN: No, Your Honor. I disagree that there's any evidence that a third plane was rushed. The government has made clear that it left after the TRO order --

THE COURT: Rushed in the sense it still leaves the same day, correct? In other words, it leaves within -- according to your own time lines, it leaves three and a half hours after the proclamation was posted, right?

MR. ENSIGN: I believe that's correct; although, that third flight was actually not pursuant to the proclamation. It was all Title 8 removals.

THE COURT: So you say, but again, the rush to get him out means you misidentified at least him.

So then when I had my hearing at 5:00, I asked you

point blank whether there were any removals under this proclamation planned in the next 24 or 48 hours.  Do you remember that?

MR. ENSIGN:  I do, Your Honor.

THE COURT:  And you said you didn't know but that you could investigate and report back, correct?

MR. ENSIGN:  That's correct, Your Honor.

THE COURT:  Okay.  So then I recessed the hearing from 5:22 to 6:00 p.m., and when we came back, you still couldn't give me any information about the planes, correct?

MR. ENSIGN:  That's correct, Your Honor.

THE COURT:  So what I want to know here, as an officer of the court, you are telling me that you had no knowledge whatsoever between 5:00 and 6:00 p.m. on that day that planes were in the air or shortly would be in the air? You had no knowledge whatsoever of that?

MR. ENSIGN:  Your Honor, I had no knowledge from my client that that was the case.  I had knowledge from plaintiffs' submissions to the Court that that might have been occurring.  I can also assure you, as an officer of the Court, I diligently tried to obtain that information but was not able to do so.

THE COURT:  Is that because they were -- and I appreciate that distinction.  I wasn't asking about the plaintiff, but I appreciate your making that distinction.  I

JA181

meant from your clients.

So why -- so they told you nothing about these planes?  You were there arguing on behalf of the government, and they told you nothing?

MR. ENSIGN:  Your Honor, as to the content of those conversations, I think they are covered by attorney-client privilege.  And at least I'm not prepared to make those attorney-client privilege calls on the fly during this hearing.

THE COURT:  But what you are prepared to tell me is that they -- no one told you from the administration that planes were in the air or would be within the next 24 or 48 hours?  That's what you are telling me?

MR. ENSIGN:  Yes, Your Honor.

THE COURT:  So now let's talk about the third plane for a minute because the plaintiffs -- I have taken your -- there was a declaration by Mr. Cerna, and there have been representations by you and others that there was nobody deported solely on the basis of the proclamation on that third plane, because you agree that if anyone on that plane was being deported solely on the basis of the proclamation, then that would be a clear violation of my order?

MR. ENSIGN:  That would appear to violate the order if it were pursuant to the proclamation and not under some separate authority such as Title 8 or --

JA182

THE COURT:  Right.  Solely on the basis of proclamation, it would be a violation of my order?

MR. ENSIGN:  That's how we read that order.

THE COURT:  Me too.

And your arguments regarding oral versus written ruling or what constitutes removal, none of that would be relevant regarding anyone on the third plane, right?

MR. ENSIGN:  As to the written, no.  But you know, certainly, I think to clarify as to that third plane, if there was an error under Title 8, I don't believe that would violate the Court's order.  It would still be a removal under Title 8, albeit potentially an erroneous one.

THE COURT:  Correct. Okay.  I agree.

So are you saying that everyone on that plane that was removed to El Salvador was Salvadoran?  Because the plaintiffs are saying maybe we're not so sure that this, the third plane, was kosher, in fact, because -- so they are saying what's the basis you had to remove to El Salvador anybody who wasn't Salvadoran under INA procedures?

MR. ENSIGN:  Your Honor, the basis would be 8 U.S.C. 1231(b) which defines where people can be removed to under final orders of removal.  It has a series of sort of interlocking provisions that are fairly complex.  But it certainly does permit removals to third countries.

THE COURT:  Okay.  We will take a look at that.

JA183

And then there were also people who were returned to the United States, and I don't know from which of the three planes, but you agree that there were people who were returned to the United States?  I think it's seven -- I guess eight women and a man.

MR. ENSIGN:  That's my understanding, Your Honor, at least broadly speaking.  I'm not sure about those precise numbers.

THE COURT:  Sure.  But my point in asking that is it's certainly operationally feasible for those planes to bring individuals back to the United States?

MR. ENSIGN:  Your Honor, I don't know anything about those operational details.  I have seen the public reporting regarding, I believe, those eight individuals, but I don't know what the operations were.

THE COURT:  Okay.  So let's then wind this area up of that day with just a few other questions.

So can you tell me, were there other government officials who were listening at the hearing, the hearing that started at 5:00?

MR. ENSIGN:  Your Honor, I believe so.

THE COURT:  Can you tell me who those were, please.

MR. ENSIGN:  I don't have a comprehensive list.  I know some people --

THE COURT:  You can start with the ones you know

then.

MR. ENSIGN: I believe members of my OIL team were --

THE COURT: Who were they?

MR. ENSIGN: I believe August Flentje. I believe Erez Reuveney. I believe Sarah Wilson.

THE COURT: Now, were there any people in the room with you at the time you were making -- you were conducting your arguments for the hearing?

MR. ENSIGN: No, Your Honor.

THE COURT: Okay. So where were these other people to your knowledge?

MR. ENSIGN: To my knowledge, everyone else was listening by phone as well. Excuse me, Your Honor. I was on Zoom, and I believe they were listening by phone.

THE COURT: Okay. So those are members of your team. Who else from the administration was listening that you are aware of?

MR. ENSIGN: Your Honor, I'm not -- I know my contact was James McHenry, who I talked to.

THE COURT: And can you say for the record his title?

MR. ENSIGN: Associate deputy attorney general.

THE COURT: Okay. So he was listening. Anybody else? Who else are you aware of?

MR. ENSIGN: I don't specifically know, Your Honor.

THE COURT: Okay. Take a minute to think because I

want you to be -- here's an opportunity, and I'm giving you time, I want to know then who either you knew at the time or have come to learn since was listening to the call.

MR. ENSIGN:  Your Honor, I don't specifically know. I mean, I know people that certainly have an awareness of the case.  I don't know specifically who was listening in to the call.

THE COURT:  So you can't tell me anyone else besides those four who were listening in?

MR. ENSIGN:  Not that I know that they were specifically listening to the call, no, Your Honor.

THE COURT:  Others who you believe were listening?

MR. ENSIGN:  Your Honor, to the extent that I believe they might be listening to the call, I think that could get into areas of attorney-client privilege.

THE COURT:  How?

MR. ENSIGN:  Because the basis of my knowledge that they were --

THE COURT:  That's not -- so if they told you, I was listening to the call, how's that provision of legal advice, seeking of legal advice?  That's just -- that's an identity issue.

MR. ENSIGN:  Your Honor, it's derived from communications.  You know, I would want to --

THE COURT:  Every communication between a lawyer and

JA186

a client is not attorney-client privilege including I was on the call. How is that possibly seeking legal advice or providing information for legal advice?

MR. ENSIGN: Your Honor, that may well be correct, but before touching on areas that may have an attorney-client privilege designation, I would want to run that by other experts in order to ascertain that.

THE COURT: Okay. So whom did you tell about my order? Whom did you tell about the oral order? Once we got off the phone, once the hearing was done at close to 7:00, 6:50-something, who did you tell about that hearing who wasn't on the call?

MR. ENSIGN: Your Honor, I relayed that information to contacts at DHS and to people at the State Department.

THE COURT: Okay. Who?

MR. ENSIGN: My email was to James Percival.

THE COURT: Who's he?

MR. ENSIGN: He is in DHS.

THE COURT: Uh-huh. Who else?

MR. ENSIGN: Joseph Mazzara at DHS.

THE COURT: Spell that, please.

MR. ENSIGN: M-A-Z-Z-A-R-A.

THE COURT: Uh-huh. Who else?

MR. ENSIGN: And at State, it was Jay -- I want to say Bischoff.

JA187

THE COURT:  Is that with a B?

MR. ENSIGN:  Yes.

THE COURT:  Anyone else who you informed about my oral ruling?

MR. ENSIGN:  I believe it was relayed to others certainly through that, but that was the immediate people that to whom I directed.

THE COURT:  Okay.  Who else did you tell that evening --

MR. ENSIGN:  Your Honor, I told --

THE COURT:  -- either orally or by email?

MR. ENSIGN:  Your Honor, I provided that information to others within DOJ.

THE COURT:  Who?

MR. ENSIGN:  The others that I mentioned on that call, and I may have emailed others too.  I don't specifically remember who all I told, but there certainly was no -- I certainly believed that it would be circulated to the relevant people.

THE COURT:  And then how about -- and then how about the written order, to whom did you communicate that?

MR. ENSIGN:  I believe to all the same people.

THE COURT:  Anybody else in addition to those you've mentioned?

MR. ENSIGN:  I don't recall offhand.  It's certainly

JA188

USCA Case #25-5452    Document #2184589    Filed: 07/22/2026    Page 193 of 401

possible that I did.  I don't remember specifically who the email chains were directed to, but certainly there was no intent not to distribute -- have that go to all the relevant...

THE COURT:  No, I'm certainly not saying that you were withholding.  I'm interested -- I'm sure you weren't. I would just like to know who you told.

So who then gave the order that the planes should not turn around?

MR. ENSIGN:  Your Honor, that would be potentially subject to attorney-client privilege as --

THE COURT:  Because?  How is that -- in other words, you are aware who -- who made the decision to either not tell the pilots anything or to tell them to keep going?  I would like to know who that was.  Again, you have said that it was perfectly appropriate for the government to act as it did.  So who made that perfectly appropriate decision?

MR. ENSIGN:  Your Honor, I don't know that.

THE COURT:  What were you told?

MR. ENSIGN:  Your Honor, I haven't been told.

THE COURT:  So you, standing here, have no idea who made the decision to not bring the planes back or have the passengers not be disembarked upon arrival?

MR. ENSIGN:  Your Honor, I do not know those operational details.

order, and I will determine if I have found that probable cause exists to believe that contempt has occurred, and if so, how we will proceed from there.  So I would not expect to issue this opinion before next week.  And I will see you folks back here for the argument regarding preliminary injunction motion next Tuesday, April 8 at 3:00 p.m.  Thank you all.

(The hearing concluded at 3:41 p.m.)

- - -

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.


4/3/25                    s/ Tammy Nestor
                          Tammy Nestor, RMR, CRR
                          Official Court Reporter
                          333 Constitution Avenue NW
                          Washington, D.C. 20001
                          tammy_nestor@dcd.uscourts.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

J.G.G., *et al.*,

    Plaintiffs,

      v.                         Civil Action No. 25-766 (JEB)

DONALD J. TRUMP, *et al.*,

    Defendants.

### MEMORANDUM OPINION

On the evening of Saturday, March 15, 2025, this Court issued a written Temporary Restraining Order barring the Government from transferring certain individuals into foreign custody pursuant to the Alien Enemies Act. At the time the Order issued, those individuals were on planes being flown overseas, having been spirited out of the United States by the Government before they could vindicate their due-process rights by contesting their removability in a federal court, as the law requires. Trump v. J.G.G., 2025 WL 1024097, at *2 (U.S. Apr. 7, 2025) (*per curiam*). Rather than comply with the Court's Order, the Government continued the hurried removal operation. Early on Sunday morning — hours after the Order issued — it transferred two planeloads of passengers protected by the TRO into a Salvadoran mega-prison.

As this Opinion will detail, the Court ultimately determines that the Government's actions on that day demonstrate a willful disregard for its Order, sufficient for the Court to conclude that probable cause exists to find the Government in criminal contempt. The Court does not reach such conclusion lightly or hastily; indeed, it has given Defendants ample opportunity to rectify or explain their actions. None of their responses has been satisfactory.

1

JA191

One might nonetheless ask how this inquiry into compliance is able to proceed at all given that the Supreme Court vacated the TRO after the events in question. That Court's later determination that the TRO suffered from a legal defect, however, does not excuse the Government's violation. Instead, it is a foundational legal precept that every judicial order "must be obeyed" — no matter how "erroneous" it "may be" — until a court reverses it. Walker v. City of Birmingham, 388 U.S. 307, 314 (1967). If a party chooses to disobey the order — rather than wait for it to be reversed through the judicial process — such disobedience is punishable as contempt, notwithstanding any later-revealed deficiencies in the order. See id. at 314, 320. That foundational "rule of law" answers not just how this compliance inquiry can proceed, but why it must. See id. at 320. The rule "reflects a belief that in the fair administration of justice no man can be judge in his own case," no matter how "exalted his station" or "righteous his motives." Id. at 320–21.

The Constitution does not tolerate willful disobedience of judicial orders — especially by officials of a coordinate branch who have sworn an oath to uphold it. To permit such officials to freely "annul the judgments of the courts of the United States" would not just "destroy the rights acquired under those judgments"; it would make "a solemn mockery" of "the constitution itself." United States v. Peters, 9 U.S. (5 Cranch) 115, 136 (1809) (Marshall, C.J.). "So fatal a result must be deprecated by all." Id.

## I.    Background

### A.  Factual Background

As just noted, the injunction in question was issued on the evening of Saturday, March 15, a day of events that moved at breakneck speed because of the Government's apparent effort to remove individuals more quickly than the judicial proceedings in which it was actively

JA192

participating could keep pace.  See generally J.G.G. v. Trump, 2025 WL 890401, at *1, *3–5 (D.D.C. Mar. 24, 2025).

The day prior, the President had seemingly signed — but not yet made public — a Proclamation invoking the Alien Enemies Act.  See 90 Fed. Reg. 13033 (Mar. 14, 2025). Through that 1798 Act, Congress granted the President broad authority if there is a "declared war" with a "foreign nation or government," or if a foreign government has "perpetrated, attempted, or threatened" an "invasion or predatory incursion . . . against the territory of the United States."  50 U.S.C. § 21.  In such a scenario, and if the President "makes public proclamation of the event," he is authorized to "apprehend[], restrain[], secure[], and remove[]" any "natives, citizens, denizens, or subjects of the hostile nation or government" who are fourteen years or older.  See id.  In his Proclamation, President Trump announced that the Government would use the Act's authorities to apprehend and remove members of Tren de Aragua, a violent Venezuelan transnational gang that had recently been designated a Foreign Terrorist Organization.  See 90 Fed. Reg. at 13033.  To support that finding, the President asserted that the Venezuelan government of Nicolas Maduro indirectly "relies" on Tren de Aragua and has been "infiltrated" by the gang.  Id.  He further announced that Tren de Aragua had committed or attempted an "invasion" or "predatory incursion" upon the United States, including through "drug trafficking," "mass illegal migration," and "irregular warfare," though he provided no examples of the last.  Id.

Although the Proclamation was not published until 3:53 p.m. on Saturday, see ECF No. 28-1 (Robert L. Cerna Second Decl.), ¶ 5, Defendants had begun setting Act-based removals into motion weeks earlier.  Beginning in early March, the Government interrogated Venezuelans in its custody about alleged membership in Tren de Aragua and transferred many of those it deemed

3

JA193

gang members to El Valle Detention Facility, located outside Harlingen, Texas, not far from the Mexico border. The reason for staging them together at El Valle became clear on Saturday. Early that morning — when the signed Proclamation was still hours from being disclosed to the public — the Government reportedly loaded scores of Venezuelans onto buses, drove them to a nearby airport, and began putting them onto three planes. See ECF Nos. 44-9 (Karyn Ann Shealy Second Decl.), ¶¶ 3–9; 44-10 (Stephanie Quintero Decl.), ¶¶ 3–4; 44-11 (Grace Carney Third Decl.), ¶¶ 11–13; 44-12 (Melissa Smyth Decl.), ¶¶ 11, 14; see also ECF No. 76 (Apr. 3 Hrg. Tr.) at 9 (Government counsel agreeing Defendants "were acting in preparation of the Proclamation before it was posted"). As the planes sat on the tarmac, officials refused to answer the deportees' questions about where they would be taken. See Shealy Second Decl., ¶ 10; Carney Third Decl., ¶ 12.

Among those queued on the tarmac or placed onto planes that morning were the five Plaintiffs in this lawsuit. Apparently catching wind of the impending Proclamation, they filed suit at 1:12 a.m. on Saturday — before the buses left El Valle — and then moved for a TRO preventing their removal under the Proclamation. In addition to asserting that the Proclamation lacks a legal foundation, each Plaintiff adamantly denies that he is even a member of Tren de Aragua. See Shealy Second Decl., ¶ 4 (J.G.O.); Carney Third Decl., ¶ 3 (G.F.F.); ECF Nos. 1 (Compl.), ¶¶ 9–10, 12 (J.G.G., J.A.V., W.G.H.); 3-6 (W.G.H. Decl.), ¶ 12; 3-8 (J.A.V. Decl.), ¶ 5.

Around 8:00 a.m., this Court learned that it had drawn the case through the court's random-assignment system. Chambers then reached out to locate Government counsel. Less than an hour later, Plaintiffs' counsel informed chambers that at least one Plaintiff was reportedly already aboard a removal flight. Having not yet heard from the Government, and given the "exigent circumstances" prompting the need to freeze in place the status quo until a hearing

4

JA194

could be held, the Court entered an *ex parte* TRO preventing Defendants from removing the five Plaintiffs for 14 days. See Minute Order of Mar. 15, 9:40 a.m. Not long after the TRO issued at 9:40 a.m., Government counsel informed chambers by email that the TRO "ha[d] been disseminated to the relevant executive branch agencies." Sure enough, several of the named Plaintiffs report that they were abruptly removed from planes, see Shealy Second Decl., ¶ 11; Carney Decl., ¶ 13; Smyth Decl., ¶ 14 — evidence that Defendants were able, if they wished, to ensure that people on the ground knew relatively quickly of developments in the Court proceedings. See also ECF No. 20 (Mar. 15 Hrg. Tr.) at 5 (Government stating on Saturday evening that relevant agencies had "confirmed" named Plaintiffs were not to be removed).

At 10:15 a.m., in an email thread including chambers and counsel for both sides, Plaintiffs asked the Court to hold an emergency hearing on their pending request to provisionally certify a class — comprising them and those similarly situated — and issue a second TRO covering the whole class. The Government objected that a "broader injunction" and a "hearing" on the issue would be "premature," and it asked the Court to wait until Monday for a hearing. The Government notably did not respond to Plaintiffs' pointed question about whether it was "prepare[d] to halt removals pursuant to the Act" in the interim. So, just after 11:00 a.m., the Court set an emergency hearing for 5:00 p.m. that same afternoon.

Shortly after the Proclamation appeared on the White House website at 3:53 p.m., and about 45 minutes before the hearing began, Plaintiffs' counsel informed chambers that he believed that two flights, both operated by a contractor used by Immigrations and Customs Enforcement for deportations, were scheduled to depart Harlingen that afternoon. Counsel expressed concern that the flights might imminently take off with his five clients and members of the potential class on board. The Government again offered no response.

JA195

In the 5:00 p.m. hearing, the Court clarified the limited scope of the TRO then in place, see Mar. 15 Hrg. Tr. at 3, and turned to whether it should provisionally certify the class. Id. at 5–6. The Government began by objecting that venue was improper because Plaintiffs' claims could be raised only through a petition for habeas corpus in the federal district in Texas where they were being held, not in the District of Columbia. Id. at 6–11.

Noting that it would benefit from further argument on the issue, the Court pivoted to addressing Plaintiffs' concerns "about imminent deportation." Id. at 11. It asked the Government point blank whether there were any "removals under this Proclamation planned . . . in the next 24 or 48 hours." Id. Government counsel said that he did not know, but that he could "investigate" and "report . . . back." Id. Plaintiffs' counsel then interjected that various "sources" had informed him that the two removal flights that were scheduled to depart that afternoon "may have already taken off," including "during this hearing." Id. at 12. So, at 5:22 p.m., the Court adjourned the hearing until 6:00 p.m. and directed Government counsel to find out whether the Government was in the process of removing people under the Proclamation. Id. at 13–15.

It was. Although the Government has refused to provide the particular details, all evidence suggests that during the short window that the Court was adjourned, two removal flights took off from Harlingen — one around 5:25 p.m. and the other at about 5:45 p.m. See ECF No. 21 (Resp. to Mar. 16 Notice) at 3–4 (relying on flight-tracking data for GlobalX Flights 6143, 6145, and 6122); see also Marianne LeVine et al., White House Official Says 137 Immigrants Deported Under Alien Enemies Act, Wash. Post (Mar. 16, 2025), https://perma.cc/U3NY-V3AS (comparing flight-tracking data with planes visible in three-minute video posted online by President of El Salvador and reposted by President Trump

6

JA196

and Secretary of State Rubio); Joyce Sohyun Lee & Kevin Schaul, Deportation Flights Landed

After Judge Said Planes Should Turn Around, Wash. Post (Mar. 16, 2025),

https://perma.cc/QT6J-3SEQ (same); Nayib Bukele (@nayibbukele), X (Mar. 16, 2025, 8:13

a.m. EDT), https://perma.cc/XLE4-DDRW.

Those later-discovered flight movements, however, were obscured from the Court when

the hearing resumed shortly after 6:00 p.m. because the Government surprisingly represented

that it still had no flight details to share. See Mar. 15 Hrg. Tr. at 15–18; see also ECF No. 51

(Mar. 21 Hrg. Tr.) at 7 (Defendants' counsel later affirming that at that time he had no

"information from the Government as to the status" of the flights). When pressed, Government

counsel stated that the "operational details" he had learned during the recess "raised potential

national security issues," so they could not be shared while the public and press listened to the

hearing through a call-in line. See Mar. 15 Hrg. Tr. at 15. He suggested, however, that the

Government could "provide [the Court] additional details in an *in camera*" setting. Id. So the

Court arranged to do just that. It disconnected the public line so that only counsel for the parties

were present and asked Government counsel to report. Id. at 15–16. Except that he did not: he

clarified only that the "additional details" he had just mentioned could eventually be provided *in

camera*, but he had no information to share at that time. Id. at 16.

With the growing realization, then, that the Government might be rapidly dispatching

removal flights in an apparent effort to evade judicial review while also refusing to provide any

helpful information, the Court turned to the pending legal issues. Id. at 18. After hearing

argument, it first determined that venue was proper, id. at 18–22, and it next provisionally

certified a class of Plaintiffs covering all noncitizens in custody subject to removal solely under

the Proclamation. Id. at 23–26; see also id. at 38.

7

JA197

The Court then addressed the sole remaining question: whether it should issue a broader TRO covering the entire class. It concluded that this was appropriate because Plaintiffs had satisfied the factors governing emergency relief and because the distinct possibility — "unrebutted by the Government" — that flights were "actively departing" or planning to depart required an immediate order preserving the status quo. Id. at 41–43. The Court therefore ordered that for 14 days the Government was enjoined from conducting the "removal" of any noncitizens in its custody solely on the basis of the Proclamation. Id. at 42. Then, at about 6:45 p.m., the Court delivered an oral command clarifying what compliance with the TRO meant. It directed Government counsel to "inform your clients of [the Order] immediately" and to notify them that if class members were on a plane "that is going to take off or is in the air, . . . those people need to be returned to the United States. However that's accomplished, whether turning around a plane or not [dis]embarking anyone on the plane . . . , I leave to you. But this is something that you need to make sure is complied with immediately." Id. at 43. The hearing adjourned at 6:53 p.m. Id. at 47. Roughly 30 minutes later, the Court memorialized the TRO in a written Order. See Minute Order of Mar. 15, 7:25 p.m. That Order referenced the just-concluded hearing and reiterated that the Government was enjoined from "removing" class members. Id.

Despite the Court's written Order and the oral command spelling out what was required for compliance, the Government did not stop the ongoing removal process. According to Defendants, the two planes that took off during the adjournment departed U.S. airspace before the Court's 6:45 p.m. oral command, see ECF No. 49-1 (Robert L. Cerna Third Decl.), ¶ 5, and "landed abroad" sometime after the Court posted the Minute Order at 7:25 p.m. See ECF No. 56 (State Secrets Notice) at 7–8. A third flight reportedly took off from Harlingen at 7:36 p.m., see

JA198

Lee & Schaul, *supra*, but the Government maintains that all aboard were removed under authorities other than the Proclamation. See Cerna Second Decl., ¶ 6. The first two planes — those carrying members of the Plaintiff class covered by the TRO — apparently touched down in Honduras at 7:37 p.m. and 8:10 p.m., and remained there for several hours before taking off again for El Salvador. See Lee & Schaul, *supra*; LeVine *et al.*, *supra*. After the planes landed in El Salvador shortly after midnight on Sunday, see Lee & Schaul, *supra*, most of the passengers were apparently transferred into one of that country's prisons, known as the Center for Terrorism Confinement (CECOT).

But not all passengers, it seems. One Venezuelan woman swears in a declaration that she was on one of the flights that landed in El Salvador but was flown back to the United States along with seven other women, apparently because Salvadoran authorities on the ground refused to accept any female prisoners. See ECF No. 55-1 (S.Z.F.R. Decl.), ¶¶ 1, 19–21; see also Didi Martinez, Julia Ainsley & Laura Strickler, "We Were Lied To:" Two Women the Trump Administration Tried to Send to El Salvador Prison Speak Out, NBC News (Apr. 2, 2024), https://perma.cc/F5Y6-XCG8. Her account is corroborated by a declaration from a Nicaraguan man, who avows that he was also on board one of the removal flights but was returned alongside the women because Salvadoran officials would not take custody of Central American nationals such as himself. See ECF No. 55-2 (Katiana Gonzalez Decl.), ¶¶ 1, 7–9.

By mid-Sunday morning, the picture of what had happened the previous night came into clearer focus. It appeared that the Government had transferred members of the Plaintiff class into El Salvador's custody hours after this Court's injunction prohibited their deportation under the Proclamation. Worse, boasts by Defendants intimated that they had defied the Court's Order deliberately and gleefully. The Secretary of State, for instance, retweeted a post in which, above

9

JA199

a news headline noting this Court's Order to return the flights to the United States, the President

of El Salvador wrote: "Oopsie . . . Too late 😂."  Nayib Bukele (@nayibbukele), X (Mar. 16,

2025, 7:46 a.m. EDT), https://perma.cc/Y384-4TDW, https://perma.cc/6VTW-5KRD (ellipses in

original).

B.  Procedural Background

A filing submitted by Defendants on Sunday afternoon failed to dispel any concerns that

they had flouted the Court's injunction.  See ECF No. 19 (Mar. 16 Notice); see also Resp. to Mar.

16 Notice at 1–6.  So the Court set a hearing for Monday, March 17, to determine what had

transpired over the weekend.  See Minute Order of Mar. 17, 3:09 p.m. (denying ECF No. 24

(Mot. to Vacate Mar. 17 Hrg.)).  The Court expected that at the hearing, Defendants might

explain that, despite appearances otherwise, none of the people on the first two flights was a

member of the Plaintiff class.  Or, at worst, Defendants would admit to a grave mistake, explain

how it transpired, and detail plans to rectify it.

The United States Government took neither tack.  Rather, what followed in the ensuing

days was increasing obstructionism on the part of the Government as it refused to answer basic

questions about what had happened, questions that were all ultimately in service of resolving one

key fact: whether members of the Plaintiff class — that is, noncitizens removable solely on the

basis of the Proclamation — were transferred out of U.S. custody after this Court's injunction

preventing their deportation.

Such stonewalling started before the Monday hearing.  Just before it was set to begin,

Defendants sought to cancel it as an unnecessary "incursion[] on Executive Branch authority."

Mot. to Vacate Mar. 17 Hrg. at 1.  Nowhere in their filing did they dispute that class members

were transferred into Salvadoran custody hours after the injunction issued.  Instead, Defendants

JA200

set forth several hyper-technical legal arguments for why, in spite of that fact, they had complied with the Court's Order. Id. at 2–5. Such arguments were unconvincing then and remain so now.

Then, in the hearing itself, the Government refused to provide any relevant facts. The lawyer the Government sent to the proceeding — conveniently not the counsel who had appeared at the TRO hearing — repeatedly stated in some form or another that he was not "at liberty to disclose anything about any flights." ECF No. 25 (Mar. 17 Hrg. Tr.) at 7. Although he would not say that such information was even classified, see id. at 9–10, he claimed that it could not be shared — even *ex parte* with the Court — because of "diplomatic concerns" and "national security concerns with flight patterns and things of that sort." Id. at 6, 8; see id. at 30. That is, the Government maintained that it could not share any details about the flights even privately with the Court despite the fact that, the previous day, Defendants had retweeted a three-minute video that portrayed a host of operational details. See Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 16, 2025, 3:54 p.m. EDT), https://perma.cc/WJ8H-F8HW; Secretary Marco Rubio (@SecRubio), X (Mar. 16, 2025, 8:39 a.m. EDT), https://perma.cc/ZD8J-KAGH. In high definition, the video displayed the planes and the runway where they parked; how migrants were restrained and transported; the faces and uniforms of many detainees, guards, and other officials; where the vehicles apparently entered CECOT; and the inside of the prison. Id.

So, on Monday evening, the Court ordered the Government to submit another filing the next day. Seeking to accommodate Defendants' national-security concerns — vague as they were — yet nonetheless needing answers on how members of the Plaintiff class had been transferred into a foreign prison hours after the injunction issued, the Court directed the Government to explain its "position on whether, and in what form, it will provide answers to the Court's questions regarding the particulars of the flights." Minute Order of Mar. 17, 6:47 p.m.

11

JA201

The Court again offered that such information could be provided *in camera*, including in a classified setting.  Id.

In their March 18 response, Defendants reiterated their various arguments for why they should not have to share information related to flights, but conceded that if ordered to do so, they would submit "an *in camera* and *ex parte* declaration."  ECF No. 28 (Mar. 18 Notice) at 1–2. The Court ordered Defendants to do just that by noon the next day, and it set out five basic questions that the declaration needed to answer: when the two flights in question took off and from where; when they left U.S. airspace; when they landed in a foreign country (or countries); what time people subject solely to the Proclamation (and not other authorities, such as the Immigration and Nationality Act) were transferred out of U.S. custody; and how many people were on the flights solely on the basis of the Proclamation.  See Minute Order of Mar. 18, 2:27 p.m.

Defendants then reversed course entirely.  On Wednesday morning, the 19th, a few hours before their deadline, they moved this Court to stay its Tuesday Order on various grounds.  See ECF No. 37 (Emergency Mot. to Stay Mar. 18 Minute Order).  Most relevant, they asserted for the first time that they were considering invoking the state-secrets privilege over the flight details and needed more time to make that determination.  See id. at 3–4.  The Court was "unsure" how answering its five questions could "jeopardize state secrets" — Defendants, after all, had publicly shared images of the flights making them trackable and had still not claimed that the questions bore on any classified information, see ECF No. 38 (Mar. 19 Order) at 2 — but nonetheless sought to accommodate their last-minute request.  It gave them yet another day either to answer the five questions or to invoke the state-secrets doctrine.  Id. at 4.

12

JA202

On Thursday, the 20th, the Government "again evaded its obligations."  ECF No. 47 (Mar. 20 Order) at 1.  Rather than invoke the privilege or answer the questions, it submitted a short declaration from an Immigration and Customs Enforcement officer stationed in Harlingen.  See Cerna Third Decl.  It was his "understand[ing]," he said, that Cabinet Secretaries were then considering whether to invoke the privilege.  Id. at 2.  In response to this wholly inadequate response from a low-level official without any actual knowledge, the Court required Defendants to submit a declaration from someone directly involved with the Cabinet-level discussions and gave Defendants five days to indicate whether they were invoking the state-secrets privilege.  See Mar. 20 Order at 3.  The Government has since invoked it.  See State Secrets Notice.  The Court also directed the parties to brief whether Defendants had violated the Court's TROs.  See Mar. 20 Order at 3.  That briefing is complete, and the Court held a hearing on the matter in early April.

In parallel to the investigation of Defendants' compliance have been further proceedings on the TROs' merits.  After briefing and a hearing, the Court denied Defendants' motion to vacate the TROs; it held that Plaintiffs had shown a likelihood of success on one of their core claims — i.e., those subject to removal under the Proclamation had a due-process right to challenge the Government's determination that they were removable — and that they would face irreparable harm if the TROs were dissolved, a harm that also tipped the balance of equities in their favor.  See J.G.G., 2025 WL 890401, at *11–14, 16–17.  The Court of Appeals then rejected Defendants' request to stay the Orders, raising concerns with both the applicability of the Act and the lack of due-process.  See J.G.G. v. Trump, No. 25-5067, 2025 WL 914682, at *8–10 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring); id. at *13–14 (Millett, J., concurring).

JA203

The Supreme Court subsequently vacated the TROs on a narrow ground. It held that challenges to removal under the Act must be brought through a habeas-corpus proceeding — not, as Plaintiffs did, through the Administrative Procedure Act — and therefore venue lay in the district of the class members' confinement, not the District of Columbia. See J.G.G., 2025 WL 1024097, at *1. While the Court split on the venue question, it unanimously held — as this Court did when declining to dissolve the TROs — that those subject to removal under the Act must be allowed to challenge their removability in federal court before being deported. See id. at *2; id. at *2 (Kavanaugh, J., concurring); id. at *2, 6 (Sotomayor, J., dissenting). Specifically, all Justices agreed that the Due Process Clause requires the Government to provide anyone it seeks to remove notice "that they are subject to removal under the Act," and to do so "within [a] reasonable time and in such manner as will allow them to actually seek habeas relief" before being removed. Id. at *2 (per curiam); id. at *6 (Sotomayor, J., dissenting). In holding as much, the Court effectively said that the Constitution flatly prohibits the Government from doing exactly what it did that Saturday, when it secretly loaded people onto planes, kept many of them in the dark about their destination, and raced to spirit them away before they could invoke their due-process rights.

As this Opinion will shortly explain at greater length, the fact that the Supreme Court determined that this Court's TROs suffered from a venue defect does not affect — let alone moot — the compliance inquiry presently teed up here.

## II.    Analysis

Defendants provide no convincing reason to avoid the conclusion that appears obvious from the above factual recitation: that they deliberately flouted this Court's written Order and, separately, its oral command that explicitly delineated what compliance entailed. They do not

14

JA204

dispute that it was hours after the written Order issued when they disembarked the class members aboard the two planes and transferred them out of U.S. custody.  <u>See</u> State Secrets Notice at 7–8; ECF No. 58 (Resp.) at 4.  Rather than offer a *mea culpa* and attempt to explain this grave error and detail plans to rectify it, Defendants offer various imaginative arguments for why they nevertheless technically complied with the Order.  None of their positions withstands scrutiny.

Defendants' core contention — that in prohibiting class members' <u>removal</u>, the written Order barred only their physical exit from the United States, not their subsequent transfer into Salvadoran custody — requires ignoring the clear context in which the Order was issued.  Their other arguments amount only to retroactive attacks on the legal validity of the injunction, but that road leads nowhere: even a legally defective order must be complied with until reversed through the appeals process.  Defendants' conduct, moreover, manifests a willful disregard of the Court's legally binding proscriptions.  Given the evidence at this early stage in the inquiry, and offered no persuasive reason to conclude otherwise, the Court finds that there is probable cause that Defendants acted contemptuously.

The following analysis first sets out the parameters of criminal contempt and then explains why court orders, regardless of their ultimate validity, must be complied with.  The Court last analyzes why Defendants' willful and knowing actions here constitute probable cause for a finding of contempt.

A.  <u>Contempt</u>

1.  *Legal Standard*

When Congress established lower federal courts in the Judiciary Act of 1789, it conferred on them the power "to punish by fine or imprisonment, at the discretion of said courts, all

15

JA205

contempts of authority in any cause or hearing before the same." 1 Stat. 83; see Bloom v. Illinois, 391 U.S. 194, 202 (1968). In doing so, Congress "gave federal courts the discretionary power to punish for contempt as that power was known to the common law." United States v. Barnett, 376 U.S. 681, 687 (1964); see id. at 699–700 ("The power to fine and imprison for contempt, from the earliest history of jurisprudence, has been regarded as a necessary incident and attribute of a court, without which it could no more exist than without a judge.") (quotation marks omitted); United States v. Dixon, 509 U.S. 688, 694–95 (1993). Although Congress eventually pared back federal courts' statutory contempt power, it preserved their authority to punish, among other transgressions, "'disobedience or resistance' to court orders." Dixon, 509 U.S. at 694 (quoting 4. Stat. 488); see Bloom, 391 U.S. at 202–04.

That statutory authority is now codified in 18 U.S.C. § 401, which provides that any "court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, . . . [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." For a contemnor to be convicted of criminal contempt under § 401(3), it must be shown beyond a reasonable doubt: (1) that the court order was "clear and reasonably specific"; (2) "that the defendant violated the order"; and (3) "that the violation was willful." United States v. Young, 107 F.3d 903, 907 (D.C. Cir. 1997) (quoting United States v. NYNEX Corp., 8 F.3d 52, 54 (D.C. Cir. 1993)).

The Court here inquires only into whether there is probable cause that Defendants violated § 401. Such an inquiry does not appear to be strictly necessary. The statute does not include a probable-cause requirement, and as the Department of Justice has explained in an internal manual, "It is unclear whether probable cause that a willful violation has occurred is a condition precedent to the commencement of a criminal contempt action." U.S. Dep't of Just.,

16

JA206

Criminal Resource Manual § 763, https://perma.cc/Z5DV-RUNU.  In practice, "the vast majority of criminal contempt decisions make no mention of such a requirement."  Id.  Some courts, however, have opted to make or require findings of probable cause before initiating criminal-contempt proceedings.  See, e.g., In re Res. Tech. Corp., 2008 WL 5411771, at *4 (N.D. Ill. Dec. 23, 2008); Beyond Blond Prods., LLC v. Heldman, 2025 WL 902445, at *1 (C.D. Cal. Mar. 25, 2025); In re Sydor, 132 B.R. 243, 245–46 (E.D.N.Y. Bankr. 1991); Reed v. Rhodes, 500 F. Supp. 363, 376, 404 (N.D. Ohio 1980); United States v. Hovind, 2014 WL 12887669, at *2 (N.D. Fla. July 8, 2014); In re United Corp., 166 F. Supp. 343, 345 (D. Del. 1958).  The Court finds that practice to be a prudent way of affording alleged contemnors the procedural protections associated with other criminal proceedings and so follows it here.

2.  *Effect of Supreme Court Vacatur*

But hold on, Defendants protest.  If the Supreme Court has since vacated the TROs, how can contempt lie?  See ECF No. 78 (Notice Regarding Supreme Court Decision) at 1.  The Supreme Court long ago answered that question: it is firmly settled that a court order "must be obeyed" until it is "reversed for error" by the issuing court or a "higher" one.  Walker, 388 U.S. at 314 (quoting Howat v. Kansas, 258 U.S. 181, 189–90 (1922)).  That, in turn, means that a party "may be punished for criminal contempt for disobedience of an order later set aside on appeal" for being defective.  United States v. United Mine Workers of Am., 330 U.S. 258, 294–95 (1947).  If a party believes that a court order suffers from legal deficiencies, it therefore "must have the injunction modified or vacated; [it] cannot simply ignore it."  Evans v. Williams, 206 F.3d 1292, 1299 (D.C. Cir. 2000).  The so-called collateral-bar rule enforces that principle.  It provides that if a party is charged with contempt for disobeying a court order, it cannot raise the legal invalidity of the order as a defense.  See id. (citing Walker, 388 U.S. 307).  Defendants

17

JA207

were thus obligated to comply with this Court's TRO until vacated by this Court or a higher one; if they failed to comply, the fact that the TRO was legally unsound is no obstacle to a contempt conviction.

There are only two narrow exceptions to this rule, neither of which applies here. First, an enjoined party can violate an order and then challenge its validity in a contempt proceeding if — and only if — "there was no opportunity for effective review of the order before it was violated." 11A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2960 (3d ed. Apr. 2025 update). Defendants do not seek cover behind this exception. For good reason. Just as they had sought emergency appellate relief for the first TRO mere hours after it issued, see ECF No. 12 (First Notice of Appeal), they notified this Court while the planes were en route to El Salvador that they intended to do the same for the TRO in question, see ECF No. 17 (Second Notice of Appeal) (filed 8:37 p.m.), docketing their appeal only minutes after the planes landed in that country. See Corrected Emergency Mot. for a Stay Pending Appeal, J.G.G. v. Trump, No. 25-5067 (D.C. Cir. Mar. 16, 2025) (filed 1:07 a.m. Sunday). Defendants also could have sought relief from this Court, including, for example, requesting a stay of the TRO pending appeal. See Fed. R. App. P. 8(a)(1)(A); J.G.G., 2025 WL 914682, at *22–23 (Millett, J., concurring) (noting failure to do so). Defendants, moreover, nowhere identify a reason that the transfer had to occur early Sunday morning. If they considered waiting for appellate relief impracticable or unattractive given the speed at which events transpired, that circumstance was entirely of their own making, not the result of any bona-fide obstacle to effective review. Indeed, the appellate process worked at a breakneck pace. Cf. Walker, 388 U.S. at 318–19 (case is "different" if party faces "delay or frustration of their . . . claims" in appellate courts).

JA208

Second, a party need not obey an injunction that is "transparently invalid or had only a frivolous pretense to validity." Id. at 315. That is an exceedingly high bar. This narrow carveout does not apply if the order was "arguably proper" or "had any pretense to validity at the time it was issued." Matter of Providence J. Co., 820 F.2d 1342, 1347 (1st Cir. 1986). The exception therefore applies "[o]nly in the rarest of situations." Zapon v. U.S. Dep't of Just., 53 F.3d 283, 285 (9th Cir. 1995). This is not one. The Supreme Court has admittedly held that Plaintiffs' claims should have been brought in habeas, see J.G.G., 2025 WL 1024097, at *1, but this Court's view of the issue at the time of the Orders was not patently frivolous. Rather, the question was "substantial," United Mine Workers, 330 U.S. at 293, dividing both the Court of Appeals and the Supreme Court. See J.G.G., 2025 WL 914682, at *23–31 (Millett, J., concurring); id. at *34–37 (Walker, J., dissenting); J.G.G., 2025 WL 1024097, at *1; id. at *7–10 (Sotomayor, J., dissenting).

To be sure, some courts outside this Circuit have suggested that when a court lacks subject-matter jurisdiction to adjudicate a dispute, an enjoined party may raise that fact as a defense to contempt. See, e.g., In re Novak, 932 F.2d 1397, 1401–02 (11th Cir. 1991); In re Estab. Inspection of Hern Iron Works, Inc., 881 F.2d 722, 726–27, 726 n.12 (9th Cir. 1989) (but noting pervasive uncertainty on the issue). Those statements, however, do not control here, not least because they are incompatible with the Supreme Court's subsequent opinion in Willy v. Coastal Corp., 503 U.S. 131 (1992). See United States v. Straub, 508 F.3d 1003, 1006, 1010 (11th Cir. 2007) (upholding 18 U.S.C. § 401(3) contempt charge even though court lacked jurisdiction "over the underlying controversy," and noting Willy "resolve[d] this issue").

In Willy, a district court imposed Rule 11 sanctions — which function like criminal contempt, as they are "designed to punish a party who has already violated the court's rules," 503

19

JA209

U.S. at 139 — even though it was later shown that it did not have subject-matter jurisdiction when the sanctionable conduct occurred; indeed, it issued the final sanctions order after its lack of jurisdiction had been determined by the court of appeals.  Id. at 133–34.  The Supreme Court nonetheless upheld the sanctions order.  Id. at 135–39.  "A final determination of lack of subject-matter jurisdiction," the Court explained, "precludes further adjudication of" the case's merits, but a sanctions order is "collateral to the merits," so a court's lack of subject-matter jurisdiction poses no constitutional bar.  Id. at 137–38; see also id. at 137 (explaining that United Mine Workers, 330 U.S. 258, "upheld a criminal contempt citation even on the assumption that the District Court issuing the citation was without jurisdiction over the underlying action").  Following Willy, the D.C. Circuit has made clear that "subject-matter jurisdiction over an underlying action is not a precondition of a federal court's authority to sanction those who violate its orders."  In re LeFande, 919 F.3d 554, 561 (D.C. Cir. 2019) (citing Willy, 503 U.S. at 137).  Notwithstanding whether a court is later determined to have lacked subject-matter jurisdiction at the time of the violation, then, a party can be held in contempt for disobedience, and the same court can impose the sanctions even after its lack of jurisdiction has been revealed.

        In any event, this Court possessed such jurisdiction.  Recall, the Supreme Court held in its *per curiam* opinion that claims challenging removal under the Alien Enemies Act "must be brought in habeas."  J.G.G., 2025 WL 1024097, at *1.  That conclusion rested on a line of cases holding that habeas is the "exclusive remedy" for state prisoners challenging their sentences, even though such claims "may come within the literal terms of" another statute.  Heck v. Humphrey, 512 U.S. 477, 481 (1994); see also Preiser v. Rodriguez, 411 U.S. 475, 489–90 (1973).  In such circumstances, the Court has previously explained, the availability of habeas relief means a separate "cause of action . . . does not accrue."  Heck, 512 U.S. at 489–90.  By

20

JA210

analogy, the same occurred here.  In holding that habeas is the exclusive remedy for Plaintiffs, the Supreme Court denied that they possessed a valid cause of action under the APA when this Court granted the classwide TRO; it did <u>not</u> hold that this Court lacked subject-matter jurisdiction.  In fact, Justice Kavanaugh noted in his concurrence that the availability of habeas relief constitutes an "adequate remedy" barring suit under the APA.  See <u>J.G.G.</u>, 2025 WL 1024097, at *2 (Kavanaugh, J., concurring) (quoting 5 U.S.C. § 704); <u>see also</u> <u>J.G.G.</u>, 2025 WL 914682, at *34 (Walker, J., dissenting) (making same point).  The adequate-remedy bar, however, is not a jurisdictional one: on the contrary, the D.C. Circuit has explained that § 704 "determine[s] whether there is a cause of action under the APA, not whether there is federal subject matter jurisdiction."  <u>Perry Capital LLC v. Mnuchin</u>, 864 F.3d 591, 621 (D.C. Cir. 2017).  Under either habeas or APA precedents, then, both paths lead to the same destination: the relevant defect in this Court's classwide TRO was not jurisdictional.

At worst, as the Supreme Court held here, "<u>venue</u> [was] improper in the District of Columbia."  <u>J.G.G.</u>, 2025 WL 1024097, at *1 (emphasis added).  Indeed, regardless of how the issue is framed, the Court has been clear that any reference to habeas "jurisdiction" does not refer to a court's "subject-matter jurisdiction."  <u>Rumsfeld v. Padilla</u>, 542 U.S. 426, 434 n.7 (2004).  Rather, the "territorial-jurisdiction rule[]" is a question of proper "venue."  <u>Id.</u> at 452 (Kennedy, J., concurring); <u>see also</u> <u>Chatman-Bey v. Thornburgh</u>, 864 F.2d 804, 812–13 (D.C. Cir. 1988) (similar).  And it is black-letter law that while subject-matter jurisdiction goes to whether any federal court may even hear the dispute, venue determines <u>which</u> jurisdiction-possessing court is the most convenient.  See 14D Wright & Miller, *supra*, § 3801 (4th ed. Apr. 2025 update); <u>Neirbo Co. v. Bethlehem Shipbuilding Corp.</u>, 308 U.S. 165, 167–68 (1939) (same).  Just

21

like the availability of a cause of action under the APA, <u>that</u> question has been determined by

statute — the federal habeas statute. <u>See</u> 28 U.S.C. §§ 2241–2242.

The upshot is that, after the Supreme Court's decision in this case, it has been

preliminarily determined that Congress channeled a challenge to removal under the Alien

Enemies Act to a habeas petition filed in a detainee's district of confinement. This Court's

decision to recognize a cause of action under the APA in the District of Columbia, while

ultimately found erroneous by the Supreme Court, therefore is not a defect that would excuse

compliance under any of the recognized exceptions.

The "firmly established" "rule of law" that even a legally unsound order must be obeyed

at the risk of contempt therefore focuses the present inquiry. <u>Walker</u>, 388 U.S. at 319. The

question presented here is whether there is probable cause that Defendants deliberately or

recklessly disregarded a clear and reasonably specific order. <u>See</u> <u>Young</u>, 107 F.3d at 907, 910.

The question is not — as many of Defendants' evasive legal arguments imply — whether that

Order was legally impeccable.

### 3.    *Sufficiently Clear, Reasonably Specific, and Unequivocal Order*

The first element of contempt requires that the injunction be "clear," "reasonably

specific," <u>Young</u>, 107 F.3d at 907 (quotation marks omitted), and "unequivocal at the time it is

issued." <u>In re Holloway</u>, 995 F.2d 1080, 1082 (D.C. Cir. 1993) (quoting <u>Traub v. United States</u>,

232 F.2d 43, 47 (D.C. Cir. 1955)). To "determin[e] whether an order is sufficiently clear and

specific," courts "apply an objective standard that takes into account" not just "the language of

the order" but also "the objective circumstances surrounding the issuance of the order." <u>Young</u>,

107 F.3d at 907. Thus, "[w]hether an order is clear enough depends on the context in which it

[was] issued," which includes "the audience to which it [was] addressed," <u>id.</u> at 907–08 (quoting

22

JA212

In re Levine, 27 F.3d 594, 596 (D.C. Cir. 1994)), as well as "the relief sought by the moving

party, the evidence produced at the hearing on the injunction, and the mischief that the injunction

seeks to prevent." Common Cause v. Nuclear Regul. Comm'n, 674 F.2d 921, 927 (D.C. Cir.

1982) (quotation marks omitted).

The question here, then, is whether it was sufficiently clear to the Government that the

Court was prohibiting it from transferring class members into another country's custody —

something Defendants admit to doing hours after the written Order issued. See State Secrets

Notice at 7–8. The Government, however, now contends that the Court's Order should be

understood to have enjoined it only from transporting class members outside of U.S. territory,

not from relinquishing custody of them once they were already outside the United States. That

narrower Order, it argues, was one with which it fully complied. That interpretation is

deliberately blind to the Court's unequivocal language and the context surrounding its Order.

At 7:25 p.m. on Saturday evening, roughly 30 minutes after the hearing adjourned, see

Mar. 15 Hrg. Tr. at 47, the Court issued its written Order. See Minute Order of Mar. 15, 7:25

p.m. Expressly referencing the hearing, the Order certified a Plaintiff class consisting of all

noncitizens in U.S. custody who were subject to the Proclamation, and, relevant here,

memorialized the TRO using the same language as in the hearing. See Mar. 15 Hrg. Tr. at 42,

46–47. Specifically, this part of the Order stated:

> As discussed in today's hearing, the Court ORDERS that . . . [t]he
> Government is ENJOINED from removing members of [the] class
> (not otherwise subject to removal) pursuant to the Proclamation for
> 14 days or until further Order of the Court.

Minute Order of Mar. 15, 7:25 p.m.

As already explained, the Government does not dispute that after this written TRO

issued, it temporarily landed two planeloads of class members in Honduras, flew them to El

23

JA213

Salvador, deplaned them there, and then — critically — transferred them from U.S. to Salvadoran custody.  See State Secrets Notice at 7–8.  Indeed, the Government does not challenge that this transfer of custody happened some five hours, at least, after the written Order was docketed.  See LeVine *et al.*, *supra* (planes landed in El Salvador at 12:10 and 12:18 a.m.).

Defendants offer a novel interpretation of the Order that, if adopted, would mean that they were not in violation.  The linchpin of their argument is that in forbidding them from "removing" class members, see Minute Order of Mar. 15, 7:25 p.m., the TRO prohibited only flying class members outside of the United States, not the further act of relinquishing custody of them into the hands of a foreign government.  See Resp. at 2–4.  And, they continue, because both planes had already departed U.S. airspace before the written Order posted (and before the oral command preceding it), everyone on board had already been removed before the Order issued.  See id.  While perhaps clever, this argument does not carry the day.

Defendants agree that an injunction must be understood in the context in which it is issued.  See Young, 107 F.3d at 907–08; Resp. at 2.  But they would have the Court search for context in all the wrong places.  After observing that the written TRO did not define "remove," Resp. at 3, they seek to show that the term has a clear meaning under the Act, with the implication that the Court incorporated that definition into its Order.  They do not make their case.

Across a couple paragraphs, Defendants halfheartedly seek to root their narrow reading of "removal" in the Act.  They cite several dictionary definitions from around the time that Congress passed the Alien Enemies Act in 1798, but these are far from conclusive.  See Resp. at 3.  They also suggest that their territorial understanding makes sense because the Act speaks of "the territory of the United States."  Id. (quoting 50 U.S.C. § 21).  This, too, is hardly definitive:

JA214

just because an "invasion" or "predatory incursion" must be "against the territory of the United States" to trigger the Act's authorities does not resolve whether the process of removal comprises a physical departure or a transfer of custody.  Defendants therefore fall well short of showing that "removal" carries a definitive meaning under the Act.

As a fallback of sorts, Defendants gesture toward the adjacent INA context, but that undercuts their position.  They cite a lone case in which the Ninth Circuit held that an INA removal order is executed when the person physically exits the United States.  Nicusor-Remus v. Sessions, 902 F.3d 895, 898, 899 (9th Cir. 2018) (citation omitted).  That court, however, recognized that departure can convey a "physical departure" (territorial exit) or, conversely, a "legal departure" (implicating questions of one's legal admission to and status in the country of destination), and it found that the former controlled only because the INA's own statutory definition made that conclusion unavoidable.  Id. at 899–900 (noting statute defined "deported or removed" as having "left the United States") (quotation marks omitted).  Here, by contrast, as Defendants concede, see Resp. at 3, we have no statutory definition that might be dispositive.

Insofar as INA cases are relevant, moreover, they demonstrate that, at the time the TRO issued, the Government understood removal to mean the exact opposite of what they now claim.  But don't take the Court's word for it.  Just listen to the argument the Government made a mere five days before the events in question here.  In a different case in this district — with some of the same Defendants, and in a filing signed by some of the same lawyers signing Defendants' show-cause response — the Government argued that "removal" under the INA is a "term of art," and that "[t]o effectuate a departure or removal, the alien must lawfully enter another country," as "the fact that [he] is physically on foreign soil is not alone sufficient to establish that he has

25

JA215

legally departed the United States." Escalona v. Noem, No. 25-604, ECF No. 14 (Opp. to Mot.

for Stay of Transfer) at 29–30 (D.D.C. Mar. 10, 2025) (citations omitted); see id. at 40 (lawyers).

Defendants, then, do not show that "removal" carries the specific meaning they urge

under the Act. For that reason, rather than a smattering of late-18th-century dictionaries and an

inconclusive fragment of the Act's text, the better — indeed the obvious — place to look for the

meaning of "removal" in the Court's written TRO is the hour-plus-long hearing that immediately

preceded it. See Young, 107 F.3d at 907–08 (context for determining meaning of injunction

includes "objective circumstances surrounding the issuance of the order" and "audience to which

it is addressed") (quotation marks omitted).

Anyone paying attention to the hearing (as the Government presumably was) would have

known that the ultimate action Plaintiffs sought to prevent through a TRO was not their mere

transportation across the U.S. border, but instead their discharge from U.S. custody into a foreign

country or into foreign hands. Common Cause, 674 F.2d at 927 (context for determining

meaning of injunction includes "the relief sought by the moving party" and "mischief that the

injunction seeks to prevent"). When the Court accordingly referred to removal or deportation in

the hearing, it consistently used those terms to mean a legal departure that was complete upon

discharge from U.S. custody, not upon mere physical exit from U.S. territory.

First, mark the opening exchange of the hearing. The Court asked the Government to

confirm that none of the five named Plaintiffs was "on any plane that has departed," Mar. 15

Hrg. Tr. at 4, as the first TRO then in place prohibited their "remov[al] . . . from the United

States." Minute Order of Mar. 15, 9:40 a.m. Government counsel said that he had "confirmed"

that they would "not be removed." See Mar. 15 Hrg. Tr. at 5. The Court then clarified what that

must entail, stating: "I would assume that means that they are either not on the planes or that they

26

JA216

<u>will not be removed from the planes and will be brought back once the planes land in El Salvador</u>." Id. (emphasis added). The Government did not disagree with that characterization. Id. From the start, then, the Court plainly considered removal (from the United States) — *i.e.*, the action that would violate the TRO — to mean a legal removal, and specifically a process that culminated not in a detainee's movement out of U.S. airspace or arrival in a foreign country, but instead upon his transfer out of U.S. custody. Similarly, during a later exchange on irreparable harm, the Court expressly said that it viewed "the status quo" (which Plaintiffs sought to maintain) as "keeping [class members] in ICE custody but not deporting them." Mar. 15 Hrg. Tr. at 35. Again, the issue was custody, not physical location.

*Second*, consider the recurring discussion about when and how the Court would lose equitable jurisdiction. These exchanges make clear that the Court considered a TRO to be appropriate in part to preserve the status quo; that the Court (and Plaintiffs) felt that this entailed ensuring that it did not lose jurisdiction; and that it was concerned that it would lose jurisdiction <u>not</u> when class members exited U.S. airspace but instead when they left U.S. custody. The Government listened to and indeed participated in these exchanges.

To start, prior to the mid-hearing adjournment, Plaintiffs' counsel interjected that "sources" "on the ground" had indicated that planes were actively departing or could be at any moment. Id. at 12. That created time pressure, he said, but not because class members would simply be flown outside the United States; instead, it was because they could imminently "end[] up in a Salvadoran prison," and <u>that</u> eventuality might "divest this Court of jurisdiction." Id.

The reason was explained later in the hearing, when the discussion returned to irreparable harm. The Government said that it did not understand Plaintiffs' irreparable-harm argument, which it construed to be "predicated on the premise that this Court would somehow lose

27

JA217

jurisdiction if [class members] were" "in the United States" but "not in D.C." Id. at 35.  The

Court clarified for the Government that Plaintiffs' "argument in part is [that class members] are

going to be sent to Salvadoran or Honduran prisons." Id. (emphasis added).  Indeed, that event,

Plaintiffs again agreed, was the crux: not only did they face "real danger . . . if they end up in a

Salvadoran prison," but if that were to occur, "the Court would lose jurisdiction because it

wouldn't be able to offer a remedy" — and a TRO was needed to prevent both things from

happening.  Id. at 36–37.  The Government surely understood the black-letter principle that to

have jurisdiction, a Court must be able to redress the plaintiff's injury.  See Uzuegbunam v.

Preczewski, 592 U.S. 279, 291 (2021).  Plaintiffs here clearly recognized that if they were turned

over to Salvadoran authorities, the Court might lose its ability to offer any remedy: while a

federal court can exercise equitable powers over U.S. officials even if they are overseas, it cannot

directly control foreign officials, see Doe v. Mattis, 928 F.3d 1, 22 (D.C. Cir. 2019), meaning that

this Court could not order the guards at CECOT to release class members.  But see Abu Ali v.

Ashcroft, 350 F. Supp. 2d 28, 30–31, 47–50 (D.D.C. 2004) (denying motion to dismiss habeas

petition filed by U.S. citizen held in Saudi prison at United States's behest because prisoner was

in "constructive" U.S. custody); Munaf v. Geren, 553 U.S. 674, 686 (2008) (one is "held 'in

custody' by the United States when" a U.S. official "has 'the power to produce' him") (citation

omitted).

In an egregious case of cherry-picking, Defendants selectively quote only a fragment of

the Court's response here to mischaracterize its position, suggesting that the Court acknowledged

that it lacked jurisdiction once class members left U.S. airspace.  See Resp. at 8; see also id. at

11.  But that contention overlooks that the first words of the response — "Right.  Sure.  I mean,

once they are out of the country, I'm not sure what I can do there," Mar. 15 Hrg. Tr. at 36 —

JA218

affirmed Plaintiffs' custody-based articulation of why it would lose jurisdiction. Defendants'

suggestion also ignores the Court's prior and repeated references to removal as a transfer of

custody. Any lingering doubt on this score is dispelled by the exchange that occurred just a few

minutes later. Immediately after the Court ruled on the TRO and delivered the oral command on

how it should be implemented (which will be addressed shortly), see id. at 42–43, Plaintiffs

provided an update on the two flights that they understood to have taken off that afternoon; one

had ended up in El Salvador and the other in Honduras, they said. Id. at 44. In response, the

Court said:

> Again, just so we are clear, if planes have already landed and
> discharged their occupants, aside from the five Plaintiffs I enjoined
> earlier, then . . . I don't have jurisdiction to require [the occupants']
> return.

Id. (emphasis added). "Right," agreed Plaintiffs. Id. If the Court believed jurisdiction to be

territorial, it would not have said the emphasized portion; instead, its answer would have been,

"If the planes have left the United States, I don't have jurisdiction to require their return."

In short, then, these exchanges on equitable jurisdiction — in which the Government was

both "audience" and participant, Young, 107 F.3d at 907–08 — demonstrate that Plaintiffs sought

a classwide TRO that would ensure that the Court retained that jurisdiction over class members;

that the Court agreed that it would lose such jurisdiction upon class members' handover to

foreign authorities, and not before; and that the only TRO the Court was considering granting

was one that would prevent such an eventuality.

*Third*, return to the oral ruling and command. At around 6:45 p.m., the Court ruled on

Plaintiffs' request for a broader TRO covering all class members. After explaining the reasons

that a TRO covering the Plaintiff class was "appropriate," the Court spelled out its scope: the

TRO "would be to prevent the removal of the class for 14 days or until further order of the Court.

JA219

And the class will be all noncitizens in U.S. custody who are subject to the Proclamation . . . and [to] its implementation." Mar. 15 Hrg. Tr. at 42 (emphasis added). After noting that it would "memorializ[e]" the TRO through a Minute Order, the Court then addressed "where we go from here," id., and turned to the Government to emphasize "the first point":

> [Y]ou shall inform your clients of [the Order] immediately, and that any plane containing [class members] that is going to take off or is in the air needs to be returned to the United States, but those people need to be returned to the United States. However that's accomplished, whether turning around a plane or not [dis]embarking anyone on the plane . . . , I leave to you. But this is something that you need to make sure is complied with immediately.

Id. at 43 (emphasis added).

From this command alone, it was clear and unequivocal that the ultimate action proscribed by the TRO was not class members' removal from U.S. territory, but instead their transfer from U.S. custody into foreign hands. If the Court's TRO only prohibited class members from being transported out of U.S. territory, much of the oral command would be nonsensical. It would make no sense to command that "people" who had never left the United States needed "to be returned to the United States." Id. (emphasis added). Nor would it make any sense for the Court to have ordered the Government not to deplane "anyone on [a] plane." Id. The inescapable meaning of that directive, particularly in light of the exchanges leading up to it, was that anyone on a removal flight that had already landed abroad should not be discharged from U.S. custody and turned over to Salvadoran (or Honduran) authorities. That was clearly the ultimate harm Plaintiffs sought to prevent and the jurisdiction-terminating event they endeavored to preclude by freezing the status quo. If the injunction only prevented class members' exit from U.S. airspace, the Court would have had no need to detail how they should be handled if their plane had already landed abroad.

30

JA220

* * *

In sum, numerous exchanges throughout the hearing, including the ultimate unequivocal oral command that clarified how the TRO must be obeyed, demonstrate that the Court consistently considered removal to be not mere physical removal, but instead legal deportation that was complete upon transfer out of U.S. custody. Defendants' proposition — that the written Order used removal in a dramatically narrower sense — flies in the face of this overwhelming context. And they provide no convincing explanation for why, after its emphatic oral command, the Court would have made an abrupt U-turn in the 30-minute window between the end of the hearing and the docketing of the Order. Contra Resp. at 7. Indeed, the Court twice told the Government in the hearing that it would "memorializ[e]" the TRO in the written Order, see Mar. 15 Hrg. Tr. at 42, 46; the only objectively reasonable expectation, then, was that the written order enshrined the injunction unchanged unless the Court expressly drew attention to any discrepancies between what was said and what was recorded in writing. Nor did the Government seek to clarify the relationship between the oral command and written Order, which it plainly should have done had it felt any confusion. The Court therefore concludes that the written TRO and the oral command defining compliance were each sufficiently clear and specific in proscribing the handover of class members to Salvadoran officials.

### 4. *Violation*

The second element of contempt requires that the sufficiently clear and specific order was in fact violated. Young, 107 F.3d at 907. Defendants do not dispute that, if the Order indeed proscribed transferring class members out of U.S. custody, they plainly violated it hours after it issued. Rather than mount any factual defense, they rely on *post-hoc* legal arguments to attack the validity of the Order itself. These positions are without merit, but, more important, they are

31

JA221

not even available to Defendants.  As previously explained, per the collateral-bar rule, what matters is whether they violated the terms of the Order, not whether the Order itself was legally valid.

a.   Separation of Powers

Defendants first claim that even if the TRO used the term "removal" to describe a legal departure and thereby <u>did</u> enjoin class members' transfer into foreign custody, it did not prohibit — indeed could not prohibit — Defendants from making such a transfer if the class members "were already outside the United States" at the time of the Order.  <u>See</u> Resp. at 9; <u>id.</u> at 2, 9–13.  That argument sails wide of the mark.

Underpinning their claim is a sweeping assertion: they contend that once the class members exited U.S. airspace, Defendants' authority over them flowed solely from the President's Article II powers, not from the congressional grant of immigration authority invoked by the Proclamation.  <u>Id.</u> at 10, 12.  In their view, from El Valle to the U.S. border, Defendants transported class members pursuant to the Act; upon exiting U.S. airspace, however, the Act fell away, and Defendants continued on under only the President's Article II powers.

From that bold premise, Defendants urge two points.  They first posit that because it only enjoined removals effectuated "pursuant to the Proclamation," Minute Order of Mar. 15, 7:25 p.m., the TRO "by its terms" did not reach conduct outside of United States territory taken pursuant to Article II.  <u>See</u> Resp. at 9–10, 12.  Even were the premise solid (which it is not), this is simply another argument about how the TRO should be construed based on its language.  But we have already been down this path: the TRO should be understood in light of the circumstances in which it issued — not given a belated gloss by virtue of sweeping separation-of-powers theories raised for the first time in briefing.  To reiterate again, the relevant context here demonstrates that the Order clearly and specifically prohibited Defendants from transferring

32

JA222

any class members into a Salvadoran prison, even — in fact, especially — if they had already been flown outside the United States.  See *supra* pp. 26–30.

To the degree that Defendants' objection does not concern the Order's interpretation, it melds into their secondary argument: even if the Court's Order prohibited (or "purported to" prohibit, see Resp. at 9) transferring custody of class members already outside the United States, the Court lacked the constitutional power to enjoin such transfers.  Id. at 11 (Executive Branch's handling of class members abroad "was beyond the courts' authority to adjudicate").  This position does not persuade.

First and most important, the collateral-bar rule stops it in its tracks.  Even if Defendants' theory of Article II power were sound, it would not help them in this contempt inquiry.  The argument, at bottom, is an attack on the legal validity of the TRO: by restraining their conduct, Defendants say, the Order infringed on the President's Article II powers and thus violated the Constitution.  See Resp. at 7; id. at 12 ("extraterritorial exercise" of President's Article II authority "present[s] a non-reviewable political question").  But, as explained above, Defendants cannot "defend contempt charges by asserting the unconstitutionality of the injunction."  Carroll v. President & Comm'rs of Princess Anne, 393 U.S. 175, 179 (1968) (citing Walker, 388 U.S. 307).  If Defendants believed — correctly or not — that the Order encroached upon the President's Article II powers, they had two options: they could seek judicial review of the injunction but not disobey it, or they could disobey it but forfeit any right to raise their legal argument as a defense against criminal-contempt charges.  See *supra* pp. 17–18.  They chose the latter course.

Even if their Article II argument could be construed as something other than a barred collateral attack on the legal soundness of the Orders, it would still come up short.  There is no

33

JA223

merit to their contention that outside U.S. airspace, Defendants somehow operated solely under the President's Commander-in-Chief powers, not the Alien Enemies Act. The Constitution gives Congress "plenary authority" over immigration, INS v. Chadha, 462 U.S. 919, 940 (1983), so any "discretion over the admission and exclusion of aliens" possessed by the Executive "extends only as far as the statutory authority conferred by Congress and may not transgress constitutional limitations." Abourzek v. Reagan, 785 F.2d 1043, 1061 (D.C. Cir. 1986). Since the Act's passage, moreover, an unbroken line of cases has considered the "disposition of alien enemies during a state of war" to be within Congress's constitutional ambit, not the President's. See Ludecke, 335 U.S. at 173; id. at 161; Brown v. United States, 12 U.S. (8 Cranch) 110, 126 (1814) (Marshall, C.J.) (Act "affords a strong implication that" President "did not possess" power over "alien enemies" "by virtue of [a] declaration of war"); Citizens Protective League v. Clark, 155 F.2d 290, 293 (D.C. Cir. 1946).

Although Defendants offer certain soundbite-ready assertions, see State Secrets Notice at 1 (declaring "President's plenary authority, derived from Article II and the mandate of the electorate . . . to remove from the homeland designated terrorists"), they cite no legal authority that Defendants here operated pursuant to a presidential power preclusive of both congressional and judicial power. Such an extraordinary claim "must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 638 (1952) (Jackson, J., concurring). Yet across multiple filings they muster not a single case in direct support of the proposition that when the Government carries out deportations pursuant to a grant of statutory authority, that authority is necessarily eclipsed by the Executive's exclusive constitutional prerogative when deportees leave U.S. territory. See State Secrets Notice at 1–2; Resp. at 9–13; Mot. to Vacate Mar. 17 Hrg. at 4–5.

JA224

Were that true, Executive Branch officials could do as they please with deportees abroad, regardless of statutory constraints that plainly apply — for example, by rerouting a plane to discharge deportees into a country where they would be tortured, even though federal law expressly forbids that outcome. See Huisha-Huisha v. Mayorkas, 27 F.4th 718, 721–22 (D.C. Cir. 2022). The Constitution cannot tolerate that result.

Even when the Supreme Court has found that an immigration statute does not apply extraterritorially, its reasoning undercuts Defendants' claim. In Sale v. Haitian Centers Council, Inc., 509 U.S. 155 (1993), the Court considered the legality of a program in which the Coast Guard interdicted Haitian refugees on the high seas and repatriated them. The executive order authorizing those operations relied on an INA provision that allowed the President to "suspend the entry of" aliens in certain circumstances, id. at 172 (quoting 8 U.S.C. § 1182(f)), but it also gestured toward the President's constitutional powers. Id. at 164 n.13. The challengers urged that the operations violated a separate provision of the INA from the one undergirding the operation. Id. at 170–71. The Court held that the second provision did not apply to extraterritorial actions, but that was a matter of statutory interpretation, not because any Article II powers dissolved all statutory constraints. Id. at 171–74, 177.

Defendants' extravagant assertion of Article II power, moreover, runs headlong into the fact that courts regularly adjudicate — and sometimes, through their equitable powers, restrain — Executive Branch conduct abroad. Indeed, this occurs even when national-security concerns are at their apex and Article II powers robust. See, e.g., Hamdan v. Rumsfeld, 548 U.S. 557 (2006) (holding Executive's military commissions on Guantanamo Bay cannot proceed given their unlawful structure and procedures); Boumediene v. Bush, 553 U.S. 723 (2008) (concluding that U.S. courts retain authority to constrain Executive action in Guantanamo Bay through writ

35

JA225

of habeas corpus).  In <u>Doe v. Mattis</u>, for instance, the U.S military held a dual U.S./Saudi citizen in Iraq, believing him to be a member of the Islamic State.  <u>See</u> 928 F.3d at 3.  The district court enjoined the U.S. military from transferring him into another country's custody without 72 hours' notice.  <u>Id.</u> at 3–4.  After the military then provided such notice, the court enjoined the ensuing transfer on the ground that the military lacked legal authority.  <u>Id.</u> at 4.  The D.C. Circuit upheld both orders, agreeing that the military had failed to satisfy the legal preconditions for such a transfer.  <u>Id.</u> at 4–5.

That courts can enjoin U.S. officials' overseas conduct simply reflects the fact that an injunction operates *in personam*, meaning that it "is directed at someone, and governs that party's conduct."  <u>Nken v. Holder</u>, 556 U.S. 418, 428 (2009).  It therefore binds the enjoined parties wherever they might be; the "situs of the [violation], whether within or without the United States, is of no importance."  <u>New Jersey v. City of New York</u>, 283 U.S. 473, 482 (1931); <u>Steele v. Bulova Watch Co.</u>, 344 U.S. 280, 289 (1952) ("Where . . . there can be no interference with the sovereignty of another nation, the District Court in exercising its equity powers may command persons properly before it to cease or perform acts outside its territorial jurisdiction."); cf. <u>Massie v. Watts</u>, 10 U.S. (6 Cranch) 148, 158 (1810) ("[T]he principles of equity give a court jurisdiction wherever the person may be found."); <u>Mallory v. Norfolk S. Railway Co.</u>, 600 U.S. 122, 128 (2023).

To argue that this Court did something more than what courts routinely do, Defendants must grossly mischaracterize its Order and oral command.  They contend that this Court ordered "the Government to reverse an extant counterterrorism operation and deliver foreign terrorists to United States soil," Resp. at 7; <u>see id.</u> at 10–11 (similar), including by mandating that they "turn[] planes around mid-air without regard to important logistical constraints such as fuel

JA226

availability or foreign airspace restrictions." State Secrets Notice at 8. Hardly. The fair reading of the TRO is that it only prevented class members' transfer from American into foreign custody. See *supra* pp. 26–30. To be sure, in its oral command, the Court said: "[A]ny plane containing [class members] that is going to take off or is in the air needs to be returned to the United States, but those people need to be returned to the United States." Mar. 15 Hrg. Tr. at 43. But the Court made clear in the same breath: "However that's accomplished" — *i.e.*, however custody is retained — "whether turning around a plane or not [dis]embarking anyone [on it] . . . , I leave to you." Id. The overriding implication was therefore that U.S. officials needed to retain custody. The Court thus warned that if retaining custody hinged on ensuring that planes did not take off, or turned around, or did not discharge their passengers, then such actions needed to happen — but it was up to Defendants to comply however they saw logistically and operationally prudent. See J.G.G., 2025 WL 914682, at *21 (Millett, J., concurring) (TROs did "nothing remotely like" Government's characterization, as they "only directed immigration officials to preserve their custody, and thus the court's jurisdiction, over the Plaintiffs"). And if the Government indeed voluntarily delivered nine passengers back to U.S. soil, see *supra* p. 9, the choice to hold them in the United States as opposed to somewhere else was the Government's, not this Court's.

Once the dust Defendants kick up is cleared away, it is evident that the TRO merely did what courts consistently do: review and sometimes restrict Executive actions, including when the officials are overseas and the issues implicate national security or foreign affairs. It in no way invaded any Article II powers, despite Defendants' effort to incant new ones into existence. In any event, even if the TRO did somehow overstep the Court's Article III power, Defendants cannot now evade a contempt charge on that basis.

37

JA227

b.  Rule 65(d)

Defendants next seek protection in one of the Federal Rules of Civil Procedure.  Rule 65(d)(1), which sets out the parameters for issuing a preliminary injunction or TRO, provides that "every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required."  Defendants argue that the written Minute Order failed to satisfy Rule 65(d)'s requirements because it did not "state the reasons why it issued" and was thus not binding upon them.  And, they contend, neither was the oral command standing alone.  See Resp. at 2, 5–9.  On each point, they are mistaken.

*First,* the collateral-bar rule once again renders this entire line of argument a non-starter.  As will shortly be explained, the written Order fully satisfied Rule 65(d).  But even if the written Order had been deficient, it would not have been void and thus non-binding; instead, it would have been subject to reversal or vacatur on appeal, while binding the parties in the interim.  See 11A Wright & Miller, *supra*, § 2955 ("A court's failure to comply with the prerequisites in Rule 65(d) as to the proper scope or form of an injunction or restraining order does not deprive it of jurisdiction or render its order void.  But an order challenged on appeal should be set aside if it fails to comply with the rule.") (footnotes omitted).  By disobeying the Order rather than pursuing appellate relief, Defendants cannot now rely on any nonconformity with Rule 65(d) as a defense to contempt.  See *supra* pp. 17–18.

To suggest otherwise, Defendants cite two cases from the Seventh Circuit.  See Resp. at 5.  But both undercut their contrarian proposition, as that Circuit considered a failure to satisfy Rule 65(d) as reason either to reverse the injunction or to remand for an explanation, but not to declare the injunction void.  Adkins v. Nestle Purina PetCare Co., 779 F.3d 481, 483 (7th Cir. 2015); e360 Insight v. The Spamhaus Project, 500 F.3d 594, 604 (7th Cir. 2007).  Defendants'

JA228

argument, moreover, makes little sense. They nowhere explain why a failure to fulfill Rule 65(d)'s requirements is a unique legal defect, rendering an injunction void rather than — like all other defects — binding but potentially reversible. Other circuits, unsurprisingly, hold the exact opposite. See In re U.S. Bureau of Prisons, 918 F.3d 431, 437 n.3 (5th Cir. 2019); Test Masters Educ. Servs., Inc. v. Singh, 428 F.3d 559, 577 (5th Cir. 2005); Lau v. Meddaugh, 229 F.3d 121, 123 n.2 (2d Cir. 2000); Bethlehem Mines Corp. v. United Mine Workers of Am., 476 F.2d 860, 862 (3d Cir. 1973); Va. Coal. for Immigrant Rts. v. Beals, 2024 WL 4601052, at *3 (4th Cir. Oct. 27, 2024); see also Lawrence v. St. Louis-San Francisco Ry. Co., 274 U.S. 588, 591–92 (1927) (failure to adhere to analogous requirements set forth by statute — requiring "every order of injunction" to "set forth the reasons for [its] issuance" — "did not render the [order] void," but instead meant it "must be . . . reversed").

*Second*, in any event, the written TRO did comply with Rule 65(d). Defendants assert that it did not contain any "reasoning," although they acknowledge that it contained "directives." Resp. at 5. They overlook, however, that the written Order expressly incorporated the reasoning provided during the hearing. See Mar. 15 Minute Order, 7:25 p.m. ("As discussed in today's hearing . . . ."); Mar. 15 Hrg. Tr. at 41–42 (explaining reasons why TRO issued). Defendants nowhere suggest that that reasoning was insufficient for purposes of Rule 65(d). They are wrong, furthermore, insofar as they contend that a TRO falls short of Rule 65(d) if its reasoning is expounded orally in a hearing (and not reiterated in the written Order). Although this section of their Response relies heavily on Seventh Circuit cases, they conspicuously neglect to address the one in which that court squarely held that to satisfy the requirements of Rule 65(d), the "explanation can be oral rather than written." EEOC v. Severn Trent Servs., Inc., 358 F.3d 438, 442 (7th Cir. 2004); see Dexia Credit Loc. v. Rogan, 602 F.3d 879, 885 (7th Cir. 2010) (same for

JA229

similar rule); see also Six Clinics Holding Corp., II v. Cafcomp Sys., Inc., 119 F.3d 393, 400–01

(6th Cir. 1997) (similar).  Defendants muster no contrary authorities.

That rule makes sense, moreover, in light of the purposes behind Rule 65(d).  One is to

ensure that parties understand their legal obligations.  Int'l Longshoremen's Ass'n v. Phila.

Marine Trade Ass'n, 389 U.S. 64, 75–76 (1967).  That concern is not present if the bound party

— here, the Government — has direct knowledge of the Court's reasoning, regardless of whether

it was in written or oral form.  Another purpose is to facilitate judicial review.  Schmidt v.

Lessard, 414 U.S. 473, 477 (1974).  Although a written opinion is presumably better on this

score, a court can review the correctness of an injunction by reviewing a Court's oral exposition

of its reasoning.  See, e.g., Six Clinics Holding Corp., 119 F.3d at 400–01.

*Third*, even if the written Order were somehow completely out of the picture — that is, if

Defendants were able to show that the written TRO failed to satisfy Rule 65(d) and was therefore

void, despite no legal support for that view — a violation of the oral command itself is grounds

for contempt.  The Fifth Circuit, for instance, has held that contempt can lie where — as here —

the oral command was "not tentative" and the court "made clear that [it] would be effective

immediately."  In re U.S. Bureau of Prisons, 918 F.3d at 437 & n.3; see also Malautea v. Suzuki

Motor Co., 987 F.2d 1536, 1542 n.7 (11th Cir. 1993) ("Oral orders are just as binding on litigants

as written orders"); United States v. Elcock, 851 F. App'x 299, 302 (3d Cir. 2021) (citing id. for

same); In re Charlotte Observer, 921 F.2d 47, 50 (4th Cir. 1990) (treating oral injunction as

enforceable but vacating on merits); Lau, 229 F.3d at 123 & n.2 (noting Rule 65(d)

"contemplates" a written order but "oral order" is not "void" by virtue of not being

"memorialize[d]").  Indeed, consider the absurd mischief that Defendants' position would

license: if an oral command is not binding for purposes of contempt unless or until memorialized

JA230

in a written Order, the enjoined party could race to accomplish the plainly proscribed act before the court could put pen to paper.

*  *  *

In sum, each of Defendants' arguments about whether there was a violation — arguments crafted for the most part as this contempt litigation has developed — are, at root, attacks on the TRO's legal soundness and are therefore precluded by the collateral-bar rule. Even if they were not, however, they do not pass muster. The Court therefore must conclude that probable cause exists to find that Defendants violated its Order.

### 5. *Willful*

Having so determined, the sole remaining question is whether such defiance was willful. See Young, 107 F.3d at 907. "To establish willfulness," the Court must determine that Defendants "acted with deliberate or reckless disregard of [their] obligation[s] under the" Order. Id. at 909 (citing In re Holloway, 995 F.2d at 1082); accord United States v. Rapone, 131 F.3d 188, 195 (D.C. Cir. 1997). Several aspects of Defendants' conduct strongly support such a conclusion. Cf. In re Holloway, 995 F.2d at 1082 (analyzing whether there was willful "intent properly encompasses the contemnor's behavior in related incidents such as disobedience or resistance to other orders of the court").

From the opening hours of Saturday, the Government's conduct betrayed a desire to outrun the equitable reach of the Judiciary. See *supra* pp. 2–10; J.G.G., 2025 WL 1024097, at *9 (Sotomayor, J., dissenting). Hustling class members to an airport before the Proclamation had even been published and in the face of a suit that sought a TRO was bad enough. The decision to launch planes during the afternoon hearing was even worse. The Government knew as of that morning that the Court would hold a hearing on whether anyone in its custody could, consistent

41

JA231

with the law, be removed pursuant to the Act — and yet it nonetheless rushed to load people onto planes and get them airborne. Such conduct suggests an attempt to evade an injunction and deny those aboard the planes the chance to avail themselves of the judicial review that the Government itself later told the Supreme Court is "obviously" available to them. See Government Reply in Support of Application at 1, Trump v. J.G.G., No. 24A931 (U.S. Apr. 2, 2025).

Second, although Defendants now seek to muddy the waters, at no point on Saturday evening — not when the Court delivered the oral command directly to the Government, nor at any time after the written Order issued — did the Government so much as hint that it was not "clear . . . precisely what action [was] proscribed." Young, 107 F.3d at 907 n.5 (quotation marks omitted). After the oral command, the hearing progressed for another five minutes. See Mar. 15 Hrg. Tr. at 43–47. Although the Government spoke for the majority of that time, it never mentioned — much less asked the Court to clarify — the injunction just issued. See id. Government counsel has since confirmed that he understood the oral command and communicated it up the chain. See Mar. 21 Hrg. Tr. at 5. Additionally, that night — after the oral injunction was relayed to the agencies, see Apr. 3 Hrg. Tr. at 21, and as custody-transfer operations proceeded — the Government never contacted the Court with any questions about the injunctions' scope. That is telling. The Government had been in regular email contact with chambers throughout the day, and it thus knew that it would get a rapid reply to any question it might have about the injunction. Indeed, that is exactly what had happened that morning: on the email chain that included the Government, Plaintiffs asked the Court to confirm whether the first TRO covered only named Plaintiffs, and the Court replied a mere nine minutes later. Only now

JA232

does the Government suggest that the Court ordered something less than what it unequivocally stated in the hearing.

Finally, the Government plainly had an opportunity to avoid noncompliance — and yet it chose to press ahead. As previously explained, the Government pulled named Plaintiffs from removal flights in response to the Court's first TRO, and two class members now aver that they were among the nine people who landed in El Salvador early Sunday morning but were later returned to the United States. See supra pp. 5, 9. Although Defendants maintain that they "did not order any removal flights to return to the United States," Resp. at 4, they offer no evidence to support that assertion or discredit the first-hand declarations of class members.

Taken together, this behavior indicates "deliberate or reckless disregard" of the Order, Young, 107 F.3d at 909, leading this Court to conclude that there is probable cause that Defendants willfully disobeyed a binding judicial decree.

B. Next Steps

So now what? The Court last details the next steps that these proceedings may take.

First, before initiating any criminal-contempt proceedings, courts typically allow the contumacious party an opportunity to purge its contempt — that is, to remedy its violation by voluntarily obeying the court order. See Yates v. United States, 355 U.S. 66, 75 (1957) ("[A] court should first apply coercive remedies in an effort to persuade a party to obey its orders, and only make use of the more drastic criminal sanctions when the disobedience continues."); cf. 9A Wright & Miller, supra, § 2465 ("The district judge normally will preface a contempt citation with an order directing either compliance with the subpoena or a showing of an excuse for the noncompliance."). The most obvious way for Defendants to do so here is by asserting custody of the individuals who were removed in violation of the Court's classwide TRO so that they might

JA233

avail themselves of their right to challenge their removability through a habeas proceeding.  See

J.G.G., 2025 WL 1024097, at *2.  Per the terms of the TRO, the Government would not need to

release any of those individuals, nor would it need to transport them back to the homeland.  The

Court will also give Defendants an opportunity to propose other methods of coming into

compliance, which the Court will evaluate.

In the event that Defendants do not choose to purge their contempt, the Court will

proceed to identify the individual(s) responsible for the contumacious conduct by determining

whose "specific act or omission" caused the noncompliance.  See Cobell v. Norton, 334 F.3d

1128, 1147 (D.C. Cir. 2003); United States v. Voss, 82 F.3d 1521, 1525–27 (10th Cir. 1996).  At

the suggestion of the Government in the last hearing, the Court will begin by requiring

declarations.  See Apr. 3 Hrg. Tr. at 24–25.  Should those be unsatisfactory, the Court will

proceed either to hearings with live witness testimony under oath or to depositions conducted by

Plaintiffs.  Id. at 29–30 (Plaintiffs suggesting declarations, depositions, hearings).  The next step

would be for the Court, pursuant to the Federal Rules of Criminal Procedure, to "request that the

contempt be prosecuted by an attorney for the government."  Fed. R. Crim. P. 42(a)(2).  If the

Government "declines" or "the interest of justice requires," the Court will "appoint another

attorney to prosecute the contempt."  Id.

* * *

Finally, a note on Defendants' invocation of the state-secrets privilege, which "permits

the Government to prevent disclosure of information when that disclosure would harm national

security interests."  United States v. Zubaydah, 595 U.S. 195, 204 (2022).  They invoke the

privilege as a ground for not providing certain details related to the movement of flights and

class members before and after this Court's TROs.  Sharing such details, they assert, could make

44

JA234

foreign countries less likely to collaborate with the U.S. in the future, and would disclose means used to thwart alien enemies, allowing them to evade capture and risking the security of removal personnel.  See State Secrets Notice at 4–6; see also ECF Nos. 56-2 (Marco Rubio Decl.), ¶¶ 10, 13; No. 56-3 (Kristi Noem Decl.), ¶ 10.  Defendants also add that there is also no need for the information in this case, as this Court "has all of the facts it needs to address the compliance issues."  State Secrets Notice at 1; see id. at 8–9.

Judicial review of a state-secrets invocation is circumscribed, but not nonexistent.  The Government's claim is to be afforded the utmost deference, and the Court must evaluate whether "there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged."  United States v. Reynolds, 345 U.S. 1, 10 (1953); but see El-Masri v. United States, 479 F.3d 296, 312 (4th Cir. 2007) ("[T]he state secrets doctrine does not represent a surrender of judicial control over access to the courts."); Linder v. Dep't of Def., 133 F.3d 17, 23 (D.C. Cir. 1998) (describing proper examination of information's national-security impact).

The Court is exceedingly doubtful that the privilege applies here.  It is not inquiring into the diplomatic agreements that facilitated the flights nor the operational specifics of how Defendants apprehended and transported class members.  Instead, the Court is simply seeking to confirm times and numbers: how many passengers the two flights carried, whether they were all deported pursuant to the Proclamation, and when they were transferred out of U.S. custody.  See Minute Order of Mar. 18, 2:27 p.m.  The Court is skeptical that such information rises to the level of a state secret.  As noted, the Government has widely publicized details of the flights through social media and official announcements, see supra p. 11 (reposting video showing operational details); ECF No. 69 (Resp. to State Secrets) at 4–10, thereby revealing snippets of

JA235

the information the Court seeks and raising doubts that such information would jeopardize future diplomatic engagements or operational security.  Defendants, moreover, have still not asserted that the information is even classified, and they have identified no case in which unclassified material was nonetheless protected by the privilege.  Nor is the Court yet persuaded that even if publicly disclosing the information might harm state secrets, sharing it only *ex parte* with a federal court would do the same.

At this point in the contempt inquiry, however, the information at issue is not necessary to proceed, so the Court will not resolve whether the invocation is warranted.  Reynolds, 345 U.S. at 11 ("necessity" of information "determine[s] how far the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate").  But if the information turns out to be necessary later in these proceedings, the Court may revisit the invocation.

## III.    Conclusion

For the foregoing reasons, the Court will find probable cause that Defendants' actions constitute contempt.  It will provide them an opportunity to purge such contempt.  If they opt not to do so, the Court will proceed to identify the contemnor(s) and refer the matter for prosecution. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  April 16, 2025

JA236

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

J.G.G., *et al.*,

    Plaintiffs,

       v.

DONALD J. TRUMP, *et al.*,

    Defendants.

          **Civil Action No. 25-766 (JEB)**

## ORDER

Here and concurrently in the Court of Appeals, Defendants seek an emergency stay pending appeal of this Court's Probable Cause Order. <u>See</u> ECF Nos. 80 (Probable Cause Order), 88 (Mot.), 89 (Mot. Br.). The Court will deny the Motion. The Court does not believe that Defendants have made an adequate showing on the merits, nor convincingly shown they will suffer irreparable harm in providing the information required by the Order. The public interest, furthermore, weighs in favor of permitting the Court's contempt inquiry to proceed. <u>See</u> ECF No. 81 (Probable Cause Op.) at 2.

Among other problems, Defendants' arguments rely on a misconstruction of the Court's directive. Having found probable cause that they committed criminal contempt, the Court required Defendants to choose one of two paths. <u>See</u> Order at 1. First, they can opt to purge their probable contempt and explain to the Court how they will do so. <u>Id.</u> In its Opinion, the Court observed that the "most obvious way" for them to do so would be by choosing to "assert[] custody of the individuals who were removed in violation of the Court's classwide TRO so that they might avail themselves of their right to challenge their removability through a habeas

1

JA237

proceeding." Op. at 43–44. In offering the Government a chance to <u>voluntarily</u> assert custody of the people it placed in a foreign prison, then, the Order did not "forc[e] the government to successfully execute foreign diplomacy" in violation of the separation of powers. <u>See</u> Mot. Br. at 11. The Court expressly allowed, moreover, that Defendants could "propose other methods of coming into compliance." Op. at 44. Whether to purge the likely contempt, and whether to do so by voluntarily asserting custody of those individuals in Salvadoran jail, is entirely up to Defendants. If they do not want to "make what was wrong, right," <u>Abrego Garcia v. Noem</u>, 2025 WL 1135112, at *1 (4th Cir. Apr. 17, 2025), they can choose the second path: identify the individual(s) whose conduct caused the noncompliance. <u>See</u> Order at 1. Although the Opinion noted that the Court might eventually refer this matter for prosecution, <u>see</u> Op. at 44 (citing Fed. R. Crim. P. 42(a)(2)), we are not at that juncture. Their separation-of-powers arguments concerning any future prosecution(s), <u>see</u> Mot. Br. at 8–11, are therefore premature and misplaced.

For the foregoing reasons, the Court ORDERS that Defendants' [88] Emergency Motion for a Stay Pending Appeal is DENIED.

<u>/s/ *James E. Boasberg*</u>
JAMES E. BOASBERG
Chief Judge

Date: <u>April 18, 2025</u>

2

JA238



1612 K Street NW Suite #808
Washington, DC, 20006
(202) 457-0034
whistleblower.org

June 24, 2025

*Sent via electronic mail*

Michael E. Horowitz
Inspector General
U.S. Department of Justice
Office of the Inspector General
950 Pennsylvania Avenue NW
Washington, D.C. 20530

Jamieson Greer
Acting Special Counsel
U.S. Office of Special Counsel
1730 M Street, NW, Suite 218
Washington, D.C. 20036

Honorable Chuck Grassley, Chair
Honorable Richard J. Durbin, Ranking Member
U.S. Senate Committee on the Judiciary
Washington, D.C. 20510

Honorable Jim Jordan, Chair
Honorable Jamie Raskin, Ranking Member
U.S. House Committee on the Judiciary
Washington, D.C. 20515

**Re:    Protected Whistleblower Disclosure of Erez Reuveni Regarding Violation of Laws, Rules & Regulations, Abuse of Authority, and Substantial and Specific Danger to Health and Safety at the Department of Justice**

Dear All:

We, the Government Accountability Project and Gilbert Employment Law, P.C., represent Mr. Erez Reuveni, formerly the Acting Deputy Director for the Office of Immigration Litigation (OIL) of the Department of Justice (DOJ), and a whistleblower. Mr. Reuveni presents the following disclosures to your attention for your respective offices to take appropriate oversight action.

Between March 14, 2025, and April 5, 2025, Mr. Reuveni, almost immediately after receiving notice of his promotion to serve as Acting Deputy Director of OIL, became aware of the plans of DOJ leadership to resist court orders that would impede potentially illegal efforts to deport noncitizens, and further became aware of the details to execute those plans.

On April 4, 2025, after raising concerns internally to his chain of command for nearly three weeks regarding the government's compliance with court orders and candor to the courts, Mr. Reuveni appeared before Judge Paula Xinis, United States District Court Judge in the District of Maryland, on behalf of the government in the case of Mr. Kilmar Abrego Garcia. During that appearance, Mr. Reuveni candidly and truthfully informed the court, based on the evidentiary record, that Mr. Abrego Garcia's removal from the United States was a mistake. Later that evening, Mr. Reuveni refused directions from his superiors to file a brief misrepresenting those facts to the

Page 1 of 27

JA239

court. As a result, Mr. Reuveni was put on administrative leave on April 5, 2025, and his employment was ultimately terminated on April 11, 2025.[1]

In this letter Mr. Reuveni exercises his rights to make disclosures to Congress, the DOJ OIG, and the OSC pursuant to 5 U.S.C. § 2302 and 5 U.S.C. § 1213. Mr. Reuveni's disclosures detail violations of law, rules or regulations, and the abuse of authority by DOJ and White House personnel, as well as the creation of substantial and specific health and safety threats to noncitizens. These high-level governmental personnel knowingly and willfully defied court orders, directed their subordinate attorneys to make misrepresentations to courts, and engaged in a scheme to withhold relevant information from the court to advance the Administration's priority of deporting noncitizens.

Since April 5, 2025, it has been widely reported that, according to DOJ sources, Mr. Reuveni was put on administrative leave by DOJ for allegations of failure to "follow a directive" from his superiors, failure to "zealously advocate" on behalf of the United States, and for arguing "against Homeland Security and [the] State Department" when he truthfully represented to the court that Mr. Abrego Garcia's removal was in error.[2] These statements by Attorney General Pamela Bondi and her deputy, Todd Blanche, are false and misleading. Indeed, it has since been reported that prior to the April 4 hearing, Senior Counselor to the Secretary of Homeland Security and Trump appointee James Percival conceded that Mr. Abrego Garcia's removal "was an administrative error […] (Not that we should say publicly.)."[3]

Nevertheless, White House officials have publicly disparaged Mr. Reuveni to justify their refusal to comply with the Constitution and with court orders.[4] White House Deputy Chief of Staff Stephen Miller falsely stated, "The only mistake that was made is a lawyer put an incorrect line in

---

[1] Through counsel Gilbert Employment Law and Government Accountability Project, Mr. Reuveni has filed an appeal alleging that his no-notice termination violated the Civil Service Reform Act and the Whistleblower Protection Act with the Merit Systems Protection Board (MSPB).

[2] Glenn Thrush, "Justice Dept. Accuses Top Immigration Lawyer of Failing to Follow Orders," *New York Times*, April 5, 2025, https://www.nytimes.com/2025/04/05/us/politics/justice-dept-immigration-lawyer-leave.html; Evan Perez, "Justice Department Fires Immigration Lawyer Who Argued Case of Mistakenly Deported Man," *CNN*, April 15, 2025, https://www.cnn.com/2025/04/15/politics/doj-fires-immigration-lawyer-who-argued-abrego-garcia-case-source-says; Constitutional Accountability Center, "Bondi's Firing of DOJ Lawyer for Lack of 'Zealous Advocacy' in Deportation Case Raises Concerns," May 1, 2025, https://www.theusconstitution.org/news/bondis-firing-of-doj-lawyer-for-lack-of-zealous-advocacy-in-deportation-case-raises-concerns/.

[3] Hamed Aleaziz and Alan Feuer, "How Trump Officials Debated Handling of the Abrego Garcia Case: 'Keep Him Where He Is'," *New York Times*, May 21, 2025, https://www.nytimes.com/2025/05/21/us/politics/trump-abrego-garcia-el-salvador-deportation.html.

[4] Alan Feuer and Glenn Thrush, "Judges in Deportation Cases Face Evasion and Delay from Trump Administration," *New York Times*, June 3, 2025, https://www.nytimes.com/2025/06/03/us/politics/judges-trump-deportations-immigration.html; Perez, "Justice Department Fires"; Fox News, "Stephen Miller Doubles Down on Deportation of Alleged Gang Member: 'Not Mistakenly Sent' | Fox News Video," April 14, 2025, https://www.foxnews.com/video/6371474279112; Dareh Gregorian, Katherine Doyle and Lawrence Hurley, "El Salvador's president says he won't return mistakenly deported man to the U.S.," *NBC News*, April 14, 2025, https://www.nbcnews.com/politics/trump-administration/president-el-salvador-wont-return-deported-man-kilmar-abrego-garcia-rcna201136.

a legal filing," and labeled Mr. Reuveni a "saboteur, a Democrat."[5] Referring to Mr. Reuveni, President Trump stated, "Well, the lawyer that said it was a mistake was here a long time, was not appointed by us—should not have said that, should not have said that."[6]

What has not been reported to date are Mr. Reuveni's attempts over the course of three weeks and affecting three separate cases to secure the government's compliance with court orders, and his resistance to the internal efforts of DOJ and White House leadership to defy them through lack of candor, deliberate delay, and disinformation. Discouraging clients from engaging in illegal conduct is an important part of the role of a lawyer.[7] Mr. Reuveni tried to do so and was thwarted, threatened, fired, and publicly disparaged for both doing his job and telling the truth to the court. Because his clients engaged in unlawful activity, abused their authority, created substantial and specific threat to health and safety, and because the pattern of this conduct continues to this day,[8]

---

[5] Perez, "Justice Department Fires"; Fox News, "Stephen Miller Doubles Down," 2:46; Gregorian, Doyle and Hurley, "El Salvador's president says."

[6] Fritz Farrow, "Trump Says 'I Could' Get Abrego Garcia Back from El Salvador," *ABC News*, April 29, 2025, https://abcnews.go.com/Politics/trump-abrego-garcia-back-el-salvador/story?id=121298276.

[7] D.C. R. Prof'l Conduct § 3.3; s*ee also*, *In re Public Defender Service*, 831 A.2d 890, 901 (D.C. 2003) ("…discouraging clients from illegal conduct is a regular occurrence in an attorney's practice. '[A]bout half of the practice of a decent lawyer is telling would-be clients that they are damned fools and should stop.' *McCandless v. Great Atlantic & Pacific Tea Co.,* 697 F.2d 198, 201–02 (7th Cir.1983) (attributed to Elihu Root)."); *see also, id.*, (noting that when a "client misguidedly contemplates or proposes" illegal action, the "lawyer is then obliged, in the interests of justice and the client's own long-term best interests, to urge the client, as forcefully and emphatically as necessary, to abandon illegal conduct or plans.").

[8] Feuer and Thrush, "Judges in Deportation Cases Face Evasion and Delay From Trump Administration," (noting pattern of "obfuscations and delays" to courts in the context of legal challenges to deportation plans so significant that multiple judges in the cases referenced herein have considered or initiated criminal contempt proceedings against the Trump administration). *See also J.G.G. v. Trump*, 1:25-cv-00766, (D.D.C. Apr 16, 2025) ECF No. 81, Memorandum and Opinion at p. 1, https://www.courtlistener.com/docket/69741724/81/jgg-v-trump/ ("the court ultimately determines that the Government's actions on that day demonstrate a willful disregard for its Order, sufficient for the Court to conclude that probable cause exists to find the Government in criminal contempt."); *J.G.G*, (D.D.C. June 04, 2025) ECF No. 148, Memorandum Opinion at p. 3, https://www.courtlistener.com/docket/69741724/jgg-v-trump/?page=2#entry-148 ("This Court, at a swiftly convened hearing on March 15, ordered the Government not to relinquish custody of the men, but that mandate was ignored. Such defiance is currently the subject of the Court's contempt inquiry."); *D.V.D. v. U.S. Department of Homeland Security*, 1:25-cv-10676, (D. Mass. May 21, 2025) ECF No. 119, Order on Remedy for Violation of Preliminary Injunction at p. 1, https://www.courtlistener.com/docket/69775896/dvd-v-us-department-of-homeland-security/#entry-119 ("[t]he Court found that Defendants violated the Court's Preliminary Injunction."); *D.V.D.*, (D. Mass. May 26, 2025) ECF No. 135, Order on Motion for Reconsideration at p. 7, https://www.courtlistener.com/docket/69775896/135/dvd-v-us-department-of-homeland-security/ ("The court reserved ruling on whether such a violation warranted a finding of contempt."); *Abrego Garcia v. Noem*, 8:25-cv-00951, (D. Md. Apr 16, 2025) ECF No. 86 at p. 69, https://www.courtlistener.com/docket/69777799/86/1/abrego-garcia-v-noem/ ("I'm not going to issue a show cause today for contempt findings, but I do find it well within my authority to proceed with expedited discovery specifically to determine whether you are abiding by the court order, my court orders, whether you intend to abide by the court orders."), ("the Court ultimately determines that the Government's actions on that day demonstrate a willful disregard for its Order, sufficient for the Court to conclude that probable cause exists to find the Government in criminal contempt."); *J.G.G*, (D.D.C. June 04, 2025) ECF No. 148, Memorandum Opinion at p. 3, https://www.courtlistener.com/docket/69741724/jgg-v-trump/?page=2#entry-148 ("This Court, at a swiftly convened hearing on March 15, ordered the Government not to relinquish custody of the men, but that mandate was ignored. Such defiance is currently the subject of the Court's contempt inquiry.");

Mr. Reuveni is exercising his rights under 5 U.S.C. § 2302 and 5 U.S.C. § 1213 to report wrongdoing.[9]

Since his unlawful termination, six members of Congress have written to Attorney General Bondi and Deputy Attorney General Blanche decrying the "Hobbesian choice" DOJ leadership has created for attorneys "who may be forced to choose between their jobs and their oath of candor to the courts," and calling for Mr. Reuveni's reinstatement.[10] We thank these members for their support of Mr. Reuveni, and urge all members of Congress committed to the rule of law along with the DOJ Inspector General and the U.S. Office of Special Counsel to investigate the disclosures presented in this letter.

## I.   Erez Reuveni: Nonpartisan Zealous Advocate with Distinguished Service at DOJ

Before his unlawful removal from federal service on April 11, 2025, Mr. Reuveni had an exemplary, nearly 15-year legal career at DOJ. Mr. Reuveni began his career at the Office of Immigration Litigation (OIL), District Court Section (DCS) in 2010 as a trial attorney and was promoted multiple times under both Republican and Democratic administrations.[11]

Most recently, Mr. Reuveni served as the Acting Deputy Director for the Office of Immigration Litigation responsible for all of OIL's immigration litigation arising in U.S. district courts nationwide, overseeing over one hundred attorneys handling hundreds of cases. His

---

*D.V.D.*, (D. Mass. May 21, 2025) ECF No. 119, Order on Remedy for Violation of Preliminary Injunction at p. 1, courtlistener.com/docket/69775896/dvd-v-us-department-of-homeland-security/#entry-119 ("[t]he Court found that Defendants violated the Court's Preliminary Injunction."); *D.V.D.*, (D. Mass. May 26, 2025) ECF No. 135, Order on Motion for Reconsideration at p. 7, courtlistener.com/docket/69775896/135/dvd-v-us-department-of-homeland-security/ ("The court reserved ruling on whether such a violation warranted a finding of contempt."); *Abrego Garcia*, (D. Md. Apr 16, 2025) ECF No. 86 at p. 69, courtlistener.com/docket/69777799/86/1/abrego-garcia-v-noem/ ("I'm not going to issue a show cause today for contempt findings, but I do find it well within my authority to proceed with expedited discovery specifically to determine whether you are abiding by the court order, my court orders, whether you intend to abide by the court orders.").

[9] As an attorney subject to rules of professional conduct, Mr. Reuveni has consulted extensively with ethics counsel, Kathleen Clark and Richard Zitrin, regarding the exercise of his whistleblower rights. Mr. Reuveni's disclosures contained herein are permitted under the DC Bar Rules of Professional Conduct 1.6 and California Rules of Professional Conduct 8.5.

[10] Rep. Daniel Goldman et al., *Letter to Attorney General Bondi and Deputy Attorney General Blanche*, April 16, 2025, https://goldman.house.gov/sites/evo-subsites/goldman.house.gov/files/evo-media-document/4.16.25_letter-from-rep-goldman%2C-et-al.%2C-to-ag-bondi-%26-dag-blanche.pdf.

[11] Mr. Reuveni was promoted to Senior Litigation Counsel in 2015, to Assistant Director of OIL-DCS in 2017, and has twice served as Acting Deputy Director for OIL, responsible for all of OIL's immigration litigation in U.S. district courts nationwide. From December 2023 to October 2024, Mr. Reuveni first served as counsel and then senior counsel to Principal Deputy Assistant Attorney General Brian Boynton and Deputy Assistant Attorney General Chris Tenorio. Mr. Reuveni first served as Acting Deputy Director of OIL, District Court Section from November to December 2024. OIL was then restructured, and the District Court Section was merged with the OIL Appellate Section into OIL, General Litigation and Appeals. After this merger, Mr. Reuveni was counsel to Acting Assistant Attorney General Yaakov Roth, Principal Deputy Assistant Attorney General Brett Shumate, and Deputy Assistant Attorney General Drew Ensign for approximately two months until Mr. Reuveni was again promoted and began a role as Acting Deputy Director of OIL, General Litigation and Appeals beginning March 21, 2025.

supervisory responsibilities included oversight of the government's defense against many significant legal challenges to multiple Executive Orders signed by President Trump and defending multiple immigration policy initiatives on behalf of the Departments of Homeland Security (DHS), State (DOS), Defense (DOD), Labor (DOL) and Health and Human Services (HHS). Mr. Reuveni received notice of his promotion to that role on March 14, 2025, effective Friday, March 21, and in the following week alone oversaw and defended the government's position in at least seven cases involving motions for temporary restraining orders or preliminary injunctions seeking court orders enjoining Trump Administration policies nationwide, including multiple emergency appeals to various courts of appeal.

Prior to Mr. Reuveni's termination following his candid and truthful representations to the court in the Abrego Garcia case, Department of Justice leadership under the Trump administration had consistently lauded Mr. Reuveni's work. For example, in a March 21, 2025 email announcing Mr. Reuveni's recent promotion, Deputy Assistant Attorney General Drew Ensign remarked that Mr. Reuveni "is a top notched [*sic*] litigator who has taken on some of OIL's most challenging cases over the past nearly 15 years," including as "Assistant Director for over 7 years," and "multiple stints as counsel in the Civil Division front office," having "led and litigated complex cases protecting our immigration authorities, developed sanctuary city affirmative cases, and worked closely with our many excellent attorneys handling district court litigation."[12]

Additionally, Mr. Reuveni's most recent performance review under the prior Trump administration was stellar. Then-Deputy Director Colin Kisor wrote that "Assistant Director Erez Reuveni continues to be one of OIL-DCS's [OIL District Court Section] premier litigators and supervisors. He is an outstanding attorney, legal writer, and oral advocate. He continues to handle some of the section's most difficult and highest profile cases."[13] Mr. Kisor further noted that "Mr. Reuveni routinely received accolades for his efforts from senior personnel within DOJ and the agencies he advocates for," is an "indispensable asset to OIL-DCS, the Civil Division, DOJ, and the many client agencies he works closely with," and "has truly earned an excellent rating for this rating period."[14]

Indeed, Mr. Reuveni has received an "excellent rating" for every year he has worked at the Department, since 2010. On top of that, he is a recipient of nine Civil Division awards, including three during the prior Trump Administration for helping lead the COVID-19 Immigration Litigation Response Team in 2020, leading district court litigation on behalf of the Sanctuary Cities Litigation Team in 2019, and leading defense of the Protecting the Nation from Foreign Terrorist Entry Executive Order in 2017.[15]

---

[12] Exhibit A.
[13] On file with Government Accountability Project.
[14] On file with Government Accountability Project.
[15] Exhibits B-D.

For years, Mr. Reuveni oversaw the defense of immigration priorities, regardless of political party. During the first Trump Administration Mr. Reuveni led the defense of the Administration's initiatives, including the Executive Orders and proclamation barring entry of certain nationalities to the United States; multiple rules barring access to asylum to migrants at the southern border, including the entry, transit, and criminal asylum bars; the Migrant Protection Protocols; and the defense of the Expedited Removal statute against constitutional challenges. Mr. Reuveni also led an affirmative suit challenging the state of California's laws alleged to interfere with federal immigration enforcement efforts. During the Biden Administration, Mr. Reuveni defended multiple immigration matters, including several rules barring access to asylum to those arriving on the southern border.[16] Earlier in his career, he defended multiple Obama-era labor and employment regulations as well as detention and removal policies and procedures.[17] Before his abrupt termination, Mr. Reuveni oversaw multiple high-profile Trump Administration immigration initiatives.[18]

In short, Mr. Reuveni has been a tireless advocate on behalf of the interests of the United States for years, with a stellar record of advocating successfully on behalf of multiple Presidential administrations, both Republican and Democratic. To suggest Mr. Reuveni is anything but a zealous advocate for the United States who takes his oath to uphold the Constitution seriously is both false and outrageous.

---

[16] Initiatives Mr. Reuveni defended under the Biden administration included: Secure the Border and Circumvention of Lawful Pathways rules, *Las Americas Immigrant Advocacy Center v. DHS*, 24-cv-1702 (D.D.C. 2024); *M.A. v. Mayorkas*, 23-cv-1843 (D.D.C. 2023), as well as ICE's immigration enforcement priorities, *Texas v. United States*, 21-cv-16 (S.D. Tex. 2022), the Asylum Officer Rule, *Arizona v. Garland*, 22-cv-1130 (W.D. La. 2024); *Texas v. Mayorkas*, 22-cv-94 (N.D. Tex. 2024), the Central American Minors program, *Texas v. Trump*, 22-cv-780 (N.D. Tex. 2025), the CHNV parole program, *Texas v. DHS*, 23-cv-7 (S.D. Tex. 2024), the termination of the Migrant Protection Protocols, *Texas v. Biden*, 21-cv-67 (N.D. Tex. 2025), and the Keeping Families Together initiative, *Texas v. DHS*, 24-cv-306 (E.D. Tex. 2024), among many others.

[17] Under the Obama Administration, Mr. Reuveni defended, for example: *Washington All. of Tech. Workers v. DHS*, 650 F. App'x 13 (D.C. Cir. 2016); *G.H. Daniels III & Assocs., Inc. v. Perez*, 626 F. App'x 205 (10th Cir. 2015); *Bayou Lawn & Landscape Servs. v. Sec'y*, *U.S. Dept of Labor*, 621 F. App'x 620, 621 (11th Cir. 2015); *Save Jobs USA v. DHS*, 210 F. Supp. 3d 1 (D.D.C. 2016), detention and removal policies and expedited removal procedures, *Castro v. DHS*, 835 F.3d 422 (3d Cir. 2016), *cert denied* 137 S. Ct. 1581 (2017), refugee settlement procedures, *Bilbro v. Haley*, 229 F. Supp. 3d 397 (D.S.C. 2017). Mr. Reuveni also secured an appellate win in a Ninth Circuit case rejecting an entitlement to counsel for minors in removal proceedings in a nation-wide class action. *JEFM v. Holder*, 837 F.3d 1026 (9th Cir. 2016).

[18] These initiatives have included: President Trump's invocation of the Alien Enemies Act the weekend of March 15, *J.G.G. v. Trump*, 25-cv-766 (D.D.C. 2025); the DHS's policies concerning removal of noncitizens to third countries, *D.V.D. v. U.S. Dept. of Homeland Security,* 25-cv-10676 (D. Mass. 2025); DHS's revocation of legal status programs for hundreds of thousands of migrants from countries like Ukraine, Venezuela, and Haiti, *National TPS Alliance v. Noem,* 25-cv-01766 (N.D. Cal. 2025); *Doe v. Noem*, 25-cv-10495 (D. Mass. 2025); the expansion of expedited removal deportation procedures to the entire United Staes, *Make the Road New York v. Huffman*, 25-cv-190 (D.D.C. 2025); Trump's declaration of an "invasion" at the southern border and Proclamation directing DHS to halt all asylum processing for individuals subject to the Proclamation, *Refugee and Immigrant Center for Education and Legal Services v. Noem*, 25-cv-306 (D.D.C. 2025); lawsuits challenging the so-called "sanctuary policies" of Illinois and New York, among others, *United States v. Illinois*, 25-cv-1285 (N.D. Ill. 2025), *United States v. New York*, 25-cv-205 (N.D. N.Y. 2025); and most recently a lawsuit challenging the wrongful removal of an Salvadoran national to his home country despite that order not being legally executable. *Abrego Garcia v. Noem*, 25-cv-951 (D. Md. 2025).

## II.    March 14, 2025: DOJ Leadership Expressed Intent to Ignore Court Orders to Effectuate Removal Flights Under the Alien Enemies Act

On Friday March 14, 2025, Mr. Reuveni received notice of his promotion to Acting Deputy Director of the Office of Immigration Litigation. That same day, following news reports that the President intended to sign a presidential proclamation invoking the Alien Enemies Act (AEA), Mr. Reuveni was summoned to a meeting by Deputy Assistant Attorney General (DAAG) of OIL, Drew Ensign. At the meeting were Principal Assistant Deputy Attorney General (PADAG) Emil Bove, Counselor to the Deputy Attorney General James McHenry, Associate Deputy Attorney General (ADAG) Paul Perkins, DAAG Ensign, Acting Director for OIL and Mr. Reuveni's direct supervisor, August Flentje, and other OIL attorneys.

At the meeting Bove indicated to those in attendance that the AEA proclamation would soon be signed and that one or more planes containing individuals subject to the AEA would be taking off over the weekend – meaning Saturday, March 15 and Sunday, March 16. Bove did not provide further details and ███████████████████████████████████.[19] Bove indicated ████████████████████████████████████[20] and stressed to all in attendance that the planes needed to take off no matter what.

Bove then made a remark concerning the possibility that a court order would enjoin those removals before they could be effectuated. Bove stated that DOJ would need to consider telling the courts "fuck you" and ignore any such court order. Mr. Reuveni perceived that others in the room looked stunned, and he observed awkward, nervous glances among people in the room. Silence overtook the room. Mr. Reuveni and others were quickly ushered out of the room. Notwithstanding Bove's directive, Mr. Reuveni left the meeting understanding that DOJ would tell DHS to follow all court orders.[21]

Mr. Reuveni was stunned by Bove's statement because, to Mr. Reuveni's knowledge, no one in DOJ leadership – in any Administration – had ever suggested the Department of Justice could blatantly ignore court orders, especially with a "fuck you." Mr. Reuveni was in disbelief, because, on the contrary, the Department of Justice consistently advises its clients of their obligation to follow court orders, not to ignore them. Mr. Reuveni knew that it was absurd and unlawful to do otherwise, a proposition that Mr. Reuveni felt even more certain of after a brief conversation with his supervisor, August Flentje, shortly after the meeting.

---

[19] This clause is redacted because it is not clear that an exception to the lawyer's duty of confidentiality applies here.
[20] This clause is redacted because it is not clear that an exception to the lawyer's duty of confidentiality applies here.
[21] Mr. Reuveni left the meeting with this impression because ████████████████████████████ ███████████████████████. This clause is redacted because it is not clear that an exception to the lawyer's duty of confidentiality applies here.

**III.    Between March 14, 2025, and His Unlawful Suspension on April 5, 2025, Mr. Reuveni Refused to Obey an Illegal Order and Made Protected Whistleblower Disclosures**

Mr. Reuveni's disbelief following the meeting with Bove is now a relic of a different time. Over the next three weeks, Mr. Reuveni was involved in three separate cases involving the legality of the Administration's immigration removal operations under its newly implemented priorities during which time he directly witnessed and reported:

- DOJ officials undermining the rule of law by ignoring court orders;
- DOJ officials presenting "legal" arguments with no basis in law;
- high-ranking DOJ and DHS officials misrepresenting facts presented before courts; and
- DOJ officials directing Mr. Reuveni to misrepresent facts in one of these cases in violation of Mr. Reuveni's legal and ethical duties as an officer of the court.[22]

Mr. Reuveni's internal reporting and ultimately his refusal to obey this illegal order directly resulted in his suspension and termination.

**A.    *J.G.G. v. Trump*: Flights departed the U.S. through invocation of the Alien Enemies Act during issuance of injunction with government claiming oral injunctions are not binding**

At 1:12 a.m.[23] on Saturday March 15, 2025, prior to publication of the Alien Enemies Act Proclamation, the American Civil Liberties Union filed suit on behalf of five Venezuelan men facing imminent deportation under the AEA and moved for a Temporary Restraining Order (TRO) to prevent their removal. When Mr. Reuveni woke up that morning, he reviewed the plaintiffs' motion and learned that the removals were allegedly to prisons in El Salvador, known for their torture and human rights abuses.[24] After learning from plaintiffs' counsel that at least one plaintiff was reportedly already aboard a removal flight, Judge James Boasberg of the U.S. District Court

---

[22] These incidents involved senior political leadership at DOJ and DHS including but not limited to: Counselor to the DAG McHenry, ADAG Perkins, Counselor to the Attorney General Henry Whitaker, Senior Counselor to the Secretary of Homeland Security James Percival, and Acting General Counsel of DHS Joe Mazzara. McHenry, Perkins, Whitaker, Percival, and Mazzara were frequently listed together in communications, including in communications from the White House, and as explained further below, appeared to hold decision making power between DOJ and DHS.

[23] All times listed are in Eastern Time.

[24] President Bukele of El Salvador instituted a state of emergency in 2022 in response to gang violence that resulted in high numbers of detentions and deaths in custody. Associated Press, "At least 261 people have died in El Salvador's prisons under anti-gang crackdown, rights group says," *Associated Press*, July 10, 2024, https://apnews.com/article/bukele-el-salvador-gang-crackdown-prison-deaths-9d14cbb1ea35175d75d007f6faade61f. Reports of formerly detained persons, families of detained persons, and autopsy reports indicate conditions of torture. "Executive Summary: One Year Under State of Exception: A Permanent Measure of Repression and Human Rights Violations," Cristosal, 2023, https://cristosal.org/EN/wp-content/uploads/2023/06/English-Executive-Summary-One-Year.pdf. *See also* U.S. State Dep't, *2023 Country Reports on Human Rights Practices: El Salvador*, https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/.

JA246

for the District of Columbia entered an *ex parte* TRO prohibiting the government from removing the five named plaintiffs and set a hearing for 4:00 p.m., which the court later changed to 5:00 p.m., to hear argument on a broader TRO.

> **1. Deputy Assistant Attorney General Ensign willfully misled the court while DHS and DOS ignored Mr. Reuveni's advice**

Shortly after Judge Boasberg entered the initial TRO, Mr. Reuveni informed the District Court via email at 10:18 a.m. that its order had been received and "disseminated to the relevant executive branch agencies."[25] At the 5:00 p.m. hearing later that day, DAAG Ensign represented the government in court while Mr. Reuveni listened on the public line, emailing DHS and DOS agency counsel periodically.

At this hearing, Judge Boasberg said that "the plaintiffs ... expected planes to be departing within the last couple of hours," and asked Ensign "if any of the named plaintiffs are, in fact, on any plane that has departed?" Ensign assured the court that none of the named plaintiffs would be removed during the pendency of the TRO. When Judge Boasberg asked if that meant the plaintiffs "are either not on the planes or that they will not be removed from the planes and will be brought back once the planes land in El Salvador," Ensign asserted, "I don't know the status of the planes. If there are removal flights, the five would not be on them." When Judge Boasberg asked whether any deportations or removals were imminent, as "in the next 24 or 48 hours," Ensign answered, "I don't know the answer to that question."[26]

Mr. Reuveni reasonably believes Ensign's statement to the court that he did not know whether AEA removals would take place "in the next 24 or 48 hours" was false. Ensign had been present in the previous day's meeting when Emil Bove stated clearly that one or more planes containing individuals subject to the AEA would be taking off over the weekend *no matter what*.

Ensign then added, "We can certainly investigate that and report that back to you." When Judge Boasberg asked how soon he could get that information, Ensign said that the government could "certainly include" the information in a document they were planning to file "tomorrow night." The plaintiffs' lawyer stressed the urgency of the situation, noting his "understanding from people on the ground, from different sources, … that planes are going right now taking Venezuelans to El Salvador"; that two flights "may have already taken off … during this hearing"; and urged the "Court to issue a class TRO now to avoid any more harm."[27]

---

[25]*J.G.G.*, (D.D.C. Apr 16, 2025) ECF No. 81, Memorandum & Opinion at p. 5, https://www.courtlistener.com/docket/69741724/81/jgg-v-trump/.
[26]*J.G.G.*, (D.D.C. Mar 16, 2025) ECF No. 20, Transcript at pp. 4-5, 11, https://www.courtlistener.com/docket/69741724/20/jgg-v-trump/.
[27] *Id* at pp. 11-13.

At that point, Judge Boasberg adjourned the hearing until 6:00 p.m. to "let Mr. Ensign do some digging." The court specified, "Mr. Ensign, I will want to know, have planes, in fact -- is deportation of people under the proclamation pursuant to the AEA in motion now and will it be for the next 48 hours." Ensign responded, "We can do that, Your Honor."[28]

The adjournment began at 5:22 p.m. Mr. Reuveni was not included in Ensign's conversation with DHS, DOS, or DOJ leadership during this period.

However, prior to 5:24 p.m., DOJ attorneys, including Ensign and Mr. Reuveni, received an email from plaintiffs' attorney citing public reporting of flight information and stating that they had reason to believe that people were on planes for imminent deportation. According to public reports and various websites that track the whereabouts of airplanes in real-time, at least two planes took off from Texas after the start of the hearing: the first at 5:26 p.m. and the second at 5:45 p.m. en route to what online sources speculated was a final destination of El Salvador.[29]

Yet, at 6:00 p.m., following the 38-minute adjournment, DAAG Ensign provided Judge Boasberg with no information regarding flight departures. Specifically, Ensign told the court, "I don't have many details to share," explaining that his "clients" said that the "operational details ... raised potential national security issues, particularly ones if discussed with a public line." When Ensign said that his clients "raised that we may be able to provide Your Honor additional details in an *in camera* hearing," Judge Boasberg quickly arranged "to disconnect the public [phone] line" and start an *in camera* proceeding. But even after the court accommodated the request for an *in camera* proceeding, Ensign failed to provide information about the flights. He explained that "we would have to sort out what can still be provided *in camera*. They suggested that as a way to potentially provide some details, but I do not personally have those right now." Once it became clear that Ensign would not provide information even *in camera*, the court ended the *in camera* proceeding and reconnected the public line.

---

[28] *Id* at pp. 13-14.

[29] Josh Gerstein, Senior Legal Affairs Reporter, POLITICO, (@joshgerstein.bsky.social), "Looks like one El Salvador-bound flight took off during a break in the hearing," *Bluesky*, March 15, 2025, https://bsky.app/profile/joshgerstein.bsky.social/post/3lkh4yqxaek2d. and FlightAware, "Flight GXA6145 History, March 15, 2025," https://www.flightaware.com/live/flight/GXA6145/history/20250315/1930Z/KHRL/MHPR (indicating that the plane took off at 4:45 p.m. CT). Also see later confirmation of flight departures, Michael Kunzelman and Regina Garcia Cano, "A Timeline of the Legal Wrangling and Deportation Flights After Trump Involved the Alien Enemies Act," *AP News*, March 21, 2025, https://apnews.com/article/trump-deportation-courts-aclu-venezuelan-gang-timeline-43e1deafd66fc1ed4e934ad108ead529; Reuters, "Flight Data Shows Timeline of Venezuelan Deportation Operation," *Reuters*, March 17, 2025, https://www.reuters.com/world/americas/flight-data-shows-timeline-venezuelan-deportation-operation-2025-03-17/.

Page 10 of 27

Plaintiffs' counsel told the court, "We understand that two flights went to El Salvador this afternoon," and that a third flight was "scheduled for 6:23, so only in a matter of minutes." After several minutes of legal argument, the court found that "class certification is warranted."[30]

When a court issues an injunction against the federal government, the normal practice is for Justice Department lawyers to work with agency counsel in developing guidance explaining what the government must do to comply with the injunction. The relevant agencies then disseminate that guidance to their components. For example, when a court order impacts DHS immigration removal operations, in normal practice DOJ and DHS lawyers create guidance that DHS would then, once approved, disseminate to Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO), and other relevant components. Because Mr. Reuveni's name was on the court papers the government filed in the three cases at issue, and because of his role as Acting Deputy Director for OIL, he had a responsibility to confirm that the government was abiding by the court orders in those cases.

With this in mind, at 6:14 p.m., as the hearing continued, Mr. Reuveni, again listening on the public line, emailed attorneys with the DHS Office of General Counsel, ICE Office of the Principal Legal Advisor (OPLA), and the DOS Office of Legal Advisor informing them along with other DOJ attorneys that the "Judge is certifying a nationwide class as we speak. It is likely a class-wide tro is imminent." At 6:44 p.m., Mr. Reuveni sent a follow-up email: "The judge is presently issuing a class-wide TRO. Can folks confirm for us if at the moment any individuals subject to the AEA are being staged for removal, or are presently in the air as part of removal (but not yet having landed and disembarked)?"

At 6:44 p.m., Mr. Reuveni texted his supervisor Mr. Flentje referencing Bove's March 14, 2025, comment that it might become necessary to tell a court "fuck you." Mr. Flentje acknowledged Bove's comment with a joke referencing the possibility that either he or Mr. Reuveni could be fired, impliedly for reporting up their chain of command concerns that a court order may have been violated.

At 6:46 p.m., Mr. Reuveni emailed DHS the substance of Judge Boasberg's oral order concerning class certification and a TRO: "The class is 'all noncitizens in US custody subject to the AEA' a minute order with more specifics will issue. Please confirm receipt of this email and let us know ASAP on the questions below concerning removals not yet effectuated, including those involving folks in the air." At 6:48 p.m. Mr. Reuveni sent another email: "Sorry for all the emails. Last email: the judge specifically ordered us to not remove anyone in the class, and to return anyone in the air."

---

[30] *J.G.G.*, (D.D.C. Mar 16, 2025) ECF No. 20, Transcript at pp. 15-18, 23, https://www.courtlistener.com/docket/69741724/jgg-v-trump/#entry-20.

After additional legal argument, Judge Boasberg stated that "a TRO is appropriate for the class members," prohibiting removal of class members, with the class consisting of "all noncitizens in U.S. custody who are subject to the proclamation of March 15, 2025, and its implementation."

Judge Boasberg explained that the court was "required to act immediately" and could not "wait any longer," particularly in light of "the plaintiffs' information, unrebutted by the government, that flights are actively departing and plan to depart," instructing Ensign:

> [Y]ou shall inform your clients of this immediately, and that any plane containing these folks that is going to take off or is in the air needs to be returned to the United States, but those people need to be returned to the United States. However that's accomplished, whether turning around a plane or not embarking anyone on the plane or those people covered by this on the plane, I leave to you. But this is something that you need to make sure is complied with immediately.[31]

At 7:04 p.m., Mr. Reuveni emailed DHS and DOS as follows:

> As we await the written order, clarifying our understanding of the injunction as clarified at the end. No one subject to AEA in our custody can be removed. And anyone in the air should be returned, unless they have a title 8 final order. Please confirm receipt and let us know what if anything is happening. Thank you.

> DHS and DOS attorneys did not respond.

Mr. Reuveni followed up with DHS at 7:18 p.m. requesting confirmation that no one without a final order of removal under Title 8 would be removed from the planes as they landed, including one scheduled to land at 7:20 p.m., noting that "We need to address this asap to avoid contempt." Mr. Reuveni again received no response.

At 7:26 p.m., the court issued a minute order memorializing its TRO.

At 7:27 p.m., Mr. Reuveni sent another email to DHS and DOS with a copy of the minute order.

At 7:31 p.m., Ensign emailed James Percival, Senior Counselor to the Secretary of Homeland Security, and Joseph Mazzara, Acting General Counsel for the Department of Homeland Security, informing them of the injunction, and two minutes later emailed DOS counsel. Both of these emails, on which Mr. Reuveni and Flentje were copied, informed the recipients of both the oral and written injunctions, informed the agency counsel that their clients were required

---

[31] *Id.* at pp. 42-43. While there is no time stamp for Judge Boasberg's statements on the transcript, Mr. Reuveni's records indicate this statement occurred at approximately 6:47 p.m.

USCA Case #25-5124   Document #2128099   Filed 06/25/2025   Page 255 of 361

to not remove anyone within the class definition, and reflected that Ensign understood the judge to be requiring that DHS not deplane any planes that had departed U.S. airspace. Mr. Reuveni was not copied on any response.

At 10:13 p.m., after he and Mr. Flentje had exchanged numerous emails and he had no information about any DHS compliance, Mr. Reuveni again emailed DHS to ask about whether guidance had been disseminated with direction for DHS to turn any planes around if not yet landed or to not deplane the people on board if already landed.

Shortly thereafter, DHS responded via email that they were holding issuance of guidance pending a decision from the Attorney General.

**2. Emil Bove advised the Department of Homeland Security that it may take actions that violate the court's injunction because the injunction was not yet issued in writing**

For the next few hours on the night of March 15, Mr. Reuveni exchanged emails with Flentje and engaged in multiple phone calls with Ensign. He was concerned about two things: 1) that deplaning any passengers would violate the court's orders, and 2) the need to notify the court of the government's compliance with those orders, or its interpretation of the orders. Sometime around midnight, Ensign informed Mr. Reuveni that DOJ would be filing a notice with the court, signed by Bove, explaining its interpretation of the court order, including that no violation of the court order had occurred because the two planes left U.S. airspace before the court's *written* minute order. Ensign directed Mr. Reuveni to prepare Bove's notice of appearance. While Mr. Reuveni disagreed with the interpretation that there was no violation of a court order, the fact that Bove, a senior DOJ official, was willing to enter an appearance in the case and make this representation to the court somewhat lessened his concerns because he believed he and his staff would not be put in the untenable position of defending this argument.

That quickly changed. On Sunday, March 16, 2025, at 12:23 a.m. Ensign informed Mr. Reuveni by phone that Bove would no longer be filing either a notice of appearance or a notice to the court explaining the government's interpretation of the court's orders. Thereafter, Mr. Reuveni and Flentje exchanged several more emails. Mr. Reuveni anticipated that the government would be held in contempt of court for deplaning those on the flight and communicated his belief that a notice to the court was necessary. At 12:33 a.m., Ensign telephoned Mr. Reuveni informing him that DOJ leadership did not appear to be in a hurry to file any such notice. Mr. Reuveni responded that the government would likely face a show cause motion seeking an explanation as to why the government should not be held in contempt of court.

That same morning at 8:07 a.m., Mr. Reuveni emailed DHS and DOS asking for confirmation of their compliance with Judge Boasberg's oral and written orders, specifically asking for the status of the individuals on each of the previous day's three flights. Mr. Reuveni's

email included a reminder that to comply with the injunction, no one subject to AEA removal should have been deplaned and anyone who had been deplaned needed to be returned to the United States. Mr. Reuveni also asked whether conversations on these issues were happening at a higher level of leadership between and among DOJ, DHS, and DOS. Mr. Reuveni received no response.

Given the absence of any email or notice from the agencies or DOJ leadership at that point, Mr. Reuveni's concerns from the prior night that DHS had been directed to violate the court orders began to escalate. Early in the morning of Sunday March 16, President Bukele of El Salvador posted a comment on social media stating "Oopsie … Too late," in reference to Judge Boasberg's order, and Secretary of State Rubio re-posted the comment soon after.[32] Soon after Bukele's initial comment, Bukele posted a video of men being escorted from planes into the Terrorism Confinement Center ("CECOT") prison.[33]

As the day continued, Mr. Reuveni's emails asking for confirmation of the status of the removal flights remained unanswered. Mr. Reuveni reported his concerns to August Flentje that based on public reporting, social media posts of the Secretary of State and the President of El Salvador, and the failure of DHS to answer any of Mr. Reuveni's questions concerning the three flights that had taken off the previous day, it appeared the government had violated the court's order and removed individuals to El Salvador.

Eventually, agency counsel for DHS informed Mr. Reuveni by telephone that DOJ leadership had advised DHS to deplane the flights in El Salvador and directed Mr. Reuveni to consult DOJ leadership if he had any questions. Through the course of the events on March 16, it became clear to Mr. Reuveni that DHS and DOS were receiving contrary directions from someone else to take actions in violation of court orders. By 2:00 p.m., the identity of that individual became

---

[32] Nayib Bukele (@nayibbukele), "Oopsie...Too Late," X, March 16, 2025, 6:46 a.m., https://x.com/nayibbukele/status/1901238762614517965.

[33] According to human rights groups like Cristosal, prison officials at CECOT have reportedly beaten, tortured, and denied prisoners access to food, water, clothing, and healthcare, allegedly causing at least 368 deaths. William Brangham, Ian Couzens, Shrai Popat, "The Conditions Inside the Infamous El Salvador Prison where Deported Migrants are Held," *PBS,* April 8, 2025, https://www.pbs.org/newshour/show/the-conditions-inside-the-infamous-el-salvador-prison-where-deported-migrants-are-held. CECOT is described as "a judicial black hole": the prison exists under a state of exception suspending constitutional rights and prisoners are detained incommunicado. Brangham, "Conditions Inside." ("'We have documented systematic physical beatings, torture, intentional denial of access to food, water, clothing, health care. And the combination of both the physical abuse and the denial of basic needs has led to the death of at least 368 people, according to our investigations... The CECOT prison has become sort of the public face of President Bukele's security strategy, which is understood as a state of exception... families and lawyers do not have access to the prisoners. They're entirely cut off... They're in a judicial black hole.'")
The 15,000 prisoners are meant to be held "permanent[ly]," and information from CECOT is tightly controlled by the Salvadoran government. Thomas Graham, "The El Salvador Mega-Prison at the Dark Heart of Trump Immigration Crackdown," *The Guardian,* April 30, 2025, https://www.theguardian.com/world/2025/apr/30/el-salvador-cecot-mega-prison-trump ("'[CECOT] is meant for permanent exile, permanent punishment'... This tight control on information coming out of Cecot allows authorities to shape its image.")

clear. In an email from Acting Assistant Attorney General (AAG) Yaakov Roth to Ensign, Flentje, and Mr. Reuveni, Roth explained that Bove had advised DHS that under the court order it was permissible to deplane individuals on the flights that departed U.S. airspace before the minute order had issued on the docket.

That afternoon, the Department of Justice filed a Notice indicating that defendants "were promptly notified of the court's temporary restraining order issued in the morning and the 7:26 PM EDT minute order that temporarily enjoined any removals pursuant to the Presidential Proclamation." The Notice also asserted that "some gang members subject to removal under the Proclamation had already been removed from United States territory under the Proclamation before the issuance of this court's second [written] order."[34]

By day's end, multiple media reports and postings from senior government officials in both the United States and El Salvador on social media confirmed that all individuals on two of the three planes that had taken off March 15 had been detained in the CECOT prison in El Salvador.[35]

The next hearing in the case occurred on Monday, March 17, 2025. At some point prior to the March 17 hearing, Ensign informed Mr. Reuveni that Ensign would not be handling the hearing given concerns that the court would likely interrogate Ensign concerning the March 15 events.

### 3. Government refused to comply with court's reporting order

On March 17, the court held a hearing to determine whether the government complied with its orders. The court issued a minute order demanding the government state "whether, and in what form, it would provide answers to the court's questions regarding the particulars of the flights."[36] The order further stated that if "the Government takes the position that it will not provide that information to the court under any circumstances, it must support such position, including with classified authorities if necessary."[37] Following this order, Flentje and Ensign told Mr. Reuveni that leadership at DOJ were reporting "down the chain" that the government was not going to answer the court's questions about anything that happened before 7:26 p.m. on March 15, and so not to provide information about when the flights took off.[38]

---

[34] *J.G.G*, (D.D.C. Mar 16, 2025) ECF No. 19, Notice to the Court at p. 1, courtlistener.com/docket/69741724/19/jgg-v-trump/.

[35] Reports later indicated that 8 individuals who were on one of the three flights were returned to the United States. Laura Romero, "Venezuelans Deported Last Week Included 8 Women Who Were Returned to US, Court Filings Say," *ABC News*, March 24, 2025, https://abcnews.go.com/US/venezuelans-deported-week-included-8-women-returned-us/story?id=120111090.

[36] *J.G.G.,* (D.D.C Mar 17, 2025), Minute Order, https://www.courtlistener.com/docket/69741724/jgg-v-trump/#minute-entry-424393366.

[37] *Id.*

[38] At the March 17, 2025, hearing, the government did provide some responsive information. The attorney for the government stated, "no planes took off from the United States after the written order came through [...] the two

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

J.G.G., et al.,

                                    Civil Case
              Plaintiff(s),         No. 25-00766 JEB

        v.
                                    Washington, D.C.
DONALD J. TRUMP, et al.,
                                    July 24, 2025
              Defendant(s).


-----------------------------------------------------------

STATUS CONFERENCE HELD VIA ZOOM
BEFORE THE HONORABLE JAMES E. BOASBERG
UNITED STATES DISTRICT CHIEF JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S):   Lee Gelernt, Esquire
                        American Civil Liberties Union
                        125 Broad Street
                        18th Floor
                        New York, New York 10004

                        Aditi Shah, Esquire
                        Arthur B. Spitzer, Esquire
                        American Civil Liberties Union
                        529 Fourth Street Northwest
                        Suite 722
                        Washington, D.C. 20043


FOR THE DEFENDANT(S):   Tiberius T. Davis, Esquire
                        United States Department of Justice
                        950 Pennsylvania Avenue Northwest
                        Washington, D.C. 20530


REPORTED BY:            Tammy Nestor, RMR, CRR
                        Official Court Reporter
                        333 Constitution Avenue Northwest
                        Washington, D.C. 20001
                        tammy_nestor@dcd.uscourts.gov

JA254

The following proceedings began at 10:01 a.m.:

THE COURT:  Good morning, everyone.

THE COURTROOM DEPUTY:  Good morning, Your Honor.

All right.  Good morning, everyone.  We are here today for a status hearing in Civil Action 25-766, JGG, et al. versus President Donald Trump.

Beginning with counsel for the plaintiff, if you would please approach the lectern and identify yourself for the record.

MR. GELERNT:  Good morning, Your Honor.  Lee Gelernt from the ACLU for plaintiffs.

THE COURT:  Good morning.

MR. DAVIS:  Good morning, Your Honor.  Tiberius Davis on behalf of the government.

THE COURT:  Okay.  Good morning.

Nikki, do we have the public line?

THE COURTROOM DEPUTY:  Yes.

THE COURT:  All right.  So I brought everybody here today to see if there are any updates on the parties' positions in the case given the fairly significant factual developments that have occurred recently, in particular, the release of the CECOT prisoners to Venezuela.

I am aware that while administrative stays from the court of appeals remain in place regarding both contempt proceedings and my preliminary injunction, that I have very

JA255

limited power to award any relief, but I still maintain jurisdiction over the underlying case to determine the parties' positions.

So I begin with a brief recap. As everyone knows, the proceedings here have been moving, or to be more accurate, right now not moving on two separate tracks, the contempt track and the merits track.

On the contempt track, on April 16, this Court found probable cause the defendants were in contempt for violating its order barring the government from transferring certain individuals into foreign custody pursuant to the Alien Enemies Act. I ordered the government to either purge its contempt or identify the contemnors so that the matter could be referred for prosecution.

The government appealed and obtained an administrative stay, not a merit stay, which has now been in place for three months. I have no doubt that such a lengthy stay has been frustrating to plaintiffs, especially now that the recent whistleblower allegations by Mr. Reuveni, to the extent they prove accurate, have only strengthened the case for contempt.

I assure you that if and when the stay is finally lifted, this Court will follow up on these revelations and how they affect the contempt proceedings.

In addition, whether or not I am ultimately permitted

JA256

to go forward with the contempt proceedings, I will certainly be assessing whether government counsel's conduct and veracity to the Court warrant a referral to state bars or our grievance committee which determines lawyers' fitness to practice in our court.

On the merits track, on June 4, this Court issued a preliminary injunction. It first found that the government did not have constructive custody over the men deported under the AEA and then housed at CECOT in El Salvador. I note as an aside that some recent developments may have called the government's representations on that issue into question.

In any event, the Court also found that there had been a due process violation in the men's summary removal, and it ordered the government to advise the Court how it intended to facilitate the ability of the CECOT class to seek habeas relief.

The court of appeals also entered an administrative stay, again not a merits stay, of that ruling over a month ago.

Now, as of last week, those class members have been sent to Venezuela as part of a prisoner exchange, so I want to explore with the plaintiffs how, if at all, this changes the posture of the case.

So to begin, Mr. Gelernt, can you tell me whether the

JA257

case.

MR. GELERNT:  Your Honor, will the government be --
sorry.

I think it would be helpful for the government to file status reports to the extent that they have any additional or new information as well.

THE COURT:  I would ask for joint status reports.

Mr. Davis, you may or may not have other information at that point, but certainly I'm most interested in hearing about plaintiffs' positions.

Okay.  Thank you all.

(The hearing concluded at 10:27 a.m.)

- - -

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

7/24/25                    s/ Tammy Nestor
                          Tammy Nestor, RMR, CRR
                          Official Court Reporter
                          333 Constitution Avenue NW
                          Washington, D.C. 20001
                          tammy_nestor@dcd.uscourts.gov

JA258

# EXHIBIT F

**July 1, 2025 Addendum to June 24, 2025 Protected Whistleblower Disclosure of Mr. Erez Reuveni Submitted Pursuant to 5 U.S.C. § 2302 and 5 U.S.C. § 1213**

| EXHIBIT NUMBER | DESCRIPTION | PAGE NUMBER |
|---|---|---|
| 1 | March 15, 2025 Text messages between Mr. Reuveni and Flentje<br><br>*This text exchange in the context of the JGG hearing and the March 15 removal flights demonstrates that Flentje knew about Bove's "fuck you" comment and understood it to mean the DOJ might ignore a court order.* | Pages 1-2 |
| 2 | March 15-16, 2025 phone records of Mr. Reuveni<br><br>*Demonstrates multiple phone calls Mr. Reuveni had related to AEA litigation on March 15-16.* | Pages 3-8 |
| 3 | March 15, 2025 Emails between Mr. Reuveni and the AEA Litigation team<br><br>*These emails were referenced in the June 24, 2025 disclosure regarding Judge Boasberg's order to halt removals in* JGG v. Trump. *In this set Mr. Reuveni communicates the instruction of Judge Boasberg's order.* | Pages 9-13 |
| 4 | March 15, 2025 Emails between Mr. Reuveni and the AEA Litigation team<br><br>*These emails were referenced in the June 24, 2025 disclosure regarding Judge Boasberg's order to halt removals in* JGG v. Trump. *In this set of emails Mr. Reuveni asks for confirmation that the government is not in contempt of Judge Boasberg's order.* | Page 14– 22 |
| 5 | March 15-16, 2025 Emails between Mr. Reuveni and the AEA Litigation team<br><br>*These emails were referenced in the June 24, 2025 disclosure regarding Judge Boasberg's order to halt removals in* JGG v. Trump. *This set of emails demonstrates that Mr. Reuveni repeatedly asked for confirmation that the government was not in contempt of Judge Boasberg's order without response.* | Pages 23-25 |

| 6 | March 16, 2025 Email from Yaakov Roth to Mr. Reuveni and Mr. Flentje<br><br>*Regarding principal associate deputy attorney general advising DHS that deplaning flights outside of US airspace prior to Judge Boasberg's minute order was permissible.* | Pages 26-27 |
|---|---|---|
| 7 | March 19, 2025 Text messages between Mr. Reuveni and Flentje<br><br>*This text exchange occurred in the context of filing a brief on March 19 asking to stay Judge Boasberg's March 18 minute order in* JGG v. Trump *and demonstrates reference to Bove's "fuck you" comment.* | Pages 28-29 |
| 8 | March 27, 2025 – April 2, 2025 Emails between Mr. Reuveni and others regarding the case of Mr. Abrego Garcia<br><br>*This email exchange demonstrates unsuccessful efforts to address the lack of evidence that Mr. Abrego Garcia was a member of MS-13.*<br><br>*P. 38 An email from James Percival states the following:*<br>*"Can we say the following?:*<br>*1. This guy is a leader of MS-13*<br>*2. His removal was due to a good faith administrative error*<br>*3. We do not believe he is in immediate danger*<br>*4. We are engaged in multiagency discussions*<br>*5. Any judicial intrusion is likely to make any subsequent*<br>*diplomatic discussions with El Sal less successful"* | Page 30-73 |
| 9 | April 1, 2025 Text messages between Mr. Reuveni and Flentje<br><br>*Messages demonstrate report Mr. Reuveni made to Flentje about the message Mr. Reuveni received from Roth that Bove was upset at Mr. Reuveni. The reason for Bove's displeasure was that Mr. Reuveni was contacting DOD, DHS, and DOS regarding the apparent violation of the injunction in* DVD v. DHS *in writing.* | Pages 74-75 |

| 10 | April 2, 2025 Email with OIL attorneys and others regarding Plaintiff's allegations of violation of injunction in *DVD v. DHS*<br><br>*P. 77 April 4, 8:57 P.M. email from DHS Acting General Counsel Mazzara: "As to the operations referenced by Secretary Rubio, DHS was not involved in those operations."* | Pages 76-79 |
|---|---|---|
| 11 | April 5, 2025 Text messages between Mr. Reuveni and Flentje<br><br>*These messages were sent following Mr. Reuveni's placement on administrative leave after the April 4, 2025 hearing in the case of Mr. Abrego Garcia before Judge Xinis. The exchange demonstrates that Flentje was at the March 14 meeting during which Bove said the government might have to say "fuck you" to courts and that Flentje sees a connection between that meeting and Mr. Reuveni's placement on administrative leave*<br><br>*P. 81 Text from Flentje on April 5 at 2:46 P.M.: "I believe I told our host we would not violate a court order. I think there is definitely a through line from that meeting to where we are today."* | Pages 80-81 |
| 12 | April 5, 2025 10:36 A.M. Notice of Administrative Leave<br><br>*Email from Human Resources Director F. Michael Sena with attached letter from Deputy Attorney General Todd Blanche notifying Mr. Reuveni that he was being placed on administrative leave for, "failure to follow a directive from your superiors; failure to zealously advocate on behalf of the United States; and engaging in conduct prejudicial to your client."* | Pages 82-83 |
| 13 | April 11, 2025 3:57 P.M. Memorandum for Erez Reuveni<br><br>*Email from Human Resources Director F. Michael Sena with attached Official Notice of removal from* | Pages 84-85 |

| | | |
|---|---|---|
| | *position as supervisory trial attorney from the Deputy Attorney General Todd Blanche.* | |
| 14 | March 17, 2025 – April 5, 2025 phone records of Mr. Reuveni<br><br>*Supports June 24, 2025 disclosure by demonstrating phone calls referenced* | Pages 86-95 |

JA263

Exhibit 1

3/15/25, 6:44 PM

guess its find out time on the "fuck you"

Yup.  It was good working with you.

the first el sal flight lands in an hour

so says flightaware

Well maybe they land and drop off all the title 8 people.

3/16/25, 9:31 AM

Check your email. Email from dhs

3/16/25, 4:05 PM

axios.com

2

We are likely saved for today by the fact that Boasberg is on vacation.

JA265

Exhibit 2



**Identity of Phone Numbers**

███████ 7275 – Drew Ensign

███████ 9643 – August Flentje

████████ 5585 – ████████ (ACLU)

███████ 0091 – James McHenry or Paul Perkins

███████ 2689 – Jimmy Percival or Henry Whitaker

███████ 8942 – Henry Whitaker

███████ 2326 – Joseph Mazarra

███████ 7417 – ████████ (DOD)



PO BOX 489
NEWARK, NJ 07101-0489

**Billing period:** Feb 17 - Mar 16, 2025

Questions about your bill?
verizon.com/support
800-922-0204

KEYLINE

EREZ REUVENI

## Ways to pay

▦ **My Verizon app**

You can check your bill easily with the My Verizon app available in App Store or Google Play.

🖥 **Online**

Go to go.vzw.com/bill and sign in to review your bill.

📞 **By phone**

Simply dial #PMT (#768) on your phone and follow the instructions to pay.

$ **Cash**

Go to www.verizon.com/stores to find a Verizon Wireless store near you or find a Check Free Pay or Western Union near you to make a cash payment.



(details on page 3)

If you don't pay the total charges due by the due date, you'll be charged 5% of the unpaid balance or $7, whichever is greater, if allowed by law in the state of your billing address.

---

# verizon

EREZ REUVENI

**Bill date**          March 16, 2025

## Total Amount Due

Will be submitted to credit card on 04/02/25
DO NOT MAIL PAYMENT

**Please see back for instructions on writing to us.**

P.O. BOX 15062
ALBANY, NY 12212-5062

47791438400104813950010000100000009595000000095956



**Billing period:** Feb 17 - Mar 16, 2025

## Talk activity (cont.)

**Erez Reuveni**

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|------|------|--------|-------------|-------------|------|-----------------|------------------|-------|
| Mar 14 | 6:00 PM | 7275 | Bethesda, MD | New York, NY | 16 | -- | -- | -- |
| Mar 15 | 8:17 AM | 7275 | Bethesda, MD | Incoming, CL | 12 | -- | -- | -- |
| Mar 15 | 9:09 AM | 7275 | Bethesda, MD | New York, NY | 1 | -- | -- | -- |
| Mar 15 | 9:12 AM | 7275 | Bethesda, MD | Incoming, CL | 3 | -- | -- | -- |
| Mar 15 | 9:17 AM | 5585 | Bethesda, MD | Nwyrcyzn01, NY | 2 | -- | -- | -- |
| Mar 15 | 9:41 AM | 5585 | Bethesda, MD | Incoming, CL | 1 | -- | -- | -- |
| Mar 15 | 9:47 AM | 7275 | Bethesda, MD | Incoming, CL | 6 | -- | -- | -- |
| Mar 15 | 9:52 AM | 7275 | Bethesda, MD | Incoming, CL | 1 | -- | -- | -- |
| Mar 15 | 10:27 AM | 7275 | Bethesda, MD | Incoming, CL | 8 | -- | -- | -- |
| Mar 15 | 10:35 AM | 9643 | Bethesda, MD | Washington, DC | 1 | -- | -- | -- |
| Mar 15 | 10:37 AM | 9643 | Bethesda, MD | Incoming, CL | 3 | -- | -- | -- |
| Mar 15 | 10:41 AM | 7275 | Bethesda, MD | Incoming, CL | 4 | -- | -- | -- |
| Mar 15 | 10:52 AM | 7275 | Bethesda, MD | New York, NY | 5 | -- | -- | -- |
| Mar 15 | 11:16 AM | 7275 | Bethesda, MD | Incoming, CL | 3 | -- | -- | -- |
| Mar 15 | 11:21 AM | 9643 | Bethesda, MD | Washington, DC | 2 | -- | -- | -- |
| Mar 15 | 11:23 AM | 7275 | Bethesda, MD | Incoming, CL | 7 | -- | -- | -- |
| Mar 15 | 11:29 AM | 9643 | Bethesda, MD | Washington, DC | 6 | -- | -- | -- |
| Mar 15 | 11:36 AM | 7275 | Bethesda, MD | Incoming, CL | 2 | -- | -- | -- |
| Mar 15 | 11:39 AM | 7275 | Bethesda, MD | Incoming, CL | 5 | -- | -- | -- |
| Mar 15 | 11:57 AM | 7275 | Bethesda, MD | Incoming, CL | 4 | -- | -- | -- |
| Mar 15 | 12:15 PM | 7275 | Bethesda, MD | Incoming, CL | 3 | -- | -- | -- |
| Mar 15 | 12:22 PM | 7275 | Bethesda, MD | Incoming, CL | 1 | -- | -- | -- |
| Mar 15 | 12:28 PM | 7275 | Bethesda, MD | Incoming, CL | 5 | -- | -- | -- |
| Mar 15 | 12:45 PM | 7275 | Bethesda, MD | Incoming, CL | 1 | -- | -- | -- |
| Mar 15 | 12:46 PM | 5585 | Bethesda, MD | Nwyrcyzn01, NY | 1 | -- | -- | -- |
| Mar 15 | 12:48 PM | 7275 | Bethesda, MD | New York, NY | 1 | -- | -- | -- |

JA269



**Billing period:** Feb 17 - Mar 16, 2025

# Talk activity (cont.)

## Erez Reuveni

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| Mar 15 | 1:02 PM | 9643 | Bethesda, MD | Washington, DC | 2 | -- | -- | -- |
| | | | | | | | | |
| | | | | | | | | |
| Mar 15 | 1:16 PM | 7275 | Bethesda, MD | Incoming, CL | 3 | -- | -- | -- |
| Mar 15 | 1:28 PM | 7275 | Bethesda, MD | Incoming, CL | 1 | -- | -- | -- |
| Mar 15 | 2:05 PM | 7275 | Bethesda, MD | Incoming, CL | 1 | -- | -- | -- |
| Mar 15 | 2:17 PM | 7275 | Bethesda, MD | Incoming, CL | 2 | -- | -- | -- |
| Mar 15 | 2:30 PM | 7275 | Bethesda, MD | Incoming, CL | 2 | -- | -- | -- |
| Mar 15 | 2:45 PM | 7275 | Bethesda, MD | Incoming, CL | 1 | -- | -- | -- |
| Mar 15 | 3:03 PM | 7275 | Bethesda, MD | Incoming, CL | 5 | -- | -- | -- |
| | | | | | | | | |
| | | | | | | | | |
| Mar 15 | 3:29 PM | 7275 | Bethesda, MD | Incoming, CL | 5 | -- | -- | -- |
| | | | | | | | | |
| Mar 15 | 4:11 PM | 7275 | Bethesda, MD | Incoming, CL | 7 | -- | -- | -- |
| Mar 15 | 4:26 PM | 7275 | Bethesda, MD | Incoming, CL | 2 | -- | -- | -- |
| | | | | | | | | |
| Mar 15 | 4:42 PM | 7275 | Bethesda, MD | Incoming, CL | 2 | -- | -- | -- |
| | | | | | | | | |
| Mar 15 | 5:30 PM | 7275 | Bethesda, MD | Incoming, CL | 6 | -- | -- | -- |
| Mar 15 | 5:41 PM | 7275 | Bethesda, MD | Incoming, CL | 6 | -- | -- | -- |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| Mar 15 | 6:53 PM | 9643 | Bethesda, MD | Incoming, CL | 3 | -- | -- | -- |
| | | | | | | | | |
| Mar 15 | 7:08 PM | 7275 | Bethesda, MD | Incoming, CL | 6 | -- | -- | -- |
| Mar 15 | 7:30 PM | 7275 | Rockville, MD | Incoming, CL | 1 | -- | -- | -- |
| Mar 15 | 7:59 PM | 7275 | Rockville, MD | Incoming, CL | 4 | -- | -- | -- |
| | | | | | | | | |
| Mar 15 | 8:30 PM | 9643 | Bethesda, MD | Washington, DC | 5 | -- | -- | -- |
| | | | | | | | | |
| | | | | | | | | |
| Mar 15 | 8:43 PM | 7275 | Bethesda, MD | New York, NY | 1 | -- | -- | -- |
| Mar 15 | 8:46 PM | 7275 | Bethesda, MD | Incoming, CL | 6 | -- | -- | -- |
| Mar 15 | 8:52 PM | 9643 | Bethesda, MD | Washington, DC | 7 | -- | -- | -- |
| Mar 15 | 8:54 PM | 7275 | Bethesda, MD | Incoming, CL | 8 | -- | -- | -- |
| | | | | | | | | |
| | | | | | | | | |
| Mar 15 | 9:39 PM | 7275 | Bethesda, MD | Incoming, CL | 3 | -- | -- | -- |
| Mar 15 | 9:44 PM | 7275 | Bethesda, MD | Incoming, CL | 2 | -- | -- | -- |
| Mar 15 | 9:47 PM | 7275 | Bethesda, MD | Incoming, CL | 2 | -- | -- | -- |
| | | | | | | | | |
| Mar 15 | 10:00 PM | 7275 | Bethesda, MD | Incoming, CL | 2 | -- | -- | -- |

JA270



Billing period: Feb 17 - Mar 16, 2025

# Talk activity (cont.)

**Erez Reuveni**

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| Mar 15 | 10:13 PM | 7275 | Bethesda, MD | Incoming, CL | 1 | -- | -- | -- |
| Mar 15 | 10:34 PM | 7275 | Bethesda, MD | Incoming, CL | 2 | -- | -- | -- |
| | | | | | | | | |
| | | | | | | | | |
| Mar 15 | 10:50 PM | 7275 | Bethesda, MD | New York, NY | 4 | -- | -- | -- |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| Mar 15 | 11:57 PM | 7275 | Bethesda, MD | Incoming, CL | 1 | -- | -- | -- |
| Mar 15 | 11:57 PM | 7275 | Bethesda, MD | Incoming, CL | 3 | -- | -- | -- |
| Mar 16 | 12:00 AM | 7275 | Bethesda, MD | Incoming, CL | 1 | -- | -- | -- |
| Mar 16 | 12:00 AM | 7275 | Bethesda, MD | Incoming, CL | 1 | -- | -- | -- |
| | | | | | | | | |
| Mar 16 | 12:23 AM | 7275 | Bethesda, MD | Incoming, CL | 3 | -- | -- | -- |
| Mar 16 | 12:55 AM | 7275 | Bethesda, MD | Incoming, CL | 2 | -- | -- | -- |
| | | | | | | | | |
| | | | | | | | | -- |
| | | | | | | | | |
| | | | | | | | | |
| Mar 16 | 9:32 AM | 9643 | Bethesda, MD | Washington, DC | 5 | -- | -- | -- |
| Mar 16 | 9:33 AM | 2326 | Bethesda, MD | Wshngtnzn1, DC | 4 | -- | -- | -- |
| Mar 16 | 9:37 AM | 9643 | Bethesda, MD | Washington, DC | 5 | -- | -- | -- |
| | | | | | | | | |
| Mar 16 | 10:30 AM | 7275 | Bethesda, MD | New York, NY | 1 | -- | -- | -- |
| Mar 16 | 10:32 AM | 7275 | Bethesda, MD | New York, NY | 2 | -- | -- | -- |
| | | | | | | | | |
| Mar 16 | 11:24 AM | 7275 | Wheaton, MD | Incoming, CL | 15 | -- | -- | -- |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| Mar 16 | 2:53 PM | 7275 | Bethesda, MD | Incoming, CL | 1 | -- | -- | -- |
| | | | | | | | | |
| Mar 16 | 3:04 PM | 7275 | Bethesda, MD | New York, NY | 4 | -- | -- | -- |
| Mar 16 | 3:30 PM | 7275 | Bethesda, MD | Incoming, CL | 7 | -- | -- | -- |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

JA271

Exhibit 3



**From:** Reuveni, Erez R. (CIV)
**To:** ███████████ ; ███████ (CIV); ████████ (CIV); ████████ ; ██████ ; ████████ ; ███████ ; ██████ ; ██████ ; ███████ ; ██████ ; █████ (HQ)
**Cc:** Flentje, August (CIV); ████ (CIV); ████ (CIV); ████ (CIV); ████ (CIV); ████ (CIV)
**Subject:** RE: AEA Litigation Team - case updates
**Date:** Saturday, March 15, 2025 7:04:08 PM

As we await the written order, clarifying our understanding of the injunction as clarified at the end. No one subject to AEA in our custody can be removed. And anyone in the air should be returned, unless they have a title 8 final order. Please confirm receipt and let us know what if anything is happening. Thank you.

**From:** Reuveni, Erez R. (CIV)
**Sent:** Saturday, March 15, 2025 6:48 PM
**To:** ████████ ; ████████ (CIV) ; ████████ (CIV) ; ████████ ; ██████ ; ██████ ; ████████████████ ; ████████ ; ████████ ; ████████ ; ██████ ; ████████ ; ████████ ; ████████ ; ██████ ; ██████ (HQ)
**Cc:** Flentje, August (CIV) ; ████████ (CIV) ; ████████ (CIV) ; ████████ (CIV) ; ████████ (CIV) ; ████████ (CIV)
**Subject:** RE: AEA Litigation Team - case updates

Sorry for all the emails. Last email: the judge specifically ordered us to not remove anyone in the class, and to return anyone in the air.

**From:** Reuveni, Erez R. (CIV)
**Sent:** Saturday, March 15, 2025 6:46 PM



**To:** ████████████████ @ice.dhs.gov>; ████████████
████████ @usdoj.gov>; ████████████████████ @usdoj.gov>; ████████
████████ @state.gov>; ████████████ @state.gov>; ████████
████████████████████ @ice.dhs.gov>; ████████
████████ @state.gov>; ████████████ @state.gov>; ████████
████████ @state.gov>; ████████████ @state.gov>; ████████
████████ @state.gov>; ████████████████ @ice.dhs.gov>; ████████
████████ @ice.dhs.gov>; ████████████ @HQ.DHS.GOV>; ████████
████████ @HQ.DHS.GOV>; ████████████ @hq.dhs.gov>
**Cc:** Flentje, August (CIV) <August.Flentje@usdoj.gov>; ████████
████████ @usdoj.gov>; ████████████████ @usdoj.gov>; ████████
████████ @usdoj.gov>; ████████████ @usdoj.gov>; ████████
████████ @usdoj.gov>
**Subject:** RE: AEA Litigation Team - case updates

The class is "all noncitizens in US custody subject to the AEA" a minute order with more specifics will issue. Please confirm receipt of this email and let us know ASAP on the questions below concerning removals not yet effectuated, including those involving folks in the air.

**From:** Reuveni, Erez R. (CIV)
**Sent:** Saturday, March 15, 2025 6:44 PM
**To:** ████████████████████████ @ice.dhs.gov>; ████████████

@usdoj.gov>; ██████ @usdoj.gov>; ██████
@state.gov>; ██████ @state.gov>; ██████
@ice.dhs.gov>; ██████
@state.gov>; ██████ @state.gov>; ██████
@state.gov>; ██████ @state.gov>; ██████
@state.gov>; ██████ @ice.dhs.gov>; ██████
@ice.dhs.gov>; ██████ @HQ.DHS.GOV>; ██████
@HQ.DHS.GOV>; ██████ @hq.dhs.gov>

**Cc:** Flentje, August (CIV) <August.Flentje@usdoj.gov>; ██████
@usdoj.gov>; ██████ @usdoj.gov>; ██████
@usdoj.gov>; ██████ @usdoj.gov>; ██████
@usdoj.gov>

**Subject:** RE: AEA Litigation Team - case updates

**Importance:** High

The judge is presently issuing a class-wide TRO.

Can folks confirm for us if at the moment any individuals subject to the AEA are being staged for removal, or are presently in the air as part of removal (but not yet having landed and disembarked)?

**From:** Reuveni, Erez R. (CIV)
**Sent:** Saturday, March 15, 2025 6:14 PM
**To:** ██████ @ice.dhs.gov>; ██████
@usdoj.gov>; ██████ @usdoj.gov>; ██████
@state.gov>; ██████ @state.gov>; ██████
@ice.dhs.gov>; ██████
@state.gov>; ██████ @state.gov>; ██████
@state.gov>; ██████ @state.gov>; ██████
@state.gov>; ██████ @ice.dhs.gov>; ██████
@ice.dhs.gov>; ██████ @HQ.DHS.GOV>; ██████
@HQ.DHS.GOV>; ██████ @hq.dhs.gov>

**Cc:** Flentje, August (CIV) <August.Flentje@usdoj.gov>; ██████
@usdoj.gov>; ██████ @usdoj.gov>; ██████
@usdoj.gov>; ██████ @usdoj.gov>; ██████
@usdoj.gov>

**Subject:** RE: AEA Litigation Team - case updates

Judge is certifying a nationwide class as we speak. It is likely a class-wide tro is imminent.

**From:** ██████ @ice.dhs.gov>
**Sent:** Saturday, March 15, 2025 6:09 PM
**To:** Reuveni, Erez R. (CIV) <Erez.R.Reuveni@usdoj.gov>; ██████
@usdoj.gov>; ██████ @usdoj.gov>; ██████
@state.gov>; ██████ @state.gov>; ██████
@ice.dhs.gov>; ██████
@state.gov>; ██████ @state.gov>; ██████
@state.gov>; ██████ @state.gov>; ██████
@state.gov>; ██████ @ice.dhs.gov>; ██████
@ice.dhs.gov>; ██████ @HQ.DHS.GOV>; ██████
@HQ.DHS.GOV>; ██████ @hq.dhs.gov>



JA274

**Cc:** Flentje, August (CIV) <August.Flentje@usdoj.gov>; ███████████
██████████@usdoj.gov>; ██████████@usdoj.gov>; ████████
██████@usdoj.gov>; ████████@usdoj.gov>; ████████
██████@usdoj.gov>; ██████████@ice.dhs.gov>

**Subject:** [EXTERNAL] RE: AEA Litigation Team - case updates

Thanks. Sorry to nudge.

███████████████████████

U.S. Immigration and Customs Enforcement

███████████████████

**\*\*\* ATTORNEY/CLIENT PRIVILEGE \*\*\* ATTORNEY WORK PRODUCT \*\*\***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this message has been misdirected and immediately destroy all originals and copies. Any disclosure of this document or information contained therein must be approved by the Office of the Principal Legal Advisor, U.S. Immigration & Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and is FOIA exempt under 5 U.S.C. § 552(b)(5), (b)(7).

**From:** Reuveni, Erez R. (CIV) <Erez.R.Reuveni@usdoj.gov>
**Sent:** Saturday, March 15, 2025 6:08 PM
**To:** ████████████████@ice.dhs.gov>; ███████████
████████@usdoj.gov>; ██████████@usdoj.gov>; ████
████████@state.gov>; ████████@state.gov>; ████████
████████@ice.dhs.gov>; ████████████
████████@state.gov>; ████████@state.gov>; ████████
████████@state.gov>; ████████@state.gov>; ████████
████████@state.gov>; ████████@ice.dhs.gov>; ████
████████@ice.dhs.gov>; ████████@HQ.DHS.GOV>; ████
████████@HQ.DHS.GOV>; ██████████@hq.dhs.gov>
**Cc:** Flentje, August (CIV) <August.Flentje@usdoj.gov>; ████████
████████@usdoj.gov>; ██████████@usdoj.gov>; ████
████████@usdoj.gov>; ██████████@usdoj.gov>; ████
████████@usdoj.gov>

**Subject:** RE: AEA Litigation Team - case updates

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

The hearing took a break to get further information and is back in session now. Update shortly.

**From:** ████████████████@ice.dhs.gov>
**Sent:** Saturday, March 15, 2025 6:06 PM
**To:** ████████████████@usdoj.gov>; ████████
████████@usdoj.gov>; ████████@state.gov>; ████
████████@state.gov>; ████████
████████@ice.dhs.gov>; ████████@state.gov>; ████
████████@state.gov>; ████████@state.gov>; ████████@state.gov>;
████████@state.gov>; ████████@ice.dhs.gov>;
████████@ice.dhs.gov>; ████████
████████@HQ.DHS.GOV>; ████████@HQ.DHS.GOV>; ████

JA273



███████ @hq.dhs.gov>

**Cc:** Reuveni, Erez R. (CIV) <Erez.R.Reuveni@usdoj.gov>; Flentje, August (CIV)
<August.Flentje@usdoj.gov>; ████████████████████ @usdoj.gov>; ██
████████████ @usdoj.gov>; █████████████ @usdoj.gov>; ██
████████████ @usdoj.gov>; ██████████
████████ @usdoj.gov>; ████████████████ @ice.dhs.gov>

**Subject:** [EXTERNAL] RE: AEA Litigation Team - case updates

Any word on the 5pm hearing?

███████████████

U.S. Immigration and Customs Enforcement

████████████

**\*\*\* ATTORNEY/CLIENT PRIVILEGE \*\*\* ATTORNEY WORK PRODUCT \*\*\***

This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this message has been misdirected and immediately destroy all originals and copies. Any disclosure of this document or information contained therein must be approved by the Office of the Principal Legal Advisor, U.S. Immigration & Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and is FOIA exempt under 5 U.S.C. § 552(b)(5), (b)(7).

13

JA276

Exhibit 4



**From:**    Reuveni, Erez R. (CIV)
**To:**      ██████ ; ██████ ; ██████ (CIV); ██████ (CIV); ██████ ;
             ██████ ██████ ██████ ██████ ██████ ██████
             ██████ ██████ ██████ ██████
**Cc:**      Flentje, August (CIV); ██████ (CIV); ██████ (CIV); ██████ (CIV); ██████
             (CIV); ██████ (CIV)
**Subject:** Re: AEA Litigation Team – case updates
**Date:**    Saturday, March 15, 2025 7:27:25 PM

Here is the minute order.

**MINUTE ORDER: As discussed in today's hearing, the Court ORDERS that: 1) Plaintiffs' [4] Motion for Class Certification is GRANTED insofar as a class consisting of "All noncitizens in U.S. custody who are subject to the March 15, 2025, Presidential Proclamation entitled 'Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua' and its implementation" is provisionally certified; 2) The Government is ENJOINED from removing members of such class (not otherwise subject to removal) pursuant to the Proclamation for 14 days or until further Order of the Court; 3) The Government shall file any Motion to Vacate this TRO by March 17, 2025, with Plaintiffs' Opposition due by March 19, 2025; and 4) The hearing set for March 17, 2025, is VACATED and RESET for March 21, 2025, at 2:30 p.m. via Zoom. So ORDERED by Chief Judge James E. Boasberg on 3/15/2025. (lcjeb1)**

Sent from my iPhone


On Mar 15, 2025, at 7:18 PM, Reuveni, Erez R. (CIV) wrote:


 All plaintiffs have reached out about the flights. Please confirm asap no one lacking a title 8 final order will be taken off these planes when they land. We need to address this asap to avoid contempt. It in particular the flight landing in three minutes. Please advise.


- GXA flight 6143 does not appear to land until 7:20 pm eastern.
- GXA flight 6145 has about at least another hour in flight.
- GXA flight 6122 has not yet left Harlingen.
-

Sent from my iPhone


On Mar 15, 2025, at 6:53 PM, Reuveni, Erez R. (CIV) wrote:


Thanks. And the two flights in the air?

**From:** ██████



**Sent:** Saturday, March 15, 2025 6:53 PM

**To:** ███████████ ; Reuveni, Erez R. (CIV) ; ████████ (CIV) ; ██████ (CIV) ; ███████ ; ███████ ; ████████ ; ████████ ; ████████ ; ███ ; ███████ ; ███████ ; ███████ ; ████████ ; ██ ; ████████ ; ██████ (HQ)

**Cc:** Flentje, August (CIV) ; ████████ (CIV) ; ████████ (CIV) ; ████████ (CIV) ; ████████ (CIV) ; ████████ (CIV)

**Subject:** [EXTERNAL] RE: AEA Litigation Team - case updates

Just confirmed on the ground that the Title 50 folks on the third flight are being pulled off.

Best,

████████████

████████████████████████

██████████████

U.S. Immigration and Customs Enforcement

███████████

**\*\*\* ATTORNEY/CLIENT PRIVILEGE \*\*\* ATTORNEY WORK PRODUCT \*\*\***

This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this message has been misdirected and immediately destroy all originals and copies. Any disclosure of this document or information contained therein must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and is FOIA exempt under 5 U.S.C. § 552(b)(5), (b)(7).

**From:** ████████████████████████ @ice.dhs.gov>

**Sent:** Saturday, March 15, 2025 6:50 PM

**To:** Reuveni, Erez R. (CIV) <Erez.R.Reuveni@usdoj.gov>; ████████████ @usdoj.gov>; ████████████ @usdoj.gov>; ████████ @state.gov>; ████████ @state.gov>; ████████████████ @ice.dhs.gov>; ████████ @state.gov>; ████████ @state.gov>; ████████ @state.gov>; ████████ @state.gov>; ████ @state.gov>; ████████ @ice.dhs.gov>; ████████ @ice.dhs.gov>; ████████ @HQ.DHS.GOV>; ████████ @HQ.DHS.GOV>; ████████ @hq.dhs.gov>



**Cc:** Flentje, August (CIV) <August.Flentje@usdoj.gov>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @usdoj.gov>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @usdoj.gov>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @usdoj.gov>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @usdoj.gov>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @usdoj.gov>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @ice.dhs.gov>

**Subject:** RE: AEA Litigation Team - case updates

Two flights departed at about 5:15 and 5:45. They are still in the air.

U.S. Immigration and Customs Enforcement

**\*\*\* ATTORNEY/CLIENT PRIVILEGE \*\*\* ATTORNEY WORK PRODUCT \*\*\***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this message has been misdirected and immediately destroy all originals and copies. Any disclosure of this document or information contained therein must be approved by the Office of the Principal Legal Advisor, U.S. Immigration & Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and is FOIA exempt under 5 U.S.C. § 552(b)(5), (b)(7).

**From:** Reuveni, Erez R. (CIV) <Erez.R.Reuveni@usdoj.gov>
**Sent:** Saturday, March 15, 2025 6:48 PM
**To:** ▮▮▮▮▮▮ @ice.dhs.gov>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @usdoj.gov>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @usdoj.gov>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @state.gov>; ▮▮▮▮▮▮ @state.gov>;
▮▮▮▮▮▮
▮▮▮▮▮▮ @ice.dhs.gov>; ▮▮▮▮▮▮ @state.gov>;
▮▮▮▮▮▮ @state.gov>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @state.gov>; ▮▮▮▮▮▮ @state.gov>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @state.gov>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @ice.dhs.gov>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @ice.dhs.gov>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @HQ.DHS.GOV>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @HQ.DHS.GOV>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @hq.dhs.gov>
**Cc:** Flentje, August (CIV) <August.Flentje@usdoj.gov>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @usdoj.gov>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @usdoj.gov>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @usdoj.gov>; ▮▮▮▮▮▮
▮▮▮▮▮▮ @usdoj.gov>;

JA280

███████ @usdoj.gov>

**Subject:** RE: AEA Litigation Team - case updates

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Sorry for all the emails. Last email: the judge specifically ordered us to not remove anyone in the class, and to return anyone in the air.

**From:** Reuveni, Erez R. (CIV)
**Sent:** Saturday, March 15, 2025 6:46 PM
**To:** ███████ @ice.dhs.gov>; ███████
███████ @usdoj.gov>; ███████
███████ @usdoj.gov>; ███████
███████ @state.gov>; ███████ @state.gov>;
███████
███████ @ice.dhs.gov>; ███████ @state.gov>;
███████ @state.gov>; ███████
███████ @state.gov>; ███████ @state.gov>; ███████
███████ @state.gov>; ███████
███████ @ice.dhs.gov>; ███████
███████ @ice.dhs.gov>; ███████
███████ @HQ.DHS.GOV>; ███████
███████ @HQ.DHS.GOV>; ███████
███████ @hq.dhs.gov>
**Cc:** Flentje, August (CIV) <August.Flentje@usdoj.gov>; ███████
███████ @usdoj.gov>; ███████
███████ @usdoj.gov>; ███████
███████ @usdoj.gov>; ███████
███████ @usdoj.gov>; ███████
███████ @usdoj.gov>
**Subject:** RE: AEA Litigation Team - case updates

The class is "all noncitizens in US custody subject to the AEA" a minute order with more specifics will issue. Please confirm receipt of this email and let us know ASAP on the questions below concerning removals not yet effectuated, including those involving folks in the air.

**From:** Reuveni, Erez R. (CIV)
**Sent:** Saturday, March 15, 2025 6:44 PM
**To:** ███████ @ice.dhs.gov>; ███████
███████ @usdoj.gov>; ███████
███████ @usdoj.gov>; ███████
███████ @state.gov>; ███████ @state.gov>;
███████
███████ @ice.dhs.gov>; ███████ @state.gov>;



@state.gov>; ▮▮▮▮▮
▮▮▮▮ @state.gov>; ▮▮▮▮ @state.gov>; ▮▮▮
▮▮▮▮ @state.gov>; ▮▮▮▮
▮▮▮▮ @ice.dhs.gov>; ▮▮▮▮
▮▮▮▮ @ice.dhs.gov>; ▮▮▮▮
▮▮▮▮ @HQ.DHS.GOV>; ▮▮▮▮
▮▮▮▮ @HQ.DHS.GOV>; ▮▮▮▮
▮▮▮▮ @hq.dhs.gov>

**Cc:** Flentje, August (CIV) <August.Flentje@usdoj.gov>; ▮▮▮▮
▮▮▮▮ @usdoj.gov>; ▮▮▮▮
▮▮▮▮ @usdoj.gov>; ▮▮▮▮
▮▮▮▮ @usdoj.gov>; ▮▮▮▮
▮▮▮▮ @usdoj.gov>; ▮▮▮▮
▮▮▮▮ @usdoj.gov>

**Subject:** RE: AEA Litigation Team – case updates

**Importance:** High

The judge is presently issuing a class-wide TRO.

Can folks confirm for us if at the moment any individuals subject to the AEA are being staged for removal, or are presently in the air as part of removal (but not yet having landed and disembarked)?

**From:** Reuveni, Erez R. (CIV)

**Sent:** Saturday, March 15, 2025 6:14 PM

**To:** ▮▮▮▮ @ice.dhs.gov>; ▮▮▮▮
▮▮▮▮ @usdoj.gov>; ▮▮▮▮
▮▮▮▮ @usdoj.gov>; ▮▮▮▮
▮▮▮▮ @state.gov>; ▮▮▮▮ @state.gov>;
▮▮▮▮▮▮▮▮
▮▮▮▮ @ice.dhs.gov>; ▮▮▮▮ @state.gov>;
▮▮▮▮ @state.gov>; ▮▮▮▮
▮▮▮▮ @state.gov>; ▮▮▮▮ @state.gov>; ▮▮▮
▮▮▮▮ @state.gov>; ▮▮▮▮
▮▮▮▮ @ice.dhs.gov>; ▮▮▮▮
▮▮▮▮ @ice.dhs.gov>; ▮▮▮▮
▮▮▮▮ @HQ.DHS.GOV>; ▮▮▮▮
▮▮▮▮ @HQ.DHS.GOV>; ▮▮▮▮
▮▮▮▮ @hq.dhs.gov>

**Cc:** Flentje, August (CIV) <August.Flentje@usdoj.gov>; ▮▮▮▮
▮▮▮▮ @usdoj.gov>; ▮▮▮▮
▮▮▮▮ @usdoj.gov>; ▮▮▮▮
▮▮▮▮ @usdoj.gov>; ▮▮▮▮
▮▮▮▮ @usdoj.gov>; ▮▮▮▮
▮▮▮▮ @usdoj.gov>

**Subject:** RE: AEA Litigation Team – case updates

JA282

Judge is certifying a nationwide class as we speak. It is likely a class-wide tro is imminent.

**From:** ███████████████████████ @ice.dhs.gov>
**Sent:** Saturday, March 15, 2025 6:09 PM
**To:** Reuveni, Erez R. (CIV) <Erez.R.Reuveni@usdoj.gov>; ████████████
████████████ @usdoj.gov>; ████████████
████████████ @usdoj.gov>; ████████████
████████████ @state.gov>; ████████████ @state.gov>;
████████████████████████████████
████ @ice.dhs.gov>; ████████████████████ @state.gov>;
████████████ @state.gov>; ████████████
████ @state.gov>; ████████████ @state.gov>; ████████
████████████ @state.gov>; ████████████
████████████ @ice.dhs.gov>; ████████████
████████████ @ice.dhs.gov>; ████████████
████████████ @HQ.DHS.GOV>; ████████████
████████████ @HQ.DHS.GOV>; ████████████
████████████ @hq.dhs.gov>
**Cc:** Flentje, August (CIV) <August.Flentje@usdoj.gov>; ████████████
████████████ @usdoj.gov>; ████████████
████████████ @usdoj.gov>; ████████████
████████████ @usdoj.gov>; ████████████
████████████ @usdoj.gov>; ████████████
████████████ @usdoj.gov>; ████████████
████████████ @ice.dhs.gov>
**Subject:** [EXTERNAL] RE: AEA Litigation Team - case updates

Thanks. Sorry to nudge.

████████████████████

████████████████████

████████████████████████

U.S. Immigration and Customs Enforcement

████████████████████

████████████████████

████████████

*** ATTORNEY/CLIENT PRIVILEGE *** ATTORNEY WORK PRODUCT ***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this message has been misdirected and immediately destroy all originals and copies. Any disclosure of this document or information contained therein must be approved by the Office of the Principal Legal Advisor, U.S. Immigration & Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and is FOIA exempt under 5 U.S.C. § 552(b)(5), (b)(7).

**From:** Reuveni, Erez R. (CIV) <Erez.R.Reuveni@usdoj.gov>
**Sent:** Saturday, March 15, 2025 6:08 PM
**To:** ████████████████████████ @ice.dhs.gov>; ████████



@usdoj.gov>;

@usdoj.gov>;

@state.gov>; @state.gov>;

@ice.dhs.gov>; @state.gov>;

@state.gov>;

@state.gov>; @state.gov>;

@state.gov>;

@ice.dhs.gov>;

@ice.dhs.gov>;

@HQ.DHS.GOV>;

@HQ.DHS.GOV>;

@hq.dhs.gov>

**Cc:** Flentje, August (CIV) <August.Flentje@usdoj.gov>;

@usdoj.gov>;

@usdoj.gov>;

@usdoj.gov>;

@usdoj.gov>;

@usdoj.gov>

**Subject:** RE: AEA Litigation Team - case updates

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

The hearing took a break to get further information and is back in session now. Update shortly.

**From:** @ice.dhs.gov>

**Sent:** Saturday, March 15, 2025 6:06 PM

**To:** @usdoj.gov>;

@usdoj.gov>;

@state.gov>; @state.gov>;

@ice.dhs.gov>; @state.gov>;

@state.gov>;

@state.gov>; @state.gov>;

@state.gov>;

@ice.dhs.gov>;

@ice.dhs.gov>;

@HQ.DHS.GOV>;

@HQ.DHS.GOV>;

@hq.dhs.gov>

**Cc:** Reuveni, Erez R. (CIV) <Erez.R.Reuveni@usdoj.gov>; Flentje, August (CIV) <August.Flentje@usdoj.gov>;

@usdoj.gov>;

██████████ @usdoj.gov>; ███████████████

██████████ @usdoj.gov>; ███████████████

███████████ @usdoj.gov>; ██████████████

██████████ @usdoj.gov>; ███████████████

██████████ @ice.dhs.gov>

**Subject:** [EXTERNAL] RE: AEA Litigation Team - case updates

Any word on the 5pm hearing?

████████████████

████████████████

█████████████████████

U.S. Immigration and Customs Enforcement

████████████████

████████████████

████████████████

*** ATTORNEY/CLIENT PRIVILEGE *** ATTORNEY WORK PRODUCT ***
This communication and any attachments may contain confidential and/or sensitive attorney/client
privileged information or attorney work product and/or law enforcement sensitive information. It is not for
release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please
notify the sender if this message has been misdirected and immediately destroy all originals and copies. Any
disclosure of this document or information contained therein must be approved by the Office of the Principal
Legal Advisor, U.S. Immigration & Customs Enforcement. This document is for INTERNAL GOVERNMENT USE
ONLY and is FOIA exempt under 5 U.S.C. § 552(b)(5), (b)(7).

22

JA285

Exhibit 5



| From: | Reuveni, Erez R. (CIV) |
| To: | (CIV); (CIV); |
| Cc: | Flentje, August (CIV); (CIV); (CIV); (CIV); (CIV) |
| Subject: | RE: AEA Litigation Team - case updates |
| Date: | Sunday, March 16, 2025 8:07:23 AM |
| Importance: | High |

Good morning everyone. Thanks everyone for being on deck last night for the filings. We really appreciate the assist.

In the meantime, following up on several different emails including the below and merging into one place. Can we please get an update on the status of compliance with the injunction, consistent with the earlier emails and guidance from us below? Specifically, can you confirm the status of the three flights referenced below, and the status of the individuals that are on each of the flights? As a reminder our advice here on injunction compliance was to not deplane anyone from these planes who is subject to an AEA removal, although it was permissible to deplane individuals with Title 8 orders, and otherwise return those individuals to the United States. We need to confirm quickly status so we can update the court if necessary.

Relatedly, to the extent conversations on these issues are occurring at a higher level within your leadership and ours, can you please confirm that?

Many thanks,
Erez

---

**From:** Reuveni, Erez R. (CIV)
**Sent:** Saturday, March 15, 2025 7:18 PM
**To:** ████████████ @ice.dhs.gov>; ████████ ████████ @ice.dhs.gov>; ████████████ @usdoj.gov>; ████ ████████ @usdoj.gov>; ████████████ @state.gov>; ████ ████ @state.gov>; ████████████ ████ @ice.dhs.gov>; ████████████ @state.gov>; ████ ████ @state.gov>; ████████ @state.gov>; ████████████ @state.gov>; ████ ████████ @state.gov>; ████████████ @ice.dhs.gov>; ████ ████████ @hq.dhs.gov>; ████████ @hq.dhs.gov>; ████ ████ @hq.dhs.gov>
**Cc:** Flentje, August (CIV) <August.Flentje@usdoj.gov>; ████████ ████ @usdoj.gov>; ████████ @usdoj.gov>; ████ ████ @usdoj.gov>; ████████████ @usdoj.gov>; ████ ████ @usdoj.gov>
**Subject:** Re: AEA Litigation Team - case updates

All plaintiffs have reached out about the flights. Please confirm asap no one lacking a title 8

final order will be taken off these planes when they land. We need to address this asap to avoid contempt.  It in particular the flight landing in three minutes. Please advise.

- GXA flight 6143 does not appear to land until 7:20 pm eastern.

- GXA flight 6145 has about at least another hour in flight.

- GXA flight 6122 has not yet left Harlingen.

- 

Sent from my iPhone

> On Mar 15, 2025, at 6:53 PM, Reuveni, Erez R. (CIV) <Erez.R.Reuveni@usdoj.gov> wrote:

25

> Thanks. And the two flights in the air?

JA288

Exhibit 6

| From: | Flentje, August (CIV) |
| To: | Reuveni, Erez R. (CIV); ████████ (CIV); ████████ (CIV) |
| Subject: | Fwd: Advice to DHS |
| Date: | Sunday, March 16, 2025 2:28:42 PM |

Hi. Does this get us comfortable with the notice as drafted earlier with the addition of the removed from US airspace line?  Drew will be the slash s and make the ECF filing even

Begin forwarded message:

**From:** "Roth, Yaakov M (CIV)" <Yaakov.M.Roth@usdoj.gov>
**Date:** March 16, 2025 at 2:26:48 PM EDT
**To:** "Flentje, August (CIV)" <August.Flentje@usdoj.gov>
**Cc:** "Reuveni, Erez R. (CIV)" <Erez.R.Reuveni@usdoj.gov>, "Ensign, Drew C (CIV)" <Drew.C.Ensign@usdoj.gov>
**Subject: Advice to DHS**

I have been told by ODAG that the principal associate deputy attorney general advised DHS last night that the deplaning of the flights that had departed US airspace prior the court's minute order was permissible under the law and the court's order.

Sent from my iPhone

JA290

Exhibit 7

3/19/25, 8:33 AM

At this point why dont we just submit an emoji of a middle finger as our filing

a picayune middle finger

So stupid.

29

3/19/25, 10:35 PM

Exhibit 11

You were at a certain meeting too

4/5/25, 2:46 PM

I believe I told our host we would not violate a
court order.  I think there is definitely a
through line from that meeting to where we
are today.

81

JA294

# EXHIBIT G

**July 7, 2025 Addendum to June 24, 2025 Protected Whistleblower Disclosure of Mr. Erez Reuveni Submitted Pursuant to 5 U.S.C. § 2302 and 5 U.S.C. § 1213**

| EXHIBIT NUMBER | DESCRIPTION | PAGE NUMBER |
|---|---|---|
| 1 | March 15, 2025 Excerpts of Text Messages Between Mr. Reuveni and a Colleague During and After the Hearing before Judge Boasberg in *JGG v. Trump*<br><br>*These messages are corroboration of Bove's comments in a meeting the day prior that planes with individuals removed under the Alien Enemies Act (AEA) would depart the U.S. over the weekend of March 15-16, 2025, and that the DOJ might have to say "fuck you" to a federal court were a court to order the planes not to depart.* | Pages 1-4 |
| 2 | March 28, 2025 email between OIL litigation team<br><br>*This email message evidences that DHS was communicating to DOJ-OIL that they had received contrary advice regarding how to interpret the scope of the court's injunction in DVD as to whether it applied only to named plaintiffs* | Pages 5-6 |
| 3 | March 28, 2025 email between OIL and DHS regarding *DVD v. DHS*<br><br>*Emails evidence that Mr. Reuveni was asking for confirmation of government's position on the scope of the injunction in* DVD v. DHS *the night of March 28, 2025, and did not receive a response. This lack of response led Mr. Reuveni to decide not to file a brief with the government's position, which led to calls in the early hours of March 29, 2025 from Perkins, McHenry, Percival, and Whitaker.* | Pages 7-8 |
| 4 | March 28-29, 2025 emails between OIL and DHS following email from Plaintiffs' attorneys in *DVD v. DHS* | Pages 9-19 |

1

JA296

*This email exchange evidences the sequence of events wherein Mr. Reuveni determined that he could not file a brief in* DVD v. DHS *because there was not confirmation that DHS and DOJ leadership agreed that the injunction had nationwide applicability.*

Pp.18-19: Mr. Reuveni states, "Hi everyone. WE understand guidance hasn't been issued yet. Can DHS confirm asap whether anyone who would be subject to the injunction as read by us in our papers and in our advice to you earlier today— that is that it bars removal of anyone with a final order other than someone with a 235b order—is not presently being staged for removal. WE are telling the court in our briefs the injunction applies to such people and that is the reason for the need for relief. If DHS removes such people nonetheless we'd be violating the court order as we read it earlier, but also as we are presenting it in our briefs. Can folks please confirm ASAP that no one subject to the order is currently being staged for removal?"

P. 17: Flentje responds, "I agree with this. If we file this brief, the United States' interpretation of the injunction is that it is universal in scope. If a decision is being considered to take a different interpretation of the order, we should not file this brief, and we would need to withdraw the brief if it has been filed."

P. 15: Percival notes, "My take on these emails is that DOJ leadership and DOJ litigators don't agree on the strategy. Please keep DHS out of it," and pp. 13-14 follows with, "Figure out what DOJ's position is and get back to us. DHS has one position from the top of the agency to the bottom. DOJ needs to do the same."

P. 13: When Mr. Reuveni asks Percival, "What is that position?" Percival responds p.

2

JA297

| | | |
|---|---|---|
| | 12 with, "Ask your leadership. Holy crap guys."<br><br>Pp. 12-13: Mr. Reuveni then notes, "Ok. We can't file the briefs then. We'll hold on that until we have some clarity on this. The briefs explicitly say we view the injunction as barring all removals. If planes are taking off or will take off with people covered by the injunction as these briefs say we cannot file the briefs as written. If our view is that the order applies only to the named plaintiffs there is no emergency that justifies these filings. The solicitor general signed off on the former approach. But if we can't get confirmation that that is how everyone reads the order then we can't file this as drafted. Standing by for guidance in the mean time."<br><br>An hour later, after Mr. Reuveni had phone calls with McHenry, Perkins, Percival and Whitaker, Percival replied p. 10 saying, "Thanks for the phone call Erez. I think we have a path forward. Have a good night everyone." | |
| 5 | March 29, 2025 emails between OIL attorneys regarding *DVD v. DHS*<br><br>*This email exchange demonstrates that as Mr. Reuveni alleged in his disclosure, he was not receiving responses from those in his chain of command, including Flentje, Ensign, and Roth, on the evening of March 29, 2025. It also illustrates Mr. Reuveni's reasonable belief that the argument made in McHenry's "odd" footnote that the court's order was ambiguous, was unreasonable.*<br><br>P. 21: an email from an OIL attorney noted that a reviewer from the white house added a comment in the draft brief, "Not sure I understand the final point in the FN about this making the scope of the order ambiguous. Consider clarifying." | Pages 20-22 |

3

JA298

| 6 | March 29, 2025 text messages between Mr. Reuveni and Mr. Flentje<br><br>*This email exchange evidences that Flentje was unavailable in the early hours of March 29 when Mr. Reuveni decided he could not file the DVD appeal brief because DHS did not agree that the injunction applied nationwide. The exchange also evidences that DHS was delaying in disseminating written guidance to the agency about the applicability of the injunction at the behest of DOJ leadership.*<br><br>P. 24: Flentje says, "The DVD thing is nuts." | Pages 23-25 |
| 7 | March 29, 2025 emails between OIL and DHS regarding *DVD v. DHS* guidance<br><br>*Email message confirms that as Mr. Reuveni disclosed, DHS did not disseminate written guidance to the agency about the Court's order in* DVD v. DHS *and instead only provided verbal guidance to one officer.* | Pages 26-29 |
| 8 | March 31, 2025 email between OIL attorneys following email from Plaintiffs' attorneys in *DVD v. DHS*<br><br>*In this email exchange Mr. Reuveni notes that he has raised up his chain of command the removal of 17 individuals to El Salvador, including a named plaintiff in* DVD v. DHS *in apparent violation of the injunction.* | Pages 30-32 |
| 9 | March 31, 2025 emails between OIL and DHS following email from Plaintiffs' attorneys in *DVD v. DHS*<br><br>*In this email exchange Mr. Reuveni challenges DHS GC Mazzara's assertion that, "DHS had nothing to do with this operation as far as I'm aware," regarding Secretary Rubio's announcement that on the night of March 30, 2025, 17 people were removed to El Salvador by noting that the* | Pages 33-35 |

4

JA299

| | | |
|---|---|---|
| | *individuals were in DHS custody prior to their transfer to El Salvador, and that DOD referred OIL back to DHS for further information.*<br><br>Pp. 34-35: Mazzara states, "These are not questions for DHS. DHS had nothing to do with this operation as far as I'm aware. DoD is not a party to this suit, nor is State I believe, and so these questions need to go to them."<br><br>P. 34: Mazzara then says, "And for the record, do not make any representations to the court regarding DHS on the matter of this reported flight."<br><br>P. 34: Mr. Reuveni asks, "These folks were in DHS custody at GTMO were they not? And they were moved from ICE custody in Texas to GTMO, were they not? We will certainly confer with our DOD colleagues (who have initially referred us back to DHS give the points I just mentioned), but parts of this appear to be in DHS's wheelhouse. If a phone call rather than an email with the right group can help clarify, happy to jump on a call." | |
| 10 | April 1, 2025 emails between OIL attorneys regarding *DVD v. DHS*<br><br>*This email exchange evidences that while news reports indicated that* DVD *class members were being removed from the U.S. in violation of the injunction, DHS was not providing DOJ-OIL with responses regarding its compliance with the court's order.* | Pages 36-38 |
| 11 | April 2, 2025 email from OIL colleague regarding *DVD v. DHS*<br><br>*This email evidences that as of April 2, 2025 DHS had not distributed guidance about the* DVD v. DHS *injunction which was resulting in violations of the court order for which the ACLU was threatening to bring suit.* | Pages 39-40 |

5

| 12 | April 2, 2025 emails between OIL attorneys regarding *DVD v. DHS*<br><br>*This email exchange evidences that DHS was not being responsive to DOJ-OIL inquiries about compliance with the nationwide injunction in* DVD v. DHS *and that DHS had still not confirmed with DOJ that the agency had issued guidance about the applicability of the court's order to DHS' components.* | Pages 41-43 |
|---|---|---|

JA301

USCA Case #25-5452   Document #2184589   Filed: 07/22/2026   Page 306 of 401

Exhibit 1

JA302

**Excerpts of Text Messages Between Mr. Reuveni and a Colleague on March 15, 2025
During and After the Hearing before Judge Boasberg in *JGG v. Trump***

Time: March 15, 2025 5:17-5:25 p.m. ET

These messages corroborate, first at 5:17, the statement on p.7 of Mr. Reuveni's June 24, 2025
disclosure that, "Bove stated that DOJ would need to consider telling the courts 'fuck you' and
ignore any such court order," and second at 5:24-5:25, the statement on p. 9 that, "Mr. Reuveni
reasonably believes Ensign's statement to the court that he did not know whether AEA removals
would take place 'in the next 24 or 28 hours' was false."

| | |
|---|---|
| Oh shit | 5:17 PM |
| That was juts not true | 5:17 PM |
| Edited to "That was just not true " | 5:17 PM |
| About to enter the find out phase follow fuck around | 5:24 PM |
| Edited to "About to enter the find out phase following fuck around " | 5:24 PM |
| I can't believe he said he doesn't know | 5:24 PM |
| He got my email | 5:24 PM |
| I mean he doesn't know for sure they're aea | 5:24 PM |
| About what what? | 5:24 PM |
| He knows they are being removed | 5:24 PM |
| About the flights | 5:24 PM |
| The email from aclu | 5:25 PM |
| He knows there are plans for AEA removals within the next 24 hours | 5:25 PM |
| Yes he does | 5:25 PM |

JA303

Time: March 15, 2025 5:55-6:02 p.m. ET

These messages at 5:55 corroborate the statement on p.7 of Mr. Reuveni's June 24, 2025 disclosure that, "Bove stated that DOJ would need to consider telling the courts 'fuck you' and ignore any such court order." The messages at 6:01 reflect the paragraph on p. 10 about the reconvened hearing in *JGG v. Trump* before Judge Boasberg at 6:00 pm.

| | |
|---|---|
| This doesn't end with anything but a nationwide injunction | 5:55 PM |
| And a decision point on fuck you | 5:55 PM |
| Its a question if drew gets out without a sanction | 5:55 PM |
| Jesus | 6:01 PM |
| Was he ready for this? Are you with him? | 6:02 PM |
| Oh boy | 6:02 PM |

JA304

Time: March 15, 2025 8:16-8:22 p.m. ET

These messages occurred after a period of non-responsiveness from Mr. Reuveni's supervisors described in Mr. Reuveni's June 24, 2025 disclosure, beginning at the last paragraph of p. 10 through the end of the first paragraph on p. 12, and also after Mr. Reuveni reviewed public information that two flights had landed in Honduras by 8:10 pm. The messages corroborate the statement on p.7 of Mr. Reuveni's June 24, 2025 disclosure that, "Bove stated that DOJ would need to consider telling the courts 'fuck you' and ignore any such court order."

> Guess we are going to say fuck you to the court    8:16 PM
>
> Super    8:16 PM

Well Pamela Jo Bondi is    8:22 PM

Not you    8:22 PM

JA305

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,                                                      Case No: 1:25-cv-00766-JEB

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Respondents–Defendants*.

**DECLARATION OF NOELLE SMITH**

I, Noelle Smith, declare as follows:

1. I am over eighteen years of age and am competent to make this declaration.

2. I am a lawyer at the American Civil Liberties Union Immigrants' Rights Project. I represent the Petitioners and Plaintiffs in this case.

3. Attached hereto as exhibits are true and correct copies of the following:

**Exhibit**

1. Attorney General, Memorandum for Law Enforcement Officers re: Guidance for Implementing the Alien Enemies Act (Mar. 14, 2025).

2. Dep't of Homeland Sec., Louisiana Lockup: A New Partnership with DHS and the State of Louisiana to Expand Detention Space (Sept. 3, 2025), https://perma.cc/6T73-3CEG.

3. Video posted by Secretary Noem (@sec_noem) and DHS (@dhsgov), Instagram (Sept. 4, 2025), https://perma.cc/5C2A-7RRX.

JA306

4.    Dep't of Homeland Sec, *DHS Releases Names of Worst of the Worst Convicted Criminal Illegal Aliens Detained at Guantanamo Bay* (July 8, 2025), https://perma.cc/58GH-85W7.

5.    The Charlie Kirk Show: *Left-Wing Judges: The Gangsters in Black with Ken Paxton and Stephen Miller* (Sept. 27, 2023), *interview available at* https://thecharliekirkshow.com/podcasts/the-charlie-kirk-show/left-wing-judges-the-gangsters-in-black-with-ken-p (approximate transcript, available at https://app.podscribe.com/episode/88595585?transcriptVersionReqId=d55a7c39-4466-44dd-8326-26a17cb2ef66, attached here for the court's convenience).

6.    Frances Robles et al., *U.S. Botched a Deal to Swap Venezuelans Held in El Salvador for Americans*, N.Y. Times (July 8, 2025), https://perma.cc/5YBW-CDUL.

7.    Caitlin Yilek et al., *10 Americans Freed in Prisoner Swap Between U.S., El Salvador and Venezuela*, CBS News (July 18, 2025), https://perma.cc/EQ6P-B4TL.

8.    Jennifer Hansler & Priscilla Alvarez, *Trump Admin Proposed Sending Up to 500 Alleged Venezuelan Gang Members During Negotiations to Use El Salvador's Mega-Prison*, CNN (Apr. 28, 2025), https://perma.cc/29VZ-PP4Y.

9.    Marco Rubio, Dep't of State, *Welcoming the Release of U.S. Nationals and Political Prisoners Held in Venezuela*, U.S. Dep't of State (July 18, 2025), https://perma.cc/636K-A92J.

10.    Hamed Aleaziz et al., *'Can We Extradite Him?' How U.S. Officials Grappled with the Release of a Triple Murderer*, N.Y. Times (Aug. 1, 2025), https://perma.cc/2EQE-ZXLK.

11.    Karen DeYoung & Samantha Schmidt, *U.S.-Venezuela Prisoner Swap Frees Americans for Migrants in El Salvador*, Wash. Post (July 18, 2025), https://perma.cc/5R85-296Y.

I hereby declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed on the 14th of October, 2025, in San Francisco, California.

Noelle Smith

JA307

# EXHIBIT 1



# Office of the Attorney General
## Washington, D. C. 20530

March 14, 2025

MEMORANDUM FOR LAW ENFORCEMENT OFFICERS

FROM:                    THE ATTORNEY GENERAL

SUBJECT:                 GUIDANCE FOR IMPLEMENTING THE ALIEN ENEMIES ACT

The President's Proclamation under 50 U.S.C. § 21 et seq., titled, "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua" ("the Proclamation"), directs the Attorney General and Secretary of Homeland Security to apprehend, restrain, secure, and remove every Alien Enemy subject to the Proclamation. The Proclamation further grants authority to the Attorney General to issue any guidance necessary to effectuate the prompt apprehension, detention, and removal of Alien Enemies. This memorandum provides guidance on implementing the President's invocation of the Alien Enemies Act ("AEA"). This guidance shall take effect when the Proclamation is made public by the President.

\*\*\*

## (1) Definitions

For purposes of this guidance memorandum, an "Alien Enemy" under the Proclamation and 50 U.S.C. § 21 is a person who is: (1) fourteen years of age or older; (2) not a citizen or lawful permanent resident of the United States; (3) a citizen of Venezuela; and (4) a member of the hostile enemy Tren de Aragua, as determined by reference to Form AEA-21A, titled, "Alien Enemies Act: Alien Enemy Validation Guide," attached to this memorandum.

## (2) Removal of Alien Enemies

All aliens who are determined to be Alien Enemies under the Proclamation and 50 U.S.C. § 21 shall be issued a Notice and Warrant of Apprehension and Removal under the AEA and removed from the United States, except as provided in section (8) of this memorandum. In effectuating the removal of Alien Enemies, law enforcement officers and agents ("officers") must follow the procedures below.

### A. Apprehension and Removal Procedures in Proactive Matters

#### i.    Step 1: Validation of Alien Enemy Status and Execution of Form AEA-21A

At Step 1 of the proactive AEA apprehension and removal procedures, a line officer, or any other available officer ("line officer"), is responsible for determining whether an individual qualifies as an Alien Enemy. As outlined above, that requires determining that an individual is: (1) at least fourteen years of age; (2) not a citizen or lawful permanent resident of the United States; (3) a citizen of Venezuela; and (4) a member of Tren de Aragua.

**LAW ENFORCEMENT SENSITIVE/LIMITED OFFICIAL USE**

JA309

Memorandum for Federal Law Enforcement Officers                                    Page 2
Subject: Guidance For Implementing the Alien Enemies Act

Form AEA-21A guides the analysis of these four requirements. Accordingly, at Step 1, a line officer must complete Form AEA-21A for each suspected Alien Enemy. As outlined in that form, there may be instances where removal proceedings under the Immigration and Nationality Act ("INA") would be more appropriate based upon a review of the facts of the case than removal under the AEA. Line officers should adhere to the instructions in Form AEA-21A, including consulting with their supervisor(s) and the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement, in making such a determination.

At the conclusion of Step 1, if all four requirements stated above are satisfied, the line officer must validate the subject individual as an Alien Enemy by signing the Validation Determination section of Form AEA-21A. Thereafter, a supervisor must review the line officer's determination and approve the reviewing officer's determination by signing in the space allotted in Form AEA-21A. In this supervisory review, the supervisor may consider all relevant facts, including but not limited to, supporting documentation, identity verification documentation, and statements made by the alien regarding his or her alienage and connection to Tren de Aragua. The supervisor may request additional information from any source and may require an interview of the alien.

ii.    **Step 2: Issuance of Warrant of Apprehension and Removal**

If, at the conclusion of Step 1, a supervisor approves the line officer's validation determination, a supervisor must then issue a Warrant of Apprehension and Removal for the subject Alien Enemy by signing the top portion of Form AEA-21B, titled "Notice and Warrant of Apprehension and Removal Under the Alien Enemies Act."

iii.    **Step 3: Deconfliction**

To the extent possible, before apprehending an Alien Enemy, officers should conduct standard conflict checks (e.g., DICE, DARTS) to ensure apprehending and removing the Alien Enemy is consistent with the interests of justice.

iv.    **Step 4: Apprehension of Alien Enemies in Proactive Matters**

After a supervisor issues a Warrant of Apprehension and Removal and deconfliction is complete, officers shall use all available tools to immediately apprehend validated Alien Enemies wherever they are found in the United States, including, but not limited to, inside Alien Enemies' residences and workplaces. Prior to entering an Alien Enemy's residence to apprehend an Alien Enemy, officers must have reason to believe the validated Alien Enemy is present inside the residence.

To be clear, as outlined below in the section titled, "Apprehension and Removal Procedures in Reactive Matters," it is not necessary to complete Forms AEA-21A and AEA-21B prior to apprehending an Alien Enemy, where an officer has a reasonable belief that all four requirements to be validated as an Alien Enemy are met. In such circumstances, officers are authorized to apprehend the Alien Enemy and thereafter complete Forms AEA-21A and AEA-21B.

Memorandum for Federal Law Enforcement Officers                                      Page 3
Subject: Guidance For Implementing the Alien Enemies Act

While a judicial or administrative arrest warrant is not necessary to apprehend a validated Alien Enemy, to perfect apprehension operation plans, officers should consider consulting federal prosecutors in the relevant district to obtain criminal search warrants and/or criminal arrest warrants based on violations of, for example, 8 U.S.C. § 1304(e) (failure to carry immigration documents), 8 U.S.C. § 1306 (failure to register and failure to comply with address obligations), 8 U.S.C. § 1324 (smuggling and harboring aliens), 8 U.S.C. §§ 1325–1326 (illegal entry and re-entry); and 18 U.S.C. § 922(g)(5) (possession of firearm by alien). Beyond these common crimes, because Tren de Aragua has been designated as a Foreign Terrorist Organization and a Specially Designated Global Terrorist, crimes including 18 U.S.C. § 2339B (providing material support or resources to designated Foreign Terrorist Organizations) and 50 U.S.C. § 1705 (violating orders issued under the International Emergency Economic Powers Act) may also be relevant to address in any consultation. While the ultimate goal is immediate identification and removal of Alien Enemies, coordination with federal prosecutors—who are required to support these operations at every step—may enhance officers' ability to conduct apprehensions safely and efficiently, and may assist in the collection of evidence identifying additional Tren de Aragua members in the vicinity of the Alien Enemy to be apprehended.

v.    **Step 5: Service of Notice and Warrant of Apprehension and Removal**

Upon apprehension, an officer must serve the Alien Enemy with Form AEA-21B. This Notice and Warrant of Apprehension and Removal must include a statement by the officer that notifies the Alien Enemy that:

a) The officer has been authorized to apprehend, restrain, and remove Alien Enemies;
b) The alien has been determined to be an Alien Enemy;
c) The alien has been determined to be at least fourteen years of age;
d) The alien has been determined to not be a citizen or lawful permanent resident of the United States;
e) The alien has been determined to be a citizen of Venezuela;
f) The alien has been determined to be a member of Tren de Aragua;
g) The alien is not entitled to a hearing, appeal, or judicial review of the apprehension and removal warrant;
h) The Alien Enemy shall be detained pending removal from the United States; and
i) After being removed from the United States, the Alien Enemy may not enter or attempt to enter the United States without the permission of the Secretary of Homeland Security.

After serving Form AEA-21B upon the validated Alien Enemy, the serving officer must obtain the signature of the Alien Enemy and execute the certificate of service on Form AEA-21B. If the Alien Enemy refuses to sign, the officer should so indicate on the signature line.

**LAW ENFORCEMENT SENSITIVE/LIMITED OFFICIAL USE**

JA311

Memorandum for Federal Law Enforcement Officers                                    Page 4
Subject: Guidance For Implementing the Alien Enemies Act

     **vi.**    **Step 6: Detention**

All apprehended Alien Enemies must be detained under 50 U.S.C. § 21 until removal is effectuated because all Alien Enemies subject to the Proclamation are chargeable with actual hostility or other crime against the public safety. Such detention may occur in any location deemed suitable by officers in the Department of Justice or the Department of Homeland Security, and may include facilities maintained by the federal government, state or local governments, or contracted private entities.

     **vii.**    **Step 7: Removal**

Immediately upon apprehension, officers should commence arrangements to promptly remove the Alien Enemy out of the territory of the United States. At the time of removal, officers must verify removal of the Alien Enemy on Form AEA-21C, titled, "Verification of Removal," and fully execute such form.

### B. Apprehension and Removal Procedures in Reactive Matters

As much as practicable, officers should follow the proactive procedures above—and have an executed Warrant of Apprehension and Removal—before contacting an Alien Enemy. However, that will not always be realistic or effective in swiftly identifying and removing Alien Enemies. For example, consistent with the law, officers may need to contact a suspected Alien Enemy to develop further facts or otherwise confirm any of the four requirements for validation as an Alien Enemy. Or an officer may encounter a suspected Alien Enemy in the natural course of the officer's enforcement activity, such as when apprehending other validated members of Tren de Aragua. Given the dynamic nature of enforcement operations, officers in the field are authorized to apprehend aliens upon a reasonable belief that the alien meets all four requirements to be validated as an Alien Enemy. This authority includes entering an Alien Enemy's residence to make an AEA apprehension where circumstances render it impracticable to first obtain a signed Notice and Warrant of Apprehension and Removal (Form AEA-21B).

Whenever officers make a reactive apprehension under the AEA, officers must thereafter complete each relevant step of the Proactive Removal Procedures outlined above. And prior to removal of an Alien Enemy, officers must complete all forms described above, namely, Forms AEA-21A, AEA-21B, and AEA-21C.

### (3) Independent Arrest Authority

Many Alien Enemies and suspected Alien Enemies are already subject to immediate arrest under traditional criminal and immigration arrest authority. Those arrests should already be occurring. And in such cases, adhering to traditional arrest requirements, there is no reason to wait for validation of Alien Enemy status before making an arrest. Following such arrests officers have discretion to initiate an AEA removal if all requirements set forth herein are satisfied.

**LAW ENFORCEMENT SENSITIVE/LIMITED OFFICIAL USE**

Memorandum for Federal Law Enforcement Officers                                     Page 5
Subject: Guidance For Implementing the Alien Enemies Act

## (4) Recordkeeping

All records associated with the apprehension and removal of an Alien Enemy, including all forms identified above and all supporting documentation, must be maintained by the Department of Homeland Security.

## (5) Limitations on Relief From Removal

### a. No entitlement to hearings, appeals, or judicial review of removal order

An alien determined to be an Alien Enemy and ordered removed under the Proclamation and 50 U.S.C. § 21 is not entitled to a hearing before an immigration judge, to an appeal of the removal order to the Board of Immigration Appeals, or to judicial review of the removal order in any court of the United States.

### b. Ineligibility for relief or protection from removal

An alien determined to be an Alien Enemy under the Proclamation and 50 U.S.C. § 21 shall be ineligible for any relief or protection from removal.

## (6) Reporting of Apprehension and Removal Warrants

All issued Forms AEA-21B under this guidance memorandum must be reported to the Secretary of Homeland Security.

## (7) Apprehension and Removal Authority

All Department of Justice and Department of Homeland Security officers and agents are hereby authorized to perform the actions described herein, including but not limited to, determining Alien Enemy status, issuing notices and warrants of apprehension and removal, and effectuating removals of Alien Enemies from the United States. At the direction of the Attorney General or the Secretary of Homeland Security, subject to applicable law, any other law enforcement officer or agent may also perform the actions described herein.

## (8) Exemptions from Removal

An alien determined to be an Alien Enemy under the Proclamation and 50 U.S.C. § 21 may be exempted from the immediate removal requirement of section (2) of this memorandum in the following circumstances:

> a. First, immediate removal is not mandated when an Assistant United States Attorney or other Department of Justice attorney determines that the Alien Enemy may have engaged in criminal misconduct in violation of federal laws and investigation and/or prosecution of that criminal misconduct would best serve the interests of justice. In such a case, the Alien Enemy shall be detained under 50 U.S.C. § 21

**LAW ENFORCEMENT SENSITIVE/LIMITED OFFICIAL USE**

JA313

(irrespective of any conditions of release set under 18 U.S.C. § 3142),[1] until the conclusion of any investigation, prosecution, and custodial sentence, or until an Assistant United States Attorney or other Department of Justice attorney determines that continued investigation or criminal prosecution no longer best serves the interests of justice. At such time, the Alien Enemy shall be removed from the United States under the AEA.

**b.** Second, immediate apprehension and removal of an Alien Enemy is not mandated when the investigating agency determines that such actions would substantially compromise a significant law enforcement investigation or prosecution, and the participating U.S. Attorney's Office concurs in writing with the agency's determination.[2]  These determinations should be made with all relevant circumstances in mind, including the safety of the public and the desire to swiftly remove Alien Enemies from the United States.  Delay in apprehension and removal of an Alien Enemy under this subsection is permitted only for such time as is reasonably necessary to complete the investigation or prosecution.  Further, in the event it would not impair an investigation or prosecution to hold an Alien Enemy in custody during the pendency of the investigation or prosecution, the Alien Enemy shall be detained under 50 U.S.C. § 21.

All exemptions under this section shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130; such reports shall specify the anticipated charges, the anticipated timeframe for bringing charges, and, where applicable, the significance of an Alien Enemy's role in an ongoing investigation or prosecution.

### (9) Prosecution Referrals

Consistent with the exemptions outlined in section (8), throughout the removal process described herein, officers should be alert to cases where a referral to the U.S. Attorney's Office for criminal prosecution, rather than immediate removal as an Alien Enemy, may better serve the interests of justice.

### (10)    Attachments

a. Form AEA-21A ("Alien Enemies Act: Validation Guide")

---

[1] In the event a court orders an Alien Enemy detained pending trial under 18 U.S.C. § 3142, officers should be prepared to resume custody of the Alien Enemy under 50 U.S.C. § 21 when the Alien Enemy's custodial status changes (e.g., when conditions of release are later set by the court or the criminal case terminates).

[2] There may be instances where a federal agency is partnered with a state or local prosecutor on an active investigation or prosecution. The presumption in such cases is that any associated Alien Enemy will be subject to immediate apprehension and removal under the AEA. This presumption may be overcome only upon approval from the Office of the Deputy Attorney General following a written request from the subject agency and prosecutor's office.

**LAW ENFORCEMENT SENSITIVE/LIMITED OFFICIAL USE**

Memorandum for Federal Law Enforcement Officers                                    Page 7
Subject: Guidance For Implementing the Alien Enemies Act

    b. Form AEA-21B ("Notice and Warrant of Apprehension and Removal Under the Alien Enemies Act")

    c. Form AEA-21C ("Verification of Removal")

# ALIEN ENEMIES ACT:
## ALIEN ENEMY VALIDATION GUIDE

In the case of: _____ A-File No.: _____

1.  The person named above is fourteen years or older: ☐
2.  The person named above is not a citizen or lawful permanent resident of the United States: ☐
3.  The person named above is a citizen of Venezuela: ☐

*If any of these three requirements are not satisfied, the person named above shall not be ordered removed under the Alien Enemies Act (AEA). In such a case, you should consult your supervisor and the Office of the Principal Legal Advisor (OPLA), U.S. Immigration and Customs Enforcement, and, where applicable, initiate removal proceedings under the Immigration and Nationality Act (INA).*

4.  The person named above is validated as a member of Tren de Aragua (TDA), as determined by reference to the following evaluation form:

*__Instructions__: Complete the following validation evaluation form for each suspected alien targeted for removal under the AEA, or, following apprehension, for each alien potentially subject to an AEA removal.*

*After accounting for the two comments below, aliens scoring 8 points and higher are validated as members of TDA; you should proceed with issuing Form AEA-21B, titled, "Notice and Warrant of Apprehension and Removal under the Alien Enemies Act." Aliens scoring 6 or 7 points __may__ be validated as members of TDA; you should consult with a supervisor and OPLA, reviewing the totality of the facts, before making that determination; if you determine an alien should not be validated at this time as a member of TDA, when available, you should initiate removal proceedings under the INA. Aliens scoring 5 points or less should not be validated at this time as members of TDA; when available, you should initiate removal proceedings under the INA.[1]*

*__Comment 1__: Even if 8 points or higher, if all tallied points for an alien are from the Symbolism and/or Association categories (with __no points__ scoring in any other category), consult your supervisor and OPLA before determining whether to validate the alien as a member of TDA (and proceed with an AEA removal) or initiate INA removal proceedings.*

---

[1] A tally of 5 points or less, or any decision to initiate INA removal proceedings, is not a finding that an alien is *not* an Alien Enemy. Relatedly, at any time, additional information may come to light that gives reason to revisit a prior decision to forego an AEA removal.

1

Form AEA-21A

JA316

*Comment 2: For purposes of validating an alien as a member of TDA, at least one scoring category must involve conduct occurring, or information received, within the past five years.*

| Validation Evaluation | | | |
|---|---|---|---|
| **Category** | **Definition/Explanation** | **Points** | **✓** |
| **Judicial Outcomes and Official Documents** | a. Subject has been convicted of violating Title 18, United States Code, Section 521 or any other federal or state law criminalizing or imposing civil penalties for activity related to TDA | 10 | |
| | b. Court records (e.g., indictments, criminal complaints, sentencing memorandums) identifying the subject as a member of TDA, describing specific activity of TDA | 5 | |
| **Self-Admission** | a. Subject self-identifies as a member or associate of TDA verbally or in writing to law enforcement officer, even if that self-identification to a law enforcement officer is unwitting, e.g., through lawful interception of communications | 10 | |
| **Criminal Conduct and Information** | a. Subject participates in criminal activity (e.g., narcotics trafficking, human smuggling, etc.) with other members of TDA, including preparatory meetings and significant incidents directly attributed to TDA | 6 | |
| | b. Law enforcement or intelligence reporting identifying subject as a member of TDA, to include Bureau of Prisons validations and reliable foreign partner information | 4 | |
| | c. Credible testimonies/statements from victims, community members, or informants that affirm the subject's membership in or allegiance to TDA | 3 | |
| | d. Detailed open-source media (e.g., newspapers, investigative journalism reports) that describe arrest, prosecution, or operations of a subject as a member of TDA | 2 | |
| | e. Subject conducts and/or facilitates business with TDA (e.g., money laundering, mule, service provider) | 2 | |
| **Documents and Communications** | a. Written or electronic communications (e.g., e-mails, letters, texts, secure messages) that discuss business with, and/or are communicating with, known members of TDA; cell phone data contains multiple group, organizational, or organization leaders' or members' information | 6 | |
| | b. Subject conducts phone calls about the business of TDA with known members of TDA | 10 | |
| | c. Financial transactions indicating criminal activity for TDA or with known members of TDA | 3 | |
| | d. Subject possesses written rules, constitution, membership certificates, bylaws, etc., indicating, together with other conduct, membership of or allegiance to TDA | 6 | |
| **Symbolism** | a. Subject has tattoos denoting membership/loyalty to TDA | 4 | |
| | b. Social media posts by the subject displaying symbols of TDA or depicting activity with other known members of TDA | 2 | |
| | c. Subject observed tagging or graffiiing to mark the territory of, and the subject's allegiance to, TDA | 2 | |
| | d. Subject observed displaying hand signs used by TDA | 2 | |
| | e. Subject displays insignia, logos, notations, drawings, or dress known to indicate allegiance to TDA, as observed by law enforcement in person or via virtual mediums | 4 | |

2

Form AEA-21A

JA317

| | | | |
|---|---|---|---|
| **Association** | a. Surveillance documentation that a subject is frequently observed closely associating with known leaders and members of TDA | 2 | |
| | b. Subject part of group photos with two or more known members of TDA | 2 | |
| | c. Subject presently resides with known members of TDA | 2 | |
| | | **Total Points** | |
| | | | |

## VALIDATION DETERMINATION

*Note: If any of the four requirements are <u>not</u> satisfied, do not complete this validation determination.*

Based on the validation guide and instructions above, including Comments 1 and 2, I find

that the person named above, _____ :

1. Is fourteen years or older;
2. Is not a citizen or lawful permanent resident of the United States;
3. Is a citizen of Venezuela; and
4. Is a member of Tren de Aragua.

Accordingly, the above-named person is validated as an Alien Enemy.

---

*Name of agent/officer*
*completing the form*

*Signature of agent/officer*
*completing the form*

*Date*

---

*Name of supervisor*

*Signature of supervisor*

*Date*

3

Form AEA-21A

JA318

## NOTICE AND WARRANT OF APPREHENSION AND REMOVAL
## UNDER THE ALIEN ENEMIES ACT

A-File No:_____    Date:_____

In the Matter of: _____

Date of Birth: _____    Sex:    Male    Female

### Warrant of Apprehension and Removal

**To any authorized law enforcement officer:**

The President has found that Tren de Aragua is perpetrating, attempting, or threatening an invasion or predatory incursion against the territory of the United States, and that Tren de Aragua members are thus Alien Enemies removable under Title 50, United States Code, Section 21.

_____ has been determined to be: (1) at least fourteen years of
　　　　　(Full Name of Alien Enemy)
age; (2) not a citizen or lawful permanent resident of the United States; (3) a citizen of Venezuela; and (4) a member of Tren de Aragua. Accordingly, he or she has been determined to be an Alien Enemy and, under Title 50, United States Code, Section 21, he or she shall immediately be apprehended, restrained, and removed from the United States pursuant to this Warrant of Apprehension and Removal.

**Signature of Supervisory Officer:** _____

**Title of Officer:** _____    **Date:** _____

### Notice to Alien Enemy

I am a law enforcement officer authorized to apprehend, restrain, and remove Alien Enemies. You have been determined to be at least fourteen years of age; not a citizen or lawful permanent resident of the United States; a citizen of Venezuela; and a member of Tren de Aragua. Accordingly, you have been determined to be an Alien Enemy subject to apprehension, restraint, and removal from the United States. You are not entitled to a hearing, appeal, or judicial review of this notice and warrant of apprehension and removal. Until you are removed from the United States, you will remain detained under Title 50, United States Code, Section 21. Any statement you make now or while you are in custody may be used against you in any administrative or criminal proceeding. This is not a removal under the Immigration and Nationality Act.

After being removed from the United States, you must request and obtain permission from the Secretary of Homeland Security to enter or attempt to enter the United States at any time. Should you enter or attempt to enter the United States without receiving such permission, you will be subject to immediate removal and may be subject to criminal prosecution and imprisonment.

Signature of alien: _____    Date: _____

---

### CERTIFICATE OF SERVICE

I personally served the original of this Notice and Warrant upon the above-named person on _____.
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　(Date)

_____    _____
Name of officer/agent    Signature of officer/agent

Form AEA-21B

JA319

## VERIFICATION OF REMOVAL

A-File No:_____    Date:_____

Alien Enemy's name:_____

| Departure Date | Port of Departure | Manner of Departure |
|---|---|---|
| Signature of Verifying Officer | | Title of Officer |

**Photograph of alien removed**

**Right index fingerprint of alien removed**

_____
(Signature of alien whose fingerprint and photograph appear above)

_____
(Signature of official taking fingerprint)

Form AEA-21C

JA320

# EXHIBIT 5

JA321

# The Gangsters in Black with Ken Paxton and Stephen Miller" episode transcripts, sponsors, audience info, episodes, content rating

 app.podscribe.com/episode/88595585

0

00:00:00

We get it. You're busy. You don't have time to waste on the mainstream media. That's why Salem News Channel is here. We have hosts worth watching, actually discussing the topics that matter. Andrew Wilco, the next Isa, Brandon Tatum. And more open debate and free speech you won't find anywhere else. We are not like the other guys. We are Salem News Channel. Watch anytime on any screen for free. 24 7 at SNC tv and on local now Channel 5 25

1

00:00:30

Hey everybody, Tan The Charlie Kirk Show Ken Paxton recently acquitted in Texas is telling us about what he plans to do to get to work. Then Stephen Miller as we have a very in-depth, extremely detailed and important conversation about immigration. Email us as always, freedom at Charlie Kirk dot com. That is freedom at Charlie Kirk dot com. Subscribe to our podcast. Open up your podcast application and type in Charlie Kirk Show and get involved with Turning Point U s a at tp USA dot com. That is tp USA dot com. Buckle up everybody. Here we go. Charlie,

2

00:01:07

What you've done is incredible here. Maybe

3

00:01:08

Charlie Kirk is on the college Campus

0

00:01:10

I want

2

JA322

collaterals when you're making those arrests. So you'd have to imagine, you know, if you, if you went to say you rated like a agricultural plant that had, say a meat packing center that had one Biden illegal, you'd probably pick up 10 other legals at the same time.

11
00:32:30

So you'll get an enormous number of collaterals. But that number, and it's unknowably large because it's of course your releases your God aways, and then all of the people who are overstaying their visas, which nobody even talks about. But, but since ice has been disabled from deporting visa overstays, there's millions more illegals than no one is even aware of or thinking about or even having a conversation about. In order to to, to carry out a deportation operation of that scale, you would need to involve the US military, which is why President Trump often talks about the Eisenhower model, where the last time the US military was involved in a large scale deportation operation.

11
00:33:11

So also the reason why President Trump has talked about invoking the Alien Enemies Act, which is a law that was passed in the late 18th century during the Adams presidency, that allows you to instantaneously remove any non-citizen foreigner from an invading country age 14 or older. So it doesn't apply to the entire, all the demographics of illegal alien groups, but it applies to those 14 and older. And so it would be particularly useful in context where you have large amounts of gang members and drug dealers and other criminal offenders who are overwhelmingly gonna be over that age threshold.

11
00:33:59

And so that allows you to suspend the due process that normally applies to a removal city. Most people don't realize who haven't worked in immigration enforcement, how bureaucratic that process is, or the fact that all illegal aliens have the ability under current practice and procedure, not only to appeal their deportations, but if they get the right kind of lawyer and they get the right kind of judge, they can even get their deportation appealed into federal Article three appellate courts. In other words, outta the immigration courts, which are under D O J and into regular federal court.

11
00:34:40

And so you can have a single deportation for a single alien get all the way to the United States Supreme Court. That's how bureaucratic system has become. And so you need to then invoke extraordinary powers to overcome that. And then you need to mobilize the US military state, federal, and local law enforcement to then carry out large scale deportations

JA323

across the whole country. And then you would need to build very large staging facilities to carry out the removals. 'cause you know, logistically what a lot of people don't think about or realize is that if a, if a deportation team goes to a particular house and arrests any illegal alien family, so say mother or father and four children, there's not like there's a plane on a tarmac that's just like 10 minutes away ready to take them.

11
00:35:28

And even if there was, it wouldn't be a very efficient use of resources, right, to have an entire chartered aircraft for a single family unit. So you need to then build massive staging facilities so that you can efficiently remove people plain, full at a time or where applicable busload if it, if it's gonna go back to Mexico at a time. And so it would be a, an undertaking. Yep. It would be greater than any national infrastructure project that we've done date. But that's what we have to do. But,

1
00:35:56

But look, we live in a modern era. We have a lot of people that want to go to work, round them up, kick 'em out, go home, go make Honduras great again since you're such a blessing to America. Stephen, thank you so much. Wonderful work we'll have you on. Again, thanks so much for listening. Everybody Email us as always, freedom at Charlie Kirk dot com. Thank you so much for listening and God bless.

12
00:36:19

For more on many of these stories and news you can trust, go to Charlie Kirk dot com.

13
00:36:24

When I grow up, I wanna work for a woke company like super woke. When I grow up, when I grow up, I wanna be hired based on what I look like rather than my skills. I wanna be judged by my political beliefs. I wanna get promoted based on my chromosomes. When I grow up, I want to be offended by my coworkers and walk around the office on eggshells and have my words policed by hr. Words like grandfather peanut gallery. Long time, no see no can do. When I grow up, I wanna be obsessed with emotional safety and do workplace sensitivity training all day long. When I grow up, I wanna climb the corporate ladder just by following the crowd.

13
00:37:04

JA324

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| J.G.G. et al., | Case No. 1:25-cv-00766-JEB |
| *Plaintiffs*; | |
| LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA, et al., | |
| *Petitioners–Plaintiffs*, | |
| v. | **RESPONDENTS–DEFENDANTS' RESPONSE IN OPPOSITION TO PETITIONERS–PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| *Respondents–Defendants*. | |

JA325

the Venezuelan nationals detained in *our* country. . . . As was offered to the Venezuelan regime back in April, *we* carried out this exchange in return for a considerable number of Venezuelan political prisoners . . . as well as the American citizens it was holding as hostages. . . . For *us*, the reward is the happiness of the fulfilled duty that *we've* been able to free 80 Venezuelans and 10 American citizens who are now going home." (emphases added)). For its part, the United States sought and received assurances from the Maduro regime that the regime would not impose obstacles to any transferred Venezuelan's travel if various conditions were all met. Landau Decl. ¶ 8. Such assurances were to ensure compliance with court orders and nothing more.

In short, once Petitioners were transferred to the custody and control of El Salvador, the United States no longer had either, nor would Petitioners have been released upon request of the United States.

d.    As for the final factor, Petitioners are wrong that the "United States transferred [them] to CECOT to evade judicial scrutiny." Mot. 16. Petitioners were removed quickly because the United States determined Petitioners to be TdA members and believed the AEA allowed for their immediate removal. Petitioners' own evidence shows as much. *See* ECF 177-12, Ex. 1 (Attorney General memorandum); ECF 177-12, Ex. 5 (transcript of conversation between Charlie Kirk and Stephen Miller), at 33:11–34:40.

Petitioners' contrary evidence is improperly leaked, privileged information that does not show that Respondents attempted to avoid review. That "whistleblower

19

JA326

evidence" consists of internal discussions about the interpretation of this Court's second TRO of March 15. Parts of the leaked information make clear that high-level officials believed the TRO did not apply once a flight was outside the United States. ECF 177-8, at 27. Respondents' counsel said at a hearing that he couldn't contest Petitioners' evidence—that is hardly evasion. ECF 20, at 11. And the D.C. Circuit even had this evidence when it granted Respondents' petition for mandamus with respect to this Court's probable-cause order. Indeed, Judge Katsas agreed that there had been no violation of the TRO. *J.G.G. v. Trump*, 147 F.4th 1044, 1046 (D.C. Cir. 2025) (Katsas, J., concurring). Petitioners' reliance on this Court's vacated probable-cause order and the leaked "whistleblower evidence" is an improper attempt to relitigate these issues, which are no longer within this Court's jurisdiction because the mandate has yet to issue.

In the end Petitioners' "new evidence" does not remotely demonstrate that the United States had constructive custody of Petitioners at CECOT. If anything, events and evidence since Petitioners' transfer to and from El Salvador prove the opposite.

### B.    In any event, Petitioners are no longer in CECOT custody.

Even if Petitioners had been in constructive custody while in El Salvador, that would not support the continued exercise of habeas jurisdiction now that they have been released from El Salvador. Petitioners concede as much. *See* Mot. 25. So they now argue that this Court retains habeas jurisdiction by virtue of supposed collateral consequences flowing from Petitioners' AEA designations. That is mistaken.

Collateral consequences are additional legal restraints that apply to individuals after a conviction; they allow for review in habeas corpus even after

20

JA327

Third, as explained above, Petitioners have not shown that they suffer any ongoing injury traceable to Respondents, for they are apparently at liberty in their home country, and any ongoing threats to their health and safety come from third parties not before this Court.

And finally, to the extent that the public interest does not merge with Respondents' interests when the government seeks a stay, the public itself would be irreparably harmed by the reintroduction of TdA members without a right to be in the United States. Those illegal aliens and members of a designated FTO will pose safety risks to the United States citizens and lawful residents who would have to hold them in custody—or the public at large should they somehow leave custody. Not to mention that the (in all likelihood irrecoverable) costs imposed on the government to transport and house Petitioners would be passed on to the taxpayers at large.

## Conclusion

Petitioners' motion for a preliminary injunction should be denied. If this Court grants preliminary injunctive relief, this Court should stay it pending appeal.

Respectfully submitted,

**Brett A. Shumate**
Assistant Attorney General
Civil Division

**Yaakov M. Roth**
Principal Deputy Assistant Attorney General
Civil Division

**Drew C. Ensign**
Deputy Assistant Attorney General
Civil Division
Office of Immigration Litigation

41

JA328

**August Flentje**
Special Counsel for Immigration
Civil Division

s/Tiberius T. Davis
**Tiberius T. Davis**
Counsel to the Assistant Attorney General
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044-0878
(202) 514-2000
tiberius.davis@usdoj.gov

**Anthony Nicastro**
Acting Director
Office of Immigration Litigation

**Ernesto Molina**
Deputy Director
Office of Immigration Litigation

Dated: October 31, 2025          *Counsel for Respondents–Defendants*

42

JA329

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Respondents–Defendants*.

Case No: 1:25-cv-00766-JEB

**DEFENDANTS' RESPONSE TO COURT ORDER**

This Court has directed the parties to propose next steps for its inquiry into potential referral for criminal contempt. Defendants respectfully submit that no further steps are warranted. As Defendants have previously explained and reiterate below—and as Judge Katsas agreed in his concurring opinion on appeal—Defendants did not violate this Court's order. Defendants stand by that legal position: Their interpretation of the Court's order is correct, and at minimum their interpretation is reasonable and therefore not grounds for contempt.

Insofar as this Court continues to disagree, Defendants identify below the officials who made and advised on the decision not to recall the flights in transit and instead to transfer detainees out of U.S. custody on March 15 and 16, 2025, which is the only remaining information necessary for this Court to proceed with a referral. If the Court believes any further information is needed for that purpose, Defendants respectfully request an opportunity to provide that information to the Court by way of declarations in the first instance (as even Plaintiffs agree is appropriate).

1

JA330

1.      At approximately 6:45 PM on March 15, 2025, the Court orally directed counsel for the Government to inform his clients of the Court's oral directives at the hearing, including statements directing that any removed class members "need to be returned to the United States." By that point, two flights carrying individuals designated under the Alien Enemies Act (AEA) had already departed from the United States and were outside United States territory and airspace.

2.      At approximately 7:25 PM, the Court memorialized its temporary restraining order in a written order, as the Court had indicated at the hearing it would do.  The written order enjoined Defendants "from removing" class members pursuant to the AEA.  The written order, unlike the oral directives, said nothing about returning class members who had already been removed.

3.      Deputy Assistant Attorney General Drew Ensign promptly conveyed both this Court's oral directives and its written order to the Department of Homeland Security (DHS), through its Office of General Counsel, and to the leadership of the Department of Justice (DOJ).

4.      Deputy Attorney General Todd Blanche and Principal Associate Deputy Attorney General Emil Bove provided DHS with legal advice regarding the Court's order as to flights that had left the United States before the order issued, through DHS Acting General Counsel Joseph Mazzara.  Mr. Mazzara then conveyed that legal advice, as well as his own legal advice, to Secretary of Homeland Security, Kristi Noem.  *See* 6 U.S.C. § 113(a)(1)(J).  After receiving that legal advice, Secretary Noem directed that the AEA detainees who had been removed from the United States before the Court's order could be transferred to the custody of El Salvador.  As explained below, that decision was lawful and was consistent with a reasonable interpretation of the Court's order.

5.      Although the substance of the legal advice given to DHS and Secretary Noem is privileged, the Government has repeatedly explained in its briefs—both in this Court and on

JA331

appeal—why its actions did not violate the Court's order, much less constitute contempt. Specifically, the Court's written order did not purport to require the return of detainees who had already been removed, and the earlier oral directive was not a binding injunction, especially after the written order.

6.    Judge Katsas's opinion concurring in the D.C. Circuit's grant of mandamus relief in this case explains that "[p]lain language, legal context, and the Court's first TRO all support the government's narrower reading of the second TRO as keyed to physical expulsion from United States territory" and, as such, inapplicable to those who had already been removed. *J.G.G. v. Trump*, 147 F.4th 1044, 1052 (D.C. Cir. 2025) (Katsas, J., concurring). *First*, the plain meaning of "remove" connotes physical displacement, not transfer of custody. *Id. Second*, statutory context "reinforces this understanding" because the AEA itself "repeatedly ties removal to physical expulsion." *Id.* The Immigration and Nationality Act (INA) "likewise supports an understanding of *removal* to mean the physical expulsion of an alien from the United States." *Id.* at 1052-53. *Third*, this Court's earlier TRO (as to the named plaintiffs) "was expressly territorial in focus," suggesting that the word removal in the subsequent TRO was similarly territorial. *Id.* at 1054. For all of those reasons, the Court's written order did not enjoin the Government from transferring custody of AEA detainees who had been removed from the United States before the issuance of the order, or otherwise require their return.

7.    As Judge Katsas further explained, this Court's oral directives at the TRO hearing were inconsistent, "garbl[ed]," and, if read in isolation, "indefensible," to the point that this Court "itself disclaimed" at least two of its own oral commands in later opinions. *Id.* at 1054-55. All of that confirms that it was appropriate to construe the written order as having superseded any oral directives, even assuming the latter "can ever be binding." *Id.* at 1056.

JA332

8.      In short, the Government's "territory-based interpretation of the TRO rest[s] on written, conventional, and publicly available sources for construing that binding legal text," while the competing interpretation rests "on generalized appeals to the purpose of the TRO, as well as fine parsing of the court's statements at an oral argument—the transcript for which was unavailable until after the assertedly contemptuous acts had already occurred, and the substance of which the district court never reduced to writing and later disclaimed in significant part." *Id.* at 1057.

9.      Accordingly, the Government maintains that its actions did not violate the Court's order—certainly not with the clarity required for criminal contempt—and no further proceedings are warranted or appropriate.  Indeed, the mere fact that Judge Katsas agreed with Defendants' interpretation of the TRO means that the order could not have been so "clear and decisive" that it left "no doubt about what it require[d] to be done," as criminal contempt requires.  *United States v. Joyce*, 498 F.2d 592, 596 (7th Cir. 1974); *see also Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971) ("long-standing, salutary rule in contempt cases is that ambiguities and omissions in orders redound to the benefit of the person charged with contempt"); *United States ex rel. Yelverton v. Fed. Ins. Co.*, 831 F.3d 585, 587 (D.C. Cir. 2016) (same).

10.     Nevertheless, insofar as the Court has inquired into the identities of the decision-making officials for purposes of making a potential criminal referral, the actions were taken by DHS (through Secretary Noem) after being formally advised about compliance with this Court's order both by DOJ leadership and the Acting General Counsel of DHS.

11.     Defendants do not believe any further facts are relevant to the Court's potential referral, but if the Court determines otherwise, Defendants request an opportunity to provide any such information by way of declarations in the first instance—as even Plaintiffs appear to agree would be a necessary first step (Dkt. 193 at 1).  No live testimony is warranted at this time.

JA333

12.    Defendants object to the involvement of Plaintiffs in these collateral proceedings. Because criminal contempt concerns the "dignity of the court," it "no longer involves the original litigants as the parties of interest," and Plaintiffs thus lack standing to participate as anything other than fact witnesses.  *See Ramos Colon v. U.S. Atty. for Dist. of Puerto Rico*, 576 F.2d 1, 5 (1st Cir. 1978); *see also Jones v. Clinton*, 206 F.3d 811, 812 (8th Cir. 2000); *United States v. Concord Mgmt. & Consulting LLC*, 2019 WL 7758635, at *6 (D.D.C. July 1, 2019).  It would be inappropriate for an interested party to essentially be conducting a criminal investigation on behalf of the court.[1]

Dated: November 25, 2025                    Respectfully submitted,

                                           Brett A. Shumate
                                           Assistant Attorney General
                                           Civil Division

                                           Drew C. Ensign
                                           Deputy Assistant Attorney General
                                           Office of Immigration Litigation

                                           */s/ Tiberius Davis*
                                           Tiberius Davis
                                           Counsel to the Assistant Attorney General
                                           Civil Division
                                           U.S. Department of Justice

                                           Anthony Nicastro
                                           Acting Director
                                           Office of Immigration Litigation

                                           *Counsel for Respondents–Defendants*

---

[1] Defendants also maintain, for preservation purposes, their objection that criminal contempt cannot be pursued for alleged violation of an order entered without jurisdiction. *See Ex parte Fisk*, 113 U.S. 713, 714 (1885) ("When … a court of the United States undertakes, by its process of contempt, to punish a man for refusing to comply with an order which that court had no authority to make, the order itself, being without jurisdiction, is void, and the order punishing for the contempt is equally void.'"); *In re Novak*, 932 F.2d 1397, 1401 (11th Cir. 1991).

JA334

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **J.G.G.**, *et al.*, | |
| **Plaintiffs,** | |
| **v.** | Civil Action No. 25-766 (JEB) |
| **DONALD J. TRUMP**, *et al.*, | |
| **Defendants.** | |

**ORDER**

At the hearing on November 19, 2025, the Court offered both sides an opportunity to propose next steps in its inquiry into whether a criminal-contempt referral is appropriate. The Government, now for the first time, has identified who purportedly made the decision not to recall planes containing Alien Enemies Act detainees on March 15, 2025: Homeland Security Secretary Kristi Noem. See ECF No. 195 (Def. Resp.) at 2. Defendants nonetheless maintain, relying heavily on Judge Katsas's concurring opinion for the D.C. Circuit panel, that her decision was proper and not contumacious. Id. at 3–4 (citing J.G.G. v. Trump, 147 F.4th 1044, 1052 (D.C. Cir. 2025) (Katsas, J., concurring)). As a result, the Government posits that "no further steps are warranted" because "Defendants did not violate this Court's order." Id. at 1. Given that the other two panel members (plus the majority of the *en banc* court) did not agree with J. Katsas, the Court is not prepared at this juncture to terminate its inquiry. Instead, it must determine whether Secretary Noem or anyone else should be referred for potential contempt prosecution. In other words, the Court must decide if: (1) the court order was "clear and reasonably specific"; (2) "the defendant violated the order"; and (3) "the violation was willful."

1

JA335

United States v. Young, 107 F.3d 903, 907 (D.C. Cir. 1997) (quoting United States v. NYNEX Corp., 8 F.3d 52, 54 (D.C. Cir. 1993)).

In conducting such inquiry, Plaintiffs submit that the Court should "require the government to promptly file declaration(s) identifying all individuals involved in the decision not to halt the transfer of class members out of U.S. physical custody on March 15 and 16, 2025." ECF No. 193 (Pl. Resp.) at 1. "[O]nce these declarations are filed and depending on what information they disclose, the Court should then determine the appropriate sequence of witness testimony, and the manner in which that testimony should be provided." Id. The Government similarly notes: "If the Court believes any further information is needed for [its inquiry], Defendants respectfully request an opportunity to provide that information to the Court by way of declarations in the first instance (as even Plaintiffs agree is appropriate)." Def. Resp. at 1.

The Court will adopt the parties' agreement on starting with declarations; it will then assess the need for witness testimony. It therefore ORDERS that by December 5, 2025, the Government shall submit declarations from all individuals involved in the decision not to halt the transfer of class members out of U.S. physical custody on March 15 and 16, 2025. Such declarations shall detail their roles in such decision.

/s/ James E. Boasberg
JAMES E. BOASBERG
Chief Judge

Date: November 28, 2025

2

JA336

BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

J.G.G., et al.,                         .
                                        .  Case Number 25-cv-766
           Plaintiffs,                  .
                                        .
      vs.                               .
                                        .
DONALD J. TRUMP, in his                 .
official capacity as President .  Washington, D.C.
of the United States, et al.,   .  November 19, 2025
                                        .  2:00 p.m.
           Defendants.                  .
- - - - - - - - - - - - - - - - -


                    TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE JAMES E. BOASBERG
                    UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:          LEE GELERNT, ESQ.
                             American Civil Liberties Union
                             125 Broad Street
                             18th Floor
                             New York, New York 10004

For the Defendants:          TIBERIUS DAVIS, ESQ.
                             U.S. Department of Justice
                             Civil Division
                             950 Pennsylvania Avenue Northwest
                             Washington, D.C. 20530




Official Court Reporter:     SARA A. WICK, RPR, CRR
                             333 Constitution Avenue Northwest
                             Room 4704-B
                             Washington, D.C. 20001
                             202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

JA337

P R O C E E D I N G S

(Call to order of the court.)

COURTROOM DEPUTY:  Good afternoon, everyone.  We are here for a motion hearing on Civil Action 25-766, *J.G.G.*, et al., v. President Donald Trump, et al.

Beginning with counsel for the plaintiff, if you would please approach the lectern and identify yourself for the record.

MR. GELERNT:  Good afternoon, Your Honor.  Lee Gelernt from the ACLU for plaintiffs.

THE COURT:  Good afternoon.

MR. DAVIS:  Good afternoon, Your Honor.  Tiberius Davis on behalf of the defendants, and with me at counsel's table is Mr. Bailey.

THE COURT:  All right.  Good afternoon to both of you.

All right.  So we have returned here after the Court of Appeals' interesting five to three to one to two split on the contempt question, as well as being here for the preliminary injunction hearing.

So let's just talk about the contempt issue first.  The bottom line is that the Court of Appeals has permitted me to go forward with my inquiry.  And just so we're all clear here, particularly given the public interest in the case, my inquiry is not to determine whether to hold the government in contempt but, rather, to find whether there is sufficient information to

JA338

make a contempt referral.

And I am permitted to go forward either under the authority of the original panel, two judges of which, Judge Rao and Judge Pillard, both agreed I could go forward, and certainly, based on the en banc court's decision not to go en banc since six votes, at least six votes plainly permit that.

And so just quoting from the statement by Judge Pillard, Judge Wilkins, and Judge Garcia, which is the narrowest ground on which I was permitted to go forward, they point out that "the first step to judicial exercise of contempt authority may require factual inquiry regarding the seeming defiance, including finding out who is responsible."

Those judges also said that the original panel agreed that I retain discretion to proceed to consider whether the facts support a criminal contempt referral.

So I am authorized to proceed just as I intended to do in April, seven months ago.

Another quote from that opinion, from Judge Pillard, Wilkins, and Garcia, "The judicial court remains free to require the government to identify the decisionmakers who directed the potentially contemptuous actions and to carefully consider next steps."

So I am certainly carefully considering those next steps, and so I have asked the parties to weigh in today on how they think I should proceed. It seems that a factual inquiry is in

order, and the best way to proceed would appear to me to bring in witnesses and have them testify under oath.

Now, there have certainly been a number of significant developments since my earlier opinion in April, most particularly the revelations from the whistleblower, Mr. Reuveni. So he would appear to be a witness we would like to hear from.

But I will hear from both sides about how they think we should proceed and the timetable. But again, this has been sitting for a long time, and I believe that justice requires me to move promptly on this.

So, Mr. Gelernt, I will hear first from you on what you would propose.

MR. GELERNT: Thank you, Your Honor.

First of all, we're in agreement that things should move quickly. It, obviously, has been a long time. And the overriding point is we agreed with your initial assessment that an investigation, at a minimum an investigation of the facts, was warranted. Now there's a mountain of evidence to suggest that an investigation is warranted.

So I think there's one of two ways to go. You can issue your initial order without the purge -- actually, let me just back up for a second.

I don't think, for the reasons Judge Pillard said and other judges said, it's necessary to have the purge option. The

JA340

government didn't seem to want to take up that offer.  It complicates matters.  And more importantly, I think as Your Honor knows, we now have a preliminary injunction motion before you to get the men back.  So I think you would just put that aside.

THE COURT:  I certainly would not intend to offer the government a purge option, which Judge Rao found wasn't permissible anyway.

And to the extent my opinion finding probable cause has been vacated, I think I need to begin to hear evidence to find out if I think there is probable cause.

MR. GELERNT:  Right.  And so I think there's one of two ways to go.  Either is fine.  You can issue your order to say tell me the people involved in the decision as a starting point, or, you know, I think at the same time, you could do that and begin to call witnesses.

And obviously, you've identified Mr. Reuveni, the whistleblower.  But I would suggest maybe doing them simultaneously, because I think there's probably more -- obviously, there's more people involved than even Mr. Reuveni could mention in his complaint.

So I think probably both things simultaneously and, as you said, probably on a quick track, given that we're now going all the way back seven months.

THE COURT:  Okay.  Thank you.

JA341

Mr. Davis?

MR. DAVIS:  Your Honor, the government objects to any further proceedings on criminal contempt.  We think there is no basis for criminal contempt on two grounds.

THE COURT:  So I should just completely disregard what the Court of Appeals said?

You would agree that a majority of the Court of Appeals said that I could go forward with criminal contempt proceedings.

MR. DAVIS:  Your Honor, that was a denial of an en banc split 3-1-2.  That's not a holding.  That's nothing that's binding.

THE COURT:  So you would agree that the original panel, two judges said I could go forward on contempt?

MR. DAVIS:  Judge Rao said that you were not prohibited from doing so.  The only thing that mandamused was the order at issue.  But I will also quote from her.  "With the issuance of this writ of mandamus, I would not assume that such an extraordinary step is forthcoming."  So she certainly cautioned against it.  I don't think that that means you must go forward with it.

THE COURT:  Well, six judges of the Court of Appeals, not even including Judge Rao, have now said that I may go forward with it.  So I will be going forward with it, following the Court of Appeals's direction.

So my question for you is not whether I should be going

JA342

forward, but what steps do you think I should take?

MR. DAVIS:  Your Honor, again, objecting to this and thinking that there's not actually jurisdiction for criminal contempt because the original order was vacated for a lack of jurisdiction, we think that's a fundamental problem here that that the Court cannot move forward on.

THE COURT:  Again, I've already covered that in *Walker v. City of Birmingham*.  So again, I appreciate the fact that you disagree with six judges on the Court of Appeals.  But my question is, do you want to go forward via hearings?  Would you like the opportunity to give me declarations under oath from everybody involved in the deportation on March 15 and 16 that explains exactly who gave the orders to defy my ruling, or should we begin with hearings with witnesses?

MR. DAVIS:  I think a first step would be identifying the relevant people, as you were going down the first instance, and then potentially declarations would be preferable before moving straight to witness testimony.  If there's nothing there, I don't think hauling high-level officials, or I don't know who actually made the decision, so whoever that might be, into court would necessarily be an appropriate first step.

THE COURT:  Well, then, what I will have both sides do, then, is by Monday, that for the -- I will let both sides give me in writing by Monday their proposals on how you believe I should proceed.

JA343

And so Mr. Gelernt, that will include also which witnesses you believe we should call to begin with.  Now, I imagine if we have factual hearings, that we will learn from those hearings the identity of other people.  So I don't plan to have a closed list of witnesses from the outset.  I feel like Mr. Reuveni, I would assume Mr. Ensign, we will begin to get an idea of what happened here, and then we will see where that leads.

So I would ask what you then, Mr. Gelernt, propose in terms of proceeding just with hearings, whether also seeking declarations from the government, and then if -- in either event, names of proposed witnesses you believe we should begin with.

Mr. Davis, you can also give -- you can start giving me declarations from people who can tell me what they did or didn't do, and you can give me names of people you believe had a role in this, and we will see.

Again, if you want to give -- if you want to provide me full declarations from people explaining precisely what happened, that might obviate the need to call certain people as witnesses.  But I certainly intend to find out what happened on that day, and the government can assist me to whatever degree it wishes.  But if you wish to avoid having people testify, then you can start submitting declarations.

Any questions about that?

MR. DAVIS:  We stand on our objections to the

JA344

proceeding, but we understand, Your Honor.

THE COURT:  Thank you.  Okay.  Thanks very much.

All right.  Let's move on to the preliminary injunction.
So, Mr. Gelernt, I will have you return.

MR. GELERNT:  Thank you, Your Honor.

THE COURT:  Let me start with an issue that the
defense raises that I think is an interesting question, which is
whether this is really preliminary relief that you're seeking
and whether the better course here would be to consolidate a
preliminary injunction with a summary judgment hearing, which
would yield a permanent injunction.

I'm not telling you anything you don't know, but again, to
make things clear for the public, that the main point that the
government makes is if my order, a preliminary order to
facilitate the return of the 137 men who were deported, their
argument is that wouldn't vary from final relief, this would not
be a form of preliminary relief.

I guess my question to you is, why do you think it's a form
of preliminary relief, or if not, what's your position on
consolidation?

MR. GELERNT:  Well, let me start with the second part.
I don't want to fight too hard about keeping it as a preliminary
injunction.  I don't think we have any particular objection to
you consolidating and treating it as summary judgment, a final
judgment.

JA345

But having said that, I think it would be preliminary. Maybe it's overly formal, but I think you are saying as a preliminary matter, you finding a due process violation, you would still ultimately have to issue a ruling that this is my final ruling, I have decided that the due process preliminary injunction should be converted to summary judgment.

I also think it may depend on whether you proceed through equity as you did originally in your June 4th opinion or find there's constructive custody for habeas and then they're proceeding with their actual claims on the merits.

THE COURT:  What I'm hearing, and tell me if I'm wrong, is that you're saying the preliminary decision would be regarding liability, and the final decision would be regarding remedy.

But -- I mean, is that what you're saying?

MR. GELERNT:  No, and I apologize if I wasn't being clear.  I was just sort of making the technical point that any preliminary injunction ultimately needs a second step where the Court decides yes, I was correct in my preliminary injunction assessment, now I want to make it a summary judgment.

But because it's a straight legal issue, you know, it's fair to say well, what actually is left to be done, and that's why I don't want to fight too hard on the summary judgment point.

The only additional point I was making is if you decide

JA346

you're going to find constructive custody, that means that the habeas claims can go forward immediately, because the merits of the habeas are before you in our complaint.  And so then I think that would be anything but preliminary.  You would be then looking to see whether these were TdA members and, more fundamentally, whether the Alien Enemies Act can even be used during peacetime without an invasion of predatory incursion.

So it would depend a little bit on how you want to proceed jurisdictionally.  But again, I don't want to fight too hard on pushing you to do it through a preliminary injunction, because from our standpoint we're somewhat agnostic.

THE COURT:  Under the rule, and we are talking about Rule 65, I do need to give notice before consolidating a preliminary injunction with trial and the merits with a final proceeding.

So are you opposed to -- I will hear what the government has to say, but if the government says we want to be able to submit more material regarding liability or relief that we weren't able to submit here, I don't know what that would be, but don't you believe that I would have to give them that opportunity to do so?

MR. GELERNT:  I think they're right, Your Honor, and fair that you don't want to take any shortcuts in this case. And so that's one very practical reason to proceed as a preliminary injunction matter.  I don't think it's fair for the

JA347

government to say you can't proceed as a matter of preliminary injunction focus.

And given that I suspect the government's going to ask for a lot of time and put a lot of stuff in, this has been -- I don't need to tell you. It's been long running, and the men were sent to CECOT now a long time ago and now back to Venezuela.

And so I think if the government were to stand up and say let's just treat the papers as summary judgment papers, I don't want to fight too hard about that. But if the government is saying no, we need a long time to convert it to summary judgment, then I think you could proceed as a preliminary injunction matter. I don't think there's any reason why you can't. It's just a matter of sort of, I think, at this point preference.

THE COURT: Right, but I think I've got to give them notice, and I'm sure you wouldn't object at all, I'm assuming, if they get up and say we're happy for you to consolidate this with --

MR. GELERNT: Right, I don't want to fight that. If they want to do that, that's okay.

THE COURT: Okay. So I will talk to them about that.

So if we're looking at preliminary relief, then one issue you have to show is irreparable harm, which is not true for summary judgment.

JA348

Can you tell me -- and I know this is complicated and complex with people in Venezuela who are difficult to reach and hard to contact and unclear where they are, but some of the government's points, and this relates to class certification also, relate to how can we treat this group as a unit.  But we will talk about that in a minute.

On irreparable harm, can you give me a little more information about how many people of the 137 have you contacted?  Can you say that 100 percent of them are suffering irreparable harm now?  How many declarations do you have, and how many are you expecting to be able to get?  Can you give me a little bit more quantification?

MR. GELERNT:  Yeah, let me try and do that but sort of treading carefully with attorney-client.

THE COURT:  Yes.

MR. GELERNT:  And also, you're right to say it's hard to reach them.  It's very hard to reach them often.  But the other factor is even when we reach them, there is real fear about talking.  There is word out there that they are being surveilled, that their phones are being tapped.  And so to some extent, we have stopped trying to have these candid conversations with them at this point before the Court rules and we know what we can specifically tell them so we don't put them in danger.

What we have basically found is that overwhelmingly they

JA349

want to pursue their case.  And so -- the irreparable harm, I think, takes two forms.  One is in a due process violation.  That's harm in itself.  It's a constitutional violation.  They didn't have a chance to show that they weren't TdA members or that the Alien Enemies Act shouldn't have been invoked in the first place.  We think that's sufficient.

But there's no question, as the illustrative affidavits that were put in show, that people are in danger in Venezuela.  And I think the very fact that they fled Venezuela is what we would point to.  There's no reason to believe that's subsiding, and the people we've talked to that that's the case.

And I know Your Honor knows this, but you could look to *J.D. v. Azar.*  At this point, the commonality is the due process violation.  How many people will ultimately decide they want that relief or want some variation on the relief is not the question at this point.  I think if Your Honor were to rule that the government has to put a plan in to facilitate, and that's all we're asking for at this point.

We understand Your Honor may want to defer to the government on a plan.  I think we would then, if the government doesn't appeal, and I think that's a big if, we would go back to the men and say, you know, this is what the plan is and the judge would like to see affidavits from all of you or, you know, illustrative affidavits.

But at this point, we have spoken to, I would say, of the

137 about 33 percent.  About 33 percent we've been able to reach and they have been willing to have candid conversations.

THE COURT:  You're saying that overwhelmingly that group wishes to return to -- wishes to return to the United States?

MR. GELERNT:  Wishes to pursue their claims, absolutely, and to return to the U.S.  There are some people who really --

THE COURT:  Hold on.  But even understanding -- we'll talk about this in a minute for remedy -- that if they return to the United States, they're very likely to be in custody in the United States.

MR. GELERNT:  Right.

THE COURT:  So the bottom line here is they would rather be in custody in the United States with a chance of a hearing than free in Venezuela?

MR. GELERNT:  So I want to be careful here so that I don't reveal attorney-client.  What I think is happening is yes, that's true for some.  For some, they're hesitant.  They're repeatedly asking us do we need to make this decision now and will there be a remote option.  Because we have told them that's one thing that we want to raise with the Court is that there could potentially be a remote option, just like there have been at Guantanamo, and that could be filing petitions and if Your Honor or whatever judge ultimately hears the habeas petitions, I

JA351

think it would be Your Honor if it was remote, whether that's an option.

But I think what they're really telling us is tell us what's going to happen for a lot of them sort of.  And I think the reason is not that they wouldn't prefer to be in detention necessarily than being in danger in Venezuela.  It's we tell them that we cannot guarantee they are not going to end up in CECOT again.

THE COURT:  Or South Sudan.

MR. GELERNT:  Right.  And so the tricky part about these conversations is when they say can you guarantee us, and they are still very, very traumatized by what happened at CECOT. I'm sure Your Honor has seen some of the media that's come out about it.  It's not anywhere near full about what happened at CECOT.

So our problem is saying to them it won't be just detention, we can guarantee you won't end up in South Sudan or CECOT.  So I think there's a lot of them waiting.  And we've told them that the Court doesn't need to know 100 percent exactly what relief you would accept at this point because of the *J.D. v. Azar* case, and I think that's right under the law, that exactly how many people will take advantage of which relief is not the relevant question at this stage, either for class action or on the merits, class certification or the merits.

THE COURT:  So if my ruling, though, is consistent

JA352

with my prior ruling in terms of the claim that you actually have and that I find that the claim you have is an equitable due process claim, not a habeas claim, if you look at the remedy that you're seeking, which is facilitation -- and let's be very clear here, is it facilitating their return to the United States so that they can bring a habeas claim or another type of claim, or is it simply to more narrowly to -- or, I guess, more broadly to facilitate their ability to have a habeas claim, which might be remote?

MR. GELERNT:  Right.  I think that's exactly the right question, and it's fair.

From our standpoint, we would say it should be an option. They can either come back to the U.S., and maybe some will want to come back immediately, notwithstanding that the government says they just need to detain them at least initially, and the fear that maybe they get sent to CECOT again or South Sudan as you said.  Some may want to know if there is a remote option if they found a sufficiently safe hiding place within Venezuela.

And so I think if Your Honor were to repeat the June 4th remedy of the government should provide a plan of how facilitation would work, I think we would want to potentially object to it if we thought it wasn't fair.  I know Your Honor would want to look at it, as you said in the June 4th opinion.

And then once we've all decided on what their options are going to be for people, we would go back to them and talk to

JA353

them.

And I think those who are not in any safe place and can't find a hiding place and feel like they're being surveilled and some of them are more high profile than others, I think they may want to rush back into U.S. custody.

THE COURT: But do you -- and let's talk about what that means. Again, if I get to this point and I issue an order similar to the one I issued in June which says I'm not telling you, government, how to do this yet, I want to hear from you, if you take the remote -- if you put the remote option aside for a minute, what do you think the government should be proposing that they do? Should it require that these folks have to make their way to the U.S. border, and once they're there, then the government has to take them? Or are you suggesting the government has to do more than that?

MR. GELERNT: If the facilitation is going to be the U.S., you're asking?

THE COURT: Yes.

MR. GELERNT: So at a minimum, it obviously has to be that they don't throw up any road blocks to them coming if they can make it themselves.

We would hope that because there was such a clear due process violation that the government's not fighting anymore, the government should be required to do more than that and actually facilitate, whether it's a plane or somehow through --

JA354

but I'm worried about getting too far ahead of myself before the government proposes something. My own feeling is that it's going to be very hard for people to make their way here, and the government has to take on some of the logistics burden.

THE COURT: Okay. And if I get to that point, that I'm certainly not -- wouldn't be dictating what the government has to do at this point.

So looking at the class question for a minute, it's your position that the class should be the 137 people again who were deported pursuant to AEA authorities only as opposed to some narrower class of people who say they want this remedy?

What I'm trying to get at is, if the government says look, we don't even know that all these people want such a remedy, they may be just happy that they're out of CECOT, they're in Venezuela, they're okay, should the class only cover people who are actually seeking relief, or is the idea that the relief be made available to all and those who want to take it can?

MR. GELERNT: The latter, Your Honor. And I don't want to beat a dead horse, but I think it's worth looking at the *J.D. v. Azar* decision from the D.C. Circuit where that very issue came up of will everyone want to take advantage of the remedy of being able to get an abortion from a detention facility. And the Court said no, you don't look at that now.

And I think that's hornbook law that at this point, have all the people suffered that injury, whether they all want the

remedy, I think, is at the later stage.  It's too hard in a (b)(2) class to know whether everyone is going to accept the remedy or force them.

So I think that's, as I understand it, the law in this circuit and certainly more generally.  So we would say that the government attempting to say you have to tell us exactly who wants the remedy before we've even -- before the government's even proposed what they would do to facilitate is not right. And that's our position.

THE COURT:  And so is the class you want certified the same class that I certified in my June 4th opinion?

MR. GELERNT:  Exactly.  And I just want to put a pin in this, because I know this is not really for now.  You and I have talked about the rest of the -- there were 250 plus.  We are still trying to find out exactly whether those individuals were really Title 8 immigration removals, but I don't want to belabor that now.  So for now, it would just be the 137 that we believe were removed solely based on the Alien Enemies Act.

THE COURT:  Last thing I want to ask is, what's your position, and I know this wasn't raised in the papers, about certifying an issue class under Rule 23(c)(4)?

Now, I know that can only get you declaratory, not injunctive, relief.  But the issue is whether due process was afforded to this class.  I don't know if that is something you have any interest in or not.

JA356

MR. GELERNT:  I think the question is sort of how the government would react to that.  So if Your Honor found that there was a due process violation, you know, founded under (c)(4), I think the government would take the position that they're not going to do anything.

And so if that was the government's position and, therefore, it had no practical effect, I would be very concerned about it.  I understand.  It's a fair question.  But I think what we're likely to see then is the government saying well, we're not under any obligation to do anything.

THE COURT:  All right.  Thank you.  I will give you a few minutes for rebuttal.

MR. GELERNT:  Thank you, Your Honor.

THE COURT:  Okay.  Mr. Davis.

All right.  Why don't we start with the same question I started with Mr. Gelernt with, which is consolidation of the preliminary injunction with a merits determination since one of the points that you raised, which I think is an interesting point, in your papers is this isn't an appropriate relief for a PI.

Now, Mr. Gelernt says it is, but he's also amenable to consolidation.  So tell me your position on that.

MR. DAVIS:  We think this should be transformed into a motion for summary judgment.  I would have to go back and ask to see if there's anything else we wanted to put in, and we could

JA357

probably get you an answer to that on Monday with everything else.

I think we believe that this is primarily a legal issue and that the relevant record evidence is here, and so there's probably not a need for anything else.  So we do think that that can move fast.

At least on whether this should be a preliminary injunction, on at least the due process part, our understanding is that that's to facilitate habeas, but in doing so, we believe we would have to take them back into custody, because that's a jurisdictional prerequisite.  And in order to do that, we would probably have to take them back to the United States Gitmo, which is still de facto United States sovereignty.

And at that point, that is sort of the final relief that they're seeking under that, and then they would have individual habeas claims that get filed in whatever is the proper district court.

So we do think that would be essentially a final permanent injunction.

THE COURT:  Your proposal is reasonable to me.  So what I would let you do -- and, Mr. Gelernt, this is without prejudice to the plaintiff, but what I will do is I will let you on Monday, by Monday, Mr. Davis, let me know if you have any objection to consolidation, and if you do, I think I would require you to explain your objection, but I would expect, for

JA358

example, if there was other information you wanted before me that would be before me in a motion for summary judgment that wouldn't be before me in a PI, which I can't think of what that would be, to let me know how quickly you would provide that, but I would be requiring a very fast turn-around on that, as in probably by the end of next week, maybe the Monday, given it's Thanksgiving.  But I will let you tell me on Monday about that issue.

MR. DAVIS:  Understood.

THE COURT:  And I think it is appropriate to give the government notice before consolidation.  I don't think it's appropriate for me to sua sponte consolidate without notice.

Okay.  So I'm not going to get into the constructive custody question today.  I didn't get into it with Mr. Gelernt. But let me ask you, you may not have agreed that there is jurisdiction for me to consider a due process claim in equity as I held in my June 4th opinion, but do you want to tell me why you think I was wrong in that?

MR. DAVIS:  We think, Your Honor, that it still sounds in habeas, and so it has to be brought in habeas.  We think the *J.G.G.* decision by the Supreme Court actually shows that.  Their due process claim without habeas was one of the core things they were raising there, and the Supreme Court said --

THE COURT:  Why doesn't *AARP*, which followed *J.G.G.*, why shouldn't I follow that language where they express

JA359

skepticism that the right to notice must be vindicated via habeas by plaintiffs who never received notice?  Why isn't that language there a guide for me to consider how -- whether I have jurisdiction on an equitable due process claim?

MR. DAVIS:  Your Honor, I think frankly that was -- obviously, that case was done very fast with limited briefing, including on these issues.  It was interim --

THE COURT:  Couldn't I say the same about the *J.G.G.* case in the Supreme Court?

MR. DAVIS:  Understood, Your Honor.  But that's still being litigated in the Fifth Circuit.  And I think the fundamental point is that case was brought as habeas in the correct district and is still being litigated as a habeas case. What I understood the majority there to be responding to is the dissent's point that this really shouldn't be putative class relief at this stage, especially when the district court denied class certifications.  They're like no, no, no, we're moving fast, we need to make sure that the planes don't go off and these people can pursue their claims, and that case is still going on in a habeas forum because they filed habeas in the proper venue.

THE COURT:  All right.  So if I believe I was correct on that jurisdictional issue in my June 4th opinion, which I understand you contest, and it's, I think, an interesting question, I trust you stand by the government's concession in

the briefing and argument there that there was in fact a due process violation?

MR. DAVIS:  I don't believe we ever conceded that, but we're not making the argument here because we believe the jurisdictional bars are what's important, and we think that that's a bit of a complicated question.

I remember in your opinion -- we talked about the retroactivity piece.  There was a bit of action there.  And you disagreed with us that the Supreme Court's decisions in *J.G.G.* and *AARP* are only prospective.  But we still think there's a question there since these should be habeas claims.  *Teague*, although in successive context, is about the retroactivity of constitutional claims.  So we think that's a bit complicated.

But I don't think --

THE COURT:  But I think you admitted in your opposition in that briefing that you are required to provide detainees with notice of their designation under the AEA and an opportunity to seek habeas relief prior to removal, didn't you?

MR. DAVIS:  I believe we offered them notice, although obviously not what the Supreme Court has since said would satisfy, and they did not receive --

THE COURT:  Hold on.  So you agree that you did not give them the notice that the Supreme Court has said is required?

MR. DAVIS:  Not at the time that they've since said is

JA361

required.

THE COURT:  So your sole point, and I think you just made it and I want to be clear, is a retroactivity point?

MR. DAVIS:  Yes.  But again, we're not really briefing or fighting about due process.  We're focused on the jurisdictional claims, but we're not conceding that there is a violation.

THE COURT:  Okay.  So let's -- so if I rule consistently with my June 4th ruling, namely on the jurisdictional issue and the violation issue, let's talk about remedy with you also for a minute.

So I trust again -- and I know you're not conceding the violation.  But if I find one and the jurisdiction, I trust you agree with the Supreme Court that the proper remedy is for you to facilitate the restoration of these folks's habeas rights; correct?

I mean, isn't that what *Abrego Garcia* said?

MR. DAVIS:  I think putting aside the jurisdictional and the merits concerns, if we're just talking about remedy, I think that's probably right.

THE COURT:  Okay.  So I think the language was that the government must facilitate -- and I'm not quoting.  The holding was that the government must facilitate Abrego Garcia's rerelease from custody in El Salvador and ensure that his case is handled as it would have been had he not been improperly sent

JA362

there.

So what Mr. Gelernt says I should do if I rule for him is to do what I did last time, which is to say okay, government, how are you going to -- how do you propose facilitating their return.

And I actually -- the case in Massachusetts that the government cites, which is the *D.V.D.* case from the District of Massachusetts, I think that's Judge Murphy, he cites in a footnote at the end of the opinion something that I didn't have in front of me before, which is ICE Policy Directive 11061.1, which is entitled "Facilitating the Return to the United States of Certain Lawfully Removed Aliens."

And in this case, the policy is, ICE's own policy is absent extraordinary circumstances, a lawfully removed alien who prevails on his appeals, that ICE will facilitate the alien's return to the United States if his presence is necessary for continued administrative removal proceedings and that facilitation -- the policy is to engage in activities that allow a lawfully removed alien to travel to the United States such as by issuing a boarding letter to permit commercial air travel and, if warranted, parole the alien into the United States upon his or her arrival at a U.S. port of entry.

So I trust that if we get that far, the government would agree to do at least this.

MR. DAVIS:  I think we -- as Your Honor ordered in the

JA363

first instance, for us to propose what we think going forward would make sense. I don't know that I can commit us to what we would do at this moment.

I do think there are some complications here from the normal case in the sense that from the United States's perspective, these people are members of TdA. Obviously, petitioners contest that, but that's still our position, and that they're members of a foreign terrorist organization.

So I don't think the typical policy would necessarily apply in that situation. But some of the options to facilitate, as I think the policy said, would be to remove domestic barriers so that if they came back they could file.

THE COURT: Right. But you certainly, I trust, wouldn't object to my giving you a subsequent opportunity to explain what facilitation you would engage in?

MR. DAVIS: No.

THE COURT: Okay. Let's talk about the class for a minute.

So your, I think, central concern regarding the class is that the people seek different relief and maybe have different circumstances that they want to -- and that, therefore, the typicality or, I guess, really commonality and the injury inflicted upon them is not the same; right?

MR. DAVIS: I think that's basically right. I think some of the collateral consequences and restraints they point to

JA364

for their constructive custody arguments and I also think some of the injuries they claim for irreparable harm are things like restrictions on entry to the United States, ability to file asylum, situations that are occurring to them in Venezuela that we have no basis to understand are common among the entire class members or that the declarations are typical of those class members.  So yeah.

THE COURT:  But the injury they are complaining of, though, is not what's happening to them in Venezuela or what might happen to them in the United States or where they might get sent.  It's that they were denied the hearing and the due process they deserved.

That's the injury they're claiming; right?

MR. DAVIS:  Yes, but I don't think that's necessarily the irreparable harm.

THE COURT:  Okay.  There's a difference there.  But in terms of whether the injury inflicted under 23(b) is the same injury on all of them, isn't it?

MR. DAVIS:  Initially, we had made the argument in class certification the last time that we think due process claims have to be individualized.  We know Your Honor disagreed with that.

But putting that aside, if the class is literally just was there a due process violation, which I also don't think would justify a class-wide PI because the PI would have irreparable

JA365

harm -- maybe that doesn't matter if we consolidate. But I think that would be the only possible grounds for commonality, would be whether there was a due process violation.

THE COURT: Okay. I will give you a few minutes if there's anything else that you would like to point out that you either didn't put in your brief or that you would like to respond to Mr. Gelernt on.

MR. DAVIS: Just I want to spend a second on why we think it sounds in habeas besides the Supreme Court's ruling in *J.G.G.* Custody is jurisdictional, and we're not even sure that it's waivable when it's whether there's custody in the first place, which is at issue here.

So we think that the United States would probably have to take people back into custody and back into the United States. And if that's the case, then saying that the removals were done in violation of due process is going to the validity of the removal itself.

Now, it's true that we can redo the removal, which I think was plaintiffs' point. Like well, if we prove that they are TdA, maybe we can remove them again. But that's true of all sort of due process habeas claims, to challenge proceedings.

THE COURT: But if they were able to have remote hearings from Venezuela, some of them, then they wouldn't be in U.S. custody to do so. In other words, it's not required.

MR. DAVIS: I'm not sure that we can do that if this

JA366

isn't constructive custody, if it's a due process violation. They're not in custody. We're facilitating habeas. I think to facilitate habeas, they have to be in our custody one way or another.

I'm not going to rule out that we couldn't consent to that, but I don't think we could be ordered to, and I think it's questionable whether we could even consent to that. *Maleng v. Cook* seems to indicate that the question of whether there's custody at all is subject matter jurisdiction. Venue might be more personal jurisdiction. So I'm not sure that we can even consent to that.

And if we have to take them into custody, I think that that is undoing the removal. Now, sure, we can have the hearings and maybe remove them later, but that's true of like, let's say, *Early v. Blankenship*, which is an Eighth Circuit case we cite. There, he was saying there was a due process problem, that he didn't get notice of a disciplinary hearing, and they said that sounds in habeas. Sure, they could redo it with the proper notice, but that's still saying that the actually procedures were invalid and you have to do it over. That still sounds of habeas.

*Savory*, an en banc --

THE COURT: Slow down a little for our court reporter.

MR. DAVIS: The Seventh Circuit opinion, *Savory*, which is en banc, the person was pardoned. He tried to sue saying

like this proves that the procedures for my conviction were invalid under 1983, and all but one judge on the Seventh Circuit said no, that sounds in habeas, because you're challenging the process by which you were convicted, and that challenges the invalidity.  Sure, maybe there would be a mistrial, you get a new trial, and maybe the outcome is the same, but that's still habeas.  And so we think that's going to be the same case here.

We also think as far as implementing the facilitation of habeas, if we have to take them into custody, might not be particularly simple, given the tensions with the Maduro regime. We obviously negotiated for assurances with them, but who knows if they will actually follow through.  So redressability could be an issue there as well.

THE COURT:  I don't disagree that relations between the countries are in a different place from where they were a number of months ago.

Okay.  Thank you very much, Mr. Davis.

Mr. Gelernt, I will give you a few minutes for rebuttal, if there's anything you want to add.

MR. GELERNT:  Thank you, Your Honor.  Just very quickly on the class and remedy and all that.

I think the page to look at in *J.D. v. Azar* is 1315 where it said it doesn't matter at this stage whether people are interested in pursuing a remedy.  And certainly, you can have remedial subclasses if it actually came down to that.

JA368

And the other thing is that the named class members are all saying they're suffering in Venezuela, suffering irreparable harm, and obviously, they stand in for the class.

On the remote thing, I guess a few things.  One is, obviously, the government feels that you should find -- if you were going to have remote and pursue habeas, it would be necessary to find constructive custody.

I don't want to belabor it.  We do feel in our papers that the new evidence makes clear that there is constructive custody, there was constructive custody at CECOT at the time of filing.  Your Honor said it was a close question on June 4.  We feel like the cumulative evidence now shows that the *Abu Ali* factors are satisfied.

But the other point I wanted to make is that if you decide to give a remote option, through due process equity, people should be allowed to raise all their merits claims through that. I don't think *J.G.G.* contemplated the government moving people, evading an order, which obviously you haven't made that finding but we do think they evaded the order, but being shuffled out of the country without any opportunity to file a habeas, not being allowed back in the country, the government saying well, we don't have custody over them, and that's the end of the matter.

So I don't think, if you just find equity due process, the remote option is off the table.  I do think people can raise all their merits claims through that.  But we would ask you also to

JA369

consider the possibility that the new evidence shows constructive custody.

THE COURT:  But it's not something that I can rule either/or, because I think the only reason you would have a due process claim is because you don't have constructive custody; correct?

MR. GELERNT:  And I recognize --

THE COURT:  That's what I said.

MR. GELERNT:  Yeah, in your June 4th opinion, I recognize you were saying they were mutually exclusive.

I think what you can do, though, Your Honor, is say this is an alternative holding.  The reason we think that's important, maybe it wouldn't be in other cases, is that it seems as if it's difficult for Your Honor to do anything now without the government appealing immediately.

And so at this point, given how long things have dragged out, an alternative holding about constructive custody or an alternative holding about due process inequity I think wouldn't be improper, and you could still say, obviously, the Court thinks these are mutually exclusive, but in the interest of avoiding another round of piecemeal appeals, you can find both.

So I think that's why we had made somewhat of a big deal in our papers about Your Honor reaching that issue.

The government is picking apart each piece of new evidence and saying well, that doesn't ultimately prove it.  It's now at

JA370

this point, there's so much cumulative evidence, that it's hard for the government really to say that the *Abu Ali* factors are not satisfied, and just picking out one, the evading judicial review, I think there's no question the whistleblower evidence shows that they were trying to avoid the writ applying.

So in that respect, we would ask that Your Honor make both findings and again find that both are available. But I think these more difficult questions about how remote would work and what can be raised through remote, maybe wait for the government's facilitation --

THE COURT: I don't see any reason, if I rule for you, that I need to decide all that yet.

MR. GELERNT: Okay.

THE COURT: So let me ask each one last question, which is, if we proceed with contempt hearings, I want to ask about schedule. My intent, I think, if counsel and witnesses are available, is to begin the Monday after Thanksgiving, so in other words a week from Monday.

So let me just ask you, Mr. Gelernt, for your team -- and you don't have to give specific days you're not available, but are you generally available the first three weeks --

MR. GELERNT: We will work around the Court's schedule for sure, Your Honor.

And this is somewhat of a housekeeping, and I'm not entirely sure I know technically what's right or wrong. But I

JA371

think the mandate in the contempt issues this Friday.  So it may be that -- this discussion, obviously, is appropriate and proper, but it may be that your order in the contempt may want to wait until Friday just until the mandate issues.

THE COURT:  I'm waiting to hear on Monday.

MR. GELERNT:  But even an order telling the government to -- I don't want to overstep.

THE COURT:  You may well be right, but I thought that the order that accompanied the Court of Appeals decision had issued the mandate.

MR. GELERNT:  Immediately?

THE COURT:  I think so.

MR. DAVIS:  I think they wait seven days.

MR. GELERNT:  You may be able to do scheduling orders now.  I don't know, Your Honor.  I don't want to overstep my bounds.

THE COURT:  I appreciate that, and I'm certainly not planning to do anything --

MR. GELERNT:  We will be available when Your Honor wants to start.

THE COURT:  All right.  Mr. Davis, same, just last question to you.  If we have hearings, any reason we can't go forward in the first few weeks of December?

MR. DAVIS:  I mean, I think it depends on what the next steps are, which have yet to be decided.  If it involves

JA372

witnesses, I don't know who those witnesses are and what their availability will be.  I can be around, but otherwise, I don't know.

THE COURT:  All right.  Thanks, everyone.  I appreciate it.

(Proceedings adjourned at 2:53 p.m.)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Sara A. Wick                    November 21, 2025

SIGNATURE OF COURT REPORTER         DATE

JA373

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LIYANARA SANCHEZ, as next friend on behalf
of FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Respondents–Defendants*.

Case No: 1:25-cv-00766-JEB

**NOTICE OF FILING OF DECLARATIONS**

Pursuant to this Court's Order (Dkt. 196), attached are declarations signed by Secretary of

Homeland Security Kristi Noem, who made the decision to continue the transfer of detainees out

of U.S. custody on March 15 and 16, 2025, and two attorneys who provided her with privileged

legal advice before she made that decision: Acting DHS General Counsel Joseph N. Mazzara and

Deputy Attorney General Todd Blanche. (Then-Principal Associate Deputy Attorney General Emil

Bove is no longer with the Department of Justice.)

The Court's order directed declarations from all individuals "involved in the decision."

Defendants interpret the word "involved," in this context, to refer to the official who personally

made the decision and the officials responsible for the legal advice regarding the decision—but

not, for example, every individual who was involved in implementing the decision, or every

1

JA374

subordinate who conducted research during formulation of the legal advice, because there would be no apparent basis to pursue criminal contempt charges against those individuals. [1]

With the identity of the relevant officials now clearly presented under oath, there is no basis for any witness testimony. Absent a waiver of the attorney-client privilege, the lawyers who gave Secretary Noem legal advice cannot testify about the substance of that advice. As for Secretary Noem, the Court has all the information it needs to make a referral if it believes one to be justified, and further factual inquiry by the Court would raise constitutional and privilege concerns.

As the Court has explained, the relevant questions are (i) whether the Court's order was "clear and reasonably specific'"; (ii) whether a defendant "violated the order"; and (iii) whether the violation "was willful." Dkt. 196 at 1-2. The first question is purely a legal one. Defendants maintain that this Court's TRO was not "clear and reasonably specific" as to returning the detainees who had already been removed from the United States. The second question, in this case, hinges solely on the first—there is no factual dispute that Defendants transferred custody of the detainees who had already been removed from the United States; the only question is whether, as a matter of law, that conduct violated the order. The third question is also derivative: the absence of a clear order unambiguously prohibiting the transfer of already-removed detainees means any violation was not willful as a matter of law. *Cf. Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69-70 & n.20 (2007) (holding that acting consistent with a "not objectively unreasonable" "albeit erroneous" interpretation cannot support even civil liability under a willfulness standard).

---

[1] Although he was identified in Defendants' prior notice about the sequence of events on March 15, Deputy Assistant Attorney General Drew Ensign was not involved in the decision at issue other than through relaying what this Court said on the record and in its written order to DHS and DOJ leadership. Defendants are therefore not submitting a declaration from him with this filing.

2

JA375

Accordingly, if the Court continues to believe its order was sufficiently clear in imposing an obligation to halt the transfer of custody for detainees who had already been removed from the United States, the Court should proceed promptly with a referral. Defendants reiterate, however, that they believe Judge Katsas's concurring opinion makes that position untenable. The point is not that a majority of the D.C. Circuit agreed with Judge Katsas. Rather, the point is that if a leading jurist like Judge Katsas concluded that Defendants' interpretation of the TRO is legally *correct*, it is impossible to find beyond a reasonable doubt that Defendants' interpretation is so unreasonable as to make their conduct *criminally contumacious*. For those reasons, Defendants maintain that this inquiry should be terminated without a referral.

In all events, however, there is no basis to require Secretary Noem, or the attorneys who gave her legal advice, to provide live testimony. Compelling senior Executive Branch officials to testify in court encroaches on the separation of powers. *See, e.g.*, Order, *In re Noem*, No. 25-2936 (7th Cir. Oct. 31, 2025) (granting mandamus). Moreover, the appropriate time for a contempt defendant to testify is at a criminal trial, if the defendant exercises the constitutional right to choose to testify in his or her defense. It would be prejudicial and constitutionally improper to compel testimony in advance of a referral for prosecution, particularly when all of the facts that are necessary for a potential referral are already known and have been presented under oath.

Dated: December 5, 2025                    Respectfully submitted,

                                           Brett A. Shumate
                                           Assistant Attorney General
                                           Civil Division

                                           Drew C. Ensign
                                           Deputy Assistant Attorney General
                                           Office of Immigration Litigation

3

JA376

/s/ Tiberius Davis
Tiberius Davis
Counsel to the Assistant Attorney General
Civil Division
U.S. Department of Justice

Anthony Nicastro
Acting Director
Office of Immigration Litigation

*Counsel for Respondents–Defendants*

4

JA377

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LIYANARA SANCHEZ, as next friend
on behalf of FRENGEL REYES MOTA,
et al.,

  Petitioners-Plaintiffs,

J.G.G., et al.,

  Plaintiffs,

v.

DONALD J. TRUMP, in his official
capacity as President of the United States,
et al.,

  Respondents-Defendants.

Civil Action No. 1:25-cv-00766-JEB

DECLARATION OF SECRETARY NOEM

I, Kristi Noem, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      As Secretary of Homeland Security, I made the decision to continue the transfer of custody of the Alien Enemies Act detainees who had been removed from the United States before this Court issued its temporary restraining order in the evening of March 15, 2025.

2.      Before making that decision, I received privileged legal advice from the Acting General Counsel of the Department of Homeland Security, Joseph N. Mazzara, and through him from the senior leadership of the Department of Justice.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of December 2025.

Kristi Noem
Secretary of Homeland Security

JA378

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA, et al.,

  Petitioner,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

Respondents.

Civil Action No. 1:25-cv-00766-JEB

## DECLARATION OF JOSEPH N. MAZZARA

I, Joseph N. Mazzara, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.    I have served as Acting General Counsel of the Department of Homeland Security (DHS) since January 2025. On March 15, 2025, I analyzed what the Court said at the TRO hearing and in its subsequent written order. After my review, I then gave Secretary Noem legal advice—prior to her decision—about the legality of continuing with the transfer of custody to El Salvador of certain terrorist aliens detained under the Alien Enemies Act. DHS had removed these terrorists from the United States before this Court issued any order (or oral statement) regarding their removal.

2.    That same evening, I also gave Secretary Noem—prior to her decision—legal advice on the same topic that I received from senior Department of Justice leaders.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of December 2025.

Joseph N. Mazzara
Acting General Counsel
Department of Homeland Security

JA379

USCA Case #25-5452    Document #2184589    Filed: 07/22/2026    Page 384 of 401

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA, et al.,

Petitioner,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

Respondents.

Civil Action No. 1:25-cv-00766-JEB

### DECLARATION OF DEPUTY ATTORNEY GENERAL BLANCHE

I, Todd Blanche, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am the Deputy Attorney General of the United States.  In the evening of March 15, 2025, after analyzing this Court's oral statements at the TRO hearing and subsequent written order, then-Principal Associate Deputy Attorney General Emil Bove and I provided privileged legal advice to the Secretary of Homeland Security, through Acting DHS General Counsel Joseph N. Mazzara, regarding the decision whether to continue the transfer of custody of the Alien Enemies Act detainees who had been removed from the United States before this Court issued those pronouncements.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of December 2025.

_____
Todd Blanche
Deputy Attorney General
U.S. Department of Justice

JA380

Leave to file GRANTED

_/s/ JGB_       12/8/25

**James E. Boasberg**    **Date**
**Chief Judge**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

JGG, *et al.*,

        *Plaintiffs,*

  v.

PRESIDENT DONALD J. TRUMP, *et al.*,

        *Defendants.*

No. 25 Civ. 766 (JEB)

---

I, Emil Bove, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.     I am submitting this declaration in response to the court's November 28, 2025 order. ECF No. 196.

2.     On March 15, 2025, I was serving as DOJ's Principal Associate Deputy Attorney General. I left that role at DOJ in late-August 2025. DOJ has not authorized me to disclose privileged information in this declaration.

3.     Beginning during the morning of March 15, 2025, and throughout that weekend, I monitored developments related to this case.

4.     On the evening of March 15, 2025, I was aware of statements by the court during proceedings that day, the court's minute entries, and other public filings on the docket sheet. *See, e.g.*, ECF No. 195 ¶ 3.

JA381

5.      Based on my evaluation of those materials, I contributed to privileged legal advice provided to the Secretary of Homeland Security on March 15, 2025—by communicating with Deputy Attorney General Todd Blanche and Acting DHS General Counsel Joseph Mazzara—regarding the transfer of custody of aliens who had been detained pursuant to the Alien Enemies Act and removed from the United States. *See* ECF No. 195 ¶ 4.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 5, 2025

/s/ *Emil Bove*
Honorable Emil Bove
Circuit Judge
U.S. Court of Appeals for the Third Circuit

2

JA382

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **J.G.G.**, *et al.*, <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **DONALD J. TRUMP**, *et al.*, <br><br> **Defendants.** | **Civil Action No. 25-766 (JEB)** |

## ORDER

In response to the Court's Order of November 28, 2025, the Government has submitted cursory declarations from Secretary Kristi Noem and attorneys then at the Department of Justice who advised her.  Noem avers that she made "the decision to continue the transfer of custody of the Alien Enemies Act detainees who had been removed from the United States before this Court issued its temporary restraining order in the evening of March 15, 2025."  ECF No. 198-1 (Declaration of Secretary Noem).  As this declaration does not provide enough information for the Court to determine whether her decision was a willful violation of the Court's Order, the Court cannot at this juncture find probable cause that her actions constituted criminal contempt. See United States v. Young, 107 F.3d 903, 907 (D.C. Cir. 1997) (contempt requires finding that (1) court order was "clear and reasonably specific"; (2) "the defendant violated the order"; and (3) "the violation was willful") (internal quotation marks omitted).  A referral for prosecution, consequently, would be premature.

The Court thus believes that it is necessary to hear witness testimony to better understand the bases of the decision to transfer the deportees out of United States custody in the context of

1

JA383

the hearing on March 15, 2025. The events surrounding this decision should shed light on this question.

The Court accordingly ORDERS that:

1.  Plaintiffs shall attempt to secure the presence of Erez Reuveni for testimony on December 15, 2025, at 9:30 a.m.;

2.  The Government shall produce Drew Ensign for testimony on December 16, 2025, at 2:00 p.m.; and

3.  Both sides shall appear in person at such hearings and will have the opportunity to question witnesses.

/s/ James E. Boasberg
JAMES E. BOASBERG
Chief Judge

Date:  December 8, 2025

2

JA384

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LIYANARA SANCHEZ, as next friend
on behalf of FRENGEL REYES MOTA,
et al.,

  Petitioner,

v.

DONALD J. TRUMP, in his official
capacity as President of the United States,
et al.,

  Respondents.

Civil Action No. 1:25-cv-00766-JEB

### DECLARATION OF DREW C. ENSIGN

I, Drew C. Ensign, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.    I am a Deputy Assistant Attorney General in the Civil Division of the U.S. Department of Justice (DOJ) and have served in that position since January 2025. I am a counsel of record for Respondents in this action.

2.    I argued on behalf of Respondents at the TRO hearings in the late afternoon on March 15, 2025, which began at 5 pm, recessed at 5:22 pm, and resumed at 6:00 pm.

3.    After the hearing concluded, I summarized for DHS senior staff what this Court had stated on the record at the hearing. I also promptly informed DOJ senior staff of the same.

4.    At 7:26pm, I received an email from this Court's ECF system that included the Court's written minute order. I forwarded that email to DHS senior staff and the Office of the Legal Advisor at the Department of State. I also notified DOJ senior staff of the written order.

5.    Beyond conveying this Court's oral directives and written order, I did not provide any legal advice to DHS regarding what the TRO required or what actions might be consistent

1

JA385

USCA Case #25-5452    Document #2184589    Filed: 07/22/2026    Page 390 of 401

with it before the decision was made to transfer custody of the aliens who had been removed from

the United States before the Court's order. I was also not involved in any discussions with DOJ

leadership regarding any legal advice given to DHS on that topic. I did not learn of the decision

to proceed with the transfer of custody for the previously removed aliens until after that decision

had been made.

6.      Almost immediately after the Court's minute order issued, I was instructed to

appeal the TRO and seek a stay pending appeal of that order. I began working on that stay motion

immediately. That stay motion was filed with the D.C. Circuit around 1 am on March 16.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this 10th day of December 2025.

Drew C. Ensign
Deputy Assistant Attorney General
U.S. Department of Justice

JA386

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LIYANARA SANCHEZ, as next friend on behalf of
FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Respondents–Defendants.*

Case No: 1:25-cv-00766-JEB

## DECLARATION OF DANIEL A. GALINDO

I, Daniel A. Galindo, hereby declare:

1. I am over eighteen years of age and am competent to make this declaration.

2. I am a Senior Staff Attorney at the American Civil Liberties Union Immigrants' Rights Project. I represent the Petitioners and Plaintiffs in this case.

3. Attached is a true and accurate copy of an excerpt from correspondence received on March 15, 2025.

I declare under penalty of perjury under the laws of the United States and California that the foregoing is true and correct.

Executed on December 11, 2025 in San Francisco, California.

/s/  *Daniel A. Galindo*
DANIEL A. GALINDO

1

JA387

# EXHIBIT A

JA388

📧 Outlook

---

## Re: [EXTERNAL] Re: adding govt re Alien Enemies Act TRO

---

From  Reuveni, Erez R. (CIV) <Erez.R.Reuveni@usdoj.gov>

Date  Sat 3/15/2025 10:47 AM

To  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ @dcd.uscourts.gov>

Cc  Lee Gelernt <LGELERNT@aclu.org>; Daniel Galindo <dgalindo@aclu.org>

---

**This Message Is From an External Sender**
This message came from outside your organization.

We respectfully believe such a hearing would be premature and potentially prejudicial to our defense. Plaintiffs filed this last night at 234 am with very little advance notice we have not had any reasonable opportunity to ascertain facts or develop a response or determine even if the class plaintiffs propose, " All noncitizens who were, are, or will be subject to the Alien Enemies Act Proclamation and/or its implementation," is ascertainable or otherwise satisfies rule 23.

That said if the court wants us to appear for a hearing we will of course do so at the court's convenience.

Sent from my iPhone

> On Mar 15, 2025, at 10:29 AM, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ @dcd.uscourts.gov> wrote:
>
>
> Would the parties be available for a Zoom hearing **today at 5 p.m.** on Plaintiffs' [4] Motion for Class Certification? If so, the Court is prepared to hold a hearing then.
>
> ---
> ▮▮▮▮▮▮▮▮
> Law Clerk to the Honorable James E. Boasberg
> U.S District Court for the District of Columbia
> ▮▮▮▮▮▮▮▮ @dcd.uscourts.gov
> 202-354-3300
>
> **From:** Lee Gelernt <LGELERNT@aclu.org>
> **Sent:** Saturday, March 15, 2025 10:24 AM
> **To:** Reuveni, Erez R. (CIV) <Erez.R.Reuveni@usdoj.gov>
> **Cc:** ▮▮▮▮▮▮▮▮▮▮▮▮ @dcd.uscourts.gov>; Daniel Galindo <dgalindo@aclu.org>
> **Subject:** Re: [EXTERNAL] Re: adding govt re Alien Enemies Act TRO
>
> **CAUTION - EXTERNAL:**

JA389

Is the government prepare to halt removals pursuant to the Act between now and the hearing?

Get Outlook for iOS

_____

**From:** Reuveni, Erez R. (CIV) <Erez.R.Reuveni@usdoj.gov>
**Sent:** Saturday, March 15, 2025 10:18:46 AM
**To:** Lee Gelernt <LGELERNT@aclu.org>
**Cc:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮@dcd.uscourts.gov>; Daniel Galindo <dgalindo@aclu.org>
**Subject:** Re: [EXTERNAL] Re: adding govt re Alien Enemies Act TRO

_____

The government respectfully requests reasonable time to submit a brief before the Monday hearing. The court has stayed removals of those Plaintiffs counsel has identified and that order has been disseminated to the relevant executive branch agencies. A broader injunction before the government has had an opportunity to file a brief and ascertain facts on the ground would be in our view premature and inappropriate on this limited, speculative record. We will be prepared to present argument on Monday as directed by the Court, in addition to filing a brief before the hearing.

Sent from my iPhone

> On Mar 15, 2025, at 10:15 AM, Lee Gelernt <LGELERNT@aclu.org> wrote:
>
>
> Understood. In light of that, would it be possible to have a hearing sooner than Monday afternoon, as soon as today, even if the initial hearing is limited to whether the initial TRO should be broadened?
>
> Get Outlook for iOS
> _____

JA390

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

J.G.G., *et al.*,

    Plaintiffs,

    v.

DONALD J. TRUMP, *et al.*,

    Defendants.

Civil Action No. 25-766 (JEB)

**ORDER**

On December 8, 2025, the Court ordered that live witness testimony would be warranted in its inquiry into whether a contempt referral is appropriate.  See ECF No. 200 (Order).  The Government now moves for reconsideration, asking the Court not to conduct such hearing or, alternatively, to greatly restrict testimony.  See ECF No. 201 (Recon. Mot.).  The Court will deny the Motion.

To begin, this inquiry is not some academic exercise.  Approximately 137 men were spirited out of this country without a hearing and placed in a high-security prison in El Salvador, where many suffered abuse and possible torture, despite this Court's order that they should not be disembarked.  See ECF No. 81 (Mem. Op.); Hum. Rts. Watch, "You Have Arrived in Hell": Torture and Other Abuses Against Venezuelans in El Salvador's Mega Prison (2025), https://perma.cc/8H6N-MJX4.  The question the Court must now answer is whether this occurred via contumacious conduct by Government officials.  See United States v. Young, 107 F.3d 903, 907 (D.C. Cir. 1997) (setting out elements including willfulness).

The *en banc* D.C. Circuit has authorized this Court to proceed with its contempt inquiry, see J.G.G. v. Trump, 2025 WL 3198891, at *4 (D.C. Cir. Nov. 14, 2025) (*en banc*) (Pillard,

1

JA391

Wilkins, and Garcia, JJ., respecting denial of rehearing *en banc*) (district court may "proceed . . . within his sound discretion" to obtain factual information); id. at *5 n.1 (Pan, J., dissenting from denial of rehearing *en banc*) ("Six of the eleven active judges on this court opine that the district court did not err."), which requires a consideration of officials' state of mind. The cursory declarations Defendants have provided, see ECF Nos. 198-1 (Declaration of Secretary Noem); 198-2 (Declaration of Acting General Counsel of DHS Mazzara); 198-3 (Declaration of Deputy Attorney General Blanche); 199 (Declaration of Emil Bove), offer little to assist such consideration. The Circuit has also vacated this Court's prior probable-cause determination. See J.G.G. v. Trump, No. 25-5124 (D.C. Cir. Aug. 8, 2025) (order vacating contempt-related order). Although this does not compel the Court to return to square one, it must reach a fresh conclusion. This is particularly warranted where significant new information — in the form of Erez Reuveni's whistleblower complaint, see ECF No. 158-1 (Letter) — has come to light since the Court's probable-cause finding. Much of his account bears directly on the question of willfulness. In addition, given their close familiarity with the case, Plaintiffs are uniquely positioned to assist the Court, and it will permit them to do so. (They would, conversely, have no role were an actual contempt prosecution initiated following a potential referral from this Court.)

While the Government also asserts that the Court's inquiry should be cabined to March 15, that is too restrictive. What occurred at the March 14 meeting with Department of Justice attorneys (including Emil Bove, Erez Reuveni, and Drew Ensign), for example, may well help to illuminate officials' decisions the next day and their mental states. Nor would everything said at such meeting necessarily be covered by the attorney-client privilege — the sole privilege Defendants have invoked — inasmuch as no client was allegedly present, and a policy (rather

2

JA392

than legal advice) was apparently discussed.  In any event, to the extent that future contempt was being considered, the crime-fraud exception would vitiate any privilege.

The Court will remain mindful of attorney-client privileges that may pertain to other communications as the testimony proceeds, and the Government will be free to object to particular questions.  At this stage, however, Plaintiffs have pointed out numerous reasons why the privilege might well not apply.  See ECF No. 205 (Pl. Resp.).  The Court, furthermore, will limit the scope of the testimony to the current case and not permit questions regarding the particulars of other cases that the witnesses may have worked on, unless there is some direct showing of relevance.  In sum, the Court sees no reason to delay the entire hearing while waiting for further, unspecified appellate guidance, as the Government also demands.

The Court, accordingly, ORDERS that Defendants' [201] Motion to Reconsider is DENIED.

/s/ James E. Boasberg
JAMES E. BOASBERG
Chief Judge

Date:  December 12, 2025

3

JA393

**Steptoe**

Michael R. Bromwich
202 429 8167
mbromwich@steptoe.com
1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

Leave to file GRANTED.

_____    12/12/2025
James E. Boasberg                Date
Chief Judge

December 11, 2025

**BY EMAIL**

Honorable James E. Boasberg
Chief Judge
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

  Re: Issues Relating to the Testimony of Erez Reuveni in *J.G.G. et. al. v. Trump,* Case No.: 1:25-cv-00766-JEB

Dear Judge Boasberg:

  We represent Erez Reuveni, the former Department of Justice (DOJ) lawyer who was unlawfully fired by Attorney General Pamela J. Bondi on April 11, 2025, after being previously suspended and placed on administrative leave on April 5, 2025.  We write this letter to bring to the Court's attention various issues relating to Mr. Reuveni's testimony in this matter, which is scheduled for Monday, December 15, and which we respectfully request the court resolve before Mr. Reuveni testifies.

  In its December 8 Order, the Court directed the plaintiffs to "attempt to secure the presence of Erez Reuveni for testimony on December 15, 2025, at 9:30 am.  On December 10, pursuant to the Court's Order, plaintiffs' counsel served a subpoena for testimony in this proceeding on December 15.  Mr. Reuveni fully intends to comply with the subpoena and the Court's order, subject to resolution of the issues raised below.

  Mr. Reuveni anticipates that the Court and the parties will ask Mr. Reuveni questions that may implicate the attorney-client privilege that existed between Mr. Reuveni and his client, the United States government, through April 5, 2025, the date he was suspended.  The cause of his suspension and termination was his candor and fidelity to his oath and his professional

JA394

Letter to Honorable James E. Boasberg
December 11, 2025
Page 2 of 4

obligations in this case before you; the matter of *D.V.D. v. U.S. Dep't of Homeland Sec.,* 25-cv-10676 (D. Mass.); and, most notably, the case of *Abrego Garcia v. Noem,* 8-25-cv-00951-PX (D. Md.).  In the *Abrego Garcia* case, Mr. Reuveni acknowledged that Kilmar Armando Abrego Garcia, a Maryland resident, had been mistakenly and improperly deported by the United States to the Government Terrorism Confinement Center (CECOT) in El Salvador.

On June 24, 2025, pursuant to 5 U.S.C. §§ 1213 and 2302, Mr. Reuveni filed a 27-page protected whistleblower disclosure with the Senate and House Judiciary Committees, the Department of Justice Office of the Inspector General, and the Office of Special Counsel (ECF 158, Attachment 1).  That disclosure focused on the actions of members of DOJ leadership to resist court orders that would block or impede potentially illegal efforts to deport non-citizens. Mr. Reuveni also provided contemporaneous emails and text messages supporting his disclosure. In making his disclosure, Mr. Reuveni relied on the advice of lawyers and legal ethics experts who concluded that it was permissible for Mr. Reuveni to share information that otherwise would arguably be protected from disclosure, and to do so under exceptions to Rule 1.6, including but not limited to Rule 1.6(e)(2)(B), which permits government lawyers to disclose information "when permitted or authorized by law."

The rule of professional conduct that applies to Mr. Reuveni's scheduled testimony in this matter is Rule 1.6(e)(2)(A) of the DC Rules of Professional Conduct.  That rule specifically authorizes the disclosure of otherwise protected client confidences "when required by…court order." A Comment to that rule explains that a lawyer who is "called as a witness to give testimony concerning a client…may comply with the final orders of a court…requiring the lawyer to give information about the client."[1]

Accordingly, in order to provide testimony while abiding by his ethical obligations, Mr. Reuveni needs the Court to issue a "final order" at the outset of Mr. Reuveni's testimony, pursuant to DC Rule 1.6, concerning the scope of that testimony and what the Court and the parties may permissibily ask Mr. Reuveni.  Further, because Mr. Reuveni is affiliated with neither of the parties in this matter, and is appearing at the Court's direction and pursuant to a subpoena, we ask that his counsel be permitted to participate in the proceedings as needed to protect Mr. Reuveni's rights and interests.

We await any further instructions and directions from the Court.

Respectfully submitted,

Michael R. Bromwich

---

[1] DC Rule 1.6 Comment [28]

JA395

Letter to Honorable James E. Boasberg
December 11, 2025
Page 3 of 4


   Copies to:

**For Plaintiffs:**

**a**shah@acludc.org

aspitzer@acludc.org

agorski@aclu.org

cwang@aclu.org

cwofsy@aclu.org

dgalindo@aclu.org

edanforth-scott@aclu.org

hshamsi@aclu.org

khuddleston@aclu.org

m.tan@aclu.org

mngo@aclu.org

nsmith@aclu.org

ojadwat@aclu.org

osarabia@aclu.org

ptoomey@aclu.org

smichelman@acludc.org

slau@aclu.org

smahfooz@aclu.org

lgelernt@aclu.org


**For Defendants:**

abhishek.kambli@usdoj.gov


JA396

Letter to Honorable James E. Boasberg
December 11, 2025
Page 4 of 4

august.flentje@usdoj.gov

drew.c.ensign@usdoj.gov

ernesto.h.molina@usdoj.gov

john.bailey@usdoj.gov

tiberius.davis@usdoj.gov

JA397