**[EN BANC ARGUMENT SCHEDULED SEPTEMBER 29, 2026]**

**No. 25-5452**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

In re DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, *et al.*,

*Petitioners.*

---

On Petition for a Writ of Mandamus to the
United States District Court for the District of Columbia
No. 1:25-cv-766-JEB
The Hon. James E. Boasberg

---

# EN BANC BRIEF FOR RESPONDENTS

---


Evelyn R. Danforth-Scott
Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770

Lee Gelernt
*Counsel of Record*
Daniel Galindo
Kathryn Huddleston
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Sean M. Lau
Omar Jadwat
Hina Shamsi
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org

Arthur B. Spitzer
Scott Michelman
Aditi Shah
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
THE DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 420
Washington, D.C. 20045
(202) 457-0800

*Counsel for Respondents*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A. Parties and Amici

All parties, intervenors, and amici appearing before the district court and in this court are listed in the Petitioners' En Banc Opening Brief.

### B. Rulings Under Review

References to the rulings at issue appear in the Petitioners' En Banc Opening Brief.

### C. Related Cases

All previous or pending appellate proceedings related to this case are listed in the Petitioners' En Banc Opening Brief.

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .......... iii

TABLE OF CONTENTS .......... iv

TABLE OF AUTHORITIES .......... vi

GLOSSARY .......... xiii

INTRODUCTION .......... 1

PERTINENT STATUTES .......... 4

STATEMENT OF THE CASE .......... 4

A. Friday, March 14: Secret Preparations. .......... 5

B. Saturday, March 15: Before the Emergency Hearing. .......... 8

C. Saturday, March 15: The District Court's Emergency Hearing. .......... 10

D. March 15-16: Post-Hearing Events. .......... 14

1. The Government's Interpretation of the Order. .......... 14

2. The Government's Decision Not to Seek Clarification or Notify the District Court of Its Interpretation of the Order. .......... 16

3. Subsequent Hearings Before the District Court. .......... 18

4. The Government's Declarations. .......... 20

E. CECOT's Brutality. .......... 22

STANDARD OF REVIEW .......... 23

SUMMARY OF ARGUMENT .......... 23

ARGUMENT .......... 25

I. THE TRO WAS CLEAR AND UNAMBIGUOUS. ............................25

II. THE TRO'S VACATUR DOES NOT ELIMINATE CRIMINAL CONTEMPT..................................................................33

III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION AND ACTED CONSISTENTLY WITH THE SEPARATION OF POWERS IN SEEKING TO ASCERTAIN ESSENTIAL FACTS BEFORE DECIDING WHETHER TO ISSUE A RULE 42 NOTICE AND REFERRAL. .............................37

IV. REUVENI AND ENSIGN HAVE RELEVANT NON-PRIVILEGED INFORMATION. ......................................................47

a. Waiver .........................................................................50

b. Crime-Fraud Exception and Special Duty of Government Attorneys ..........................................................53

CONCLUSION ..............................................................................................55

CERTIFICATE OF COMPLIANCE ......................................................................57

CERTIFICATE OF SERVICE ...........................................................................58

## TABLE OF AUTHORITIES

**Cases** **Page**


*Ace Motor Acceptance Corp. v. McCoy Motors*,
2019 WL 7000078 (W.D.N.C. Dec. 20, 2019)....................41

*American Airlines, Inc. v. Allied Pilots Association*,
968 F.2d 523 (5th Cir. 1992)....................45

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011)....................32

*Bloom v. Illinois*,
391 U.S. 194 (1968)....................45

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991)....................46

*Clark v. United States*,
289 U.S. 1 (1933)....................53

*Common Cause v. Nuclear Regul. Comm'n*,
674 F.2d 921 (D.C. Cir. 1982)....................26

*Cox v. Adm'r U.S. Steel & Carnegie*,
17 F.3d 1386 (11th Cir. 1994)....................50

*Drummond Co, Inc. v. Conrad & Scherer, LLP*,
885 F.3d 1324 (11th Cir. 2018)....................54

*Ex parte Fisk*,
113 U.S. 713 (1885)....................36, 37

*Ex parte Fox*,
236 F. 861 (3d Cir. 1916)....................40

*Ex parte Merryman*,
17 F. Cas. 144 (C.C.D. Md. 1861)....................39, 40

*Ex parte Robinson*,
86 U.S. 505 (1873)....................38

*Exxon Mobil Corp. v. Corporacion Cimex*,
146 S. Ct. 1909 (2026) ........................................ 32

*Fanshawe v. Tracy*,
8 F. Cas. 997 (C.C.N.D. Ill. 1868) ........................................ 40

*Farese v. United States*,
209 F.2d 312 (1st Cir. 1954) ........................................ 41

*Food Lion v. United Food & Com. Workers Int'l Union*,
103 F.3d 1007 (D.C. Cir. 1997) ........................................ 30

*Foster v. Kansas ex rel. Johnston*,
112 U.S. 201 (1884) ........................................ 40

*Ganek v. Leibowitz*,
874 F.3d 73 (2d Cir. 2017) ........................................ 44

*Haskell v. Kan. Nat'l Gas Co.*,
224 U.S. 217 (1912) ........................................ 26

*Hill v. McDonough*,
547 U.S. 573 (2006) ........................................ 33

*Hope v. Pelzer*,
536 U.S. 730 (2002) ........................................ 32

*Ideal Elec. Sec. Co. v. Int'l Fidelity Ins. Co.*,
129 F.3d 143 (D.C. Cir. 1997) ........................................ 50

*In re Al Baluchi*,
952 F.3d 363 (D.C. Cir. 2020) ........................................ 23

*In re Grand Jury Subpoena Duces Tecum*,
112 F.3d 910 (8th Cir. 1997) ........................................ 54

*In re Holloway*,
995 F.2d 1080 (D.C. Cir. 1993) ........................................ 25, 29

*In re Kellogg Brown & Root, Inc.*,
756 F.3d 754 (D.C. Cir. 2014) ........................................ 47

*In re LeFande*,
919 F.3d 554 (D.C. Cir. 2019)....................................................27, 34, 47

*In re Lindsey*,
158 F.3d 1263 (D.C. Cir. 1998)....................................................47, 54

*In re Sealed Case*,
107 F.3d 46 (D.C. Cir. 1997)....................................................53

*In re Sealed Case*,
737 F.2d 94 (D.C. Cir. 1984)....................................................49

*In re Sealed Case*,
754 F.2d 395 (D.C. Cir. 1985)....................................................53, 54

*In re United Shore Fin. Serv.*,
2018 WL 2283893 (6th Cir. Jan. 3, 2018)....................................................52

*In re United States*,
398 F.3d 615 (7th Cir. 2005) ....................................................45

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
512 U.S. 821 (1994)....................................................39

*J.G.G. v. Trump*,
147 F.4th 1044 (D.C. Cir. 2025)..................................... 1, 20, 26, 27, 28, 30, 33

*J.G.G. v. Trump*,
No. 25-5124, 2025 WL 3198891 (D.C. Cir. Nov. 14, 2025) .................20, 21, 39

*Jones v. SEC*,
298 U.S. 1 (1936)....................................................46

*Just Goods, Inc. v. Eat Just, Inc.*,
Nos. 20-17033 & 20-15809, 2022 WL 614053 (9th Cir. Mar. 2, 2022) ....................................................31

*Kendig v. Stolar*,
173 F.4th 466 (3d Cir. 2026) ....................................................51

*Landmark Legal Found. v. EPA*,
272 F. Supp. 2d 70 (D.D.C. 2003)....................................................30

*McComb v. Jacksonville Paper Co.*,
336 U.S. 187 (1949) .......... 30

*Michaelson v. United States ex rel. Chi., St. Paul, Minneapolis & Omaha Ry. Co.*,
266 U.S. 42 (1924) .......... 38

*Piemonte v. United States*,
367 U.S. 556 (1961) .......... 31

*Potter v. District of Columbia*,
126 F.4th 720 (D.C. Cir. 2025) .......... 32

*Rosen v. NLRB*,
735 F.2d 564 (D.C. Cir. 1984) .......... 54

*Safford Unified Sch. Dist. No. 1 v. Redding*,
557 U.S. 364 (2009) .......... 32

*Saul N. v. Lyons*,
2026 WL 555567 (D. Minn. Feb. 26, 2026) .......... 41

*Taylor v. Riojas*,
592 U.S. 7 (2020) .......... 32

*Trump v. IRS*,
2026 WL 2015525 (S.D. Fla. July 13, 2026) .......... 46

*Trump v. J.G.G.*,
604 U.S. 670 (2025) .......... 33

*United States v. Anonymous*,
21 F. 761 (C.C.W.D. Tenn. 1884) .......... 40

*United States v. Barnett*,
376 U.S. 681 (1964) .......... 39

*United States v. Bilzerian*,
926 F.2d 1285 (2d Cir. 1991) .......... 50, 51

*United States v. Burr*,
25 F. Cas. 41 (C.C.D. Va. 1807) .......... 40

*United States v. Christian*,
187 F.3d 663 (D.C. Cir. 1999).....44

*United States v. Exxon Corp.*,
94 F.R.D. 246 (D.D.C. 1981).....51, 52

*United States v. Hudson*,
11 U.S. (7 Cranch) 32 (1812).....38

*United States v. McMahon*,
104 F.3d 638 (4th Cir. 1997).....31

*United States v. Neal*,
101 F.3d 993 (4th Cir. 1996).....45, 46

*United States v. Parker*,
696 F. App'x 443 (11th Cir. 2017).....41

*United States v. Shipp*,
203 U.S. 563 (1906).....34, 35, 36, 37

*United States v. Stites*,
56 F.3d 1020 (9th Cir. 1995).....41

*United States v. Straub*,
508 F.3d 1003 (11th Cir. 2007).....36

*United States v. United Mine Workers of Am.*,
330 U.S. 258 (1947).....34, 35, 36, 37

*United States v. Young*,
107 F.3d 903 (D.C. Cir. 1997).....26, 29

*United States v. Zolin*,
491 U.S. 554 (1989).....54

*United States ex rel. Murphy v. Porter*,
27 F. Cas. 599 (C.C.D.C. 1861).....40

*U.S. Catholic Conf. v. Abortion Rights Mobilization, Inc.*,
487 U.S. 72 (1988).....36

*Willy v. Coastal Corp.*,
503 U.S. 131 (1992) .......... 34, 36

*Young v. United States ex rel. Vuitton et Fils S.A.*,
481 U.S. 787 (1987) .......... 1, 38, 42, 45

**Statutes**

28 U.S.C. § 1331 .......... 33

50 U.S.C. § 21 .......... 6

50 U.S.C. § 24 .......... 29

**Rules & Regulations**

Fed. R. Crim. P. 42 .......... 3, 24, 25, 37, 38, 41, 42, 43, 44, 46, 53

**Other Authorities**

Aditya Bamzai & Samuel L. Bray, *Prosecuting Contempt* (Uni. of Chi. L. Sch., Paper No. 2026-42, 2026) .......... 38, 39, 41, 45, 46

Br. for the United States in Opposition, No. 07-1254, *Straub v. United States*, 2008 WL 2961319 (U.S. July 30, 2008) .......... 36

C-SPAN (Mar. 14, 2025) .......... 7

C-SPAN (Mar. 17, 2025) .......... 5

Defs.' Mot. for Clarification of TRO, *Missouri v. U.S. Dep't of Educ.*, 4:24-cv-1316 (S.D. Ga. Sept. 10, 2024), Dkt. 38 .......... 30

DOJ Criminal Resource Manual (1997) .......... 38, 44

*Espinoza Escalona v. Noem*,
No. 1:25-cv-00604-CJN (D.D.C. May 19, 2025), ECF 33-1 .......... 29

Haberman & Swan, *Regime Change: Inside the Imperial Presidency of Donald Trump* (2026) .......... 22

*J.G.G. v. Trump*,
No. 25-5067 (D.C. Cir. Mar. 15, 2025), Doc. No. 2105928 .......... 9, 10

*A Judge Ordered Deportation Planes to Turn Around. The White House Didn't Listen*, N.Y. Times (Mar. 17, 2025)....17

Marco Rubio (@marcorubio), X (Mar. 16, 2025)....5

Marco Rubio (@SecRubio), X (Mar. 16, 2026)....5

Resp's' Opp'n, *Espinoza Escalona v. Noem*, No. 1:25-cv-00604-CJN (D.D.C. Mar. 10, 2025), ECF 14....29

Samuel Bray, *When Does the Contempt Clock Begin to Run?*, Divided Argument (Jan. 16, 2026)....47

*Venezuelans Describe Being Beaten, Sexually Assaulted and Told to "Commit Suicide" During El Salvador Detention*, NBC (July 28, 2025)....23

13D Wright & Miller, Fed. Prac. & Proc. Juris. § 3537 (3d ed. 2025)....37

## GLOSSARY

| | |
|---|---|
| AEA | Alien Enemies Act |
| APA | Administrative Procedure Act |
| AUSA | Assistant United States Attorney |
| CECOT | Centro de Confinamiento del Terrorismo (Terrorism Confinement Center) |
| DHS | Department of Homeland Security |
| DOJ | Department of Justice |
| ICE | Immigration and Customs Enforcement |
| INA | Immigration and Nationality Act |
| OIL | Office of Immigration Litigation |
| TdA | Tren de Aragua |
| TRO | Temporary Restraining Order |

## INTRODUCTION

"The ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other Branches." *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 796 (1987).

Reading the government's sanitized version of events, one would never know that the district court was responding to blatant attempts to hide the timing of flights under the Alien Enemies Act ("AEA") and a flagrant violation of its order. The Executive Branch cannot now claim it is the *court* creating friction between the branches.

This Court should definitively reject the government's "manufactured," "*post hoc*" interpretation of the TRO. *J.G.G. v. Trump*, 147 F.4th 1044, 1091 (D.C. Cir. 2025) (Pillard, J., dissenting). The court made unmistakably clear its concern was with potentially losing jurisdiction if Plaintiffs were deplaned. It is inconceivable that only minutes later the court changed its entire focus and suddenly became concerned only with whether the planes were in U.S. airspace, a factor that had no bearing on its jurisdiction. The government block quotes the minute order, OB.10, yet excises the telltale prefatory language—"As discussed in today's hearing"—that members of this Court found critical in linking the oral and written orders.

The government's conduct also leaves little doubt it did not reach its "airspace" interpretation in good faith. The government hid its flight plans from the district court when directly asked. Then, when the government's own lawyers explained that the order barred deplaning Plaintiffs in El Salvador, higher-ups excluded them from post-hearing discussions and never asked them to confirm the government's invented airspace theory with the court—a step any litigant acting in good faith would have taken. The government did not do so because it knew full well what the court would say. From the moment the government hatched its plan to use the AEA in this unprecedented manner, its goal was to eliminate due process and avoid judicial scrutiny. The deliberate violation of the order simply consummated that plan.

The Court should likewise reject the government's new argument that contempt is unavailable because the district court lacked subject matter jurisdiction. The district court did not lack subject matter jurisdiction; regardless, it is well settled that *criminal* contempt is available even where subject matter jurisdiction is later found lacking.

The district court has proceeded patiently and incrementally in the face of repeated stonewalling. The government has yet to answer the most basic questions, including (to name just a few) why it affirmatively misled the court by telling it that a weekend hearing was unnecessary despite knowing flights would depart before Monday; why, incredibly, it had planes depart *during* the hearing; why it did not tell

the court during the hearing that the flights had departed; what those involved in the decision *specifically* knew about the court's oral order and who else they consulted; and whether, the day before the hearing, then-Principal Associate Deputy Attorney General Bove told DOJ lawyers they might have to say "fuck you" if the courts tried to stand in their way. The government has instead chosen to spend the last sixteen months—including two trips to this Court—asserting impunity for its egregious actions and trying to scapegoat the Judiciary. The district court has thus decided, in its considered discretion, not to take the extraordinary step of criminally referring high-level officials without ascertaining more information. Whether the district court ever does, and whether there is ever a prosecution, is for another day.

The government's separation of powers argument is wrong, inconsistent with Federal Rule of Criminal Procedure 42, and ahistorical. District courts must have discretion to ascertain the essential Rule 42 facts. The Executive Branch cannot dictate when the Judiciary has sufficient information, especially where Executive officials are potential contemnors and have obstinately refused to provide critical information. At minimum, the district court plainly has not crossed a clear line warranting the extraordinary remedy of mandamus. That said, if this Court nonetheless believes it should provide guidance for further proceedings, it can.

This is not a mere "academic" exercise, as the district court forcefully explained. JA.391. Plaintiffs experienced months of harrowing abuse in a

Salvadoran prison. Their suffering is all the more outrageous given the government's (belated) concession that the men were denied due process and refused *any* opportunity to contest their supposed gang membership.

## PERTINENT STATUTES

All applicable statutes and rules are contained in the government's brief.

## STATEMENT OF THE CASE

The government's use of the AEA was championed by now-Homeland Security Advisor Stephen Miller, who expressed outrage that "a single deportation for a single alien" can "get all the way to the United States Supreme Court" and that "you need to then invoke extraordinary powers to overcome that." JA.323. Miller saw the AEA as a way "to instantaneously remove" noncitizens, claiming that the Act "allows you to suspend the due process that normally applies" and would prevent access to a "regular federal court." *Id.*

The idea that the AEA would allow the government to circumvent due process and judicial scrutiny set the stage for an extraordinary weekend in March 2025, in which the government summarily removed Plaintiffs to a Salvadoran prison without any process; directed planes carrying Plaintiffs to depart during the emergency Saturday hearing held expressly to determine whether the removals were lawful; failed to inform the district court of the flights' status; and deplaned the men in El Salvador in defiance of the court's order. Still worse: the decision to defy the court

was premeditated, as whistleblower disclosures have revealed. The Administration even took the remarkable step of highlighting its conduct the morning after the transfer. Secretary Rubio reposted a social media post by the Salvadoran President: "Oopsie… too late 😂." Marco Rubio (@marcorubio), X (Mar. 16, 2025), https://perma.cc/345X-C8G7. And both President Trump and Secretary Rubio amplified a video of the men being led away in the middle of the night in shackles to the notorious Salvadoran CECOT prison, forced to kneel while armed soldiers shaved their heads. ECF 102-14, Exhs. 14, 15; Marco Rubio (@SecRubio), X (Mar. 16, 2026), https://perma.cc/JA3A-LTXX.

Miller summed up the Administration's position that Monday:

> "The American people voted for this specific action to occur, and it has occurred and it is occurring and it will continue to occur. And the idea that a single district court judge has the authority to direct as though they were the president the movement of airplanes around the globe is, again, it is the most outrageous thing I've seen from a district court judge in my lifetime, but frankly going back multiple lifetimes."

C-SPAN (Mar. 17, 2025) at 7:11-36, https://perma.cc/QGM4-2G6A.

### A. Friday, March 14: Secret Preparations.

In early March 2025, Venezuelan immigration detainees were abruptly transferred to a Texas facility from across the country. JA.82-83 ¶ 5; JA.85 ¶¶ 12-13; JA.87 ¶ 5; JA.89 ¶ 7; JA.92 ¶ 11; JA.94 ¶ 7. Although few realized it then, the men had been designated as supposed members of a Venezuelan gang, Tren de Aragua ("TdA"), based on vague and often arbitrary criteria—such as tattoos

unrelated to gang membership. *See* ECF 102-2 ¶¶ 21-27; 102-3 ¶ 14; 102-4 ¶ 25; 102-14 Exh. 1.

On Friday, March 14, six separate events left no doubt that the goal was not only to use the AEA, but to do so secretly to prevent judicial review—and that the President was counting on AEA removals happening by the next day.

*First*, the United States and El Salvador finalized an agreement in which El Salvador would receive millions of dollars from the United States in exchange for imprisoning alleged TdA members. *See* ECF 177-10, 177-11, 177-12 Exh. 8.

*Second*, in the early morning, the men detained in Texas were taken to await an AEA removal flight. The flight was ultimately canceled, apparently due to mechanical failure; the men were told they would instead be deported that evening or weekend. JA.83 ¶ 6; JA.87 ¶ 8. They were not told that they would be imprisoned in El Salvador. JA.83 ¶ 67; JA.86 ¶ 17; JA.94 ¶ 10.

*Third*, President Trump signed a Proclamation officially invoking the AEA and designating members of TdA as "enemy aliens." It was signed "in secret," Op.55 (Childs, J., dissenting), despite the AEA requiring a "public proclamation" to invoke the statute's extraordinary powers, 50 U.S.C. § 21.

*Fourth*, President Trump gave a speech at the DOJ leaving no doubt that the government had a plan in motion already and that he expected it to be effectuated by the next day. Without mentioning the AEA specifically, he stated:

> [W]e've caught hundreds of them, the Venezuelan gang, which is, uh, as bad as it gets, and you'll be reading a lot of stories tomorrow [Saturday, March 15] about what we've done with them, and you'll be very impressed.

C-SPAN (Mar. 14, 2025) at 56:40-52, https://perma.cc/5R6F-4RXD.

*Fifth*, then-Attorney General Bondi issued an internal memorandum "on implementing" the AEA. JA.309. The memorandum came to light only weeks later (via the media) and stated that AEA detainees were not entitled to "judicial review" or a "hearing" before removal. JA.313; *see also* JA.319.

*Finally*, according to a whistleblower disclosure by Erez Reuveni (then-Acting Deputy Director of DOJ's Office of Immigration Litigation ("OIL"), and a member of the government's litigation team on this case), he and other DOJ attorneys attended a March 14 meeting regarding AEA removals. JA.245. Meeting attendees included Bove, OIL Deputy Assistant Attorney General Ensign, then-OIL Acting Director Flentje, and additional OIL attorneys. *Id.* The full list of attendees is currently unknown. According to Reuveni, Bove stated that "one or more planes containing individuals subject to the AEA would be taking off over the weekend—meaning Saturday, March 15 and Sunday, March 16" and that "the planes needed to take off no matter what." *Id.* Reuveni additionally noted that Bove raised "the possibility that a court order would enjoin those removals before they could be

effectuated" and "stated that DOJ would need to consider telling the courts 'fuck you' and ignore any such court order." *Id.*

Contemporaneous messages from that weekend corroborate that Bove made that remarkable statement. Reuveni referred to Bove's statement in texts he sent the following day, during and after the emergency Saturday night hearing. His colleagues' responses left no doubt they understood the reference. *See* JA.304 (Reuveni: "This doesn't end with anything but a nationwide injunction," "And a decision point on fuck you"; Colleague: "Its [sic] a question if drew [Ensign] gets out without a sanction"); JA.265 (Reuveni: "guess its [sic] find out time on the 'fuck you'"; Flentje: "Yup. It was good working with you."); JA.305 (similar).

**B. Saturday, March 15: Before the Emergency Hearing.**

Although the AEA Proclamation was still secret, there were scattered reports from immigration attorneys that their Venezuelan clients were being hurriedly prepared for removal. Believing that the President either had invoked the AEA or would imminently do so, Plaintiffs filed a complaint and motion for a classwide TRO at 1:50 a.m. on Saturday, March 15.[1]

At 9:40 a.m., the district court entered a TRO for the five named plaintiffs. JA.175:19-23. The TRO's limited scope was based on the district court's belief that an AEA Proclamation had not been signed. JA.100:16-25. The district court

[1] All times are Eastern.

scheduled a hearing on whether to expand the TRO to the putative class for Monday, March 17. Plaintiffs, concerned that Monday would be too late, requested a Saturday afternoon hearing. JA.390.

Although DOJ attorneys knew from Bove's statements the previous day that AEA flights were scheduled to depart over the weekend—in other words, that a Monday hearing would in fact be too late—DOJ, through Reuveni, nevertheless protested that a Saturday hearing was "premature," that Plaintiffs' allegations about an AEA Proclamation were "speculative," and that the government needed time to "ascertain facts on the ground" and "develop a response." *Id.*; *see also* JA.195. It is still unknown who may have directed Reuveni to push for the Monday hearing; he and Ensign were in touch throughout the morning, and Reuveni also spoke twice with Flentje. JA.267-69. It is also unknown who else Ensign and Flentje were in contact with that morning.

At 3:05 p.m., the government sought a stay from this Court of the TRO for the named plaintiffs. *J.G.G. v. Trump*, No. 25-5067 (D.C. Cir. Mar. 15, 2025), Doc. No. 2105928. The motion referred to an "alleged Proclamation," "any such AEA Proclamation," and "a potential invocation of the AEA." *Id.* at 3, 4, 10. Yet language in the motion closely tracked the AEA Proclamation the President had *already* secretly signed the previous day, strongly suggesting full awareness of the Proclamation. *See, e.g.*, *id.* at 10-11 (laying out similar language). The signature

block included Ensign, Flentje, and Reuveni, as well as then-Acting Assistant Attorney General Yaakov Roth. *Id.* at 15.

At 3:53 p.m., roughly an hour before the scheduled 5:00 p.m. emergency hearing and just 82 minutes before the first plane would depart, the Proclamation was finally published. JA.162:20-163:16.

### C. Saturday, March 15: The District Court's Emergency Hearing.

At the start of the hearing, the district court observed that the AEA Proclamation had now been published. JA.100:24-25. The court asked Ensign, who appeared for the government: "[A]re imminent deportations and removals under this proclamation planned? When I say imminent, I mean in the next 24 or 48 hours." JA.108:12-14. Ensign replied: "Your Honor, I don't know the answer to that question. We can certainly investigate that and report that back to you. But I don't know that—the answer to that." JA.108:15-18. Ensign went on to state: "I think we were certainly planning on opposing the TRO by tomorrow night in advance of the hearing on Monday if that's still going forward. We can certainly include it [the answer] in that filing if that works." JA.109:1-3. Yet, according to Reuveni, Ensign had been present at the meeting where Bove stated that AEA flights would depart over the weekend.

Contemporaneous text messages during the hearing between Reuveni and an undisclosed colleague indicate that Reuveni and the colleague understood Ensign's

statements to be material misrepresentations. At 5:17 p.m., the colleague texted Reuveni: "Oh shit. That was just not true." JA.303. Reuveni replied: "About to enter the find out phase following fuck around." *Id.*

At 5:22 p.m., frustrated that the United States had sent counsel seemingly without the most basic information, the court adjourned the hearing until 6:00 p.m. to allow Ensign time to determine when planes were scheduled to depart, stating that the court "will want to know" if "deportation of people under the proclamation pursuant to the AEA [is] in motion now and will it be for the next 48 hours, because that would require a more immediate decision." JA.110:20-25; JA.112:2. During the recess, Ensign called Reuveni at 5:30 p.m. and 5:41 p.m.; each call lasted six minutes. JA.270. Critically, it is still unknown who else, if anyone, Ensign contacted during the recess.

When the hearing resumed, Ensign stated, incredibly, "I do not have additional details I can provide at this time," but that "we may be able to provide Your Honor additional details in an in camera hearing." JA.112:12-15. However, when the court removed the public from the call, Ensign said, "I am still trying to get additional details." JA.113:7-8. He added that his clients had proposed providing details in camera, "but I do not personally have those right now. ... I'm certainly trying to get that information, but that is not something, the details, that I know." JA.113:9-11, 19-21.

Those statements are stunning: two AEA deportation flights took off *during* the hearing—one just before the recess, one during the recess. The government was racing detainees out of the country before the district court could rule, at the same moment it was defying the court's request for flight information. It remains unknown who decided the planes would take off during the hearing, and who decided to withhold this information from the court.

Reuveni's text messages during the hearing reflect that a DOJ colleague believed Ensign might be sanctioned. JA.304 (Colleague, 5:55 p.m.: "Its [sic] a question if drew gets out without a sanction"; Reuveni, 6:01 p.m.: "Jesus"; Colleague, 6:02 p.m.: "Was he ready for this? Are you with him?" "Oh boy").

Meanwhile, an interagency group of twenty-three officials was corresponding on an email thread titled "RE: AEA Litigation Team – case update," leaving no doubt the Administration was well aware of the hearing. JA.278-88. The group included Reuveni, Flentje, and seven other undisclosed DOJ recipients, as well as seven undisclosed recipients from the State Department, three from DHS, and four from ICE. JA.279-80. At 6:06 p.m., *post*-recess, an ICE official emailed: "Any word on the 5pm hearing?" JA.285. Why this group, specifically created to monitor the hearing, was apparently still unaware of what information the court had requested during the recess is yet another unanswered question.

Frustrated by the government's lack of information and concerned by Plaintiffs' information indicating that planes had already departed or would imminently do so, the court issued a classwide TRO. JA.139:16-21. The district court specifically ordered:

> [A]ny plane containing these folks that is going to take off or is in the air needs to be returned to the United States, but those people need to be returned to the United States. However that's accomplished, whether turning around a plane or not [dis]embarking anyone on the plane or those people covered by this on the plane, I leave to you. But this is something that you need to make sure is complied with immediately.

JA.140:11-19.

Only then did a DOJ attorney (Reuveni) finally ask the email thread: "Can folks confirm for us if at the moment any individuals subject to the AEA are being staged for removal, or are presently in the air as part of removal (but not yet having landed and disembarked)?" JA.281-82 (6:44 p.m. email). Two minutes later, Reuveni reiterated: "[L]et us know ASAP on the questions below concerning removals not yet effectuated, including those involving folks in the air." JA.281.

At 6:48 p.m., as the hearing was concluding, Reuveni emailed the same thread: "the judge specifically ordered us to not remove anyone in the class, and to return anyone in the air." JA.280-81. Two minutes later, at 6:50 p.m., an ICE official replied: "Two flights departed at about 5:15 and 5:45. They are still in the air," JA.279-80—leaving no doubt that DOJ could quickly ascertain this information when it wanted. At 6:53 p.m., at the hearing's conclusion, an ICE official wrote that

"Title 50 [AEA] folks on the third flight are being pulled off," Reuveni responded: "And the two flights in the air?" JA.278-79. The emails Reuveni disclosed do not reflect a response.

No DOJ attorney informed the court or Plaintiffs that DOJ knew that two AEA planes had departed during the hearing. Indeed, not until the next morning, after the transfer, did either the court or Plaintiffs' counsel learn that the men were now imprisoned in El Salvador, and then only because El Salvador bragged about it publicly.

Notably, no DOJ attorney apparently ever inquired on the thread whether the two flights were still in U.S. airspace, nor did any DHS or State Department official volunteer that information in any of the disclosed emails—presumably because none saw that as salient, despite the government's subsequent argument that the key fact was whether the planes were outside U.S. airspace when the TRO issued. *See* JA.273-88; JA.132.

### D. March 15-16: Post-Hearing Events.

#### 1. The Government's Interpretation of the Order.

At 7:04 p.m., Reuveni again emailed the same thread, requesting an update and reiterating that "[n]o one subject to AEA in our custody can be removed" and that "anyone in the air should be returned." JA.273. Reuveni's disclosure states: "DHS and DOS attorneys did not respond." JA.250. At 7:18 p.m., Reuveni emailed

again: "Please confirm asap no one lacking a title 8 [immigration] final order will be taken off these planes when they land. We need to address this asap to avoid contempt." JA.278. Reuveni's disclosure states he "again received no response." JA.250. Notably, there is no indication that the other DOJ attorneys on the thread raised any objection or concern, at this point or any other, regarding Reuveni's interpretation that the injunction prohibited the government from deplaning any AEA detainees. Reuveni's messages described "*our* understanding of the injunction" and "*our* advice here on injunction compliance." JA.273; JA.287 (emphasis added).

At 7:25 p.m. the court issued its minute order. At 7:30 p.m. Ensign and Reuveni talked by phone; what they discussed is unknown. JA.270. One minute later, Ensign emailed Percival, then-Senior Counselor to the DHS Secretary, and Mazzara, then-Acting General Counsel for DHS, informing them "of both the oral and written injunctions" and "that their clients were required to not remove anyone within the class definition." JA.250-51. Ensign sent a similar email to State Department counsel. JA.250. How precisely he described the court's oral order to agency officials at this or any other point, and whether it was a verbatim recounting of the order, remain unknown. Reuveni's disclosure, however, states that the emails "reflected that Ensign understood the judge to be requiring that DHS not deplane any planes that had departed U.S. airspace." JA.250-51. Whether anyone responded remains unknown. *Id.* Perplexingly, although Ensign argued the TRO, he subsequently stated

in a declaration that he "did not provide any legal advice to DHS regarding what the TRO required or what actions might be consistent with it before the decision was made" to transfer Plaintiffs. ECF 201-1 ¶¶ 3-5.

In the meantime, the flights landed in Honduras. "Reuveni reviewed public information that two flights had landed in Honduras by 8:10 pm." JA.305. At 8:16 p.m., Reuveni texted his colleague, "Guess we are going to say fuck you to the court," "Super," to which the colleague responded, "Well Pamela Jo Bondi is," "Not you." *Id.*

At this point, neither the court nor Plaintiffs' counsel had any reason to believe the Executive Branch would not comply with the court's order. At approximately 10:15 p.m., while the planes were still in Honduras, DHS finally informed Reuveni that "they were holding issuance of guidance pending a decision from the Attorney General." JA.251. To date, the government has provided no further information about what role, if any, the Attorney General played in the transfer decision.

### 2. The Government's Decision Not to Seek Clarification or Notify the District Court of Its Interpretation of the Order.

Reuveni's disclosure states that "[s]ometime around midnight, Ensign informed Mr. Reuveni that DOJ would be filing a notice with the court, signed by Bove, explaining its interpretation of the court order." JA.251. However, "at 12:23 a.m. [now Sunday, March 16], Ensign informed Mr. Reuveni by phone that Bove would no longer be filing either a notice of appearance or a notice to the court

explaining the government's interpretation of the court's orders." *Id.* "At 12:33 a.m., Ensign telephoned Mr. Reuveni informing him that DOJ leadership did not appear to be in a hurry to file any such notice." *Id.* Public information indicates that this discussion's timing roughly overlaps with the time when the planes carrying Plaintiffs landed in El Salvador. *A Judge Ordered Deportation Planes to Turn Around. The White House Didn't Listen*, N.Y. Times (Mar. 17, 2025), https://perma.cc/B8UP-TLC8.

Early on Sunday morning, Reuveni again emailed the "AEA Litigation Team" thread, reiterating that "our advice here on injunction compliance was to not deplane anyone from these planes who is subject to an AEA removal ... and otherwise return those individuals to the United States." JA.287. No disclosed correspondence reflects disagreement with Reuveni's interpretation of the injunction from DOJ attorneys on the thread. Reuveni again received no response. JA.252. Later that morning, Reuveni had phone calls with Flentje, Mazzara, and Ensign. JA.271. Reuveni's disclosure states that "agency counsel for DHS informed Mr. Reuveni by telephone that DOJ leadership had advised DHS to deplane the flights in El Salvador and directed Mr. Reuveni to contact DOJ leadership if he had any questions." JA.252.

At 2:26 p.m. Sunday afternoon, Roth emailed Flentje, Reuveni, and Ensign, stating that Bove "advised DHS last night that the deplaning of the flights that had departed US airspace prior the court's minute order was permissible under the law

and the court's order." JA.290. Roth's email did not mention Blanche (or Bondi), even though Blanche's declaration in this case stated that he also advised DHS. JA.380.

DOJ did not notify the court or Plaintiffs' counsel of the government's interpretation of the order until 3:46 p.m.—more than fifteen hours after the government had deplaned Plaintiffs. *See* JA.96. Twenty minutes after the notification, Flentje texted Reuveni: "We are likely saved for today by the fact that Boasberg is on vacation." JA.265.

**3. Subsequent Hearings Before the District Court.**

The district court held a hearing on March 17, after which it issued a minute order directing the government to provide specific information—including its "position on whether, and in what form, it will provide answers to the court's questions regarding the particulars of the flights"—if necessary via "*in camera* review or in a classified setting." JA.27. Reuveni stated in his disclosure that "[f]ollowing this order, Flentje and Ensign told Mr. Reuveni that leadership at DOJ were reporting 'down the chain' that the government was not going to answer the court's questions about anything that happened before 7:26 p.m. on March 15, and so not to provide information about when the flights took off." JA.253. Indeed, the government has never provided this information. On March 20, the district court issued an order to show cause. JA.154-56.

At a March 21 hearing, the district court asked Ensign if he "knew nothing about those flights when [he] appeared during that whole two hours from 5:00 to 7:00 in which the argument took place." JA.161:6-8. Ensign responded that he "didn't have any information from the government as to the status of them." JA.161:11-12. The court asked: "And so yet, your clients had you come argue this and kept you in the dark about all of that [information]?" JA.161:13-14. Ensign responded: "Your Honor, I sought the information in that window between the two hearings and was unable to secure it from my clients." JA.161:15-17. Yet during the hearing, when Reuveni wrote the "AEA Litigation Team" email thread asking about the status of the flights, he received a response within six minutes. JA.279-82.

At an April 3 hearing, the district court reminded Ensign that at the TRO hearing the court had "asked [Ensign] point blank whether there were any removals under this proclamation planned in the next 24 or 48 hours." JA.180:25-181:2. The district court asked Ensign: "[A]s an officer of the court, you are telling me that you had no knowledge whatsoever between 5:00 and 6:00 p.m. on that day that planes were in the air or shortly would be in the air? You had no knowledge whatsoever of that?" JA.181:12-16. Ensign responded: "Your Honor, I had no knowledge from my client that that was the case. ... I can also assure you, as an officer of the Court, I diligently tried to obtain that information but was not able to do so." JA.181:17-22. Again, the court asked: "But what you are prepared to tell me is that they—no one

told you from the administration that planes were in the air or would be within the next 24 or 48 hours? That's what you are telling me?" JA.182:10-13. Ensign responded: "Yes, Your Honor." JA.182:14.

Regarding his contemporaneous understanding of the TRO, Ensign stated at the March 21 hearing that he was not "aware of at that time" any argument that the district court's oral order was not binding. ECF 51 at 31:12-20. But Ensign has not said, at any point, whether he believed the written and oral orders applied only while the planes were in U.S. airspace. *But see* JA.250-51 (Reuveni describing undisclosed emails showing that "Ensign understood the judge to be requiring that DHS not deplane any planes that had departed U.S. airspace").

**4. The Government's Declarations.**

In April 2025, the district court concluded that there was probable cause that the government's actions "demonstrate[d] a willful disregard for" the order. ECF 81 at 1, 41. A divided panel of this Court issued a non-precedential, per curiam mandamus opinion finding the district court's remedial order invalid. *J.G.G. v. Trump*, 147 F.4th 1044, 1044-45 (D.C. Cir. 2025). The full Court denied rehearing; three judges would have granted, and three believed the non-precedential nature of the per curiam decision made rehearing unnecessary, stressing that "no member of this court has taken the position that the panel's disposition stands in the way of the district court" seeking to ascertain what had happened. *J.G.G. v. Trump*, No. 25-

5124, 2025 WL 3198891, at *3 (D.C. Cir. Nov. 14, 2025) (en banc) (Pillard, Wilkins, and Garcia, JJ.) (district court may "proceed … within his sound discretion" to obtain factual information); *id.* at *5 n.1 (Pan, J.) ("Six of the eleven active judges on this court opine that the district court did not err.").

On remand, the district court instructed the government to "submit declarations from *all* individuals *involved* in the decision not to halt the transfer of class members out of U.S. physical custody on March 15 and 16, 2025." ECF 196 at 2 (emphases added). The government chose instead to provide declarations from only a few individuals, based on its restricted view of who was "involved." JA.374-82.

Secretary Noem's two-sentence declaration states that she "made the decision to continue the transfer" of Plaintiffs and that "[b]efore making that decision, [she] received privileged legal advice from" Mazzara "and through him from the senior leadership of the Department of Justice." JA.378 ¶¶ 1-2. Blanche's and Bove's declarations each contain a single sentence of substance, stating only that they provided legal advice to Secretary Noem through Mazzara. JA.380 ¶ 1; JA.382 ¶ 5. Mazzara's declaration states that he provided the Secretary with his own legal advice and "also" conveyed the advice of "senior Department of Justice leaders." JA.379

¶¶ 1-2. The declaration does not state whether Mazzara's advice diverged from that of DOJ leadership.[2]

Finding that Noem's declaration did not allow it "to determine whether her decision was a willful violation of the Court's Order," and that Reuveni's recent disclosure revealed significant new information, the district court sought testimony from Reuveni and Ensign. JA.383-84. The government again sought mandamus and the panel, 2-1, held criminal contempt was barred because the TRO was insufficiently clear. Op.28. This Court granted rehearing *en banc*.

**E. CECOT's Brutality.**

The government's decision to transfer the men to the notorious CECOT prison despite the district court's order had devastating consequences. Plaintiffs' four months at CECOT were nothing short of barbaric.

They were subjected to horrific physical and psychological abuse, and deprived of food, water, and medical care. They were regularly severely beaten by guards and subjected to other physical abuse, including being shot at close range with rubber bullets. Some have permanent physical harm—including permanently

---

[2] Recent reporting indicates others were involved in the Saturday night discussions: "Stephen Miller had wanted the planes to keep going; [White House Counsel] David Warrington, Todd Blanche, Susie Wiles, and other top officials conferred quickly." Haberman & Swan, *Regime Change: Inside the Imperial Presidency of Donald Trump* (2026), 164.

damaged vision, missing teeth, a crooked nose, and scars from rubber bullets. They were locked in "punishment cells" for hours to days. They were told they would never leave—El Salvador's President brags that no one leaves CECOT "alive." *See, e.g.*, *Venezuelans Describe Being Beaten, Sexually Assaulted and Told to "Commit Suicide" During El Salvador Detention*, NBC (July 28, 2025), https://perma.cc/EB5Y-N8LX.

It is now evident that few Plaintiffs had any criminal history, let alone convictions for serious crimes. ECF 234 at 6. And, as noted, "evidence" supposedly linking them to the gang was nonexistent or flimsy, often nothing more than an unrelated tattoo. ECF 67-21 at Exhs. 4-18 (stories of erroneous AEA designations). Yet they were given no opportunity to contest the government's gang accusations before being whisked away.

## STANDARD OF REVIEW

Mandamus is "extraordinary": the petitioning party must identify a case "in which a federal court has held that relief is warranted in a matter involving like issues and comparable circumstances." *In re Al Baluchi*, 952 F.3d 363, 365, 369 (D.C. Cir. 2020).

## SUMMARY OF ARGUMENT

The district court did not transgress any line, much less one warranting mandamus.

1. The TRO was clear and unambiguous. The government's manufactured, post-hoc interpretation that the order applied only within U.S. airspace was unreasonable—and, notably, Reuveni (and apparently Ensign as well) did not understand the order in that way. The minute order began with five clear words: "As discussed in today's hearing," leaving no doubt the court meant its written order to track the oral order preserving its jurisdiction, and did not mean to arbitrarily limit its order in a way that neither the court nor the government had ever raised. The government's conduct, moreover, strongly suggests its interpretation was not reached in good faith.

2. The TRO's vacatur does not eliminate criminal contempt. The Supreme Court did not find the district court lacked subject matter jurisdiction. Regardless, it is settled law that criminal contempt is available when a litigant ignores an order designed to preserve the status quo, even where subject matter jurisdiction is later found lacking.

3. The district court has authority, under its inherent authority and Rule 42, to ascertain essential facts necessary to determine whether to issue a Rule 42 notice and referral—especially where it is contemplating the extraordinary step of referring high-ranking Executive Branch officials. The authority to determine whether a criminal contempt prosecution is warranted has long been understood as a "judicial" function: the Judiciary cannot be beholden to the other branches to protect its

authority. Here, the district court had ample reason to seek further information given how much remains unknown about what appears to have been a premeditated plan to defy the court's authority. The district court did not abuse its discretion by refusing to allow the Executive Branch—the potential contemnors—to dictate when it must make a Rule 42 referral.

4. Nor does the district court's order violate attorney-client privilege. There are highly relevant non-privileged facts to which Ensign and Reuveni can testify, including basic information that ordinarily appears in a privilege log like who participated in pivotal meetings and communications. The court properly declined to declare Ensign's and Reuveni's testimony off-limits as a whole or in the abstract. Moreover, the district court will need to decide if the privilege applies at all given waiver, the crime-fraud exception, and the special duty of candor owed by government attorneys.

## ARGUMENT

### I. THE TRO WAS CLEAR AND UNAMBIGUOUS.

**1.** Neither the district court's oral order nor its written memorialization could *reasonably* have been understood to apply only within U.S. airspace. One "may not avoid" contempt "by twisted interpretations or tortured constructions." *In re Holloway*, 995 F.2d 1080, 1084 (D.C. Cir. 1993). But these are precisely what the government advances here.

“Whether an order is clear enough depends on the context in which it is issued and the audience to which it is addressed.” *United States v. Young*, 107 F.3d 903, 907-08 (D.C. Cir. 1997). The relevant context includes “the circumstances surrounding (the injunction’s) entry: the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent.” *Common Cause v. Nuclear Regul. Comm’n*, 674 F.2d 921, 927 (D.C. Cir. 1982); *see also Haskell v. Kan. Nat’l Gas Co.*, 224 U.S. 217, 223 (1912) (“[T]he decree must be read in view of the issues made and the relief sought and granted.”).

As Judges Pillard and Childs carefully explained, the district court issued an “unambiguous command, overwhelmingly confirmed by context.” *J.G.G.*, 147 F.4th at 1087 (Pillard, J.); Op.118 (Childs, J.) (“both the context and the text squarely support that the second temporary restraining order was clear and reasonably specific”).

At the hearing, the court was crystal clear: “any plane … that is going to take off or is in the air needs to be returned” and “those people need to be returned to the United States.” JA.140:11-15. Leaving nothing to chance, the court added that this could be “accomplished” either by “turning around a plane or not [dis]embarking anyone on the plane ….” JA.140:16-18. Judge Rao’s claim that “these oral statements” were only “perhaps suggestive of some custodial responsibility” but

"did not clearly and specifically require the government to retain custody," Op.27, is an "entirely implausible" reading, *J.G.G.*, 147 F.4th at 1076-77, 1088 (Pillard, J.). Judge Walker, though nominally joining Judge Rao's opinion in full, appeared to recognize as much. Op.33 (Walker, J.) (arguing that "unlike the oral order, the written order did not protect anyone already removed").

Critically, neither the panel nor the government offers any plausible reason why the court would have been concerned with the territorial line—and, indeed, the government never mentioned that distinction during the hearing. Nor did the government express any uncertainty about the order's scope during the hearing. The court made clear its focus was on losing jurisdiction if Plaintiffs were transferred to foreign physical custody. JA.132-33; JA.141. Whether the planes were inside U.S. airspace had no bearing on that.[3]

The minute order likewise left no doubt that the government was prohibited from transferring Plaintiffs. Judge Walker sought to sever the oral and written orders, contending that the written order "superseded" the oral directive because the court stated that the lawyers need not "write [] down" the oral order and the written order

---

[3] The government half-heartedly attempts to revive an argument that oral orders are not binding, but that ignores circuit precedent. *In re LeFande*, 919 F.3d 554, 562-63 (D.C. Cir. 2019) ("in-person order" formed basis for contempt); *see also J.G.G.*, 147 F.4th at 1089 (Pillard, J.) (collecting cases); Op.37 n.20 (Walker, J., concurring) (agreeing that oral orders can require compliance). The inapposite cases on which the government relies, OB.44-45, simply did not involve clear oral directives.

did not then repeat everything from the oral order. Op.33. But by expressly beginning the minute order with "*[a]s discussed in today's hearing*," JA.25; JA.278, the court plainly "incorporated by reference" its oral directive not to deplane Plaintiffs, Op.112 (Childs, J.). The government block quotes the minute order but conspicuously excises that critical prefatory language, OB.10, and never once mentions it in its brief.

Nor is it plausible that "in the thirty-minute interval between the TRO hearing and the Minute Order, the district court changed its mind" and wholly altered its focus and "point-blank" oral order. *J.G.G.*, 147 F.4th at 1087-88 (Pillard, J.). Nothing in the record remotely supports the notion that the court spontaneously decided to allow the government to transfer physical custody provided the planes had cleared U.S. territory—thereby putting its jurisdiction at risk. Indeed, the *written* order defined the class as "[a]ll noncitizens *in U.S. custody*" subject to the AEA. JA.25 (emphasis added).

Judge Rao's focus on the word "removal" in isolation, Op.23-24, ignores context. Nothing about the case indicated that "removal" corresponded to territorial limits, or that DOJ was confused about its meaning in the written order. When Reuveni emailed agency officials, he specifically told the agencies not to "deplane anyone … subject to an AEA removal" and asked about "removals not yet

effectuated, including those involving folks in the air"—with no territorial caveat. JA.281; JA.287.

Judge Rao cited the INA to suggest that "removal" can sometimes have a territorial rather than custodial meaning. Op.24. But whatever the INA's proper reading, it does nothing to alter the clear meaning of these orders in context. And *the day before* the TRO hearing, Ensign himself told a D.D.C. judge in a different case involving the INA that noncitizens "aren't removed until the United States government officials essentially release them." *Espinoza Escalona v. Noem*, No. 1:25-cv-00604-CJN (D.D.C. May 19, 2025), ECF 33-1 at 43:4-6; *see also* Resp's' Opp'n, *Espinoza Escalona v. Noem*, No. 1:25-cv-00604-CJN (D.D.C. Mar. 10, 2025), ECF 14 at 40 ("the removal process is not complete until the individual reaches the final destination"). Any argument about the interpretation of "removal" in 50 U.S.C. § 24 or dictionary definitions, none of which were discussed at the hearing, ignores context and the district court's pointed directive.

**2.** The government also ignores that while the contempt standard is "objective," it "takes into account" the "audience to which it is addressed" and how the order was "understood." *Young*, 107 F.3d at 907-08; *see also Holloway*, 995 F.2d at 1084 (rejecting effort "to interject some ambiguity" given record evidence that contemnor "knew what the judge meant"). "The basic inquiry is 'whether the parties subject to the injunctive order understood their obligations under the order,'"—not whether the

enjoined party can invent a loophole to attempt to evade those obligations. *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 70, 74-75 (D.D.C. 2003) (counsel's statements at hearing "indicate[d] that EPA understood" the injunction).

Here, Reuveni expressly and repeatedly informed the agencies, before and after the minute order, that the court had prohibited "deplaning" Plaintiffs and that doing so would subject them to "contempt." *Supra* STATEMENT C & D.1. Reuveni's disclosure further states that Ensign shared his understanding of the order. JA.251. If Ensign did not share that understanding, he could have said so in his declaration or at any other time.

Had the government *genuinely* believed the order did not prohibit transfer or even that it was unclear, it "could have petitioned the District Court for a modification, clarification or construction of the order," instead of running with its "own determination of what the decree meant." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949); *J.G.G.*, 147 F.4th at 1080 (Pillard, J.) ("Nor, to the extent there was any confusion about the meaning of the TRO, did defendants seek any clarification from the court."); *Food Lion v. United Food & Com. Workers Int'l Union*, 103 F.3d 1007, 1019 (D.C. Cir. 1997) (affirming contempt finding, noting litigant "did not seek a clarification"). Indeed, the government often files such requests for clarification. *See, e.g.*, Defs.' Mot. for Clarification of TRO, *Missouri v. U.S. Dep't of Educ.*, 4:24-cv-1316 (S.D. Ga. Sept. 10, 2024), Dkt. 38.

Notably, the government does not suggest it tried to seek clarification or believed the district court would have been unreachable. Instead, the government informed the court of its contrived interpretation the next afternoon as a fait accompli. JA.96-97; *see Piemonte v. United States*, 367 U.S. 556, 560 (1961) (where "[n]either [contemnor] nor his counsel ever claimed confusion in the District Court," contemnor's later contention that order was ambiguous was "sheer afterthought"); Op.112 (Childs, J.). In the context of a TRO hearing to maintain the status quo and the district court's jurisdiction, at which the word "removal" was not parsed in any way, and at which the district court specifically directed that the government must "immediately" turn planes around or "not [dis]embark" Plaintiffs still in U.S. custody, it is simply implausible that the government *genuinely* believed they were free to transfer the men.

**3.** Finally, the government contends that "it is now impossible as a matter of law to conclude" that the TRO was unambiguous, because three judges have concluded it was not. OB.46. This sweeping argument is flatly wrong and would have implications far beyond this case.

Courts have found contempt for violation of an injunction despite disagreement over the order's clarity. *United States v. McMahon*, 104 F.3d 638, 645 (4th Cir. 1997) (majority affirming contempt even though dissent believed order did not clearly bar contemnor's conduct); *Just Goods, Inc. v. Eat Just, Inc.*, Nos. 20-

17033 & 20-15809, 2022 WL 614053 (9th Cir. Mar. 2, 2022) (similar, as to some conduct). The government provides no case adopting its approach in construing injunctions, and Plaintiffs are aware of none.[4]

The government cites a qualified immunity case, *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Even assuming its relevance here, the Court there did not suggest that qualified immunity was required where there are dissents. Indeed, the Court has since explained: "We would not suggest that entitlement to qualified immunity is the guaranteed product of disuniform views of the law in the other federal, or state, courts." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 378 (2009); *see Hope v. Pelzer*, 536 U.S. 730, 748 (2002) (no qualified immunity, three dissenting justices); *Taylor v. Riojas*, 592 U.S. 7, 9-10 (2020) (same, dissent); *cf. Exxon Mobil Corp. v. Corporacion Cimex*, 146 S. Ct. 1909, 1918, 1925 (2026) (statutory text unambiguous despite dissent's contrary interpretation). And in this case, the three judges did not appear fully aligned. Judge Walker, unlike Judge Rao, did not claim the oral order was ambiguous. *Compare* Op.33 (Walker, J.), *with* Op.27 (Rao, J.);

[4] The government suggests that a *criminal* conviction could not stand where there was lack of judicial agreement on the order's clarity. OB.46. But that ignores that a conviction would also require a later willfulness finding. Moreover, the government's rule—that judicial disagreement means an order was unclear—would also bar *civil* contempt for violation of such orders. *See Potter v. District of Columbia*, 126 F.4th 720, 724 (D.C. Cir. 2025).

*see also J.G.G.*, 147 F.4th at 1074 (Pillard, J.) (in first mandamus opinion, noting that Judges Rao and Katsas provided "non-overlapping" reasons).

## II. THE TRO'S VACATUR DOES NOT ELIMINATE CRIMINAL CONTEMPT.

The government's argument that the district court lacked subject matter jurisdiction is wrong. Regardless, the absence of subject matter jurisdiction would not render *criminal* contempt unavailable.

The Supreme Court's vacatur was based on "venue," not subject matter jurisdiction. *Trump v. J.G.G.*, 604 U.S. 670, 672 (2025); *id.* at 674 (Kavanaugh, J., concurring) (question was "*where*" review should occur); *J.G.G.*, 147 F.4th at 1083 (Pillard, J.) (Supreme Court vacated TRO "for want of venue"). Proceeding under one species of claim where another is available is not a subject matter infirmity and, not surprisingly, the government has not previously suggested that vacatur was on subject matter grounds. Claims are regularly recharacterized between equity and habeas. *See, e.g.*, *Hill v. McDonough*, 547 U.S. 573, 576 (2006). Given the time pressure (created by the government's obfuscation), the district court quickly decided to dismiss the habeas count believing it had jurisdiction under 28 U.S.C. § 1331 to engage in APA review. Had the government complied with the TRO, the district court could simply have reinstated Plaintiffs' habeas claim and transferred the case to Texas.

Regardless, the Supreme Court has "upheld a criminal contempt citation even on the assumption that the District Court issuing the citation was without jurisdiction over the underlying action." *Willy v. Coastal Corp.*, 503 U.S. 131, 137 (1992). The "concern" is for "the maintenance of orderly procedure, even in the wake of a jurisdiction ruling later found to be mistaken." *Id.* Citing *Willy* and *United States v. United Mine Workers of America*, 330 U.S. 258 (1947), this Court has likewise explained that for criminal contempt "subject-matter jurisdiction over an underlying action is not a precondition of a federal court's authority to sanction those who violate its orders." *In re LeFande*, 919 F.3d 554, 561 (D.C. Cir. 2019). The government does not address *LeFande*.

The rationale for such a rule is especially important where, as here, plaintiffs seek emergency relief to prevent irreparable harm and preserve the court's ability to determine its own jurisdiction and authority. The Supreme Court has been emphatic that a litigant may not seek to eliminate the possibility of subsequent relief by ignoring an order designed to preserve the status quo.

In *United States v. Shipp*, 203 U.S. 563 (1906), for instance, the Court ordered the sheriff to retain custody during the pendency of death penalty litigation. *Id.* at 571-72. Instead, the sheriff caused the lynching of the petitioner via a mob. *Id.* at 572. In rejecting the sheriff's argument that criminal contempt could not lie because appellate jurisdiction was lacking, the Court explained that "it had authority, from

the necessity of the case, to make orders to preserve the existing conditions and the subject of the petition." *Id.* at 573. The Court stressed that contempt would lie "even if the circuit court" and the Supreme Court ultimately "had no jurisdiction." *Id.* The sheriff could not disobey, without consequence, the court's order preserving the status quo for the Judiciary's "gravest and most anxious consideration" of that question. *Id.* at 574.

Similarly, *United Mine Workers* held that the "Court had the power to preserve existing conditions while it was determining its own authority to grant injunctive relief," stressing that a party "by his own act of disobedience" may not render "the courts impotent" to provide relief. 330 U.S. at 290 n.56, 293. So long as the question of subject matter jurisdiction is not "frivolous and not substantial," criminal contempt is available, even if the court might ultimately be found to lack subject matter jurisdiction. *Id.* at 293.

As in *Shipp* and *United Mine Workers*, the government sought to make Plaintiffs' transfer to El Salvador "an accomplished fact." *United Mine Workers*, 330 U.S. at 290. Now, in the related appeal concerning Plaintiffs' right to a hearing, No. 26-5074, the government concedes it violated due process but contends that the district court lacks jurisdiction to provide relief because Plaintiffs have been removed—precisely what the district court anticipated the government would argue if the men were deplaned in El Salvador.

The government does not dispute that *Shipp* and *United Mine Workers* establish that a litigant who ignores an interim order designed to preserve the status quo cannot escape criminal contempt if subject matter jurisdiction is later found lacking. OB.55. Instead, it contends that those cases are inapplicable because here the district court found it *had* jurisdiction. *Id.* That distinction makes little sense, and, not surprisingly, the case on which the government relies, *United States Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72 (1988), does not remotely support the government. *Catholic Conference* involved *civil* contempt. *Id.* at 75. Citing *Shipp* and *United Mine Workers*, the Court explained that the rule is different for "criminal" contempt (and for inherent civil sanctions). *Catholic Conference*, 487 U.S. at 78-79; *see also Willy*, 503 U.S. at 138 (explaining that *Catholic Conference* applied only to civil coercive contempt).

The government's reliance on *Ex parte Fisk*, 113 U.S. 713 (1885), is misplaced. As explained by the Eleventh Circuit in *United States v. Straub*, 508 F.3d 1003, 1009-10 (11th Cir. 2007), and in the Solicitor General's successful opposition to *certiorari* in that case, *Fisk* involved a court order in defiance of a clear-cut statutory prohibition—not a situation where, as here, the court's non-frivolous exercise of jurisdiction was later overturned. Br. for the United States in Opposition, No. 07-1254, *Straub v. United States*, 2008 WL 2961319, *6, *9 (U.S. July 30, 2008) (stating the Eleventh Circuit was "correct" and properly distinguishing *Fisk*: "while

a court is considering its jurisdiction, or is under the mistaken understanding that it has jurisdiction … it may punish those who willfully flout those orders”). Indeed, *United Mine Workers* distinguished *Fisk* on precisely that ground. 330 U.S. at 291.[5]

At bottom, the government contends that it could flout a court order meant to preserve the status quo and the court's jurisdiction; prevent “the possibility of a decision either way” in the litigation through that violation, *Shipp*, 203 U.S. at 573; send Plaintiffs to be brutally tortured; subsequently *concede* that the removal violated due process; and face no possibility of criminal contempt. That extraordinary argument is contrary to settled law and should be squarely rejected.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION AND ACTED CONSISTENTLY WITH THE SEPARATION OF POWERS IN SEEKING TO ASCERTAIN ESSENTIAL FACTS BEFORE DECIDING WHETHER TO ISSUE A RULE 42 NOTICE AND REFERRAL.

Courts' inherent authority and Rule 42 provide the judiciary with the authority—and responsibility—to ascertain “essential facts” before deciding whether to issue a notice and referral for criminal contempt. Fed. R. Crim. P. 42(a).

---

[5] The government cites the wrong section of Wright & Miller. OB.49-50. The correct section addresses situations where, as here, the court issues interim relief to preserve the status quo and its jurisdiction. Citing *Shipp* and *United Mine Workers*, Wright & Miller explains (at § 3537) that orders “must be obeyed until they are set aside, and their violation is punishable as criminal contempt, even if it ultimately is determined that the district court lacked jurisdiction to make the order.”

If the court then chooses to do so, it must state the facts "constituting the charged criminal contempt" as well as the "time and place of the trial." *Id*.

**1.** "[T]he power to punish for contempts is inherent in all courts, has been many times decided and may be regarded as settled law." *Michaelson v. United States ex rel. Chi., St. Paul, Minneapolis & Omaha Ry. Co.*, 266 U.S. 42, 65 (1924); *accord Ex parte Robinson*, 86 U.S. 505, 510 (1873); *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 33-34 (1812).

As the Supreme Court explained in *Young*, it has "long been settled" that the "the initiation of contempt proceedings to punish disobedience to court orders is a part of the judicial function." 481 U.S. at 795-96. *Young* stressed that courts *must* have this power because they "cannot be at the mercy of another Branch in deciding whether such proceedings should be initiated." *Id.* at 796; *see also* DOJ Criminal Resource Manual § 768 (1997) ("in a number of circumstances, involving the disobedience of judicial authority outside the presence of the court, contempt proceedings are initiated sua sponte by the court").

Professors Bamzai and Bray recently surveyed pre- and post-Founding evidence and concluded that "ascertaining and punishing contempt" has historically been part of the judicial power, not an executive function, and that this contempt power is "inherent in the sense of being possessed by default by the federal courts."

Aditya Bamzai & Samuel L. Bray, *Prosecuting Contempt* 51, 53 (Uni. of Chi. L. Sch., Paper No. 2026-42, 2026), https://perma.cc/5C8Z-7EGB.

A necessary corollary to the power to bring contempt charges is the ability to ascertain the information needed to determine whether to initiate a criminal contempt proceeding. *See United States v. Barnett*, 376 U.S. 681, 697 (1964) ("In order that a court may compel obedience to its orders, it must have the right to inquire whether there has been any disobedience thereof."); *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 833-34 (1994) (emphasizing importance of "reliable factfinding" to address contempt); Bamzai & Bray 42 (for "both direct and indirect criminal contempt, the judge may inquire into whether the contempt occurred"); *J.G.G.*, 2025 WL 3198891, at *4 (Millett, J.) ("the district court exercises its most fundamental and inherent authority to obtain non-privileged information necessary to police the integrity of proceedings in its own courtroom"); *id.* at *5 (Pan, J.) (government's action "has a real and detrimental impact on the ability of the judiciary to uphold the law"; explaining that district court undertook "legitimate efforts to investigate an apparent contempt of court").

Courts have long exercised their inherent power to conduct an inquiry to satisfy themselves that initiating a criminal contempt proceeding is warranted. In *Ex parte Merryman*, for instance, a military commander disobeyed a habeas writ issued by Chief Justice Taney, riding circuit. 17 F. Cas. 144, 145-46 (C.C.D. Md. 1861).

The Chief Justice "inquired of the officer" who delivered the return and, after receiving an unsatisfactory answer, issued a writ of attachment requiring the general's presence in court for the contempt. *See id.* at 146-47. As one court contemporaneously explained, the Judiciary possesses a power of "preliminary inquiry to determine whether any proceedings in contempt should be taken," including through a show cause order why an attachment for criminal contempt should not issue. *United States v. Anonymous*, 21 F. 761, 767-68 (C.C.W.D. Tenn. 1884).

At a show cause hearing for an attachment, courts could thus compel potential contemnors or witnesses to appear and answer questions before initiating contempt proceedings. *See, e.g.*, *Foster v. Kansas ex rel. Johnston*, 112 U.S. 201, 204 (1884) (Supreme Court Justice "require[d] [alleged contemnor] to appear … and show cause why he should not be attached for contempt"); *Ex parte Fox*, 236 F. 861, 864 (3d Cir. 1916) (district court "called and examined" potential contemnor); *United States ex rel. Murphy v. Porter*, 27 F. Cas. 599, 601 (C.C.D.C. 1861) (general ordered "to appear before the court and show cause why an attachment for contempt should not issue"); *Fanshawe v. Tracy*, 8 F. Cas. 997, 997 (C.C.N.D. Ill. 1868) ("practice" in district, upon learning of "violation of an order," was to require contemnor to "appear in court and furnish some good reason" why attachment should not issue); *United States v. Burr*, 25 F. Cas. 41, 47 (C.C.D. Va. 1807) (during

hearing contemplating initiation of contempt proceedings, Chief Justice Marshall ruled that "witness was only bound to answer such questions as directly applied to the subject before them").

"[T]he relevant history" accordingly shows that "courts may investigate contempt and do so on their own initiative." Bamzai & Bray 49-50. At times, they would seek the "help of aides" like special masters, but that was not required, and that option is available to the district court here. *Id.* at 50.

Modern courts have continued the practice, ascertaining whether a Rule 42 notice and referral is warranted—including by requiring appearances to testify. *See, e.g.*, *United States v. Stites*, 56 F.3d 1020, 1024 (9th Cir. 1995) (after learning of "unethical, improper, and possibly criminal conduct," court "held a hearing" in which alleged contemnor answered question "evasively"; district court then initiated criminal contempt proceeding); *Farese v. United States*, 209 F.2d 312, 314 (1st Cir. 1954) (district court "conducted a preliminary examination" of two witnesses before initiating criminal contempt proceedings); *United States v. Parker*, 696 F. App'x 443, 446 (11th Cir. 2017) (court held "fact-finding hearing" in which it questioned witnesses and afterwards initiated criminal contempt proceedings); *Ace Motor Acceptance Corp. v. McCoy Motors*, 2019 WL 7000078, at *2 (W.D.N.C. Dec. 20, 2019) (referring criminal contempt "after holding a status conference and two show cause hearings"); *Saul N. v. Lyons*, 2026 WL 555567, at *1-2 (D. Minn. Feb. 26,

2026) (for combined hearing on civil and criminal contempt, ordering U.S. Attorney, assistant U.S. attorney, and ICE representative to appear).

**2.** The district court's order seeking information from Ensign and Reuveni is consistent with this venerable practice and with Rule 42. The government's separation of powers argument is ahistorical and wrong.

The government argues that criminal referral "is required not only for the ultimate prosecution, but also for *any* preceding investigation," because both are Executive Branch functions. OB.30 (emphasis added). But that would force courts to issue blind Rule 42 notices and referrals, perhaps of the wrong people. That cannot be correct, and indeed, Judge Rao acknowledged that a court could "undertake some limited factfinding before making a referral for criminal contempt." Op.18 n.11.

The government seeks support for its position in *Young*'s statement that "referral will … enhance the prospect that investigative activity will be conducted by trained prosecutors pursuant to Justice Department guidelines." OB.30 (quoting *Young*, 481 U.S. at 801-02 (internal quotation marks omitted)). But that statement, ripped wholly out of context, concerned the district court's decision to appoint the *adverse party's lawyer* in the case below as the *prosecutor*; indeed, it came after the Court had already upheld the use of a private prosecutor and explained at length that the contempt power is a "judicial" function that cannot be "at the mercy" of the Executive. *Young*, 481 U.S. at 796.

The government contends that even if a court can take steps to ascertain the essential facts, the district court already has sufficient information to make a referral. OB.33-35, 55-58. But the Executive Branch—especially as the potential contemnor—cannot dictate when the district court must issue a Rule 42 notice and referral, and about whom. The district court certainly need not accept the government's concession that there is probable cause of Noem's willfulness for purposes of a Rule 42 referral or that no one else was involved in willfully violating the order—just as a court need not accept a corporation's bare representation that a single employee was the lone bad actor. Roth's email stating that Bove "advised DHS" that deplaning "was permissible under the law and the court's order," JA.290, *see also* JA.252, indicates that Bove—and possibly also Blanche and Mazzara—gave plainly *unreasonable* advice to Noem. But, among other things, it is unknown whether Noem had independent knowledge of the oral order; consequently, the district court may seek to ascertain whether Noem knew she was defying the injunction.

Moreover, the available information makes it inconceivable that Noem made the extraordinary transfer decision on her own, that she alone devised a plan to obscure from the court that the Proclamation had been signed the day before, that she alone ensured that Ensign would (purportedly) have no information about the impending Saturday night flights when he appeared at the hearing, or that Noem

unilaterally decided to stall until Sunday afternoon to notify the court that the transfers had happened. As the district court noted, the whistleblower disclosure included "significant new information," which "may well help to illuminate officials' decisions … and their mental states." JA.392.

And while Rule 42 does not, in terms, require probable cause, the district court plainly did not abuse its discretion in taking the "prudent" step of seeking probable cause, as many courts do under Rule 42. JA.207 (collecting cases; citing DOJ Criminal Resource Manual § 763). Indeed, a Rule 42 notice is no small step, given that it requires the court to state the grounds of contempt and even when the trial will occur.

The government claims that probable cause does not require investigation into *mens rea*. OB.57. This Circuit has held the opposite: "when specific intent is a required element of the offense," probable cause must be satisfied with respect to that specific intent. *United States v. Christian*, 187 F.3d 663, 667 (D.C. Cir. 1999). Even the Second Circuit case on which the government relies does not say otherwise: it merely held that where there was already probable cause of *mens rea* and other elements for several co-conspirators, the evidence sufficed to search an additional potential co-conspirator's office. *Ganek v. Leibowitz*, 874 F.3d 73, 86 (2d Cir. 2017) (cited at OB.57).

*Bloom v. Illinois*, 391 U.S. 194 (1968), OB.28, likewise does not help the government. The government conspicuously fails to mention that, in *Young*, the Court expressly rejected a separation of powers argument based on *Bloom*. As the Court explained, although *Bloom* held that criminal contempt is a "crime in the ordinary sense" for purposes of the "protections normally provided in criminal proceedings"—and that the accused is therefore entitled to due process—criminal contempt remains *sui generis* because it "serve[s] the limited purpose of vindicating the authority of the court" and thus is not limited to prosecution by the Executive Branch. *Young*, 481 U.S. at 799-800 (affording due process does "not mean that any prosecution of contempt must now be considered an execution of the criminal law in which only the Executive Branch may engage"); *see also* Bamzai & Bray 6-7, 44, 49 (discussing *Young* and *Bloom*).

Nor do the government's other cases support its position. In *In re United States*, 398 F.3d 615, 618 (7th Cir. 2005), OB.30-31, a court ordered one DOJ component to investigate another and "report back ... with its findings," and further requested that an AUSA receive "immunity from prosecution" in exchange for cooperation with the court's investigation. Those extreme actions have no parallel here. In both *United States v. Neal*, 101 F.3d 993 (4th Cir. 1996), and *American Airlines, Inc. v. Allied Pilots Association*, 968 F.2d 523 (5th Cir. 1992), OB.31-32,

the district courts *convicted* alleged contemnors without a Rule 42 referral, thereby "assuming the role of a prosecutor," *Neal*, 101 F.3d at 998.

The government additionally seeks support in Rule 42 itself, claiming the Rule requires courts to refer the matter to a prosecutor to ascertain the essential facts *prior* to issuing a notice, and not just for prosecution after issuance of the notice. *See* OB.33, 38. But the Rule's structure provides for referral, Fed. R. Crim P. 42(a)(2), *after* the court first issues a "notice" that sets forth the "essential facts" and the "time and place" of trial, *id.* 42(a)(1). And even if Rule 42 could be construed to *permit* courts to seek assistance from a prosecutor prior to that, nothing requires it. *See* Bamzai & Bray 5-6, 49-50.

In short, courts must be able to ascertain the facts before making a referral. Rule 42 says as much, requiring the court to "state the essential facts" before issuing a notice and referral.[6]

---

[6] The government says that although a judicial investigation for "civil contempt" is permissible, "all agreed" it is unavailable here. OB.13 n.10. But there are distinct types of civil sanctions. Even if civil *coercive* contempt may be unavailable, the district court plainly may pursue other inherent civil sanctions, which may be appropriate in this case as they can be imposed for bad faith attempts to evade court orders and processes. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-46 (1991) (stressing that party cannot engage in what amounts to "fraud … upon the court"). Judge Williams recently imposed such sanctions against federal officials. *Trump v. IRS*, 2026 WL 2015525 (S.D. Fla. July 13, 2026).

Notably, civil remedies are even available in so-called "race-against-the-law" cases where a party intentionally seeks to thwart a court's jurisdiction by making the subject of an impending hearing unavailable *before* the court can order relief, precisely what the government attempted here. *See Jones v. SEC*, 298 U.S. 1, 15-19

## IV. REUVENI AND ENSIGN HAVE RELEVANT NON-PRIVILEGED INFORMATION.

**1.** The government's claim that the attorney-client privilege categorically and preemptively bars testimony by Ensign and Reuveni—before a single question has been asked—is wrong. OB.60. The district court was correct to refrain from resolving privilege questions in the abstract. JA.393 ("Government will be free to object to particular questions"); *see also, e.g.*, *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) ("blanket assertion[s] of the privilege will not suffice"); *LeFande*, 919 F.3d at 563 ("correct process" is to "take the stand").[7]

Reuveni and Ensign plainly have knowledge of unprivileged, relevant facts. While this Court need not guess what questions might arise (especially when, on remand, the district court could choose to start by requesting further targeted affidavits), Reuveni and Ensign can shed light on key pieces of the puzzle.

Most obviously, they can testify about information that would ordinarily appear in privilege logs and historical facts lying outside the privilege, including who was involved in written communications, meetings, and discussions; when they occurred; and what actions the government took as a result. Here, those unprivileged

---

(1936); Samuel Bray, *When Does the Contempt Clock Begin to Run?*, Divided Argument (Jan. 16, 2026), https://perma.cc/6VF7-EVAE.

[7] The government's reliance on *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754 (D.C. Cir. 2014), is misplaced because that case involved a *specific* production order, only after in camera review—not a preemptive blanket privilege assertion.

matters include who attended the March 14 Bove meeting and who spoke; the identities of the twenty-three officials monitoring the hearing on the AEA "case updates" thread; when Ensign and Reuveni learned the Proclamation had been signed; who was involved in the decisions to send the planes during the TRO hearing, to halt the planes in Honduras, and to send the planes on to El Salvador; who besides Noem was involved in the transfer decision; who they spoke with before the hearing and during the recess; who Reuveni spoke with before telling the court a weekend hearing was "premature"; whether Bove, Blanche, Mazzara, and/or Noem listened to the hearing and, if not, whether Ensign provided the oral directive verbatim to higher-ups; and numerous other questions. The government's suggestion that the district court's focus must be solely on Noem because the government chose to inculpate her is simply wrong. Indeed, the district court has already noted its concern with "government counsel's conduct and veracity to the Court." JA.257:1-5.

The court can also ask Ensign and Reuveni other essential questions to determine whether DOJ or DHS officials knowingly misled or lied to the court, including whether Ensign and Reuveni knew that planes would depart that weekend and how; whether they learned during the hearing recess that planes had taken off; and whether they learned after the recess, but before the hearing concluded, that planes had in fact departed. Importantly, Ensign already answered questions on this topic during the March 21 hearing without claiming privilege. *See* JA.161:6-17

(Ensign claiming he "didn't have any information from the government as to the status of [the planes]" during the TRO hearing). But Reuveni's contemporaneous messages cast serious doubt on Ensign's answers. JA.303-04. The court can ascertain, through questioning, who was likely responsible for withholding crucial, time-sensitive facts from the district court as it rushed to preserve its jurisdiction.

In addition, the privilege protects only confidential attorney-client communications for the purpose of securing legal advice. *In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984); *e.g.*, JA.392-93 (district court noting privilege may not apply to DOJ discussions of "a policy (rather than legal advice)"). The government has repeatedly claimed that Ensign and Reuveni were not "involved in the discussions about what legal advice to provide" and that neither "provided legal advice to the Secretary." OB.59-60; *see also* JA.385-86 ¶¶ 3-5 (Ensign asserting he "did not provide any legal advice to DHS regarding what the TRO required or what actions might be consistent with it before the decision was made"); ECF 198 at 2 n.1 ("Ensign was not involved in the decision at issue other than through relaying what this Court said on the record and in its written order to DHS and DOJ leadership."). Their communications concerning the district court's TRO are therefore nonprivileged. Op.97-98 (Childs, J.). The government cannot have it both ways by trying to claim the line attorneys' understanding of the TRO was irrelevant but then invoking privilege to keep them from testifying.

**2.** Finally, privilege here has been waived and in any event is overcome by the crime-fraud exception and the government's special duty of candor. JA.393 (district court noting "numerous reasons why the privilege might well not apply").

**a. Waiver**

This Court recognizes both express and implied waiver. Implied waiver occurs where a party "place[s] otherwise privileged matters in controversy" or selectively invokes privileged advice for litigation advantage. *Ideal Elec. Sec. Co. v. Int'l Fidelity Ins. Co.*, 129 F.3d 143, 151 (D.C. Cir. 1997). Courts find implied waiver where a party puts its good faith at issue. *United States v. Bilzerian*, 926 F.2d 1285, 1291-92, 1294 (2d Cir. 1991) (if defendant "asserted his good faith," waiver doctrine would permit exploration of his "conversations with counsel"); *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1419 (11th Cir. 1994) (by "assert[ing] good faith" defense, defendant "injected the issue of its knowledge of the law into the case and thereby waived" privilege). That is precisely what the government has done here.

From the moment the government violated the TRO, it has defended its actions as in "good faith" and "consistent" with a "reasonable interpretation of the Court's order." JA.331 ¶ 4; ECF 25 at 22:12-15. Government counsel has argued that further inquiry was unnecessary because "we did comply with the Court's written order and did rely in good faith on it," offering to "walk [the district court]

through the reasons why." ECF 25 at 14:23-15:1; ECF 58 at 7 (assertion about what "the Government could reasonably have understood" about the order); JA.327 (assertion that "high-level officials believed the TRO did not apply"); JA.330 (assertion that government's "interpretation of the Court's order is correct" and "at minimum … reasonable"). Noem also subsequently stated that "before" her decision she received "privileged legal advice"—a wholly unnecessary fact to include unless the government considered it relevant to the contempt inquiry. JA.378. The government may not cloak Noem's decision in the veneer of good-faith reliance on counsel while refusing to allow the court to inquire into the content of that legal advice. *Bilzerian*, 926 F.2d at 1292 ("attorney-client privilege cannot at once be used as a shield and a sword"). The government's attempt to have it both ways is exactly what the implied waiver doctrine forbids.[8]

*United States v. Exxon Corporation*, 94 F.R.D. 246 (D.D.C. 1981), is instructive. Exxon argued that it acted in good-faith reliance on the government's regulations and representations—which amounted to waiver, because Exxon "voluntarily injected" its "state of mind" into the litigation. *Id.* at 248-49 (waiver

---

[8] The government suggests that it could put advice of counsel at issue *only* as an "affirmative defense" in subsequent proceedings, OB.62, but there is no such rule, and its own case is to the contrary, *Kendig v. Stolar*, 173 F.4th 466, 475 (3d Cir. 2026). Affirmative defenses are relevant to probable cause where the defense would "negate[] the requisite mental state," and particularly relevant here where willfulness is at issue. *Id.*

when party "makes his intent and knowledge of the law relevant"). Because Exxon's internal communications would "reveal whether Exxon honestly believed that it acted in good faith," *id.* at 247, the company waived privilege over communications "where Exxon's interpretation of" the law "was established" and "where Exxon expressed its intentions regarding compliance with" that law, *id.* at 249. Here, as in *Exxon*, the government's "interpretation of" the TRO and "intentions regarding compliance" are central to its claim of good faith. *See id.* at 248-49 (collecting additional cases).

The government has also waived privilege by citing its own allegedly privileged communications. *See, e.g.*, *In re United Shore Fin. Serv.*, 2018 WL 2283893, at *1-2 (6th Cir. Jan. 3, 2018) (denying mandamus; petitioner waived privilege "by citing to … conclusions" of "attorney-client communications"). The government has relied on an email disclosed by Reuveni, in which Roth stated that Bove "advised DHS" that "the deplaning of the flights … was permissible under the law and the court's order." JA.290. In briefing, the government waived privilege by relying on this email to argue "that high-level officials *believed* the TRO did not apply once a flight was outside the United States." JA.327 (emphasis added).

Finally, the government has waived privilege through selective representations by Ensign at the TRO hearing, where he provided a partial presentation of what he had discussed with his clients. *See, e.g.*, JA.112:8-12 (stating,

after the recess, that clients "let me know the sort of operational details" but "unfortunately" he did not "have many details to share"); JA.113:7-8 ("I am still trying to get additional details."). This "selective disclosure" of client communications "for tactical purposes waives the privilege." *Sealed Case*, 676 F.2d at 818.

**b. Crime-Fraud Exception and Special Duty of Government Attorneys**

"[P]rivilege takes flight" where the attorney-client relationship is abused, *Clark v. United States*, 289 U.S. 1, 15 (1933), and does not protect communications "made in furtherance of a crime, fraud, or other misconduct," *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985). The showing is made where there is evidence "that if believed by the trier of fact would establish the elements of an ongoing or imminent crime or fraud." *Id.*; *In re Sealed Case*, 107 F.3d 46, 50 (D.C. Cir. 1997).

The government says there is no need to probe whether Noem acted willfully because it has conceded that, for purposes of a Rule 42 notice, the court can assume she committed criminal contempt. OB.24, 57-58. That concession, limited to Noem, does not circumscribe the court's authority. Indeed, it makes the court's further inquiry all the more justified.

In the public record alone, there is ample evidence to allow the district court to inquire further about the exception's applicability, including through in camera review if necessary. At minimum, the record readily satisfies the modest threshold

for such review. *See, e.g.*, *United States v. Zolin*, 491 U.S. 554, 572 (1989) (requiring only "a factual basis adequate to support a good faith belief by a reasonable person" that review "may reveal evidence to establish ... crime-fraud"); *Sealed Case*, 754 F.2d at 398 (affirming in camera review to address crime-fraud exception); *Drummond Co, Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1333 (11th Cir. 2018) (same).

This Court has also emphasized that because of their special duty to the public, "[w]hen *government* attorneys learn, through communications with their clients, of information related to criminal misconduct, they may not rely on the governmental attorney-client privilege to shield such information from disclosure." *Lindsey*, 158 F.3d at 1278 (emphasis added); *see In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 921 (8th Cir. 1997).[9]

In short, the district court correctly declined to preemptively resolve privilege issues in the abstract. The court certainly did not transgress a clear line warranting mandamus.

* * *

[9] Other similar exceptions may also apply. *See Rosen v. NLRB*, 735 F.2d 564, 576-77 (D.C. Cir. 1984) (testifying attorneys may disclose information to respond to charges of their *own* misconduct).

It has been almost a year and a half since the government sent Plaintiffs to a brutal Salvadoran prison. Whatever else this Court decides, it should definitively hold that the district court's order was clear and unambiguous and that criminal contempt is not barred as a matter of law.

## CONCLUSION

The Court should deny the petition.

Date: August 21, 2026

Respectfully submitted,


/s/ *Lee Gelernt*
Lee Gelernt
*Counsel of Record*
Daniel Galindo
Kathryn Huddleston
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Sean M. Lau
Omar Jadwat
Hina Shamsi
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org

Evelyn R. Danforth-Scott
Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770

Arthur B. Spitzer
Scott Michelman
Aditi Shah
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 420
Washington, D.C. 20045
(202) 457-0800

*Counsel for Respondents*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,940 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced and easy-to-read typeface using Microsoft Word in 14-point size font.

/s/ *Lee Gelernt*
Lee Gelernt
August 21, 2026
*Counsel for Respondents*

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2026, I electronically filed the foregoing Brief with the Clerk for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. A true and correct copy of this brief has been served via email on counsel of record.

/s/ *Lee Gelernt*
Lee Gelernt
August 21, 2026
*Counsel for Respondents*