**Case No. 25-5452**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

In re DONALD J. TRUMP, in his official capacity, et al.,

Petitioners.

On Petition for a Writ of Mandamus
to the United States District Court for the District of Columbia
Case No: 1:25-cv-766-JEB

# BRIEF OF BIPARTISAN FORMER DEPARTMENT OF JUSTICE OFFICIALS AS *AMICI CURIAE* IN SUPPORT OF RESPONDENTS


Carey R. Dunne
Mark Pomerantz
Mónica Folch
Stephen Cha-Kim
Zack Goldberg
Martha Reiser
FREE AND FAIR LITIGATION GROUP, INC.
266 West 37th Street, 20th Floor
New York, NY 10018
Telephone: (646) 434-8604

Joseph T. Baio
JOSEPH T. BAIO LLC
240 Centre Street
New York, NY 10013
Telephone: (914) 523-2255

## TABLE OF CONTENTS

STATEMENT OF INTEREST AND INTRODUCTION .......................................1

ARGUMENT .....................................................................................................4

I. A Court's Ability to Examine Statements and Conduct By DOJ Attorneys Is Essential to Ensuring that Such Attorneys Meet Their Heightened Duty of Candor .....................................................................4

II. The Public Record in this Case Raises Serious and Unanswered Questions About Statements and Actions By DOJ Attorneys, Warranting the District Court's Further Factfinding .......................................8

A. The Government's Knowledge and Representations About the Planned Flights..........................................................................................9

B. The Government's Own Understanding of the District Court's Directions ..........................................................................................12

C. The Government's Failure to Provide Ex Post Answers to the Court's Requests For Explanation ..........................................................15

CONCLUSION ..............................................................................................17

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Berger v. United States*,
295 U.S. 78 (1935) .......... 4, 5

*Fusari v. Steinberg*,
419 U.S. 379 (1975) .......... 6

*In re Lindsey*,
158 F.3d 1263 (D.C. Cir. 1998) .......... 5

*Tiverton Board of License Commissioners v. Pastore*,
469 U.S. 238 (1985) .......... 6

*United States v. Brock*,
94 F.4th 39 (D.C. Cir. 2024) .......... 7

*United States v. Bruce*,
89 F.3d 886 (D.C. Cir. 1996) .......... 6

*United States v. Nejad,*
487 F. Supp. 3d 206 (S.D.N.Y. 2020) .......... 7

*United States v. Shaffer Equip. Co.*,
11 F.3d 450 (4th Cir. 1993) .......... 12

**Statutes:**

18 U.S.C. § 401 .......... 7

**Rules:**

D.C. Cir. Rule 29(d) .......... 1

Fed. R. Crim. P. 42 .......... 7

**Other Authorities:**

ABA Prosecution Standards, Standard 3-1.4(a) ........ 5

D.C. Rules of Professional Conduct, Rule 3.3(a)(1) ........ 6

D.C. Rules of Professional Conduct, Rule 3.3(a)(2) ........ 6

Justice Manual § 1-4.010 ........ 6

## STATEMENT OF INTEREST AND INTRODUCTION

Amici are former high-level Department of Justice ("DOJ" or "the Department") officials who served during Republican and Democratic administrations[1]:

- **Donald B. Ayer**, Deputy Attorney General (1989-1990); Principal Deputy Solicitor General (1986-1988); United States Attorney for the Eastern District of California (1982-1986); Assistant United States Attorney for the Northern District of California (1977-1979)

- **Deirdre M. Daly**, United States Attorney for the District of Connecticut (2013-2017); First Assistant United States Attorney for the District of Connecticut (2010-2013); Assistant United States Attorney for the Southern District of New York (1985-1997)

- **Murray Dickman**, Primary Assistant to the United States Attorney General (1988-1991)

- **Robert J. Cleary**, United States Attorney for the District of New Jersey (1999-2002); Acting United States Attorney for the Southern District of Illinois (2002-2002) First Assistant United States Attorney for the District of New Jersey (1994-1999); Assistant United States Attorney for the Southern District of New York (1987-1994); Trial Attorney, Tax Division, U.S. Department of Justice (1984–1986)

- **John Giraudo**, Attorney Advisor in the Department of Justice Office of Legal Counsel (1986-1989)

[1] No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparation or submission of this brief. All parties consented to the filing of this brief. Pursuant to D.C. Circuit Rule 29(d), amici certify that this separate amicus brief is necessary because amici, as a group of bipartisan former Justice Department officials, provide a unique perspective regarding government attorneys' duty of candor and the need for judicial oversight over the conduct of government attorneys to uphold the public's faith in the fair administration of justice.

- **Harry Litman**, United States Attorney for the Western District of Pennsylvania (1998-2001); Special Assistant United States Attorney for the Eastern District of Virginia (1996–1998); Deputy Assistant Attorney General (1993–1996); Assistant United States Attorney for the Northern District of California (1990–1993)

- **Hon. J. Michael Luttig (Ret.)**, Assistant Attorney General for the Office of Legal Counsel and Counselor to the Attorney General (1990-1991); Principal Deputy Assistant Attorney General, Office of Legal Counsel (1989–1990).

- **Hon. John S. Martin Jr**. **(Ret.)**, United States Attorney for the Southern District of New York (1980-1983); Assistant to the Solicitor General of the United States (1967–1969); Assistant United States Attorney for the Southern District of New York (1962-1966);

- **John McKay**, United States Attorney for the Western District of Washington (2001-2007)

- **Robert Shanks**, United States Deputy Assistant Attorney General for the Office of Legal Counsel (1981-1984)

- **Stanley Twardy**, United States Attorney for the District of Connecticut (1985-1991)

- **Bill Weld**, United States Assistant Attorney General for the Criminal Division (1986-1988); United States Attorney for the District of Massachusetts (1981-1986)

Collectively, amici have many decades of experience supervising DOJ lawyers in criminal and civil investigations and representing the Department at all levels of the federal courts. Amici well understand the importance of candor on the part of all attorneys, especially those who represent the United States. Government lawyers occupy a unique place in our system of justice: they advocate not for any

ordinary litigant, but for the sovereign. They seek to zealously promote their clients' interests but also have an obligation to pursue justice and to reinforce the rule of law that is central to the government's legitimacy.

Amici and their colleagues over the years have preserved and enforced this heightened duty of candor through training, supervision, and, where necessary, discipline of attorneys at all levels of the Department. History teaches that the DOJ has long respected its obligations of forthrightness and expected absolute candor by its attorneys. But history also teaches that, on rare occasions, there is a critical need to police that duty through independent means, including through the power of the courts to investigate and initiate contempt proceedings. This is especially true when senior DOJ officials may themselves have been involved in possible misconduct, potentially undermining the nation's confidence in the integrity of the Department. In such rare cases, it is essential that the courts exercise their independent authority to review the conduct of DOJ attorneys. Where necessary, an appropriately focused factual inquiry by a district court does not constitute an unwarranted intrusion by the Judiciary into the affairs of the Executive. To the contrary, such an inquiry can permit the court to vindicate its authority, independence and integrity, and thus maintain the necessary balance of power between co-equal branches. Just as crucially, judicial oversight of the conduct of DOJ lawyers in such cases is necessary

to uphold the public's faith in the fair administration of justice in the many disputes of enormous importance in which the government is a litigant.

Amici do not argue that any government officials involved in this case have committed criminal contempt. The facts have yet to be established. However, amici submit that the extremely unusual and high-profile circumstances of the proceedings and the allegations in the public record raise serious questions about the Department's statements to the district court and the government's responses to the court's directives. Given these unanswered questions, amici submit that the district court should be allowed to continue to pursue an appropriately limited fact-finding review to lift the cloud of uncertainty surrounding the actions of the government: a cloud that may cause long-term damage to the Department and to the public's confidence in the Judiciary if the district court's effort to determine the facts remains prematurely concluded.

## ARGUMENT

### I. A Court's Ability to Examine Statements and Conduct By DOJ Attorneys Is Essential to Ensuring that Such Attorneys Meet Their Heightened Duty of Candor

Our justice system depends upon the honesty of litigants and their scrupulous adherence to judicial orders and decrees. As all attorneys know, their duty of candor is essential for our common law, adversarial system to function. For government attorneys, that duty is of unique and paramount importance.

In *Berger v. United States*, the Supreme Court famously explained that, unlike any other litigant in court, the government's overriding directive when it is a party to litigation "is not that it shall win a case, but that justice shall be done." 295 U.S. 78, 88 (1935). Because DOJ attorneys act on behalf of a government elected by and for the people, they are "representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Id*. As a result, government lawyers understand that courts look to them in particular to be meticulously forthright and complete in their representations and compliance with court orders, even (and especially) amid the most heated and fast-moving cases. *See also generally* ABA Prosecution Standards, Standard 3-1.4(a) ("In light of the prosecutor's public responsibilities, broad authority and discretion, the prosecutor has a heightened duty of candor to the courts and in fulfilling other professional obligations."). As this Court has reaffirmed, "[u]nlike a private practitioner, the loyalties of a government lawyer therefore cannot and must not lie solely with his or her client agency." *In re Lindsey*, 158 F.3d 1263, 1272 (D.C. Cir. 1998) ("With respect to investigations of federal criminal offenses, and especially offenses committed by those in government, government attorneys stand in a far different position from members of the private bar.").

In amici's long experience, DOJ lawyers for many decades have recognized and accepted this heightened duty to speak candidly and truthfully in court and to ensure that

they and other officials obey judicial directives. It is an integral aspect of the training provided to every attorney who joins the Department, and it is a responsibility entrusted to supervisors at all levels of seniority. Proper supervision ensures that corrective measures are taken when necessary, such as promptly updating the court and correcting misstatements that have been made (even unknowingly) to a tribunal. *See Tiverton Board of License Commissioners v. Pastore*, 469 U.S. 238, 240 (1985) (counsel has "a 'continuing duty to inform the Court of any development which may conceivably affect the outcome' of the litigation") (quoting *Fusari v. Steinberg*, 419 U.S. 379, 391 (1975) (Burger, C.J. concurring)); *see also* D.C. Rules of Professional Conduct, Rule 3.3(a)(1) ("Candor Toward the Tribunal") ("A lawyer shall not knowingly . . . make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer[.]"). This responsibility can be paramount even where compliance could risk disclosure of confidential client information. *See id.*, Rule 3.3(a)(2) (lawyer may not knowingly "[c]ounsel or assist a client to engage in conduct that the lawyer knows is criminal or fraudulent"); *see also United States v. Bruce*, 89 F.3d 886, 894 (D.C. Cir. 1996) (describing due consideration attorney must give to duty of candor against client confidentiality). Proper supervision also includes candid acknowledgment and reporting of relevant violations, and appropriate disciplinary measures where required. *See* Justice Manual §§ 1-4.010 *et seq.* (requiring attorneys to comply with rules of professional conduct and outlining

procedures for reporting, reviewing, and responding to allegations of misconduct). In amici's experience, DOJ in the past has met these obligations with integrity and has thus earned the well-established presumption of regularity that is typically accorded to the conduct of DOJ lawyers before the courts.

But in amici's experience, DOJ lawyers have also historically recognized that the presumption of regularity is only a presumption, and that courts are entitled to appropriately scrutinize the representations and conduct of DOJ attorneys in the few cases where a reasonable basis exists to question whether these obligations have not been met. Such a review, when conducted by a court, is not an improper intrusion into the function of the Executive Branch; instead, court-initiated fact-finding is a pivotal feature of our constitutional order of checks and balances, and a process that DOJ has historically embraced in cases that have merited such inquiry. *See, e.g.*, *United States v. Nejad,* 487 F. Supp. 3d 206, 226 (S.D.N.Y. 2020) (ordering further factfinding from cooperative DOJ related to government's apparent lack of candor related to belated disclosure of records).

Indeed, a district court has not only the inherent authority to oversee the conduct of DOJ attorneys as well as the availability of Federal Rule of Criminal Procedure 42, but the statutory authority as well. Under 18 U.S.C. § 401, district courts are given the power to punish "contempt of its authority." This statute covers disobedience of court orders but also embraces "misbehavior of any person" before

the court that "obstruct[s] the administration of justice." *See United States v. Brock*, 94 F.4th 39, 53 (D.C. Cir. 2024) (noting § 401(1) covers any intentional "act that . . . interrupt[s] the orderly process of the administration of justice, or thwart[s] the judicial process") (surveying sister circuits).

As discussed below, the public record in this case raises reasonable questions as to whether the government may have engaged in such misconduct. Yet, absent the ability of the district court to conduct an appropriate factual inquiry, it appears these questions will never be answered. In amici's view, this would be a grave mistake, especially given the involvement of senior government officials in the litigation, and the high-profile nature of the matter. Such a lack of accountability could cause lasting harm to the integrity of DOJ, as well as to the public's confidence in the ability of the Judiciary to preserve the rule of law, at least in matters in which the government is a party.

## II. The Public Record in this Case Raises Serious and Unanswered Questions About Statements and Actions By DOJ Attorneys, Warranting the District Court's Further Factfinding

Consistent with the above, amici submit that there are three specific and limited areas of inquiry that need to be addressed by the district court if accountability is to be appropriately maintained. All are well within the inherent and statutory authority of the court to inquire into the conduct of attorneys and litigants before it. For the reasons discussed below, the district court should be permitted to request relevant evidence on these targeted topics. They are:

- Representations made by government attorneys to the district court about planned flight departures, and whether such representations reflected any misstatements or deceit;
- The government's understanding of the court's oral and written orders, and whether actions by government representatives were inconsistent with the government's own understanding of its obligations; and
- The government's response to the court's subsequent requests for explanations about the flight departures and disembarkations, and whether that response reflected any improper attempt to avoid providing the requested information.

Each of these categories of questions is briefly discussed below.

### A. The Government's Knowledge and Representations About the Planned Flights

The opinion of the panel majority focuses on the district court's written TRO, and whether it was sufficiently clear to warrant a finding that the government disobeyed it. But in amici's view this focus should not obscure other significant factual issues related to the proceedings that took place before the district court on March 15, 2025. A central question remains whether any attorneys at DOJ, the Department of Homeland Security ("DHS"), or any other agency intentionally withheld information from the court *or their own colleagues* that they knew the court had asked the government to provide.

Heading into and during the 5:00 p.m. hearing, there could have been no doubt among those participating that the district court's intention was to determine whether there were any removal flights imminently planned (or in progress)—information which the court could only obtain from DOJ attorneys. Indeed, the court had already issued relief that morning forestalling such flights as to the named plaintiffs. The government confirmed that this order had been disseminated to relevant agencies that morning; since DHS complied with the order, and took steps to ensure that the named plaintiffs would not be removed from the country, it is apparent that DOJ and DHS were necessarily conferring about the proceedings taking place before the court that day.

Based on their experience, amici can attest that line and supervisory DOJ attorneys should and would have met and prepared for these proceedings by fully discussing with their client agency, DHS, the circumstances surrounding DHS's imminent removal flights. Nonetheless, at the hearing, DOJ counsel stated he lacked any information about imminent flights but would investigate with his clients. Following an adjournment that was granted solely for that purpose, the same lawyer represented shortly after 6:00 p.m. that he still was unaware of any such flights. Yet it is now undisputed that two DHS removal flights took off (at 5:25 p.m. and 5:45 p.m.).

In the experience of amici, this sequence of events is extremely disconcerting and warrants further inquiry. The district court was plainly considering the entry of a restraining order addressing removal flights as to the proposed class. The

government knew that court proceedings relating to these flights were taking place. Yet, flights took off as the district court was waiting for information and considering what order to enter. This undisputed record raises several factual questions as to which the district court had the right to inquire:

- Was the DOJ attorney who disclaimed knowledge about departing flights speaking truthfully and in good faith to the court?
- What efforts did the attorney make to obtain information about the flights from his client, as he was required by the court to do?
- Were there others in the government who were advised of the court's directive and who were aware of the departing flights prior to the DOJ attorney's response to the court?
- Did any such government actors avoid providing information to DOJ attorneys or the court as a means to ensure that removal flights would take off or land, despite knowing that there was a pending request from the court for such information?

Again, these questions go beyond the narrow issue of the government's adherence to the language of the final written TRO. They focus on a related but different issue: whether government lawyers and officials were withholding information from the court that they knew to be time sensitive and directly material to a contemplated order about to be issued. For the reasons discussed above, such an effort by any private

attorney would be a clear violation of the duty of candor such an attorney owes to a court. Coming from a senior DOJ official, amici submit that it would be a breach of historic significance. *See, e.g, United States v. Shaffer Equip. Co.*, 11 F.3d 450, 461 (4th Cir. 1993) (holding client agency employee's misrepresentation of material information was basis to make finding of fraud and finding DOJ lawyers "overstepped bounds of zealous advocacy" and violated duty of candor by failing to take curative steps and obstructing efforts to reveal perjury).

### B. The Government's Own Understanding of the District Court's Directions

In amici's experience, DOJ lawyers have historically understood that scrupulous, good-faith compliance with a judicial order is an unquestioned requirement. Government lawyers are obliged to obey the letter and spirit of court orders, whether they are issued orally or in written form. This includes an obligation to seek clarification where the intent of an order is unclear prior to any government action that may be relevant to the court's directive. In this respect, DOJ attorneys have traditionally been trained and expected to err on the side of caution and maintain the status quo to avoid even inadvertently countermanding a judicial directive. This principle is of utmost importance in litigation involving liberty interests and constitutional rights.

Here, the district court directly ordered DOJ counsel to "inform your clients . . . immediately" that if class members were on a plane "that is going to take off or is in the air, . . . those people need to be returned to the United States," whether by

"turning around a plane or not [dis]embarking anyone on the plane" or any other step taken at DHS's discretion. JA.140. Counsel for DOJ did not question any aspect of this directive, which the court declared was "something that you need to make sure is complied with immediately." *Id*.

In this circumstance, and independent of the question of whether DOJ counsel at the hearing was aware of the status of any pending flights, the government lawyers were required to take immediate action as soon as the hearing ended to ensure that their client agencies were abiding by the court's order, at least as the lawyers understood it. Most importantly, this would have included taking all reasonable steps to determine if any planes still within the government's control might need to be turned around and class members not disembarked.

Again, this record raises several basic questions about the government's actions following the court's orders, and whether those actions intentionally violated what the government itself believed to be its obligations:

- What actions did DOJ and other government representatives take in the wake of the court's directives at the hearing, and in the wake of the court's subsequent written order? Did government representatives conclude in good faith that the combined directives permitted them to allow planes to depart and to continue to their final destinations and later to disembark class members? Alternatively, did

the government allow such actions to proceed notwithstanding a contrary understanding?

- Was there any discussion of whether to seek clarification from the court if any government attorneys believed the court's directives to be unclear? Why was such a clarification not sought?

Importantly, and contrary to the analysis advanced by the panel majority, the question is not only how the court's written TRO on its face could objectively be understood by the government's attorneys in isolation, but also how the DOJ and other government representatives who were on the receiving end of those directives actually understood and responded to the court's orders.

It is true that the district court noted that DOJ counsel did not have to "write down" all of his instructions because the written TRO would follow. But in amici's experience, no reasonable DOJ lawyer would have understood such a statement to mean that a party was free to simply disregard otherwise clear and discrete oral directions while awaiting a written order memorializing the same (or that the memorialization to follow would entirely supersede unambiguous commands already issued on the record). Certainly not so in response to an order to act "immediately" with respect to real-time developments *uniquely within the government's control and knowledge*. At minimum, such facts would suggest to any reasonable DOJ lawyer a need to seek clarification.

On the one hand, information relevant to the district court's inquiry could demonstrate that the DOJ and other government representatives indeed understood the TRO as written to not apply to the planes in the air given their locations and status. On the other hand, such information might reflect a decision by government actors to keep the DOJ lawyers in the dark about the status of the planes, or (worse) reveal a government decision to deliberately ignore the court's directives, regardless of how those directives were interpreted by the attorneys involved. At this point, the answers to these important questions are unknown, as the facts have not been found by the district court. Again, in amici's view, continued speculation and uncertainty about these important events would do a lasting disservice to the DOJ and the public's confidence in the courts.

### C. The Government's Failure to Provide Ex Post Answers to the Court's Requests For Explanation

Given the sequence of events discussed *supra*, it is not surprising, in amici's view, that the district court immediately sought explanations from DOJ about the events at issue in this case. What is surprising, however, is DOJ's subsequent response to the court's request for information, which, in amici's view, appears inconsistent both with the Department's longstanding commitment to transparency and candor, and with the settled principle that the Department bears an obligation to investigate and report to a court whenever reasonable questions arise concerning the Department's conduct and institutional integrity.

Faced with the circumstances here, the following are additional important issues that district court should be allowed to probe:

- In the wake of the district court's request for information about the events following the court's oral and written orders, what actions did DOJ attorneys and other government representatives take to provide such explanations or otherwise respond to the court's request? Did any such actions reflect an intention to avoid providing such explanations, or to mislead the court in any fashion? Alternatively, was a good faith decision reached that the government's responses were in compliance with the court's requests?
- What internal steps were taken by DOJ attorneys or others to assemble the facts and chronology in response to the court's inquiry? What attorneys and officials at DOJ and other agencies were included in that process?

At bottom, it appears from the public record that DOJ has not provided explanations for the statements made by the DOJ attorney to the court about departing flights, or explanations of how the DOJ and DHS became comfortable that the decision to allow flight plans and disembarkation to continue would not violate the court's directives. Again, it may be that, upon further inquiry, the facts bear out that the DOJ and government representatives acted in good faith. But the record as it stands raises

more questions than it answers, which, in amici's view, requires further factfinding by the district court.

## CONCLUSION

Given the enormous implications both in this matter as well as in the many other cases in which the Executive appears as litigant, amici respectfully submit that the district court's fact-finding inquiry should be allowed to proceed.

DATED: August 28, 2026

*/s/ Carey R. Dunne*

Carey R. Dunne
Mark Pomerantz
Mónica Folch
Stephen Cha-Kim
Zack Goldberg
Martha Reiser
FREE AND FAIR LITIGATION GROUP, INC.
266 W. 37th St., 20th Floor
New York, NY 10018
Telephone: (646) 434-8604

Joseph T. Baio
JOSEPH T. BAIO LLC
240 Centre Street
New York, NY 10013
Telephone: (914) 523-2255

*Counsel for Bipartisan Former Department of Justice Officials*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface and type-volume requirements of Federal Rule of Appellate Procedure 32 and Circuit Rule 32. The brief contains 3,924 words and was prepared with 14-point proportionally spaced serif typeface using Microsoft Word.

DATED: August 28, 2026

*<u>/s/ Carey R. Dunne</u>*
Carey R. Dunne

## CERTIFICATE OF SERVICE

I, Carey R. Dunne, certify that on August 28, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

DATED: August 28, 2026

*/s/ Carey R. Dunne*
Carey R. Dunne