**EN BANC ARGUMENT SCHEDULED SEPTEMBER 29, 2026**

**No. 25-5452**

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

In re DONALD J. TRUMP, in his official capacity, et al.,
*Petitioners.*

On Petition for a Writ of Mandamus to the United States District Court for the District of Columbia, No. 1:25-cv-766-JEB
Before the Honorable James E. Boasberg

**BRIEF FOR *AMICI CURIAE* LEGAL ETHICS SCHOLARS IN SUPPORT OF PLAINTIFFS-RESPONDENTS**

DANIEL SCHUBERT
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(202) 663-6000

MARK C. FLEMING
MADELEINE C. LAUPHEIMER
CARRIE N. PATTERSON
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

DELPHERT C. SMITH III
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue
Los Angeles, CA 90071
(213) 443-5300

August 28, 2026

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *Amici Curiae* Legal Ethics Scholars certify as follows:

**A. Parties And *Amici*.** Except for *Amici Curiae* Legal Ethics Scholars, all parties and *Amici* appearing in the district court and before this Court are listed in the En Banc Opening Brief for the Petitioners.

**B. Rulings Under Review.** The rulings under review are listed in the En Banc Opening Brief for the Petitioners.

**C. Related Cases.** The related cases are listed in the En Banc Opening Brief for the Petitioners.

## CERTIFICATE REGARDING SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(d), counsel for *Amici Curiae* Legal Ethics Scholars certifies that a separate brief is necessary to provide views focused on the attorney-client privilege issues raised by this litigation. A separate *amicus* brief is necessary because the *amici* joining this brief seek only to discuss the specific points on which their unique perspective and expertise are most relevant.

August 28, 2026 /s/ Mark C. Fleming

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

CERTIFICATE REGARDING SEPARATE BRIEFING....................................... ii

TABLE OF AUTHORITIES ..........................................................................iv

IDENTITY AND INTEREST OF *AMICI CURIAE*.................................................1

SUMMARY OF ARGUMENT ..........................................................................4

ARGUMENT ..................................................................................................7

CONCLUSION ..............................................................................................28

CERTIFICATE OF COMPLIANCE....................................................................30

CERTIFICATE OF SERVICE ..........................................................................31

## TABLE OF AUTHORITIES

### CASES


Page(s)

*Clark v. United States*,
289 U.S. 1 (1933)........8

*Coleman v. American Broadcasting Companies*,
106 F.R.D. 201 (D.D.C. 1985)........12

*Cox v. Administrator United States Steel & Carnegie*,
17 F.3d 1386 (11th Cir. 1994)........16, 21

*Cutter v. Wilkinson*,
544 U.S. 709 (2005)........13

*Drummond Company, Inc. v. Conrad & Scherer, LLP*,
885 F.3d 1324 (11th Cir. 2018)........9

*Feld v. Fireman's Fund Insurance Company*,
292 F.R.D. 129 (D.D.C. 2013)........21

*FTC v. Shaffner*,
626 F.2d 32 (7th Cir. 1980)........7

*Ideal Electronic Security Company v. International Fidelity Insurance Company*, 129 F.3d 143 (D.C. Cir. 1997)........15, 17

*In re A Witness Before the Special Grand Jury 2000-2*,
288 F.3d 289 (7th Cir. 2002)........24

*In re Grand Jury*,
475 F.3d 1299 (D.C. Cir. 2007)........8, 11, 14

*In re Grand Jury Investigation,*
399 F.3d 527 (2d Cir. 2005)........27

*In re Grand Jury Investigation*,
810 F.3d 1110 (9th Cir. 2016)........9

*In re Grand Jury Subpoena,*
909 F.3d 26 (1st Cir. 2018)........26, 27

*In re Grand Jury Subpoena Duces Tecum*,
112 F.3d 910 (8th Cir. 1997) ....................................................................7, 24

*In re Kellogg Brown & Root, Inc.*,
796 F.3d 137 (D.C. Cir. 2015)....................................................................15

*In re Lindsey*,
158 F.3d 1263 (D.C. Cir. 1998)...............................................4, 7, 24, 25, 26

*In re Marshall*,
No. SACV-01-0097 DOC, 2013 WL 2370711 (C.D. Cal.
May 29, 2013)..............................................................................................9

*In re Sealed Case*,
107 F.3d 46 (D.C. Cir. 1997)........................................................................9

*In re Sealed Case*,
676 F.2d 793 (D.C. Cir. 1982)......................................................9, 15, 21, 22

*In re Sealed Case*,
737 F.2d 94 (D.C. Cir. 1984)........................................................................7

*In re Sealed Case,*
754 F.2d 395 (D.C. Cir. 1985)..........................................8, 9, 10, 12, 13, 14

*In re United States*,
872 F.2d 472 (D.C. Cir. 1989)....................................................................26

*John Doe Company v. United States*,
350 F.3d 299 (2d Cir. 2003) .......................................................................21

*JTR Enterprises, LLC v. Columbian Emeralds*,
697 F. App'x 976 (11th Cir. 2017)..............................................................14

*Navajo Nation v. Peabody Holding Company*,
255 F.R.D. 37 (D.D.C. 2009) .....................................................................22

*Savignac v. Day*,
763 F. Supp. 3d 17 (D.D.C. 2025)..............................................................21

*SEC v. Gulf & Western Industries*,
518 F. Supp. 675 (D.D.C. 1981)...................................................................7

*United States ex rel. Barko v. Halliburton Company*,
No. 1:05-cv-1276, 2014 WL 12774003 (D.D.C. Dec. 17, 2014)............21, 22

*United States v. Bilzerian*,
926 F.2d 1285 (2d Cir. 1991) ............................................................15, 16, 17

*United States v. Doe*,
429 F.3d 450 (3d Cir. 2005) ..........................................................................11

*United States v. Zolin*,
491 U.S. 554 (1989).........................................................................................14

*Wadler v. Bio-Rad Laboratories Inc.*,
212 F. Supp. 3d 829 (N.D. Cal. 2016)............................................................22

*Washington Alliance Technology Workers v. United States Department of Homeland Security,*
50 F.4th 164 (D.C. Cir. 2022)..........................................................................1

## DOCKETED CASE

*J.G.G. v. Trump*,
No. 25-5124 (D.C. Cir. 2025)....................................................................19, 23

## CONSTITUIONAL PROVISION

U.S. Const. art. II, § 3 ........................................................................................26

## OTHER AUTHORITY

8 J. Wigmore, Evidence in Trials at Common Law (J. McNaughton rev. 1961) .........................................................................................16, 21

Fed. R. Evid. 502(a) ...........................................................................................16

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici* are legal ethics and professional responsibility scholars. They are all current or former professors at leading U.S. law schools. They have a strong interest in ensuring that the Court receives a full presentation regarding the privilege issues arising in this litigation and can provide "unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Washington All. Tech. Workers v. United States Dep't of Homeland Sec.,* 50 F.4th 164, 193 (D.C. Cir. 2022) (internal quotation marks and brackets omitted). In *amici*'s view, the government is wrong that attorney-client privilege categorically bars the district court's investigation from proceeding at this preliminary stage. Instead, the district court should have the first opportunity to consider any objections based on the attorney-client privilege in the context of particular evidence or testimony. Further fact-finding, including testimony from government attorneys and/or Department of Homeland Security (DHS) officials, may well assist the district court without violating the ethical obligations attorneys have to their clients.[1]

[1] No party's counsel authored the brief in whole or in part. No party, party's counsel, or any other person other than *amici* and their counsel contributed money that was intended to fund preparing or submitting the brief. All parties have consented to the filing of this brief.

*Amici*, listed below, join this brief in their personal capacities with affiliations noted for identification purposes only.

1. W. Bradley Wendel, Edwin H. Woodruff Professor of Law, Cornell Law School.
2. Richard L. Abel, Connell Distinguished Professor of Law Emeritus, UCLA School of Law.
3. Elizabeth Chambliss, Henry Harman Edens Professor of Law, Director, NMRS Center on Professionalism, University of South Carolina Joseph F. Rice School of Law.
4. George M. Cohen, Brokaw Professor of Corporate Law, University of Virginia School of Law.
5. Scott Cummings, Robert Henigson Professor of Legal Ethics, UCLA School of Law.
6. Bruce A. Green, Louis Stein Chair of Law, Fordham Law School.
7. Lawrence K. Hellman, Professor Emeritus and Dean Emeritus, Oklahoma City University School of Law.
8. Peter A. Joy, Henry Hitchcock Professor of Law, Washington University in St. Louis.
9. Susan P. Koniak, Professor Emerita of Law, Boston University School of Law.

10. David Luban, Distinguished University Professor, Georgetown University Law Center.
11. Milan Markovic, Professor & Presidential Impact Fellow, Texas A&M School of Law.
12. Veronica Root Martinez, Professor of Law, Duke University School of Law.
13. David McGowan, Lyle L. Jones Professor of Competition and Innovation Law, University of San Diego School of Law.
14. Deborah Pearlstein, Director, Princeton Program on Law and Public Policy, Charles and Marie Robertson Visiting Professor of Law and Public Affairs, Princeton University.
15. Nancy B. Rapoport, UNLV Distinguished Professor and Garman Turner Gordon Professor of Law, William S. Boyd Law School, University of Nevada, Las Vegas.
16. Margaret Raymond, Warren P. Knowles Chair and Professor of Law, University of Wisconsin Law School.
17. Jessica A. Roth, Professor of Law, Cardozo Law School.
18. Philip G. Schrag, Delaney Faily Professor of Public Interest Law Emeritus, Georgetown University.

19. Abbe Smith, Scott K. Ginsburg Professor of Law, Director, Criminal Defense & Prisoner Advocacy Clinic, Co-Director, E. Barrett Prettyman Fellowship Program, Georgetown University Law Center.
20. Ann Southworth, Professor of Law and Raymond Pryke Chair, University of California, Irvine School of Law.
21. Eli Wald, Charles W. Delaney Jr. Professor of Law, University of Denver Sturm College of Law.
22. Ellen Yaroshefsky, Professor Emerita, Maurice A. Deane School of Law, Hofstra University.

## SUMMARY OF ARGUMENT

The government asserts that holding a hearing with testimony from two government attorneys "poses a mortal threat to the attorney-client privilege." OB.24. That concern is overblown and premature. While the district court may well have to confront serious questions related to attorney-client privilege, the government's arguments to this Court are no reason to stop the hearing altogether.

As an initial matter, the government cannot assert privilege over the answer to every possible question its attorneys might be asked in the abstract—it has the burden to show, for each specific question, that the privilege applies. *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) (per curiam). Depending on what questions are asked, the hearing may never stray into privileged territory: Indeed,

basic non-privileged facts surrounding attorney communications that routinely appear on privilege logs—who spoke to whom, when, regarding what topics—are not subject to any privilege.

Moreover, given the facts of this case, it is highly likely that the answers to many potential questions are either not privileged in the first place or subject to an exception to the attorney-client privilege. ***First***, the district court may find that certain communications fall within the crime-fraud exception. In particular, there is evidence suggesting that a high-level government attorney, involved in providing advice to the DHS decisionmaker, was considering ignoring a potential court order outright, and that another attorney lied to the court about whether removals were in fact scheduled for the weekend of March 15-16, 2025. The district court may well find probable cause to believe that the government, through its attorneys, was planning to engage in criminal contempt (disobeying a court order) and committing fraud (lying to the court), which would except communications in furtherance of those ends from the attorney-client privilege. Further, a district court may review allegedly privileged communications in camera whenever the evidence supports a reasonable belief that such review may reveal that the crime-fraud exception applies.

***Second,*** the district court may find that the government waived privilege over certain communications by placing at issue the state of mind of the

government actors responsible for the government's actions—including what they "believed" about whether the government's actions were lawful and whether those beliefs were held in "good faith"—and by relying on and quoting from the very privileged advice the government seeks to shield.

***Third,*** there is a serious question whether the attorney-client privilege even protects communications in this context at all. This Court's precedent indicates that, in view of the duty government employees owe to the American people to uphold the Constitution, there is no attorney-client privilege between a government agency and its lawyers when the communications are sought in connection with alleged criminal actions. This Court need not now decide the extent to which that doctrine applies here, because the crime-fraud and waiver doctrines may provide the district court with sufficient information. In any event, all questions about whether any particular communication is privileged, whether an exception applies, and whether the privilege has been waived should be answered by the district court in the first instance.

The government's fear that it will have to justify any privilege assertions is not a reason to grant mandamus—an extraordinary remedy—to stop the hearing. Rather, it is a reason for the government to object to particular inquiries and then to carry its burden of proving that the privilege applies and has not been waived. The government's arguments strongly suggest that it seeks to use a blanket assertion of

attorney-client privilege to shield any investigation into its conduct. The Court should reject the government's strategy and allow the district court to decide any attorney-client privilege questions, rather than prejudging such questions on appeal without the benefit of a developed record or the district court's reasoning.

**ARGUMENT**

The attorney-client privilege protects client communications "only if the person to whom the communication was made is 'a member of the bar of a court' who 'in connection with th[e] communication is acting as a lawyer' and the communication was made 'for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding,'" and communications from lawyers conveying legal advice. *In re Lindsey*, 158 F.3d at 1270 (quoting *In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984)).[2] The party claiming the privilege has the burden to show that it applies. *Id.* "A blanket assertion of the privilege will not suffice." *Id.* Instead, the proponent "must 'present the underlying facts demonstrating the existence of the privilege' in order to carry its burden," *id.* (quoting *FTC v. Shaffner*, 626 F.2d 32, 37 (7th Cir. 1980)), and "conclusively prove each element of the privilege," *id.* (quoting *SEC v. Gulf &*

[2] Some courts have found that the privilege applies even where there is no attorney-client relationship if the "client" reasonably believes that the individual to whom the communication was made was an attorney acting for the client. *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 923 (8th Cir. 1997).

*Western Indus.*, 518 F. Supp. 675, 682 (D.D.C. 1981) (internal quotation mark omitted)).

Here, the government did not attempt to carry this burden in the district court as to any particular communication, and the district court accordingly has not decided that any communication is or is not privileged. As Respondents explain, RB.47-49, there are many facts and communications pertinent to the district court's investigation that are clearly not privileged at all. For others, as explained below, there are good reasons to believe that (1) the crime-fraud exception would apply or (2) the government could be found to have waived the privilege through its conduct and advocacy. Finally, this Court's precedent acknowledges the strong public interest in preventing the government from using attorney-client privilege to shield government actors from investigations into criminal conduct, such that there may well be no privilege here for the government to assert in the first place.

**I. The Crime-Fraud Exception.** The attorney-client privilege "takes flight" if abused. *Clark v. United States*, 289 U.S. 1, 15 (1933). Otherwise privileged attorney-client communications lose their protection if they are "made in furtherance of a crime, fraud, or other misconduct." *In re Grand Jury*, 475 F.3d 1299, 1305 (D.C. Cir. 2007) (quoting *In re Sealed Case,* 754 F.2d 395, 399 (D.C. Cir. 1985)). A party asserting that the crime-fraud exception applies must demonstrate that a "prima facie violation" occurred by showing the client "was

engaged in or planning a criminal or fraudulent scheme" and establish a "relationship between the communication … and the prima facie violation." *Sealed Case*, 754 F.2d at 399. "The prima facie violation may also be the attorney's, since attorney misconduct negates the premise that the adversary system furthers the cause of justice." *In re Sealed Case*, 676 F.2d 793, 815 (D.C. Cir. 1982). To meet this burden, the party asserting the crime-fraud exception may offer "evidence that if believed by the trier of fact would establish the elements of an ongoing or imminent crime or fraud." *In re Sealed Case*, 107 F.3d 46, 50 (D.C. Cir. 1997). This Court has applied the crime-fraud exception after finding evidence of perjury and obstruction of justice. *Sealed Case*, 754 F.2d at 401. Other courts have applied the crime-fraud exception after finding that false statements were knowingly made to the court. *Drummond Co. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1332 (11th Cir. 2018); *In re Marshall*, 2013 WL 2370711, at *12-14 (C.D. Cal. May 29, 2013) (admitting evidence via crime-fraud exception when document contradicted lawyer's claim that he never represented the client); *see In re Grand Jury Investigation*, 810 F.3d 1110, 1113 (9th Cir. 2016) (applying crime-fraud exception for "false statements to and obstruction of the FDA").

Here, the record contains ample evidence from which the district court could conclude that the government engaged in, or at least planned, an ongoing or imminent criminal or fraudulent scheme.

***First***, record evidence supports the conclusion that the Department of Justice (DOJ) planned to disobey any order halting the removal of noncitizens on the March 15, 2025 flights. Former senior DOJ lawyer Erez Reuveni's June 24, 2025 whistleblower disclosure describes a March 14, 2025 DOJ meeting at which a senior DOJ official, Principal Associate Deputy Attorney General (PADAG) Emil Bove, "stressed to all in attendance," including Deputy Assistant Attorney General Drew Ensign, that the planes set to leave on March 15 and 16 carrying individuals subject to the soon-to-be-public Alien Enemies Act (AEA) proclamation "needed to take off no matter what," and "DOJ would need to consider telling the courts 'fuck you' and ignore any … court order" that might "enjoin those removals before they could be effectuated." JA245; *see also* JA304-305 (corroborating text messages referring to "a decision point on fuck you" and "say[ing] fuck you to the court"). If credited, this blatant suggestion by a high-ranking DOJ official to ignore a court order establishes a prima facie showing of ongoing or imminent crime or fraud, as the crime or fraud need not be proven "beyond a reasonable doubt." *Sealed Case*, 754 F.2d at 399. And PADAG Bove's statement—made the day before the planes took off—is particularly relevant, as he is one of the DOJ

attorneys who provided advice to DHS that deplaning the noncitizens in El Salvador was permissible. JA290; JA378-382.

***Second***, there is evidence from which the district court could conclude that a DOJ attorney lied to the court to allow the planes to take off before any injunction could enter.[3] During the hearing at 5 p.m. on March 15, 2025, the district court asked government counsel: "Can you tell us, Mr. Ensign, are imminent deportations and removals under this proclamation planned? When I say imminent, I mean in the next 24 or 48 hours"; Mr. Ensign replied "I don't know the answer to that question." JA108 (11:12-20). But Mr. Reuveni's whistleblower complaint states that "Mr. Reuveni reasonably believes Ensign's statement to the court that he did not know whether AEA removals would take place 'in the next 24 or 48 hours' was false" because "Ensign had been present in the previous day's meeting when Emil Bove stated clearly that one or more planes containing individuals subject to the AEA would be taking off over the weekend *no matter what*." JA247, *see* JA245. And Mr. Reuveni's assertion is corroborated by text

---

[3] Some circuits require that, for the crime-fraud exception to apply, the attorney-client communication must be made for the purpose of obtaining assistance to engage in a crime or fraud. *United States v. Doe*, 429 F.3d 450, 454 (3d Cir. 2005). Although this Court requires only that the communication be "made in furtherance of a crime, fraud, or other misconduct," *Grand Jury*, 475 F.3d at 1305, the facts here would meet even the stricter standard of other circuits if the district court were to find that the government sought its attorney's assistance by asking the attorney to lie to the court.

messages between Mr. Reuveni and a colleague expressing disbelief ("Oh shit"); asserting that Mr. Ensign's answer "was just not true" and "I can't believe [Mr. Ensign] doesn't know"; and affirming that Mr. Ensign "knows there are plans for AEA removals within the next 24 hours." JA303; *see also* JA304 ("It[']s a question if drew [Mr. Ensign] gets out without a sanction").

Each of these instances taken separately may show probable cause of a "crime, fraud, or other misconduct"—specifically, a plan to commit a criminal contempt by willfully disobeying a court order and the fraud of lying to the court. Together, these facts may establish probable cause to believe that the government sought to effect removals under the AEA in a manner that would obstruct judicial review, namely by (1) signing the AEA proclamation in secret, announcing it on a Saturday, and sending two planeloads of noncitizens later that very day during the hearing, JA172-182; (2) lying to (or at least misleading) the district court about the imminence of the removals when the court was considering a temporary restraining order (TRO);[4] and (3) preparing to disregard a TRO if needed.

---

[4] Even if the district court credits Mr. Ensign's answer that he did not know about the planes' status or whether removals were imminent, *see* JA101-102(4:23-5:12), JA108(11:12-20), his ignorance does not defeat application of the crime-fraud exception if there is reason to believe that the government was purposefully keeping him in the dark in furtherance of misconduct. *Sealed Case*, 754 F.2d at 402 ("It is well settled that an attorney's ignorance of his client's misconduct will not shelter that client from the consequences of his own wrongdoing"); *Coleman v. American Broad. Cos.*, 106 F.R.D. 201, 206 n.5 (D.D.C. 1985).

Given that the planes took off one day after PADAG Bove's statement to DOJ officials to be prepared to say "fuck you" to the courts, and that Mr. Ensign apparently misled the court regarding his knowledge of the planes' status, the district court could well find a clear connection between a prima facie violation (be it the plan to disobey a court order, lying to the court, or the broader scheme) and communications relating to how the DOJ understood the court's orders and what advice was communicated among DOJ attorneys and to DHS on March 15 and 16.

Of course, the district court has not yet been able to engage these issues and make pertinent findings that this Court could review. The right course is accordingly to allow the district court to proceed; like the Supreme Court, this Court is a "court of review, not of first view." *Cutter v. Wilkinson*, 544 U.S. 709 718 n.7 (2005); *Sealed Case*, 754 F.2d at 399 ("The determination that a prima facie showing has been made lies within the sound discretion of the district court[.]"). Nonetheless, the government baldly asserts—without explanation—that the crime-fraud exception "has no application" and contends that "invoking that exception requires *at least* probable cause that a crime was actually committed, … at which point continued judicial investigation would be unnecessary." OB.62. That is a false equivalence. The district court is seeking to investigate whom, among the many individuals involved, it should refer for prosecution for criminal contempt. But the crime-fraud exception applies more broadly than just to

communications made in furtherance of actions that would be considered criminally contumacious—it applies where the statements were made in furtherance of any "crime, fraud, or other misconduct." *In re Grand Jury*, 475 F.3d at 1305. Even assuming Mr. Ensign lied to the court, that does not exhaust the potential for further investigation into other actors who may have engaged in a scheme to willfully frustrate the court's ability to administer justice—and communications in furtherance of such "crime, fraud, or other misconduct" would not be privileged. *See JTR Enters., LLC v. Columbian Emeralds*, 697 F. App'x 976, 988 (11th Cir. 2017) (crime-fraud exception applied to "compel discovery which would reveal existence of the fraud as well as efforts to conceal it" to determine whether attorneys were culpable even after client conceded fraud). Notably, as long as there is evidence to support a reasonable belief that in camera review of allegedly privileged communications may yield evidence establishing the applicability of the crime-fraud exception, the district court may receive such evidence in camera to determine whether those communications fall within the crime-fraud exception. *United States v. Zolin*, 491 U.S. 554, 572 (1989).

In any event, this Court need not and should not determine in the first instance whether the facts above establish a prima facie violation—that is a job for the district court. *Sealed Case*, 754 F.2d 395 at 399. The evidence already in the record shows good reason to believe that the crime-fraud exception would apply to

at least some communications among the government attorneys. Accordingly, the government's blanket assertion of privilege is no reason to grant mandamus to stop the hearing altogether.

**II. At-Issue Waiver.** "[T]he attorney-client privilege cannot at once be used as a shield and a sword," *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 145 (D.C. Cir. 2015) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991)), and "a party may not use privilege 'as a tool for manipulation of the truth-seeking process,'" *id.* (quoting *In re Sealed Case*, 676 F.2d at 807). Accordingly, "a party asserting attorney-client privilege cannot be allowed, after disclosing as much as he pleases, to withhold the remainder." *Id.* (internal quotation marks omitted).

Instead, when a party selectively discloses privileged information or otherwise puts privileged subject matter at issue, it operates as an implied waiver of privilege. *Ideal Elec. Sec. Co. v. International Fidelity Ins. Co.*, 129 F.3d 143, 151-152 (D.C. Cir. 1997) (finding implied waiver where "a party partially discloses the allegedly privileged information in support of its claim against another, but then asserts the privilege as a basis for withholding from its opponent the remainder of the information which is necessary to defend against the claim"); *Sealed Case*, 676 F.2d at 818 ("When a party reveals part of a privileged communication in order to gain an advantage in litigation, it waives the privilege

as to all other communications relating to the same subject matter because 'the privilege of secret consultation is intended only as an incidental means of defense and not as an independent means of attack, and to use it in the latter character is to abandon it in the former.'" (quoting 8 J. Wigmore, Evidence in Trials at Common Law § 2327 at 636 (J. McNaughton rev. 1961))). The extent to which any partial disclosure amounts to a waiver must be determined on a case-by-case basis as a matter of fairness. *Bilzerian*, 926 F.2d at 1292 ("[T]he privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications."); *see* Fed. R. Evid. 502(a) (intentional disclosure waives attorney-client privilege when "the disclosed and undisclosed communications or information concern the same subject matter" and "they ought in fairness to be considered together").

Here, there are at least two circumstances that could lead the district court to determine that the government impliedly waived the privilege by putting allegedly privileged communications at issue.

***First***, to the extent the government is relying on a good-faith belief that its actions were consistent with the district court's order, it has put at issue communications that—in fairness—must be considered to test the good-faith nature of its beliefs. *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1418-1419 (11th Cir. 1994) (holding that assertion of a "good faith" defense

arguing that defendant "believed the [leave-of-absence] policy to be lawful" "injected the issue of [defendant's] knowledge of the law into the case and thereby waived the attorney-client privilege"); *Bilzerian*, 926 F.2d at 1291-1292, 1294 (holding that defendant's testimony as to his good-faith belief that his actions were legal "would have put his knowledge of the law and the basis for his understanding of what the law required in issue" and would waive privilege over "conversations with counsel regarding the legality of his schemes"); *see Ideal Elec. Sec.*, 129 F.3d at 151-152 (holding party waived privilege over time-entry descriptions by asserting that bills were "reasonable").

Several statements suggest the government was doing just that. For example, at the March 17, 2025 hearing called "solely to perform fact finding about the government's compliance with [the district court's] orders," JA147 (ECF 25) at 4:21-24, the government stated (emphasis added unless otherwise noted):

- "[W]e do ***believe*** that we complied with the court order, which is that no flights took off from U.S. territory after the written order." JA152 (ECF 25) at 9:13-18.
- "[W]e do ***believe*** that we complied with the written order. And I can talk to the Court a little bit about why we ***believe*** that is." ECF 25 at 10:20-23.
- "[W]e do want to be heard on the issue of why we ***believe*** that we complied with the injunction …." ECF 25 at 11:24-12:1.

- "[W]e did comply with the Court's written order and did rely ***in good faith*** on it, and I can walk you through the reasons why." ECF 25 at 14:23-15:1.
- "And especially when the Court has said that it will issue a minute order memorializing this so that you don't have to race to write it down, the defendants ***on good faith*** understood the written order to be the order of the court." ECF 25 at 16:15-18.
- "Now, I [government attorney Abishek Kambli] was not in the discussions and wouldn't be able to relate attorney-client advice given anyway, but we do ***believe*** that that is a ***good faith*** interpretation of what the Court said." ECF 25 at 16:19-22.
- "And what the possible options were, what we are talking about is whether there was ***good faith compliance*** with the injunction and whether the United States ***believed it reasonably, which they did*** in this scenario." ECF 25 at 22:12-15.
- "Your Honor, we ***believe*** that we complied with the order." ECF 25 at 23:15-16.
- "And our point is, first, we do ***believe*** that we complied with the written order …." ECF 25 at 24:18-21.

At that hearing alone, the government put its "belief" and "good faith" at issue at least nine times. It could have simply stated that it did not violate the order

full stop—the position it appears to be taking now, OB.1—but chose instead to invoke its beliefs and good faith. In particular, Attorney Kambli's statement that "I was not in the discussions and wouldn't be able to relate attorney-client advice given anyway, but ***we do believe*** that that is ***a good faith*** interpretation of what the Court said," ECF 25 at 16:19-22 (emphasis added), illustrates the unfairness of keeping the communications to DHS confidential—in the same breath, the government is self-servingly asserting its good faith belief, yet alleging that the content of those communications was privileged.

The government continued to rely on its asserted good-faith beliefs after that hearing. In a subsequent filing opposing Plaintiffs' motion for a preliminary injunction, the government further argued that it did not transfer noncitizens to El Salvador to evade judicial scrutiny and that "[p]arts of the leaked information make clear that high-level officials ***believed*** the TRO did not apply once a flight was outside the United States." JA326-327 (emphasis added); *see also* Appellants' Resp. to Mot. to Dismiss 17, *J.G.G. v. Trump*, No. 25-5124, Doc. No. 2112879 (D.C. Cir. Apr. 25, 2025) (arguing against contempt because "the government in good faith interpreted the limited written order to mean territorial removal").

The district court may also take into account the evidence that the government's selective disclosure concealed that it was actively considering violating whatever order might come out of the March 15, 2025 hearing. JA245

(Reuveni whistleblower complaint describing March 14, 2025 meeting at which "Bove … stressed to all in attendance that the planes needed to take off no matter what" and, "concerning the possibility that a court order would enjoin those removals before they could be effectuated," "stated that DOJ would need to consider telling the courts 'fuck you' and ignore any such court order"); JA303-305 (texts from unnamed colleague saying "Guess we are going to say fuck you to the court" and "Super" provided as corroboration). Those statements, made before and after the court's order, cast grave doubt on the government's good faith[5] and further support the conclusion that the government, in touting its good faith, was selectively disclosing information that would serve its litigation strategy while withholding unhelpful information under a privilege claim. That is precisely the sword-and-shield situation the doctrine of at-issue waiver forbids.

The government insists that there has been no waiver because—while it reserves its right to potentially rely on an advice-of-counsel defense in a contempt prosecution—it is not relying on such a defense now.[6] OB.61-62. But at-issue

---

[5] Indeed, the district court raised questions regarding the government's good faith. JA171-172(5:23-6:3) (Apr. 3, 2025 hearing transcript) ("THE COURT: Okay. So it seems to me that there is a fair likelihood that that is not correct, and in fact, that the government acted in bad faith throughout that day [March 15]. If you really believed everything you did that day was legal and could survive a court challenge, I can't believe you ever would have operated in the way you did.").

[6] The government's assertion that it "has not put any legal advice at issue," OB.62, need not be afforded any weight. "A privileged person would seldom be found to

waiver is not limited to situations where the advice of counsel is being relied on to support a claim or defense. *See Cox*, 17 F.3d at 1418-1419 (finding waiver despite defendant's "deni[al of] any intent to assert a defense of advice of counsel or to rely on any privileged attorney-client communications in its defense"); *Feld v. Fireman's Fund Ins. Co.*, 292 F.R.D. 129, 139-141 (D.D.C. 2013) (finding "at issue" waiver even where "the party asserting the privilege does not rely on advice of counsel or any particular attorney-client communication to support its claim or defense"); *Savignac v. Day*, 763 F. Supp. 3d 17, 31 (D.D.C. 2025) (though defendant had not asserted an advice-of-counsel defense, that was "beside the point since an advice-of-counsel defense is just one example of an 'at issue' waiver"); *United States ex rel. Barko v. Halliburton Co.*, 2014 WL 12774003, at *3 (D.D.C. Dec. 17, 2014) ("KBR argues that it has disclosed only non-privileged facts, but '[i]t is well established doctrine that in certain circumstances a party's assertion of factual claims can, out of considerations of fairness to the party's adversary, result in the involuntary forfeiture of privileges for matters pertinent to the claims asserted.'" (quoting *John Doe Co. v. United States*, 350 F.3d 299, 302 (2d Cir. 2003)). Further, the government cannot simply retract its statements regarding its good faith now that it does not like the consequences: its waiver is a waiver all the

---

waive, if his intention not to abandon could alone control the situation." *Sealed Case*, 676 F.2d at 807 (quoting 8 Wigmore § 2327 at 636).

same. The government cannot tell the district court that it was acting in good faith while asserting privilege to prevent the court from testing the accuracy of that assertion. *See Halliburton*, 2014 WL 12774003, at *2-3; *Navajo Nation v. Peabody Holding Co.*, 255 F.R.D. 37, 44 (D.D.C. 2009) ("With limited exception, once a party voluntarily waives privilege that privilege is relinquished ***for all purposes and in all circumstances thereafter***." (emphasis added, internal quotation marks omitted)).

***Second***, while the whistleblower complaint's disclosure of privileged information is not itself a waiver by the government, the government's choice to comment on that information and use it to resist further investigation into the events of March 15 could well support a finding that the government is selectively relying on privileged information to gain a litigation advantage. *See Sealed Case*, 676 F.2d at 818. For example, the court in *Wadler v. Bio-Rad Laboratories Inc.*, 212 F. Supp. 3d 829 (N.D. Cal. 2016), held that a company had waived attorney-client privilege over certain communications related to a whistleblower complaint because it had commented extensively on the allegations to regulators. *Id.* at 835-836, 851-852.

The government has similarly commented (albeit selectively) on the whistleblower-disclosed privileged communications here. For example, as noted above, the government argued that it did not transfer noncitizens to El Salvador to

evade judicial scrutiny and that "[p]arts of the leaked information make clear that high-level officials believe the TRO did not apply once a flight was outside the United States." JA326-327. The "parts" of the leaked information referred to are an email from Acting Assistant Attorney General (AAG) Yaakov Roth explaining that PADAG Bove "advised DHS last night [the night of March 15th] that the deplaning of the flights that had departed US airspace prior to the court's minute order was permissible under the law and the court's order." JA290; *see also* JA253. The government relied on AAG Roth's same email again before this Court, stating: "[T]he Government's attorneys ultimately concluded that deplaning the already-removed aliens was 'permissible under the law and the court's order.'" Resp. to Mot. to Suppl. R. 3-4, *J.G.G. v. Trump*, No. 25-5124, Doc. No. 2127017 (D.C. Cir. July 23, 2025). The fact that the government relied on—and even quoted—the substance of the advice from PADAG Bove to DHS could be seen to require, in fairness, disclosure of other privileged communications on the subject matter of the lawfulness of deplaning and transferring custody of the AEA detainees, including communications contributing to PADAG Bove's determination.

**III.** ***Government Attorney-Client Privilege.*** The potential application of the crime-fraud exception and at-issue waiver is reason enough to deny mandamus, as those doctrines show the hollow nature of the government's alleged "mortal

threat" to the attorney-client privilege. *See* OB.24. Moreover, beyond those commonly applied doctrines, this case raises the serious question whether attorney-client privilege even applies in the first place to communications among government attorneys and government actors when the information sought bears on possible criminal wrongdoing by government actors.

This Court addressed this question in *In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998), where an independent counsel subpoenaed the Deputy White House Counsel to testify before a federal grand jury. He refused, stating that his testimony was barred by the government attorney-client privilege, in part. The Court disagreed and held that the privilege gives way when the purportedly privileged information is needed to investigate criminal wrongdoing by government actors. *Id.* at 1272 ("When an executive branch attorney is called before a federal grand jury to give evidence about alleged crimes within the executive branch, reason and experience, duty, and tradition dictate that the attorney shall provide that evidence."); *see also In re A Witness Before the Special Grand Jury 2000-2*, 288 F.3d 289, 290 (7th Cir. 2002) (finding no government-attorney-client privilege existed that could prevent government attorney from testifying before federal grand jury); *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 924 (8th Cir. 1997) (holding that the White House could not use the attorney-client privilege to avoid complying with federal grand jury subpoena).

The rationale for that rule rests on the recognition that the government—which owes a duty of loyalty not to itself but to the American people—is in a special position regarding the attorney-client privilege: "[T]he Office of the President is a part of the federal government, consisting of government employees doing government business, and neither legal authority nor policy nor experience suggests that a federal government entity can maintain the ordinary common law attorney-client privilege to withhold information relating to a federal criminal offense." *Lindsey*, 158 F.3d at 1266. Instead, "[t]he public interest in honest government and in exposing wrongdoing by government officials, as well as the tradition and practice … of government lawyers reporting evidence of federal criminal offenses whenever such evidence comes to them, lead to the conclusion that a government attorney may not invoke the attorney-client privilege in response to grand jury questions seeking information relating to the possible commission of a federal crime." *Id.* This Court stressed that the duty of a government attorney "is not to defend clients against criminal charges" or "to protect wrongdoers from public exposure"; rather, they have a "constitutional responsibility"—"bound by oath"—to "'take Care that the Laws be faithfully executed.'" *Id.* at 1272-1273

(quoting U.S. Const. art. II, § 3). Accordingly, government attorneys' "proper allegiance" is to the public and not solely to their client agency. *Id.*[7]

This case falls squarely within the rule established in *Lindsey*. Just as the federal grand jury in that case was investigating potential criminality in the Executive Branch, so too here the district court is investigating whether certain DHS and DOJ officials should be referred for a criminal contempt prosecution for willfully violating the district court's TRO.

The government previously resisted application of *Lindsey* by invoking cases that are easily distinguishable and rest on a rationale supporting disclosure here. *See* Pet'rs' Reply in Support of Pet. for a Writ of Mandamus 19-20, Doc. No. 2153031 (Jan. 5, 2026). In *In re Grand Jury Subpoena*, the First Circuit emphasized that its holding that the Rhode Island Department of Labor and Training could withhold privileged material was based on the fact that the requester (the U.S. government, via a federal grand jury subpoena) had ***not*** shown that the grand jury was investigating wrongdoing by Rhode Island officials. 909 F.3d 26, 32 (1st Cir. 2018). The court took care to limit its holding to the case's

[7] Notably, *Lindsey* discusses only the ***attorney-client*** privilege in the specific scenario of suspected criminal wrongdoing by government actors. Other privileges available to the government—including the state secrets privilege, executive privilege, and official information privilege—may apply to the extent the government seeks to invoke them. *See In re United States*, 872 F.2d 472, 474-475 (D.C. Cir. 1989) (discussing state secrets privilege).

facts and contrasted the record with *Lindsey*, where the investigation targeted potential presidential wrongdoing. *Id.* ("So in this context – i.e., a grand jury investigating potential crime within the government – the United States' principal arguments [for a broad no-privilege rule] are both joined in reinforcement and heightened in their importance, enough so, perhaps, to tip the balance.").

Further, the Second Circuit in *In re Grand Jury Investigation* was concerned with the federal government upsetting a state's values-balancing decisions if it were to find no attorney-client privilege existed for ***state*** government attorneys testifying before the federal grand jury. 399 F.3d 527, 534 (2d Cir. 2005). No such federalism concerns arise here.

Attempts to distinguish this case from *Lindsey* are unavailing. That this case involves a judicial investigation rather than a grand jury is of no consequence, because *Lindsey*'s focus is on the subject of the investigation rather than the method: both investigations concern potential criminal violations by Executive Branch officials. The government may try to limit *Lindsey* to its posture as an intra-branch dispute between an Executive Branch prosecutor and an Executive Branch lawyer. But the Court's rationale in *Lindsey* did not turn on who sought the information, but rather on the nature of the government lawyer's role. Government lawyers are public servants who owe duties to the public that prevent them from invoking privilege to withhold evidence of possible criminal

wrongdoing. That duty does not vary depending on which investigating authority seeks the evidence.

The Court need not decide at this stage the extent to which *Lindsey* applies here, because this issue was not fully presented below. In fact, the government's opening brief does not even cite *Lindsey*. As the district court has not yet had an opportunity to consider the many issues surrounding application of the attorney-client privilege to any communications in this case, the proper result is to deny mandamus and allow the district court to address any government assertions of privilege in the first instance.

**CONCLUSION**

For the foregoing reasons, *amici* respectfully submit that the Court should not grant the government's petition for mandamus on the grounds that the district court's proposed hearing would implicate the attorney-client privilege. Instead, the Court should allow the district court to address any assertions of privilege in the first instance.

Respectfully submitted.

/s/ Mark C. Fleming

MARK C. FLEMING
MADELEINE C. LAUPHEIMER
CARRIE N. PATTERSON
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

DANIEL SCHUBERT
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(202) 663-6000

DELPHERT C. SMITH III
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, CA 90071
(213) 443-5300

August 28, 2026

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 6446 words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Office for Word 365 in 14 point Times New Roman font. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Mark C. Fleming
MARK C. FLEMING

August 28, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of August, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Mark C. Fleming
MARK C. FLEMING