No. 25-5452

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

In re DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, et al.,
*Petitioners.*

On Petition for a Writ of Mandamus to the United States District Court for the District of Columbia No. 1:25-cv-00766 The Hon. James E. Boasberg.

# BRIEF OF 204 FORMER JUDGES AS *AMICI CURIAE* IN SUPPORT OF RESPONDENTS

Norman L. Eisen
Stephen A. Jonas
Joshua G. Kolb
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE #15180
Washington. D.C. 20003
(202) 594-9958
norman@democracydefenders.org

**Counsel for *Amici Curiae***

## STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING[1]

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amici curiae* certifies that this separate brief is necessary because it provides unique insights regarding the importance of the court's contempt power. The brief explains how the criminal contempt power is a core inherent judicial authority indispensable to the existence of a court, the calibrated range of options possessed by courts to inquire into disobedience, and the grievous damage of shutting down a permissible judicial inquiry. Because *amici* are not aware of any other *amicus* brief addressing these issues, *amici* certify pursuant to D.C. Circuit Rule 29(d) that joinder in a single brief with other *amici* would be impracticable. Respondent and Petitioner are unopposed to this filing.

*/s/ Norman L. Eisen*
Norman L. Eisen
Stephen A. Jonas
Joshua G. Kolb
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE #15180
Washington. D.C. 20003
(202) 594-9958
norman@democracydefenders.org

**Counsel for *Amici Curiae***

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amici curiae* or its counsel made a monetary contribution to its preparation or submission.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

*/s/ Norman L. Eisen*
Norman L. Eisen
Stephen A. Jonas
Joshua G. Kolb
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE #15180
Washington. D.C. 20003
(202) 594-9958
norman@democracydefenders.org

**Counsel for *Amici Curiae***

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### I. Parties and *Amici*

Except for *amici* and any other *amici* who had not yet entered an appearance in this case as of the filing of Petitioners' brief, all parties, intervenors, and *amici* appearing in this Court are listed in Petitioners' brief. *Amici* former judges are as follows:

- Judge Nancy Gertner, U.S. District Judge, District of Massachusetts (Ret.)
- Judge Michael Luttig, U.S. Circuit Judge, U.S. Court of Appeals for the Fourth Circuit (Ret.)

**Federal**

- Judge Nancy F. Atlas, U.S. District Judge, Southern District of Texas (Ret.)
- Chief Judge John W. Bissell, U.S. District Judge, District of New Jersey (Ret.)
- Judge Geraldine Soat Brown, U.S. Magistrate Judge, Northern District of Illinois (Ret.)
- Chief Judge Rubén Castillo, U.S. District Judge, Northern District of Illinois (Ret.)
- Judge Robert J. Cindrich, U.S. District Judge, Western District of Pennsylvania (Ret.)
- Chief Judge U.W. Clemon, U.S. District Judge, Northern District of Alabama (Ret.)
- Judge Susan E. Cox, U.S. Magistrate Judge, Northern District of Illinois (Ret.)
- Judge Andre M. Davis, U.S. Circuit Judge, U.S. Court of Appeals for the Fourth Circuit (Ret.)
- Judge Morton Denlow, U.S. Magistrate Judge, Northern District of Illinois (Ret.)
- Chief Judge William F. Downes, U.S. District Judge, District of Wyoming (Ret.)

- Judge Allyson K. Duncan, U.S. Circuit Judge, U.S. Court of Appeals for the Fourth Circuit (Ret.)
- Judge David K. Duncan, U.S. Magistrate Judge, District of Arizona (Ret.)
- Chief Judge Sheila Finnegan, U.S. Magistrate Judge, Northern District of Illinois (Ret.)
- Judge Jeremy Fogel, U.S. District Judge, Northern District of California (Ret.)
- Judge Royal Furgeson Jr., U.S. District Judge, Western District of Texas (Ret.)
- Judge Marilyn Go, U.S. Magistrate Judge, Eastern District of New York (Ret.)
- Judge Steven M. Gold, U.S. Magistrate Judge, Eastern District of New York (Ret.)
- Judge A. Benjamin Goldgar, U.S. Bankruptcy Judge, Northern District of Illinois (Ret.)
- Judge Paul W. Grimm, U.S. District Judge, District of Maryland (Ret.)
- Chief Judge Randolph J. Haines, U.S. Bankruptcy Judge, District of Arizona (Ret.)
- Judge Thelton Henderson, U.S. District Judge, Northern District of California (Ret.)
- Chief Judge Robert Harlan Henry, U.S. Circuit Judge, U.S. Court of Appeals for the Tenth Circuit (Ret.)
- Judge Richard J. Holwell, U.S. District Judge, Southern District of New York (Ret.)
- Judge Ellen Segal Huvelle, U.S. District Judge, District of Columbia (Ret.)
- Judge John E. Jones III, U.S. District Judge, Middle District of Pennsylvania (Ret.)
- Judge Abdul K. Kallon, U.S. District Judge, Northern District of Alabama (Ret.)
- Chief Judge George H. King, U.S. District Judge, Central District of California (Ret.)
- Judge James Larson, U.S. Magistrate Judge, Northern District of California (Ret.)
- Judge Roanne L. Mann, U.S. Magistrate Judge, Eastern District of New York (Ret.)

- Judge A. Howard Matz, U.S. District Judge, Central District of California (Ret.)
- Chief Judge Paul Michel, U.S. Circuit Judge, U.S. Court of Appeals for the Federal Circuit (Ret.)
- Judge Margaret Morrow, U.S. District Judge, Central District of California (Ret.)
- Judge Liam O'Grady, U.S. District Judge, Eastern District of Virginia (Ret.)
- Judge Kathleen O'Malley, U.S. Circuit Judge, U.S. Court of Appeals for the Federal Circuit (Ret.)
- Judge Jamie Orenstein, U.S. Magistrate Judge, Eastern District of New York (Ret.)
- Judge Brian Owsley, U.S. Magistrate Judge, Southern District of Texas (Ret.)
- Judge Philip M. Pro, U.S. District Judge, District of Nevada (Ret.)
- Judge Shira A. Scheindlin, U.S. District Judge, Southern District of New York (Ret.)
- Judge Fern M. Smith, U.S. District Judge, Northern District of California (Ret.)
- Chief Judge Deanell Reece Tacha, U.S. Circuit Judge, U.S. Court of Appeals for the Tenth Circuit (Ret.)
- Judge John D. Tinder, U.S. Circuit Judge, U.S. Court of Appeals for the Seventh Circuit (Ret.)
- Judge Ursula Ungaro, U.S. District Judge, Southern District of Florida (Ret.)
- Judge Thomas I. Vanaskie, U.S. Circuit Judge, U.S. Court of Appeals for the Third Circuit (Ret.)
- Judge T. John Ward, U.S. District Judge, Eastern District of Texas (Ret.)
- Judge Paul Watford, U.S. Circuit Judge, U.S. Court of Appeals for the Ninth Circuit (Ret.)
- Judge Alexander Williams Jr., U.S. District Judge, District of Maryland (Ret.)
- Judge Mark Wolf, U.S. District Judge, District of Massachusetts (Ret.)
- Chief Judge Diane P. Wood, U.S. Circuit Judge, U.S. Court of Appeals for the Seventh Circuit (Ret.)
- Judge Lee Yeakel, U.S. District Judge, Western District of Texas (Ret.)

**State**

- Judge Verna A. Adams, Marin County Superior Court, California (Ret.)
- Chief Justice Jeffrey Amestoy, Vermont Supreme Court (Ret.)
- Judge Elaine Andrews, Anchorage Superior Court, Alaska (Ret.)
- Judge Beth M. Andrus, Washington State Court of Appeals (Ret.)
- Judge Stephanie A. Arend, Pierce County Superior Court, Washington (Ret.)
- Judge Sharon S. Armstrong, King County Superior Court, Washington (Ret.)
- Chief Justice Scott Bales, Arizona Supreme Court (Ret.)
- Chief Justice Thomas A. Balmer, Oregon Supreme Court (Ret.)
- Judge Paul A. Bastine, Spokane County Superior Court, Washington (Ret.)
- Judge Martha Beckwith, Anchorage District Court, Alaska (Ret.)
- Chief Justice Michael L. Bender, Colorado Supreme Court (Ret.)
- Justice Margot Botsford, Massachusetts Supreme Judicial Court (Ret.)
- Justice G. Arthur Brennan, York County Superior Court, Maine (Ret.)
- Associate Justice Bobbe J. Bridge, Washington Supreme Court (Ret.)
- Chief Justice Eric Brown, Supreme Court of Ohio (Ret.)
- Chief Justice Roger Burdick, Idaho Supreme Court (Ret.)
- Judge Regina S. Cahan, King County Superior Court, Washington (Ret.)
- Judge William Cahill, San Francisco County Superior Court, California (Ret.)
- Chief Justice Walter L. Carpeneti, Alaska Supreme Court (Ret.)
- Judge Wynne Carvill, Alameda County Superior Court, California (Ret.)
- Judge Paula Casey, Thurston County Superior Court, Washington (Ret.)
- Judge Patrick A. Cathcart, Los Angeles Superior Court, California (Ret.)
- Chief Justice Sue Bell Cobb, Alabama Supreme Court (Ret.)
- Judge Harriett Cody, King County Superior Court, Washington (Ret.)
- Justice Carol Ann Conboy, New Hampshire Supreme Court (Ret.)
- Chief Justice Dori Contreras, 13th Court of Appeals, Texas (Ret.)
- Associate Justice Patricia Cotter, Montana Supreme Court (Ret.)

- Judge Denise Navarre Cubbon, Lucas County Court of Common Pleas Juvenile Division, Ohio (Ret.)
- Judge Ronald E. Culpepper, Pierce County Superior Court, Washington (Ret.)
- Judge Beverly W. Cutler, Alaska Superior Court, Third Judicial District (Ret.)
- Judge James Dannenberg, Hawaii District Court, First Circuit (Ret.)
- Justice Mary McGowan Davis, New York State Supreme Court (Ret.)
- Justice Carolyn E. Demarest, New York State Supreme Court (Ret.)
- Justice Michael P. Donnelly, Supreme Court of Ohio (Ret.)
- Judge Kitty-Ann van Doorninck, Pierce County Superior Court, Washington (Ret.)
- Justice Fernande R.V. Duffly, Massachusetts Supreme Judicial Court (Ret.)
- Judge Sally Duncan, Maricopa County Superior Court, Arizona (Ret.)
- Justice Robert D. Durham, Oregon Supreme Court (Ret.)
- Judge Lynn Duryee, Marin County Superior Court, California (Ret.)
- Judge George Eskin, Santa Barbara County Superior Court, California (Ret.)
- Judge Noel Fidel, Arizona Court of Appeals (Ret.)
- Judge Francisco Firmat, Orange County Superior Court, California (Ret.)
- Judge Lisa Daniel Flores, Maricopa County Superior Court, Arizona (Ret.)
- Justice Helen E. Freedman, New York State Appellate Division, First Department (Ret.)
- Judge Julia Garratt, King County Superior Court, Washington (Ret.)
- Judge Deborra Garrett, Whatcom County Superior Court, Washington (Ret.)
- Judge David George, First Judicial District of Alaska (Ret.)
- Judge Tim Gerking, Jackson County Circuit Court, Oregon (Ret.)
- Justice Janine P. Geske, Wisconsin Supreme Court (Ret.)
- Justice Emily Jane Goodman, New York State Supreme Court (Ret.)
- Judge Dianna Gould-Saltman, Los Angeles Superior Court, California (Ret.)
- Judge Ernestine S. Gray, Orleans Parish Juvenile Court, Louisiana (Ret.)
- Justice Karen F. Green, Massachusetts Superior Court (Ret.)

- Chief Justice Mark V. Green, Massachusetts Appeals Court (Ret.)
- Associate Justice L. Priscilla Hall, New York State Supreme Court, Appellate Division (Ret.)
- Judge Helen Halpert, King County Superior Court, Washington (Ret.)
- Judge Brook Hedge, Superior Court of the District of Columbia (Ret.)
- Judge James Hely, New Jersey Superior Court, Vicinage 12 (Ret.)
- Judge Bethany G. Hicks, Maricopa County Superior Court, Arizona (Ret.)
- Justice Geraldine S. Hines, Massachusetts Supreme Judicial Court (Ret.)
- Judge Vicki L. Hogan, Pierce County Superior Court, Washington (Ret.)
- Justice Robin E. Hudson, North Carolina Supreme Court (Ret.)
- Judge J. Robin Hunt, Washington Court of Appeals (Ret.)
- Justice Barbara Jaffe, New York State Supreme Court (Ret.)
- Judge Nely Johnson, Multnomah County Circuit Court, Oregon (Ret.)
- Chief Justice Jim Jones, Idaho Supreme Court (Ret.)
- Judge Henry Kantor, Multnomah County Circuit Court, Oregon (Ret.)
- Judge Ann O'Regan Keary, Superior Court of the District of Columbia (Ret.)
- Judge Steven J. Kleifield, Los Angeles Superior Court, California (Ret.)
- Judge Scot Kline, Vermont Superior Court (Ret.)
- Judge Michael S. Kupersmith, Chittenden County Superior Court, Vermont (Ret.)
- Judge David A. Kurtz, Snohomish County Superior Court, Washington (Ret.)
- Judge Linda Lau, Washington State Court of Appeals (Ret.)
- Chief Judge John P. Leopold, Colorado District Court, 18th Judicial District (Ret.)
- Judge Richard A. Levie, Superior Court of the District of Columbia (Ret.)
- Judge John R. Lockett, 13th Judicial Circuit Court, Alabama (Ret.)
- Judge John Lohrmann, Walla Walla County Superior Court, Washington (Ret.)
- Judge Richard Lyman, Los Angeles Superior Court, California (Ret.)
- Judge Barbara Mack, King County Superior Court, Washington (Ret.)
- Chief Justice Eric Magnuson, Minnesota Supreme Court (Ret.)

- Judge Patrick J. Mahoney, San Francisco County Superior Court, California (Ret.)
- Chief Justice Conrad L. Mallett Jr., Michigan Supreme Court (Ret.)
- Judge Victoria S. Marks, Hawaii First Circuit Court (Ret.)
- Justice Mary Anne Mason, Illinois Appellate Court, First District (Ret.)
- Chief Justice Mike McGrath, Montana Supreme Court (Ret.)
- Justice James F. McHugh, Massachusetts Appeals Court (Ret.)
- Judge Kevin McKenney, Santa Clara County Superior Court, California (Ret.)
- Judge Robert Mello, Addison County Superior Court, Vermont (Ret.)
- Judge Christopher Melly, Clallam County Superior Court, Washington (Ret.)
- Judge Louis Menendez, Juneau Superior Court, Alaska (Ret.)
- Judge John Meyer, Skagit County Superior Court, Washington (Ret.)
- Judge Peter Michalski, Anchorage Superior Court, Alaska (Ret.)
- Judge Rita Miller, Los Angeles Superior Court, California (Ret.)
- Judge David Minge, Minnesota Court of Appeals (Ret.)
- Judge Walter M. Morris Jr., Orleans County Superior Court, Vermont (Ret.)
- Associate Judge John M. Mott, Superior Court of the District of Columbia (Ret.)
- Judge Peggy J. Nelson, Eighth Judicial District Court of New Mexico (Ret.)
- Justice James C. Nelson, Montana Supreme Court (Ret.)
- Judge Leslie C. Nichols, Santa Clara County Superior Court, California (Ret.)
- Judge John B. Van de North Jr., Minnesota District Court, Second Judicial District (Ret.)
- Judge Rita M. Novak, Cook County Circuit Court, Illinois (Ret.)
- Chief Justice Lawton R. Nuss, Kansas Supreme Court (Ret.)
- Justice Michael J. Obus, New York County Supreme Court (Ret.)
- Chief Justice Maureen O’Connor, Supreme Court of Ohio (Ret.)
- Associate Justice Robert F. Orr, North Carolina Supreme Court (Ret.)
- Judge Gary Oxenhandler, 13th Circuit Court, Missouri (Ret.)
- Judge Philip M. Pallenberg, Juneau Superior Court, Alaska (Ret.)
- Chief Justice Barbara J. Pariente, Florida Supreme Court (Ret.)
- Chief Justice Thomas R. Phillips, Supreme Court of Texas (Ret.)

- Judge Lynn Pickard, New Mexico Court of Appeals (Ret.)
- Judge Maurice Portley, Arizona Court of Appeals (Ret.)
- Judge Jeffrey M. Ramsdell, King County Superior Court, Washington (Ret.)
- Judge Judith H. Ramseyer, King County Superior Court, Washington (Ret.)
- Chief Justice Mark Recktenwald, Hawaii Supreme Court (Ret.)
- Judge John Reese, Anchorage Superior Court, Alaska (Ret.)
- Judge Stephanie Rhoades, Anchorage District Court, Alaska (Ret.)
- Justice Rosalyn Richter, New York State Appellate Division, First Department (Ret.)
- Judge Palmer Robinson, King County Superior Court, Washington (Ret.)
- Judge Erik Rohrer, Clallam County Superior Court, Washington (Ret.)
- Judge John Romero, New Mexico 2nd Judicial District Court (Ret.)
- Judge David A. Rosen, Los Angeles Superior Court, California (Ret.)
- Judge Carol Schapira, King County Superior Court, Washington (Ret.)
- Judge Barry C. Schneider, Maricopa County Superior Court, Arizona (Ret.)
- Judge Robert Schnider, Los Angeles Superior Court, California (Ret.)
- Judge Richard L. Seabolt, Alameda County Superior Court, California (Ret.)
- Judge Catherine Shaffer, King County Superior Court, Washington (Ret.)
- Judge Nan R. Shuker, Superior Court of the District of Columbia (Ret.)
- Justice Jacqueline Silbermann, New York County Supreme Court, Civil Branch (Ret.)
- Associate Justice Sheila Sonenshine, California Court of Appeal (Ret.)
- Judge Michael Spearman, Washington Court of Appeals (Ret.)
- Judge Julie Spector, King County Superior Court, Washington (Ret.)
- Chief Justice Laura Denvir Stith, Supreme Court of Missouri (Ret.)
- Judge Diana I. Stuart, Multnomah County Circuit Court, Oregon (Ret.)
- Judge Paul Suzuki, Los Angeles Superior Court, California (Ret.)

- Judge Jeffrey Swartz, Miami-Dade County Court, Florida (Ret.)
- Judge Sen Tan, Anchorage Superior Court, Alaska (Ret.)
- Chief Justice Marsha Ternus, Iowa Supreme Court (Ret.)
- Judge Philip E. Toci, Arizona Court of Appeals (Ret.)
- Judge Michael J. Trickey, Washington Court of Appeals (Ret.)
- Judge
- Emily E. Vasquez, Sacramento County Superior Court, California (Ret.)
- Judge Art Wang, Washington Court of Appeals (Ret.)
- Chief Justice Daniel Wathen, Maine Supreme Judicial Court (Ret.)
- Judge Larry Weeks, Juneau Superior Court, Alaska (Ret.)
- Judge John P. Wesley, Windham County Superior Court, Vermont (Ret.)
- Judge Ken Williams, Clallam County Superior Court, Washington (Ret.)
- Judge Jeffrey K. Winikow, Los Angeles Superior Court, California (Ret.)
- Chief Justice Michael A. Wolff, Supreme Court of Missouri (Ret.)
- Judge Frances Q.F. Wong, O'ahu First Circuit Court, Hawaii (Ret.)
- Judge Beverly Wood, Marin County Superior Court, California (Ret.)
- Judge Margie G. Woods, San Diego County Superior Court, California (Ret.)
- Judge Merri Souther Wyatt, Multnomah County Circuit Court, Oregon (Ret.)
- Chief Justice Michael Zimmerman, Utah Supreme Court (Ret.)

**International**

- Judge Patricia Whalen, War Crimes Chamber, Court of Bosnia and Herzegovina (Ret.)

## II. Rulings Under Review

References to the ruling at issue in this case appear in Petitioners' En Banc Opening Brief.

## III. Related Cases

Related cases are listed in Petitioners' En Banc Opening Brief.

*/s/ Norman L. Eisen*
Norman L. Eisen
Stephen A. Jonas
Joshua G. Kolb
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE #15180
Washington. D.C. 20003
(202) 594-9958
norman@democracydefenders.org

**Counsel for *Amici Curiae***

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ xiv

INTRODUCTION AND STATEMENT OF INTEREST ........ 1

FACTUAL AND PROCEDURAL BACKGROUND ........ 3

ARGUMENT ........ 5

I. Federal Courts Possess Inherent Authority to Investigate and Determine Whether Their Orders Were Obeyed, Independent of Executive Cooperation and of Ultimate Enforcement ........ 5

II. The District Court Has to Date and Can Continue to Conduct the Criminal Contempt Investigation with the Restraint Required ........ 10

III. Tools are Available to the District Court to Address the Government's Assertion of Privilege ........ 14

IV. The District Court's Authority to Complete its Criminal Contempt Investigation Should Not be Foreclosed ........ 16

CONCLUSION ........ 18

# TABLE OF AUTHORITIES

**Cases**

*Abrego Garcia v. Noem*, 348 F.R.D. 589 (D. Md. 2025) .......................................13

*Bessette v. W.B. Conkey Co.*, 194 U.S. 324 (1904) ................................................16

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)........................................................6

*Clark v. United States*, 289 U.S. 1 (1933) ..........................................................14

*Ex parte Merryman*, 17 F. Cas. 144 (C.C. Md. 1861) ..............................................9

*Ex parte Robinson*, 86 U.S. (19 Wall.) 505 (1873) ..................................................6

*FG Hemisphere Associates, LLC v. Democratic Republic of Congo*,
637 F.3d 373 (D.C. Cir. 2011)...............................................................................9

*Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418 (1911)................................16

*In re Brown*, 173 Mass. 498 (1899) ........................................................................6

*In re Debs*, 158 U.S. 564 (1895)..........................................................................1, 5

*In re Kellogg Brown & Root, Inc.*, 796 F.3d 137 (D.C. Cir. 2015).........................14

*In re Lawrence*, 279 F.3d 1294 (11th Cir. 2002)....................................................12

*In re Trump*, 172 F.4th 44 (D.C. Cir. 2026) .......................................... 5, 10, 15, 17

*J.G.G. v. Trump*, 147 F.4th 1044 (D.C. Cir. 2025)...............................................2, 7

*J.G.G. v. Trump*, No. 25-5124, 2025 WL 3198891 (D.C. Cir. Nov. 14, 2025) ........4

*Taggart v. Lorenzen*, 587 U.S. 554 (2019) ...........................................................12

*United States v. Anonymous*, 21 F. 761 (C.C.W.D. Tenn. 1884) ............................13

*United States v. Bryan*, 339 U.S. 323 (1950).........................................................12

*United States v. Emerson*, 25 F. Cas. 1012 (C.C.D.D.C. 1831) ....................... 11, 12

*United States v. Green*, 26 F. Cas. 30 (C.C.D.R.I. 1824) ................................ 11, 12

*United States v. Hudson & Goodwin*, 11 U.S. (7 Cranch) 32 (1812)....................1, 6

*United States v. Nixon*, 418 U.S. 683 (1974).........................................................15

*United States v. Wilson*, 421 U.S. 309 (1975) .......................................................18

*United States v. Zolin*, 491 U.S. 554 (1989)..........................................................14

*Watson v. Williams*, 36 Miss. 331 (Miss. Err. & App. 1858).................................16

*Young v. United States ex rel. Vuitton et Fils S.A,* 481 U.S. 787, 801 (1987).........17

**Other Authorities**

Bamzai, Aditya & Bray, Samuel L. , *Prosecuting Contempt*, U. Chi. L. Sch. Pub. L. & Legal Theory Working Paper No. 26-13, at 42–43 (May 2026) .......... 11, 12

Deutsch, Eberhard P., *The United States Versus Major General Andrew Jackson*, 46 A.B.A. J. 966 (1960)...........................................................................................8

The Federalist No. 78 (Alexander Hamilton) .........................................................3

## INTRODUCTION AND STATEMENT OF INTEREST

A federal district court's authority to determine whether its own orders have been obeyed is among the oldest and most firmly settled powers the judiciary possesses. "[T]he inquiry as to the question of disobedience has been, from time immemorial, the special function of the court," and "[i]n order that a court may compel obedience to its orders, it must have the right to inquire whether there has been any disobedience thereof." *In re Debs*, 158 U.S. 564, 594–95 (1895). That authority is not derivative or borrowed; it is inherent to the judiciary's own creation, traceable to the earliest exercises of the federal judicial power, *see United States v. Hudson & Goodwin*, 11 U.S. (7 Cranch) 32, 33–34 (1812), and never seriously disputed even by executive officials confronted with it directly.

The district court's conduct of the contempt inquiry in this case is a faithful exercise of that inherent authority, not a departure from it. The court proceeded first to request declarations from all the officials involved. It determined, on the record before it, that further inquiry through witness testimony was warranted to understand precisely what had occurred. At this point, the Defendant sought mandamus for a second time, and a D.C. Circuit panel held, 2-1, that criminal contempt was barred and prevented the district court from continuing its investigation.

However, at every stage of these proceedings, the district court pursued inquiry into criminal contempt—after a finding of probable cause of criminal

contempt by the government—through means calibrated to the question presented, including declining, pending further factual inquiry, to treat the matter as ripe for any prosecutorial referral. Order at 2, *J.G.G. v. Trump*, No. 1:25-cv-00766 (D.D.C. Dec. 8, 2025), ECF 200. This is precisely how the investigative authority the case law describes has and should operate: proceeding by degrees, using the tool suited to the question at hand, and reserving the most searching measures for when less searching ones prove insufficient. That the officials under investigation are executive branch officials, rather than private parties, does not diminish this authority—if anything, it is in exactly this circumstance, where the government's own conduct is at issue, that the judiciary's independent capacity to find out what happened matters most. *See J.G.G. v. Trump*, 147 F.4th 1044, 1061 (D.C. Cir. 2025) (Katsas, J., concurring) ("[O]ne may safely assume that the Executive Branch would decline to prosecute itself in the circumstances of this case.").

*Amici* are 204 former judges who have unique knowledge of and experience with the foundational importance of the judiciary's authority to conduct investigations into criminal contempt of court orders. *Amici* write to urge this court to affirm the district court's inherent authority to conduct its inquiry and permit it to continue its probe of the government's conduct, especially given the calibrated nature of the court's investigation. The Government's mandamus petition should therefore be denied.

Shutting down the district court's contempt inquiry would have grievous consequences for the fundamental integrity of the judiciary and rule of law. Alexander Hamilton described the federal judiciary as the "least dangerous" branch precisely because it commands "neither FORCE nor WILL, but merely judgment." The Federalist No. 78 (Alexander Hamilton). What judgment requires, at a minimum, is the capacity to ascertain basic facts. A court stripped of that capacity —required to accept, without inquiry, a resisting party's own account of what occurred—would possess no judgment at all, only the appearance of it. *Amici* respectfully submits that the district court's investigation was, at each step, both authorized and justified, and that this Court should say so.

## FACTUAL AND PROCEDURAL BACKGROUND

Last year, on March 15, 2025, the district court issued a Temporary Restraining Order, first orally and then written, barring the Government from transferring certain individuals into foreign custody pursuant to the Alien Enemies Act; nevertheless, the Administration ordered those flights to continue and land in El Salvador, where, after the written TRO had been issued, the individuals were transferred into the Salvadoran megaprison CECOT. On April 16, 2025, the district court found that probable cause existed for a finding that the Government's actions constituted criminal contempt. Mem. Op., *J.G.G. v. Trump*, No. 1:25-cv-766 (D.D.C. Apr. 16, 2025), ECF 81. Responding to the Defense's petition for

mandamus, the panel vacated the district court's Probable Cause Order, but the D.C. Circuit denied rehearing en banc of the non-precedential per curiam opinion and the Court indicated that the district court could proceed with its factual inquiry to support an ultimate finding as to whether a referral for criminal contempt should be made. *J.G.G. v. Trump*, No. 25-5124, 2025 WL 3198891, at *4 (D.C. Cir. Nov. 14, 2025) (en banc) (Pillard, Wilkins, and Garcia, JJ.) (district court may "proceed…within his sound discretion" to obtain factual information); *id*. at *5 n.1 (Pan, J.) ("Six of the eleven active judges on this court opine that the district court did not err.").

On remand, effectively starting from a fresh factual slate, the district court instructed Defendants to "submit declarations from all individuals involved in the decision not to halt the transfer of class members out of U.S. physical custody on March 15 and 16, 2025." ECF 196 at 2. Defendants submitted sparse declarations, with barely any information and from a limited number of individuals. The district court found that the "declaration does not provide enough information for the Court to determine whether [Secretary Kristi Noem's] decision was a willful violation of the Court's Order," and thus ordered witness testimony from two involved attorneys —Drew Ensign and Erez Reuveni—in order to "to better understand the bases of the decision to transfer the deportees out of United States custody in the context of the hearing on March 15, 2025." *J.G.G.*, No. 25-766, ECF 200. Following this order,

the Government petitioned for mandamus again. This time the panel, in a 2-1 decision, expressly barred the district court from proceeding with its contempt inquiry. The majority opinion found that the district court's actions violated separation of powers and was an "unwarranted judicial intrusion into Executive Branch decisionmaking regarding matters of national security." *In re Trump*, 172 F.4th 44, 52 (D.C. Cir. 2026). Moreover, it further justified granting the Government's mandamus petition by reasoning that since, in its estimation, the TRO was ambiguous, "any referral for prosecution faces a dead end." *Id.*, at 62. Respondents subsequently filed a petition for rehearing en banc, which this Court has granted.

## ARGUMENT

### I. Federal Courts Possess Inherent Authority to Investigate and Determine Whether Their Orders Were Obeyed, Independent of Executive Cooperation and of Ultimate Enforcement

A federal court's authority to determine whether its own order was obeyed is not a derivative or borrowed power—it is original to the court itself. "[T]he inquiry as to the question of disobedience has been, from time immemorial, the special function of the court," and "[i]n order that a court may compel obedience to its orders, it must have the right to inquire whether there has been any disobedience thereof." *In re Debs*, 158 U.S. at 594–95. Justice Holmes stated the same principle for the Massachusetts high court: "[a] court is not obliged by the constitution to

resort to a jury to find out whether a defendant is obeying or disobeying its decree." *In re Brown*, 173 Mass. 498, 501 (1899) (Holmes, J.).

This authority to inquire and determine is part of a broader inherent power that does not depend on any statutory grant. Even while declining to recognize a general federal common law of crimes, the Supreme Court carved out contempt specifically, holding that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution." *Hudson & Goodwin*, 11 U.S. (7 Cranch) at 33–34. That principle—that the power is inherent to the judiciary's own creation, not conferred by Congress—has been restated for two centuries. "[T]he power to punish for contempts is inherent in all courts." *Ex parte Robinson*, 86 U.S. (19 Wall.) 505, 510 (1873); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (reaffirming the same principle). This inherent authority necessarily encompasses both ends of the process it describes: the antecedent determination of whether disobedience occurred, addressed above, and the court's own authority to decide the appropriate sanction once it does, including referring the matter for criminal prosecution.

Where the government itself is the alleged contemnor, the district court's inherent authority to investigate is not a supplementary safeguard; it is, as a practical matter, the only mechanism by which the question of compliance can be examined at all. As Judge Katsas observed in his own concurrence in the first mandamus

proceeding arising from this litigation, "one may safely assume that the Executive Branch would decline to prosecute itself in the circumstances of this case." *J.G.G.*, 147 F.4th at 1061 (Katsas, J., concurring).

The proper sequence—the court investigating, with only final enforcement dependent on executive cooperation—is not a modern invention, and it is not the first time American courts have properly exercised this authority against a resistant or reluctant executive branch. The pattern recurs across the Nation's history, and in each instance, the courts' authority to obtain the facts was not seriously disputed, even by the executive officials involved.

The earliest such dispute arose in 1807, during the treason trial of Aaron Burr, when Chief Justice Marshall issued a subpoena for documents to President Jefferson himself. Jefferson's Attorney General, Caesar Augustus Rodney, analyzed the question of what would follow if the Executive Branch simply declined to comply, and did not dispute that courts possessed the underlying authority. Rodney acknowledged that circuit courts had long exercised "the authority…to issue an attachment within the limits of their respective jurisdictions against a witness who has disobeyed a subpoena duly served," observing that "this has been done in many instances," and noted that some judges considered their courts "inherently vested with such an authority" by their "very nature" and by the Constitution itself. That the President's own chief legal officer, in the earliest and most fraught judiciary-

versus-executive confrontation in the Republic's history, never questioned the basic authority at issue here is powerful evidence of how uncontroversial that authority has always been.

A second episode confirms the same principle even where the contemnor held not merely executive office but military command. In 1815, Judge Dominic Hall held General Andrew Jackson in contempt and fined him $1,000, which Jackson paid, after a sequence of escalating confrontations arising from Jackson's imposition of martial law in New Orleans. Jackson had arrested a state legislator for publishing an article criticizing that martial law; when Judge Hall issued a writ of habeas corpus on the legislator's behalf, Jackson ordered the judge arrested, as well. After martial law was lifted, the United States Attorney—whom Jackson had also moved against—prosecuted Jackson for contempt, resulting in the fine. *See* Eberhard P. Deutsch, *The United States Versus Major General Andrew Jackson*, 46 A.B.A. J. 966 (1960). That Congress later indemnified Jackson, decades afterward, as a matter of political grace does not diminish the point: the contempt determination itself stood on the court's own authority, properly exercised, unassisted by and indeed directed at the very military and executive power then arrayed against it.

The pattern reached its most severe test during the Civil War, and it was properly exercised then, too. When President Lincoln suspended the writ of habeas corpus in 1861, Chief Justice Taney, riding circuit, ordered an attachment against

General Cadwalader for refusing to produce a habeas petitioner. *Ex parte Merryman*, 17 F. Cas. 144, 146 (C.C. Md. 1861). That attachment compelled the general's presence to answer for the contempt—it was a step in obtaining information, not a punishment. Only when the physical enforcement of that inquiry met armed military resistance did Chief Justice Taney stop, expressly noting that he had "exercised all the power which the constitution and laws confer upon me," and transmitting the record to the President to determine what further measures, if any, he would take. *Id*. at 152.

These three episodes, spanning from the founding era through the gravest constitutional crisis in the Nation's history, establish the same pattern: the judiciary retained sole authority to investigate, even when tested against executive resistance at its most extreme, with executive cooperation only necessary for the ultimate act of physical compulsion. That is the same line the district court followed here.

Finally, the value of the district court's investigation does not depend on the court's ability to compel compliance with any eventual sanction. A court's authority "to impose a contempt sanction" is analytically distinct from "the authority to enforce it," and the government's effort to conflate the two has been rejected. *FG Hemisphere Associates, LLC v. Democratic Republic of Congo*, 637 F.3d 373, 379 (D.C. Cir. 2011) (Silberman, J.). Indeed, even where a criminal contempt sanction could ultimately be vitiated by executive clemency, that possibility does not

diminish the value of any antecedent factual determination; the point at which courts genuinely depend on the executive branch is the final act of enforcement, and not any determination that precedes it. A completed factual record—an actual determination of what occurred and who was responsible—serves the essential function of the judicial power even apart from any question of ultimate enforcement or clemency, and that function alone justifies the district court's continued exercise of its investigative authority here.

## II. The District Court Has to Date and Can Continue to Conduct the Criminal Contempt Investigation with the Restraint Required[2]

The district court's conduct of this investigation illustrates a graduated, escalating approach, not an unbounded one. The court first required declarations from the officials involved in the underlying decision. Order, *J.G.G. v. Trump*, No. 1:25-cv-00766 (D.D.C. Nov. 28, 2025). It turned to live witness testimony only after determining, on the specific record before it, that testimony was "necessary…to better understand the bases of the decision," while simultaneously and expressly finding that "[a] referral for prosecution…would be premature." Order at 2, *J.G.G.*,

[2] Judge Childs' dissent from the second mandamus order properly describes the nature of the review and where the majority erred: it "resolved this petition as if it were reviewing a conviction for indirect criminal contempt," when in truth the court was reviewing only "a factfinding order," in a posture this Circuit has "never" previously reviewed—"where no referral has been made and no contempt trial has even begun." *In re Trump*, 172 F.4th at 73 (D.C. Cir. 2026) (Childs, J., dissenting).

No. 25-766, ECF 200. The district court's own words confirm that it proceeded cautiously and incrementally, on an investigative track expressly and repeatedly distinguished from prosecution, exactly as the authority described in Part I contemplates.

As the district court continues its inquiry, it can draw on other tools, short of live testimony, to provide a more complete record. For example, written interrogatories to an alleged contemnor are not a novel or improvised mechanism; they are, on the historical record, one of the principal means by which courts have properly investigated potential contempt for two centuries. "[I]n the case of both direct and indirect criminal contempt, the judge may inquire into whether the contempt occurred—either through interrogatories to the potential contemnor or the appointment of some kind of assistant to ascertain the contempt." Aditya Bamzai & Samuel L. Bray, *Prosecuting Contempt*, U. Chi. L. Sch. Pub. L. & Legal Theory Working Paper No. 26-13, at 42–43 (May 2026) (citing *United States v. Green*, 26 F. Cas. 30, 31 (C.C.D.R.I. 1824) (Story, Circuit Justice)). A court has "rel[ied] on a U.S. attorney to file interrogatories that would be answered by the contemnor in court." *Id*. at 25 n.116 (citing *United States v. Emerson*, 25 F. Cas. 1012 (C.C.D.D.C. 1831)). Issuing interrogatories is therefore a historically-grounded practice.

The district court has already demonstrated a willingness to use this kind of calibrated tool. And it remains available now. A declaration, as was used by the

district court to date, permits the declarant and counsel to control the framing and scope of what is disclosed; interrogatories place that control in the court's own hands, requiring specific, itemized responses to specific questions the court itself selects. Where declarations have proven insufficiently precise to resolve the willfulness inquiry or determine who else may be involved, targeted interrogatories represent a calibrated, historically grounded intermediate step—one squarely within the *Green* and *Emerson* tradition—that remains available before any resort to further live testimony, and that directly answers any concern that the district court's inquiry lacks a defined and bounded scope.

There is also a longstanding practice of appointing "commissioner[s]," "examiner[s]," or "master[s]" to develop the factual record underlying a contempt determination—titles chosen, tellingly, because the function performed was investigative, not prosecutorial. Bamzai & Bray, supra, at 24.

This flexibility is not incidental; it reflects the nature of the inquiry itself. "Contempt is a process; as is often true in equity, that process is iterative and includes a wide range of considerations," extending to "questions of impossibility, excuse, and purgation" that "are factually involved and may be factually intense." Bamzai & Bray, supra, at 25 (citing *In re Lawrence*, 279 F.3d 1294, 1300 (11th Cir. 2002); *United States v. Bryan*, 339 U.S. 323, 332 (1950); *Taggart v. Lorenzen*, 587 U.S. 554, 562 (2019)). A single, rigid investigative format was never the historical

practice, and none is required now. *See United States v. Anonymous*, 21 F. 761, 762 (C.C.W.D. Tenn. 1884). A commissioner or special master would, in addition, introduce institutional distance between the district judge personally and the Executive Branch officials whose conduct is under review—directly answering any suggestion that the inquiry has become unduly personal or adversarial between the court and the witnesses.

Depositions, conducted under the district court's supervision, provide an additional available step consistent with the required restraint. The district court's own April 2025 opinion in this case contemplated precisely this graduated structure, reserving the most intrusive tools for last: declarations first, and, if those proved unsatisfactory, "hearings with live witness testimony under oath or…depositions conducted by Plaintiffs," with depositions offered as an alternative to, not merely a precursor of, testimony taken directly before the court. A closely related proceeding confirms the same graduated approach is neither unusual nor excessive: in *Abrego Garcia v. Noem*, the district court ordered expedited discovery, including depositions of named officials and written interrogatories, expressly limited in scope and directed "to assist the Court in determining whether contempt proceedings are warranted." *Abrego Garcia v. Noem*, 348 F.R.D. 589, 594 (D. Md. 2025).

## III. Tools are Available to the District Court to Address the Government's Assertion of Privilege

The government's declarations, to the extent they represent that the transfer decision was made in reliance on legal advice, do not close the door on further inquiry. A party that selectively discloses the conclusion of legal advice while withholding the underlying reasoning invites, rather than forecloses, judicial scrutiny of whether the privilege has been waived by that very disclosure. *See In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 149–50 (D.C. Cir. 2015) (recognizing that a party may not use the substantive conclusions of privileged material as a sword while shielding the underlying communications from scrutiny, and that such selective use of an investigation's conclusions can itself work as an implied "at issue" waiver of the privilege). And where the willfulness of the underlying conduct is itself the question under investigation, the crime-fraud exception to the attorney-client privilege is a legitimate and foreseeable line of inquiry: the privilege does not shield communications made in furtherance of a knowing violation of a court's order. *See United States v. Zolin*, 491 U.S. 554, 562–75 (1989) (holding that a district court may conduct in camera review of allegedly privileged communications, upon a threshold showing of "a factual basis adequate to support a good faith belief by a reasonable person" that such review may reveal evidence the crime-fraud exception applies) (citing *Clark v. United States*, 289 U.S. 1, 15 (1933) ("The privilege takes

flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law.").

And in camera review of potentially sensitive materials would not be a novel proposal in this litigation; it has already been suggested by the Government. At the very hearing that gave rise to the order now at the center of this dispute, government counsel himself "suggested the propriety of an in camera hearing" to discuss sensitive operational details, a suggestion "the district court allowed." *In re Trump*, 172 F.4th at 76 (Childs, J., dissenting) (reciting the March 15, 2025 hearing transcript).

Moreover, the Supreme Court has approved exactly the balance sought here—testing a confidentiality claim against the specific need for the underlying facts, through in camera review rather than either blanket disclosure or blanket deference: "we find it difficult to accept the argument that even the very important interest in confidentiality of Presidential communications is significantly diminished by production of such material for in camera inspection with all the protection that a district court will be obliged to provide." *United States v. Nixon*, 418 U.S. 683, 706–07 (1974). Should the government resist further inquiry into the substance of the legal advice referenced in its declarations, the district court is not confined to accepting that resistance at face value; it may require the underlying communications, or targeted follow-up interrogatories and affidavits addressed to

them, be submitted for in camera review to resolve both the waiver question and the applicability of the crime-fraud exception—without public disclosure, and without necessarily requiring anyone's live testimony at all.

## IV. The District Court's Authority to Complete its Criminal Contempt Investigation Should Not be Foreclosed

Without the contempt power, courts would be "mere boards of arbitration, whose judgments and decrees would be only advisory." *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911). If a party subject to a court's order could control whether that order's violation is ever investigated, "the courts [are] impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery." *Id*. A century of state and federal authority has recognized the same principle in similar terms: "[a] court without the power effectually to protect itself against the assaults of the lawless, or to enforce its orders, judgments, or decrees against the recusant parties before it, would be a disgrace to the legislation, and a stigma upon the age which invented it." *Watson v. Williams*, 36 Miss. 331 (Miss. Err. & App. 1858).

Nor is the interest at issue here merely institutional. The contempt power exists not principally to vindicate judicial dignity, but because it is "necessary to the due administration of law and the protection of the rights of citizens." *Gompers*, 221 U.S. at 450 (quoting *Bessette v. W.B. Conkey Co.*, 194 U.S. 324, 333 (1904)). That is precisely what is at stake in this case: the rights of the individuals whose custody

and transfer were governed by the order whose violation is under investigation. An executive-branch veto over the investigation of its own compliance would not merely weaken a court's institutional standing; it would leave the individuals the underlying order was designed to protect without any means of learning whether that protection was honored.

Judge Childs' dissent identifies the precise, practical version of the danger presented by this case: if a contempt investigation can be halted before any finding is even made, based on a litigant's "preferred interpretation" of the underlying order, then "any litigant" gains that same escape hatch, and "in any challenge where one may wave the wand of separation of powers, the Government knows it can petition this court for mandamus to relieve it from such proceedings." *In re Trump*, 172 F.4th at 68 (Childs, J., dissenting).

None of this counsels unbounded judicial power. *Young v. United States ex rel. Vuitton et Fils S.A.* itself instructs that contempt authority "must be restrained by the principle that only the least possible power adequate to the end proposed should be used in contempt cases." 481 U.S. 787, 801 (1987). But the constitutionally proper response to the possibility that this power may be misused is not to eliminate it; it is the same appellate mechanism that polices every other exercise of judicial discretion. Indeed, the Supreme Court has recognized that the mere ability for a judicial power, such as those related to contempt, to be abused

does not mean that courts should be unnecessarily limited in exercising that power. *United States v. Wilson*, 421 U.S. 309, 319 (1975) ("As with all power, the authority under Rule 42(a) to punish summarily can be abused; the courts of appeals, however, can deal with abuses of discretion without restricting the Rule in contradiction of its express terms, and without unduly limiting the power of the trial judge to act swiftly and firmly to prevent contumacious conduct from disrupting the orderly progress of a criminal trial.").

*Amici* submit that the district court has acted properly at every stage of this investigation: from declarations to a considered and expressly non-prosecutorial finding that testimony was necessary. Furthermore, additional less intrusive mechanisms exist—including interrogatories, appointed fact-finders, depositions, and in-camera review of the privilege questions raised by the government's own declarations—which the district court could pursue before proceeding directly to direct live testimony.

## <u>CONCLUSION</u>

For the foregoing reasons, *Amici* urge the court to find that the district court's contempt investigation was wholly proper and appropriate and permit that investigation to continue.

Dated: August 28, 2026

Respectfully submitted,

*<u>/s/ Norman L. Eisen</u>*
Norman L. Eisen
Stephen A. Jonas
Joshua G. Kolb
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave., SE #15180
Washington, D.C. 20003
(202) 594-9958
norman@democracydefendersfund.org

**Counsel for the *Amici Curiae***

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 4,263 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6), respectively, because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point font.

Respectfully submitted,

*/s/ Norman L. Eisen*

Norman L. Eisen
Stephen A. Jonas
Joshua G. Kolb
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE #15180
Washington. D.C. 20003
(202) 594-9958
norman@democracydefenders.org

**Counsel for *Amici Curiae***

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on August 28, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

*/s/ Norman L. Eisen*

Norman L. Eisen
Stephen A. Jonas
Joshua G. Kolb
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE #15180
Washington. D.C. 20003
(202) 594-9958
norman@democracydefenders.org

**Counsel for *Amici Curiae***