[EN BANC ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 29, 2026]
No. 25-5452

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

IN RE DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY, *et al.*,
*Petitioners*.

---

On Petition for a Write of Mandamus to the United States
District Court for the District of Columbia
Case No: 1:25-cv-766-JEB

---

# *EN BANC* BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN SUPPORT OF RESPONDENTS

---

Elizabeth B. Wydra
Brianne J. Gorod
Smita Ghosh
CONSTITUTIONAL
ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW
Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amicus curiae* represents that counsel for all parties have consented to the filing of this brief.[1]

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amicus* certifies that a separate brief is necessary.

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus curiae* or their counsel made a monetary contribution to its preparation or submission.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### I. PARTIES AND *AMICI CURIAE*

Except for any *amici* who had not yet entered an appearance in this case as of the filing of Petitioners' *en banc* brief, all parties, intervenors, and *amici* appearing in this Court are listed in Petitioners' brief.

### II. RULINGS UNDER REVIEW

Reference to the rulings under review appears in Petitioners' *en banc* brief.

### III. RELATED CASES

Reference to any related cases pending before this Court appears in Petitioners' *en banc* brief.

Dated: August 28, 2026

/s/ Brianne J. Gorod
Brianne J. Gorod

*Counsel for Amicus Curiae*

**TABLE OF CONTENTS**


**Page**

TABLE OF AUTHORITIES .......... v

GLOSSARY .......... ix

INTEREST OF *AMICUS CURIAE* .......... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 1

ARGUMENT .......... 4

I. Federal Courts Have the Inherent Authority to Investigate and Sanction Bad-Faith Conduct .......... 4

II. Civil Sanctions May Be Used to Respond to Fraud on the Court, Especially when Such Fraud Aims to Defeat the Court's Jurisdiction .......... 11

III. District Courts Have the Inherent Authority to Conduct Investigations to Determine Whether Sanctions Are Appropriate .......... 19

CONCLUSION .......... 22

## TABLE OF AUTHORITIES

**Page(s)**

Cases

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
421 U.S. 240 (1975) .......... 6

*Anderson v. Dunn*,
19 U.S. (6 Wheat.) 204 (1821) .......... 5

*Armstrong v. Exec. Office of the President*,
1 F.3d 1274 (D.C. Cir. 1993) .......... 11

*Baltia Air Lines, Inc. v. Transaction Mgmt., Inc.*,
98 F.3d 640 (D.C. Cir. 1996) .......... 3, 13

*Bradley v. Fisher*,
80 U.S. (13 Wall.) 335 (1871) .......... 5

*Bulloch v. United States*,
721 F.2d 713 (10th Cir. 1983) .......... 3, 13

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991) .......... 2-4, 6-12, 14, 19, 21

*Corp. of Burford v. Lenthall* (1743),
26 Eng. Rep. 731; 2 Atk. 551 .......... 5

*Dakota Cnty. v. Glidden*,
113 U.S. 222 (1885) .......... 21

*Demjanjuk v. Petrovsky*,
10 F.3d 338 (6th Cir. 1993) .......... 14

*Gompers v. Buck's Stove & Range Co.*,
221 U.S. 418 (1911) .......... 9

*Goodyear Tire & Rubber Co. v. Haeger*,
581 U.S. 101 (2017) .......... 10, 19

*Griffin v. Cnty. Sch. Bd.*,
363 F.2d 206 (4th Cir. 1966) .......... 18

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*Haeger v. Goodyear Tire & Rubber Co.*, 906 F. Supp. 2d 938 (D. Ariz. 2012) .......... 19

*Hatfield v. King*, 184 U.S. 162 (1902) .......... 20

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) .......... 3, 8, 12

*Heartland Plymouth Ct. MI, LLC v. NLRB*, 838 F.3d 16 (D.C. Cir. 2016) .......... 10

*Hutto v. Finney*, 437 U.S. 678 (1978) .......... 7, 8, 11

*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821 (1994) .......... 9, 10

*Jennings v. Carson*, 8 U.S. (4 Cranch.) 2 (1807) .......... 17

*Jones v. Springer*, 226 U.S. 148 (1912) .......... 17, 18

*King of Spain v. Oliver*, 14 F. Cas. 577 (C.C.D. Pa. 1810) (No. 7814) .......... 21

*Kiyemba v. Obama*, 561 F.3d 509 (D.C. Cir. 2009) .......... 18

*Lamb v. Cramer*, 285 U.S. 217 (1932) .......... 16

*Link v. Wabash R.R.*, 370 U.S. 626 (1962) .......... 5

*Lockwood v. Bowles*, 46 F.R.D. 625 (D.D.C. 1969) .......... 13

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*Lundahl v. Halabi*,
600 F. App'x 596 (10th Cir. 2014) ........................................................ 18

*Martin v. Automobili Lamborghini Exclusive, Inc*.,
307 F.3d 1332 (11th Cir. 2002)............................................................... 20

*Merrimack River Sav. Bank v. City of Clay Ctr.*,
219 U.S. 527 (1911) ........................................................................... 3, 14-16

*NASCO, Inc. v. Calcasieu Television and Radio, Inc.*,
124 F.R.D. 120 (W.D. La. 1989) ............................................................ 3, 7, 19

*Pearson v. First NH Mortg. Corp.*,
200 F.3d 30 (1st Cir. 1999) ..................................................................... 20

*Potter v. District of Columbia*,
126 F.4th 720 (D.C. Cir. 2025) ................................................................ 11

*Priority One Servs., Inc. v. W & T Travel Servs., LLC*,
987 F. Supp. 2d 1 (D.D.C. 2013) ............................................................ 11

*Richard v. Van Meter*,
20 F. Cas. 682 (C.C.D.C. 1827) (No. 11,763) ........................................ 15

*Shepherd v. American Broadcasting Cos.*,
62 F.3d 1469 (D.C. Cir. 1995) .......................................................... 2, 4, 8, 10

*Toledo Scale Co. v. Computing Scale Co*.,
261 U.S. 399 (1923) .................................................................................. 5

*United States v. Shaffer Equip. Co.*,
11 F.3d 450 (4th Cir. 1993)...................................................................... 14

*United States v. Shipp*,
203 U.S. 563 (1906) ............................................................................ 16, 17

*United States v. Shipp*,
214 U.S. 386 (1909) ............................................................................ 17, 18

*United States v. Throckmorton*,
98 U.S. 61 (1878) ..................................................................................... 12

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Universal Oil Prods. Co. v. Root Ref. Co.*,
328 U.S. 575 (1946) ........................................................ 4, 6, 7, 8, 11, 19, 20

*Webb v. District of Columbia*,
146 F.3d 964 (D.C. Cir. 1998) ........................................................ 20

<u>Books, Articles, and Other Authorities</u>

Amy Coney Barrett, *Procedural Common Law*,
94 Va. L. Rev. 813 (2008) ........................................................ 6

Mark Curriden & Leroy Phillips, *Contempt of Court: The Turn of the Century Lynching That Launched A Hundred Years of Federalism*
(1999) ........................................................ 16, 17

9 Cyclopedia of Law & Procedure (William Mack & Howard P. Nash eds.,
1903) ........................................................ 14, 15

Abraham Clark Freeman, *Treatise of the Law of Judgments* (5th ed.
1925) ........................................................ 13, 14

*Lynching Mob to Feel Supreme Court's Anger*, N.Y. Times, Mar. 21,
1906 ........................................................ 17

7 Moore's Federal Practice ........................................................ 14

Robert J. Pushaw, Jr., *The Inherent Powers of Federal Courts and the Structural Constitution*, 86 Iowa L. Rev. 735 (2001) ........................................................ 5

11 Wright & Miller's Federal Practice & Procedure (3d ed. 2026) .......... 13

13D Wright & Miller's Federal Practice & Procedure (3d ed. 2026) ........ 18

# GLOSSARY

| | |
|---|---|
| TRO | Temporary Restraining Order |

## INTEREST OF *AMICUS CURIAE*

Constitutional Accountability Center is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC seeks to uphold constitutional protections for noncitizens as well as for citizens and to promote the rule of law. Accordingly, it has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

One Saturday evening last March, the D.C. District Court held an emergency hearing regarding allegations that the government was preparing to invoke the Alien Enemy Act to remove Respondents—Venezuelan nationals in immigration custody—"imminently" and without process. JA.58-95. Concerned that it might lose jurisdiction once Respondents were handed over to the physical custody of another country, JA.133, the court ordered "any plane containing these folks that is going to take off or is in the air . . . to be returned to the United States" so that the status quo would be preserved while the court considered the "hard questions" involved in Respondents' suit, JA.140.

But the government would not take no for an answer. In defiance of the court's order, the government decided to transport these immigration detainees to a notorious foreign prison where they were subjected to physical abuse and deprived of food, water, and medical care. Resp'ts Br. 22-23. Unsurprisingly, this action

prompted the district court to investigate whether government officials intentionally violated the order. Petitioners resisted this effort at every turn. Eventually, the court below ordered a hearing because it "believe[d] that it [wa]s necessary to hear witness testimony to better understand the bases of the decision to transfer the deportees out of United States custody." *See* JA.283-84. Petitioners filed a writ of mandamus, arguing that "it should be plain that the government did not commit criminal contempt" by violating the order and that the anticipated investigation exceeds the court's "proper role" in criminal contempt proceedings. Pet'rs Br. 2-4.

But more than criminal contempt is at stake here. As the Supreme Court has recognized, courts possess the "inherent authority"—separate from criminal or coercive civil contempt—to protect the integrity of their proceedings by sanctioning conduct that abuses the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 42-46 (1991). These sanctions, which include dismissal, default judgments, adverse inferences, referrals for attorney disciplinary proceedings, and attorneys' fees, "serve the same purposes as contempt, 'vindicat[ing] the District Court's authority over a recalcitrant litigant.'" *Shepherd v. American Broadcasting Cos.*, 62 F.3d 1469, 1475, 1477-78 (D.C. Cir. 1995) (alteration in original) (quoting *Chambers*, 501 U.S. at 53). Furthermore, courts possess inherent authority to investigate whether such sanctions are appropriate. Even if

Petitioners were correct that the court "cannot investigate indirect criminal contempt" (and they are not), the investigation below would still be an appropriate exercise of the court's inherent power to pursue civil sanctions. *See generally* Resp'ts Br. 28-37.

This inherent sanctioning authority is indispensable because it allows courts to address situations where attorneys or parties have potentially deceived the court. After all, fraud on the court is more than garden-variety fraud: it is "a wrong against the institutions set up to protect and safeguard the public," *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944), and is "directed to the judicial machinery itself," *Baltia Air Lines, Inc. v. Transaction Mgmt., Inc.*, 98 F.3d 640, 642 (D.C. Cir. 1996) (quoting *Bulloch v. United States*, 721 F.2d 713, 718 (10th Cir. 1983)). Thus, conduct that corrupts the truth-seeking process and frustrates a court's ability to adjudicate impartially is not merely an injury to an opposing litigant, but an affront to the judicial institution itself. *Chambers*, 501 U.S. at 44.

Relatedly, the Supreme Court has held that sanctions are appropriate when a party attempts to "deprive" a court of jurisdiction by "acts of fraud." *Chambers*, 501 U.S. at 41 (quoting *NASCO, Inc. v. Calcasieu Television and Radio, Inc.*, 124 F.R.D. 120, 138 (W.D. La. 1989)). This is true even when a litigant's actions do not violate any particular court order—the "wilful removal beyond the reach of the

court of the subject-matter of the litigation" is "in and of itself" deserving of sanction. *Merrimack River Sav. Bank v. City of Clay Ctr.*, 219 U.S. 527, 536 (1911).

Of course, the extent to which such sanctions are warranted here will require the court's careful consideration. Because the civil sanctions authority is not "grounded in rule or statute," it must be "exercised with particular restraint." *Shepherd*, 62 F.3d at 1478. For precisely this reason, the authority to sanction for fraud carries with it the authority to conduct "an independent investigation in order to determine" whether sanctions are appropriate. *Chambers*, 501 U.S. at 44 (citing *Universal Oil Prods. Co. v. Root Ref. Co.*, 328 U.S. 575, 580 (1946)).

That inherent authority to "unearth . . . fraud" is crucial here. *Universal Oil*, 328 U.S. at 580. The hearing that Petitioners seek to terminate would not only allow the court to explore the possibility of a contempt referral, but also to impose civil sanctions that would serve "the same punitive and compensatory purposes" as contempt. *Shepherd*, 62 F.3d at 1477. Accordingly, this Court should deny the petition.

## ARGUMENT

### I. Federal Courts Have the Inherent Authority to Investigate and Sanction Bad-Faith Conduct.

**A.** As the Supreme Court has long recognized, federal courts possess the "inherent authority to sanction bad-faith conduct." *Chambers*, 501 U.S. at 42.

This authority is part of a broader array of inherent judicial powers—for example, the power to hold a party in contempt, *see Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204 (1821), to discipline attorneys, *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 354 (1871), and to dismiss a case *sua sponte*, *Link v. Wabash R.R.*, 370 U.S. 626, 630-31 (1962). Collectively, these powers exist to protect a court "whose dignity has been offended and whose process has been obstructed." *Toledo Scale Co. v. Computing Scale Co*., 261 U.S. 399, 428 (1923).

These inherent authorities are, to some degree, rooted in English legal history, when courts derived their powers from the King's prerogative and disobedience of a court's order was seen as an affront to royal authority and punished accordingly. *See* Robert J. Pushaw, Jr., *The Inherent Powers of Federal Courts and the Structural Constitution*, 86 Iowa L. Rev. 735, 810 (2001). British courts possessed the power to sanction misbehavior or disobedience of their orders, *id.* at 812-14, including by, in equity cases, exercising their inherent discretion to shift fees "on account of vexation," *Corp. of Burford v. Lenthall* (1743) 26 Eng. Rep. 731, 732; 2 Atk. 551, 553.

But the inherent sanction authority also transcends this English history. As English legal thinkers began to embrace a conception of separate powers, in which "judges' allegiance shifted from the king to the law," Pushaw, *supra,* at 810, they saw courts' authority to sanction attorneys and parties as inherent components of

the judicial role—at least when that power was necessary to "functioning as a court and exercising judicial power." Amy Coney Barrett, *Procedural Common Law*, 94 Va. L. Rev. 813, 845-50 (2008). By the time the Framers entrenched the burgeoning concept of separated powers into the Constitution, the power to impose civil sanctions, like the power to punish for contempt, was understood to be "incident to all courts" and to be conferred upon federal courts by Article III's references to "courts" and "judicial power." *Id.* at 816; *see id.* at 858 (describing "powers that Founding-era lawyers apparently treated as inherent in all courts," including the "powers to grant new trials, administer oaths or affirmations, and punish contempt").

In *Chambers*, the Supreme Court confirmed the inherent authority to sanction attorneys and litigants in cases of "bad faith," "vexatious[]" or "wanton[]" conduct, or when an offending party "practices a fraud upon the court" that defiles "the very temple of justice." *Chambers*, 501 U.S. at 45-46 (first quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-259 (1975); and then quoting *Universal Oil,* 328 U.S. at 580). Chambers was the sole principal of a television station that initially agreed to be sold to NASCO. *Id.* at 35-36. After Chambers changed his mind, and upon being notified on a Friday that NASCO intended to seek a temporary restraining order (TRO) preventing the sale of the station to a third party, Chambers made arrangements over the weekend to sell the

facility to a trust made up of his family members. *Id.* at 36-37. At the TRO hearing on Monday morning, Chambers and his attorney "made no mention" of the sale despite the judge's queries about the possibility that Chambers was negotiating to sell the property to a third party. *Id.* at 37. After the court ultimately issued injunctive relief, Chambers continued to obstruct the progress of the suit by refusing to participate in discovery, filing meritless motions, and seeking to "render . . . meaningless" the purchase agreement at issue by relocating the television transmission tower to an area not covered by the purchase agreement. *Id.* at 37-39. After the district court entered judgment, and after it initiated civil contempt proceedings and otherwise warned Chambers and his attorneys that it considered their conduct unethical, it invoked its inherent authority to impose attorneys' fees as sanctions for, among other things, "attempt[ing] to deprive this Court of jurisdiction by acts of fraud." *Id.* at 38-41 (quoting *NASCO*, 124 F.R.D. at 138).

The Supreme Court upheld these sanctions. As the Court explained, such sanctions are appropriate "if a court finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled,'" *id.* at 46 (quoting *Universal Oil,* 328 U.S. at 580), or when a party "shows bad faith by . . . hampering enforcement of a court order," *id.* at 46 (quoting *Hutto v. Finney,* 437 U.S. 678, 689 n.14 (1978)). Because the sanctions compensated NASCO for the "fraud [Chambers]

perpetrated on the court . . . throughout the course of the litigation," *id.* at 54, including the fraudulent transfer of assets in anticipation of the court's order, *id.* at 54 n.17, the district court did not err by "resort[ing] to its inherent power to impose attorney's fees as a sanction for bad-faith conduct," *id*. at 50.

*Chambers*—and the Supreme Court's prior cases in this area including *Hazel-Atlas*, 322 U.S. at 246; *Universal Oil*, 328 U.S. at 580; and *Hutto*, 437 U.S. at 689 n.14—stand for courts' inherent authority to "sanction attorney or party misconduct." *Shepherd*, 62 F.3d at 1475; *Chambers*, 501 U.S. at 46 (reiterating the court's "inherent power to police itself"). While the Justices in *Chambers* disagreed about when courts should resort to their inherent powers, they all agreed that those powers existed. S*ee id.* at 61 (Kennedy, J., dissenting) (stressing that the "assertion [of inherent powers] requires special justification in each case"); *id.* at 58, 60 (Scalia, J., dissenting) (concluding that the power to sanction stems from "necessity" and that the Court should have remanded to ensure that the sanctions did not impermissibly address the breach of contract itself).

Crucially, the sanctions the Court recognized in *Chambers* include more than the coercive civil contempt sanctions that are not at issue here. *See* Pet'rs Br. 42. Three years after its ruling in *Chambers*, the Supreme Court distinguished between coercive civil proceedings for "indirect contempts"—sanctions that are aimed at forcing a party's compliance with an existing order—and other "judicial

sanctions" that "penalize a party's failure to comply with the rules of conduct governing the litigation process," like the sanctions at issue in *Chambers*. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 833 (1994). In *Bagwell*, the Court considered whether fines issued by a state court for a labor union's violations of a complex injunction amounted to civil or criminal contempt. *Id.* at 823. As the Court explained, civil contempt sanctions are "penalties designed to compel future compliance with a court order." *See id.* at 827. Criminal contempt sanctions, by contrast, are "punitive" and aim "to vindicate the authority of the court." *Id.* (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441 (1911). The sanctions at issue in *Bagwell* were for criminal contempt, the Court found, because, among other things, they were not compensatory and did not give the contemnors an ability to purge the violation. *Id.* at 836-39.

As the Court went on to emphasize in *Bagwell*, however, courts also possess an inherent authority to impose other sanctions outside of contempt—including "assessing costs" and "entering default judgment"—to "penalize a party's failure to comply with the rules of conduct governing the litigation process." *Id.* at 833. These remedies are designed to "penalize" past misconduct, rather than compel future compliance, but also do not fall into the category of criminal contempt. *Id.*; *cf. Chambers*, 501 U.S. at 56 (rejecting the argument that civil sanctions must be

imposed before the court enters judgment on the merits to have "the desired deterrent effect"); *Heartland Plymouth Ct. MI, LLC v. NLRB*, 838 F.3d 16, 29 (D.C. Cir. 2016) (noting that attorneys' fees serve "the dual purpose of vindicating judicial authority . . . and making the prevailing party whole for expenses caused by his opponent's obstinacy" (quoting *Chambers*, 501 U.S. at 46)).

When the Court later considered a fee award that aimed to sanction litigation misconduct, it emphasized that those sanctions were *civil* but not coercive. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 105-08 (2017). In *Goodyear*, the Court considered a multi-million-dollar fee award against a party who had, with its attorneys, concealed crucial information from the plaintiffs. *Id.* at 105. It confirmed that the fees were a civil sanction—they were "imposed pursuant to civil procedures"—and held that they therefore must "go no further than to redress the wronged party 'for losses sustained.'" *Id.* at 108 (quoting *Bagwell*, 512 U.S. at 829). But the Court also explained that these civil sanctions differed from the "coercive" civil contempt sanctions described in *Bagwell*, which were "designed to make a party comply with a court order." *Id.* at 108 n.4 (stressing that "[t]hat kind of sanction is not at issue here"); *Shepherd*, 62 F.3d at

1477 (describing attorneys' fees, dismissal, default, and contempt citations as different sanctions, but observing that they serve similar purposes).

## II. Civil Sanctions May Be Used to Respond to Fraud on the Court, Especially when Such Fraud Aims to Defeat the Court's Jurisdiction.

As the Supreme Court's opinion in *Chambers* makes clear, civil sanctions can be appropriate in a wide variety of circumstances. Two are particularly relevant here. First, courts may pursue civil sanctions after finding that "fraud has been practiced upon it." *Chambers*, 501 U.S. at 46 (quoting *Universal Oil,* 328 U.S. at 580). Second, and relatedly, courts may sanction parties that use such fraud to deprive the court of jurisdiction. *Id.* at 41. Notably, while some forms of civil sanctions require the violation of a "clear and unambiguous" order, *see, e.g.*, *Potter v. District of Columbia*, 126 F.4th 720, 723 (D.C. Cir. 2025) (quoting *Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993)) (damages for civil contempt), these particular theories do not depend on the existence of a court order.[2]

[2] That said, because the violation of a clear court order can help to demonstrate the appropriateness of sanctions even outside of civil contempt, correcting the panel's erroneous conclusion that the order was ambiguous would ensure that the district court could consider the full range of appropriate civil sanctions here. *See, e.g.*, *Chambers*, 501 U.S. at 47 (describing the possibility of sanctions "when a party 'shows bad faith . . . by hampering enforcement of a court order'" (quoting *Hutto*, 437 U.S. at 689 n.14)); *Priority One Servs., Inc. v. W & T Travel Servs., LLC*, 987 F. Supp. 2d 1, 4 (D.D.C. 2013) (describing the court's inherent power to impose fees as a sanction as limited "to cases in which a litigant has engaged in bad-faith conduct or willful disobedience of a court's orders"

**A.** As the Supreme Court has explained, courts have long possessed the ability to respond when litigants commit deception or fraud that amounts to "tampering with the administration of justice." *Hazel-Atlas*, 322 U.S. at 246. In *Hazel-Atlas*, a patent attorney for Hartford wrote an article about a Hartford product and arranged to have the article printed in a trade journal under the name of an "ostensibly disinterested expert" and submitted the article in a patent infringement suit. *Id.* at 240-41. Almost ten years after the final judgment, Hazel-Atlas gained "indisputable proof" that the article was fraudulent and commenced suit seeking to set aside the prior judgment. *Id.* at 243. The Court held that the court below had an inherent power to set aside the prior judgment because of Hartford's "deliberately planned and carefully executed scheme to defraud" the court and the patent office. *Id.* at 245.

*Hazel-Atlas* built on a long-established rule allowing relief from judgments when "the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practised on him by his opponent, as by keeping him away from court." *United States v. Throckmorton*, 98 U.S. 61, 65 (1878). By this logic, "[f]raudulent representations to or concealment of facts from the court" would, under some circumstances, amount to fraud on the court, "particularly where they

(quoting *Chambers*, 501 U.S. at 47)); *see generally* Resp'ts Br. 25-33 (explaining that the TRO was clear and unambiguous).

affect its jurisdiction." Abraham Clark Freeman, *Treatise of the Law of Judgments* § 1237, at 2579 (5th ed. 1925). Courts could offer relief in equity after, for example, discovering an attorney or party had taken "active measures . . . previous to and during a trial to conceal the real facts of the case," *id.* § 1234, at 2574, including by "conceal[ing] from the court . . . facts affecting its jurisdiction," *id.* at 2572 n.6.

In the years following *Hazel-Atlas*, federal courts have elaborated on its rule. A "fraud on the court" is a "fraud that attempts to subvert the integrity of the court itself," rendering judges unable to "perform in the usual manner their impartial task of adjudging the cases before them." 11 Wright & Miller's Federal Practice & Procedure § 2870 (3d ed. 2026); *Baltia*, 98 F.3d at 642-43 ("'Fraud on the court . . . is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury.' . . . Fraud upon the court refers only to 'very unusual cases involving far more than an injury to a single litigant.'" (first ellipsis in original) (first quoting *Bulloch*, 721 F.2d at 718; and then quoting 11 Wright & Miller, *supra*, at § 2870)).

The doctrine has a special role to play when "an attorney, an officer of the court," is involved. 11 Wright & Miller, *supra*, at § 2870; *Lockwood v. Bowles*, 46 F.R.D. 625, 632 n.31 (D.D.C. 1969) (emphasizing that an attorney's "loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court,"

and that departure from "that standard in the conduct of a case . . . perpetrates a fraud upon the court" (quoting 7 Moore's Federal Practice ¶ 60.33 at 510-11)); *Demjanjuk v. Petrovsky*, 10 F.3d 338, 352 (6th Cir. 1993) (same); *see also United States v. Shaffer Equip. Co.*, 11 F.3d 450, 452, 461-62 (4th Cir. 1993) (explaining that sanctions were appropriate when government's attorneys "failed to reveal" fraud perpetrated by an agency witness); *see generally* Freeman, *supra*, § 1238, at 2580 (noting that fraud of an "attorney or agent" of a party can constitute grounds for equitable relief).

**B.** Sanctions are also appropriate when litigants or attorneys aim to "deprive th[e] court of jurisdiction" by tampering with the subject matter of the litigation. *Chambers*, 501 U.S. at 41. Courts have long possessed the authority to sanction those who "wilfully destroy, remove, conceal, or dispose of, the subject-matter of the litigation pending the proceedings." 9 Cyclopedia of Law & Procedure, at 8 (William Mack & Howard P. Nash eds., 1903); *Merrimack*, 219 U.S. at 535 (contempt could issue upon "conduct calculated to remove the subject matter of the appeal beyond [the court's] control"). This rule exists "irrespective of any . . . injunction" that the court has ordered; as long as the party intended to defeat the court's jurisdiction, sanctions are appropriate. *Id.* at 536.

This historic rule extends to both "persons and property" that form the subject matter of a pending suit. 9 Cyclopedia, *supra*, at 8. Under this rule, a court

could sanction a party for destroying the secured property at issue in a mortgage dispute, *Merrimack*, 219 U.S. at 533, and could also punish a slaveholder who "attempt[ed] to carry the petitioner out of the jurisdiction" while his freedom suit was pending, *Richard v. Van Meter*, 20 F. Cas. 682 (C.C.D.C. 1827) (No. 11,763) (explaining in syllabus that the court had authority to take "proper measures . . . to protect [the petitioner] from further violence, and unlawful hindrance in the prosecution of his suit for freedom"); *see*, *e.g.*, 9 Cyclopedia, *supra*, at 8 n.23 (contempt for a parent to fail to disclose the location of a child that was the subject of a custody battle).

This rule rests on courts' inherent authority to prevent destruction or removal of the litigation's subject matter to ensure that any eventual order will not be "rendered nugatory." *Merrimack*, 219 U.S. at 535. In *Merrimack*, the plaintiff bank obtained a "temporary injunction" barring the defendants from destroying property securing the bank's mortgage. *Id.* at 533. After the defendants appealed, the circuit court concluded that it lacked jurisdiction and dismissed the appeal, but allowed the injunction to remain in effect while the plaintiff sought Supreme Court review. *Id.* After the Court ruled for the defendants, but before its mandate issued, some defendants destroyed the property. *Id.* The Court held that those defendants had committed a "technical contempt": contempt because their "wilful removal beyond the reach of the court of the subject-matter of the litigation" was "in and of

itself, a contempt," and technical only because the Court found that the defendants had acted in "good faith." *Id.* at 535-36. Ultimately, the Court affirmed the availability of contempt when a party's interference with the subject of the litigation would make even a successful result a "barren victory" by destroying the court's ability to resolve the litigation in the first place. *Id.* at 536; *see Lamb v. Cramer*, 285 U.S. 217, 219 (1932) (contempt proceedings might be brought against a person whose "receipt and diversion" of property that was considered in the possession of the court "tended to defeat any decree which the court might ultimately make in the cause").

In unlawful detention cases, this principle authorizes courts to sanction those who remove or harm a prisoner whose liberty is the subject of pending litigation. *See United States v. Shipp*, 203 U.S. 563, 573 (1906). In *Shipp*, Ed Johnson appealed the circuit court's denial of his habeas petition after he was convicted of rape and sentenced to death in a trial in which he was "deprived of various constitutional rights." *Id.* at 571. The Court ordered Shipp, a Tennessee sheriff, to stay Johnson's execution while it considered the appeal. *Id.* Instead, Shipp allowed a mob to drag the prisoner out of his cell, brutally murder him, and pin a note to his body addressed to Justice Harlan. *Id.* at 572; Mark Curriden & Leroy Phillips, *Contempt of Court: The Turn of the Century Lynching That Launched A Hundred Years of Federalism* 214 (1999). After the widely-publicized incident

"shocked" Supreme Court justices, *see Lynching Mob to Feel Supreme Court's Anger*, N.Y. Times, Mar. 21, 1906, at 1, the Attorney General charged Sheriff Shipp and several other defendants with criminal contempt—the first original contempt proceeding filed at the Court, *see* Curriden & Phillips, *supra*, at 270 (quoting then-Solicitor General Henry Hoyt). The Court appointed a commissioner to preside over a several-month trial and eventually convicted Sheriff Shipp and several other defendants of contempt. *Id.* at 286-87, 292; *United States v. Shipp*, 214 U.S. 386, 425 (1909) (pronouncing verdict).

As Respondents explain, *Shipp* is foundational in stating the rule that criminal contempt can arise from the disobedience of an order even if the court is later found to lack jurisdiction. Resp'ts Br. 34-37; *Shipp*, 203 U.S. at 573. But the Supreme Court in *Shipp* also emphasized its authority to protect the "subject" of the case—Ed Johnson—and sanction litigants accordingly, regardless of any order. *Id.* Indeed, when Justice Holmes recounted his opinion in *Shipp* several years later, he used it to describe a court's authority, "whether it had jurisdiction or not, . . . to preserve the subject of the petition" until the matter was decided. *Jones v. Springer*, 226 U.S. 148, 155-56 (1912). Much like a court presiding over a suit concerning perishable goods had a "power springing from necessity" to order a sale of the goods while the proceedings were pending, *id.* at 156 (referencing *Jennings v. Carson*, 8 U.S. (4 Cranch.) 2 (1807)), he explained that the Court in

*Shipp* could issue sanctions to protect the "subject-matter of the controversy," *id.* at 155; *see also Shipp*, 214 U.S. at 425 ("It is plain that what created this mob and led to this lynching was the unwillingness of its members to submit to the delay required for the appeal."); 13D Wright & Miller's Federal Practice & Procedure § 3537 (3d ed. 2026) (describing situations where "the violation of the order operated in itself to defeat the jurisdiction of the court, such as by destroying the object of the dispute and thereby making the case moot," and citing *Shipp*).

While the Court in *Shipp* imposed punishment for criminal contempt, courts levying civil sanctions have cited this case for the principle that inherent powers should be used when misconduct threatens the subject matter of the litigation. *See, e.g.*, *Lundahl v. Halabi*, 600 F. App'x 596, 608 (10th Cir. 2014) (monetary sanctions and filing restrictions); *Griffin v. Cnty. Sch. Bd.*, 363 F.2d 206, 210-11 (4th Cir. 1966) (using the principle of preservation of the litigation's subject matter in coercive civil contempt). And this Court echoed *Shipp* in noting the possibility of "fraud on the court" when the government transfers detainees as a "ruse" designed "to maintain control over the detainees beyond the reach of the writ." *Kiyemba v. Obama*, 561 F.3d 509, 515 n.7 (D.C. Cir. 2009).

## III. District Courts Have Inherent Authority to Conduct Investigations to Determine Whether Sanctions Are Appropriate.

The authority to issue civil sanctions carries with it the power to hold a hearing to investigate whether sanctions are appropriate. In *Chambers*, the district court issued sanctions "[a]fter full briefing and a hearing," 501 U.S. at 40 (citing *NASCO*, 124 F.R.D. at 141 n.11); *id.* at 57 (emphasizing that Chambers received "an appropriate hearing"); *NASCO*, 124 F.R.D. at 141 n.11 (describing a hearing to "determine whether sanctions were appropriate and justified by the conduct of defendants in our Court"). In *Goodyear*, the district court ordered sanctions after reviewing defendants' responses to an order raising the possibility of sanctions, "direct[ing] additional briefing" due to defendants' failure "to provide clear answers on certain issues," and holding an evidentiary hearing in which attorneys for the defendants testified. *See Haeger v. Goodyear Tire & Rubber Co.*, 906 F. Supp. 2d 938, 965, 967 (D. Ariz. 2012); *Goodyear*, 581 U.S. at 105 (reviewing the district court's assessment of Goodyear's actions).

These cases built upon the longstanding rule that "a court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud." *Chambers*, 501 U.S. at 44 (citing *Universal Oil,* 328 U.S. at 580). In *Universal Oil*, the Court assessed a fee award related to a judgment in a patent-infringement case against Root Refining that had been obtained by bribery. *Universal Oil*, 328 U.S. at 576-77. Third-party companies whose interests were

affected by the fraudulent judgment brought evidence concerning the bribery to the attention of the circuit court that had affirmed the original judgment. *Id.* at 578. The circuit court appointed a master to investigate whether the judgment was "tainted" by fraud. *Id.* at 579. After a substantial investigation involving live testimony and a review of records from the U.S. Attorney's Office, the master determined that the judgment should be invalidated, and the appeals court vacated the judgment. *Id.* In assessing the related fee award, the Supreme Court described the court's "inherent power" to investigate whether "fraud has been practiced upon it" and to assess the whole costs of the investigation against the guilty parties. *Id.* at 580. More modern cases have confirmed that courts have the "discretion to permit preliminary discovery and evidentiary proceedings" to investigate claims of fraud on the court. *Pearson v. First NH Mortg. Corp.*, 200 F.3d 30, 35 (1st Cir. 1999); *Martin v. Automobili Lamborghini Exclusive, Inc*., 307 F.3d 1332, 1334-36 (11th Cir. 2002) (affirming district judge and magistrate judges' sanctions for fraud on the court after magistrate judge had "conduct[ed] many hearings" and issued a fifty-page report).

This rule makes sense: If a court has the inherent authority to sanction the parties that appear before it, it must have the power to investigate whether such sanctions are appropriate. In fact, such investigation should be encouraged to ensure that the "poten[t]" sanctions power is "exercised with restraint and

discretion." *Chambers*, 501 U.S. at 44; *see also Webb v. District of Columbia*, 146 F.3d 964, 972 (D.C. Cir. 1998) (describing the "intrinsic need for self-restraint" when using the inherent power to sanction); *cf. Hatfield v. King*, 184 U.S. 162, 166-68 (1902) (noting that when a court considers a request to set aside judgment on account of "collusion," proceeding by "*ex parte* affidavits" is often "quite unsatisfactory," because "it is only through the sifting process of cross-examination that the real facts can be disclosed"). As Justice Washington once observed, it "would be strange, if a court whose duty it is to superintend the conduct of its officers, should not have the power to inquire . . . whether its process is used for the purpose of vexation or fraud." *King of Spain v. Oliver*, 14 F. Cas. 577, 578 (C.C.D. Pa. 1810) (No. 7814); *Dakota Cnty. v. Glidden*, 113 U.S. 222, 226 (1885) ("[t]o refuse to receive appropriate evidence of [facts that would show that judgment had been obtained for improper purposes] . . . is to deliver up the court as a blind instrument for the perpetration of fraud").

* * *

In addition to possessing the inherent authority to investigate whether contempt occurred, the court below also possesses the inherent authority to investigate the appropriateness of civil sanctions. This authority is necessary to protect the court from becoming a "blind instrument for the perpetration of fraud," *Glidden*, 113 U.S. at 226.

## CONCLUSION

For the foregoing reasons, this Court should deny the petition.

Respectfully submitted,

/s/ Brianne J. Gorod
Elizabeth B. Wydra
Brianne J. Gorod
Smita Ghosh
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: August 28, 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 5,173 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 28th day of August, 2026.

/s/ Brianne J. Gorod
Brianne J. Gorod

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of August, 2026, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: August 28, 2026

/s/ Brianne J. Gorod
Brianne J. Gorod