**[EN BANC ARGUMENT SCHEDULED SEPTEMBER 29, 2026]**

**No. 25-5452**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

In re DONALD J. TRUMP, in his official capacity, et al.,

Petitioners.

---

On Petition for a Writ of Mandamus to the United States
District Court for the District of Columbia
Case No: 1:25-cv-766-JEB

---

# EN BANC REPLY BRIEF FOR PETITIONERS

---

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DEREK WEISS
TIBERIUS DAVIS
*Attorneys*
*Civil Division, Room 7230*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5365*

---

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

GLOSSARY ........ vi

INTRODUCTION AND SUMMARY ........ 1

ARGUMENT ........ 4

I. The District Court's Criminal Investigation Exceeds The Judicial Role. ........ 4

A. Prosecutors, Not Judges, Investigate Contempt. ........ 6

B. The Investigation Is Legally Futile. ........ 18

1. Contempt Is Impossible Because The TRO Did Not Clearly Prohibit The Government's Actions. ........ 18

2. Contempt Is Impossible Because The TRO Was Void. ........ 23

II. The District Court's Order Improperly Threatens The Attorney-Client Privilege. ........ 27

III. Mandamus Relief Is Warranted. ........ 33

CONCLUSION ........ 33

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Ace Motor Acceptance Corp. v. McCoy Motors, LLC*,
2019 WL 7000078 (W.D.N.C. Dec. 20, 2019) .................................... 14

*Bloom v. Illinois*,
391 U.S. 194 (1968) ................................................................... 9, 10

*Cheney v. U.S. Dist. Ct. for D.C.*,
542 U.S. 367 (2004) ........................................................................ 33

*Cox v. Administrator U.S. Steel & Carnegie*,
17 F.3d 1386 (11th Cir. 1994) ........................................................ 31

*Cumming v. Waggoner*,
7 Paige Ch. 603 (N.Y. Ch. 1839) ...................................................... 12

*Dietz v. Bouldin*,
579 U.S. 40 (2016) .......................................................................... 17

*Donziger v. United States*,
143 S. Ct. 868 (2023) ...................................................................... 18

*Ellison v. Shell Oil Co.*,
882 F.2d 349 (9th Cir. 1989) ........................................................... 21

*Farese v. United States*,
209 F.2d 312 (1st Cir. 1954) ........................................................... 14

*Fisk, Ex parte*,
113 U.S. 713 (1885) ........................................................................ 25

*Green v. United States*,
356 U.S. 165 (1958) .......................................................................... 9

*Grossman, Ex parte*,
267 U.S. 87 (1925) .......................................................................... 10

*J.G.G. v. Trump*,
147 F.4th 1044 (D.C. Cir. 2025) ................................................. 19, 20

*LeFande, In re*,
919 F.3d 554 (D.C. Cir. 2019) .......... 26

*Lindsey, In re*,
158 F.3d 1263 (D.C. Cir. 1998) .......... 32

*Ludecke v. Watkins*,
335 U.S. 160 (1948) .......... 24

*Merryman, Ex parte*,
17 F. Cas. 144 (C.C.D. Md. 1861) .......... 13

*Offutt v. United States*,
348 U.S. 11 (1954) .......... 10, 30

*Rowland, Ex parte*,
104 U.S. 604 (1881) .......... 23, 25

*Sacher v. United States*,
343 U.S. 1 (1952) .......... 15

*Saul N. v. Lyons*,
2026 WL 555567 (D. Minn. Feb. 26, 2026) .......... 14

*Sona v. Aluminum Castings Co.*,
214 F. 936 (6th Cir. 1914) .......... 11

*Terry, In re*,
128 U.S. 289 (1888) .......... 9

*Trump v. J.G.G.*,
604 U.S. 670 (2025) .......... 24, 25

*Trump v. United States*,
603 U.S. 593 (2024) .......... 18

*U.S. Cath. Conf. v. Abortion Rts. Mobilization, Inc.*,
487 U.S. 72 (1988) .......... 26

*United States, In re*,
398 F.3d 615 (7th Cir. 2005) .......... 8

*United States v. Bilzerian*,
926 F.2d 1285 (2d Cir. 1991) ........................................................ 31

*United States v. Burr*,
25. F. Cas. 41 (C.C.D. Va. 1807) ................................................... 13

*United States v. Parker*,
696 F. App'x 443 (11th Cir. 2017) ................................................ 14

*United States v. Providence J. Co.*,
485 U.S. 693 (1988) ....................................................................... 19

*United States v. Rapone*,
131 F.3d 188 (D.C. Cir. 1997) ...................................................... 19

*United States v. Shipp*,
203 U.S. 563 (1906) ........................................................... 12, 25, 26

*United States v. Stites*,
56 F.3d 1020 (9th Cir. 1995) ........................................................ 14

*United States v. United Mine Workers of Am.*,
330 U.S. 258 (1947) ................................................................ 25, 26

*United States ex rel. Vuitton et Fils SA v. Klayminc*,
780 F.2d 179 (2d Cir. 1985) ......................................................... 27

*Young v. United States ex rel. Vuitton et Fils SA*,
481 U.S. 787 (1987) ................................. 3, 4, 7, 10, 14, 16-17, 18, 28

**Statutes:**

8 U.S.C. § 1101(g) ............................................................................. 20

50 U.S.C. § 24 .................................................................................. 20

**Rules:**

Fed. R. Crim. P. 42 .......................................................... 1, 6, 14-17

D.C. R. of Pro. Conduct 1.6............................................................30

**Other Authorities:**

Aditya Bamzai & Samuel L. Bray, *Prosecuting Contempt* (Univ. of Chi. L. Sch. Research Paper No. 26-13), https://perma.cc/C27Z-8C3D ............................................ 9, 10-11, 12

2 James L. High, *A Treatise on the Law of Injunctions* (3d ed. 1890) .. 11

Richard F. Kimball, *Contempt*, *in* 4 The Encyclopaedia of Pleading and Practice (1896)...........................................................12

1 John Newland, *The Practice of the High Court of Chancery* (Albany 1818) ....................................................................11, 12

Stewart Rapalje, *A Treatise on Contempt* (1890) ..................................11

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| TRO | Temporary Restraining Order |

## INTRODUCTION AND SUMMARY

Plaintiffs' brief underscores the error of the district court's freewheeling criminal investigation into the *mens rea* of senior Executive Branch officers. The purported purpose of that investigation is not to prove or disprove contempt liability on the merits, but merely to decide whether to issue a contempt referral under Rule 42(a)(2)—that is, to decide whether there is sufficient basis to ask a prosecutor to investigate. But Plaintiffs nowhere explain why the court is unable to make that decision on the existing record.

The district court already has all the information it previously said it needed to make a referral, including sworn declarations identifying the decision-maker. The essential facts are common ground. And Plaintiffs themselves clearly do not believe any more information is needed for a referral. *See, e.g.*, Br. 4-5 (asserting as fact that the government acted "in defiance of the court's order" and that "the decision to defy the court was premeditated").

At bottom, Plaintiffs' brief only highlights that the fundamental obstacle to a contempt prosecution in this case is not factual but legal: whether the term "removing" in the TRO prohibited only the removal of

class members from United States territory, or whether it also clearly barred the transfer of custody of class members already outside the United States. *Compare* Pl. Br. 25-31, *and* Dissent 69-76 (urging the latter interpretation), *with* Gov. Br. 43-48, *and* Op.21-29 (urging the former). That interpretive dispute—a pure question of law—is the heart of the matter.

It is also the reason why criminal contempt is foreclosed as a matter of law. No reasonable prosecutor would pursue a criminal-contempt charge when three members of this Court have already concluded that the territorial interpretation of the TRO was not merely defensible, but affirmatively correct. Plaintiffs respond as though this were a statutory interpretation case: they insist (at 31-33) that the en banc Court might conclude, on balance, that the district court's interpretation was the better one. But that misses the point: criminal contempt requires a clear and specific judicial order. An interpretation of the TRO reached by three judges of this Court cannot be so clearly incorrect that acting on that understanding is a federal crime. Nor, for that matter, could it be a crime to violate a void TRO.

At a minimum, these are not questions that any factual investigation could resolve. Certainly they do not justify the unconstitutional, intrusive, and rapidly metastasizing pre-referral investigation the district court has launched.

Plaintiffs do not acknowledge the extraordinary nature of the district court's criminal investigation. Plaintiffs fail to identify any appellate decision, in any jurisdiction, upholding any remotely similar procedure. Plaintiffs insist (at 39) that a court has "inherent power" to investigate criminal contempt itself, citing cases long pre-dating the Supreme Court's 20th-century transformation of criminal-contempt practice. Even their best historical sources would not support the district court's investigation here. But in all events, the Supreme Court has since established that judges do not investigate or prosecute indirect contempt—prosecutors do. *Young v. United States ex rel. Vuitton et Fils SA*, 481 U.S. 787, 807 (1987) (a prosecutor independent of the court must determine the "methods of investigation" and "what information will be sought as evidence"). The district court's plan to interrogate witnesses and search for evidence to decide whether to appoint a prosecutor gets matters backwards.

Plaintiffs also fail to justify compelling the government's lawyers in this litigation to testify. Again, Plaintiffs fail to identify any precedent for such an anomalous proceeding. As Plaintiffs do not dispute, Ensign and Reuveni did not directly advise Secretary Noem and have no personal knowledge of her *mens rea*—the stated purpose of the district court's inquiry, JA383. Although Plaintiffs now offer (at 47-49) a litany of other questions that they would like to pose, they do not suggest the answers to any of those questions would affect whether a contempt *referral* was appropriate. Their extended arguments about privilege waivers only underscore what a sideshow this proceeding would become. And Plaintiffs make no effort to defend the court's order allowing them to participate in the criminal-contempt hearing.

## ARGUMENT

### I. The District Court's Criminal Investigation Exceeds The Judicial Role.

Prosecutors, not courts, investigate crimes. A district court's role is limited to "the initial decision that a contempt prosecution should proceed." *Young v. United States ex rel. Vuitton et Fils SA*, 481 U.S. 787, 807 (1987). After that point, the court must refer the matter to a prosecutor for investigation and prosecution. Fed. R. Crim. P. 42(a)(2).

As Plaintiffs do not dispute, the district court already possesses all the information it previously said it needed to decide whether to make that "initial decision." The timeline is undisputed and the essential facts are known:

- The relevant flights left United States territory *before* the oral directive or written class-wide TRO. JA150.
- The next day, class members on those flights were transferred to the custody of El Salvador. JA199.
- Secretary Noem personally made the decision to proceed with that transfer of custody. JA378.

That is the crux of the matter. Whether those facts establish prima facie grounds for criminal contempt depends on how the TRO is interpreted.

The government has consistently and forthrightly argued that the TRO is best read to forbid territorial removal only. The government articulated that explanation from the outset, even before the initial order to show cause. *See* Dkts. 18, 28.

The government had hoped that the district court would eventually acknowledge that its written order did not clearly and specifically forbid a transfer of custody and let the matter go. We acknowledge that the court nevertheless has the authority to refer the

matter to a prosecutor under Rule 42(a)(2)—even though, as we have explained, no reasonable prosecutor would pursue charges here because contempt is foreclosed as a matter of law.

But what the district court *cannot* do is refuse to hand off the matter to a prosecutor and, instead, launch its own quasi-inquisitorial investigation into the alleged criminal scienter of senior Executive Branch officers, or allow Plaintiffs to interrogate the government's own litigation counsel about privileged matters. Mandamus is warranted.

### A. Prosecutors, Not Judges, Investigate Contempt.

On Plaintiffs' telling, there is nothing remarkable about a court itself conducting an investigation into whether criminal contempt occurred outside of the court's presence. Here, the district court itself decided to seek testimonial evidence; selected the witnesses; and identified the topics for that testimony. JA383. All of this, Plaintiffs say (at 39), is justified by an "inherent power" to decide whether a criminal-contempt referral is warranted. That contention fails.

**1.** Plaintiffs make no effort to reconcile their sweeping vision of judge-as-criminal-investigator with the Supreme Court's decision in *Young*, which held that the prosecutor in an indirect criminal-contempt

case must be independent of the district court and the opposing party. The Supreme Court stressed that it is the prerogative of the prosecutor, not the court, to decide "what methods of investigation should be used, what information will be sought as evidence, … [and] which persons should be utilized as witnesses." 481 U.S. at 807. "These decisions," the Court explained, although "critical to the conduct of a prosecution, are all made outside the supervision of the court." *Id.* Yet, the district court here has retained exactly those decisions for itself.

Plaintiffs have nothing to say in response to this central holding of *Young*. They do not explain how, after *Young*, a court can insist on its own preferred "methods of investigation" or decide "what information will be sought as evidence" of a defendant's *mens rea*. Nor do Plaintiffs identify any appellate decision, in any jurisdiction, upholding any similar procedure in the 40 years since *Young*. That is hardly surprising. As our opening brief observed, the procedure proposed by the district court—compelled testimony from witnesses, under oath and before the factfinder, to assess the viability of a criminal charge—bears a striking resemblance to a grand-jury proceeding. Plaintiffs do not deny it.

As the Seventh Circuit explained, granting mandamus to terminate a similar judicial investigation, "[i]n the rare situations when a prima facie case of criminal contempt has been made out, and … is not … amenable to summary dispositio[n], the judge must turn the matter over to a prosecutor rather than assume an inquisitorial role inappropriate to the Judicial Branch." *In re United States*, 398 F.3d 615, 618 (7th Cir. 2005) (per curiam).

Plaintiffs' only response is to suggest (at 45) that the Seventh Circuit case involved "extreme actions" with "no parallel here." But that court's actions were, if anything, far *less* extreme: it believed the government had submitted an improper application for the release of grand-jury information and "demanded to know who … participated in the decision to file such a request and why they had approved it." 398 F.3d at 617. The district court here, by contrast, is investigating the *mens rea* of a Cabinet official in authorizing actions outside the territorial United States. Regardless, the Seventh Circuit's conclusion was categorical: "Our legal system does not contemplate an inquisitorial role for federal judges." *Id.* at 619.

**2.** Plaintiffs draw extensively (at 38, 39, 41, 45, 46) from a forthcoming academic article examining Founding era practices of courts in criminal-contempt cases. *See* Aditya Bamzai & Samuel L. Bray, *Prosecuting Contempt* 47 (Univ. of Chi. L. Sch. Research Paper No. 26-13), https://perma.cc/C27Z-8C3D. On this basis, Plaintiffs urge that courts historically possessed inherent authority to supervise contempt prosecutions, including the collection of evidence, and they defend (at 38-41) the investigation here as an exercise of that authority.

As the same article recognizes, however, criminal contempt at the Founding was altogether different. Courts at that time "were not punishing crime in the ordinary sense." Bamzai & Bray 47. Often assisted by opposing counsel as prosecutor, judges were the triers of fact, issuing final decisions that an adjudicated contemnor had no right to appeal. *See, e.g.*, *Green v. United States*, 356 U.S. 165, 187 (1958) (no right to a jury); *In re Terry*, 128 U.S. 289, 306 (1888) (no direct appeal).

As the Supreme Court explained at length in *Bloom v. Illinois*, 391 U.S. 194 (1968), that is no longer how criminal contempt works. *See id.* at 195-208 (surveying history). Today, indirect contempt "is a crime in the ordinary sense." *Id.* at 201. A criminal-contempt defendant is

entitled to a jury trial, *id.* at 202, before an unbiased judge, *Offutt v. United States*, 348 U.S. 11 (1954). Judges can no longer preside over investigations or appoint opposing counsel to investigate. *Young*, 481 U.S. at 807. And the President can pardon criminal contempt. *Ex parte Grossman*, 267 U.S. 87, 108-22 (1925).

It is therefore no answer for Plaintiffs to string-cite cases (at 40) from the 19th century and assert that courts previously "compel[led] potential contemnors or witnesses to appear and answer questions before initiating contempt proceedings." Even accepting for the moment that inaccurate characterization of the historical evidence, the law of criminal contempt is altogether different today. In cases of indirect contempt, as *Young* establishes, a court's role is limited to "the initial decision that a contempt prosecution should proceed." 481 U.S. at 807. As in any other criminal case, whom to investigate, what investigative methods should be used, what information to seek as evidence, and related matters are all decisions for a prosecutor to make "outside the supervision of the court." *Id.*

**3**. In all events, Plaintiffs badly misunderstand the historical practice discussed by Professors Bamzai and Bray. The district court's

quasi-inquisitorial, court-led, pre-trial evidentiary hearing has no analogue whatsoever in early American law.

Historically, the pre-trial phase of a criminal-contempt proceeding involved an order (or "rule") to show cause why an attachment should not issue. For out-of-court contempt, the court's pre-trial decisions were based on information submitted by the parties. The "most common" method of initiating a proceeding, "and in the United States, the almost universal practice in this matter, [was] to present to the court an affidavit, setting forth the facts and circumstances constituting the alleged contempt, sworn to by the aggrieved party, or some other person who witnessed the offense." Stewart Rapalje, *A Treatise on Contempt* § 93 (1890); *see* 1 John Newland, *The Practice of the High Court of Chancery* 199-200 (Albany 1818) (similar); 2 James L. High, *A Treatise on the Law of Injunctions* § 1452 (3d ed. 1890) (similar).[1]

If these affidavits were insufficient to prove the contempt, the proceeding ended. *See* Rapalje, *supra*, § 93 (collecting cases); *Sona v. Aluminum Castings Co.*, 214 F. 936, 938 (6th Cir. 1914) (per curiam). If

[1] The government could also initiate proceedings by information or indictment. Bamzai & Bray 44.

they were sufficient, the court could try the merits, or—more commonly—first provide the accused an opportunity to show cause and present his own rebuttal evidence why trial was unwarranted. *See* Richard F. Kimball, *Contempt*, *in* 4 The Encyclopaedia of Pleading and Practice 782-83 (1896). Importantly, these orders were issued *to accused contemnors*, not third-party witnesses. *See* Bamzai & Bray 42-44.

If the accused failed to show cause, the court would proceed to trial for the contempt. This often involved appointing a commissioner to take testimony rather than an in-court hearing. *See, e.g.*, Bamzai & Bray 24-25. These commissioners were appointed only for trial, not for any pre-trial investigation. *See, e.g., United States v. Shipp*, 203 U.S. 563, 575 (1906) (announcing "the trial of the case will proceed" before later appointing the commissioner). And the trials were still adversarial proceedings. *See, e.g.*, Newland, *supra*, at 199 (explaining the "prosecutor" propounded interrogatories); *Cumming v. Waggoner*, 7 Paige Ch. 603, 606 (N.Y. Ch. 1839) (explaining the master may "take such proofs as either party may produce before him in relation to the alleged contempt").

In other words, then as now, the presiding official acted as an impartial *judge*, not an investigator. Plaintiffs cite no support for their key claim (at 40) that courts at the pre-trial stage "compel[led]" "witnesses to appear"—let alone that the judge could pick the witnesses. The order to show cause was an opportunity *for the accused* to present evidence. Even Plaintiffs' own parenthetical descriptions of their historical cases (at 39-40) involved testimony from the accused contemnor. The two exceptions are obviously distinguishable. The first is *United States v. Burr*, which involved the merits trial of contempt, not an order to show cause. 25. F. Cas. 41, 42 (C.C.D. Va. 1807) (explaining that the court would go directly to the trial of "a motion for an attachment" skipping the "rule to show cause"). The second exception—*Ex parte Merryman*—involved one question to the representative the accused sent on his behalf. 17 F. Cas. 144 (C.C.D. Md. 1861).[2]

[2] The "inquir[y]," in its entirety: After a general was "commanded to produce the body of Mr. Merryman," the colonel he sent was asked: "whether he had brought with him the body." 17 F. Cas. at 146.

Nor do the modern cases Plaintiffs cite (at 41) suggest courts have authority to call witnesses prior to making a referral, other than a threshold ability to provide the accused contemnor an opportunity show cause. Plaintiffs' examples all involve either show-cause orders *to the accused contemnor*,[3] or courts investigating misconduct *during ongoing trials*.[4]

In short, Plaintiffs badly misunderstand the historical evidence, which does not establish any "inherent authority" to investigate crimes on courts' own initiative. And in all events, *Young* establishes that any such investigation today must be conducted by a prosecutor independent of the court.

**4**. Plaintiffs also suggest (at 24, 37, 46) that Rule 42 itself authorizes pre-referral investigation. But Rule 42 confers no authority. Rather, it sets out the basic requirements for criminal contempt

---

[3] *Ace Motor Acceptance Corp. v. McCoy Motors, LLC*, 2019 WL 7000078, (W.D.N.C. Dec. 20, 2019); *Saul N. v. Lyons*, 2026 WL 555567 (D. Minn. Feb. 26, 2026).

[4] *United States v. Stites*, 56 F.3d 1020, 1024 (9th Cir. 1995) (attorney contacting juror); *Farese v. United States*, 209 F.2d 312, 314 (1st Cir. 1954) (witness intimidation); *United States v. Parker*, 696 F. App'x 443, 446 (11th Cir. 2017) (upcoming witness receiving trial updates).

established by the Supreme Court. *See Sacher v. United States*, 343 U.S. 1, 7 (1952) (explaining that Rule 42 merely makes "explicit 'the prevailing usages at law'"); *see also* Fed. R. Crim. P. 42 advisory committee's notes to 1944 amendment (describing Rule as "substantially a restatement" of existing procedures); *id.* committee notes to 2002 amendment ("Rule 42(a)(2) … adopts language to reflect the holding in *Young*.").

In indirect-contempt cases, Rule 42 imposes two pertinent requirements. Rule 42(a)(1) requires that the court give the accused contemnor a notice that includes the charges and the date of trial. And Rule 42(a)(2) requires that the court "must request that the contempt be prosecuted by an attorney for the government."

Like the panel dissent, Dissent 61, Plaintiffs mistake the order of the Rule's subparagraphs for a mandatory order of operations. Thus, in Plaintiffs' view (at 46), a district court is free to conduct any investigation it wishes, as long as the court has not yet provided the notice of the trial date required by Rule 42(a)(1). Only when that notice is finally given, according to Plaintiffs, is the court required to refer the matter to a prosecutor under Rule 42(a)(2). That contention makes no

logical sense and is inconsistent with both the text of Rule 42 and with *Young* itself, on which Rule 42(a)(2) is based.

First, Rule 42(a)(1) requires notice to the defendant of "the *charged* criminal contempt." Fed. R. Crim. P. 42(a)(1) (emphasis added). As the Court explained in *Young*, however, it is normally prosecutors, outside the court's supervision, who decide which charges to bring and against whom. 481 U.S. at 807. It makes no sense to insist, therefore, that a prosecutor cannot be appointed until the (a)(1) notice has been provided. Similarly, Plaintiffs' concern (at 42) about "blind Rule 42 notices ... perhaps of the wrong people" is misplaced, because an (a)(1) notice will ordinarily issue after an appointed prosecutor investigates, as occurred in *Young* itself, *see* Brief for the United States as Amicus Curiae, *Young*, 481 U.S. 787, 1986 WL 727438, at *4-6.

Second, Plaintiffs' interpretation of Rule 42 would, as a practical matter, essentially overrule *Young*. On Plaintiffs' view, a district court is entirely unconstrained in its conduct of a pre-notice contempt investigation. It is therefore difficult to see why a court could not simply have opposing counsel conduct a contempt investigation—

complete with secret recordings, as in *Young*—so long as the court *eventually* appoints a disinterested prosecutor for trial.

That interpretation cannot be correct. The entire point of Rule 42(a)(2) is to reflect the holding in *Young*, which requires the entire prosecution, including any investigation, be conducted by an appointed prosecutor—whether that investigation occurs before the (a)(1) notice or afterwards. A district court has no inherent authority to circumvent Rule 42. *See, e.g.*, *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016).

**5.** Lastly, Plaintiffs repeatedly imply (at 1, 38) that the district court must have the power to conduct its own investigation because courts cannot be dependent on the Executive Branch. But Rule 42(a)(2) sets out the mandatory procedure to conduct such an investigation: appoint a prosecutor.

Constitutional questions about whether that prosecutor could be independent of the Executive Branch would only arise if the district court referred the matter for further investigation and "the government decline[d] the request," Fed. R. Crim. P 42(a)(2)—neither of which has

occurred here.[5] That distinct separation-of-powers question, however, is not a reason for the district court to step outside its judicial role and conduct its own criminal investigation.

### B. The Investigation Is Legally Futile.

The district court's improper criminal investigation warrants mandamus by itself. That investigation is especially offensive to the separation of powers, however, because of its futility. Contempt is foreclosed, and Plaintiffs fail to show otherwise.

#### 1. Contempt Is Impossible Because The TRO Did Not Clearly Prohibit The Government's Actions.

As our opening brief explained (at 43-48), the TRO's plain text, supported by the context in which it was issued, forbade the government from removing class members from United States *territory*. The government complied with the TRO under that correct

---

[5] The *Young* Court said judges could appoint prosecutors outside the Executive Branch, but "only if" their "request" to the Executive "is denied." 481 U.S. at 801. Recent Supreme Court cases on the scope of Executive Power, however, have raised serious questions about "the continuing vitality of" this dicta. *Donziger v. United States*, 143 S. Ct. 868, 870 (2023) (Gorsuch, J., joined by Kavanaugh, J., dissenting from the denial of certiorari); *see, e.g., Trump v. United States*, 603 U.S. 593, 620 (2024) ("the Executive Branch has 'exclusive authority …' to decide which crimes to … prosecute").

interpretation. And three members of this Court have already concluded that the territorial interpretation of the TRO was not merely defensible but affirmatively correct. Op.23; Conc.Op.1; *J.G.G. v. Trump*, 147 F.4th 1044, 1052 (D.C. Cir. 2025) (Katsas, J, concurring).

**a.** In response, Plaintiffs insist (at 31-32) that a majority of the en banc Court might still favor the custodial interpretation. That contention misses the point. This is not some routine question of statutory interpretation. At issue is the extraordinary power of a district court to punish, as a federal crime, the violation of its own order. It is black-letter law that criminal contempt cannot lie unless the court issued a clear and specific prohibition. *See, e.g.*, *United States v. Rapone*, 131 F.3d 188, 192 (D.C. Cir. 1997). That three judges of this Court interpreted the TRO in the same way is compelling evidence that the TRO did not clearly and specifically forbid the government's conduct. *Cf. United States v. Providence J. Co.*, 485 U.S. 693, 703 (1988) (explaining that once "members of the Judiciary had decided that the District Judge erred in" thinking the accused might be "in contempt," the use of extraordinary inherent contempt powers was no longer justified). Put differently, a prosecutor would have to show that

the interpretation endorsed by Judges Katsas, Rao, and Walker was so obviously meritless and unreasonable that acting consistent with it was a crime. To state that proposition is to refute it.

**b.** In any event, the territorial interpretation of the TRO is objectively reasonable, and a reasonable interpretation of a court order cannot be criminal contempt. We do not repeat here the extensive analyses by Judge Katsas and the panel majority. *J.G.G.*, 147 F.4th at 1052-57 (Katsas, J., concurring); Op.21-29. It bears emphasizing, however, Plaintiffs barely dispute (at 25-29) that the territorial interpretation of "remove" is most consistent with its ordinary meaning. They dismiss (at 29) that interpretive issue as a fight over "dictionary definitions" that were not "discussed at the hearing," arguing that the government "ignores context" and the oral "directive."

But it is Plaintiffs who brush aside context. As the panel explained, the Alien Enemies Act and federal immigration laws use "remove" in the territorial sense, Op.23-24 (discussing 50 U.S.C. § 24 and 8 U.S.C. § 1101(g)). There are thus "plausible reason[s] why the court would have been concerned with the territorial line." Pl. Br. 27; *see also J.G.G.*, 147 F.4th at 1055 (Katsas, J., concurring) (listing

additional reasons the court may have limited its order to U.S. territory). Indeed, Plaintiffs' own TRO motion urged the court to act before "planes removing Plaintiffs-Petitioners depart the United States." Dkt. 3-2, at 2.

Likewise, Plaintiffs have no convincing answer to Judge Walker's concurring opinion, which stressed that the court's repeated assurances that counsel need not write down the court's remarks "made clear that 'the written minute order could be expected to say everything necessary.'" Conc.Op.7. Plaintiffs object (at 28) that the docket entry began with the phrase "[a]s discussed in today's hearing." But there was no transcript available at that point for the government to consult, and the text of the written order itself said nothing about turning planes around. The possibility that "[s]ubsequent consideration" after the "oral" statements "may [have] cause[d] the district judge to modify his or her views" is precisely why the written order, not the oral statement, should govern. *Ellison v. Shell Oil Co.*, 882 F.2d 349, 352 (9th Cir. 1989). At a minimum, given the court's assurances that it was unnecessary to write down the details, the government was entitled to

take the written order at face value. And Plaintiffs make no serious argument that the government violated the TRO as written.

Plaintiffs also argue (at 26) that the TRO should be interpreted in light of "the relief sought by the moving party." But Plaintiffs' own proposed TRO used the term "remove" in the territorial sense. Plaintiffs proposed that anyone who had "already been removed from the United States pursuant to the Alien Enemies Act, but remain[ed] within the custody, control, and/or jurisdiction of the United States," be "returned to the United States." Dkt. 3-9, at 2. Thus, plaintiffs themselves understood that individuals removed from U.S. territory but still in U.S. custody had already been "removed from the United States pursuant to the Alien Enemies Act," *id.*, which is what the TRO prohibited, JA25. And as Plaintiffs do not dispute, the district court omitted Plaintiffs' proposed requirement to return class members still in custody to the United States. *See* JA227 (district court disclaiming any such obligation).

In short, given the considered views of three members of this Court, as well as the text and context of the TRO, no reasonable prosecutor would seek criminal-contempt charges in these

circumstances, and no court could plausibly sustain them. The district court's procedurally improper investigation is therefore futile as well, as no contempt conviction could ever come of it.

#### 2. Contempt Is Impossible Because The TRO Was Void.

Contempt is legally foreclosed for the additional reason that the TRO was void and, under settled principles, could not support punishment for contempt. *See* Gov. Br. 48-49. Plaintiffs' contention (at 36-37) that the TRO could nonetheless support contempt, even if the court had no power to act, is without merit.

**a**. It has long been "the settled rule of decision" that "if the command was … beyond the power of the court," then "the writ, or so much as was in excess of jurisdiction, was void, and the court had no right in law to punish for any contempt of its unauthorized requirements." *Ex parte Rowland*, 104 U.S. 604, 612 (1881) (collecting cases). As our opening brief explained, Plaintiffs initially asserted both APA and habeas claims, JA105, but Plaintiffs consented to dismiss their habeas claims to facilitate certification of a nationwide class, JA104-05, JA119. The TRO, therefore, was based only on Plaintiffs' APA claims. JA105. The Supreme Court then vacated the TRO for lack

of jurisdiction, holding that the Alien Enemies Act precludes judicial review under the APA. *See Trump v. J.G.G.*, 604 U.S. 670, 672 (2025) (per curiam) (citing *Ludecke v. Watkins*, 335 U.S. 160, 163-64 (1948)).

Plaintiffs do not meaningfully dispute any of this. In particular, they make no argument that the district court actually had jurisdiction under the APA. Instead, they contend that district courts sometimes have discretion to "recharacteriz[e]" or "constru[e]" a different cause of "action as a petition for a writ of habeas corpus." Pl. Br. 33. That contention is puzzling, as the district court did not purport to recharacterize anything as a habeas claim here. To the contrary, the district court made a point of ensuring that it was not certifying a class for a habeas claim by "first grant[ing] the plaintiffs' motion to dismiss their habeas count." JA119. Having affirmatively waived their reliance on habeas to obtain class certification, Plaintiffs cannot now act as though the TRO was predicated on a habeas claim.

Plaintiffs suggest that the Supreme Court vacated the TRO on venue grounds, citing (at 33) Justice Kavanaugh's concurring opinion. But Plaintiffs misread that opinion. Justice Kavanaugh agreed Plaintiffs' APA claim was foreclosed and merely acknowledged that a

new action in habeas would allow for judicial review, albeit in another "venue." *J.G.G.*, 604 U.S. at 674 (Kavanaugh, J., concurring). The district court's TRO, meanwhile, was void for lack of jurisdiction.[6]

**b.** Because the court lacked subject-matter jurisdiction or any other source of judicial power—Plaintiffs point to none—it follows that the TRO it issued was void and cannot be the basis for contempt. *See, e.g.*, *Ex parte Rowland*, 104 U.S. at 612. Rather than engage with this longstanding rule, Plaintiffs try to cabin one particular case—*Ex parte Fisk*, 113 U.S. 713 (1885)—to its facts. *See* Pl. Br. 36-37. But the principle that injunctions entered without jurisdiction cannot support contempt did not derive from *Fisk* alone and is recognized by even the cases on which Plaintiffs rely. *See, e.g., Shipp*, 203 U.S. at 573.[7] Moreover, it necessarily follows from first principles: void orders are nullities.

---

[6] The government has, *contra* Pl. Br. 33, repeatedly explained the TRO was vacated for lack of jurisdiction. Dkt. 78, at 1; Mandamus Pet'n 7.

[7] Plaintiffs' suggestion (at 37) that *United States v. United Mine Workers* "distinguished *Fisk*" on any basis (much less the one they assert) is puzzling: The only citation to *Fisk* is a block quote from *Shipp*. 330 U.S. 258, 291 (1947) (quoting 203 U.S. at 573).

When "a district court does not have subject-matter jurisdiction over the underlying action," it must have another source of judicial power, or its orders are "void." *U.S. Cath. Conf. v. Abortion Rts. Mobilization, Inc.*, 487 U.S. 72, 76 (1988).[8] For example, a court has certain "power" "while it [is] determining its own authority." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 293 (1947). Orders entered in those circumstances, the Court has explained, can support contempt, because a court has a source of jurisdiction. *See id.*; *Shipp*, 203 U.S. at 573. Plaintiffs (at 35-36) do not claim that the district court here could exercise the same power; the court had already (erroneously) found it had jurisdiction, JA105. Instead, Plaintiffs argue that *Shipp* and *United Mine Workers* dispensed with any inquiry into the court's jurisdiction or power. But neither case extends beyond the limited circumstances of a court still determining whether it has jurisdiction, and neither calls into doubt the venerable rule that injunctions entered without any source of jurisdiction are void.

---

[8] As *Shipp* and *U.S. Catholic Conference* clarify, possessing subject-matter jurisdiction "is not a precondition" for contempt, *In re LeFande*, 919 F.3d 554, 561 (D.C. Cir. 2019), but the injunction not being void *is* a precondition.

In sum, the district court's improper, quasi-inquisitorial, quasi-prosecutorial investigation of the *mens rea* of senior Executive Branch officers warrants mandamus for the additional reason that the court's TRO was void and, thus, cannot support a criminal-contempt charge. No purpose is served by allowing the investigation to continue.

## II. The District Court's Order Improperly Threatens The Attorney-Client Privilege.

The district court also grossly abused its discretion in ordering two government lawyers to take the stand and submit to cross-examination by opposing counsel. That order independently warrants mandamus, and Plaintiffs fail to justify it.

**1.** As an initial matter, Plaintiffs do not defend their own participation in a criminal-contempt inquiry. The district court's only justification for Plaintiffs' participation was that, "given their close familiarity with the case, Plaintiffs are uniquely positioned to assist the Court." JA392. That bears a striking similarity to the Second Circuit's reasons for allowing an opposing party's lawyer to be appointed prosecutor in *Young*. *See United States ex rel. Vuitton et Fils SA v. Klayminc*, 780 F.2d 179, 183 (2d Cir. 1985) ("Counsel for the plaintiffs are already fully informed and ready to go forward without delay.").

The Supreme Court reversed, explaining that allowing opposing counsel to participate in a criminal investigation wrongly permits an adverse party to engage in prosecutorial functions while advancing their own private interests. *Young*, 481 U.S. at 805-07. This Court likewise should not countenance a court's recruitment of opposing parties in a criminal investigation.

**2**. Although Plaintiffs defend (at 47-55) the order compelling the government's litigation counsel to testify, their argument proceeds as though cross-examining opposing counsel were an ordinary step in any civil case. But Plaintiffs fail to identify any precedent for such an anomalous proceeding, which poses a mortal threat to the attorney-client privilege. The compelled examination of a party's litigation counsel under oath about the subject-matter of the litigation itself is an extraordinary and perilous endeavor by any measure, and neither the district court nor Plaintiffs justify that step here.

Plaintiffs do not dispute that neither Ensign nor Reuveni directly advised Secretary Noem. Consequently, neither has personal knowledge of her *mens rea*—the supposed subject of the district court's inquiry. Undeterred, Plaintiffs now offer (at 47-49) a litany of questions

that they believe government counsel should be required to address. But none of those questions has any obvious bearing on the Secretary's scienter, nor on whether the government's transfer of custody violated the TRO. Nor, for that matter, do Plaintiffs explain how the questions would inform the district court's referral decision (which, again, is the stated purpose of the hearing). A prosecutor appointed under Rule 42(a)(2) could pursue some of the questions Plaintiffs suggest—and litigate the attendant privileges—if the prosecutor decided the effort was worthwhile. But there was no basis for the district court to compel government lawyers to testify, and thereby invite hotly contested privilege litigation, to decide whether to appoint a prosecutor in the first place.

**3**. Plaintiff suggest (at 47-49) the court might inquire only about unprivileged facts. But the obvious purpose of the hearing is to compel the disclosure of privileged information—a result that Plaintiffs expressly sought below and reiterate in this Court (at 50-54), and that Reuveni all but invited in his letter to the district court. Throughout their briefs, Plaintiffs already extensively rely upon improper disclosures from Reuveni that include privileged information (albeit

from his limited vantage point on the events in question). If Reuveni had additional relevant, nonprivileged information, presumably he would already have given it to Plaintiffs.

Plaintiffs' evident hope is that the district court will provide legal cover for Reuveni to disclose even more privileged information. *See* JA395 (Reuveni letter) (observing that ethics rules allow him to "disclos[e] … otherwise protected client confidences 'when required by … court order'" (quoting D.C. R. of Pro. Conduct 1.6)). The government has not waived privilege, however, and neither Reuveni nor Ensign is authorized to disclose client confidences (or any other form of privileged information).

Yet the judge intends to put them on the stand and to allow opposing counsel to cross-examine them. That is grossly improper. Nor is it appropriate for a district court judge, as *judge*, to rule on privilege disputes over what information that the judge, as *investigator*, is entitled to receive. *Cf. Offutt*, 348 U.S. at 14 (stressing the need for an unbiased judge in contempt proceedings because "justice must satisfy the appearance of justice"). Again, Plaintiffs point to no prior example of any similar investigative hearing, let alone any decision of any

appellate court blessing such a process. The proceeding poses an intolerable threat to the attorney-client privilege.

**4.** Finally, Plaintiffs' arguments that any privileges are waived or do not apply are both premature and meritless. There is no concrete privilege dispute before the Court, and the Court does not resolve hypothetical privilege-waiver claims.

Regardless, Plaintiffs' waiver arguments lack merit. The government has not placed the substance of its privileged legal advice in controversy. Plaintiffs' own cases make clear that the privilege will turn on what arguments are made at a contempt trial, if matters reach that stage. *E.g.*, *United States v. Bilzerian*, 926 F.2d 1285, 1293 (2d Cir. 1991). A witness's "intention to testify" about good-faith reliance on the advice of counsel does not waive the privilege; it would occur only "if he were to do so." *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1419 (11th Cir. 1994). Nor is the government raising any advice-of-counsel defense to a referral decision. *See* Dkt. 201, at 6. The district court, therefore, has no basis for compelling the disclosure of privileged information concerning an uncontested point.

Plaintiffs' arguments (at 53-54) about the "crime-fraud exception" and government attorneys are likewise meritless. Plaintiffs neither explain why that exception applies nor engage with the problem that, if the district court believed a crime occurred, it would be obligated for the same reason to refer the case to a prosecutor. Nor does it make sense to import doctrine relying on the special role of grand juries, *see In re Lindsey*, 158 F.3d 1263, 1272-78 (D.C. Cir. 1998), to require government lawyers to breach client confidences in this public hearing.

Plaintiffs' arguments only underscore the fundamental impropriety of the entire endeavor. That the proposed hearing otherwise has all the hallmarks of a grand jury reflects the core problem that the judge is acting as a prosecutor. Plaintiffs' proposal (at 53-54) for *in camera* review of privileged information suffers from the same problem: the concept of *in camera* review presupposes an adversarial proceeding, not an inquisitorial one. For a judge to review privileged information *in camera*, outside the presence of the prosecutor seeking the information, the judge and prosecutor cannot be the same person.

## III. Mandamus Relief Is Warranted.

This Court will issue a writ of mandamus to vindicate a (1) "clear and indisputable" right, where (2) "no other adequate means" of relief exists, if (3) the writ is "appropriate under the circumstances." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380-81 (2004).

Plaintiffs address only the first prong. They do not contest that, if the government is correct on the merits, it will suffer here-and-now injuries for which no other avenue of review is available. *See* Gov. Br. 67-69. Nor do Plaintiffs advance any argument that mandamus is inappropriate under the circumstances. They stake their entire opposition on their view that a district court is empowered to conduct its own quasi-inquisitorial, quasi-prosecutorial pre-referral investigation, including compelling the government's lawyers to testify about privileged matters under cross-examination from Plaintiffs. Because a district court clearly lacks that authority, the en banc Court should grant mandamus.

## CONCLUSION

For the foregoing reasons, the Court should grant mandamus and terminate the contempt proceeding. At a minimum, the Court should

direct the district court to make a referral decision on the existing record. If this Court denies relief, the government requests that it continue the administrative stay for 14 days to allow the Solicitor General an opportunity to seek relief in the Supreme Court.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN

*/s/ Derek Weiss*
DEREK WEISS
TIBERIUS DAVIS
*Attorneys*
*Civil Division, Room 7230*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5365*
*derek.l.weiss@usdoj.gov*

September 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,418 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Derek Weiss*
Derek Weiss